1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3      * * * * * * * * * * * * * *
     UNITED STATES OF AMERICA    *
4                                *    CRIMINAL ACTION
                   v.            *    No. 21-10256-RWZ-1, 3
5                                *
     KINGSLEY R. CHIN, and       *
6    SPINEFRONTIER, INC          *
       * * * * * * * * * * * * * *
7

8

9              BEFORE THE HONORABLE M. PAGE KELLEY
                UNITED STATES MAGISTRATE JUDGE
10                        ARRAIGNMENT
                    September 20, 2021
11

12     APPEARANCES:

13          UNITED STATES ATTORNEY'S OFFICE, (By AUSA David G.
       Lazarus, AUSA David J. Derusha, AUSA Abraham R. George,
14     and AUSA Patrick M. Callahan) 1 Courthouse Way, Suite
       9200,  Boston, Massachusetts, 02210, on behalf of the
15     United States of America

16          QUINN EMANUEL URQUHART & SULLIVAN, LLP, (By William
       D. Weinreb, Esq.) 111 Huntington Avenue, Suite 520,
17     Boston, Massachusetts, 02199, on behalf of Defendants

18

19

20                              Courtroom No. 25
21                              (Via Videoconference)
                                1 Courthouse Way
22                              Boston, Massachusetts 02210

23
                    James P. Gibbons, RPR, RMR
24                     Official Court Reporter
                   1 Courthouse Way, Suite 7205
25                 Boston, Massachusetts  02210
                     jamesgibbonsrpr@gmail.com

```
 1                    P R O C E E D I N G S

 2                   (VIA TELECONFERENCE)

 3           THE CLERK:  Today is Monday, September 20, 2021,

 4    and we are on the record in the Criminal Case No. 21-10256,

 5    the United States versus Chin, et al., the Honorable M. Page

 6    Kelley presiding.

 7        Will counsel please identify yourselves for the record.

 8           MR. LAZARUS:  Good afternoon, your Honor.  David

 9    Lazarus on behalf of the United States, along with my

10    colleagues, Abe George, Patrick Callahan, and David Derusha,

11    and if it's acceptable to your Honor, our intention is to

12    have Mr. Derusha speak as to the arraignment and the initial

13    for the company, and I will handle the initial and the

14    arraignment as to Dr. Chin.

15           THE COURT:  Okay.  Thank you very much, and

16    welcome.

17           MR. WEINREB:  Good afternoon, your Honor.  William

18    Weinreb on behalf of Dr. Chin, who is present.

19           THE COURT:  All right.  Good afternoon.

20           PROBATION OFFICER:  Good afternoon, your Honor.

21    Doris Fitzpatrick for Probation.

22           THE COURT:  Hello, Ms. Bello.

23        So who's representing the company?

24           MR. WEINREB:  I'm here on behalf of the company as

25    well.
```

1          THE COURT:  All right.

2      You know, I've never arraigned a company.  So this is a

3  first for me.

4      Okay.  So welcome everyone, and this is the initial

5  appearance in this district for this case, and also I hope

6  we'll arraign Mr. Chin, and I see there Mr. Chin.

7      How are you, sir?

8          THE DEFENDANT:  I'm fine, thank you, your Honor.

9  Thank you for asking.

10          THE COURT:  All right.  So I assume you were given

11  all the boilerplate warnings at your first initial, but I'm

12  going to go ahead and do them here because I think it's

13  required.

14      First of all, this is your initial appearance in

15  federal court in Massachusetts.  You have the right to

16  remain silent.  Anything you say can be used against you,

17  and if you wanted to say anything about the case, you can

18  talk to Mr. Weinreb before you did that.

19      So do you understand your right to remain silent?

20          THE DEFENDANT:  Yes, I do, your Honor.

21          THE COURT:  Okay.

22      And I know Mr. Weinreb has entered his appearance for

23  you, so that's great.  And we don't need to talk about your

24  right to representation.

25      Have you had a chance to go over the indictment here

1    with Mr. Weinreb so that you understand what it is that

2    you're charged with?

3              THE DEFENDANT:  Yes, I did, your Honor.

4              THE COURT:  Okay.

5        And I'm going to ask the government now to state the

6    charges against both Mr. Chin -- Dr. Chin, excuse me, and

7    the company and the maximum possible penalties that someone

8    would face if they were convicted of these charges.

9              MR. LAZARUS:  Each defendant, both Dr. Chin and the

10   company, are charged in Count One with conspiracy to violate

11   the anti-kickback statute, in violation of 18 USC, 371; in

12   Counts Two through Seven, both of these defendants are

13   charged with substantive anti-kickback statute violations in

14   violation of 42 USC, 1320a-7b.  And both defendants are also

15   charged in Count Eight with conspiring to commit money

16   laundering, in violation of 18 United States Code,

17   Section 1956(h).

18       As to Dr. Chin, the maximum penalties for Count One are

19   a term incarceration of up to five years, supervised release

20   of no more than three years, a fine of $250,000, or twice

21   the gross gain or loss resulting from the offense, whichever

22   is greater, a mandatory special assessment of $100,

23   forfeiture, and restitution.

24       For Counts Two through Seven, Dr. Chin faces a maximum

25   term of incarceration of up to ten years, supervised release

1    of not more than three years, a fine of not more than

2    $100,000, special assessment of $100 per count, forfeiture,

3    and restitution.

4        And as to Count Eight, Dr. Chin faces a term of

5    incarceration of up to 20 years, supervised release of not

6    more than three years, a fine up to $500,000 or twice the

7    value of the property involved in the transactions,

8    whichever is greater, a special assessment of $100,

9    forfeiture, and restitution.

10       And I'll let Mr. Derusha, if it's all right with the

11   Court, speak with regard to the penalties as to the company.

12           MR. DERUSHA:  Good afternoon, your Honor.  For each

13   of Count One through Eight, SpineFrontier as an

14   organization may be fined up to $500,000 or twice the gross

15   pecuniary gain or loss, whichever is greater, a term of

16   probation of up to five years, a mandatory special

17   assessment of $100, and forfeiture and restitution as may be

18   applicable, and that's for each of Counts One through Eight

19   for SpineFrontier.

20           THE COURT:  Okay, thank you.

21       And I forgot at the initial stages of this hearing to

22   ask Dr. Chin, you know, sir, you have the right to be

23   present in court with me for this hearing today, but you can

24   waive that right if you want to.  And is it okay with you if

25   we conduct the hearing by Zoom?

1          THE DEFENDANT:  Yes, your Honor.  Thank you.

2          THE COURT:  Okay.

3      And any objection to that, Attorney Weinreb?

4          MR. WEINREB:  No, your Honor.

5          THE COURT:  Okay.  So I'm going to find that Dr.

6   Chin's waiver of his right to be present in court is knowing

7   and voluntary, and it's necessary to conduct the hearing

8   this way because of the COVID pandemic.

