1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3    _____

4    UNITED STATES OF AMERICA,

5                         Plaintiff,        Criminal Action
                                            No. 21-cr-10256-RWZ
6    v.

7    ADITYA HUMAD and
     KINGSLEY R. CHIN,                      Pages 1 to 36
8
                         Defendants.
9    _____

10

11

12

13
              TRANSCRIPT OF HEARING VIA ZOOM VIDEOCONFERENCE
14
         BEFORE THE HONORABLE CHIEF MAGISTRATE JUDGE M. PAGE KELLEY
15
                    UNITED STATES DISTRICT COURT
16

17

18

19

20

21

22                      JOAN M. DALY, RMR, CRR
                        Official Court Reporter
23                  John J. Moakley U.S. Courthouse
                     One Courthouse Way, Room 5507
24                    Boston, Massachusetts  02210
                        joanmdaly62@gmail.com
25

1    APPEARANCES:

2

3    FOR THE GOVERNMENT:

4    DAVID J. DERUSHA
     DAVID G. LAZARUS
     United States Attorney's Office
5    One Courthouse Way
     Suite 9200
6    Boston, MA 02210
     617-748-3100
7    David.derusha@usdoj.gov
     david.lazarus2@usdoj.gov

8

9    FOR THE DEFENDANT KINGSLEY R. CHIN:

10
     WILLIAM D. WEINREB
11   Quinn Emanuel Urquhart & Sullivan, LLP
     111 Huntington Avenue
12   Suite 520
     Boston, MA 02199
13   617-712-7100
     Email: Billweinreb@quinnemanuel.com

14

15   FOR THE DEFENDANT ADITYA HUMAD:

16   FRANK A. LIBBY, JR.
     Libby Hoopes Brooks, P.C.
17   399 Boylston Street, Suite 600
     Boston, MA 02116
18   617-338-9300
     Email: Falibby@lhblaw.com

19

20

21

22

23

24

25

P R O C E E D I N G S

　　　　　(The following proceedings were held by Zoom
Videoconference before the Honorable Chief Magistrate Judge
M. Page Kelley, United States Chief Magistrate Judge, United
States District Court, District of Massachusetts on
October 6, 2021.

　　　　　The defendants, Aditya Humad and Kingsley R. Chin,
are present with counsel.  The Assistant U.S. Attorney is
present.)

　　　　　THE CLERK:  We are on the record with criminal case
number 21-10256, The United States versus Humad.  The
Honorable M. Page Kelley presiding.  Would counsel please
identify themselves for the record.

　　　　　MR. LAZARUS:  Good morning, Your Honor.  David
Lazarus and David Derusha on behalf of the United States.
Sorry Mr. Libby.

　　　　　MR. LIBBY:  Good afternoon, Your Honor.  Frank
Libby, Libby Hoopes Brooks, Boston, for Mr. Humad.

　　　　　THE COURT:  All right.  Good afternoon, gentlemen.
And Mr. Humad, you're here, too, right?

　　　　　DEFENDANT HUMAD:  Yes, I am, Your Honor.

　　　　　THE COURT:  Can you see and hear everything on the
screen in front of you?

　　　　　DEFENDANT HUMAD:  Yes, I can.  Thank you.

　　　　　THE COURT:  Mr. Humad, you have the right to be

1    present in court for this hearing because it's a continuation

2    or a further detention hearing, and we have not been bringing

3    people to court these days because of COVID.  So is it all

4    right with you if you waive your right to be present in court

5    and we conduct the hearing by Zoom?

6              DEFENDANT HUMAD:  Yes, Your Honor.

7              THE COURT:  Okay.  And Mr. Libby, any objection to

8    that?

9              MR. LIBBY:  None at all.  Thank you, Your Honor.

10             THE COURT:  All right.  So we have a motion by

11   Mr. Humad to modify the amount of his appearance bond.  And

12   then the government filed an opposition to that.  I just

13   wanted to say I think this hearing has been designated as

14   being under seal.  Is that correct, Mr. Viera?

15             THE CLERK:  Yes.  When I set the hearings on the

16   public docket, but because the motion was filed under seal,

17   it goes as under seal.

18             THE COURT:  Okay.  Is there any reason for this

19   hearing to be under seal?  I'll start with you, Mr. Libby.

20             MR. LIBBY:  Your Honor, I actually raised that with

21   Mr. Viera.  I think where we landed was that the motion is

22   under seal and the particularized information within the

23   motion is under seal.  But there may be a way we can navigate

24   this for purposes of the hearing where we can without

25   particularizing that information we can address it, we can

1    identify it at least generically for the Court's benefit and

2    conduct the matter without sealing the hearing.

3            THE COURT:  I think what I'll say, I don't think we

4    have members of the public present.  I can't really ly tell.

5    I know Ms. Anderson is my law clerk.  I think what we'll say

6    is this hearing is not under seal.  And if after the hearing

7    you feel that certain things should be sealed, I'm happy to

8    hear you.

9            I think the only issue is the amount of the

10    appearance bond.  And I read your arguments, Mr. Libby, which

11    set out in detail your client's assets.  It appears to me

12    that there's some reasons for not having him liquidate

13    certain assets, and then the real estate asset he needs to

14    live on.

