# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 1:21-cr-10256-RWZ |
| ) | |
| KINGSLEY R. CHIN, ) | |
| ADITYA HUMAD, and ) | |
| SPINEFRONTIER, INC., ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' MOTION TO COMPEL DISCOVERY

Defendants Kingsley R. Chin, Aditya Humad, and SpineFrontier, Inc. respectfully submit this motion to compel discovery from the government pursuant to Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure, Local Rule 116.1(c) of the Local Rules of this Court, and the Fifth and Sixth Amendments to the United States Constitution.

Specifically, defendants request that the Court issue an Order compelling the government (1) to search the entirety of the contents of Jason Montone's seized phone for discoverable information, and (2) to provide the information that the defendants have requested concerning the interactions between the criminal and civil teams representing the government, which is required as a matter of due process in connection with the underlying parallel investigations and consistent with *Brady* obligations, particularly given the overlap of fact witnesses (and overlap in the interactions with fact witnesses) in the civil and criminal cases.

**Preliminary Statement**

The Indictment in this action (ECF No. 1) charges the defendants with violating the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and related charges. The government asserts that the defendants made or are responsible for unlawful payments to surgeons,

characterized as consulting payments but allegedly made to encourage use of surgical products offered by defendant SpineFrontier, Inc., including in surgeries paid for by federal health care programs. Defendants Chin and Humad are alleged to have controlled SpineFrontier and been responsible for the payments.

As part of its prosecution theories, the government contends that surgeons who received payments did not perform actual consulting. The government's theories create issues about the roles the surgeons played, their statements, and their culpability. According to the government, these surgeons received improper payments that affected how they treated patients and billed for their services. But many of these surgeons never faced any actual criminal charges. In defending the case, one example of a possible defense theory would be that these surgeons – not the defendants – were responsible for failing to perform contemplated consulting roles. After all, the government has made serious implied accusations against these surgeons concerning their professional integrity.

Defendants are also entitled to explore *fully* any facts that would support defenses relating to the surgeons' interactions with civil and criminal prosecution and investigation teams, and how parallel investigations by multiple government agencies may have affected those surgeons and the stories that emerged. In short, the defense is entitled to learn about communications with and about these witnesses that implicate such matters.

In one particular instance, the government has acknowledged that it possesses material from a cooperating witness, surgeon Jason Montone, that it refuses to produce or even to search for discoverable information, including potential *Brady* material. The government offers as an excuse for its refusal an agreement it reached with the cooperator to limit the scope of its review, purportedly for the purpose of shielding potentially privileged communications between the

cooperator and his counsel. Once the government has taken possession of materials, however, the government cannot rely on an agreement with a third-party to avoid its obligations to defendants under the Due Process Clause or applicable discovery rules. In another case, this Court has previously considered and squarely rejected the government's effort to do so.

Furthermore, because the government claims not to have reviewed the material in its possession, the government cannot simultaneously verify that any communications are actually privileged or that it does not possess exculpatory material. And even if the communications at issue would otherwise have been privileged, the cooperator's decision to voluntarily place them in the hands of the government would waive any such protection. Nothing in the applicable rules allows the government to confine its search of materials *in its possession* in this manner. The defendants are entitled to know if the materials the government possesses contain discoverable information, including *Brady* material.

The government is also refusing to provide information concerning interactions between its prosecution team in this action and the team that investigated and pursued the related civil case against the same defendants based on the same allegations. Denied such discovery, the defendants are unable to assess fully whether the two teams' interactions crossed the line between routine and permissible sharing of information in parallel proceedings and impermissible intermingling of civil and criminal matters, particularly with respect to the government's interactions with the surgeons at issue and information concerning the culpability of each surgeon.

