## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 1:21-cr-10256-RWZ |
| | ) | |
| KINGSLEY R. CHIN, | ) | |
| ADITYA HUMAD, and | ) | |
| SPINEFRONTIER, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REPLY IN SUPPORT
## OF THEIR MOTION TO COMPEL DISCOVERY

Barry S. Pollack
Joshua L. Solomon
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com
*Counsel for defendants SpineFrontier, Inc. and Kingsley Chin*

William W. Fick
Daniel N. Marx
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com
*Counsel for defendant Aditya Humad*

Defendants Kingsley R. Chin, Aditya Humad, and SpineFrontier, Inc. respectfully submit this reply in further support of their motion to compel discovery from the government, and in response to the government's opposition to that motion.

The government opens its opposition with a recitation of the discovery it has produced, praising itself for the manner in which it organized materials and made them somewhat searchable. What the government may have done right in aspects of discovery says nothing about the two discrete but critical discovery failures on which the motion to compel is based. Nothing in this Court's discovery rules gives the government a pass on its discovery obligations, particularly *Brady* obligations, simply because it claims to have done more than is required with respect to other items. The government may superficially argue that it understands its *Brady* obligations, but its opposition does not refute its failure to appreciate theories of defense in this case based on the interaction of multiple government agencies with material witnesses and each other. Defendants are entitled to more information, including promises or threats to alleged co-conspirators, or, to the extent the government continues to contest the factual scope or impact of joint investigations, to an evidentiary hearing in the alternative.

## I.    The Government Cannot Avoid Producing Discoverable Information from Their Cooperating Witness's Phone.

### A.  The Entirety of Montone's Phone Is in the Government's Possession.

To resist discovery of information from a cooperating witness's phone, the government argues that the Court should refuse to treat as in the government's possession material that the government acknowledges is literally in the government's possession. At best, the government's position actually appears to be that because of an understanding that it reached with counsel for the cooperating witness, material is not in its "control." But the government's obligation to provide discovery is framed in the disjunctive, where possession *or* control triggers obligations.

*See, e.g.*, Fed. R. Crim. P. 16(a)(1)(E)(i) ("Upon a defendant's request, the government must permit the defendant to inspect ... if the item is within the government's possession, custody, ***or*** control and: (i) the item is material to preparing the defense. . . ." (emphasis added)). While "control" might itself be subject to debate, there can be no doubt about – nor does the government contest – the reality that the material is in the government's actual, physical "possession."

By erroneously labeling an express holding and affirmance as *dicta*, the opposition ignores the directly on-point holding and reasoning on this issue from *United States v. Gibson*, 15-cr-10323-IT, 2016 WL 3248206, at *2 (D. Mass. June 10, 2016), *objections overruled and order amended by*, 15-cr-10323-IT, 2016 WL 3566198 (D. Mass. June 24, 2016). As set forth in the defendants' motion, *Gibson* rejected the exact same argument that the government makes here: that because the government reached an agreement with its witness not to look at material that the government possessed, the Court should pretend that the government does not actually possess it. In rejecting that position, the Court held: "First, the Court finds that the entire portion of computer server the government imaged is in its custody, possession or control for discovery purposes." *Gibson*, 2016 WL 3248206, at *2. The opinion further explained that "[n]o party has provided any persuasive authority holding that a protocol agreement such as the one used here can render material which is indisputably physically held and controlled by the government as somehow outside of its custody, possession or control for purposes of its discovery obligations." *Id.* When the third-party owner of the server at issue objected to that ruling by the Magistrate Judge, the District Judge upheld that decision: "Neither the government nor the interveners have provided any authority suggesting that material within the physical custody of the government is not within its 'possession.' Accordingly, the court finds no error in the determination that the

[server] is within the government's possession, custody, or control." *Gibson*, 2016 WL 3566198, at *2.

