# EXHIBIT G



BOSTON    NEW YORK
www.psdfirm.com
**POLLACK SOLOMON DUFFY LLP**
31 St. James Ave . Suite 940 . Boston, MA 02116
617.439.9800

December 22, 2023

**By Email**

Abraham R. George, Esq. (*abraham.george@usdoj.gov*)
Patrick Callahan, Esq. (*patrick.callahan@usdoj.gov*)
Christopher Looney, Esq. (*christopher.looney@usdoj.gov*)
U.S. Attorney's Office
One Courthouse Way
Boston, MA 02210

Re:    *United States v. Chin, et al.,* No. 21-cr-10256-IT

Dear AUSA George:

Thank you for your time on the call among counsel earlier this week. We write to summarize the status of our ongoing discussions.

**The Government's Burden to Prove "Willfulness"**

Based on our call, with respect to the definition of willfulness applicable to this case, we seemed to agree that (1) this is not a case in which the statutory use of the term willfulness serves as a form of general intent; (2) the term willfulness under the anti-kickback statute refers to a form of specific intent; and, (3) whether willfulness here entails a heightened form of specific intent under the Anti-Kickback statute poses an issue of first impression in the First Circuit as it has not been addressed as a contested matter. At the very least, the cases that the parties have identified in the First Circuit do not appear to have involved litigation over the applicability of *Ratzlaf*, *Cheek*, or *Liparota* to the anti-kickback statute. We have identified cases from the Second Circuit (and others exist) that apply the standard of an "intentional violation of a known legal duty." Regardless of that nuance within forms of specific intent, you agreed that (1) the government bears the burden of proving willfulness beyond a reasonable doubt, and (2) no statutory defense under the anti-kickback statute appears to place a burden of proof on defendants here. Our conversation on this issue thus turned primarily to whether we would agree to a date by which to disclose whether a defendant intended to challenge proof of *mens rea* by eliciting from any lawyer his or her legal advice or legal opinion given to any of the defendants at the pertinent time. We explained that, if there were going to be a deadline for such a disclosure, it should follow a disclosure by your office about any firm commitment to call or not call any lawyer as a witness in the government's case in chief. You agreed to speak to your team about undertaking that sort of deadline for the government as a next logistical step. You also suggested that a "presence of counsel defense" may justify some sort of deadline too. In part, our

December 22, 2023
Page 2

response is that a "presence of counsel defense" takes on different meanings in different cases, but that by charging SpineFrontier, here the government has essentially raised a "presence of counsel *offense*" because of the "corporate collective" doctrine it has undertaken to prove. At some point, you agreed that some of these *mens rea* issues are "context-dependent." We agreed to think more about these issues and reconvene. Please let us know when the government has reached a position on whether it will undertake a deadline for identifying and ***making a firm commitment*** about whether or not it will call any of the defendants' lawyers as witnesses.

## *Brady* Issues

Next, we discussed *Brady* issues arising from the government's interaction with alleged co-conspirators, cooperating witnesses, and their counsel. You stated that your office is going through (or perhaps again going through) all emails between government attorneys or agents, on the one hand, and co-conspirators, cooperating witnesses, and their counsel, on the other hand. You agreed to ensure that list includes the surgeons referenced in the indictment, Amanda Dalton, Scott Autrey, Sarah Cook, John Balzer, and their respective lawyers. We explained that, from our perspective, even emails that effectively show a schedule of government access to educate these individuals on the government's theory of the case is material to the preparation of the defense. As an example, we discussed that, on December 19, 2019, you questioned Amanda Dalton under oath, and she explained "I guess that was a concern in light of pay-for-play discussions, which we've had over the course of time," and then she made clear that by "we" she meant you and her having these sorts of educational discussions "over the course of time." Given the overwhelming evidence of many of these witnesses changing their testimony after being educated by the government in follow-up encounters or otherwise after threats from the government, the government's schedule of past interactions with all these witnesses is critical to the preparation of the defense. Also, as you know, Judge Kelley made clear that the government is required to review, and the government has committed to review, communications among members of the government's criminal and civil teams for *Brady* material. Please confirm that such communications are also being included in your review for this form of *Brady* information, in addition to emails between government attorneys or agents, on the one hand, and alleged co-conspirators, cooperating witnesses, and their counsel on the other hand.

