**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES, <br><br> v. <br><br> KINGLEY R. CHIN, <br> ADITYA HUMAD, and <br> SPINEFRONTIER, INC., <br>     *Defendants*. | No. 1:21-cr-10256-IT |

**DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTION**
**REGARDING SUPPOSED WAIVER OF ATTORNEY-CLIENT PRIVILEGE**
**AND NOTICE OF ADVICE-OF-COUNSEL DEFENSE [D.E. 152]**

In an attempt to invade the attorney-client privilege between Defendant SpineFrontier, Inc. and its corporate counsel, including outside counsel from Strong and Hanni LLP, the prosecution argues that by distributing legal opinion letters about the company's consulting program to third-party surgeon-consultants, Defendants Kingsley Chin, Aditya Humad, and SpineFrontier, Inc. impliedly waived any claim of corporate privilege regarding all related communications with Strong and Hanni. That argument fails because the letters were not themselves privileged communications. SpineFrontier never intended to keep them confidential; to the contrary, and as outside counsel knew, they were drafted to be shared by SpineFrontier with non-client doctors and their own counsel. Regardless, the extrajudicial disclosure of those letters—that is, sharing them for business reasons with potential consultants, not using them for a strategic advantage in this litigation—would not impliedly trigger the sort of broad subject-matter waiver that the prosecution seeks. Indeed, in *XYZ Corp. v. United States*, 348 F.3d 16 (1st Cir. 2003), the First Circuit rejected that contention.

In a related attempt to discover the defendants' trial strategies, especially as they might relate to SpineFrontier's attorneys, the prosecution also asks this Court to impose a novel requirement that, 60 days before trial, the defendants decide whether they intend to present advice- or involvement-of-counsel defenses and, if so, to disclose all materials relevant to those defenses, including otherwise-privileged communications with their attorneys. The prosecution cannot cite any rule for such a requirement because none exists. Nor can the prosecution present any compelling reason for this Court to exercise its inherent authority, especially when doing so threatens to undermine the attorney-client privilege and infringe on the defendants' constitutional rights to a fair trial.

The prosecution chose to bring this highly unusual case, charging not only Dr. Chin and Mr. Humad, but also SpineFrontier, thereby inherently implicating the role and presence of the company's attorneys. The prosecution's decision does not trigger any obligation that the defendants disclose, months before trial, how they intend to defeat the far-fetched and baseless allegations that numerous attorneys actively, but unwittingly, engaged in brazen schemes to bribe doctors and launder kickbacks. Rather in the extraordinary circumstances that this prosecution presents, where the prosecution may call company attorneys to testify against their former employer or clients, imposing such a requirement would unfairly burden the defendants' constitutional rights to evaluate that evidence before they decide whether to testify, call defense witnesses, or present any defense case at all. If any early pretrial disclosures should be made, it is the prosecution that should be ordered to identify, well in advance of trial, all attorneys whom it plans to call as witnesses against their former employer or clients. To date, however, the prosecution has refused to say whether it intends to call any attorneys as witnesses.

## BACKGROUND

The Indictment charges Defendants Kingsley Chin, Aditya Humad, and SpineFrontier, Inc. with conspiring to violate the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b)(2) (Count 1), violating the AKS (Counts 2 to 7), and conspiring to launder money (Count 8). All the charged offenses are "specific intent" offenses, requiring the prosecution to prove beyond a reasonable doubt that the defendants acted "willfully."

To convict the defendants of violating the AKS, or conspiring to do so, the prosecution must prove the defendants engaged in an "intentional violation of a known legal duty." *United States ex rel. Hart v. McKesson Corp.*, No. 15-CV-0903 (RA), 2023 U.S. Dist. LEXIS 53295, at *29 (S.D.N.Y. Mar. 28, 2023) (quoting *Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 77 (2d Cir. 2022)).[1] The prosecution accuses the defendants of willfully bribing doctors to use SpineFrontier's products by paying "sham" consulting fees to surgeons who failed to comply with consulting agreements that required them to provide consulting services, including expert feedback on the products and design assistance for new or improved products.

