**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA

v.

KINGSLEY R. CHIN,
ADITYA HUMAD, and
SPINEFRONTIER, INC.,

              Defendants.

Criminal No. 1:21-10256-IT

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS COUNTS 1-7**

## INTRODUCTION

Defendants' Motion to Dismiss Counts 1-7 is wrong in all respects—it is wrong on the facts, wrong on the law, and wrong on the application of the law to the facts. Indeed, rather than proving that the Government engaged in any misconduct, the Motion only demonstrates that *Defendants themselves* seek to mislead the Court. Defendants fulminate against the Government's supposed misleading presentation of evidence to the Grand Jury. They argue that the Government hid from the Grand Jury that Defendant SpineFrontier made submissions to CMS's Open Payments program, as Congress mandated pursuant to the Physician Payments Sunshine Act, 42 U.S.C. § 1320a-7b(h) (the "Sunshine Act"). But, in so doing, Defendants fail to inform the Court that the ████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████. Moreover, Defendants ignore that (i) no witness testified that SpineFrontier failed to report Sunshine Act information, (ii) the Government presented no evidence demonstrating that SpineFrontier failed to report such information, and (iii) the Indictment did not charge any Sunshine Act violations. Defendants' failure to raise any of this (the testimony, the documents, the actual charges in the Indictment), and instead blithely assert prosecutorial misconduct, is unfortunate. Even more disconcerting, Defendants propose a radical remedy that lacks any basis here: a complete dismissal of the Indictment. *See United States v. Laboy*, 909 F.2d 581, 585 (1st Cir. 1990) ("'The remedy of dismissal of an indictment based on prosecutorial misconduct is an extraordinary one.'") (citing *United States v. Rodriguez*, 738 F.2d 13, 16 (1st Cir. 1984)). The Court should deny the Motion.

**FACTUAL BACKGROUND**

I.    **The Indictment's Allegations Regarding SpineFrontier and IME**

Relevant here, the Indictment charges Defendants with conspiracy to violate the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b, (Count 1) and seven counts of substantive AKS violations (Counts 2-7). The Indictment alleges that SpineFrontier, a medical device company, and its principal owner and CEO (Kingsley Chin), and its CFO (Aditya Humad), conspired to pay, and paid, surgeon-consultants bribes, "pursuant to a sham consulting program that paid those surgeons between approximately $250 and $1,000 for each hour the surgeon supposedly spent performing consulting services." Dkt. No. 1, ¶ 29.  The Indictment charges that Defendants did so both (i) indirectly through an entity they owned and controlled—Impartial Medical Experts ("IME")—and (ii) "directly," *i.e.*, through SpineFrontier itself, including before Defendants began using IME. *See* Dkt. No. 1, ¶¶ 38(r), 39-40, 41-42. The Indictment further alleges that the Defendants paid surgeon-consultants "for purported consulting hours based not on time spent consulting, but on the number and type of surgeries the surgeon performed," including those reimbursed by Government health care programs. Dkt. No. 1, ¶ 37(e). One surgeon-consultant, Dr. Jason Montone, and his third-party, SpineFrontier distributor, John Balzer, already have pled guilty to, *inter alia*, one count of Conspiracy to Violate the AKS. *See United States v. Jason Montone*, No. 20-cr-10159 (D. Mass. 2020); *United States v. John Balzer*, No. 20-cr-10158 (D. Mass. 2020).

With respect to Count 1, the Indictment sets forth eleven subparagraphs concerning the "Manner and Means of the Conspiracy." Dkt. No. 1, ¶ 37. Among those manner and means, the Indictment specifically describes how Defendants falsely "[held] out IME as a separate and independent entity from SPINEFRONTIER, despite the fact that IME was not independent and was in fact owned and controlled by CHIN and operated by HUMAD and others, in part to evade

Sunshine Act reporting obligations" and "Us[ed] IME as a vehicle to funnel bribe payments to surgeons, including Surgeons 1-7, and to conceal the true nature of the relationship between SPINEFRONTIER and those surgeons." *Id.* ¶¶ 37(c)-(d). Nowhere does the Indictment allege, however, that any of Defendants, or IME, failed to make required Sunshine Act disclosures.

