## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES

    v.

KINGSLEY R. CHIN and
ADITYA HUMAD,
    *Defendants*.

No. 1:21-cr-10256-IT

## DEFENDANTS' MOTION TO CONTINUE TRIAL AND
## FOR HEARING CONCERNING *BRADY* VIOLATIONS

Barry S. Pollack
Joshua L. Solomon
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
*Counsel for Defendant Kingsley R. Chin*

William W. Fick
Daniel N. Marx
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
*Counsel for Defendant Aditya Humad*

Pursuant to the Court's Order dated September 7, 2021 (the "*Brady* Order"), issued in accordance with the Due Process Protections Act, Rule 5 of the Federal Rules of Criminal Procedure, and Rules 116.1 & 116.2 of the Local Rules for the District of Massachusetts, and following a series of belated *Brady* disclosures and dismissal of certain counts vaguely justified as "in the interests of justice," defendants Kinglsey Chin and Aditya Humad respectfully submit this memorandum in support of their motion to continue the trial in this matter. Defendants also respectfully request that the Court use the date currently scheduled for the start of jury selection, March 17, 2025, to hold instead a hearing concerning these *Brady* issues, which could inform whether dismissal of this case is warranted in light of the *Brady* violations, whether additional documents being withheld should be compelled from the government, whether evidentiary exclusions at the continued trial are appropriate, or whether other appropriate relief is called for as a result of the government's *Brady* violations.

## Preliminary Statement

Recent and significant events have occurred in this matter that would make a trial at the currently scheduled time fundamentally unfair. Many of these events occurred just within the last several days, and others within the last few weeks. As trial is approaching, disclosures appear ongoing even as this motion is being filed.

As the Court is aware, on January 17, 2025, the government abruptly filed a motion to dismiss all charges against SpineFrontier, Inc. and Counts Six and Seven against defendants Chin and Humad. This motion came without any advance warning to the defense.[1] The government's dismissal of charges came in the midst of a then-developing revelation of egregiously-late productions of *Brady* materials that both this Court's rules and its *Brady* Order had required the

---

[1] The government apparently tried to call one lawyer from each defense team unsuccessfully minutes before filing its motion to dismiss at 5:15 p.m. on Friday, January 17.

government to provide to the defense more than three years earlier. As discussed in more detail below, the government first began revealing that it had failed to provide timely *Brady* material when it made a production in October 2024. Surprised by the extensive *Brady* material that the government was producing so long after its October *2021* deadline for doing so, defendants raised various questions about the late production, the government's reasons for it, and other apparent gaps in productions that the government might have been withholding. Initially, the government claimed that the material it produced in October 2024 was not actually exculpatory, and refused to commit to producing any other similar material it possessed.

After further communications between the government and the defense, the government ultimately relented, agreeing just last month to produce additional *Brady* information beyond what it provided in October 2024. That agreement opened the proverbial floodgates for significant amounts of *Brady* material that had been withheld for years – most of which the government possessed long before its October 2021 deadlines for disclosing exculpatory information under the *Brady* Order and Local Rules. The government made document productions on January 13, January 17, January 24, February 3, February 5, and February 12, each of which contained exculpatory information that the government had inexplicably withheld until just weeks before trial, with most of it having been in the government's possession for years.

It was in this context – indeed, in the middle of the government's flurry of late productions – that the government abruptly dropped SpineFrontier from this case, along with two of the substantive counts against defendants Chin and Humad. The two dismissed counts concerned the two surgeons who, according to the Indictment, were the recipients of the largest alleged payments. The government's actions, and the *Brady* issues surrounding them, led the defendants to ask for additional information about the government's intentions for the upcoming trial and bases for

claiming that dismissal of two counts would "streamline" the case, notwithstanding a broad, pending conspiracy charge that expressly includes the two surgeons that were the subject of the dismissed substantive counts. The government refused to answer several of the defendants' questions that arose from the last-minute change in the prosecution's case. In the meantime, on February 10, 2025, despite its motion's promise to "streamline" the case, the government provided a list of over 550 exhibits that it claims it intends to use at trial. Defendants' preliminary review of the government's list suggests that those exhibits run to over 33,000 pages.

