# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

KINGSLEY R. CHIN,
ADITYA HUMAD

Defendants.

No. 1:21-cr-10256-IT

**GOVERNMENT'S MOTION *IN LIMINE* RE: ADMISSIBILITY OF EMAILS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................. 1

BACKGROUND .............................................................................................................................. 1

I.     SpineFrontier and IME Were Intertwined ........................................................................... 1

II.    The Conspiracy With Doctors and Other Third Parties ...................................................... 4

III.   The Communications Should Be Admitted Under Fed. R. Evid. 801(d)(2)(D)
or 801(d)(2)(E)..................................................................................................................... 5

ARGUMENT .................................................................................................................................... 7

I.     Emails Between and Among SpineFrontier and IME Employees Are Not Hearsay Pursuant
to Rule 801(d)(2)(D) ............................................................................................................ 7

II.    Emails Sent by Chin and Humad's Co-Conspirators are Not Hearsay Pursuant to
Rule 801(d)(2)(E)............................................................................................................... 10

CONCLUSION............................................................................................................................... 12

## INTRODUCTION

The United States submits this motion *in limine* in support of its argument that the Court should admit certain communications as non-hearsay.

*First*, certain communications by agents or employees of SpineFrontier, Inc. ("SpineFrontier") and Impartial Medical Expert, LLC ("IME") are admissible because the declarant's statements in these communications were made "by the party's agent or employee on a matter within the scope of that relationship while it existed," Fed. R. Evid. 801(d)(2)(D).

*Second*, statements of Chin and Humad's co-conspirators, including agents or employees of SpineFrontier or IME, as well as third-party distributors of SpineFrontier products and the doctors who received bribes from SpineFrontier, are admissible because they were made "by the party's coconspirator during and in furtherance of the conspiracy," Fed. R. Evid. 801(d)(2)(E).

The Court should find that the communications (primarily emails) in question contain non-hearsay statements under Rule 801(d)(2)(D) agency principles or Rule 801(d)(2)(E) conspiracy principles, as described below, and should admit the communications into evidence either in full or provisionally in accordance with *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).

## BACKGROUND

### I. SpineFrontier and IME Were Intertwined

Defendant Kingsley Chin was the founder and owner of Kingsley Investment Company, LLC, which owns KICVentures, LLC, which in turns owns both SpineFrontier and IME. Ex. 1 at 1 [SIK-000001]. Chin was the CEO of SpineFrontier, Ex. 2 at 1 [IME-DUD-00002582], and Aditya Humad was SpineFrontier's President and CFO. Ex. 3 at 1 [IME-DUD-00052246]; Ex. 1 at 3 [SIK-000001]. Chin also owned KIC Management Group Inc., which is the "Manager" for

(i) KICVentures, LLC, (ii) SpineFrontier, Inc., (iii) KIC, LLC, and (iv) IME, LLC.  Ex. 1 at 2 [SIK-000001].  Humad listed himself as a co-founder, and Chief Financial Office, of "KICVentures."  Ex. 4 at 1 [SF-MCF-00023888].  Chin owned 100% of KICVentures and 100% of KIC, LLC.  Ex. 1 at 2 [SIK-000002].  Chin also owned 98.26% of SpineFrontier and 100% of IME.  Ex. 1 at 2 [SIK-000002].

Vanessa Dudley, Chin's wife, was IME's "Client Relations/Business Administrator" and its *sole* employee.  Ex. 5 at 1 [IME-DUD-00157947].  IME had no physical location, aside from a P.O. Box in Fort Lauderdale, FL.  Ex. 6 (IME P.O. Box application) [USAO-GJ-0000073].  Chin and Humad established and ran IME.  Ex. 7 at 1 (Email from Chin responding to Dudley's IME email address suggestion with subject line "Re: IME contract for new surgeons"; "We need a generic email address for consulting[.]") [IME-DUD-00034857].  Dudley at all times reported to Chin and Humad.  Chin and Humad told Dudley and IME how and when to make payments.  Ex. 8 at 1 [IME-DUD-00030485].  They also directed her as to how to answer questions about inputting consulting hours, Ex. 9 at 1 (Email from Dudley to Humad, et al., "How should I advise?") [IME-DUD-00055480], and directed IME to manipulate the submitted consulting hours.  Ex. 10 at 1 (Email from Chin: "The surgeons made a great point that we should manually reconcile their final payments with their IME numbers.  So if they bill 14 hours and we pay for 10 hours we should change their online numbers to the 10 hours and not leave a discrepancy.") [IME-DUD-00002582].