9      So, Attorney Weinreb, is Dr. Chin ready to be arraigned

10  today?

11         MR. WEINREB:  He is.

12         THE COURT:  And does he waive the formal reading of

13  the indictment?

14         MR. WEINREB:  Yes, he does.

15         THE COURT:  Okay.  So, Dr. Chin, I'm going to ask

16  my clerk Leo Vieira to arraign you.

17         THE DEFENDANT:  Thank you, your Honor.

18         THE CLERK:  Mr. Chin, as to Count One of the

19  indictment charging you with conspiracy to violate the

20  anti-kickback statute, Title 18, United States Code, Section

21  371, how do you plead, "guilty" or "not guilty"?

22         THE DEFENDANT:  Not guilty.

23         THE CLERK:  As to Counts Two through Seven of the

24  indictment, charging you with violations of the

25  anti-kickback statute, Title 42, United States Code,

1    Section 1320a-7b(b)(1)(B), (b)(2)(B), how do you plead,

2    "guilty" or "not guilty"?

3              THE DEFENDANT:  Not guilty.

4              THE CLERK:  And to Count Eight of the indictment,

5    charging you with conspiracy to commit money laundering,

6    Title 18, United States Code, Section 1956(h), how do you

7    plead, "guilty" or "not guilty"?

8              THE DEFENDANT:  Not guilty.

9              THE COURT:  Okay, thank you.

10   So, Attorney Weinreb, I think my understanding of the

11   rules is just appear on behalf of the company, and you can

12   stand in for the arraignment, correct?

13             MR. WEINREB:  That's correct, your Honor.  I

14   believe all there is to do is enter a plea of "not guilty"

15   on behalf of the company, which I'm prepared to do.

16             THE COURT:  Okay.  So we will just have the record

17   reflect, Mr. Vieira, that Attorney Weinreb on behalf of the

18   company, SpineFrontier, Incorporated, enters a plea of "not

19   guilty" to the relevant counts in the indictment.

20   Okay.  So I would like to continue this to November 22

21   at 10:30 a.m., which is when we have the co-defendant,

22   Mr. Hummad on for an initial status conference.

23   I know that's not giving you much time, Mr. Weinreb,

24   but I'm happy to continue it for more than one interim if

25   you need that time.  So is that okay with you?

1           MR. WEINREB:  I'm sorry, November 22?

2           THE COURT:  Yes, at 10:30 a.m.

3           MR. WEINREB:  Yes, that's a good time.  Thank you.

4           THE COURT:  Okay.  And I'm going to exclude the

5   time for both the company and Dr. Chin until that date.

6       And what else do we need to do today?

7       I'm assuming there's nothing to say about detention.

8   Dr. Chin was already released.  I've looked at the

9   conditions.  They look fine to me.  And Probation has no

10  comment about the conditions either.

11      Would the parties like to be heard?

12          MR. WEINREB:  Your Honor, with respect -- go ahead.

13          MR. LAZARUS:  I would just say, your Honor -- thank

14  you.

15      I understand Mr. Weinreb does want to be heard, and I

16  would just say at this outset that the conditions that were

17  set in Florida were set by the judge there.  And that Mr. --

18  Dr. Chin had his Boston counsel present for the remote

19  hearing as well as somebody standing in as local counsel.

20      Those conditions were recommended by government after

21  careful consideration of Dr. Chin's finances, his ties to

22  the community, and his ties to Jamaica, and his risk of --

23  significant risk of flight.  And it's our position that that

24  hearing was conducted on the merits in Florida and that at

25  this point the District Court here could review those

1    conditions but that the defendant should not get a second

2    bite at the apple before your Honor with respect to those

3    conditions, that the conditions that were set transferred

4    here by the terms of the bond and by the terms of the

5    statute.

6        And we would just note that Dr. Chin has been ordered

7    to secure his appearance, and we think that that's really

8    important, and we would ask that he do so as ordered by the

9    court -- the Magistrate Court in Florida, your Honor.

10            THE COURT:  Okay, thank you.

11        Attorney Weinreb?

12            MR. WEINREB:  Yes.

13        Your Honor, we would like to ask the Court to revisit

14    those conditions of release.  My understanding of the Rule 5

15    proceeding that took place in Florida was that was a

16    proceeding of limited scope.  The conditions that were set

17    were simply to ensure that he would appear in front of this

18    Court to be arraigned.

19        Now we're talking about the conditions that will govern

20    him throughout the entire course of this proceeding, a much

21    lengthier period of time, where the Court has to take

22    special consideration of not just the risk of flight but

23    ensuring that he's able to remain employed, gainfully

24    employed, that he can have other reasonable accommodations

25    that he needs to live his life, and that -- the case in

1    Florida is terminated once the case is brought here,

2    although the statute does say that any bail that he posted

3    gets transferred.  It doesn't say anything about other

4    conditions of release.

5         So I believe this Court needs to reimpose conditions of

6    release, and we have conditions to propose.  Among other

7    things, one of the conditions, the one that appears to be

8    the most important to the government, which was a bond to

9    secure his appearance, the Florida Court ordered a so-called

10   corporate security bond.  That simply doesn't exist in

11   Massachusetts.  It was abolished years ago because it

12   requires defendants to pay money up front that's

13   nonrefundable simply to get out of court, and here bonds can

14   only be secured in other ways.

15        So I think there is no choice but to revisit those

16   conditions, even if the Court were inclined to accept them.

17        So we understand that the government has an interest in

18   assuring that Dr. Chin not flee, and that he appear as

19   required.  And I have spoken to the government about that.

20   We didn't have a chance before this hearing to reach an

21   agreement on any particular set of conditions.  But keeping

22   in mind that they have to be the least restrictive to

23   achieve that goal, we would propose a $500,000 bond secured

24   by $150,000 lien on Dr. Chin's residence in Florida, twice

25   weekly check-ins with Pretrial, domestic travel restricted

1    to the continental United States.

2         And then in terms of contact with -- there's a very

3    extensive no-contact order in place.  We don't disagree with

4    that in principle, but some of the individuals who were

5    covered by that are people who were Dr. Chin's either

6    employees or officers of companies, basically coworkers,

7    with whom he has to be able to communicate in order to do

8    business.

9         So we would propose that with respect to current and

10   former officers and employees of his practice, and of the

11   KIC companies that he -- over which he is the controlling

12   shareholder of and hopes to operate, that contact with them

13   be permitted so long as there's no discussion of the case or

14   the facts underlying it, and that contact with others who

15   are on the list be permitted so long as there's is a lawyer

16   present.

17        I would mention -- Mr. Lazarus said that Dr. Chin was

18   represented in the hearing down in Florida, and that's true,

19   but I believe at that point his counsel was under the

20   impression that Dr. Chin would be arraigned here before he

21   needed to post any kind of bond or before any of those other

22   conditions became a meaningful restraint and at that point

23   they would go away and they would be revisited here.