15            And then I read what you filed, Mr. Lazarus,

16    talking about -- I'll let you talk about it.  I'm happy to

17    hear you argue it, that he does have quite a bit of assets,

18    notwithstanding their nonliquid state, and that you think the

19    $500,000 secured bond is appropriate here.  So why don't I

20    hear from the government first.  Then we'll ask you a couple

21    of questions, Mr. Libby.  So go ahead, Mr. Lazarus.

22            MR. LAZARUS:  Thank you, Your Honor.  I'll be brief

23    because we did try to set it out in the papers.

24            THE COURT:  Right.

25            MR. LAZARUS:  I would just note that when you look

1    at the net worth that's provided by the defendant in his

2    motion to modify the bond.  It's approximately ███████ when

3    you factor in the 401(k), the investments, the equity in the

4    home and the cash.  And he's asking to secure that with a

5    $20,000 secured interest.  When you do the math, I'm not a

6    mathematician as I think I've told this Court in several

7    prior hearings, but I believe that $20,000 is only ████

8    percent of his net worth as he acknowledges it.

9            That's a paltry sum when the Court is considering

10   whether it's sufficient to make sure he comes back to court

11   and doesn't flee.  So what we've proposed is one of two

12   things.  Either a secured interest against the equity in the

13   home or a restraining order against the investment account so

14   they don't have to be liquidated.  They can continue to rise

15   and fall with the market.  And those pledged as collateral.

16   So what were to happen if the defendant were to abscond, we

17   would move to forfeit the bond and seek an order authorizing

18   liquidation at that point of those investment accounts.

19           What it would also do is ensure the status quo of

20   the investment capital remains held.  And if for some reason

21   there are significant changes in the market or the defendant

22   wants to change his investment strategy or diversify further,

23   whatever he wants to do, he's free to either bring that to

24   the government and see if we can work it out, or he can file

25   a motion.  So he's not being prejudiced in any way if his

1    real fear is potentially liquidating those and potentially

2    paying a tax penalty to use them as collateral.

3            If it's a procedural objection to using the

4    investment for security, there are ample mechanisms in the

5    law to get around that.  If it's an issue of he doesn't want

6    to do that because he wants to keep spending the money, ███

7    percent of his net worth is flat out not enough of an

8    incentive given his presumably unstable employment.

9            By that I mean he's not having any income aside

10   from perhaps the company maybe paying for his car.  But other

11   than that, he reported he hasn't made any money from the

12   company and it seems like he's spending money to live.  His

13   sister, as we noted, is a member of the community, but she

14   rents her home and she wasn't willing to secure his

15   appearance.  So his ties to the community are also thin.

16           So in light of those things, which we've set out in

17   our speaking indictment and previous hearings, we think it's

18   important that the defendant's appearance be properly

19   secured.

20           THE COURT:  Okay.  Mr. Libby?  And I'd just ask you

21   what about if instead of liquidating the investment

22   portfolios if we just put a restraining order on them.

23           MR. LIBBY:  Your Honor, if I may, I'll answer that.

24   If we're leaving everything else aside, and I'd like to be

25   heard on that, some of the government's additional points

1    made in its opposition.  I think the least intrusive and

2    harmful way would be to place a lien on his property.  It

3    does have equity in it.  So that amount that I've identified

4    in our pleadings is under seal.  But on the other hand, I

5    would like to speak to, rather than tying up the investments,

6    even though as Mr. Lazarus pointed out, they'd be within some

7    kind of framework where he could move them, but there are, in

8    fact, procedural concerns about this.  Going to motion

9    practice to even touch those kinds of things, missed

10   opportunities in order to address those kinds of assets.

11           So first, if I may, we took to heart listening to

12   the Court's comments made in the course of Dr. Chin's hearing

13   I think it's last week where this whole exercise 3142 is

14   proportionate to the figures, and that's why we got the Court

15   the figures so you're not acting in a void, you're not in the

16   dark.  You understand who this person is and what his current

17   posture is with respect to staying occupied, employed on the

18   one hand and meeting his daily and now, not insignificant,

19   legal obligations and reasonably assuring his appearance.

20           So that, all told, Your Honor, understand as we

21   pointed out Mr. Humad was taken into custody coming back to

22   the United States.  Not leaving.  Coming pack to the United

23   States.  He always comes back.  Travel, as the government

24   suggests, somehow is some kind of nefarious activity.  It is

25   not.  It is central to his job duties and responsibilities to

the companies.  He's the point man for the investor pitches.
He goes to where investment money is located.  That's what
he's doing.

There's nothing at all untoward about that.  He was
visiting his parents in Dubai.  Yes, they're in Dubai.  His
mother is a U.S. citizen.  Father is a medical doctor.  They
have long range plans to move to the United States, to
relocate to the United States to be with their daughter who's
gainfully employed.  She's an upstanding member of society, a
citizen here in the Boston area with her ████████████
daughter who is much beloved by Mr. Humad whose plans to see
her this weekend include Friday night dinner, Saturday
soccer, and Sunday something else.  I can't remember what it
was.  He's deeply involved in her life.  He's very family
oriented, very family oriented on that.