Unique circumstances provide more than sufficient bases for discovery into this topic. Two lawyers for the government have appeared in both cases, entering appearances in the civil case, withdrawing from that case, and then appearing in the criminal case. In discussions

concerning the potential resolution of the civil case, the government made demands for extensive factual admissions in a manner and at a time, pre-indictment, that suggested the civil attorneys might have been attempting to obtain admissions through the civil action for the purpose of providing prosecutors with evidence for use in a later criminal case against the same defendants. The timing of the eventual indictment is also suspicious, coming mere days after settlement discussions in the civil case had broken down, suggesting potential use of the indictment to pressure the defendants into changing their positions on settlement of the civil case (which is, ultimately, what happened). The possibility that criminal charges might have been used improperly for a civil advantage is further suggested by evidence that either a civil or criminal government attorney, or both, told a surgeon-witness and alleged (but unindicted) co-conspirator that he would not be charged if he entered into an acceptable resolution of civil claims.

In combination, this information at least warrants further investigation, beginning with the limited discovery the defendants have sought concerning interactions between the government's criminal and civil teams, and the overlap in their interactions with potentially culpable surgeons.

## Discussion

I.  **The Government Should Be Compelled to Search the Entirety of the Contents of its Cooperating Witness's Phone and Produce Any Discoverable Material from That Search.**

The Indictment lists alleged co-conspirators who are not defendants in this action. Among them is Jason Montone, a surgeon identified in the Indictment both by name and as "Surgeon 1." Allegations concerning Montone's role, including allegations that he received unlawful payments from the defendants, appear throughout the Indictment. (*See, e.g.*, Indictment ¶¶ 5, 29-31, 34-36, 37(a)-(b), 37(d)-(i), 38(a)-(b), 38(k), 38(s), 42.) The government has also listed Montone as an unidentified co-conspirator pursuant to Local Rule 116.1(C)(1)(e). (*See*

Exhibit A hereto [October 5, 2021 Discovery Letter].) In addition to alleging that Montone accepted illegal payments, the government has also charged him with, and he has pled guilty to, obstructing a criminal investigation, including by creating and providing the government with false documents.[1] *See United States v. Montone*, No. 1:20-cr-10159-WGY-1 (D. Mass.) (ECF No. 1, ¶ 21).

Montone was charged by information in a separate proceeding before this Court, waived indictment and pled guilty on October 30, 2020, and his sentencing has been repeatedly deferred over the nearly three years since his guilty plea. *See id.* (ECF Nos. 3, 14, 24, 35, 39, 47). He thus appears to be serving as a cooperating witness for the government. Given the manner in which the government appears to be using Montone for this action, he is highly likely to have possessed or generated discoverable information, and likely had contact with government attorneys who in turn have appeared in both the civil and criminal actions. Information concerning Montone's culpability is critically relevant to a possible theory of the defense.

Through a series of discovery letters, the government revealed that it had collected a copy of the full contents of Montone's cell phone, but is refusing to fully search those contents and produce any discoverable information from the excluded portions. Specifically, the government reported the following:

> Dr. Montone **consensually** provided a copy of his cell phone to the government and, through counsel, identified phone numbers of his attorneys so that those communications could be segregated from the investigatory team. The investigatory team has not accessed **or reviewed** data from Dr. Montone's cell phone other than this report [which excludes content exchanged with the identified phone numbers], due to the presence of privileged communications.

---

[1] The government has not alleged that the defendants here had any involvement in Montone's alleged obstruction.

(Exhibit B [June 15, 2022 Discovery Letter] (emphases added).) Presumably, the government used a grand jury subpoena or search warrant, but it has not even made clear whether any agreement reached with Montone limited what the subpoena or search warrant contemplated as responsive or subject to seizure. The reference to "investigatory team" in the government's above-quoted report lacks specificity about the full members of the "team" and the timing of their activities.

Because the entirety of the phone's contents is in the government's possession – and was voluntarily given to the government by its cooperating witness – the defendants requested that the government search the *entirety* of the phone's contents, including those that the government had not yet reviewed out of supposed concerns for Montone's potential privilege. (*See* ECF No. 96 [February 28, 2023 Discovery Letter], item 5.) The government refused, relying on its agreement with Montone to "segregate" some of the material on the phone. (Exhibit C [March 14, 2023 Letter], item 5; ECF No. 99 [April 3, 2023 Letter]; Exhibit D [April 18, 2023 Letter].) The government's position, as the defendants understand it, is that the government cannot review the material it excluded from its prior search because of the agreement it reached with Montone.