The Court reached this conclusion despite the government and the third-party in *Gibson* having negotiated a detailed protocol for handling data and potentially privileged materials, which included the government running search terms, but not accessing *anything* on the server without the third-party first reviewing and approving it. *Id.* at *1. Here, the argument for withholding discovery material that a third-party voluntarily gave to the government is even weaker than in *Gibson*. Unlike in *Gibson,* the government has provided the Court with no clear agreement or protocol, but merely with an email from Montone's counsel that identifies his attorneys' contact information "[f]or purposes of protecting any attorney-client privileged text messages or emails on his cell phone." (Oppos. Ex. 1.) This one unsigned email, which does not even purport to bind multiple federal agencies involved in this matter, cannot justify the government's self-serving counterfactual position that it does not "possess" the entirety of Montone's phone.

The opposition offers no answer to *Gibson*'s reasoning and holdings on this point. To the contrary, in that portion of its opposition, the government ignores *Gibson* entirely, save for a footnote in which it attempts to dodge the holdings by labeling them "dicta." The opposition asserts erroneously that the issue was "not squarely litigated" in *Gibson* "because the government there chose instead to *propose* that the defendant address the issue by serving a Rule 17 subpoena on the third-party law firm for specific and admissible evidence." (Oppos. at 4 n.1 (emphasis added).) That claim is a blatant mischaracterization of what happened in *Gibson*, as the government knows, given that the same office litigated and lost that issue there.

The issue of possession was fully, and vigorously, contested as a core issue in *Gibson*. The government's effort to avoid a finding that the server was in the government's possession, by "propos[ing]" a Rule 17 subpoena to the law firm that provided the server instead, ultimately failed when the Court rejected the government's proposal and *held*, repeatedly, that the server was in the government's possession for purposes of its discovery obligations. In the same brief in *Gibson* to which the government here cites, in which the government had proposed use of a Rule 17 subpoena, it also took the position that the server was "presently outside the government's possession" – the same position it takes about the phone here. (*Gibson*, 15-cr-10323-IT, ECF No. 46, at 4.) Not only did the government take that position in *Gibson*, but the third-party law firm that had voluntarily put the server in the government's hands intervened and filed its own opposition. That opposition described the government's position as, "[t]he government opposes [defendant's] motion because it is not in possession of the server." (*Id.*, ECF No. 48, at 1.) Contrary to the government's argument here, the law firm's lead argument in *Gibson* was literally that "The BH Server Is Not in the Government's Possession." (*Id.* at 4-6.) In reply, the defense further argued for a finding that the server was in the government's possession, including by expressly objecting to the government's Rule 17 "proposal": "Invoking Rule 17 would create a fiction – that the discoverable material is not actually in the possession of the Government." (*Id.*, ECF No. 51, at 5.) The Court conducted a hearing on the motion, during which the Court repeatedly made clear that it viewed the server as being in the government's possession, including when remarking, for example, that "we were asking ourselves should we be viewing the server as evidence that is in the government's custody, possession or control; *because we think a lot flows from that*. And in our view it is. We think the server is in the

4

government's custody, possession or control." (*Id.*, ECF No. 76 (Transcript), at 6 (emphasis added).)

Ultimately, as quoted above, the Court – through both Magistrate Judge Cabell and then Judge Talwani – issued written decisions expressly ruling on the issue, rejecting the non-sensical position that the government did not possesses what it admitted to possessing. In the first of those written decisions, in addition to the holding quoted above, the Court explained that "the government opposes the motion to compel on the ground that it only possesses for discovery purposes the responsive files it had access to under its [agreement with the third-party]." *Gibson*, 2016 WL 3248206, at *1. In short, the opposition's assertion here that this was "dicta" on an issue that was "not squarely litigated" cannot be taken seriously.