On another *Brady* topic, we discussed the presence at CMS or the broader HHS of exculpatory material and the identity of government witnesses in possession of exculpatory information. For example, as you know, despite the Indictment stating that defendants implemented IME to evade reporting requirements, SpineFrontier made extensive reports under the Sunshine Act. As we understand it, each time there is such a disclosure, CMS's system creates internal and external data responses, including but not limited to information and materials concerning Error and Warning Codes, Review and Dispute Data, Review and Correct Data, Data Displays, and communications among various stakeholders during these processes. Particularly since the Indictment charges efforts to evade reporting requirements by SpineFrontier, the government must search these materials for *Brady* material, including the identification of government employees who are witnesses to communications about SpineFrontier's reports of payments, and all other communications and data tending to show compliance by SpineFrontier. You stated that your team would look into these matters further.

December 22, 2023
Page 3

Obviously these materials may be informative for upcoming motions, requiring receipt by mid-January.

**Belated Production of Montone's Written Consent**

Finally, we discussed your office's recent production of a document titled "Consent to Search Electronic Evidence" from Dr. Jason Montone dated February 8, 2019 (USAO_004244). This document indicates that Dr. Montone agreed to "a complete search" of a "personal cell phone." He confirmed in this Consent that no "promises of any kind" were provided in connection with his surrender of his phone, expressly waived his rights to refuse such consent, and contained no exemptions from the "complete search" to which Dr. Montone consented. This Consent *post-dates* the email from Dr. Montone's counsel on which the government relied in opposing the defendants' motion to compel, while withholding the written Consent itself. In an April 18, 2023 letter, the government confirmed that it had not taken possession of any devices, or seized data from devices, other than those disclosed in its October 5, 2021 letter. The latter disclosed only one phone from Dr. Montone. We thus assume that the Montone phone that was the subject of our motion to compel is the same phone as the "personal cell phone" referred to in the recently-produced Consent to Search Electronic Evidence. Of course, if that is incorrect, and the government possesses an additional Montone phone (or data from another Montone phone), please let us know.

As you know, the government represented in multiple letters to defense counsel that Dr. Montone limited his consent to search his phone by excluding from his consent communications with his counsel that might appear on the phone. In response to the motion's argument that Dr. Montone had waived any privilege by placing the phone in the government's possession, the government again represented that any consent *clearly* excluded communications with Dr. Montone's counsel. For example, the government wrote in its opposition that "Dr. Montone explicitly carved out his attorney-client communications when he consented to turn over data from his phone." (Dkt. No. 110, at 5.) The government also represented "[t]hat carve-out could not have been clearer," (*id.*), and that Dr. Montone "took steps to make it unmistakably clear that he was ***not*** giving the government access to his communications with his attorneys, (*id.* at 6 (emphasis in original)). The government made these representations while possessing – but not revealing to the defendants or the Court – a written consent to "a complete search," without limitation, signed after the email on which the government relied in its opposition. At argument on the motion, AUSA Callahan even went so far as to represent to the Court that accessing the materials posed concerns about "a Fourth Amendment violation." (9/13/23 Tr. at 15). Dr. Montone's lawyer likewise raised Fourth Amendment issues multiple times during the hearing. (*Id.* at 22-23.) AUSA Callahan did not contradict Dr. Montone's counsel's invocation of the Fourth Amendment at the hearing, despite the government possessing and withholding from defense counsel a written Consent in which Dr. Montone had knowingly and voluntarily waived constitutional rights to refuse access, and without disclosing to the Court that the government possessed that signed waiver.

Furthermore, repeatedly during that hearing (and in its eventual written decision), the Court noted its understanding that the government had "agreed" not to review the materials at issue. The government has not corrected its inaccurate representations underlying that assumption. Nor did the government inform the Court that the government possessed a Consent

December 22, 2023
Page 4

that expressly recited that the government had made no promises "of any kind" related to the consent to a "complete search."

    To avoid motion practice concerning the inconsistencies between the government's representations and the Consent, I asked you during our call to consider speaking with Dr. Montone's counsel and making the decision together to produce to defendants those documents that he submitted for an *in camera* inspection and any others from the cell phone that have been withheld. As explained above, communications that involve scheduling matters, or even just the timing of such communications, are important to the preparation of the defense. We believe the Court was improperly deprived of the impact of the Consent on the issues before the Court, and the context of the text messages in light of viable defenses. Please let us know if the government will be in a position to produce these items at least a couple of weeks before motion deadlines, or whether the government will assent to a continuance for the purpose of supplementing its deficient disclosures. We also request that the government provide explanations as to why it withheld the Consent until after the conclusion of pertinent motion practice, and how the government reconciles the Consent with the representations it made to the defendants during discovery, and to the Court in the course of the motion practice.

    Thank you for your prompt attention to these matters. Happy Holidays.

                                          Sincerely,

                                          Barry S. Pollack

cc:    Josh Solomon, Esq.
       Daniel Marx, Esq.
       William Fick, Esq.
       AUSA Patrick Callahan