The problem for the prosecution is that SpineFrontier's outside counsel, Peter Baxter, of Strong and Hanni, reviewed the consulting agreements, and in a series of opinion letters, he concluded that the agreements complied with all applicable federal laws and regulations, including the AKS. Baxter provided signed letters, first to SpineFrontier and later to Impartial Medical Experts, LLC ("IME"), specifically for distribution to non-client surgeon-consultants, who reviewed those letters, often with their own counsel. SpineFrontier sent the consulting agreements, along with the legal opinion letters, under a cover letter that was drafted and signed by SpineFrontier's General Counsel, Paul Speidel, who was actively involved in the consulting

---

[1] The prosecution concedes that Counts 1 to 7 are specific intent offenses, but it endorses a different definition of "willfulness."

program. The prosecution presented the legal opinion letters and related documents to the Grand Jury, has attached them to its pending motion, and will presumably offer them as evidence at trial. *See* D.E. 153-1, 153-2, 153-3.

To convict the defendants of conspiring to launder alleged kickbacks, the prosecution must prove the defendants willfully schemed to engage in financial transactions knowing that those transactions involved "the proceeds of specified unlawful activity" and intending "to conceal or disguise" those proceeds. 18 U.S.C. § 1956(a)(1)(B)(i). On this score, the prosecution accuses the defendants of using a "sham" company, IME, to "evade" reporting requirements under the Sunshine Act and to hide that SpineFrontier made consulting payments to surgeons. Yet the prosecution fails to reckon with the undisputed facts that (1) SpineFrontier publicly disclosed all payments *in its own name* and (2) Speidel and SpineFrontier's Associate General Counsel, Lesley Olson, whom the prosecution interviewed as part of its investigation, actively participated in the logistics for SpineFrontier's disclosures to CMS through its Open Payments portal, helping to ensure the company's annual payment disclosures were accurate, complete, and compliant with applicable regulations. *See* D.E. 150 at 6-7; D.E. 151-1, 151-2, 151-3, and 151-4.

Given the extensive involvement of these many corporate attorneys in the key events and transactions at issue, it should come as no surprise that, during pre-trial conferences and in meet-and-confer discussions, defense counsel has commented on the role and presence of counsel as salient and peculiar features of this criminal prosecution. Presumably, at trial, the prosecution will call attorney witnesses and present non-privileged documents that they wrote, reviewed, received, or otherwise knew about, including the legal opinion letters signed by SpineFrontier's outside counsel and distributed by its General Counsel. But the prosecution has declined to engage in meaningful discussions with defense counsel on these issues. Pointing to this Court's Pretrial

Order, D.E. 144 (requiring the prosecution to disclose its trial witnesses by August 5, 2024), the prosecution has refused to make (or commit to a deadline for) any earlier disclosure of its intention to call attorneys to testify against the defendants. Instead, it has filed an aggressive motion, attacking the attorney-client privilege and demanding that the defendants disclose their defense strategies two months before trial.

On December 20, 2023, as ordered by this Court, the parties met and conferred, and the prosecution asked whether the defendants intended to assert advice-of-counsel defenses. Defense counsel explained that the defendants had not yet decided on their trial strategies and, further, that those decisions would depend, in part, on the evidence that the prosecution planned to offer during its case-in-chief. Following up on the call, on December 22, 2023, defense counsel sent a letter and asked: "Please let us know when the government has reached a position on whether it will undertake a deadline for identifying and *making a firm commitment* about whether or not it will call any of the defendants' lawyers as witnesses." Ex. A (12/22/23 Pollack Letter). On January 12, 2024, the prosecution responded: "The government will identify witnesses on August 5, 2024, as required by the Court's pretrial order. *See* Dkt. 144. The government does not agree to setting a deadline to disclose whether it will call specific witnesses (and commit to calling them) before that deadline." Ex. B (1/12/24 George Letter). The parties conferred again on January 19, 2024, and the prosecution still refused to commit to any such disclosure.