## II.    The Government Presented Testimony and Evidence to the Grand Jury About SpineFrontier's Sunshine Act Disclosures

Defendants level a serious charge of misconduct: that prosecutors presented "materially false information to mislead a Grand Jury." Dkt. No. 150 at 13. Specifically, Defendants argue that "SpineFrontier made [] Sunshine Act disclosures, not in IME's name, but in SpineFrontier's own name," Dkt. No. 150 at 6, and that these disclosures are "inconsisten[t]" with ¶ 37 of the Indictment. Therefore, Defendants infer, the prosecutors must have misled the Grand Jury:

> Even if the Government were not required to provide the Grand Jury with exculpatory information about SpineFrontier making more than 1,000 proper Sunshine Act disclosures in its own name, and none in IME's name, the Government should not have misled the Grand Jury to believe such disclosures did not exist.

Dkt. No. 150 at 6; *see also id.* at 14.

This allegation is jarringly false.



What's more, the Government produced early, voluminous discovery of *Jencks*-Act material concerning this very evidence. Defendants knew their charge—that the Government misled the

Grand Jury about SpineFrontier's Sunshine Act disclosures—was false, and yet they leveled it

anyway.

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████

　█　　████████████████████████████████████████

　　　　████████████████████████████████████████████████

　█　　██████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

　　　Similarly, Amanda Dalton, a former SpineFrontier sales representative also testified that

she knew that SpineFrontier reported Sunshine Act information:[1] "I would say in general I knew

---

[1] Defendants wrongly claim that the Government educated Dalton on the meaning of "pay for play." Dkt. No. 150 at 11 n.5. Dalton herself used that phrase in text messages years before speaking with anyone from the Government. *See* Ex. 4 ("You're right. He doesn't realize how dirty it is and the fact that it's basically ***pay for play***").

█████████████████████████████████████████████████████

that we reported everything from a Sunshine Act standpoint, and so I didn't understand IME to be a vehicle to circumvent that reporting." Ex. 6 at 107:8-11.[2] In response to a question about whether she knew "that SpineFrontier eventually made reports under the Sunshine Act," Dalton responded: "Yes. And I didn't come to know of the delay until the investigation." *Id.* at 108:1-4.

**III.    The Government Presented** ███████████████████████████████████
███████████████████████████████████████████████████████████████████

Defendants repeatedly held out IME as a separate and independent entity from SpineFrontier when that was not true. ███████████████████████████████████████████. For example, Dalton testified that she discussed with Autrey and others that they "felt it [IME] was a shell company. I do recall that verbiage. I mean, the consulting agreements have certainly been a concern since the beginning." Ex. 6 at 83:1-9. Although SpineFrontier told prospective surgeon-consultants that IME was separate and independent, Dalton, a longtime SpineFrontier employee, conceded that IME was not independent, was controlled by Dr. Chin's wife, and served no companies *other* than SpineFrontier:

> Q: Was IME, to your knowledge, independent in any real way from SpineFrontier?
> A: No.
>
> Q: You are not aware of any physician consultant who worked through IME who did work for any company other than SpineFrontier?
> A: Correct.

Ex. 6 at 115:9-116:11.

In a similar vein, documents reflect that ████████████████████████████████
███████████████████████████████████████████████████████████████████

_____

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
[2] ████████████████████████████████████████████████████



Defendants not only presented IME to prospective surgeon-consultants as an independent, third-party entity, but also as a means to evade Sunshine Act reporting. That Defendants did not ultimately follow through on that aspect of their scheme does not change the manner in which they *presented* IME to prospective physicians to gain their interest in becoming physician-consultants.

During





In summary, the Defendants' serious allegations of misconduct are manifestly wrong on all fronts.[4] The Government ████████████████████████

████████████████████████████████—even if, ultimately, SpineFrontier did make Sunshine Act disclosures in its own name.

---

[3] Defendants' argument that an FBI agent "mis-described . . . or at least described [an unsigned, undated, unsent document] in a materially incomplete way," ████████████████████████, is wrong for multiple reasons. Dkt. No. 150 at 15. ████████████████████████

[4] Defendants' allegations of misconduct also are ironic, given Defendant Chin's deletion of, and failure to preserve, his own text messages in response to the Government's 2017 subpoenas. *See* Ex. 17.