To be clear, the current team of prosecutors, consisting of three AUSAs, appear to be making efforts to cure the egregious disclosure failures. One of those AUSAs is fairly new to this case. The present prosecution team taking this case to trial was preceded in the matter, however, by at least three others who are no longer with the U.S. Attorney's Office. The actions and inactions of prosecutors earlier in the case have been compounded by transitions as AUSAs have left the office, complicating the current prosecution team's compliance with the government's obligations.[2] For example, as discussed in more detail below, *Brady* disclosures have not only been delayed, but obvious *Brady* information – such as assurances made to witnesses as an inducement for information – may have been lost or made inaccessible to the current prosecutors. Whether ongoing curative efforts will eventually suffice to allow for a fair adjudication of this matter remains to be seen, as information that should have been produced years ago continues to flow to the defense even as this motion is being submitted. What is clear at this point, however, is that the bevy of recently – and egregiously late – produced *Brady* material, the government's recent dismissal of charges and unwillingness to provide information about the intended effects, including

---

[2] Defendants thus do not seek findings against the current AUSAs of record for the government failures that they have been working to fix. To the contrary, albeit some of the efforts to cure past failures are not yet adequate, as discussed below, the recent addition of the latest AUSA to join the prosecution appears to coincide with the government making disclosures that had previously been withheld improperly.

impact on the pending conspiracy count, and other significant gaps in the government's productions discussed herein make the currently scheduled trial date no longer viable if the defendants are to receive a fair trial consistent with Due Process rights. In addition, a hearing following continuation of the trial could help inform other appropriate remedies that should result.

## I. The Government Abruptly Dismissed Counts Six and Seven, Concerning the Largest Alleged Recipients of So-Called "Bribes."

In its January 17, 2025 motion to dismiss, the government argued that the dismissal served "the interests of justice" without explaining what, if anything, meaningful had changed. On the next business day, January 21, 2025, the Court granted the government's motion. Counts Six and Seven were two of the six substantive counts alleging violations of the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)(2)). Those two counts alleged that defendants had made unlawful payments to two surgeons, identified in the Indictment as Surgeons 6 and 7. According to the government, Surgeon 6 is Dr. ▮▮▮▮▮▮, and Surgeon 7 is Dr. ▮▮▮▮▮▮▮▮.

The Indictment alleged that Dr. ▮▮▮ and Dr. ▮▮▮▮ were, by far, the largest recipients of payments that the Indictment claims were actually bribes, rather than payments for legitimate consulting services. The Indictment alleged payments to Dr. ▮▮▮ totaling $911,938 and payments to Dr. ▮▮▮▮ totaling $978,831, for a combined total between them of $1,890,769. *See* Indictment ¶ 35. In contrast, the other four surgeons that are the subjects of Counts Two through Five (Surgeons 1, 3, 4, and 5) were alleged to have been paid, *combined*, less than what each of Dr. ▮▮▮ and Dr. ▮▮▮▮ was paid individually. *See id.* (listing payments to Surgeons 1, 3, 4, and 5 as $379,719, $125,288, $61,037, and $35,625, respectively, for a combined total of $601,669). Not surprisingly, defense counsel had focused much of their efforts on the preparation of a defense to Counts Six and Seven because those involved by far the largest payments.

In its motion to dismiss, the government wrote that "the dismissal of these charges is in the interests of justice" because it would make for "an efficient trial, and will simplify and streamline the presentation of evidence to the jury." ECF No. 225, at 1. The government did not explain how dismissal of Counts Six and Seven would achieve that goal, particularly as Drs. ████ and ████ are alleged to be co-conspirators for purposes of Count One, which charges conspiracy to violate the Anti-Kickback Statute, and which the government did not dismiss. Defendants asked the government for an explanation of that stated basis, but the government initially declined to respond for nearly four weeks because, it says, "[w]e do not believe we are required" to do so.[3]

The likely reality behind the dismissal of Counts Six and Seven is that the government now recognizes that it cannot rely on these two physicians as witnesses because of exculpatory information it had long possessed, but only belatedly produced. Indeed, on February 10, 2025, the government served on defendants its list of anticipated witnesses for trial, which does not include either Dr. ████ or Dr. ████, despite their being the alleged recipients of the largest payments. This development calls into question the government's ability to have obtained a conviction on the dismissed counts, leading the government to take steps to avoid facing issues related to its late disclosure of *Brady* material about these physicians. Yet that explanation alone would not have justified dismissing substantive counts, while leaving in place a conspiracy charge that the government convinced a Grand Jury to indict through a presentation that included, in part, what is