Dudley did not have access to IME's bank accounts.  *See* Ex. 5 at 1 ("I don't have access to IME's accounts.  As far as I know, only Aditya and Kingsley do.") [IME-DUD-00157947].  Nor was Dudley in charge of approving purported consulting hours that surgeons submitted to IME.  Rather, Humad as President and CFO of SpineFrontier, worked primarily with one of his

employees, financial analyst Chantal Goldson, and others, to conduct cursory reviews of the supposed consulting that doctors submitted. *See, e.g.*, Ex. 11 at 1 [IME-DUD-00082261]; Ex. 12 at 1 ("Attached file with approved hours and the 2 batches for next week and week after. Send final schedule, numbers and dates to Erin and Swapnil to account for in SF and IME.") [SF-SHI-00011633]; Ex. 13 at 1 ("Chantal[,] See attached sheet with approved hours. . . . Please match up with IME portal and provide schedule to Erin/Tami.") [SF-SHI-00011675]; Ex. 14 at 1 ("Expected hours was just what I had expected, I changed them from what I had originally because you said that they should always be lower than the surgeon submitted hours. I will go ahead and approve all the ones we discussed yesterday on IME.") [SF-MCF-00007284]. The government expects to enter into evidence bank records that show IME had no revenue, and that it received from SpineFrontier all funds it used to issue payments to surgeons for "consulting." *See also* Ex. 4 at 1 (Email from Humad's KIC Ventures email address to Goldson, et al., "Diana need[s] to review the net amount due from IME to each surgeon, and receipt of funds from SF to IME to cover those payments and submit the unpaid log to HR") [SF-MCF-00023888]. Further, Dudley appears to have used IME to conduct personal transactions. Ex. 15 at 1 ("$42.35 paid to TMS Beachwear" in Pompano Beach, FL) [SF-DEG-00006826]. After first contemplating that IME would be paid a 3% "administration fee," Ex. 16 at 1 [SF-HUM-00236868], Chin and Humad eventually determined that IME (which they owned and controlled) would receive a 5% "administration" fee for payments it processed for "consulting" doctors supposedly performed for SpineFrontier (which Chin and Humad also owned and controlled). Ex. 17 at 1 ("Its net of 5% admin/processing fee charged by IME when paid by its client (SF)") [USAO-VD-0007511]. The government also expects there will be testimony that Chin told at least one SpineFrontier sales representative that he had "negotiated" with IME (really, himself) a higher rate per case for

3

a potential surgeon consultant. Ex. 18 at 1 ("I have talked with Dr. Chin and he in turn has been negotiating with IME. We have come to an agreement for you to be able to bill at $1000/hour per case evaluated to help us improve current products.") [SF-AUT-00014566].

In short, the government will present overwhelming evidence that Chin owned and intermingled SpineFrontier and IME, and that Humad acted with Chin on behalf of SpineFrontier, IME, KICVentures, and the other entities under Chin's ownership and control.

## II.    The Conspiracy With Doctors and Other Third Parties

The Indictment alleges that Defendants Chin and Humad entered into a conspiracy with each other and with others, including surgeons identified in the Indictment (the "Surgeons"), as well as other third parties, such as non-employee product distributors.[1]  *See, e.g.*, Dkt. No. 1 at 14. The Indictment alleges that Defendants Chin and Humad paid and directed the payment of kickbacks to the Surgeons. The Defendants devised sham consulting arrangements, pursuant to which they paid the Surgeons for performing cases with SpineFrontier products, rather than for actual consulting. Dkt. No. 1 at ¶ 29. For their part, the Surgeons accepted the Defendants' kickbacks despite the fact that they performed either no, or minimal, consulting in return for the specific payment at issue. Dkt. No. 1 at ¶¶ 30, 34. The Defendants told the Surgeons that they would receive better financial opportunities if they used more of SpineFrontier's products, that they would be paid more in consulting if they used more of SpineFrontier's products or more expensive SpineFrontier products, that they could submit 1 hour of consulting time for each cervical *case* they performed and two hours for each lumbar *case* they performed with

---

[1] The Indictment does not allege, nor does the government seek to prove, that every interaction between every doctor and SpineFrontier related to consulting was a sham. Instead, the Indictment alleges, and the government intends to prove, that there was a conspiracy between Chin and Humad, and others, and *certain* doctors, pursuant to which Chin and Humad paid *certain* doctors for use of SpineFrontier's products, rather than for bona fide consulting.