24        So I don't think anybody has been ever made a complete

25   presentation of the reasons why he is not a risk of flight

1     and can be counted on to appear when required.

2          And with the Court's permission, I would like to do

3     that, if it would be helpful to hear something --

4               THE COURT:  Sure.

5          So what's the state of the bond now because I noticed

6     from the papers it was supposed to be posted a week from his

7     appearance in Florida?

8               MR. LAZARUS:  Your Honor, may I --

9               THE COURT:  Yes.

10         Let Mr. Weinreb answer, and then I will be happy to

11    hear from you.

12              MR. LAZARUS:  I apologize, Mr. Weinreb.

13              MR. WEINREB:  So the Court in Florida ordered a

14    $250,000 corporate secured -- I'm sorry.  A $1 million

15    corporate security bond.

16         And in Florida what that means is that he would have

17    had to pay 15 percent of that amount, $150,000, to a bail

18    bondsman, and it would be a nonrefundable payment.

19         And, in addition, that bond would be tied to the case

20    in Florida.  When that case in Florida was terminated and

21    this was began, that $150,000 would be gone forever.  And it

22    was only going to be lasting a few days before he came here.

23         Originally, it was thought that he was going to be

24    arraigned here this -- a week ago on Monday, which would

25    have been within the week he was given to post the bond.  I

1    was not available on Monday because I had a witness in the

2    "Varsity Blues'" case that was testifying.  I requested that

3    it be continued to Wednesday so that it would still be

4    within the week, but the court was all filled up on

5    Wednesday, so we got placed on this Monday.

6        We filed a motion with the court in Florida to extend

7    the time for posting the bond an additional week.  The

8    government assented to that request.  That request was

9    granted.

10        And now that Mr. -- I'm sorry.  Now that Dr. Chin has,

11    in fact, been arraigned and this Court is going to set

12    conditions of release, that case is going to be terminated.

13    And so that bond is never going to have to be purchased.

14        So that's where things stand with respect to what

15    happened in Florida.

16                THE COURT:  Thank you.

17        So, Mr. Lazarus?

18                MR. LAZARUS:  Yes, your Honor.

19        There's a few points that I would just like to address.

20    One, the discussions with prior counsel for Dr. Chin about

21    the bond in Florida were surrounded on the idea that this is

22    what he was going to have to do to have his release.  There

23    was no discussion that they were temporary or that it was

24    only until arraignment.

25        And I understand Mr. Weinreb is at the disadvantage of

1    coming in after that, so he wasn't a part of any of those

2    discussions, but there was nothing on the record at that

3    hearing, which I viewed, or in the discussions leading up to

4    it, to suggest these are temporary.

5         If I may share my screen, your Honor, I would like to

6    show the Court a copy of the bond on file with the Florida

7    Court.

8              THE COURT:  Okay.  Yes.

9              MR. LAZARUS:  It looks like it's disabled.

10   Mr. Vieira, may I have permission to share?

11             THE CLERK:  Yes.  I'll turn that on right now.

12             MR. LAZARUS:  Thank you, sir.

13        So, your Honor, on the screen here this is for --  I'll

14   just scroll up so you can see.  This is in the Florida

15   docket.  It's Docket No. 8 in the Florida case.

16        And the bond that's here, I have highlighted a couple

17   parts.  First of all, it's a million-dollar corporate surety

18   bond with a *Nebbia* hearing to be posted.

19        And then it includes some language, including here at

20   the end of this paragraph, "this is a continuing bond,

21   including any proceeding on appeal or review which shall

22   remain in full force or effect until such time as the court

23   shall order otherwise.  It also contemplates appearances in

24   this district or any other United States District Court to

25   which the defendant may be held to answer or the cause

1    transferred.

2        So the bond itself does not talk about any limited

3    duration for the conditions.

4            THE COURT:  Can you just enlarge that again.

5            MR. LAZARUS:  Yes, your Honor.  Absolutely.  Is

6    that better?

7            THE COURT:  What is "*Nebbia*"?

8            MR. LAZARUS:  A *Nebbia* is essentially a hearing in

9    which the defendant -- my understanding is the defendant has

10   to prove to the court's satisfaction that the source of the

11   funds that are posted as bond are untainted.  And they're

12   ordered routinely in Florida, and the judge there inquires

13   whether there's any reason not to do it in this case and

14   then ordered it in this case as well.

15           THE COURT:  So here's the problem, Mr. Lazarus.  I

16   don't know if you want to brief this or whatever, but I

17   routinely alter conditions of release on cases where people

18   have been released out of other districts and I need to

19   alter the conditions for some reason.  Sometimes people

20   agreed to a curfew and it doesn't go with their work

21   schedule or whatever happens.  I frequently change the

22   initial conditions.

23       Because I do think it's my case now, and I know he's

24   supervised out of Florida, and I would certainly be

25   interested in what any Florida probation officer had to say

1    about the conditions, but I don't know that I am bound by

2    that judge's determination at the initial appearance there.

3         And also, do you really think he needs to forfeit

4    $150,000 just to post a bond in this case?

5              MR. LAZARUS:  So, your Honor, no is the easy answer

6    to that question, no.

7         But I think that when your Honor is changing

8    circumstances it's because the motion is essentially one for

9    a change of conditions based on a change of circumstances.

10   There are no change of circumstances here, and --

11             THE COURT:  So I would say, though, I am -- I think

12   that's terrible, that they're going to make him pay

13   $150,000, and it seems unconstitutional to me.  I don't like

14   that.

15             MR. LAZARUS:  So, your Honor -- so if the Court is

16   not inclined to agree with us, and there's a Tenth Circuit

17   case on this, and there's a number of district courts'

18   opinions, but if the Court is inclined not to agree on it, I

19   don't want to waste the Court's time briefing these issues.

20        If the Court is considering it, securing his appearance

21   is what's important, your Honor.

22             THE COURT:  I agree.

23             MR. LAZARUS:  So what I would like to just say in

24   that respect is this is an individual who in April of 2020,

25   and I have documents to this effect, reported on a signed

1    document that he signed in support of a loan he was seeking,

2    that his total assets minus liabilities were $34,476,147,

3    your Honor.

4        He also reported in another signed document that -- a

5    personal financial statement that he submitted in connection

6    with a different financing proceeding, that as of

7    September 30, 2019, his total liabilities and net worth was

8    $36,228,270, your Honor.

9        So this is a defendant who a little over a year ago

10   reported that he was worth $34 million.  So the idea that

11   $150,000 is sufficient to keep this defendant in the United

12   States or appearing for the Court, that is -- I don't do

13   math, your Honor, but that's a tiny percentage of his

14   reported net worth.