I'd like to underscore, Your Honor, that all of
this is legitimate activity on behalf of legitimate companies
with legitimate medical devices performing real value,
beneficial services, orthopedic surgeons.  There's no
suggestion that these are somehow unnecessary surgeons or
this is a fly-by-night operation.  To the contrary.  He's
very deeply invested in this, wants to move the business
forward for the benefit of everybody here.  He's perfectly
entitled to do that.  These are allegations.  This is not a
conviction.  It should not be punitive, and I understand the

1    Court is not dealing with this in punitive.  But to strike a

2    balance between ensuring his appearance, and making sure that

3    he still, in fact, has access to funds, so he can live, meet

4    his daily obligations, and provide and mount a serious

5    defense to these serious charges.  Yes.

6           I've only been in the case two to three weeks.  And

7    I've already found there are significant counterpoints and

8    defenses to these charges, and we'd very much like to go

9    after them and dig after them and get me up to speed.  I've

10   missed out on four or five years of prior litigation in this,

11   false claims litigation where there had been negotiations

12   ongoing for months, which, in fact, Mr. Humad thought was

13   kind of leaning favorably.  That's why he decided to take an

14   opportunity to see his parents with his sister and his niece

15   who were on the plane when he was escorted off.

16          He understood the promise of perhaps resolving

17   those false claims allegations.  In fact, his counsel had

18   filed just a week before a motion with Judge Zobel to extend

19   his temporary appearance.  I noted explicitly in the motion

20   that they were continuing their negotiations with the

21   government about resolving those, about resolving those

22   claims at which point negotiations shut down.  The indictment

23   issued, and here he is in the lock up or in a courtroom

24   awaiting initial appearance with Your Honor when he's called

25   upon to pull from memory off the top of his head where his --

1   [technical issue].  There's no "discrepancy here."  I don't

2   know if any one of us on the Zoom call could call that up on

3   a moment's notice completely and accurate.

4           So on that we see that recently the government

5   hearing words such as massive and voluminous, what-have-you,

6   all of the investigation that's gone on for years here is

7   coming our way in the next two to three weeks.  I know

8   Mr. Weinreb and I are eagerly awaiting that stuff.  But in

9   order to hit that meaningfully and to actually do the job

10  that we need to do properly, at least so far as Mr. Humad is

11  concerned, he needs to be able to be there and to support

12  that, to fund that effort.

13          So I would ask the Court to keep in mind, as you

14  always do, you typically do, in conducting this balancing

15  that contrary to what Mr. Lazarus' point of somehow making

16  this a linear assessment, that whatever percentage of his net

17  assets, it's more than that.  It's his personal history, his

18  characteristics, who he is, and how he right now finds

19  himself fighting to defend his name, defend his charges, and

20  he wants an opportunity to do that reasonably.  He does not

21  want to be backed into a corner where he's somehow rendered

22  impoverished and unable to do that.

23          The proposal that I set forth in our papers under

24  seal, and I won't identify them specifically right now, but

25  everybody on the call knows what it is, in fact, is a real

world incentive -- disincentive to flee to this defendant in these circumstances right now.  In fact, he is insistent that he stay in this and meet these charges because of all the hard work and effort and years of getting to the this point for his piece of success in this country.

He's a United States citizen.  He's not a citizen of any other place.  He wants to be here.  This is his center of his gravity right here for now and the future.  For all those things, Your Honor, we suggest that the bond configured as we proposed is more than sufficient.  In fact, it is indeed, I submit, the least restrictive means of assurance his appearance.

MR. LAZARUS:  Your Honor, may I make one further point briefly?  I would just note that it would not be unusual or in the government's view objectionable to put a carve out on the restraining order for whatever reasonable expenses the defendant might think he's going to incur on perhaps a monthly basis.  So if he does intend to liquidate assets to pay for counsel or to live on, the restraining order could certainly build that in to the order of the Court.  And so that would be one way to address that.

To under secure, to be theoretically be able to allow the defendant to meet these expenses is to under secure and to let him then dissipate the rest of his assets and further disincentivize the need for him to return.  Thank

1    you.

2                THE COURT:  Okay.  So what I'm inclined to do is to

3    ask counsel to do the necessary paperwork to restrain the

4    retirement account that's worth about ████████, and that

5    would be obviously less than half of what I originally asked

6    him to post but quite a bit more than what he's asking for.

7    I think that strikes a good balance.  I trust that this is,

8    in fact, all of his assets that I'm looking at in his motion.

9    And I think that's a big enough sum that that's going to be

10   meaningful.

11               So, Mr. Libby, any other comment about that?

12               MR. LIBBY:  No, Your Honor.  So far as I understand

13   it, to be sure we're talking about the number, ████ on the

14   401(k)?

15               THE COURT:  Yes.  I think I'm going to do what the

16   government talks about in footnote 2, entering a restraining

17   order directing that the investment portfolios be restrained

18   pending the outcome of the case.  They're considered

19   encumbered for purposes of bail subject to declaration of

20   forfeiture on failure to appear under 18 U.S.C. Section

21   3146(d).  And I'll ask the parties to work together to

22   effectuate that.