Not only is the government authorized to review the material it excluded, discovery rules *require* it to do so. The government's position raises two general issues. First, the government appears to be treating the excluded material as outside its discovery obligations generally. That position is untenable, as this Court has previously held, because the material is in the government's possession. Second, the government takes the position that the material, even if otherwise subject to discovery obligations, remains privileged. That position, as well, cannot succeed, as (1) the government cannot determine whether the contents of the communications are actually privileged without looking at those communications, and (2) Montone waived any

6

privilege when he voluntarily disclosed the material to the government. Indeed, Montone and his counsel knew (or, at least, should have known) that doing so would require the government to review and to produce the material if necessary to comply with its *Brady* obligations or other discovery obligations to the defendants.

With respect to the first issue – whether the material is subject to discovery obligations generally – this is not the first time prosecutors in this District have attempted to exempt materials in their possession from the government's discovery obligations, including *Brady* obligations, based on the government having reached an agreement with the materials' owners to which the defendants were not parties. This Court previously rejected that position in *United States v. Gibson*, No. 15-cr-10323-IT, 2016 WL 3248206, at *2 (D. Mass. June 10, 2016), *objections overruled and order amended by*, No. 15-cr-10323-IT, 2016 WL 3566198 (D. Mass. June 24, 2016). In *Gibson*, the government chose to take possession of a law firm's server, subject to a limited-access agreement with the law firm's counsel. The government then attempted to shield from its Rule 16 obligations to defendants any materials from the server that the law firm did not consent to being reviewed. The Court held that the agreement to limited access did not protect the server from being deemed within the government's possession for Rule 16 purposes, as the material was "within the physical custody of the government." *Id.* at *2. Accordingly, the Court found that the material was subject to the government's discovery obligations notwithstanding the agreement of limited access, but with protocols to protect the privileged materials belonging to the law firm's clients, whose information had been placed into the hands of the government by the law firm. Any material over which the law firm maintained a claim of privilege was required to be entered onto a privilege log to be provided to the defense. *Id.* at *2-3. Similarly, here, the government cannot evade its discovery obligations for materials it

concedes are in its actual possession by relying on a quasi-private agreement it reached with a cooperating witness (without the defendants' involvement or knowledge) not to review such materials.

Nor can the government avoid its obligations by invoking another's (i.e., Montone's) potential privilege. As an initial matter, the government has made clear that it simply excluded all communications involving Montone and his counsel, without making any item-by-item assessment of whether such communications might actually be privileged or contain *Brady* information that could trump any potential privilege. Not all communications involving an attorney and client are privileged. Privilege can be abrogated if third parties are included in the communication. *See, e.g.*, *Cavallaro v. United States*, 284 F.3d 236, 246-47 (1st Cir. 2002). Further, to qualify for privilege, the communication must specifically be "for the purpose of obtaining legal advice." *City of Springfield v. Rexnord Corp.*, 196 F.R.D. 7, 8 (D. Mass. 2000) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). In addition, "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn*, 449 U.S. at 395. As a result, privilege may not apply to communications where "an attorney is merely conveying to his client the substance of what a third party has conveyed." *TVT Recs., Inc. v. Island Def Jam Music Grp.*, No. 02 CIV. 6644 (VMDF), 2003 WL 749801, at *2 (S.D.N.Y. Mar. 5, 2003). Thus, to the extent, for example, Montone's counsel may have reported to Montone facts, such as what government lawyers said, such reports may not be privileged. Because the government has refused even to look at certain communications contained within materials in its possession, based on a flawed reliance on its agreement not to do so, the government is unable to make *any* representation to

the Court as to whether any or all such communications actually or even potentially qualify for privilege.