Nor do the two cases from outside this Court to which the opposition cites assist its position. The first, *United States v. Parnas*, 19-CR-725, 2021 WL 2981567 (S.D.N.Y. July 14, 2021), in no way involved a party – much less a government cooperating witness represented by counsel – voluntarily putting material into the government's hands, while simultaneously seeking to deny a defendant access to that material through a private agreement with the government. Rather, that case involved a search warrant on lawyers, with *judicially imposed* restrictions on access to the materials the government seized, including a privilege review by a court-appointed special master. *Id.* at *9. The decision in *United States v. Walker*, 10-CR-186, 2011 WL 3349365 (M.D. Ala. July 14, 2011), is equally inapposite. That opinion never mentions, much less decides, whether the materials sought were in the government's possession. To the contrary, there the defendant was not seeking discovery from the prosecution, but rather a subpoena to obtain recordings of a third-party's legal calls from a county jail, over which that third-party was claiming a privilege. The privilege claim was based on an automated message that preceded the

calls and that informed callers that if the call was with counsel, it would *not* be monitored and recorded. *Id.* at *1 ("[T]he only reasonable understanding of the message is that a 'privileged communication between an attorney and client' is excepted from 'being recorded or monitored.'"); *id.* at *2 ("[B]ecause the Lee County Jail's recorded message explicitly excluded attorney-client calls from being recorded and monitored, Massey and his attorney were not aware that they were being recorded. Indeed, the court is rather surprised that they were, considering the contents of the message."). The third-party did not voluntarily give to prosecutors the material at issue. Simply put, the *Parnas* and *Walker* cases involved nothing like the situation here.

Neither of these cases says anything about whether material that a cooperating witness voluntarily gave to the government is in the government's possession for purposes of the government's discovery obligations. *Gibson*, in contrast, addressed that question "squarely," rejecting the position that the same U.S. Attorney's Office then took unsuccessfully in *Gibson* and now takes here. As this is at least the second time in recent years that this office has attempted in this way to shield from defendants material that is indisputably in its physical possession, and as this Court has already rejected the government's non-possession ruse, the Court should make clear that the government cannot evade discovery obligations by reaching self-serving private agreements with cooperators that purport to exclude from review, even for *Brady* purposes, materials that the government undeniably possesses. Importantly, the defendants' motion does *not* ask that the government be compelled to turn over every communication on the Montone phone *en masse*, but merely that the government be required to subject all communications from the phone to the same review for discovery obligations,

including *Brady* material and the creation of a privilege log, as any other evidence in the government's actual possession.

**B.  The Government Cannot Avoid its Obligations by Invoking a Third-Party's Purported Attorney-Client Privilege.**

Beyond its unwillingness to concede the truism that material it actually possesses is in its possession, the government continues to label the withheld material "privileged communications." Even putting aside issues of waiver, not all communications with lawyers are privileged. The defendants' motion made that point, explaining various well-established ways in which communications with one's lawyer may not qualify for privilege. (*See* Opening Br. at 8-9.) The opposition never responds. In particular, the opposition does not address how it is able to represent to the defense, and to the Court, that communications are in fact privileged when it apparently knows nothing about them, other than that a lawyer was involved. Because the government has (purportedly) not reviewed the communications, it (purportedly) does not know, for example, whether third-parties were included on them, whether they were intended to be kept strictly confidential, whether legal advice was given or sought in every one of them, whether they reported on non-privileged communications with the government itself, or whether an applicable privilege was waived. A prosecutor has a duty to learn of any exculpatory evidence in the government's possession. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Here, the government eschews that duty by blithely labeling the communications on Montone's phone as "privileged," without any basis beyond the participation of counsel. In that way, the government has essentially elevated a preference by its own cooperating witness that communications with his counsel not be reviewed – whether privileged or not – above the defendants' discovery and constitutional rights. And it has done so without so much as a particularized privilege log that could be subjected to judicial review and testing, as support for its invocation of a cooperating

witness's supposed privilege. The government has not, and cannot, justify its ongoing *assumption* that all communications at issue are in fact privileged.