Moreover, during these meet-and-confer efforts, the prosecution never suggested that it would file a motion claiming an implied waiver of the attorney-client privilege, much less that a finding of broad subject-matter waiver would be the principal relief it would seek. As a result, the parties had no meaningful opportunity to discuss those disputed issues. Only on January 25, 2024, the day before filing its motion, the prosecution first raised with defense counsel the issue of

supposed waiver. And on January 26, 2024, the date of the prosecution's filing, that issue was discussed on a call for the first time.[2]

The prosecution bears the burden to prove beyond a reasonable doubt that, notwithstanding the active involvement of many corporate attorneys, none of whom has been identified as an unindicted co-conspirator or otherwise accused of any misconduct, the defendants willfully violated the AKS and conspired to launder the unlawful proceeds from a bribery scheme. Even without asserting advice-of-counsel defenses (*i.e.*, without arguing the defendants are excused from any unlawful conduct because their attorneys expressly or implicitly blessed it), the defendants may fairly argue, and the jury may reasonably conclude, that no one would openly engage in extensive criminal conduct, willfully scheming to pay kickbacks and to launder money, in the presence of so many corporate attorneys.

## ARGUMENT

I.    **Neither SpineFrontier nor IME waived the attorney-client privilege by sharing legal opinion letters from outside counsel with prospective surgeon-consultants who were the intended recipients of those letters.**

SpineFrontier did not impliedly waive the attorney-client privilege by sharing with third-party surgeon-consultants the legal opinion letters that outside counsel drafted for that very purpose. Regardless, the limited extrajudicial disclosures of those letters, before this prosecution began, would *not* trigger a subject-matter waiver.

---

[2] Defense counsel also asked if the prosecution had sought approval from the Department of Justice to serve a subpoena on Strong and Hanni LLP for documents and information about its legal work for SpineFrontier and IME, *see* Ex. C (1/25/24 Pollack email), but the prosecution refused to say, *see* Ex. D (1/25/24 Callahan email) ("We are aware of the Justice Manual Guidelines. Respectfully, we don't believe we need to provide a narrative of the internal steps we may take nor not take.").

A.    **Because the opinion letters were not intended to be confidential for SpineFrontier and IME only, they were not privileged communications.**

The prosecution's waiver argument stumbles out of the gate. If a communication between a company and its counsel is not privileged, either because the communication was not for the purpose of obtaining legal advice or because it was not intended to be confidential, the disclosure of that communication to another party cannot waive any privilege. Put simply, disclosure cannot waive a privilege that does not exist in the first place.

While reciting the familiar platitude that "generally, disclosing attorney client communications to a third-party undermines the privilege," D.E. 152 at 4 (citing *Cavallaro v. United States*, 284 F.3d 236, 246-47 (1st Cir. 2002)), the prosecution ignores the antecedent principle that, "[f]or the attorney-client privilege to attach to a communication, it must have been made in confidence and for the purpose of securing or conveying legal advice." *XYZ Corp. v. United States*, 348 F.3d 16, 23 (1st Cir. 2003). The expectation that a communication will be shared with another party, who stands outside the attorney-client relationship, "shatter[s] the necessary confidentiality." *Id.* (citing *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1016 n.6 (1st Cir. 1998) ("All depends on the circumstances surrounding a given communication. Absent an expectation of confidentiality, none accrues.")); *see United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 684 (1st Cir. 1997) ("An intent to maintain confidentiality is ordinarily necessary to continued protection[.]").

Here, as the prosecution knows and the record establishes, SpineFrontier and IME engaged outside counsel, Strong and Hanni, not just to advise them, but to draft opinion letters about the legality of consulting agreements specifically for distribution by the companies to potential surgeon-consultants. Counsel drafted several versions of those letters, and as planned,

SpineFrontier and IME provided those letters to doctors, who reviewed them. In some cases, the would-be consultants had their own attorneys review the letters as well.

The letters leave no doubt that SpineFrontier and IME always intended to share them, and that Strong and Hanni drafted them to be shared, with surgeon-consultants, who were also known as "clinical advisors." The first version of the letter, dated February 4, 2013, is not written to SpineFrontier or IME, or any executive of those companies, but "To Whom It May Concern," a placeholder for third-party surgeon-consultants. D.E. 153-3. In addition, the letter states that "each consultant is advised to seek independent counsel in evaluating the agreement and its compliance with applicable laws and regulations." *Id.* That direction confirms the common understanding, among SpineFrontier, IME, and outside counsel, that "consultants," and possibly their own "independent counsel," would receive and review the letters. Finally, the first version of the letter also states that it "is intended only for SpineFrontier and its clinical advisors/consultants . . ." *Id.* It could hardly be clearer that the letters were "intended" to be shared with doctors who might become "clinical advisors." The second and third versions of the letters, dated September 26, 2023, and February 26, 2014, respectively, bear the same generic salutation, "To Whom It May Concern," and direction that surgeons who receive the letters should consult with their own attorneys. D.E. 153-1, 153-2.