## ARGUMENT

I.    **The Defendants Have Failed to Carry The Heavy Burden Necessary to Challenge a Facially Valid and Regularly-Returned Indictment**

The Supreme Court has explained that the "proper functioning of our jury system depends upon the secrecy of grand jury proceedings," *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979), and that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Costello v. United States*, 350 U.S. 359, 363 (1956). As a corollary, defendants seeking to look behind a facially-valid indictment and challenge the underlying Grand Jury proceedings face a "heavy burden." *United States v. Schlegel*, 687 F. App'x 26, 30 (2d Cir. 2017); *United States v. Loc Tien Nguyen*, 314 F.Supp.2d 612, 616 (E.D. Va. 2004); (*United States v. Rodriguez-Torres*, 570 F. Supp. 2d 237, 242 (D.P.R. 2008). This burden cannot be satisfied by "conclusory or speculative allegations of misconduct," *United States v. Morgan*, 845 F. Supp. 934, 941 (D.Conn.1994), but instead requires defendants to show that "particularized and factually based grounds" supporting the indictment's dismissal. *United States v. Abcasis*, 785 F.Supp. 1113, 1119 (E.D.N.Y. 1992).

Defendants fail to carry this burden.  The Indictment alleges no violations of the Sunshine Act, but does accurately and supportably allege, as one of eleven manners and means of the conspiracy, that Defendants "held out IME as a separate and independent entity from SPINEFRONTIER . . . in part to evade Sunshine Act reporting obligations."  Dkt. No. 1, ¶ 37(c). Based on ¶ 37(c), Defendants incorrectly infer that the Government misled the Grand Jury into believing that SpineFrontier did not make Sunshine Act disclosures.  Defendants inference is both factually wrong, and precisely the sort of "conclusory or speculative allegation[] of

misconduct" that is insufficient to meet Defendants' burden.  For this reason alone, the Court

should reject Defendants' attempt to second guess the Grand Jury.

## II.    Defendants Are Not Entitled to Dismissal

Even if the Court accepts Defendants' invitation to scrutinize the Grand Jury's process,

Defendants face a high bar to obtain dismissal of the Indictment. As the Supreme Court has held,

dismissal is appropriate only where the purported violation "substantially influenced the grand

jury's decision to indict, or if there is grave doubt that the decision to indict was free from the

substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250,

254, 256 (1988) (cleaned up).  "In considering dismissal because of prosecutorial misconduct

before a grand jury, it must be determined whether the misconduct significantly infringed on the

grand jury's ability to exercise independent judgment." *Laboy*, 909 F.2d at 585 (citing *United*

*States v. Pino*, 708 F.2d 523 (10th Cir. 1983) and *United States v. DeRosa*, 783 F.2d 1401 (9th

Cir. 1986)).

"The basic rule is that, because of the constitutionally mandated independence of the

grand jury and the prosecutor, courts should be reluctant to dismiss an indictment. A dismissal

will, therefore, be ordered only for serious and blatant prosecutorial misconduct that distorts the

integrity of the judicial process." *United States v. Ogden*, 703 F.2d 629, 636 (1st Cir. 1983). As

Defendants acknowledge, the Government is under no obligation to present exculpatory evidence

before the grand jury, nor is it obligated to impeach its own witnesses. *United States v. Williams*,

504 U.S. 36, 51-55 (1992). Here, as described above, the Government presented truthful and

accurate information to the Grand Jury— ███████████████████████████████

███████████████. So, there is no basis whatsoever for dismissal.

Even if that were not true, Defendants still would not be entitled to the extraordinary

remedy that they request: outright dismissal. "Misstatements or mistakes alone do not justify

dismissing an indictment that is facially valid." *United States v. Maceo*, 873 F.2d 1, 4 (1st Cir. 1989) (cleaned up), *cert denied*, 493 U.S. 840 (1989).  For misleading or perjured testimony to justify the basis for dismissal, Defendants must demonstrate that the "government knew the indictment was based partially on perjured testimony which is material." *United States v. Rivera-Santiago*, 872 F.2d 1073, 1087-88 (1st Cir. 1989).  Finally, Defendants must demonstrate prejudice arising from the supposed misconduct. *United States v. Pimental*, 204 F.R.D. 223, 226-27 (D. Mass. 2001) (citing *Bank of Nova Scotia*, 487 U.S. at 254, 256).