---

[3] The government may now have relented on its refusal to answer the question about Count One (conspiracy). In a meet-and-confer call on February 12, 2025, after defendants sent the government a draft of this motion, the government orally committed to not introducing evidence about Dr. ████ or Dr. ████, or including them as part of Count One, despite the allegations of the Indictment. Defendants are awaiting written confirmation of that response. The government's evolving position still leaves uncertainty, however, about whether and how the defendants will be able to use now-revealed exculpatory information. Simply put, evidence that the lion's share of consulting payments, among those the Indictment alleges to have been involved in violations of the Anti-Kickback Statute, went to surgeons who performed legitimate consulting work and are not part of any kickback conspiracy would tend to support a defense that payments to the other four surgeons identified in the remaining four counts, and the consulting program in general, are consistent with a good faith effort to comply with the law.

now indisputably misleading evidence. At the same time, the government refused for weeks even to say whether it would still seek to treat those physicians as alleged co-conspirators.

## II.    The Government Has Made Egregiously Late Productions of *Brady* Materials, Which Are Ongoing, Within *Thousands of Pages* of New Documents Provided Within Just Weeks of Trial.

### A.    The Government Revealed That It Had Been Withholding Documents That it Was Obligated to Produce Three Years Earlier

The government was obligated to produce *Brady* material to the defense years ago. Specifically, pursuant to Local Rules 116.2(b)(1) and 116.1(c)(1), the government was required to produce all exculpatory information in its possession, custody, or control to Mr. Humad and Dr. Chin by October 5, 2021 and October 18, 2021, respectively, 28 days from their respective arraignments. The government's obligation to produce exculpatory information "in a timely manner" was also included in this Court's September 7, 2021 *Brady* Order, issued pursuant to Federal Rule of Criminal Procedure 5 and the Due Process Protections Act. *See* ECF No. 12. The *Brady* Order expressly admonished the government that "failure to discharge this obligation may result in consequences, including the reversal of any conviction, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and/or sanctions by the Court." *Id.*

Revealing a blatant violation of those obligations, on October 9, 2024, three years after its deadline, the government made a document production that contained extensive *Brady* material – including material that the government had possessed for more than four years, yet had never disclosed. Some of the most extensive of that *Brady* material concerned Dr. ■■■ (i.e. Surgeon 6). When making the production, the government attempted to excuse its egregiously late disclosure with the position that what it was then producing was not, in fact, discoverable, but that the government was nonetheless providing it "in an abundance of caution." (*See* Production Letter,

attached hereto as <u>Exhibit A</u>.) Naturally, that untenable position called into question other determinations that the government made concerning the scope of its *Brady* obligations.

In reality, the documents the government belatedly produced contained obvious and extensive *Brady* material, was undeniably discoverable, and should have been produced years ago. For example, included in the production was a letter from Dr. ███ counsel – which the government had received *four and half years* before producing it to the defense – providing detailed factual information explaining why payments to Dr. ███ were not bribes, but rather compensation for legitimate consulting work. Included in the letter's explanations were factual details of various points that are directly contrary to the government's theory of the case. The letter explained, with facts in support of each point:

(1) that "the consulting payments received by Dr. ███ most definitely *do not correspond to his use of SpineFrontier products*";

(2) that the timing of Dr. ███ use of SpineFrontier's products and the beginning of the consulting arrangement belied the government's claim that the promise of consulting payments was an inducement to begin using SpineFrontier products;

(3) that "SpineFrontier itself did not believe that Dr. ███ required consulting payments to continue using SpineFrontier's product";

(4) that Dr. ███ had "spent hundreds of hours and made valuable contributions in his consulting work – contributions that actually led to changes in the device"; and,

(5) that the payments from SpineFrontier were a very small portion of Dr. ███ income, such that "[s]imply put, Dr. ███ did not need SpineFrontier's money" and "used SpineFrontier products because he believed they helped his patients."

(*See* Goodwin Letter, attached hereto as <u>Exhibit B</u>, at 2-3 (emphasis in original).)