4

SpineFrontier's products (or in the case of one Surgeon that he would receive 10% of the revenue generated on his SpineFrontier cases), and that in general SpineFrontier, via a sham entity (IME), would compensate the Surgeons based on the number and type of surgeries they conducted with SpineFrontier's products.  Dkt. No. 1 at ¶¶ 38.  As part of the government's case-in-chief, several of the Surgeons will testify.  Further, the government also expects that a non-employee product distributor, John Balzer, who pled guilty to conspiracy to violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2), pursuant to 18 U.S.C. § 371, will testify that he conspired with Surgeon 1 and Defendants Chin and Humad to pay Surgeon 1 kickbacks in exchange for his use of SpineFrontier's products.  Similarly, the government expects an employee sales representative to testify that Defendants Chin and Humad told him to offer potential surgeon-consultants a flat rate per case, under the guise of consulting fees.

Based on the above-outlined evidence and more, the Court should admit the evidence in full or *de bene* under *Petrozziello*, 548 F.2d 20.

### III. The Communications Should Be Admitted Under Fed. R. Evid. 801(d)(2)(D) or 801(d)(2)(E)

The government seeks to admit communications pursuant to Fed. R. Evid. 801(d)(2)(D) (statement of a party's agent or employee) or 801(d)(2)(E) (statements made by a co-conspirator in furtherance of the conspiracy.

*First*, there are emails between and among employee-agents of SpineFrontier and IME that the Court should admit as non-hearsay [2] because they were made by Chin and Humad's

---

[2] The list the government provides for each category is not exhaustive, but only representative.

agents and employees within the scope of their agency.[3] Fed. R. Evid. 801(d)(2)(D). This includes, for example:

- **Emails from Vanessa Dudley, IME's "Business Administrator," and Chin's Wife.**[4] *See, e.g.*, Ex. 19 at 1 (Feb. 22, 2014 Email from Dudley to Chin, Humad, *et al*: "SpineFrontier agrees to $1000 on the lumbar but must stay at $500 on the cervical but he can bill for 2 hours max on these.") [IME-DUD-00007333]; Ex. 5 at 1 (January 24, 2014 Email from Dudley to Chin, Humad, and Li Chen Zhang: "I don't have access to IME's account. As far as I know, only Aditya and Kingsley do.") [IME-DUD-00157947]; Ex. 20 at 1 (February 26, 2014 Email from Dudley to Chin, Humad, Dr. DeGenova, *et al*: "Thank you again for your interest in consulting with IME and our client, SpineFrontier. I am attaching the consultant agreement for your review and signature.") [SF-DEG-00001275]; Ex. 21 at 1 (Dec. 10, 2014 Email from Dudley to Humad forwarding an email from Dr. Shehadi's Office Manager: "Please remove 3 hours from the November timesheet: 11/7 and 11/24. Did not see until now that those cases were cancelled.") [SF-SHE-00000220].

- **Emails from Chantal Goldson, a "Jr. Financial Analyst" with SpineFrontier.** *See, e.g.*, Ex. 14 at 1 (Feb. 24, 2015 Email from Goldson to Humad, attaching "IME Payment Log 01.15.xlsx; January 2015 Total Surgeon Cases & Submitted Hours.") [SF-MCF-00007284]; Ex. 22 (Apr. 6, 2015 Email from Goldson to Humad attaching March 2015 "Total Surgeon Cases & Submitted Hours.xlsx") [SF-MCF-00007266].