15       In addition, the defendant owns property -- he owns --

16   I believe it's a condo in Jamaica.  He's filed foreign bank

17   account registration statements as required by law.  I don't

18   know whether he'll file one for last year.  His time to do

19   so is not run until October.  But for at least the preceding

20   several years he filed what are called "FBARs," your Honor,

21   indicating that he's got foreign bank accounts in Jamaica,

22   at lease one, and so he's got significant net worth.

23       As for strength of the case, your Honor, this is a case

24   alleging a widespread kickback conspiracy essentially and

25   money laundering from about 2012 through 2019 at least.

1    There are three defendants.  This defendant was the CEO

2    and founder of the company.  He's the top, your Honor.

3    And strength of the case, it's set out in a very

4    detailed speaking indictment.

5    And we, in addition, have secured guilty pleas and

6    cooperation from one of the surgeons listed in the

7    indictment, as well as one of the distributors listed in the

8    indictment.  And I believe it's four or five surgeons have

9    settled civilly with the United States Attorney's Office as

10   well.

11   And so the strength of the case is significant.

12   The defendant faces significant incarceration,

13   significant financial penalties, restitution.

14   His guidelines, as we calculate them, and this is an

15   approximation, your Honor, but based on our review, we think

16   his guidelines without acceptance are somewhere around 151

17   to 188 months.

18   And so he's a defendant with significant risk of flight

19   and a lot to lose by conviction.

20   Now, we don't think he needs to be incarcerated while

21   he's awaiting trial on this case.  We think there are

22   conditions that can be set.  And those are the conditions

23   that we've previously recommended, which is a million

24   dollars bond secured by cash or real property, and the other

25   conditions that were imposed, including travel restrictions

1   to Florida and the District of Massachusetts.  We think that

2   it is risky, too risky, in the analysis the Court has to

3   undertake to permit Dr. Chin to travel around the country

4   and certainly to travel to Jamaica.

5       We would, especially in the days of Zoom and Webex, and

6   the pandemic has shown that geography is not as important as

7   it otherwise was.  So it would -- it's not necessarily

8   reasonable to argue that you have to travel around the

9   country, and so we would argue that limiting Dr. Chin's

10  travel to Florida and Massachusetts is necessary.

11      The no-contact orders, as I think I understood them

12  from Mr. Weinreb, sound reasonable; that if there are

13  certain people that he needs to have contact with for

14  current business, then we wouldn't oppose that if they're

15  not talking about the current case.  But it would depend on

16  who some of those people are.

17      So, for example, with Mr. Hummad, the co-defendant, he

18  had asked for permission to speak to certain doctors that he

19  said was necessary, and I believe that the arrangement there

20  is that he's going to have to talk to Pretrial and Probation

21  and talk to us about who they are and sus out  what our

22  positions are going to be on those, and we would ask for

23  something similar here.

24      The ongoing need to talk to surgeons who previously

25  were associated is small.  And so we don't think that's as

1    important.

2        And I'm just looking over my notes your Honor.  I

3    apologize.  I'm seeing whether I missed anything.

4        I would also just point out another important fact that

5    the Court should be aware of in addition to his reported

6    high net worth, your Honor.  The defendant's home in

7    Florida, according to Redfin earlier today, is estimated to

8    be worth $3,804,891, so 3,804,891.  It is encumbered.  There

9    are loans on the property, but there's also equity there.

10       I would note -- you know, again, your Honor, Dr. Chin

11   has retained counsel and so seemingly he does have access to

12   resources as well.

13       And then I think that -- and finally, your Honor,

14   Dr. Chin's a signatory on at least ten different bank

15   accounts.  And according to our analysis at the FBI, over

16   the last nine years those accounts in aggregate have had

17   over $100 million moving in and out.  And so, even in

18   addition to his own net worth, those companies have had

19   significant money going in and out.  Some of his companies,

20   I don't know the current state of them, but, for example,

21   some of his companies have had million dollar lines of

22   credit that he can draw on as needed.

23       And so the access to money, were Dr. Chin to choose to

24   flee, appears to be significant, and so the only way to make

25   sure that he's going to come back is to impose a

1    significant-enough condition to keep that high on his mind.

2              THE COURT:  Have you frozen any of his assets?

3              MR. LAZARUS:  No, your Honor.

4              THE COURT:  Do you know how much equity is in the

5    house?

6              MR. LAZARUS:  Your Honor, it's difficult for me to

7    know based on the current payoff status on some of the

8    loans, and so I don't know how much equity is in the house.

9    We've looked at the title, and we have a general sense that

10   there should be equity in that property.  But how much

11   equity is there is difficult for me to say without

12   additional documentation.

13             THE COURT:  Okay, Mr. Weinreb.

14             MR. WEINREB:  Your Honor, what I am proposing in

15   the way of a bond is essentially the Massachusetts

16   equivalent of exactly what the Florida Court did.

17       So the Florida Court imposed a CSB with *Nebbia*, the

18   corporate security bond with *Nebbia* -- or surety bond, I'm

19   sorry.

20       *Nebbia* is just the name of a state court case in

21   Florida, and so there's a procedure that happens in state

22   court, and some of the federal judges have imported it to

23   federal court.  I've never heard of anything like it in a

24   Massachusetts court or any other court.

25       As for the corporate surety bond, the way a corporate

1    surety bond works is basically it means you go to a bail

2    bondsman.  And you pay the bail bondsman, in this case

3    because it's a federal felony, it has to be 15 percent of

4    the total amount of the bond.  So in this case you pay

5    $150,000, and effectively the rest of the bond is unsecured.

6        If the defendant defaults, if he doesn't show up for

7    court as required, then the bail bondsman has a judgment

8    against him for the entire $1 million and becomes

9    essentially a bounty hunter, can go all over the world

10    trying to the find the defendant and bring him in.

11        In Massachusetts we have a more enlightened system.

12    They have abolished bail bondsmen.  They've abolished the

13    corporate surety bond.  There's no way for that particular

14    condition to be imposed here.  There are no Massachusetts

15    bail bondsmen.  The Florida bail bondsmen are licensed to do

16    business in Florida, not in Massachusetts.

17        What we are proposing is effectively the same thing.

18    There would be a $1 million unsecured bond secured by

19    $150,000, except we are proposing that it be $150,000 in

20    property, which is common in Massachusetts, as you know.

21        If the defendant defaults or fails to appear, then

22    he'll be -- the court will have a judgment for a million

23    dollars against him, or the U.S. Attorney's Office.  I'm not

24    sure exactly who actually owns that judgment.

25        But the court or the U.S. Attorney's Office can go

1   after him for the million dollars, and they can look to find

2   him wherever he might be and haul him in.  It's basically

3   exactly the same thing.