23               And I would like Mr. Humad to be able to invest or

24   whatever else it is he needs to do without withdrawing money

25   from the accounts.

1        MR. LIBBY:  So I'm clear, Your Honor, if I may.

2        THE COURT:  Yes.

3        MR. LIBBY:  The ███ is the number.  And it's

4   spread somehow jointly, severally across the 401(k) and the

5   investment accounts.

6        THE COURT:  No.  I thought the 401(k) retirement

7   account had roughly ███████ in it.

8        MR. LIBBY:  So we're talking 401(k)?

9        THE COURT:  Yes.

10        MR. LIBBY:  Not any general investment accounts?

11        THE COURT:  Correct.

12        MR. LIBBY:  Okay.

13        MR. LAZARUS:  And, Your Honor, with respect to the

14   401(k), I'll obviously work with counsel.  I'll need the

15   particulars of that account.  I understand its value is just

16   shy of the ███ as reported in the papers.  I would just ask

17   for the sake of clarity, and I think it meets what the Court

18   is directing, that we simply restrain that account in its

19   entirety without including any figures or facts.

20        So instead of saying ███████, if that rises and

21   we're arguing over $2,000 at the end of the day.  It will be

22   easier, if it's okay, if we just restrain that retirement

23   account.

24        MR. LIBBY:  David, it has to have a figure.  And it

25   has to have ███████ as the Court has concluded.

1          MR. LAZARUS:  I will say it does not need a figure.

2     It's just the account itself.

3          THE COURT:  I think we'll just do the account.  As

4     of today, I don't want any money withdrawn from that account.

5     If the account rises to a higher level, then that's going to

6     be seized over time if it appreciates.

7          MR. LIBBY:  So the restraining order as to the

8     entirety of the account and the reference to ████████

9     means --

10          THE COURT:  So here's the idea, Mr. Libby.  I'm

11     assuming over time his apartment will appreciate.  Let's hope

12     so for everyone's sake, and also that his investment account

13     will appreciate.  And so as his net worth rises, assuming

14     this case takes a year or two, then so will his 401(k) rise.

15     And so will the amount that the government is going to be

16     entitled to seize if he flees.

17          So the 401(k) is sort of frozen right now except he

18     can work within it if he needs to.  Whatever is in there

19     belongs to the government if he doesn't show up for court as

20     he's required to.

21          MR. LIBBY:  I'm trying to square that with the

22     ████████ figure, Your Honor.

23          THE COURT:  I believe there's roughly ████████ in

24     that account now.  So the account is seized as of today.  And

25     then that's approximately how much he'll be on the hook for

1    if he doesn't come to court.  But if it's worth a lot more

2    than that, the government is going to seize a lot more than

3    that.

4              MR. LIBBY:  So the principal figure is going to be

5    ██████████ or is going to fluctuate over time?  I'm trying to

6    be clear.

7              THE COURT:  It will fluctuate over time, I presume.

8              MR. LIBBY:  So it's account specific, not a number

9    within that account specific?

10             THE COURT:  Right.

11             MR. LIBBY:  Okay.  I understand.

12             THE COURT:  Is there anything else I can do for

13   anyone today.

14             MR. WEINREB:  Your Honor, William Weinreb on behalf

15   of Dr. Kingsley Chin.  I obviously have nothing to say about

16   Mr. Humad's bail.  We're also awaiting a decision from the

17   Court on bond.  If we could schedule a time for that.  We're

18   eager -- as the Court knows, it kept Dr. Chin under his

19   preexisting conditions pending a decision on a bond by this

20   Court.  And one of those conditions is that he can't travel,

21   and he's really struggling to try to keep his medical

22   practice going, and that's hindered by the restriction on

23   travel.  So we'd just like to get that resolved.

24             THE COURT:  Okay.  You need to set up a hearing on

25   that.

1          MR. WEINREB:  We both submitted arguments in our

2    papers.  It's really at the Court's discretion.  If the Court

3    wants a hearing, we're more than happy to argue it in person.

4    If the Court is inclined to decide it on the papers, that's

5    -- of course the government has a say in that, too.  I think

6    the parties are in agreement, and Mr. Lazarus will correct me

7    if I'm saying this wrong, but I think the parties are in

8    agreement on the conditions other than the amount of a bond

9    or the degree to what the security for a bond should be.

10          MR. LAZARUS:  Your Honor, I wasn't expecting to go

11   into the substance of this right now.  I think Mr. Weinreb is

12   going to be no doubt correct that there are a number of areas

13   that we do agree on.  I don't have it in front of me.  And I

14   don't doubt that it's probably all of them except sort of how

15   we're going to secure his appearance.

16          We're fine if the Court would like a hearing,

17   obviously we'll be there.  Whatever would assist the Court.

18   We're also fine resting on our papers.  I'm just not prepared

19   to argue the substance of it right now.  If the Court was

20   inclined, I would just ask for five minutes so I could

21   address it now.

22          THE COURT:  If we were to have a brief hearing in a

23   few minutes, do you care if Dr. Chin is not here, Mr.