Even more problematic for the government, unlike in *Gibson*, where a law firm and the government ill-advisedly coordinated to put in the government's hands materials that the law firm had an obligation (to its uninvolved clients) to protect, this case involves no privilege that belongs to others not involved in that decision. In contrast to the law firm clients whose information was given to the government without their knowledge or consent, Montone chose to entrust the government with his own (potentially) privileged information. It is axiomatic that "[g]enerally, disclosing attorney-client communications to a third party undermines the privilege." *Cavallaro*, 284 F.3d at 246-47. Not only did Montone voluntarily turn over his potentially privileged communications, but he did so while represented by counsel and in a context that would allow no reasonable person to take comfort that the information would not eventually be shared further. That is, he turned it over in the course of a criminal investigation in which he was agreeing to serve as a cooperating witness against others to whom the government would have obvious disclosure obligations. Any privilege – even if all the communications were actually otherwise entitled to such protection – was waived by Montone's production of those communications in that context. Besides, evidentiary privileges often must fall to "due process, confrontation, and compulsory process clauses" of the Constitution. *United States v. Fuentes-Correa*, Crim. No. 13-71, 2013 WL 588892 at *7 (D.P.R. Feb. 13, 2013) (distinguishing civil context "in a criminal case, where the Government can invoke its evidentiary privileges only at the price of letting the defendant go free" (quotation marks omitted)).

The government should be ordered to produce any material from Montone's phone that is otherwise subject to discovery, regardless of any putative concern for Montone's potential

privilege. At the very least, a review should be conducted and a privilege log provided *if* there is any claim of privilege over specific communications. A blanket failure to review such communications for *Brady* material or other discoverable information cannot be justified.

II. **The Government Should Be Required to Disclose Information Concerning Interactions Between the Criminal and Civil Teams, and Any Overlap in Their Interactions with Witnesses, Particularly Potentially Culpable Surgeons.**

The government has purported to assign two separate teams to litigate this criminal action and the purportedly parallel civil action, *United States v. SpineFrontier, Inc., et al.*, 15-cv-12908-RWZ (D. Mass.). All defendants here are also defendants in that civil action. While some degree of coordination between parallel criminal and civil cases is appropriate, such coordination must not go so far as to produce "a violation of due process or a departure from proper standards in the administration of justice." *United States v. Kordel*, 397 U.S. 1, 11 (1970). Here, however, the government has, at a minimum, blurred the line between the two cases against the defendants in ways that give rise to concerns warranting further inquiry.

Accordingly, the defendants requested certain limited discovery regarding the interaction between the criminal and civil teams:

> Provide an affidavit(s) detailing the nature, extent, substance and timing of your interaction and your case agents' interaction with civil investigators or civil government attorneys, including all communications about the subject of this action between, on the one hand, criminal prosecutors and/or government investigators and, on the other hand, civil government attorneys and/or investigators, along with copies of any substantive written communications.

(ECF No. 96.) The government has refused to provide any such information.

As the government appears to recognize, the degree to which federal prosecutors and federal civil attorneys may permissibly coordinate their related cases against the same defendants is not without limits. The U.S. Attorneys' Manual admonishes that "attorneys should remain mindful of their ethical obligation not to use criminal enforcement authority unfairly to extract,

10

or to attempt to extract, additional civil or administrative monetary payments." U.S. Attorneys' Manual § 1-12.100, available at *https://www.justice.gov/jm/jm-1-12000-coordination-parallel-criminal-civil-regulatory-and-administrative-proceedings#1-12.100*.