In any event, even if the communications were once, or are potentially, privileged, the defendants may nevertheless be entitled to otherwise-discoverable information contained in them. Whether for convenience, to curry favor with prosecutors from whom he is obviously expecting a benefit as a cooperator, or some other advantage, Montone *chose* to put in the hands of the government data that he knew contained communications with his counsel. He did so while represented by that same counsel and knowing that the government was engaged in a criminal investigation and, thus, would have disclosure obligations to any indicted defendants – including obligations grounded in constitutional rights. While the opposition seeks to give the impression that there was no alternative because of data-integrity issues, it stops short of contending, and in truth could not reasonably contend, that there was no alternative for obtaining the contents of Montone's phone without Montone giving the government a complete copy that included the communications at issue. Indeed, parties disclose electronic data every day in the course of litigation, including in forensically sound ways, without turning over communications that must be kept confidential if they are to remain protected. In the context of a criminal investigation, the approach that Montone chose to take is not consistent with reasonable precaution to preserve privilege. Any privilege, even if one indulges the government's assumption that the communications were once privileged, was waived by the choice and disclosures that Montone made in the course of cooperating with the government.

Furthermore, as defendants noted in their motion without a meaningful response by the government in its opposition, even *actual* privileged status must give way to constitutional rights, including rights under the Confrontation Clause. *See, e.g.*, *Murdoch v. Castro*, 365 F.3d

699, 702 (9th Cir. 2004) ("[E]videntiary privileges or other state laws must yield if necessary to

ensure the level of cross-examination demanded by the Sixth Amendment."). In fact, even where

privileged information is not in the government's possession, the privilege is not inviolate in the

face of constitutional rights. As one court has explained in finding error by a trial court that

would not even consider an *in camera* review:

> Because the rules of privilege tend to exclude legally relevant evidence, these rules
> are not favored by the courts in the criminal context. *Herbert v. Lando* (1979), 441
> U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115, 133; *see In re Grand Jury
> Proceedings* (C.A.4, 1984), 727 F.2d 1352, 1355. As a result, evidentiary privileges
> are not absolute. *Rainone*, 32 F.3d at 1206. Even long-recognized privileges may
> be trumped by Sixth Amendment rights.
>
> The right to the production of all evidence at a criminal trial has constitutional
> dimensions, whereas there is no explicit reference in the United States Constitution
> to any privilege of confidentiality. *Turner*, 14 Ohio App.3d at 305, 14 OBR at 363,
> 471 N.E.2d at 163; *see Nixon*, 418 U.S. at 711–713, 94 S.Ct. at 3109-3110, 41
> L.Ed.2d at 1065-1067. The protections of the attorney-client privilege and the work
> product doctrine will yield to the right to confront witnesses when that right is
> violated by enforcing privilege. *Rainone*, 32 F.3d at 1206; *Jenkins v. Wainwright*
> (C.A.11, 1985), 763 F.2d 1390, 1392; *United States ex rel. Blackwell v. Franzen*
> (C.A.7, 1982), 688 F.2d 496, 500–501. The right to compulsory process will also
> outweigh privilege when enforcing privilege prejudices the right. *Romano*, 46 M.J.
> at 274.

*State v. Hoop*, 731 N.E.2d 1177, 1186-87 (Ohio App. 1999); *see also Murdoch*, 365 F.3d at 702

("[E]videntiary privileges or other state laws must yield if necessary to ensure the level of cross-

examination demanded by the Sixth Amendment."); *United States v. Mix*, No. 12-171, 2012 WL

2420016, at *3 (E.D. La. June 26, 2012) ("In the event this matter proceeds to trial, the Court

will establish a protocol at the appropriate time for a determination of which of the submissions

are subject to the attorney-client privilege and whether any such documents shall be admitted

into evidence at trial."); *United States v. Weisberg*, No. 08-CR-347 NGG RML, 2011 WL

1327689, at *5 (E.D.N.Y. Apr. 5, 2011) (requiring *in camera* review of potentially privileged

documents "[i]n order to determine whether a particular item of evidence is privileged and, if so,

whether it is nevertheless so important to the defense that its disclosure is constitutionally required"); *United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1145 (D. Mont. 2006) ("[T]he law requires that the privilege yield where its invocation is incompatible with a criminal defendant's Sixth Amendment rights.").