Further, the prosecution knows that the legal opinion letters were drafted by outside counsel for distribution to potential surgeon-consultants, so that they could review the proposed consulting agreements and consult with their own attorneys. In its investigation, the prosecution obtained copies of the letters from doctors and elicited testimony about them. For example, Dr. Diana Wilson recounted that she received the Strong and Hanni letter from IME and produced it to the DOJ in response to a subpoena. In her statement, she confirmed, "this was an opinion letter

provided by a law firm on behalf of Impartial Medical Experts," and that she had read it before she agreed to serve as a consultant for IME and to provide product feedback to SpineFrontier. *See* Ex. E (Wilson Tr. at 43-44); Ex. F (Wilson Ex. 3). Dr. Joseph Shehadi, an unindicted alleged co-conspirator (Surgeon #4), gave similar testimony before the Grand Jury. Shehadi testified that he received the "To Whom It May Concern" letter from Strong and Hanni along with the proposed consulting agreement with IME. *See* Ex. G (Shehadi Tr. 22). He reviewed all those materials, "ran" them by his own "healthcare attorney," and signed the agreement. *Id.* at 22-26. Dr. Agha Khan also testified that he received the legal opinion letter with the proposed consulting agreement. *See* Ex. H (Khan Tr. at 23-25).

The prosecution also took sworn testimony in its investigation from Peter Prinos, a SpineFrontier employee, about how the opinion letters from outside counsel were distributed by IME to potential surgeon-consultants. The prosecution asked Prinos about an email, dated March 20, 2014, from Vanessa Dudley, for IME, to Dr. John Shaiu that attached "updated documents" concerning the consulting agreement, including the letter, dated February 26, 2014, from Strong and Hanni. *See* Ex. I (Prinos Tr. 66-67); Ex. J (Prinos Ex. 9). Prinos testified that IME sent the package of materials to Dr. Shiau before Prinos met with him to discuss SpineFrontier products and consulting opportunities. *See* Ex. I. [3]

Because SpineFrontier, IME, and their counsel never intended to keep confidential within the companies the legal opinion letters from Strong and Hanni, they always planned to provide those letters to potential surgeon-consultants, and Strong and Hanni drafted them expressly with

---

[3] In its motion, the prosecution chides SpineFrontier for using the opinion letter and consulting agreements as "sales tool[s]." D.E. 153 at 4. Although SpineFrontier, Dr. Chin, or Mr. Humad did nothing wrong by recruiting and engaging surgeon-consultants to provide feedback on and improvements to company products, the prosecution is correct that distributing the letters to potential business partners was always the plan.

the intent that they be shared, the letters were not privileged attorney-client communications, and their disclosure could not impliedly waive any privilege over them or related communications. Indeed, if the prosecution's misguided theory were correct, any lawyer who wrote a communication to a third-party about the client's position, such as to opposing counsel, or even a court, in the course of litigation, would waive all communications between that lawyer and the client. That, of course, is not the law.[4]

### B.    Extrajudicial disclosure by SpineFrontier and IME of the legal opinion letters did not impliedly waive any privilege over related communications.

Disclosure of confidential legal communications between a client and counsel can impliedly waive the attorney-client privilege. But context matters. When disclosures are "extrajudicial," meaning communications are revealed outside of court proceedings and not for any litigation advantage, waiver will be "rare" and "the scope of any ensuing waiver will be narrow." *XYZ Corp.*, 348 F.3d at 25 n.6 (citing *In re von Bulow*, 828 F.2d 94, 102 n.1 (2d Cir. 1987)); *see United States v. Mass. Gen. Hosp.*, 475 F. Supp. 3d 45, 69 (D. Mass. 2020) (noting "distinction" between "use" of privileged communications in "judicial and nonjudicial setting[s] is significant" and rejecting argument for subject-matter waiver from extrajudicial disclosure).