Defendants clear none of these hurdles. The Indictment is valid on its face, and Defendants cannot show any misconduct, let alone misconduct that "substantially influenced the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. 256; *Costello*, 350 U.S. at 363("An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires no more."); *United States v. DiMasi*, 2011 WL 468213, at *3 (D. Mass. Feb. 4, 2011) (same). Defendants cannot show that the testimony was false, that it was misleading, or that the Government *knew* that the indictment was based on perjured testimony. And they cannot show prejudice, because the supposedly false information—that SpineFrontier failed to make Sunshine Act disclosures—is nowhere alleged in the Indictment.[5]

### III.    The Court Should Not Require Production of Grand Jury Legal Instructions

Arguing that the Government was required to instruct the Grand Jury on a definition of "willful" that the First Circuit has never adopted, Defendants urge the Court to dismiss all AKS charges or, in the alternative, to submit the legal instructions to the Court for *in camera* review. In making this argument, Defendants (1) fail to identify the appropriate standard for dismissal

---

[5] Finally, the Indictment even alleges that the Defendants paid bribes to Surgeon 1 *before* the Defendants had begun using IME as a part of the consulting arrangement. Dkt. No. 1, ¶ 38(r).

based on allegedly improper legal instructions; (2) fail to cite a ***single*** decision in the First

Circuit where a court dismissed an indictment based on improper legal instructions; and (3) fail

to cite the numerous decisions in the First Circuit where courts have denied motions to disclose

grand jury legal instructions. *See* Dkt. 150 at 15-19.

      Rule 6(e) demands secrecy of grand jury proceedings with several limited exceptions.

One exception is that a court "may authorize disclosure … of a grand jury matter … at the

request of a defendant who shows that a ground may exist to dismiss the indictment because of a

matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Recognizing that the

"proper functioning of our jury system depends upon the secrecy of grand jury proceedings,"

*Douglas Oil Co.* 441 U.S. at 218, a party requesting access to grand jury materials—including

legal instructions—must show "that the material they seek is needed to avoid a possible injustice

in another judicial proceeding, that the need for disclosure is greater than the need for continued

secrecy, and that their request is structured to cover only material so needed." *Id.* at 222.

Specifically, a party requesting grand jury legal instructions bears the "heavy burden" of

establishing that "particularized and factually based grounds exist to support the proposition that

irregularities in grand jury proceedings may create a basis for dismissal of an indictment."

*United States v. Rodriguez-Torres*, 570 F. Supp. 2d 237, 242 (D.P.R. 2008); *see United States v.*

*George*, 839 F. Supp. 2d 430, 437 (D. Mass. 2012) (denying motion for grand jury legal

instructions; noting defendant's burden of showing "particularized need").

      Defendants have not alleged any prosecutorial misconduct in connection with the Grand

Jury legal instructions—or even any basis to believe that the Government gave an incorrect

instruction. At most, they contend that the Government should have provided an out-of-circuit

definition of "willful" concerning the AKS. Dkt. No. 150 at 16-17.  Because the First Circuit has

ruled that "a prosecutor is not obligated to provide any legal instruction to the grand jury" and

because "simply reading the statute to the grand jury" suffices, Defendants' preference for a specific "willful" definition cannot come close to meeting their heavy burden. *See United States v. Lopez-Lopez*, 282 F.3d 1, 9 (1st Cir. 2002) (denying motion to dismiss based on improper grand jury instructions; "under federal law, the prosecutor is not obligated to provide legal instruction to the grand jury"). Where, as here, Defendants allege no misconduct with respect to the grand jury legal instructions, the case should proceed to trial. *Costello*, 350 U.S. at 363.