The government's production also included a presentation about Dr. ██, dated November 3, 2020, almost a year before the government's October 2021 production deadlines for exculpatory evidence, and four years before the government actually produced it. (*See* Goodwin Presentation, attached hereto as <u>Exhibit C</u>.) That presentation revealed that Dr. ██ and his counsel had been interacting with the prosecution team since as early as May 2019, and that his counsel had provided "hundreds of pages of evidence of Dr. ██ consulting work for SpineFrontier." (*Id.* at 2.) As discussed below, more documents, produced in just the last several weeks, revealed that early communications had provided the government with additional exculpatory information consistent with that contained in <u>Exhibit B</u>. To date, the government has not provided to the defense *any* memoranda of interviews or notes regarding several of the meetings referenced in the November 2020 presentation, or notes or memoranda regarding the November 2020 meeting itself. As with the earlier letter from Dr. ██ counsel, the November 2020 presentation contained detailed explanations as to why the charged conspiracy simply did not exist – a position directly contrary to the conspiracy and substantive charges involving Dr. ██.

Nor was the exculpatory material in this production limited to information concerning Dr. ██. For example, the government also produced a document from counsel for Dr. ██████ – which it possessed since October 2018, *six years* before the government produced it and three years before its production deadline for exculpatory information, which deadline had passed three years before the government made its production. Dr. ██ is another of the surgeons whom the government alleges to be a co-conspirator in Count One. That document provided a detailed presentation as to why Dr. ██ consulting for SpineFrontier was not a "sham" as the government has alleged. It included such assertions as the following:

> Dr. ██ chooses which products to use for a particular procedure based exclusively on the best interests of each patient. His consulting and investment

relationships with SpineFrontier do not influence his clinical judgment. It is his clinical judgment that SpineFrontier products often provide patients with the least invasive treatment option, leading to fewer complications and better outcomes. Dr. ███ also uses products that are competitive with SpineFrontier's products where he views the competitor's product as superior.

(McGuire Woods Presentation, Exhibit D, at 1-2.) In fact, the presentation even noted that the evidence it was offering was directly contrary to the government's theory of the case:

In recent meetings, the government denied seeing any evidence to support Dr. ███ legitimate consulting arrangement with SpineFrontier and has insinuated that the consulting fees were not earned, but rather an effort to recover the funds Dr. ███ loaned to SpineFrontier. These claims are contradicted by demonstrable and uncontroverted evidence. As further explained in this document, Dr. ███ consulting and investment relationships with SpineFrontier are commercially reasonable, good faith arrangements that have not influenced his selection and use of products.

(Id.) Over the course of 20 single-spaced pages, the document then proceeded to detail the legitimacy of Dr. ███ dealings with SpineFrontier, supported by evidentiary citations.

These documents undeniably constituted and contained *Brady* material. *See, e.g.*, *United States v. Nacchio*, No. 05-cr-00545-EWN, 2006 WL 8439750, at *8 (D. Colo. Aug. 28, 2006) ("An attorney's representations to the Government of what his or her client would testify to if called as a witness are discoverable statements."); *United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020) (ordering the production of "attorney proffers" as *Brady* material). While the newly-configured prosecution team recently produced more materials, the government took the position, and apparently still maintains, that such materials do not qualify as *Brady* information, and that it was providing them merely "in an abundance of caution." That excuse reflects the challenges the prosecution team is facing when gathering and producing what constitutes *Brady* material based on acts of concealment by one or more former AUSAs, as it also tries to minimize the government's past failure to have provided such material far earlier. The government's past practices and present

9

excuse also undermine the ability of defendants and the Court to rely on the government as a filter for what gets produced as exculpatory information that is material to the defense.

**B.**    **Just Weeks Before Trial, the Government Produced Multiple Waves of Extensive Additional *Brady* Material That Defendants Are Attempting to Process and Use in the Limited Time Before Trial**

When defendants responded to the government's assertion that the October 2024 material was not discoverable, the government initially maintained its position, and thus refused to commit to producing any other similar types of material. Defendants continued to press the government on its untenable position that what it produced in October 2024 could legitimately have been withheld. (*See, e.g.*, Fick & Marx Letter dated December 20, 2024, attached hereto as <u>Exhibit E</u>.) As defendants would later learn, the October 2024 production was just the tip of the iceberg. The government was in possession of far more extensive *Brady* material that the present prosecution team either had not known about or was withholding.

Specifically, just last month, the government finally relented, at least in part, by committing to review communications between prosecutors and agents, on the one hand, and alleged co-conspirators or their counsel, on the other. The government then began a series of additional late productions of more *Brady* material, making productions on January 13, January 17, January 24, February 3, February 5, and February 12, 2025. These productions included (but were by no means limited to) exculpatory material relating to the charges involving Dr. ███ and Dr. ███████ specifically. In the midst of gathering and producing these materials, the government abruptly filed its motion to dismiss Counts Six and Seven concerning those two surgeons.