- **Emails from SpineFrontier sales representatives.** *See, e.g.*, Ex. 23 at 1 (Dec. 2, 2013 Email from Scott Autrey (SpineFrontier sales representative) to a prospective surgeon-consultant, attaching IME sign-up package: "SF pays the highest rate of anyone in the market for production evaluation (flat rate per case).") [SF-AUT-00012099]; Ex. 18 at 1 (Feb. 26, 2014 Email from Autrey to a prospective surgeon-consultant: "We have come to an agreement for you to be able to bill at $1000/hour per case evaluated to help us improve current products. . . .For example if you were to do 2 cervical cases and 2 lumbar cases a week at the average time of surgery, that would be an additional $6K a week, or more than $300K annually.") [SF-AUT-00014566]; Ex. 24 (Oct. 28, 2014 Email from Dan Habbyshaw[5] (SpineFrontier sales representative) to V. Dudley: "Vanessa,

---

[3] Many of the communications at issue also are admissible because they reflect statements that were made *to* Defendants Chin and Humad and they provide context for the Defendants' own statements and complete the conversation. They also are admissible for notice and their effect on the listener.

[4] Dudley's communications also are admissible under Fed. R. 801(d)(2)(E) as statements of a coconspirator.

[5] Habbyshaw was both an employee or agent of Defendants Chin and Humad (and SpineFrontier), but also an agent of Dr. DeGenova, in that he carried out Dr. DeGenova's instructions to log and submit cases on the latter's behalf.

6

    Please see the attached spreadsheet outlining cases for Dr. DeGenova.") [SF-SHE-00007560].

- **Emails from other SpineFrontier employees.** *See, e.g.*, Ex. 25 (March 12, 2013 Email from Peter Prinos, a SpineFrontier Sales Manager to Chin and Humad: ("I spoke with Dr. Montone tonight and we are good. He understands our position and is willing to totally involve himself and use us for all his cases.") [SF-MON-00003255]; Ex. 26 (June 19, 2015 Email from Frank Schnur, SpineFrontier's Chief Sales Officer, attaching document titled "WHY report.xlsx": "Here is the first pass on the 'why are they using SpineFrontier' report.") [SF-SHI-00007809].

*Second*, the Court should admit as non-hearsay emails that contain statements made in furtherance of the conspiracy by Chin and Humad's co-conspirators. These include the statements described above as well as emails from co-conspirator surgeons or third-party distributors to Chin, Humad, and others. *See, e.g.,* Ex. 27 [SF-SHE-00001378]; Ex. 28 [SF-HUM-00127961] (Jan. 4, 2015 Email from Dr. Shehadi to Humad: "It was a busy December for me and for SF. I logged 17.5 hours using the 1hr and 1.5hr general guideline. I had to add .5hr for extra long 5 level fusion on 30th."); Ex. 29 at 1 [SF-MON-00003683] (June 6, 2013 Email chain between John Balzer, independent distributor of SpineFrontier products, and Chin and Humad).

## ARGUMENT

I. **Emails Between and Among SpineFrontier and IME Employees Are Not Hearsay Pursuant to Rule 801(d)(2)(D)**

A party moving to admit statements under Rule 801(d)(2)(D) must establish, by a preponderance of the evidence, "(1) that an agency relationship existed; (2) that the statements were made during the course of the relationship; and (3) that the statements relate to matters within the scope of the agency." *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 116 (1st Cir. 2003) (citing *Larch v. Mansfield Mun. Elec. Dep't.*, 272 F.3d 63, 72 (1st Cir. 2001)). Terms such as "agent" or "servant" are undefined by the Rules of Evidence, but "federal courts have adopted

and applied the traditional meanings of those terms as reflected in the federal common law of agency." *Rivera Rodriguez*, 344 F.3d at 116 (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 557 n. 9 (11th Cir. 1998)); *Lippay v. Christos*, 996 F.2d 1490, 1497 (3d Cir. 1993). "An agency relationship must be shown to exist by independent evidence before out-of-court statements by a purported agent can be deemed admissions by a party opponent." *Rivera Rodriguez*, 344 F.3d at 116 (citing *Mackey v. Burke*, 751 F.2d 322, 326 n. 3 (10th Cir. 1984); *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 321 (4th Cir. 1982)).