4            THE COURT:  So --

5            MR. WEINREB:  Yes?

6            THE COURT:  Go ahead.

7            MR. WEINREB:  As for the issue of, you know, his

8   wealth, so Dr. Kingsley is an orthopedic spine surgeon.  He

9   has a practice in Florida.  He has a practice in Phoenix,

10  and he is about to open a practice in Tucson.  He is not

11  just an orthopedic spine surgeon, but he's an inventor and

12  innovator and has developed certain techniques to do

13  minimally invasive spine surgery that doctors all over the

14  country are eager to learn.  And for that reason he often

15  travels to hospitals in various parts of the country because

16  doctors who want to perform this technique, there are

17  hospitals where they have privileges, require that

18  Dr. Kingsley teach them how to do it and then proctor them

19  doing it several times.

20       And that is the reason why we requested travel

21  throughout the continental United States, both so

22  Dr. Kingsley can continue to engage in remunerative

23  employment and be a productive member of society by helping

24  sick patients get treatment that very few people are able to

25  perform and helping doctors learn how to give that treatment

1    to others.

2        With respect to these documents, which I have never

3    seen and was never shown by the government, in which

4    Dr. Kingsley supposedly said he had $38 million in assets or

5    whatever it is, because I haven't seen them, I don't want to

6    say what that might be.

7        But I will say that Dr. Kingsley, in addition to being

8    a surgeon, is also, as I mentioned, an inventor.  He holds

9    over 50 patents.  And there is a -- I don't know what its

10   corporate constitution is but something called KICVentures.

11   Kingsley is his first fame, Kingsley I. Chin Ventures, I

12   believe.  And it owns a number of small startup companies

13   that are in the business of trying to develop products for

14   spine surgery and other things and market them.  And it may

15   be that on paper some of these companies have a very large

16   value because of their potential future earnings, but they

17   don't -- he doesn't earn any money from KICVentures, a

18   nominal amount, and we can demonstrate that, that his

19   remuneration from those companies over time has been small.

20   He mainly supports himself with his medical practice.

21       So he does have a home in Florida, as Mr. Lazarus

22   mentioned.  I believe that it was purchased for -- give me

23   one moment here -- I believe it was purchased for

24   $2.3 million in 2015.  He owes $1.6 million on it.

25       It hasn't been -- you know, other than Zillow or

Redfin, I mean there's no actual official appraisal of what it's worth now.

But we do agree he has the $150,000 in property that he could put up to secure a bond equivalent to what the Florida Court had ordered, and he's prepared to do that.

You know, to the extent the house is worth more or that he may have other sources of income, that's not a reason to increase the bond. I mean, the law says the conditions have to be the least restrictive that will assure his appearance in court. In Florida, despite the fact that nobody really argued on his behalf why he's not a risk of flight, that's all the court thought was necessary.

Nothing more is necessary here.

He's already had two weeks. If he wanted to flee, he could have gone. He didn't.

And on that score I would just like to say a few more things about Dr. Chin because I think it's important for the Court to know.

He is 57 years old. Although he was born in Jamaica, he came to the US in 1984 when he was 19 to attend Columbia College on a soccer scholarship, and he has lived in the US ever since for 37 years, and he's been a citizen for approximately 30 years.

He lives in Florida with his wife, Vanessa, and his three children who are ages eight, nine and eleven. All of

1    them are US citizens.  All three children were born here and

2    attend school in Florida.

3         He has a brother and two nieces who live in Boston.  He

4    has several aunts who live in the US.

5         So he has -- this is his country.  This is his home.

6    He is no different from any other United States citizen and

7    shouldn't be viewed or treated any differently simply

8    because he was born in another country.

9         And he has been an extremely productive member of

10   society from the day he got here.  He has a BA, a BS, and an

11   MD, did his residency here.  And, as I mentioned, he is a

12   highly trained orthopedic spine surgeon who has developed

13   innovative products and techniques that have helped hundreds

14   and hundreds and hundreds of patients.

15        There is no reason to believe that he is going to flee

16   or that he won't appear as required.  He is a surgeon.  He

17   knows how to show up on time where he's supposed to be.

18        And the reason we have asked for travel within the

19   continental United States is because if he's going to

20   maintain his employment, he needs to go to these various

21   places to do his work.  He needs to be able to go to Arizona

22   where he has an existing practice.  He needs to be able to

23   go to the hospitals where he's training other doctors to

24   perform these procedures.

25        And, frankly, he would also ask, although I realize

1    that this will be the most controversial ask that we would

2    make, that he be allowed to travel to Jamaica for three days

3    out of each month because he performs spine surgery there,

4    and he is the only board certified spine surgeon in all of

5    Jamaica.  So either he goes to them or they have to come to

6    him or to somebody else.

7        And, you know, I think we can easily arrange a

8    procedure in which -- he's already surrendered his passport.

9    Pretrial has it.  I assume they have it in Florida.  It's

10   still there.  I hope so.

11       And, you know, the arrangement could be that he will

12   notify Pretrial of the proposed travel.  They have to

13   approve it.  He will go there no more than three days before

14   the trip to pick up his passport.  He will travel solely for

15   business purposes to perform surgeries.  When he's done,

16   he'll come back within three business days.  He will have to

17   return the passport.  And if at any point his Pretrial

18   Services officer believes he is a risk of flight, Pretrial

19   can simply decide not to give it to him.

20       So that's the basis for our requests, and I believe

21   that they are more than sufficient to ensure that he will

22   appear as required.

23           MR. LAZARUS:  Your Honor, may I respond briefly?

24           THE COURT:  Yes, you may.

25           MR. LAZARUS:  Thank you.

1        With respect to the house, we would ask that the entire

2   million dollars be secured against the real property, your

3   Honor.  That was done in, I believe, the Facto [ph.] case,

4   United States v. Facto, which counsel is no doubt very

5   familiar with.  I believe that the entire million dollars

6   was secured there.

7        The difference in Florida with the bond is that if it's

8   $150,000, you also have the bail bondsman whose job it is,

9   who's out there trying to find the defendant and to -- it's

10  just a different scheme work -- a different framework.

11  There's no reason not to secure the full million dollars

12  against the real property in light of his access to capital,

13  all the things that I went over earlier, your Honor.

14       I would also note in terms of ties to the community and

15  risk of flight, I don't know the current status of it, but

16  according to the Florida Department of Health, the Board of

17  Health website, they filed an administrative complaint

18  against Dr. Chin in July of 2020 looking to, I believe, take

19  his license.  And I don't know that he has privileges at any

20  hospitals in Florida.  I believe he does surgery at his

21  surgical center.

22       So I don't know, your Honor -- you know, in light of

23  these different items that we've identified for the Court,

24  the risks of the flight is significant, securing it for

25  $1 million is -- there's no harm to the defendant if he

1    doesn't flee.  If he needs to refinance or sell the house or

2    pull equity out of the property, your Honor, he can then,

3    with a specific reason, revisit it with the Court.  He can

4    move based on whatever that need is at that time to lower

5    the amount of the lien that's put on the house temporarily,

6    assuming he shows up as he's supposed to.