24   Weinreb?

25          MR. WEINREB:  No, he would waive his appearance.

1   If we could address it today, I think that would be fine.

2   He's already told me that he's happy to have the argument

3   without him.

4            THE COURT:  I don't want to ambush you,

5   Mr. Lazarus.  Why don't we take a break until 10 past 2 and

6   you can come back.  Is that okay with you, Mr. Lazarus, and

7   then we'll see, can we just square some things away or do we

8   need to set another hearing?

9            MR. LAZARUS:  That's plenty of time, Your Honor,

10  and I appreciate it.  If I could just say one more thing as

11  to the hearing as to Mr. Humad.  The government heard the

12  Court say the hearing is not sealed, and we think the hearing

13  should not be sealed.  If Mr. Libby would like to redact any

14  portions of the transcript where I mentioned specific

15  figures, I have no objection to that.

16           MR. LIBBY:  I would actually like to do that, if

17  the Court please.

18           THE COURT:  So I think we'll ask that a transcript

19  be prepared.  Let's put it under seal for now.  We'll ask

20  that the transcript be prepared, and then we'll let the

21  parties look at it and see if they want to propose

22  redactions.  Okay?  And we'll keep it under seal in the

23  meantime.

24           MR. LAZARUS:  Thank you, Your Honor.

25           THE COURT:  Okay.  So we'll take a break now until

1    about 10 past 2.  Let's say quarter past 2.  And then we'll

2    just resume on this same Zoom.  I'm going to turn off my

3    video and sound, and I'm going to turn it back on in about 15

4    minutes.

5             MR. LIBBY:  Thank you, Judge.

6             THE COURT:  And we definitely can -- or you can

7    call me on my cell phone, Mr. Viera, if you want to talk.

8             THE CLERK:  Okay, Judge.  Thank you.

9             (Recess taken.)

10            THE COURT:  So Leo, do you want to call this part

11   of the case.

12            THE CLERK:  Today is Wednesday, October 6, 2021.

13   We are on the record in criminal case number 21-10256, The

14   United States versus Humad.  The Honorable M. Page Kelley

15   presiding.  Would counsel identify themselves for the record.

16            MR. LAZARUS:  David Lazarus and David Derusha on

17   behalf of the United States, Your Honor.

18            THE COURT:  Okay.  Thank you.

19            MR. WEINREB:  Good afternoon, Your Honor.  William

20   Weinreb on behalf of Dr. Kingsley Chin.

21            THE COURT:  So now we are here to talk about

22   Dr. Kingsley Chin's further conditions of release.  I note on

23   the docket it's a sealed document number 30 on page 1.  The

24   parties including U.S. probation have agreed to a no contact

25   order that has four parts.  I'm not going to read them into

1    the record, but it's on page 1, and we will incorporate that

2    into the conditions of release, which I think Dr. Chin will

3    need to sign again at some point since they've changed.

4            With regard to the secured bond, I note in the

5    sealed order it has the government's position, and then it

6    has the defense position. ██████████████████████████

7    ████████████████████████████████████████████████

8    ██████████████████████████████████████████████

9    ████████████████████████████████████████

10   ██████████████████

11           I think you've done a fabulous job, Attorney

12   Weinreb, talking about his background and his strong ties to

13   the community, but I'm inclined to just encumber the home as

14   the government suggests so that he can't further indebt the

15   home, and whatever equity is in the home would go to the

16   government if he flees as the government sets out there.

17   Knowing that that's kind of my inclination, I'm happy to hear

18   you on that.

19           MR. WEINREB:  Your Honor, I just want to clarify

20   that the statements that were submitted on -- that the

21   government attached its exhibits to that joint memorandum

22   include his equity in KIC Ventures as part of his net worth,

23   but the number we presented doesn't include it.  I don't

24   think that the government, as far as I know, is disputing the

25   fact that that is essentially illiquid.  That has potential

1    value, but it has no actual -- it's not like a liquid asset.

2    He can't cash in part of it on the market.  He owns shares in

3    some of these companies, but they're not registered with the

4    SEC because it's not a public company.  They're just start

5    ups.

6         The remainder of his net worth, really all he -- he

7    has plowed all of his money into those companies, and they

8    are worth a lot.  Even though it has gone down quite a bit

9    because of the pandemic, we're not disputing that their book

10   value is considerable.  But his actual assets that he can use

11   to, among other things, fund his children's food and clothing

12   and not to mention his defense in this case are money that he

13   can borrow -- money that he earns, money that he can get paid

14   from whatever income those companies are earning, and money

15   that he can borrow against his assets.

16        And to that extent his assets are the house here,

17   which is already quite encumbered, and this piece of property

18   in Jamaica, which is also quite encumbered.

19        The question is, as you put it yourself the last

20   time we were here, not what will give the government security

21   that it will get a certain amount of money if he flees, which

22   is not the purpose of the bail statute obviously.  It's what

23   gives him a sufficient incentive not to flee irrespective of

24   what the government gets to collect at the end of the day.

25   An amount that is tantamount to a quarter of what he actually

1    has at his disposal is a very significant amount under the

2    circumstances.