In addition, concerns about misuse of grand jury materials arise where civil and criminal teams for the government work too closely on related matters. In rejecting the government's proffered reading of Rule 6(e) that would have automatically allowed prosecutors to share grand jury information with civil attorneys for the government, the Supreme Court held that "Rule 6(e) was never intended to grant free access to grand jury materials to *attorneys not working on the criminal matters* to which the materials pertain." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 429 (1983) (emphasis added). In doing so, the Court reasoned, "[n]ot only is disclosure for civil use unjustified by the considerations supporting prosecutorial access, but it threatens to do affirmative mischief." *Id.*

Consistent with concerns about undue closeness between civil and criminal proceedings, courts have recognized that while parallel investigations and proceedings can be appropriate, they must remain truly parallel, rather than become intertwined: "To be parallel, by definition, the separate investigations should be like the side-by-side train tracks that never intersect." *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1139 (N.D. Ala. 2005). Here, the civil and criminal investigations and cases have, in various ways, been intertwined to an extent that gives rise to concerns that at least warrant further inquiry, beginning with the government disclosing the type of information that the defendants have requested.

As an initial matter, at least two Assistant United States Attorneys have made appearances in both the civil and criminal cases. Those two attorneys worked originally on, and appeared in, the civil matter, later withdrew from that case, and then re-appeared for the

11

government in this criminal action. Specifically, one of those AUSAs appeared for the government in the civil case as early as 2015, withdrew from the civil case in 2020, and then appeared on the Indictment in this action in 2021. (*See* 15-cv-12908-RWZ, ECF No. 11 [Notice of Appearance]; *id.* ECF No. 66 [Notice of Withdrawal]; 21-cr-10256, ECF No. 1 [Indictment].) The other attorney likewise appeared first in the civil action in 2018, withdrew from that action along with his colleague in 2020, and also appeared on the Indictment the following year. (*See* 15-cv-12908-RWZ, ECF No. 36 [Notice of Appearance]; *id.* ECF No. 65 [Notice of Withdrawal]; 21-cr-10256, ECF No. 1 [Indictment].) The defendants are, of course, unable to know whether other attorneys, staff, or agents who have not formally appeared as counsel of record likewise transferred between or otherwise worked on the two actions.

Second, the timing of the indictment in this action, in relation to failed efforts to resolve the civil matter, is at least suspicious. Beginning in January 2021, counsel for the defendants were engaged in settlement discussions with government attorneys about a potential resolution of the civil action. (*See* Declaration of Seth Orkand, filed herewith, ¶ 2.) These settlement discussions accompanied multiple and lengthy extensions of time to file answers to the civil complaint. In several of those discussions, the government insisted that a settlement would require the defendants to make factual admissions consistent with the civil complaint's allegations. In fact, on one such call, held on February 19, 2021, the government declared that because of the defendants' refusal to make such admissions and disagreement on other key terms, the government was pessimistic about the possibility of a settlement. (*Id.* ¶ 3.) During a follow-up call on February 24, 2021, the government reiterated that it did not believe the parties were close to reaching a settlement. (*Id.* ¶ 4.) Discussions did continue for several months, however, which continued to include the government insisting on factual admissions, as late as a

call on April 7, 2021. (*Id.*) The discussions ultimately broke down over the summer of 2021. Specifically, on a June 15, 2021 call, the government stated its view that settlement discussions should not continue given the state of negotiations. (*Id.* ¶ 5.) The defendants requested one more discussion, which led to a final settlement call during the pre-indictment period, held on August 18, 2021. That call did not succeed in breaking the stalemate, and settlement discussions ended. (*Id.*) The defendants were indicted in this action less than two weeks later, on August 30, 2021.

The timing of these events raises at least two concerns. First, the government's adamant insistence on factual admissions to resolve the civil action during the months preceding the indictment strongly suggests that the government may have been attempting to use the civil case, and the prospect of resolving that case, to obtain evidence – in the form of admissions from the defendants – that it then planned to use against the defendants in a criminal proceeding. Indeed, it was not until much later settlement discussions, after the defendants had been indicted, when the government knew that there was no prospect for admissions in light of the defendants' then facing pending criminal charges, that the government finally abandoned its demand for admissions. Second, the government's indictment of the defendants coming only after – and nearly immediately after – the settlement discussions had reached an impasse in August 2021, raises concern that the indictment was used to pressure the defendants to revise their settlement position in the civil case.