At issue here are communications *in the government's possession* and with a government cooperating witness. The government has represented that those communications are with a lawyer representing the cooperator in this very matter. It is far from the speculation that the government attempts to depict it as being that such communications may contain material with which the defense would seek to cross-examine or otherwise confront this particular cooperating witness. In any event, it is the government's duty to learn whether those communications could potentially serve that purpose. *See United States v. Bases*, 549 F. Supp. 3d 822, 829 (N.D. Ill. 2021) (holding that "in carrying out its *Brady* obligations, the government must do more than assume" the absence of *Brady* material). The government shirks that duty by refusing to review the material for *Brady* or otherwise-discoverable information, simply because some of it *might* be privileged – a status that itself will not always suffice in the face of constitutional protections afforded criminal defendants. The constitutional issues at stake are only heightened here, where the testimony by a cooperating witness is at issue – a context in which the law requires that defendants be afforded especially wide latitude for cross-examination. *See Banks v. Dretke*, 540 U.S. 668, 673 (2004) ("[Informant] testimony poses serious credibility questions. This Court, therefore, has long allowed defendants broad latitude to cross-examine informants. . . ."); *Murdoch*, 365 F.3d at 704 ("Not only should defense counsel be allowed wide latitude in questioning, but also when, out of necessity, the government relies on witnesses who have themselves engaged in criminal activity and whose record for truthfulness is far from exemplary

full disclosure of all relevant information concerning their past record and activities through cross-examination and otherwise is indisputably in the interests of justice." (internal editing and quotation marks omitted)).

Finally, after all but ignoring *Gibson* on the issue of possession, the government then leans into that decision on the issue of privilege. In ruling on the third-party's objection, and after affirming the Magistrate Judge's finding as to government possession, the District Judge amended in part the protections that the Magistrate Judge had imposed with respect to privileged information. Rather than allowing the defense to review the entire contents of the server in the first instance, the Court provided the law firm that owned the server to review the contents first. The law firm was then required to produce a privilege log with respect to every document that it claimed was privileged. The defendants would then be given a complete copy of all other contents not on the log. The defendants would also be permitted to move to compel any documents on the log. *Gibson*, 2016 WL 3566198, at *3. The Court never held that the privilege could not be overcome if it were material to the defense. It merely imposed a first step of separating items over which there was an actual privilege claim from those that were concededly not privileged.

The particular procedure that the *Gibson* Court adopted in that regard does not assist the government's argument here. First, because the third-party that had turned over to the government the entirety of its server in *Gibson* was a law firm, the contents of the server necessarily included material protected by a privilege owned by many of the law firm's unrelated and unwitting clients, who had no involvement in the ill-advised agreement between the government and the law firm. That situation stands in stark contrast to Montone who, in the course of becoming a government cooperator during a criminal investigation, and while

11

represented by counsel, voluntarily chose to give his entire phone to the government. In contrast to *Gibson*, the only party here who might claim a privilege – Montone – thus acted inconsistently with protecting his own privilege. Contrary to the government's assertion, Montone is not, therefore, "in the same position as" the law firm in *Gibson*. (Oppos. at 6.) Second, the procedure that the Court adopted in *Gibson* to protect the rights of the law firm's unrelated clients still included a process for allowing the defense and the Court to assess whether all the materials in the government's possession were in fact privileged, rather than merely assuming privilege, as the government does here. The Court required a log, as well as a mechanism for challenging any privilege claims on a document-by-document basis. The government here, in part because of its unsupportable position that the phone's contents are not in its possession, has failed to produce such a log, and has remained unwilling to provide *any* further information about the communications at issue or even to review it for *Brady* material.