---

[4] Alternatively, even if the opinion letters were subject to the attorney-client privilege, their distribution would be protected by the common-interest doctrine. *See Lionbridge Techs., LLC v. Valley Forge Ins. Co.*, 53 F.4th 711, 725 (1st Cir. 2022). That doctrine "prevents clients from waiving the attorney-client privilege when attorney-client communications are shared with a third person who has a common legal interest with respect to these communications." *Cavallaro*, 284 F.3d at 250. Here, the confidential distribution of opinion letters from Strong and Hanni by SpineFrontier or IME to the potential surgeon-consultants would not waive any privilege, because all parties shared a common interest in establishing the legal validity of the proposed consulting agreements. Such communications, if deemed to be "seeking or discussing legal advice," remain privileged, even if the communications occurred between non-lawyers. *See Crane Sec. Techs., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 21-22 (D. Mass. 2017) (denying motion to compel) (citing *In re Prograf Antitrust Litig.*, No. 1:11-md-02242-RWZ, 2013 U.S. Dist. LEXIS 63594, at *6-8 (D. Mass. May 3, 2013) (characterizing as "uncontroversial" that, consistent with maintaining privilege, "non-lawyers could discuss or relay legal advice without copying an attorney")).

Although the prosecution relies on *XYZ Corp.*, that case established, "as a matter of first impression in this circuit," that the extrajudicial disclosure of privileged communications "*cannot work an implied waiver of all confidential communications on the same subject matter.*" 348 F.3d at 24 (emphasis added). In other words, the First Circuit rejected the same implied waiver argument that, in this case, the prosecution reprises 20 years later. *See id.* at 25 ("Because the [disclosure] was plainly extrajudicial, the district court erred in using it as a fulcrum for the implication of a broad subject-matter waiver of the attorney-client privilege."); *see also In re Lott*, 424 F.3d 446, 453 (6th Cir. 2005) (granting mandamus and vacating district court order that found habeas petitioner's arguments impliedly waived attorney-client privilege) ("Implied waivers [of the attorney-client privilege] are consistently construed narrowly."); *In re von Bulow*, 828 F.2d at 103-04 (granting mandamus and vacating district court order that found a broad privilege waiver) ("[W]here, as here, disclosures of privileged information are made extrajudicially and without prejudice to the opposing party, there exists no reason in logic or equity to broaden the waiver beyond those matters actually revealed.").

Here, the prosecution erroneously argues that the voluntary disclosure by SpineFrontier and IME of the opinion letters from Strong and Hanni to potential surgeon-consultants impliedly waived the attorney-client privilege for *all* related communications with Strong and Hanni about the consulting agreement (or presumably, the consulting program in general). But those disclosures were undoubtedly "extrajudicial." They occurred in the context of contemplated business relationships and long before the civil investigation of SpineFrontier, much less this criminal prosecution. Thus, no implied, subject-matter waiver occurred. To paraphrase the decision in *XYZ Corp.*, the distribution of the legal opinion letters to potential surgeon-consultants had no "ripple effect." 384 F.3d at 23; *see Trs. of Boston Univ. v. Everlight Elecs. Co.*, No. 12-11935-PBS, 2015

U.S. Dist. LEXIS 68281, at *17 (D. Mass. May 27, 2015) (rejecting claim that disclosure of attorney opinion about patent dispute caused implied waiver of "every other attorney-client communication on the same subject-matter" as "contrary to First Circuit precedent").

Ironically, the same U.S. Attorney's Office that is now prosecuting SpineFrontier, Dr. Chin, and Mr. Humad, previously defended the U.S. Citizenship and Immigration Service (USCIS) in FOIA litigation regarding proposed new immigration regulations. In that case, the government asserted the attorney-client privilege over "email exchanges in which USCIS employees sought and received legal advice from counsel about a variety of topics." *Lawyers for Civil Rights v. United States*, No. 20-cv-11777-RGS, 2023 U.S. Dist. LEXIS 165747, at *19 (D. Mass. Aug. 14, 2023). The plaintiff argued that disclosure of the draft rule and associated talking points affected a waiver regarding the related communications. The government argued, successfully, against any such waiver, and the court agreed: "a rule that imposed a broad subject-matter waiver whenever a public statement is contemplated would mean that no party could seek confidential legal advice before making public statements." *Id.* at *22. That is not the rule, and this Court should reject the prosecution's improper request to apply it here.