Defendants fail to cite a single case in the First Circuit where a court has granted the relief they seek.[6] Courts in this district repeatedly have rejected motions for disclosure of legal instructions where—as here—there is a facially valid indictment, and where a defendant can only **speculate** that the Government **may** have provided an erroneous legal instruction. *See George*, 839 F. Supp. 2d at 437 (defendant's positing of potential defect in legal instructions did not meet burden of showing "particularized need" for requested instructions); *United States v. Luthra*, 2018 WL 283892, at *3 (D. Mass. Jan. 3, 2018) (rejecting motion to compel grand jury instructions because defendant could not show "particularized need" based on speculative allegation that AKS instruction was "faulty"); *United States v. Gurry*, 2019 WL 247205, at *2-3 (D. Mass. Jan. 17, 2019) (denying disclosure of legal instructions "[w]here the [superseding indictment] is facially valid and … Defendants have not established the requisite particularized need"); *United States v. Acherman*, 2015 WL 6126811, *2-3 (D. Mass. Oct. 16, 2015) (denying

---

[6] Defendants rely heavily on *United States v. Stevens*, 771 F. Supp. 2d 556, 564-67 (D. Md. 2011), which, apart from being outside the First Circuit, is also distinguishable. In *Stevens*, the court ordered disclosure of grand jury instructions only after the Government on its own disclosed that the grand jury had asked and been instructed about the "advice of counsel." *Id.* The court held that advice of counsel was not an affirmative defense, ordered the instruction produced, and dismissed the indictment on the ground that the instruction was incorrect and could have misled the grand jury on the element of intent. *Id.* (The Government later re-indicted the defendant on the same charges.)  In contrast, here, there is no basis to believe that the Grand Jury was improperly instructed on the elements of conspiring to violate, and violating, the AKS.

motion for grand jury instructions where indictment was valid on its face; no "particularized need"); *United States v. Facteau*, 2016 WL 4445741, at \*4-5 (D. Mass. Aug. 22, 2016) (affirming magistrate judge's decision not to order disclosure and acknowledging that, while disclosure of instructions could be beneficial, court would not compel disclosure due to "the prevailing case law"); *United States v. Prange*, 2012 WL 3263606, at \*1 (D. Mass. Aug. 7, 2012); *DiMasi*, 2011 WL 468213, at \*3; *United States v Kantengwa,* 2010 WL 3023871, at \*4 (D. Mass. July 29, 2010).[7]

Defendants have not provided—and cannot provide—any basis for deviating from this settled area of law. The Indictment is valid on its face. Defendants have not argued or alleged otherwise. Counts 1-7 allege that Defendants conspired to violate the AKS, and violated the AKS, by "willfully offer[ing] and pay[ing] remuneration … to induce the purchase … of SPINEFRONTIER spinal implants and products, for which payment may be made in whole or in part by a Federal health care program." Indictment, ¶¶ 40, 42. The Defendants have not pointed to any inaccurate statement of law to the Grand Jury, or anything in the text of the Indictment suggesting that the Government advanced an improper or erroneous legal theory. *See Gurry*, 2019 WL 247205, at \*3 (rejecting motion for disclosure where Defendants failed to identify "any

---

[7] *See also United States v. Welch*, 201 F.R.D. 521, 525 (D. Utah 2001) (rejecting claim that grand jury instructions should be disclosed or reviewed *in camera* because indictment is complex or due to potential legal error and noting "[d]istrict courts should not be obligated to conduct *in camera* review on bare speculation, generalized complaint, or a fishing expedition."); *United States v. Battista*, 646 F.2d 237, 240-42 (6th Cir. 1981) ("[E]ven if an incorrect instruction was given to the grand jury, which did not occur in the present case, the indictment was valid on its face and was sufficient to require a trial of the indictment on its merits."); *United States v. Graham*, 247 F. Supp. 923, 925 (S.D. Ohio 2002) (declining *in camera* review of grand jury instructions because, even if prosecutor did not define an element of the crime properly, the court "could not dismiss the prosecution as a result"). *But see United States v. Sampson*, 01-CR-10384-MLW (8/19/14 Order, Dkt. 1505) (ordering, in special context of capital case, disclosure of grand jury instructions based on argument that lack of notice to grand jury that special findings rendered defendant death penalty eligible could be basis for dismissal of indictment).

statements by the Government to the grand jury that incorrectly stated the law"). Where, as here, an indictment "is facially adequate and demonstrates that the grand jury found probable cause to believe [Defendants committed the charged crimes], any lack of instructions or mistakes in instructions to the grand jury would not be sufficiently prejudicial to justify relief." *DiMasi*, 2011 WL 468213, at *3 (denying motion to dismiss and to provide instructions even where there was a significant change in the law between the time of indictment and motion).