Included in the more recent productions, for example, was another presentation about Dr. ███, dated June 2019 (for which the defense cannot locate any notes or reports in the government's productions), which included detailed examples of actual consulting work that Dr. ███ had provided in exchange for payments that the government has labeled "sham" consulting

payments and "bribes." (*See* <u>Exhibit F</u> hereto, at 27-53.) The government also produced, for the first time, yet another detailed, exculpatory letter from Dr. ███ counsel. That letter was dated June 12, 2020, and was thus in the government's possession for more than a year before its disclosure deadline, and more than four and half years before the government actually provided it to defendants just last month. (*See* <u>Exhibit G</u> hereto.) That June 2020 letter was accompanied by an "Appendix A," consisting of a *49-page chart* detailing Dr. ███ actual consulting work, with references to documentary evidence for each event. (*Id.*)

     In addition to being exculpatory, ███████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████



Some of the most recent productions also include *Brady* information linked to Dr.

▮▮▮▮, Surgeon Six, who had been the subject of the now-dismissed Count Six. This *Brady*

information is plainly revealed by comparing the memorandum of the government's September 6,

---

[4] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2019 interview of Dr. ███████, which the government produced long ago, with handwritten notes from the same interview, which the government belatedly produced only last week. In the timely-produced memorandum, written *thirteen days* after the interview, the agent stated: "Total hours in surgery are not total hours of consulting time." (*See* Exhibit J, at 1.) As the defense recently learned, however, in the handwritten notes taken on the day of the interview, the actual statement taken down, as a full sentence, did not use the word "total," twice, the way it appeared in the report. The handwritten notes instead showed the full sentence as: "Hours of surgery is not hours of consulting time." (*See* Exhibit K, at 2.) While this change is to just two words, the meanings of the sentence are substantively night and day in light of the government's theory that defendants encouraged surgeons to bill for consulting time while in surgery. As noted above, just before producing the handwritten notes with the witness's actual apparent statement, the government voluntarily dismissed the substantive count of the Indictment pertaining to Dr. ████████.

Nor is information concerning Drs. ████ and ██████ the full extent of the government's recently produced, egregiously late *Brady* material. To the contrary, productions made just in the last few weeks are filled with undeniable *Brady* material, produced years late without explanation for the delay. For example, on Friday, January 24, 2025, the government produced a summary of a 2019 interview of Dr. ████████, conducted more than two years before the government's October 2021 deadline for producing exculpatory information. The government has identified Dr. ████ as an unindicted alleged co-conspirator. Included in the memorandum was a report of Dr. ████ having told the government that "SF [SpineFrontier] products are good products. ████ realized this once he stopped using them. In his mind, he entered into the SF consulting agreement *in good faith and had no intention of it becoming a kickback*." (Exhibit L (emphasis added).) Such information is directly contrary to the government's theory of conspiracy behind Count One.

As an additional example, the government also produced on January 24, 2025, more than *three years* after its production deadline, another memorandum of interview, of Dr. ████ ████, conducted nearly *seven years* earlier. As reflected in that memorandum, Dr. ████ described legitimate consulting work for SpineFrontier, including through IME, and reported that he "did not use SF's products more frequently because he was consulting for them." (Exhibit M, at 5.) Such information is directly contrary to the Indictment's assertion that the consulting program was a "sham" put in place to induce surgeons to use SpineFrontier products.

While defendants are still working through the recently produced materials and thus expect to identify even more *Brady* information, it is evident already that the productions are filled with late-produced, exculpatory information that the government was required to produce years ago. Given the volume and timing of the most recent productions, defendants have not yet been able to fully review what has been produced over the last several weeks, and thus determine the full scope of relief that is appropriate in light of the government's *Brady* violations. By way of example, in multiple batches beginning on just February 3, 2025, the government has produced 137 sets of mostly *handwritten* notes (many of which are thus difficult to read), spanning over 1,100 pages of notes and their exhibits. In the minimal time that defendants have had with these materials, they have not been able to review them in their entirety, let alone follow up on leads or otherwise use them to prepare adequately for their defense at trial. Exacerbating the challenge of attempting to process and use this mountain of new evidence is the government having told the defendants, on February 10, 2025, that it intends to use over 550 trial exhibits, spanning more than 33,000 pages, despite promises to "streamline" the trial. Notwithstanding the limited time that defendants have had to work with the material produced over the last several weeks (both notes and documents), defendants have already identified at least a portion of the late-disclosed *Brady* information,

summarized in the chart submitted herewith as **Appendix 1**. As the dates of the documents in that Appendix demonstrate, the government has had most of it for years, while giving it to defendants just weeks before trial.