An agency relationship between an agent/employee-declarant and a principal/employer-defendant may be established by a variety of evidence, such as evidence that the declarant is directly responsible to the defendant; that the declarant reports directly to the defendant who owns an overwhelming majority of stock in the company; that the declarant was hired by the defendant and worked on matters in which the defendant was actively involved; or that the defendant "directed [the declarant's] work on a continuing basis." *United States v. Agne*, 214 F.3d 47, 55 (1st Cir. 2000) (internal citations omitted). *See, e.g.*, *Ferring Pharm., Inc. v. Braintree Labs, Inc.*, No. 13-12553-NMG, 2016 WL 6078287, at *3 (D. Mass. Oct. 14, 2016) ("[T]he statements . . . include emails from various Ferring employees, such as sales representatives, the national sales director, the director of business intelligence and medical science liaisons. The declaration also refers to Ferring's internal updates, presentations and reports. These are statements by Ferring's employees made in the course of their employment and are thus excluded from the hearsay rule").

As outlined above, the government expects to present evidence at trial that Defendant Chin owned and controlled SpineFrontier and IME, and Humad was second-in-command at each of those entities. SpineFrontier and IME were both privately held companies with Chin holding

8

all ownership of IME and all but 1.74% of the ownership of SpineFrontier. Ex. 1 at 2 [SIK-000002]. Chin and Humad controlled all operations at both SpineFrontier and IME. Chin and Humad's control of SpineFrontier and IME permeated every facet of the companies' operations. With respect to the consulting program, for example, Chin and Humad made the decisions to set up a consulting program, craft a consulting contract, market and publicize the consulting contract and the consulting arrangement, determine to whom to offer the consulting opportunity, approve submitted consulting hours, deny submitted consulting hours, decide how much to pay the consultants, control the timing of the payments for purported consulting to the surgeons, and choose the terms of payments to independent distributors based, in part, on whether the surgeon was a consultant. *See, e.g.,* Ex. 30 (Sept. 2, 2014 Email from Chin to Humad, Autrey, and SpineFrontier's VP of Sales, "Please let surgeons know if they are only doing pedicle screws they cannot bill for a full hour per me unless more than one level. This is a phone call to the surgeons otherwise they will consult on the interbody and with us on the screws and double dip which will raise a red flag. Even if they do not double dip. Call me if any questions on how you will discuss this with the surgeons. . . . .") [SF-HUM-00150829]. Chin and Humad even chose the sham "administrative" fee that IME would take from surgeons for "processing" their "consulting" submission to SpineFrontier (even though SpineFrontier and IME were only nominally separate) Exs. 16, 17, and developed and made changes to the interface of the supposedly independent IME website. Ex. 31 at 1 (Oct. 13, 2013 Email from Humad to Dudley, Chin, et al.) (Humad: "The total at bottom of column though could be a calculation as hours which is # of cervical evals *1 hour. Or # of lumbar evals *2 hours[.] This way they [the surgeons] input and see # of cases but total at bottom for submission of form will be hours that are needed for payment[.]") [SF-HUM-00236871].

9

In short, Chin and Humad completely owned and controlled SpineFrontier and IME. Both entities were nothing more than Chin's alter ego, with Humad running all operations. Although SpineFrontier at least had a physical space, sold actual products, and had actual employees, IME was a total sham—its only employee was Chin's wife (Dudley), its "physical space" was a P.O. Box, and it took in no revenue. Given these factual circumstances, evidence of which the government will present at trial via documents and testimony, the statements of SpineFrontier and IME's employees are not hearsay pursuant to Fed. R. Evid. 801(d)(2)(D).

## II. Emails Sent by Chin and Humad's Co-Conspirators are Not Hearsay Pursuant to Rule 801(d)(2)(E)

Rule 801(d)(2)(E) permits the admission of statements made "by a co-conspirator of a party during the course and in furtherance of the conspiracy." *United States v. Portela,* 167 F. 3d 687, 702 (1st Cir. 1999). To introduce coconspirator statements, "[t]he proponent of the statement bears the burden of establishing, by a preponderance of the evidence, 'that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy.'" *United States v. Mitchell*, 596 F.3d 18, 23 (1st Cir. 2010) (quoting *United States v. Bradshaw*, 281 F.3d 278, 283 (1st Cir. 2002)). The threshold evidence offered by the government need not be overwhelming. *United States v. Ammar*, 714 F.2d 238, 250 (3d Cir. 1983). In deciding whether the Rule 801(d)(2)(E) prerequisites have been met, the trial court makes a determination whether it is "more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *Petrozziello*, 548 F.2d at 23. A court's determination whether the government has met its burden by a preponderance of the evidence is known in the First Circuit as a *Petrozziello* ruling. *Mitchell*, 596 F.3d at 23; *United States v. Famania-Roche,* 537 F.3d 71, 75 (1st Cir. 2008)