7         And so the prejudice to him is very small, but the risk

8    if he were to flee is very high, and so, therefore, the

9    whole million dollars should be secured against the

10   property.

11        And as far as traveling to Jamaica, your Honor, that is

12   a -- as the Court's aware, a relatively unusual, I won't say

13   unheard of but unusual, condition to allow a defendant on

14   pretrial release, allowing him to leave the country.  And we

15   would urge the Court not to allow the defendant access to

16   his passport and to leave the country.

17        And I would -- if I could just clarify the no-contact

18   orders, your Honor, that I mentioned a little while ago.

19        What we are looking for is no contact with former

20   employees of and distributors for SpineFrontier, AxioMed,

21   KICVentures, and IME.  No contact with former physician

22   consultants.  Some contact with, but no discussion of the

23   case, with any current employees or current physician

24   consultants, and whatever contact is necessary but no

25   discussion of the case with any co-defendants without

1    counsel present, your Honor.

2         THE COURT:  Okay.

3       So, Mr. Lazarus, I do just want to say as an aside, not

4    to be catty, but I think you're asking -- you are now asking

5    me to do exactly what you said I didn't have the authority

6    to do a few minutes ago, which is to change the conditions.

7         So are we over that?  Are we in agreement that I can

8    set some conditions here?

9         MR. LAZARUS:  So --

10    (Laughter.)

11         THE COURT:  I mean, this happens all the time.  We

12    have Rule 5 in a different district, and the judge, on

13    limited information, releases someone.  And when we get up

14    here, things are changed.

15       I mean, on notice I imposed basically all these same

16    conditions with regard to Mr. Hummad, and I don't know if

17    they weren't asked for down there, but they are not

18    appearing in the original conditions.  So I will just say,

19    because the hearing is kind of dragging on here, I'm going

20    to revisit the conditions and set the conditions that I

21    think will secure Dr. Chin's appearance and also satisfy the

22    government's concerns apparently about obstruction of

23    justice and that type of thing.

24       So I would just ask you, if you don't mind, to reduce

25    to writing what you just said because I was trying to take

 1    it down word for word, and I can't trust myself to do so.

 2    And I would like you to send it to Mr. Weinreb before you

 3    send it to the Court and ask Mr. Weinreb if he wants to

 4    tweak it at all.  I'm inclined to do it. I did for the

 5    co-defendant.

 6         And Mr. Weinreb, I guess there's some kind of

 7    convoluted thing where if your client needs to meet with

 8    doctors, et cetera, you're going to run that by the

 9    government.  I think there's some problems with that, but

10    I'm confident you can work something out.  And so let's work

11    out that condition about who he can have contact with and

12    under what conditions.

13         Is that okay with you, Attorney Weinreb?

14              MR. WEINREB:  Yeah, of course.  I'm happy to work

15    with the government and try and work something out.

16         But if I could just have the last word on the bond

17    issue?

18              THE COURT:  No.  Don't say any more about the bond

19    issue, because here's my concern.  I think I've heard you a

20    lot on that.

21         I'm reading from the Pretrial Services report.  So the

22    defendant reports a checking account that has a current

23    balance of $2,000.  He can't recall any additional

24    information about his business accounts for his medical

25    practice.  He might have a life insurance policy.  He

1    doesn't remember.  He doesn't know the current value of his

2    practice.  He bought his residence.  He's got his monthly

3    mortgage.  He doesn't know what the outstanding mortgage on

4    balance is.  He's financing a 2018 Tesla X, but he doesn't

5    know what he owes on that.  And all this information was

6    corroborated by his wife.

7        So, frankly, I've never seen anything so vague.  And I

8    know you haven't seen the documents from the government

9    concerning his net worth, but surely you know his net worth,

10   or if you don't, you need to ask him some questions about

11   it.

12       And, frankly, I don't think $150,000 or a million

13   dollars is the correct amount for a secured bond without

14   knowing what his assets are.  And that's kind of, honestly,

15   ridiculous.

16       $150,000 is a ton of money to someone who only has that

17   much money in the bank, but a million dollars might be a

18   drop in the bucket to someone who has access to hundreds of

19   millions of dollars.

20       So let's figure it out.

21       I would like him to be interviewed by Probation and for

22   him to give Probation some numbers.  If it's somehow

23   incriminating, I don't know what to say.  I don't know what

24   to say about that.

25       But I can't set a secured bond amount without knowing

1    what he's worth, and one benchmark might be the equity in

2    his house, if he wants to put that up.  And that might be as

3    good as we're doing.

4        So because the hearing has taken a lot longer than I

5    thought a typical arraignment would, I need to take a short

6    break.  It will be about three minutes.  And so I'm going to

7    leave this meeting and make a phone call.  So let's just

8    take a three-minute break, and if you want to turn your

9    screen off you can.

10        And Mr. Weinreb, if you want to go into a private room

11    with your client, you're welcome to do that, but I will be

12    right back.

13        (Pause in proceedings.)

14            THE COURT:  Okay.  Thank you very much.  I'm back.

15        Let's see.  Before we wind up, I will hear you again if

16    you want to be heard, Mr. Weinreb, but let me also just see.

17    Does Probation have anything to add to this, because I know

18    Probation in these situations usually contacts Probation in

19    Florida.

20            PROBATION OFFICER:  Yes, your Honor.  Thank you for

21    your time.

22        I wanted to just note that in reviewing the Pretrial

23    report that was prepared in the Southern District of

24    Florida, although they recommended a percentage bond and a

25    personal security bond, they do not set, typically set, an

1    amount.  It's set by the court.  And I think, given the lack

2    of information of the defendant's total assets, it makes it

3    a little difficult at this time for us to make a formal

4    recommendation of what that bond should be.

5         I heard the counsel's argument for a modification of

6    conditions to include travel, and I do note that the

7    defendant is on a curfew with GPS.

8       I think that after speaking with the probation officer

9    in the Southern District of Florida, they have no objections

10   to the home detention or curfew with location monitoring to

11   be removed, but if it is to stay in place, they do ask that

12   it be switched from the GPS to a radio frequency unit, or a

13   unit to be determined by Probation and Pretrial Services.

14      Aside from that, I don't think there were any other

15   conditions that needed modification from our end, but I just

16   wanted to share that piece of information for your Honor.

17            THE COURT:  Okay.  Thank you.

18            MR. LAZARUS:  Your honor --

19            THE COURT:  I appreciate that.

20        Yes?  Go ahead.

21            MR. LAZARUS:  Very briefly, with respect to the

22   GPS, I think that the court imposed the GPS with the curfew

23   until the defendant were to secure his appearance.  And so

24   we would ask that some type of electronic monitoring -- I

25   would defer entirely to Probation as to the specifics of the

1    technology -- but some type of device be used until he

2    secures his presence.  I know that they can be cut off and

3    that they're not always a guarantee of anything.  And I've

4    had personal experience in cases with that, but it's better

5    than nothing.  And we have the capabilities, and seemingly

6    the defendant has the resources to pay for it.  And so until

7    such time as the defendant were to secure his attendance, we

8    would ask that that continue.