3           Part of the basis for this argument that we have

4    made and the number that we have proposed is that if he is

5    able to borrow more against his house, and that's a question

6    mark, that's something he ought to be able to do.  The bail

7    statute isn't here to enrich the government.  It's simply to

8    ensure that he won't flee.  To the extent that he's got

9    assets and he's able it use them for other purposes, he's

10   supposed to be able to do that.  The statute says that it's

11   got to be the least restrictive condition, not the one that

12   is the 100 percent.  It's supposed to be the least

13   restrictive condition that will reasonably assure his

14   appearance.

15          So I think what the government is asking for is the

16   most.  Pretty much a million dollars bond secured by

17   potentially of up to a million dollars of equity in his

18   house, ███████████████████████████████.  It just

19   doesn't seem to match what the statute calls for.

20          THE COURT:  How much equity does he have in his

21   house right now?  Is it about 250?

22          MR. WEINREB:  In the house in Florida, we don't

23   have a recent appraisal.  The parties are relying on Zillow

24   and Redfin to give them a good -- And based on the Redfin

25   estimate, which is the higher one, which we're willing to

accept, it's about 400,000.  And then for the property in
Jamaica, there actually was an appraisal that was done pretty
recently.  If the Court were inclined, you could Google
what's happened with real estate prices in Jamaica.  It looks
like they've stayed about steady since then.  So the Court
can take judicial notice about that.  That one's got about, I
think, 200K or so in equity.  That's the equity that he's got
on those two properties.

THE COURT:  Mr. Lazarus, if you can just answer
this question, then I'm happy to hear you.  Let's say we just
did a $500,000 lien against the house.  Are you making some
kind of argument in your papers that that still allows him to
borrow against the house so that that could encroach on the
500,000?

MR. LAZARUS:  No, Your Honor.  If the lien against
the property is for $500,000, then as soon as that's
recorded, we have our place in line at 500,000 of the equity.
If anything that he borrows after that, if somebody thinks
there's more equity and they want to lend to him behind the
$500,000, that wouldn't encroach on our $500,000.

So if the Court is inclined to enter an order
restraining up to $500,000 of equity in the property or
securing it that way, that would accomplish that.  I would
just note that the contents of the three different financial
documents the Court has to consider with respect to Dr. Chin

1    is very important.  The first two documents, I think it's

2    Exhibits 1 and 2 or 2 and 3, to the joint filing, but they're

3    the government's exhibits, are documents that were signed by

4    the defendant when he was trying to get credit. █████████

5    ████████████████████████████████████████████████

6        Now when the defendant is before the Court, he

7    would have the Court completely disregard that he owns 99

8    point something percent of this portfolio of companies that

9    Mr. Humad has told the Court repeatedly he's out raising

10   money for around the country.

11       And so the idea that there's this illiquid asset of

12   a company ████████████████████████ that he can't touch

13   or get money out of is not necessarily the reality of how

14   that asset works.  It can't be sold in a Fidelity account

15   this afternoon, but they're out raising money. ████████

16   ████████████████████████████████████████████████

17   ████████████████████      ████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████      ████████████████

22   ████████████████████████████████████

23   ████████████

24       So there are not these assets that are just

25   floating out there nebulously on a piece of paper with

25

1    nothing behind them.  We've told the Court before that there

2    has been millions of dollars that have flown through the

3    accounts for these companies.  But they have to be

4    considered.

5            All that being said, if the Court would enter an

6    order up to $500,000, that would secure up to that amount

7    from his home.

8            THE COURT:  So I am curious, Mr. Weinreb, on the

9    government's exhibit that they've attached to their motion,

10   which is document 30-1 at page 14, he lists the current value

11   of his personal residence, ██████.  Marketable

12   securities, ██████████.  Real estate investments, ██

13   ██████.  So I'm not quite sure what's happened to all of

14   that.

15           MR. WEINREB:  The marketable securities line is

16   where he put what's in KIC Ventures.  If you look at the

17   form, it doesn't have options for unmarketable securities or

18   for more complicated interest.  But these are banks.  They're

19   sophisticated entities.  This was his simply disclosing what

20   he's got.  It's the same thing before this Court.

21           It is true that, you know, Mr. Humad and Mr. Chin

22   are trying to raise money for those companies.  They have not

23   kept that as a secret from the government.  █████████

24   ████████████████████████    ██████████████

25   ████████████████████    ████████████    ██████

2    As for the real estate value, when you're applying

3 for a bank loan, you've got to be careful not to overstate

4 the value of your home.  If you listed there's less real

5 estate equity than he is telling this Court that he has

6 because it's mixing apples and oranges.  I think there's full

7 disclosure.  Nobody is hiding anything here.  He wasn't

8 hiding anything from the banks.  We're not hiding anything

9 from the government.  It's all out there.

10    We agree.  These are companies that have valuable

11 technology, valuable products.  Dr. Chin and Mr. Humad

12 certainly hope that they will -- that value will one day

13 become liquid.  But now that the government has indicted both

14 of them, who knows if that's ever going to happen.  Even if

15 they hadn't indicted them, it's just the nature of these

16 things, that it could take -- it's not that easy to sell a

17 company.