In fact, assuming it was the government's strategy to use the criminal indictment to pressure the defendants into a civil settlement, that tactic ultimately succeeded. Facing the prospect of a long and expensive civil proceeding, combined with the need to defend the criminal case, the defendants ultimately re-engaged in settlement discussions in April 2022. When doing so, defense counsel expressly told the government that the defendants felt pressured to attempt

13

again to reach a resolution, to avoid having to defend two separate proceedings, and that the defendants were incentivized to settle by the need to avoid collateral consequences to the criminal case from the civil case. (*Id.* ¶ 6.) With the defendants then facing criminal charges, the parties reached an agreement in principle to resolve the civil action, as reported to the Court on April 14, 2023. (*See* 15-cv-12908-RWZ, ECF No. 124.)

Upon reaching agreement in principle, and further heightening concerns about misuse of parallel proceedings, the government is now using the civil settlement to disadvantage the defense of this criminal action. Despite prosecutors having steadfastly refused to agree that any civil settlement would be inadmissible at trial in this criminal action, in part on the purported ground that the two actions must be kept separate, the civil attorneys for the government have provided a draft settlement agreement that would expressly prohibit the defendants from taking certain positions in this criminal case as to the effect of the civil settlement. Specifically, the government included in a proposed written settlement agreement a term that would require the defendants to waive and not assert in this case any defenses based on the Fifth Amendment's Double Jeopardy Clause or the Eighth Amendment's Excessive Fines Clause as a result of the civil settlement. (*Id.* ¶ 7.) The government's proposed settlement agreement also attempted to require the defendants to release the government from all claims related to its prosecution or investigation of the defendants, including claims based on the investigation and conduct of this criminal action. (*Id.*)

Finally, and perhaps most disturbingly, counsel for one witness has reported that the government expressly tied the avoidance of criminal charges to a favorable civil resolution. Specifically, the government reportedly provided assurances to a witness's counsel that the witness would not be criminally prosecuted *if* he agreed to a civil settlement (which he ultimately

did, and was not thereafter charged). (*Id.* ¶ 8.) Those negotiations of a *civil* settlement were conducted on the government's behalf primarily by two of the government's attorneys who later appeared on the *criminal* team in this matter. (*Id.*) Within the discussions that led to that civil settlement, similar to discussions with other surgeons at issue, exculpatory information would exist in, for example, either admissions by such witnesses of their own misconduct, or statements by them that nothing wrong had occurred.

Government attorneys and investigators have interacted with surgeons and others who are material witnesses, some of whom were at least implicitly accused of accepting payments from the defendants in exchange for using and billing for certain products under allegedly fake consulting agreements. One surgeon has been charged with obstruction of justice. Another was reportedly told that he could avoid criminal charges if he settled civilly. Any threats of prosecution to these witnesses, and any express or implicit understanding about whether they will be prosecuted, are directly relevant to potential theories of the defense. The government built both their civil and criminal cases on these witnesses, all while attempting to structure settlement discussions in the civil case and, at the same time, holding back on the related criminal charges. These matters go to the heart of a theory of the defense that surgeons, not the defendants, are responsible for issues here, if any. The government's obligations to search for and provide *Brady* material are far broader than what they have undertaken. *See United States v. Zhen Zhou Wu*, No. CR. 08-10386-PBS, 2010 WL 817324, at *3 (D. Mass. Mar. 2, 2010) (taking into account the "theory of the defense" and holding, "[a]fter balancing the interests, the interest of the government in frank inter-agency and intra-agency discussion against the particularized needs of the defendants to defend themselves against serious charges, I find this information

should be produced as relevant to defending the charge that defendants willfully exported defense articles designated on the United States Munitions List").

Given the fact that discussions with at least the witness who settled civil claims, and others who faced criminal charges, must have involved interactions between civil and criminal attorneys or investigators, communications by those government attorneys and agents would be reasonably expected to contain exculpatory evidence. Communications between those teams, therefore, are likely to contain evidence as to others' culpability, and other forms of exculpatory evidence.