II.     **The Government Should Be Required to Make Additional Disclosures About Interactions Among its Criminal and Civil Teams, and Material Witnesses Who Include Alleged Unindicted Co-Conspirators.**

The government's opposition to additional disclosures concerning the intermingling of criminal and civil proceedings relies primarily on two points. First, the government notes its pre-indictment disclosure of a criminal investigation. Second, the government relies on its representation that prosecutors have searched for discoverable information from the files of both the criminal and civil teams, which it claims moots the defendants' request. Neither of those points should relieve the government of providing the additional disclosures that the defendants request.

With respect to the defendants' knowledge of a criminal investigation, their motion never claimed that they were unaware of an *investigation*, but rather that the timing of the *indictment* fell within a pattern of government agencies leveraging their joint investigations, thereby

providing a basis for seeking additional disclosures. This pattern included various flags of suspect criminal/civil overlap. For example, the opposition does not, and cannot, contest that while the civil action was pending, lengthy settlement discussions took place throughout the winter, spring, and summer of 2021, in which the government repeatedly demanded factual admissions from the defendants as a condition of settling. At that stage, no criminal charges had been brought. The government's effort to obtain admissions failed. Nor does the opposition contest that the government did not indict the defendants until August 2021, supposedly unrelated to, yet almost immediately after, those civil settlement discussions broke down. As set forth in the defendants' motion, such timing raises concerns about potential efforts to use the civil case to extract admissions in advance of a plan to charge defendants criminally, potential efforts to use criminal charges to pressure defendants into a civil settlement when settlement discussions appeared to have broken down, or both. Statements in the opposition about knowledge of a criminal investigation do not address the suspicious timing of the actual indictment in relation to civil settlement discussions.[1]

In fact, the opposition's focus on the timing of events with respect to the criminal investigation only serves to raise further questions about the propriety of the degree to which the criminal and civil proceedings were intertwined. As noted in the defendants' motion, two AUSAs appeared in the civil case, withdrew from that case, and then later appeared for the government in the criminal case. The opposition asserts that this was done once "the government determined that it would file a civil lawsuit," and "to dispel any possible appearance that

---

[1] The opposition's lengthy discussion of the possibility of a stay of the civil case adds little to the government's argument. The challenges of facing two separate proceedings, whether simultaneously or sequentially, including the need to redirect enormous resources away from a civil case to fund a criminal defense, are not cured by postponing the civil case through a stay, as the defendants would still be forced to litigate the civil case eventually.

13

criminal prosecutors were improperly using the criminal investigation to advance the civil case."
(Oppos. at 11.) Those withdrawals were filed on March 4, 2020, the day before the government's
complaint-in-intervention in the civil case. The government, however, had filed a notice of an
intent to intervene and to file a complaint a month earlier, on February 7, 2020. It thus knew by
no later than that earlier date (and likely well before it) that it would file a civil complaint. Just
three weeks before that, on January 14, 2020, while they had appearances in the civil case, the
same two AUSAs who would later withdraw from the civil case, appeared before the Grand Jury.
In fact, they had appeared before the Grand Jury repeatedly since at least May 8, 2018, and thus
necessarily had access to Grand Jury material while working on and planning the civil
intervention and complaint. Furthermore, while the opposition asserts (not through a declaration
or anything other than a statement in a brief) that "[a]fter the government filed its civil suit, no
member of the government's criminal team *directed or participated in* any civil settlement
discussion with the defendants," (Oppos. at 11 (emphasis added)), it does not go further to
represent that those withdrawing AUSAs, who had participated in Grand Jury proceedings for
years, never consulted or had discussions with their colleagues who did direct or participate in
civil settlement discussions with the defendants.