II.    **Vague "fairness concerns" do not warrant this Court exercising its inherent authority to impose novel notice and disclosure requirements on the defendants, which would undermine the attorney-client privilege and infringe on their constitutional rights to a fair trial.**

No rule requires a defendant in a criminal case to provide pre-trial notice of an intent to defend based on the involvement or presence of counsel. Indeed, no rule requires notice of a formal advice-of-counsel defense. *See United States v. Mubayyid*, No. 05-cr-40026-FDS, 2007 U.S. Dist. LEXIS 45655, at *3 (D. Mass. June 22, 2007); *see also United States v. Ray*, No. 20-cr-110 (JLL), 2021 U.S. Dist. LEXIS 226839, at *12 (S.D.N.Y. Nov. 22, 2021) ("The Federal Rules of Criminal Procedure do not explicitly require the defense to provide notice of an advice of counsel defense.").

In particular, Rules 12.1, 12.2, and 12.3 mandate pretrial notice only of "certain, carefully enumerated defenses," *United States v. Wilkerson*, 388 F. Supp. 3d 969, 974 (E.D. Tenn. 2019). Beyond those three defenses – alibi, insanity, and public authority – it imposes no similar requirements for advice-of-counsel or any other defenses. *See Mubayyid*, 2007 U.S. Dist. LEXIS 45655, at *3. "Whatever wisdom supported the adoption of these rules, courts should not *ad hoc* invest new ways to coerce criminal defendants to assist the government in their prosecution— absent a compelling reason to do so." *Wilkerson*, 388 F. Supp. 3d at 974-75.

It is true, of course, that this Court has inherent authority to manage its docket, including to impose notice and disclosure requirements that exceed the applicable rules. *See Deitz v. Bouldin*, 579 U.S. 40, 45 (2016) (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)). But that basic fact, which the defendants do not dispute, "does not necessarily require that [such authority] be exercised to the fullest extent," especially when doing so threatens to undermine the attorney-client privilege or infringe on the constitutional right to a fair trial. *Mubayyid*, 2007 U.S. Dist. LEXIS 45655, at *5. "In the absence of a specific rule, the requirement of notice should be imposed only to the extent reasonably necessary to ensure a fair and reasonably efficient trial." *Id.* For that reason, in *Mubayyid*, the court *denied* without prejudice the prosecution's motion for pre-trial notice of an advice-of-counsel defense. *See id.* ("defer[ing]" decision and "recogniz[ing] that any such notice, if ordered, is likely to occur relatively close to the onset of the trial").[5]

---

[5] Notably, none of the cases that the prosecution has cited imposed a 60-day pre-trial requirement like the one it requests here. For example, in *United States v. Dallman*, 433 F. Supp. 3d 804 (E.D. Va. 2020), the court required notice of a formal advice-of-counsel defense only 10 days before trial, while noting that two other courts had refused similar requests by the government. *See id.* at 808-09 & n.7. In *United States v. Crowder*, 325 F. Supp. 3d 131 (D.D.C. 2018), the court set a 14-day deadline for a formal assertion of the defense. *See id.* at 138; *see also United States v. Atias*, No. 14-cr-0403 (DRH), 2017 U.S. Dist. LEXIS 19421, at *7-8 (E.D.N.Y. Feb. 10, 2017) (requiring notice by defendant "twenty-four hours before calling the [defense] witness to the stand").

In this case, no compelling reason calls for this Court to exercise its inherent authority to impose a 60-day, pre-trial notice requirement of an intention to offer evidence or make arguments about the roles or presence of counsel. Rule 12 conspicuously omits any notice requirement of even a formal advice of counsel defense, which is not at issue here. All defendants are afforded the fundamental right to put the prosecution to its burden of proof and, only after the prosecution rests, to determine whether to present a defense. Due process guarantees "the accused," with the assistance of his counsel, the right to choose whether to present a defense, including whether to testify, only after having "an opportunity to evaluate the actual worth of the[] evidence." *Brooks v. Tennessee*, 406 U.S. 605, 612-13 (1972) (invalidating state law that barred defendant from "putting off his testimony until its value c[ould] be realistically assessed"). Because a likely witness for a formal advice-of-counsel defense would be the defendant, an early notice requirement takes on constitutional significance. Given these constitutional issues for the defendants, the prosecution's vague complaints about "fairness concerns" ring hollow, for several reasons. D.E. 153 at 12 (citing *United States v. Gorski*, 36 F. Supp. 3d 256, 268 (D. Mass. 2014)).