The Court should decline Defendants' invitation to engage in a retrospective inquiry and dissect every question asked or instruction given (or not). If courts ordered the disclosure of grand jury instructions each time there was a dispute as to the interpretation of a particular term or a particular statute, indictments would be regularly re-assessed, and trials would be delayed by examination of preliminary grand jury proceedings. "Protecting the rights of Defendants through review of the sufficiency of the face of the indictment is consistent with the legal maxim that '[a]n indictment returned by a legally constituted and unbiased grand jury, . . . *if valid on its face*, is enough to call for trial of the charge on the merits.'" *DiMasi*, 2011 WL 468213, at *3 (quoting *United States v. Maceo*, 873 F.2d 1, 3 (1st Cir. 1989)).[8]

## III.    The Government Has Not Violated *Brady*

Failing on the merits of their arguments for dismissal, defendants attempt to tar the Government with claims of *Brady* violations.  In fact, the Government has exceeded its discovery obligations in this case—including by providing early access to grand jury transcripts

---

[8] While no specific instruction on the AKS was required and the time to address that has not come, the Government notes its disagreement with Defendants' position concerning willfulness. Defendants ignore a 2010 Amendment to the AKS, 42 U.S.C. § 1320a-7b(h), which makes it clear the Government need not prove specific intent post-2010. Of course, following the First Circuit's holding in *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir. 1989), that has been true in this Circuit since at least 1989.

*over two years ago*—well before the Local Rules require disclosure of those materials.  Where the Government has declined to provide discovery (*i.e.*, declining to catalogue every non-material/non-*Brady* communication with counsel for coconspirators) or has made belated disclosures of information (*i.e.*, the consent to search form signed by Jason Montone), the Government has done so transparently, raising the issues with the parties and the Court.

Defendants' approach to these supposed *Brady* issues is exemplified by their handling of allegations set out in the July 2023 Seth Orkand Affidavit (Dkt. No. 108). The Orkand Affidavit contains anonymized allegations of misconduct: that an unnamed prosecutor made promises to an unnamed defense lawyer that their client, an unnamed witness, "would not be criminally prosecuted if he agreed to a civil settlement." *Id.* ¶ 8. The Government has asked Defendants multiple times to identify the prosecutor, lawyer, and witness—so that it can investigate and produce any potential *Brady* material. *See*, *e.g.*, Ex. 12 at 2.  Defendants, however, persistently have declined to do so, suggesting they have little interest in getting to the truth of the allegation, preferring instead to wield the anonymous allegations over the Government's head.

A.    **The Government Is Not Obligated to Seek Out Exculpatory Information That is Not in Its Possession, Custody, or Control**

Under the guise of a motion to dismiss, Defendants assert that the Government has failed to comply with its *Brady* obligations by not searching through CMS's files for supposedly exculpatory information.  Defendants concede, however, that the Government **agreed** to ask for precisely the information Defendants requested (for the first time) on December 22, 2023. *See* Ex. 13. Unsatisfied, Defendants contend that because HHS-OIG agents participated in the investigation, the Government has an obligation to comb through CMS's files because CMS—like the FDA, NIH, and CDC—falls under HHS's umbrella. Defendants overstate the scope of the Government's obligations and incorrectly suggest that CMS is part of the "prosecution team."

The law is clear that *Brady* obligations do not apply to materials that are not in the Government's possession, custody, or control. *See United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002); *United States v. Hall*, 434 F.3d 42, 55 (1st Cir. 2006) (ruling that the duty to disclose on the part of the prosecutor does not extend to information possessed by Government agents not working for the prosecution); *United States v. Rivera-Rodriguez*, 617 F.3d 581, 595 (1st Cir. 2010).  The Government is not required to search through, and produce in discovery, evidence from sources outside the "prosecution team," whether the sources be investigative bodies or other governmental agencies. *See United States v. Casas*, 356 F.3d 104, 116 (1st Cir. 2004) (observing that the Government is not required to search through the files of agencies not under the Government's supervision); *United States v. DeCologero,* 2013 WL 3728409, at *5 (D. Mass. July 11, 2013) (ruling that the Government was not obligated to produce two FBI reports relevant to charged murder where the FBI was not part of the prosecution team). *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (refusing to impute to the AUSAs prosecuting the case knowledge of reports prepared by FBI agents "uninvolved in the investigation or trial of the defendants[]";"We will not infer the prosecutors' knowledge simply because some other government agents knew about" the evidence.).