And defendants understand that more is still to come. Indeed, one recent batch, produced on February 5, 2025, contained notes of interviews for which there are no corresponding, previously-produced memoranda. The defendants have already seen some clear *Brady* material in even this latest production, such as the notes of the government's interview of Mr. ███, discussed above, which the government has had since 2019, but produced for the first time on February 5, 2025. There are also approximately 20 memoranda of interviews for which no notes have yet been provided, further suggesting either additional upcoming productions or spoliation. As mentioned above, some of the late-produced material refer to meetings about Dr. ███ for which neither notes nor memoranda have yet been produced. On February 12, 2025, just the day before this motion is being filed, the government produced for the first time a proffer letter from *2017*, issued to a witness whom the government has identified as an unindicted alleged co-conspirator and the subject of one of the remaining substantive counts. At the same time, the government informed the defendants that it has been unable to find another proffer letter that it entered into with another alleged co-conspirator – a likely casualty of the failure to have produced it years ago when due.

Other critical gaps in what would constitute obvious *Brady* material also remain. For example, ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████

A similar gap appears with respect to Dr. ███████████, another unindicted alleged co-conspirator, the subject of Count Four, and a witness on the government's list of anticipated trial witnesses. During his testimony in another proceeding, Dr. ██████ described the former lead prosecutor on this matter having told him "don't worry, you're not the target," and "Please cooperate, and everything's going to – nothing will happen to you." As a result, Dr. ██████ "said of course I'm going to cooperate," and "flew there on my time and my penny." (*See* Hearing Excerpts, Exhibit N, at 157.) Dr. ██████ dated that exchange as having occurred in 2017, and thus information concerning it would have been required of the government years ago, and certainly by the October 2021 deadline for producing then-existing *Brady* material. None of the materials that the government has produced, however, acknowledge such an assurance and apparent exchange of cooperation for a promise that "nothing will happen to you." With the lead prosecutor who apparently engaged in that discussion no longer in the office or participating in this prosecution, the current prosecution team has (at least to date) not been able to provide any further information about the pertinent promise and inducement.

III.    **A Trial Cannot Justly Be Held as Scheduled While Protecting Defendants' Due Process Rights in Light of Recent Developments.**

Facing concerns over its years' late disclosure of clear *Brady* material, and its untenable position that such material is not discoverable, the government began producing substantial amounts of *Brady* information just weeks before trial, and abruptly dismissed two substantive counts, involving the two surgeons who were alleged to have been the largest recipients of "bribes" masked as consulting payments. It explained its basis for doing so as an effort to "streamline" evidence at trial, without explanation of how that could possibly be the case while the two surgeons remained alleged co-conspirators for purposes of Count One.

Given the degree to which the allegations concerning Dr. ███ and Dr. █████ (the subjects of the now-dismissed counts) involved far more extensive payments of supposed bribes than any other recipient of payments alleged in the Indictment, the dismissal of those counts has already caused a significant refocus of trial-preparation efforts by defendants and their counsel. At the same time, however, defendants could not simply cease work on preparing to defend against allegations concerning those two surgeons. The government had told defendants at the outset that both were unindicted alleged co-conspirators for purposes of Count One, which the government did not dismiss. Following the dismissal of Counts Six and Seven, the government would not disclose, for nearly four more weeks as trial approached, whether it was still treating Drs. ███ and █████ as co-conspirators (as noted in footnote 3 above, after those four weeks, the government finally answered, and defendants are awaiting written confirmation of the government's commitment).

Compounding the confusion that the government's recent conduct has caused is its similar refusal – despite having failed to meet and confer in advance of its motion – to explain the basis for its request to dismiss those counts. The government has even refused to tell defendants whether,

prior to dismissing those counts, the government had recent communication with either surgeon about evidence from them or their possible participation at trial. In response to those inquiries in the wake of the government's dismissal motion, and others related to Dr. ███ and Dr. ████████, the government took the position that "[w]e do not believe we are required to provide answers."