10

*(quoting Petrozziello,* 548 F.2d at 23*).* A *Petrozziello* ruling generally has two stages at trial. First, "the trial court is not required to decide the *Petrozziello* question prior to admitting hearsay statements under Rule 801(d)(2)(E), but may admit the statements provisionally, subject to its final *Petrozziello* determination at the close of all evidence." *United States v. Capelton,* 350 F.3d 231, 241 (1st Cir. 2003)*; see also United States v. Newton*, 326 F.3d 253, 257 (1st Cir. 2003). Then, at the close of all evidence, the trial court may weigh all the available evidence pursuant to Rule 104(a), including the content of the offered coconspirator statements, to make a final determination of admissibility. *Id*. The trial court's *Petrozziello* ruling will be upheld on appeal unless it was clearly erroneous. *Mitchell*, 596 F.3d at 23; *United States v. Thompson*, 449 F.3d 267, 273 (1st Cir. 2006).

At trial, the government will introduce ample evidence to support the existence of a conspiracy between Chin and Humad and various employees of SpineFrontier and IME, independent distributors of SpineFrontier products, and the surgeons who accepted kickbacks from SpineFrontier under the guise of a legitimate consulting program.

That evidence will include numerous emails from each of the Defendants, as well as testimony from several doctors who entered into sham consulting arrangements and received illegal directives from Chin and Humad, and testimony from at least one sales representative, Scott Autrey. The government anticipates that several consultant-surgeons will testify that they billed for sham consulting hours in line with one or both of the Defendants' instructions that the surgeons could bill a predetermined number of hours *per case*, that they provided minimal or no consulting, no one from SpineFrontier questioned their conduct or provided any oversight, and that they knew what they were doing was wrong. The government also anticipates that Autrey will testify to the instructions that Defendants Chin and Humad gave him as to how to sell the

11

sham consulting arrangement and that he knew that he was engaged in wrongful conduct. Likewise, the government expects that an independent distributor of SpineFrontier's products will testify that he negotiated with Chin and Humad to pay a 10% kickback to a surgeon based on revenue generated from that doctor's kickback-tainted surgeries, and that he knew this conduct was wrong. With respect to Dudley, Chin's wife, the government will introduce evidence that she worked at a sham company (IME) and based on emails and documents she sent and received was fully aware both (i) that paying surgeons based on the volume or value of their referrals (i.e., a flat rate per case) was wrong, and (ii) that was exactly how SpineFrontier and IME paid certain surgeons.

In summary, emails sent by Chin and Humad's co-conspirators, including SpineFrontier and IME employees, third-party distributors, and doctors who received bribes, should be admitted under Fed. R. Evid. 801(d)(2)(E) and *Petrozziello*.

## CONCLUSION

For the foregoing reasons the Court should admit emails including, but not limited to, those refenced above that were either statements by the Defendants' agent or employee within the agent or employment relationship, Fed. R. Evid. 801(d)(2)(D), or that were statements made by coconspirators in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E).

Dated: February 18, 2025                    Respectfully submitted,

                                                  LEAH B. FOLEY
                                                  United States Attorney

                                                  */s/ Abraham R. George*
                                                  Abraham R. George
                                                  Christopher Looney
                                                  Mackenzie A. Queenin
                                                  Assistant U.S. Attorney
                                                  1 Courthouse Way
                                                  John Joseph Moakley U.S. Courthouse
                                                  Boston, MA 02210
                                                  (617) 748-3100

## **CERTIFICATION PURSUANT TO LOCAL RULE 7.1**

     I, Abraham R. George, hereby certify that the parties have conferred and in good faith have attempted to narrow the issue before the Court. However, the parties were unable to arrive at a resolution.

Date: February 18, 2025                    */s/ Abraham R. George*
                                                  Abraham R. George
                                                  Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

     I hereby certify that this document was filed through the ECF system on February 18, 2025, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) (with paper copies to be sent to those indicated as non-registered participants).

                                                 */s/ Abraham R. George*
                                                 ABRAHAM R. GEORGE
                                                 Assistant United States Attorney