9         And I would just -- well, I'll stop.

10        Thank you, your Honor.

11        THE COURT:  All right.  So here's what I'm

12   inclined --

13        MR. WEINREB:  Your Honor --

14        THE COURT:  Let me say this, Mr. Weinreb, and then

15   I'll hear from you.

16        So I am inclined to remove the GPS with the curfew.  So

17   no curfew, no GPS.  But I do want the matter of the bond to

18   be resolved first.  So as soon as the bond is resolved, then

19   the GPS and the curfew will be taken off the conditions.

20        Then with regard to the bond, I will leave the ball in

21   your court, Mr. Weinreb.  You can either have a discussion

22   with your client and Probation about his assets, or, if you

23   wish, you can have him post whatever equity there is in his

24   home in the alternative for a secured bond for that amount.

25        And before you do that, I want you to talk to the

1    government about the amount.

2         So if, for example, you have a Zillow appraisal of -- I

3    don't remember -- $3.8 million and your client says that

4    it's lower than that, I would go ahead and -- I think we

5    accept those appraisals all the time on these types of bonds

6    and figure out what is the equity in the home and put that

7    up as the equity.  And if it turns out he doesn't have that

8    much equity, then the government can't get it.

9         But it will be a secured bond for a certain amount of

10   money, which you will discuss with the government.

11        And if you have problems with that, Mr. Lazarus, you

12   can come back to the court.  You can just email Mr. Vieira.

13   We will have another hearing about the precise amount.

14        I mean, I know that the judge in Florida -- I agree

15   with you, Mr. Weinreb, that the judge in Florida basically

16   it seems was going to fine him $150,000 that he would lose,

17   and then he would be in debt to a bail bondsman who would

18   hunt him for the remainder of it, I guess, if he absconded.

19        I don't like that system.  I think that's a terrible

20   system, and I don't agree with it.  And so I'm not going to

21   impose anything like that.

22        My view is, you figure out what are the person's

23   assets, what's a meaningful amount of money.

24        And I'll just say, Mr. Lazarus, as far as the bail

25   bondsman hunting people down, I think the marshals are

1    pretty good at finding people in my experience.

2              MR. LAZARUS:  I agree.  I agree.

3              THE COURT:  Yeah, yeah.

4         And if you want, Mr. Lazarus, a partly secured and a

5    partly unsecured bond to get you up to a reasonable amount,

6    that's fine.

7              MR. LAZARUS:  Agreed that the --

8              THE COURT:  So --

9              MR. LAZARUS:  I'm sorry.  I thought you were done.

10        I agree the marshals are a wonderful resource, your

11   Honor.

12             THE COURT:  Okay.

13        With regard to the no-contact order, I'm going to ask

14   the parties to confer on that.

15        And with regard to the travel, I'm going to ask you,

16   Mr. Weinreb, to, first of all, report to the Court, you're

17   welcome to do it under seal, as to the status of your

18   client's medical licensure.

19        And then also as to the -- I forget what other question

20   the government raised about his travel.

21        Well, I would like some type of verification that he --

22   so what he's doing in Jamaica.  And, also, do we have an

23   extradition treaty with Jamaica?

24             MR. LAZARUS:  I believe we do, your Honor.  I would

25   have to verify what offenses it covers, but I believe we do

 1    have a treaty.

 2         And if I'm wrong, your Honor, I will file something and

 3    let the Court know.

 4              THE COURT:  Okay.

 5         And Mr. Weinreb, do you have a different Guidelines

 6    range without acceptance with the lower range being 151?

 7              MR. WEINREB:  Your Honor, frankly, I haven't had a

 8    chance to calculate the Guidelines range.

 9              THE COURT:  Okay.

10              MR. WEINREB:  So I would like to say, if now's the

11    right time --

12              THE COURT:  Yes.

13              MR. WEINREB:  -- I think the question of Dr. Chin's

14    assets, I would like to make sure that a lot of this loose

15    talk about his assets that's coming from the government does

16    not result in him actually losing access to all the assets

17    he has.  This is a time in his life where he needs every

18    penny because he's got to be fighting a lot of charges

19    against a very well-financed, well-resourced opponent.

20         And the statute does say that the conditions of release

21    have to be the ones that are the least restrictive possible.

22         So I don't think simply saying, you know, it should be

23    whatever his house is worth, if that's his only asset,

24    that's really depriving him of all his resources.

25              THE COURT:  So is that his only asset?  Does he own

1    the property in Jamaica?  Does he have access to bank

2    accounts?  If he has no assets, why is he negotiating to buy

3    what I presume is an expense vehicle?  And how is he paying

4    his $10,000 monthly mortgage?

5        And, you know, I just -- and also, what are his wife's

6    assets, honestly, because I don't think it's just him,

7    right.

8        So if you want to say he doesn't have any assets,

9    that's fine.  But as an officer of the court, you know,

10    you're talking about "loose talk" about his assets, it is

11    loose talk because none of us know because he wouldn't say,

12    so...

13        MR. WEINREB:  So, your Honor, can I just correct a

14    misunderstanding here?

15        THE COURT:  Okay.

16        MR. WEINREB:  He was arrested -- in usual fashion,

17    he was arrested by 12 agents who took him straight to jail,

18    and he was interviewed by Pretrial in the holding cell.  He

19    was asked all these questions about his companies and about

20    the revenues of his practice and so on.  But he's a doctor.

21    He performs surgeries.  He's not an accountant.  He doesn't

22    do the books for his company or for his own practice.  He

23    has people who do that, and he handles the medical side of

24    it.

25        He did not want to say something inaccurate and be

1    called a liar after the fact.  So he's told the truth, which

2    is that he didn't know the accurate information, and I think

3    that's perfectly fair.

4        Nobody told him afterwards -- nobody said, Find it out

5    and come back to us or anything like that.

6        He just then immediately went into court for his

7    initial appearance and that was that.

8        So I don't think it's fair to suggest that he was

9    being, you know, purposely vague in order to hide anything.

10       Secondly, we've heard about 38 million -- you know,

11   millions of dollars.

12       So Dr. Chin is the CEO of something called KICVentures.

13   It is basically an investment holding company.

14           THE COURT:  I think you've already said this.

15           MR. WEINREB:  Yeah, but -- so I just want to make

16   clear that all of that -- all of those assets are completely

17   illiquid.  There is no cash flow.

18           THE COURT:  You already said that.

19           MR. WEINREB:  Okay.

20           THE COURT:  So I don't know if that's what the

21   government's talking about.  I have no idea.  I have no firm

22   information.