18    In that sense they're not liquid assets, and I

19 don't think there's any serious dispute about that.  So yes,

20 he owns them.  But no, they're not assets that he can use as

21 if they were money.

22    THE COURT:  I'm going to order the $500,000 in his

23 home to be posted.  Let's say a $500,000 secured bond against

24 the Florida residence.  I'll leave it to the parties to work

25 out -- Well, Mr. Weinreb, you know how to perfect that and

1   get those papers in.  How much time would you like to get the

2   papers in?

3            MR. WEINREB:  It depends how extensive we're going

4   to have to get.

5            THE COURT:  I think we're happy to use a Zillow

6   estimate.  I think everyone is doing that now.  You don't

7   have to get a formal appraisal of the residence because I

8   think that's really time consuming and expensive.  And I

9   think the Zillow or Redfin or some kind of estimate like that

10  is fine.

11           MR. WEINREB:  I would say, not to give the

12  overworked civil servants here extra work, but if Mr. Lazarus

13  would be kind enough to give me whatever forms he believes is

14  sufficient.

15           THE COURT:  They're on the website.  They're on our

16  website.  If you can't find them, let us know and we'll see

17  what we can do.  They were on the old website.  I don't know

18  about the new website.  Good luck finding it on the new

19  website.  They were on there before.

20           MR. WEINREB:  The actual filing of everything,

21  we'll get that the done within a week.

22           THE COURT:  Okay.  Let's say within a week.  If it

23  turns out you need more time, that's fine.  Just file

24  something.  But I think within a week is good.

25           MR. WEINREB:  Thank you.  And then we've addressed

1    the no contact order.  So the Court had indicated that

2    several of the other conditions that are in effect in

3    Florida, namely, the curfew and the bracelet would be -- the

4    need for those would be obviated once the bond was in place.

5    So we'd ask that those conditions be removed.

6           THE COURT:  So that we don't have to keep doing

7    multiple versions of the conditions, we'll just keep

8    everything as it is right now.  You post the bond.  As soon

9    as the bond is posted, I'll go through and remove the curfew

10   and the bracelet.  And then we'll add in the other things I

11   talked about today about no contact and the bond obviously on

12   the conditions.  And then that will finally be the

13   conditions.

14          Did the parties negotiate any further Dr. Chin's

15   travel to Jamaica to do spinal surgery there, Mr. Lazarus?

16          MR. LAZARUS:  The government remains opposed to it,

17   Your Honor.  I understood at the prior court hearing that it

18   sounded like the Court had decided to allow that if you were

19   satisfied that he had a legitimate need to go there.  We

20   still think that's a very real flight risk.  The

21   international travel in particular we would oppose.  But I

22   understood the Court had previously addressed that.

23          MR. WEINREB:  Just to remind the Court.  He goes

24   there about once or twice a month to perform spine surgery.

25   The Court wanted some kind of documentation that he actually

did that.  So we submitted his medical license and the lease
for his office, his clinical office in Jamaica to demonstrate
that he does practice medicine there.  Just as a reminder, we
believe he's the only spine surgeon in Jamaica certified to
do spine surgery.  He's an important resource there.

        And then the other request we have, right now his
travel is restricted to Florida and the District of
Massachusetts.  And we had asked that that be changed to the
continental United States.  He has licenses to practice
medicine in other states, in particular Arizona, where he
also currently has an office.  It's hard to practice medicine
when the government has indicted you.  It's obviously not
great advertising for your practice, but we are hopeful that
he is going to be able to overcome that and continue
practicing here.  I don't know that it would affect anything
in Jamaica.

        THE COURT:  I'm just trying to find the place where
you filed those things because I did look at them when you
filed them.

        MR. WEINREB:  I believe I captioned it
Supplemental -- let me pull up the docket here to see if I
can find it myself.

        THE COURT:  I think it's number 30.

        MR. WEINREB:  I don't think it's 30.

        MR. LAZARUS:  It appears to be 29.

1          THE COURT:  I see.  It is 29.  Thanks.  We've got

2    medical licenses that show that he does have medical

3    licenses.  I guess my question is is he under review?  Are

4    they pulling any of these?

5          MR. WEINREB:  I should have said this at the outset

6    of the hearing which is we filed some of these matters under

7    seal with the Court's permission, and we'd just ask for the

8    same opportunity to redact the transcript with respect to

9    matters that ordinarily wouldn't be matters of public record.

10   That's, in part, the financial details of his company and

11   what it's worth and all of that.



1 ████████████████████████████████ ██████████

2 ██████████████████████ ████████████████████

3 ████████████████████████████████████

4 ██████████████████████ ████████████████

5 ████████████████████ ████████████████████████

6 ██████████ ████████████████████

7          THE COURT:  Thank you.  I guess my concern about

8 the travel is the government's objection to his going to

9 Jamaica.  If he's the only spine surgeon there, and he goes

10 there, I thought last time it was once a month, now it's

11 twice a month to perform spine surgery.  I guess I see that

12 he's rented a place there, but I don't really see any

13 evidence of his being the only spine surgeon or that he's

14 performing spine surgery there somewhere.  I get it that he's

15 renting an office there.  Does he have --

16          MR. WEINREB:  It is listed on the lease as a

17 clinical office.  That's at the very end of the document.