One recent decision, in the context of a parallel investigation, ordered that the Department of Justice produce the following in the criminal case:

> (1) The CFTC's notes, memoranda, or other documentation from joint interviews conducted with the DOJ;
>
> (2) Presentations, memoranda, communications, and notes relating to joint calls or meetings between Defendants' former employers, on the one hand, and the CFTC and DOJ, on the other, regarding the subject matter of this case;
>
> (3) Documents or memoranda reflecting statements from any jointly interviewed individual concerning Defendants; and
>
> (4) Any exculpatory analyses of trading activity by Defendants or the DOJ's cooperating witness to the extent that such analyses and related data were shared or discussed with the DOJ.

*United States v. Bases*, 549 F. Supp. 3d 822 (N.D. Ill. 2021). Drawing from *Bases*, here the government attorneys and agents who have interacted with surgeons and other witnesses, while cross-pollinating the "parallel" matters, would be expected to have generated comparable witness interviews, meetings, calls, and exculpatory information. At the very least, the government should provide further information, as requested by the defendants.

Another decision in the context of parallel proceedings confirms that *Brady* obligations are much broader than what the government here apparently perceives:

> The USAO will produce to Defendant any communication between the SEC and counsel for Dr. Gilman or counsel for Dr. Ross in which a doctor's counsel makes statements that are materially different from the denials of culpability already produced to Defendant. The USAO's obligation to produce such communications is extended to communications that are in the sole possession of the SEC.
>
> The USAO will also produce to Defendant communications from the SEC to the doctors' counsel, or to Dr. Gilman or Dr. Ross directly, that (1) threaten criminal prosecution of either doctor if he does not implicate Martoma; or (2) promise a non-prosecution agreement to either doctor if he implicates Martoma. The USAO's obligation to produce such communications is extended to communications that are in the sole possession of the SEC.

*United States v. Martoma*, 990 F. Supp. 2d 458, 462 (S.D.N.Y. 2014).

To be clear, through this motion, the defendants are seeking only discovery, not substantive relief such as the exclusion of evidence or dismissal of charges. Rather, the defense seeks to collect additional evidence through discovery about the degree and type of intermingling between the government's prosecution of this action and its pursuit and settlement of the civil action, to build a record of possible prosecutorial misconduct. For now, the defendants seek only to learn more about these matters, through discovery, as there is certainly enough for "reasonable concern about intertwinement." *United States v. Mahaffy*, 446 F. Supp. 2d 115, 127 (E.D.N.Y. 2006).

## CONCLUSION

Based on the foregoing, the defendants respectfully request that the Court issue an order directing the government (1) to search the entirety of the contents of Montone's phone for discoverable information, and (2) to provide the information that the defendants have requested concerning the interactions between the criminal and civil teams representing the government,

and their overlapping interaction with potentially culpable witnesses, which is needed for, among other things, an adequate consideration of *Brady* issues.

                                                  Respectfully submitted,

                                                  /s/ Joshua L. Solomon
                                                  Barry S. Pollack (BBO #642064)
                                                  Joshua L. Solomon (BBO #657761)
                                                  POLLACK SOLOMON DUFFY LLP
                                                  31 St. James Avenue, Suite 940
                                                  Boston, MA 02116
                                                  (617) 439-9800
                                                  bpollack@psdfirm.com
                                                  jsolomon@psdfirm.com

                                                  /s/ Daniel N. Marx
                                                  Daniel N. Marx (BBO #674523)
                                                  William W. Fick (BBO #650562)
                                                  FICK & MARX LLP
                                                  24 Federal Street, 4th Floor
                                                  Boston, MA  02110
                                                  (857) 321-8360
                                                  dmarx@fickmarx.com
                                                  wfick@fickmarx.com

## **Certificate of Service**

      The undersigned certifies that this document, filed through the ECF system, will be electronically served on counsel who are registered users of ECF on July 31, 2023.

                                            /s/ Joshua L. Solomon