Similarly, the opposition touts the contents of settlement agreements with witnesses, in
response to the motion's reliance on a report by one settling witness's counsel that prosecutors
had told the witness that he would not be prosecuted if he settled civilly. The government is not
persuasive in this regard, and is certainly not entitled to a presumption of its version of events to
the extent a fact issue appears in the record. As noted in the motion, those settlement negotiations
were conducted principally by government attorneys who would later appear as prosecutors in
this criminal action. What the opposition does not tout about that same settlement agreement,

however, is that it also contains a provision *requiring* the settling witness "to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this agreement" – i.e. to cooperate against the criminal defendants here. The government thus obtained from this witness, through a civil settlement, a commitment to help the government with this prosecution. And the same AUSAs discussed above who appeared in the related civil case here, then withdrew, and then appeared in the criminal case, are listed in the signature block of that settlement agreement with a witness. That agreement was signed in April 2020, *after* they withdrew from the civil action in this Court, supposedly, according to the opposition, to avoid the appearance of improper intermingling of civil and criminal matters. [2]

The defendants recognize that prosecutors serving dual roles does not necessarily equate to misconduct by itself. But as the defendants' motion makes clear, the defense is not at this stage attempting to *prove* misuse of the civil or criminal proceedings, or even to demonstrate impermissible overlap, but rather sets forth why there is at least enough potential for such impropriety to warrant adequate disclosures. The government's opposition, if anything, only heightens those concerns. When one adds the timing of the indictment to other indications of potential impermissible intermingling – such as a witness's lawyer reporting that members of the criminal team here promised that charges would not be brought if the witness reached a civil settlement, and civil government attorneys attempting in a draft settlement agreement to obtain releases related to the conduct of the *criminal* investigation – the government should at least be required to provide additional information about the interactions between its criminal and civil teams.

---

[2] A link to that settlement agreement appears on page 12 of the government's opposition, at note 7.

As discussed in defendants' motion, in addition to due-process concerns that can arise when parallel investigations morph into unduly intermingled use of criminal and civil proceedings, the degree to which both teams were speaking to particular witnesses, and communicating with each other about the information those witnesses were providing, will inform potential sources for *Brady* and other Rule 16 information. It is here where the government's second contention – that the defendants' request is moot because the government claims to have already searched both criminal and civil files for such information – misses the mark. In describing what the government has searched, the opposition notably does not claim that communications between AUSAs and investigators, communications among AUSAs, and communications among investigators, were included in what the government searched for *Brady* and other Rule 16 material. The apparent omission of those categories of documents from the government's review for discoverable information is what makes unpersuasive the opposition's effort to distinguish *United States v. Bases*, 549 F. Supp. 3d 822 (N.D. Ill. 2021). Not only did *Bases* explain how the degree of interaction between civil and criminal investigations can increase the scope of what prosecutors must review for *Brady* material, but it also included certain categories of exchanges between civil and criminal teams in what must be reviewed. *See id.* at 829 (requiring production of the CFTC's "exculpatory analyses of trading activity … to the extent that such analyses and related data were shared or discussed with the DOJ"). Here, the defendants merely seek at this stage disclosures about the nature and extent of the civil and criminal teams' interactions, in part to inform potential sources for *Brady* material that have not yet been searched for that purpose.

In a case where there is reason for concern that what were supposed to be parallel proceedings crossed into something far more intertwined – including AUSAs appearing in the

civil action, withdrawing from it, and then appearing in the criminal action; suspicious timing of civil settlement negotiations in relation to an indictment; and a witness's lawyer reporting improper use of criminal threats to obtain a civil settlement – there is heightened justification for enhanced disclosures about what government attorneys and agents in the civil case said to government attorneys and agents in the criminal case, and vice versa, regarding, in particular, witnesses' assertions.