First, "the decision to pursue criminal charges carries with it important consequences, including that the defendant has the right to remain silent while the government is required to prove its case beyond a reasonable doubt." *United States v. Alessa*, 561 F. Supp. 3d. 1042, 1049 (D. Nev. 2021) (finding *Wilkerson* "more persuasive" than contrary authorities in which courts required pre-trial notice of advice-of-counsel defenses); *see United States v. Lacour*, No. 6:08-cr-118-Orl-22DAB, 2008 U.S. Dist. LEXIS 146001, at *5 n.1 (M.D. Fla. Dec. 10, 2008) ("Defendants are not obligated to put on *any* defense, and, except for certain defenses which must be disclosed prior to trial, Defendants are free to make that decision at trial[]."). The constitutional guarantee of due process "protects" Dr. Chin, Mr. Humad, and SpineFrontier "against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with which [they are] charged." *In re Winship*, 397 U.S. 358, 364 (1970) (due process "protects the accused" not the prosecution); *United States v. Rodriguez*, 735 F.3d 1, 11 (1st Cir. 2013) ("It is fundamental that a criminal defendant, presumed innocent, can be found guilty only if the government proves guilty beyond a reasonable doubt."). "[F]orcing the defense to disclose anything to the government without the imposition of reciprocal discovery rights is foreign to the rules of criminal procedure and our Constitutional system." *Alessa*, 561 F. Supp. 3d at 1049.

Second, the prosecution misconstrues the exculpatory nature of extensive evidence about the many attorneys who worked for and with SpineFrontier. In this case, the prosecution chose to indict SpineFrontier, along with Dr. Chin and Mr. Humad, and at trial, corporate counsel may play a significant part. The jury may hear that, according to the prosecution, several attorneys—all innocent persons—were actively involved and continuously present during the supposed conspiracies to bribe doctors and launder money, which at least tends to undermine any finding of "willfulness." Such evidence does not remotely amount to a reliance-on-counsel defense.

By way of example, the jury may hear testimony and see documents that establish that SpineFrontier's General Counsel, Paul Speidel, co-authored and signed the letters from SpineFrontier, about IME, to potential surgeon consultants about consulting opportunities, first for SpineFrontier. *See* Ex. K (USAO GJ_0000440, USAO GJ_000453). The prosecution contends that the consulting program, in which Attorney Speidel was actively involved, was a fraudulent scheme to pay illegal kickbacks. The jury may also hear that the company's outside counsel, Peter Baxter, of Strong and Hanni LLP, reviewed the consulting agreements and drafted a series of opinion letters in which he concluded those agreements complied with all applicable laws, including the AKS. *See* D.E. 153-1, 153-2, and 153-3. The prosecution claims those agreements were "shams"

that served only "to provide a veneer of legitimacy" to the charged "kickback scheme." D.E. 153 at 1. In addition, the evidence will show that SpineFrontier's Associate General Counsel, Leslie Olsen, worked closely with Mr. Humad, year after year, to report all payments to its surgeon-consultants, in SpineFrontier's own name, even when payments were made through IME, as the Sunshine Act required. *See* D.E. 151-2, 151-3, 151-4. The prosecution falsely asserts, D.E. 1 at ¶ 37(c), despite considerable contrary evidence that it never presented to the Grand Jury, that those disclosures were made by IME to "evade" the need to report payments by SpineFrontier. *See* D.E. 150, 151 (moving to dismiss Counts 1 through 7 based on the prosecution's misleading presentation to the Grand Jury about SpineFrontier's disclosures); *see also* D.E. 151-1 (CMS disclosures of consulting payments by SpineFrontier).