Specifically, courts have declined to impute to federal prosecutors knowledge of investigative bodies that are not part of the prosecution team, in part, because "the imposition of an unlimited duty on a prosecutor to inquire of other offices ***not working with*** the prosecutor's office on the case in question would inappropriately require [courts] to adopt 'a monolithic view of Government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (citation omitted; emphasis added)). This is especially true when dealing with a government agency—like HHS—that employs over

88,000 people and has within it twelve large, distinct "operating divisions" like FDA, CDC,

NIH, and—the one Defendants focus on—CMS.  *See* Ex. 14.[9]

Defendants maintain, however, that because the prosecution team includes HHS-OIG

agents, the Government should comb through the files of CMS because CMS—in their view—is

"closely connected" to the prosecution team.  This argument fails for two reasons.  ***First***, HHS-

OIG is not part of CMS and does not fall anywhere within CMS's operating divisions.  *See* Ex.

14; Ex. 15.  Instead, HHS-OIG is one of the fourteen offices within the Office of the Secretary of

HHS and has a separate line of reporting from CMS.  *See* Ex. 15.  ***Second***, Defendants' "closely

connected" argument—even if it were accurate (and it is not)—is not the standard. The relevant

inquiry is whether CMS (or CMS-Center for Program Integrity) is part of the "prosecution

team." Here, it is not. CMS has had no investigatory role on the prosecution team.  The same

goes for the CMS-Center of Program Integrity, the group that deals with Sunshine Act reporting

and is one of 23 centers/offices within CMS. Ex.15 at 1, 48, 50).  *See United States v. Luthra,*

2016 WL 5946864, at *10 (D. Mass. Oct. 12, 2016) (holding that CMS data was not within the

prosecutors' possession, custody, or control where CMS did not participate in the investigation);

*see also Luthra*, 15-cr-30032, Dkt. 187 at 4-6 (trial testimony of HHS-OIG Special Agent

explaining involvement in defendant's criminal prosecution); *United States v. Ferguson*, 478 F.

Supp. 2d 220, 239 (D. Conn. 2007) (denying defendants' request for discovery materials from

state AG's office, despite finding that government conducted joint interviews with state AG's

office); *United States v. Volpe,* 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) ("Courts have construed

the term 'government' in this rule narrowly to mean the prosecutors in the particular case or the

*governmental agencies jointly involved in the prosecution* of the defendant, and not the

---

[9] *See* https://www.hhs.gov/about/agencies/orgchart/index.html.

'government' in general."); *United States v. Upton*, 856 F. Supp. 727, 750 (E.D.N.Y. 1994)

(denying defendants' request for material within the FAA even where prosecution team included

two FAA investigators where the FAA itself did not participate in the investigation).

Finally, the materials Defendants request here—SpineFrontier's Sunshine Act

submissions and communications—are already ***in Defendants' possession***; after all,

SpineFrontier itself has said it made those disclosures.[10] *See Bender*, 304 F.3d at 164 (finding

that the Government complied with its *Brady* obligations because, in part, the defendant himself

was "on notice" of the existence of the potentially exculpatory material he requested); *United*

*States v. Pandozzi*, 878 F.2d 1526, 1529 (1st Cir. 1989) (ruling that "*Brady* does not require the

Government to turn over information which, with any reasonable due diligence, the defendant

can obtain himself"); *United States v. Carmona-Bernacet*, 645 F. Supp. 3d 6, 14 (D.P.R. 2022)

(finding that the Government "need not disclose 'information that already is known to the

defendant and its failure to do so cannot be deemed prejudicial'") (citations omitted).[11]

**B**.    **Defendants Are Not Entitled to All Communications Between the**
         **Government and Counsel for Witnesses**

Defendants are not entitled to every communication the Government had with counsel for

witnesses. On October 25, 2023, over two years after Indictment, the Defendants demanded that

the Government search for communications addressing five topics, including in particular: (1)

---

[10] Provided that Defendants produced those Sunshine Act submissions in response to the subpoenas the Government served on SpineFrontier (as they were legally required to do), Defendants have received those same documents again in the automatic discovery.