This late change in the government's case leaves defendants scrambling to adjust and to try to develop answers through other means, with just weeks remaining before trial. Dr. ███ and Dr. ██████, the most obvious sources of information (other than the government itself), have refused to speak with defense counsel. Dr. ███████ has ignored entirely all efforts to contact him. Dr. ████ has responded to requests to speak only to say that *someone* advised him not to speak with anyone about the matter (he won't reveal who, but his prior counsel at Goodwin had reported at the time no contact with him for years). Defendants are thus left to attempt to develop admissible evidence concerning these potentially critical witnesses, including with regard to the extensive recently produced *Brady* material from and about Dr. ████ specifically.

Furthermore, as set forth above, and in the attached **Appendix 1**, the late-disclosed *Brady* material extends far beyond just Dr. ████ and Dr. ██████. Given the timing of the government's production of documents that it was obligated to produce over three years ago, but has now produced just weeks before trial – and is continuing to produce as this motion is being prepared – defendants have not yet come close to being able to review fully such material, let alone adequately develop leads, follow up on them, and generate evidence for trial.

Just by way of example, as set forth in **Appendix 1**, the government provided for the first time on January 24, 2025 a report of an interview with Dr. ████, conducted almost seven years earlier, in January 2018. That memorandum revealed that the government received significant exculpatory information contrary to its theory that the SpineFrontier consulting arrangement was

a "sham," yet withheld the information until last month. Furthermore, as discussed above, defendants are attempting to make their way through over 1,100 pages of recently-produced handwritten notes and their accompanying exhibits, already identifying material discrepancies between notes and earlier-produced memoranda supposedly derived from them, previously undisclosed *Brady* information within the notes, and additional gaps in productions (such as notes for which there are no accompanying memoranda, memoranda for which notes are missing, and evidence of meetings for which neither notes nor memoranda have yet been provided).

Whether the late production of *Brady* material was intentional on the part of prior members of the prosecution team who are no longer working on this matter, the result of overly-narrow views of what is exculpatory, or mere poor record-keeping by former AUSAs remains unclear. But the result is the same: defendants have lacked access to significant amounts of discoverable material that they are now just receiving despite this Court's rules and the *Brady* Order requiring its production years ago. The current team of AUSAs seems focused on attempting to fix what went wrong in this prosecution for the last several years by making wave after wave of productions. But too much is arriving too late at this stage. Defendants are significantly hampered in their trial-preparation efforts by the enormity of the productions that are continuing to occur during these weeks leading up to the currently scheduled trial date. They are attempting to process and use the massive amounts of new materials while now also having to address a supposedly "streamlined" exhibit list from the government containing over 550 exhibits, including 11 that are so voluminous that the government has stated an intention to introduce them through summary charts, and running in total to over 33,000 pages. It remains to be seen what else defendants will find in this late-produced material, but the amount of *Brady* information that they have already identified in just their preliminary reviews suggests that there will be significantly more.

To ensure that this matter can be adequately tried consistent with defendants' Due Process rights, a continuance is necessary. That continuance would also permit the holding of a hearing at which the extent of the government's *Brady* violations could be addressed, for the purpose of assisting in a determination as to other relief that may be warranted, such as dismissal of additional or all claims, evidentiary preclusions at a continued trial, orders to produce missing documents, or other appropriate remedies tied to the government's conduct. Defendants thus respectfully request that the Court continue the March 17, 2025 trial date, set a scheduling conference at which an appropriate new trial date can be selected, and set a hearing to further address *Brady* issues in advance of the continued trial.

### Conclusion

For the reasons set forth herein, defendants respectfully request that the Court allow this motion and continue the March 17, 2025 trial date in this matter. Defendants also respectfully request that a hearing be held (and suggest it could be held on March 17, 2025, in lieu of the currently scheduled start of jury selection), to address *Brady* issues.

Respectfully submitted,

**KINGSLEY CHIN**

By his attorneys,

/s/ *Joshua L. Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

**ADITYA HUMAD**

By his attorneys,

/s/ *William W. Fick*
Daniel N. Marx (BBO #674523)
William W. Fick (BBO #650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

## CERTIFICATE OF SERVICE

The undersigned certifies that this document, filed on February 13, 2025, through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Joshua L. Solomon*

## **Local Rule 7.1(a)(2) Certification**

Defense counsel conferred in good faith with counsel for the government in an effort to resolve or narrow the issues described herein. Some issues were narrowed, as set forth herein, and the government stated that it would oppose this motion.

*/s/Joshua L. Solomon*