23       And I understand if there's something tricky about his

24   finances that you don't want the government to know because

25   then they might freeze them all or that type of thing.

1    That's a big problem in the case, and I'm not going to put

2    you on the spot right now and just start asking you

3    questions about his net worth.  But he has to have a net

4    worth, and we don't know it, and someone ought to find it

5    out.

6        Because to me he is a flight risk, but I think it can

7    be mitigated.  And you did a very nice job explaining who he

8    his, his family, his ties to the country, et cetera.  And I

9    don't intend for him to put up every asset he has as an

10   appearance bond.  I don't think that's fair.

11       But, on the other hand, this is a serious case where

12   he's looking at over ten years in prison if he gets

13   convicted after trial, and I think he should put up some

14   secured bond to assure his return to court.

15       I'm just finding that.  I have no idea what the proper

16   amount is because I don't know what he's worth.  For someone

17   who has a lot of money, a little bit of money is nothing.

18   And for someone who has no money, a small amount of money

19   might do it.

20       So that's -- I can't really -- I can't really say

21   what's the proper amount in this case.

22       So one thing is I think you could negotiate with the

23   government and come up with an agreed amount and see if you

24   can do that.

25       And once we do that, we'll get everything posted.

1    We'll take off his GPS, and then I would like you to give me

2    some documentation about the work in Jamaica, and also about

3    his licensure, and that he's not about to lose his license.

4    Because then if he's not, I'm -- and he is working in

5    Jamaica, I'm happy to have another brief hearing --

6    hopefully briefer than this one -- where we talk about his

7    travel.  I'm happy to let him travel, but I would like some

8    documentation about the claims about Jamaica.

9            MR. LAZARUS:  Your Honor, as to Jamaica, your

10   Honor, the latest FR that we have I believe is from 2019.  I

11   think it only talks --

12           THE COURT:  What is an "FR"?

13           MR. LAZARUS:  Foreign Bank Account Registration,

14   your Honor.

15           THE COURT:  I see.

16           MR. LAZARUS:  And so I'm not asking for the

17   defendant to tell the government that information.  I don't

18   think he has to tell the IRS that for another month or so.

19       But I would just ask when the Court's considering the

20   information about Jamaica, if the bank account in Jamaica

21   has a million dollars in it, I would argue that that's

22   important for the Court to know.  And so I would just ask

23   the Court to also take that into consideration in any

24   further decision that you're making as far as gathering

25   information from the defendant, your Honor.

1        THE COURT:  So in a month Dr. Chin will need to

2   tell the government how much money he has in his Jamaican

3   account?

4        MR. LAZARUS:  I think that the filing requirement,

5   and I would have to confirm the exact dates on this, but I

6   was told by the forensic accountant at the FBI that they're

7   due in mid October.  And so that's my understanding.

8        The defendant has filed them in the past, and so if he

9   still has a foreign bank account, not reporting it again

10  would be a crime.  He has reported it for the last several

11  years in row.  I don't have any reason to think he would not

12  report it this year.

13       I'm just bringing to the Court's attention he has

14  resources there that we don't know what they are, and we

15  can't readily identify them; and I would just ask you when

16  you're finding out about his business in Jamaica to also

17  find out about his access to capital there.

18        THE COURT:  Okay.

19  So, Mr. Weinreb, unless it impacts your client's

20  defense in some way, I think if you talk to Probation about

21  your client's assets, you should also talk about his assets

22  overseas.

23        MR. WEINREB:  Understood.

24        THE COURT:  Okay.

25  So I'm going to let you, Mr. Weinreb, contact Probation

1    Officer Bello, and then we will regroup once I start getting

2    some information from the parties on these various

3    conditions.

4        Okay.  So I'm going to continue this to November for an

5    initial status conversation, and I will exclude the time,

6    and is there anything else that we need to take up today?

7            PROBATION OFFICER:  Your Honor, given that Dr. Chin

8    is being supervised in Florida, I just want to make sure

9    that I give them the proper notice of what occurred today.

10       So as of today are you modifying any of the conditions

11   that were imposed in Florida?

12           THE COURT:  Yes, I am.  And so I think what I will

13   do is I will just draft a quick docket entry about that that

14   you can draw the probation officer's attention to in

15   Florida.

16           PROBATION OFFICER:  Excellent.

17       And then as I indicated, the probation officer in

18   Florida just requests that we note that the monitoring

19   system for the curfew, if it is going to continue until such

20   time that a bond is paid, that it is the radio frequency

21   unit.

22           THE COURT:  Okay.  So the curfew -- so right now

23   the curfew is still on.  And if the Probation Department in

24   Florida wants to make that a radio frequency unit, they can

25   do that.

1              PROBATION OFFICER:  Thank you, your Honor.

2              THE COURT:  Sure.

3         Okay.  And then we'll just work out these other things

4    in the coming days.

5         And so far I would say, except that the GPS unit is

6    going to be changed to one that works on radio frequency,

7    the conditions that were set in Florida are in place with

8    the exception of the bond which we're still working out.

9         Okay.  So he need not post a bond by any deadline right

10   now.

11        Okay.  Anything else from anyone?

12        And we've done everything we need to with regard to the

13   company, right, Mr. Weinreb?

14             MR. WEINREB:  As far as I'm aware, your Honor,

15   we've done everything.

16             THE COURT:  All right.

17             MR. LAZARUS:  And, your Honor, we're working with

18   Mr. Weinreb, and we'll work with the lawyer for Mr. Hummad

19   on a -- hopefully on an assented-to protective order so we

20   can get discovery over to the other side as quickly as

21   possible.

22             THE COURT:  Great.

23        Okay.  All right.  And if you're running into

24   difficulties working these things out, just email Mr. Vieira

25   and we'll see everyone again.

1          I hope that -- I mean, we're going to have a hearing

2    soon anyway to nail all this down, but let's just try to

3    work these things out, and then we'll get the conditions

4    settled out.

5          Okay.

6              PROBATION OFFICER:  Thank you, your Honor.

7          And can I request a breakout room with Attorney Weinreb

8    and Dr. Chin for a few minutes at the conclusion of this

9    hearing?

10             THE COURT:  Yes.  No problem.

11         Okay.  So, Dr. Chin and Attorney Weinreb, just stay on

12   the line.  You're going to go into a private room with

13   Ms. Bello.

14         And for everyone else, thank you very much.  The

15   hearing is terminated.

16             MR. WEINREB:  Thank you, your Honor.

17             MR. LAZARUS:  Thank you, your Honor.

18         (Proceedings adjourned.)

19

20

21

22

23

24

25

**C E R T I F I C A T E**

    I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

    /s/James P. Gibbons         November 18, 2021
       James P. Gibbons

JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jamesgibbonsrpr@gmail.com