18 But it's not like a --

19          THE COURT:  Does he perform spine surgery in his

20 office?

21          MR. WEINREB:  I believe the office is effectively

22 like an ASC, ambulatory surgical center.  Unfortunately,

23 because he's not here, I can't clarify with him.  But my

24 understanding is that he can do these surgeries, it's not

25 exactly outpatient, but he can do them outside of a hospital.

1    As for his being the only spine surgeon, I'm not sure exactly

2    how we would prove that.  I think that's probably something

3    you just know if you're a spine surgeon in Jamaica that you

4    don't have any colleagues there doing the same thing.

5            I'm not sure the government disputes that he

6    performs spine surgery in Jamaica.  If it does or has a

7    question about it, I can try to get further documentation of

8    it.

9            MR. LAZARUS:  I was going to say I have no idea

10   what he's doing in Jamaica right now.  I know from looking at

11   documents in the past he's had various professional contacts

12   with Jamaica, and he's also had personal contacts with

13   Jamaica.  I don't have any reason not to believe Mr. Weinreb

14   of course.  I just have no idea as I sit here what Dr. Chin

15   is or is not doing in Jamaica.

16           THE COURT:  I guess another issue would be let's

17   say he somehow flees to Jamaica and he has property there,

18   etc., I don't really think it would be that hard to fine find

19   him in Jamaica, right, Attorney Lazarus?

20           MR. LAZARUS:  We've successfully located and

21   extradited fugitives in Jamaica in the past.  The marshals

22   are very good at their job.  Once he's in Jamaica, however,

23   he's outside the purview of the United States.  So anywhere

24   he chooses to go from there, noting of course that it is an

25   island, and there are other islands nearby.  So who knows?

1    The risk is not as much that he would disappear in Jamaica

2    which is a risk with some countries.  The risk is that once

3    he's in Jamaica, there's no more control, that he can go

4    wherever he wants.

5              THE COURT:  I do think he seems to have a lot of

6    ties to the United States including this home here that he

7    would lose, his family, children.  He seems to be in a lot of

8    trouble, but he's fairly well known.  It seems like he does

9    have a lot of earning potential, whether he gets in trouble

10   on this case or not.

11             So I'm inclined to let him go to Jamaica if he's

12   performing spine surgery there.  I think we might keep this

13   to once a month though, Attorney Weinreb.  And I see that

14   you're nodding.  Because I think that's what you were saying

15   last time.

16             MR. WEINREB:  I may have said that.  My memory is

17   what he told me was once or twice a month.  I'm sure once is

18   going to be sufficient given the circumstances he's under.

19             THE COURT:  Why does he need to travel all over the

20   United States?  I know he has licenses in various states.

21             MR. WEINREB:  Well, he has two forms of earned

22   income.  One of which is actually performing, being a doctor

23   or treating patients.  And the other is teaching physicians

24   how to do particular spine surgical techniques, just

25   techniques themselves and others involving surgical implants.

1    That's pretty common.  As the Court may know, in the medical

2    device industry, that's extremely common.  And I believe some

3    of these techniques are of sufficient difficulty and

4    sophistication that the doctors can't even get certified to

5    do them unless somebody like him who knows how to do them and

6    is able to be there to not only teach them but kind of

7    proctor, be present for the whole thing.  And that occurs in

8    a lot of different places, and it's not limited to the places

9    where he has a medical license.

10           There seems to be little reason -- I understand,

11    where it says the continental United States, I never really

12    understood why Hawaii and Alaska are such a flight risk.  Be

13    that as it may, I don't think he's got any business there.

14    So the continental United States is not an unusual travel

15    limitation in white collar cases like these.  I just think it

16    will be vastly simpler for probation and for the Court if

17    that's the limitation as opposed to a list of states.

18           He might have a connecting flight through a state.

19    Again, it's supposed to be the least restrictive set of

20    conditions that will reasonably assure his appearance and not

21    the theoretical ideal.

22           THE COURT:  I'm inclined to allow business-related-

23    only travel throughout the continental United States and to

24    Jamaica once a month with notice and explanation to probation

25    so they know where he is.  So we'll do all this once you get

1    the bond posted, Mr. Weinreb.  And once the conditions go up,

2    then he'll need to review them and sign them again.  And you

3    can take a look at them, and you, too, Mr. Lazarus and see if

4    you have any tweaks you want to do before he signs them.

5            MR. WEINREB:  Very well.

6            THE COURT:  So thank you both very much.  If

7    there's nothing else, we'll terminate the hearing.  Thank

8    you.

9            (Court recessed at 2:40 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    - - - - - - - - - - -

 2                       CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5     transcript of the record of proceedings in the above-entitled

 6     matter to the best of my skill and ability.

 7

 8

 9

10     /s/ Joan M. Daly                December 8, 2021

11

12     _____            _____

13     Joan M. Daly, RMR, CRR          Date
       Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```