The government has extensively interviewed many surgeons involved in what the government alleges was an unlawful kickback scheme. As the recipients of consulting payments that the government claims were actually kickbacks, those surgeons' explanations of their arrangements with SpineFrontier are, of course, highly material, and present particularly strong potential to contain *Brady* material. For example, a surgeon admitting to having taken consulting payments without actually spending time consulting could be exculpatory as to the individual defendants here where, for example, the surgeon admitted to falsely representing to SpineFrontier time spent consulting. Inversely, if a surgeon at any point in discussions with government investigators or attorneys exculpated himself or herself by claiming that the surgeon did perform the consulting hours submitted, that would likewise be exculpatory of the defendants here. It appears undisputed that at least certain surgeons changed their stories over time, while interacting with different arrays of government agents. When preparing for trial, defendants are entitled to information concerning the government attorneys' and other agents' interactions with these alleged co-conspirators, which could tend to suggest the surgeons were not culpable co-conspirators or that they were solely culpable by not intending to follow through on contractual obligations to SpineFrontier. Either way, the evolution of their changing stories, and the

government actors' interactions with them and each other on these issues, would naturally trigger *Brady* obligations that the government's opposition makes clear it does not appreciate.

Similarly, the government's interactions with SpineFrontier's lawyers who were present and participating in key underlying events, and their communications with each other about the roles of those SpineFrontier lawyers during pertinent events, give rise to *Brady* obligations that the government's opposition reflects it does not appreciate. With two teams – one civil, one criminal – conducting supposedly parallel (but in reality joint) investigations, communications between those teams, not only formal reports of interactions with witnesses, are likely to be revealing as to their interactions with such key witnesses.[3]

---

[3] Indeed, courts have recognized as a general matter that information about interactions between and among investigators, government attorneys, and witnesses can constitute *Brady* material concerning a theory of the defense about weaknesses in investigations. As the Supreme Court has recognized, challenging the reliability of an investigation, including through cross-examination of government agents as to what they knew about the credibility of sources of evidence, can be a viable defense strategy at trial. *See Kyles v. Whitley*, 514 U.S. 419, 446-47 (1995) ("Even if Kyles's lawyer had followed the more conservative course of leaving Beanie off the stand, though, the defense could have examined the police to good effect on their knowledge of Beanie's statements and so have attacked the reliability of the investigation in failing even to consider Beanie's possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted.… By demonstrating the detectives' knowledge of Beanie's affirmatively self-incriminating statements, the defense could have laid the foundation for a vigorous argument that the police had been guilty of negligence."); *United States v. Bagcho*, 151 F. Supp. 3d 60, 71 (D.D.C. 2015), *aff'd*, 923 F.3d 1131 (D.C. Cir. 2019) ("Evidence that the DEA's Kabul office was told that Qari had been deemed a liar *by another government agency*, yet still it elected to use him as a witness would serve to undermine the reliability of the government's investigation and its sources. The DEA agents who testified at trial could have been cross-examined as the detectives were in *Kyles*." (emphasis added)).

The government should be compelled to provide information concerning the interactions between its civil and criminal teams, or at least to include in its review for *Brady* and other Rule 16 materials, communications between the two teams and a log of pertinent items. In the alternative, the Court should conduct an evidentiary hearing on these matters.

## CONCLUSION

For the reasons set forth herein and in the defendants' opening brief, the defendants respectfully request that the Court issue an order directing the government (1) to search the entirety of the contents of Montone's phone for discoverable information, and (2) to provide the information and/or privilege log that the defendants have requested concerning the interactions between the criminal and civil teams representing the government, and their overlapping interactions with witnesses. In the alternative, an evidentiary hearing should be held.

Respectfully submitted,

/s/ Joshua L. Solomon
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

/s/ Daniel N. Marx
Daniel N. Marx (BBO #674523)
William W. Fick (BBO #650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

**<u>Certificate of Service</u>**

The undersigned certifies that this document, filed through the ECF system, will be electronically served on counsel who are registered users of ECF on September 7, 2023.

/s/ Joshua L. Solomon