Particularly in light of the willfulness requirement for an AKS violation, evidence of lawyers' involvement is exculpatory, regardless of whether the defendants eventually decide to assert any formal advice- or involvement-of-counsel defenses. Those "somewhat amorphous term[s]" have "different meanings in different contexts," but the "'thrust'" is that "'the defendant, on the basis of counsel's advice, believed his conduct to be lawful and thus could not be found to have had unlawful intent.'" *Gorski*, 36 F. Supp. 3d at 267 (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989)). In other words, the defenses turn on the notion that *advice* from an attorney, whether express or tacit, reasonably led the defendant to believe that his conduct was lawful. In short, they present arguments that a defendant did not willfully commit any crime, because an attorney "said so." But in this case, even absent any advice of counsel, the role and presence of attorneys permit other exculpatory inferences concerning the defendants' *mens rea*.

The First Circuit has "frequently recognize[d]" that "the factfinder may fairly infer . . . that it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes." *United States v. Batista-Polanco*, 927 F.2d 14, 18 (1st Cir. 1991) (citing *United States v. Pacheco*, 794 F.2d 7, 11 (1st Cir. 1986) (noting that criminal conduct "by its nature is kept secret from outsiders. . . .")); *see United States v. Ortiz*, 966 F.2d 707, 712 (1st Cir. 1992) ("Jurors can be assumed to know that criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences."); *see also United States v. Gilmer*, 534 F.3d 696, 703-04 (7th Cir. 2008); *United States v. Staten*, 581 F.2d 878, 885 (1978)). Here, it strains credulity that Dr. Chin, Mr. Humad, or SpineFrontier itself would willfully engage in an unlawful kickback scheme and flout payment disclosure requirements not only in the presence of many innocent bystanders, but with so many lawyers "in the room."

Finally, the demand that the defendants disclose their trial strategies, 60 days before jury selection, is remarkable given that the prosecution has, to date, flatly refused to disclose any lawyers it intends to call as trial witnesses. *See* Ex. B. In other words, in this criminal case, the prosecution wants to take asymmetrical discovery from the defendants. Such "one-sided" discovery, with "the defense disclosing to the Government what the Government [will] not disclose to the defense," is not only inconsistent with the limited "reciprocal" discovery under the applicable rules but also "casts a shadow over the defendant[s'] right against self-incrimination, [their] right to counsel, and work product doctrine." *United States v. Young*, No. CR-090140-BW, 2010 U.S. Dist. LEXIS 34073, at *5 (D. Me. Apr. 6, 2010). If the prosecution calls Baxter, Speidel, and/or Olson in its case-in-chief, for example, there may be no reason for the defense to call them separately. The jury would hear, on direct examination, that these witnesses, all attorneys, were

actively involved in the consulting program and payment disclosures, and they would be available for cross-examination. Similarly, if the prosecution were to present Baxter's opinion letters blessing the consulting agreements, Speidel's letter to surgeon-consultants, or Olson's many communications with Dr. Chin and Mr. Humad concerning the Sunshine Act disclosures by SpineFrontier, the defense may have no reason to offer the same evidence, which would already be made part of the record for the jury to consider. Also, if any notice were required, it should concern only the plan to call a lawyer as a witness about privileged matters, not the possibility of testimony by a defendant, after the prosecution rests, concerning who participated in creating the consulting program and making Sunshine Act disclosures.

Given that the prosecution has expressly refused to make these basic early disclosures about its witnesses and evidence to the defendants, its arguments about "fairness concerns" turn the notion of fair play on its head. The logical, fair, and constitutional way to proceed in this unusual criminal case, if there is to be any additional disclosures beyond the standard witness and exhibit disclosures, would be for this Court to order the prosecution to put its cards on the table and, only then, to decide what, if any, reciprocal discovery may be due from the defendants.

## CONCLUSION

For the foregoing reasons, Defendants Kingsley Chin, Aditya Humad, and SpineFrontier, Inc. respectfully request that this Court deny the prosecution's motion to find a waiver of the attorney-client privilege or, in the alternative, to require the defendants to disclose 60-days before trial whether they intend to assert advice-of-counsel defenses. Instead, the prosecution should be directed to identify promptly whether it intends to call any lawyers as witnesses against their former employer or clients and, if so, which lawyers.

Respectfully submitted,

/s/ *Daniel N. Marx*
Daniel N. Marx (BBO #674523)
William W. Fick (BBO #650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

/s/ *Barry S. Pollack*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

Dated: February 16, 2024

## CERTIFICATE OF SERVICE

I,  Daniel N. Marx, certify that this document filed on February 16, 2024, through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Daniel N. Marx*
Daniel N. Marx