[11] Additionally, Defendants are wrong that because CMS was the "victim" in this case, Dkt. No. 150 at 19, the Government had an obligation to investigate and disclose materials in its possession. *See United States v. Ellison*, 527 F. Supp. 3d 161, 164-67 (D.P.R. 2021) (finding that FEMA, the relevant agency victim of the defendant's fraudulent practices, was not "closely connected" to the prosecution and thus not subject to *Brady* disclosure obligations even though the Government interviewed FEMA members).

"contact that the Government had with alleged co-conspirators or their counsel during the charged conspiracy period" and (2) "interactions with any alleged co-conspirators or their counsel about actual or potential resolution of claims or charges" without regard to whether those contacts or interactions constitute *Brady* or are discoverable under Rule 16 or the Local Rules. The Government agreed to, and has produced, documents falling within the other three categories,[12] but the Government declined to produce all communications on the two topics above and asked Defendants for authority supporting their position. Ex. 16. Defendants provided no such authority and did not respond to the Government's letter.  Defendants now claim—again without authority—that the Government has violated its *Brady* obligations by not producing "emails with counsel for cooperating witnesses." Dkt. No. 150 at 13.

The Government has produced proffer letters, immunity letters, settlement agreements, cooperation agreements, plea agreements, memoranda of interview, and grand jury transcripts relating to coconspirators.  The Government produced much of this material years ago and well before the deadlines required by the Local Rules.  *See* L.R. 116.2(b)(2).  Defendants are not entitled under *Brady*, Rule 16, or the Local Rules to emails revealing, for example, "scheduling matters," or even negotiations with counsel for cooperating witnesses who entered into cooperation agreements. *See S.E.C. v. Gupta*, 2012 WL 1592525, at *1 (S.D.N.Y. May 1, 2012) (denying motion to compel settlement negotiations with cooperating witnesses); *United States v. Buske*, 2011 WL 2912707, at *4-5 (E.D. Wis. July 18, 2011) ("[D]isclosure of communications regarding 'the negotiation process' by which any immunity or leniency agreements were reached would be unnecessary so long as the final agreements between [the cooperating witnesses] and

---

[12] These included, among other things, threats made to alleged coconspirators, comments made by coconspirators about their culpability, and communications about the credibility of coconspirators.

the government were fully and accurately reflected in the plea agreements and proffer letters defendant already had. Preliminary versions of such agreements may confuse more than enlighten."); *United States v. Weaver*, 992 F. Supp. 2d 152, 158 (E.D.N.Y. 2014) (rejecting defendant's motion to compel all communications with cooperating witnesses and counsel and noting that "requiring production of the substance of such communications with counsel, and/or draft agreements, could have a chilling effect on plea negotiations"); *United States v. Miller*, 250 F.R.D. 588, 593 (D. Kan. 2008) (holding that Defendants were entitled to the final, operative plea agreement, proffer letter and immunity agreement, but not drafts).

The Government has produced the statements made by coconspirators or witnesses, either in interviews or before the Grand Jury. To the extent that witnesses made, or go on to make at trial, inconsistent statements, Defendants can impeach those witnesses. But rote administrative communications between the Government and counsel predating these agreements are not impeachment material, would be inadmissible at trial, and the disclosure of these materials could have a chilling effect on plea negotiations as described above. *See*, *e.g.*, *Weaver*, 992 F. Supp. 2d at 158.

## CONCLUSION

For all the above reasons, the Court should deny the Motion.

Dated: February 16, 2024

Respectfully submitted,

UNITED STATES OF AMERICA,

By its attorney,

JOSHUA S. LEVY
Acting United States Attorney

*/s/ Abraham R. George*
ABRAHAM R. GEORGE
PATRICK CALLAHAN
CHRISTOPHER LOONEY
Assistant U.S. Attorneys
1 Courthouse Way
John Joseph Moakley U.S. Courthouse
Boston, MA 02210
(617) 748-3100