UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>KINGSLEY R. CHIN and<br>ADITYA HUMAD,<br>    *Defendants*. | No. 1:21-cr-10256-IT |

**DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE EVIDENCE CONCERNING USE OF DEFINITIVE NEURODIAGNOSTICS AND YEHSS**

Pursuant to Fed. R. Evid. 403 and 404(b), defendants respectfully move for an order precluding other supposed "bad acts" evidence that the government has stated it intends to introduce at trial. As described below, contrary to the government's limited proffer, the evidence has no "intrinsic" bearing on any charges or on any cognizable predicate for admissibility under Rule 404(b).

In a February 10, 2025 letter (attached hereto as Exhibit A), the government informed defendants of the following:

> [T]he government intends to introduce evidence that the defendants utilized Definitive NeuroDiagnostics, Dr. John Atwater's neuromonitoring business, in exchange or reward for Dr. Atwater's use of SpineFrontier products. The government also intends to introduce evidence that the defendants utilized another company owned by Dr. Atwater, Your Extra Hands Surgical Services ("YEHSS") in exchange or reward for Dr. Atwater's use of SpineFrontier products.

Defendants interpret this statement as the government alleging that "defendants utilized" services that Dr. Atwater's companies provided as a form of inducement for Dr. Atwater to use SpineFrontier products. Thus, at the same time the government is representing an intention to "streamline" the presentation of this case for trial, it is apparently now planning to inject an entirely new theory of supposed kickbacks that is not mentioned, or even alluded to, in the Indictment.

The government's proffered evidence offers a thinly-veiled effort at proving propensity of defendants to engage in kickbacks, rather than any sort of cognizable ground for admissibility. The Indictment's *entire* kickback theory is its allegation that the SpineFrontier consulting program, by which doctors served as paid consultants to evaluate and give feedback on SpineFrontier's products, was a "sham," such that the consulting payments were actually "bribes" to induce physicians to use SpineFrontier products. The Indictment is explicit in setting forth that theory, and only that theory, of the AKS violations it charges. With the exception of one concluding paragraph that merely asserts that SpineFrontier received millions of dollars in revenue from the sales of its products to the surgeons at issue, every one of the paragraphs in the Indictment under the heading "Overview of the Conspiracy" is about the consulting program and cash payments made to doctors pursuant to that program. *See* Indictment ¶¶ 29-35. Similarly, all four remaining substantive counts under the Anti-Kickback Statute (Counts Two through Five) charge violations based expressly on cash payments, including by alleging the specific amounts of such payments, derived from the consulting program. In short, nowhere in the Indictment is there any allegation of the existence of an additional scheme or plan that would be shown by the defendants' use of services provided by companies owned by Dr. Atwater as a *quid pro quo* for Dr. Atwater's use of SpineFrontier products.

The government's theories of admission, whether under Rule 404(b) or otherwise, would likely confuse a jury about speculative matters. As defendants understand the services to which the government refers, they are not services provided or sold by SpineFrontier. Rather, they are ancillary support services that surgeons may choose to use while performing a surgery and are, the government says, offered for sale by companies owned not by the defendants here, but by Dr. Atwater. The government's new theory set forth in its February 10 letter, that using those services

2

was a form of kickback to Dr. Atwater for his use of SpineFrontier products, thus begs various questions that would become improper sideshows were the government permitted to add it to this action at this late stage. For example, what does it mean that "defendants," who are charged with orchestrating SpineFrontier's sale of products, "utilized" the neuromonitoring and surgical support services that Dr. Atwater's companies apparently supplied? Is the government suggesting that SpineFrontier, which sold products to surgeons, somehow caused the same purchasing surgeons also to purchase Dr. Atwater's services? If so, how were SpineFrontier products and those services tied together as part of the same alleged scheme? Did those who chose to use such services pay fair value for them, or were Dr. Atwater's companies overpaid for them? How, and to what extent, did Dr. Atwater benefit, apparently indirectly, from "defendants utilizing" these services? Was the benefit material? The government's letter says nothing about such issues, and any effort to infer something otherwise would be speculative, confusing, and unduly prejudicial. The Indictment makes no reference whatsoever to alleged kickbacks in the form of using services provided by Dr. Atwater's companies. Rather, this case is, and has always been, about alleged kickbacks in the form of consulting payments made directly to surgeons buying SpineFrontier products.

Permitting the government to introduce evidence concerning this tangent would require evidence delving into all of those side issues, and likely others that have no apparent relevance to the genuine or sham nature of the consulting program that is the sole focus of the Indictment. More importantly, introducing an entirely new theory of alleged kickback beyond the consulting program would amount to an impermissible and prejudicial variance from the violations set forth in the Indictment, given the lack of any apparent connection between the SpineFrontier consulting program that led to cash payments to doctors, and the new theory that Dr. Atwater specifically was given some type of benefit through (some unclear, unspecified) use of certain surgical services.

Contrary to the February 10 letter in which the government informed defendants of the government's intention to introduce this tangent, the use of certain ancillary surgical services that *other* companies (not SpineFrontier) supplied is in no way "intrinsic" to the charges alleged in the Indictment. In making that pitch, the government's letter cited to *United States v. Epstein*, 426 F.3d 431, 438-39 (1st Cir. 2005), in which the Court of Appeals found no error in the government's use of the defendant's tax return, which included some, but also omitted some, of the income from the fraudulent scheme that was actually charged. The First Circuit found no reversible error based on the view that the tax return was "part and parcel of the crime," and thus "intrinsic" to it, because it both proved that the defendant received income from the underlying scheme (to the extent the tax return disclosed some income) and showed the defendant's awareness that the conduct was illegal (to the extent it did not disclose all income). *Id.* at 439. In contrast here, there is no sense in which "defendants utilizing" (whatever that means) Dr. Atwater's companies' services is relevant to – much less "intrinsic" to – an alleged scheme to use the SpineFrontier consulting program to make payments to doctors.

In reality, the government hopes to use an entirely different set of transactions, having no connection to the consulting program, to suggest that there was additional wrongdoing beyond that which the Indictment actually charges, for the purpose of suggesting propensity by the defendants to engage in wrongdoing. Indeed, in its February 10 letter, the government stated in one sentence that it will seek to introduce the evidence at issue pursuant to Fed. R. Evid. 404(b) in the alternative, if the evidence is deemed extrinsic to the crimes charged. Rule 404(b) does not make the proffered evidence any more admissible. Before evidence of other crimes, wrongs, or bad acts may be admitted pursuant to Rule 404(b): (1) the evidence must be "specially probative of an issue" in the case – such as intent or knowledge – without including propensity as a necessary link in the

inferential chain; and (2) even if such "special relevance" is found, it is nonetheless inadmissible if its probative value is "substantially outweighed by the danger of, *inter alia*, unfair prejudice, confusion of the issues, or misleading the jury." *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996) (quotation marks omitted); *see also* Fed. R. Evid. 403. Evidence in criminal trials must be "strictly relevant to the particular offense charged." *Williams v. New York*, 337 U.S. 241, 247 (1949).

Here, the government's one-sentence notice that it would seek to admit such evidence under Rule 404(b) in the alternative comes nowhere close to satisfying its burden to provide defendants with sufficient notice of properly-available 404(b) evidence. The government has not even articulated what the "special relevance" would be under Rule 404(b), and thus how this evidence could qualify under Rules 404(b) and 403. Nor has it provided other detail that Rule 404(b) requires. Rule 404(b) requires, among other things, that the government "(A) provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it," and "(B) articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." The government has provided nothing of the sort. As noted above, defendants do not even understand from the government's vague letter how the defendants, both officers of a company that itself sold products to surgeons, supposedly "utilized" the services at issue, which defendants understand are services available to surgeons during surgery and offered not by SpineFrontier, but by different companies. As the First Circuit has explained:

> [W]e think that the court was warranted in having concerns about the extent to which [404(b) issues] would have to be litigated during the course of the trial. This is not a situation where the "extrinsic act" is conceded by all to have taken place. Indeed, Gilbert vehemently denies [it]. It is thus nearly certain that there would be a mini-trial on whether [it] actually took place.… We think the potential for confusion of the issues and for unfair prejudice in such a scenario is manifest.

5

*U.S. v. Gilbert*, 229 F.3d 15, 24 (1st Cir. 2000). The Court should preclude the government from referencing or introducing the proffered evidence at least until it can demonstrate to the Court during trial a sufficient form of special relevance, and the defense has an opportunity to address any such specific theory.

Furthermore, given the nature of the neuromonitoring and other surgery-support services at issue, fair presentation of such matters would likely require expert testimony as to the function of such services, whether they were actually needed for the surgeries at issue, their value to surgeons during surgery, and the extent to which Dr. Atwater as the (alleged) owner of the companies providing them benefited from their use. The government's proposed evidence would create a trial within a trial on medical issues. Because this is a case about the SpineFrontier consulting program and nothing more, defendants have not been given adequate notice to retain an expert to address such issues. Expansion of this case to include supposed kickbacks in the form of "utilizing" other companies' services would be highly prejudicial to defendants, even if there were "special relevance" that the government has not articulated in its notice to defendants.

## Conclusion

For the reasons set forth herein, defendants respectfully request that the Court preclude the government from presenting the proffered evidence concerning Definitive NeuroDiagnostics and YEHSS, whether offered as supposed evidence "intrinsic" to the crimes charged or as Rule 404(b) extrinsic evidence. At the very least, the Court should preclude the government from referencing or introducing any such evidence until a showing of special relevance is made during the trial and the defense has an opportunity to address that specific showing on an evidentiary record.

Respectfully submitted,

**KINGSLEY CHIN**

By their attorneys,

/s/ *Joshua L. Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

**ADITYA HUMAD**

By his attorneys,

/s/ *William W. Fick*
Daniel N. Marx (BBO #674523)
William W. Fick (BBO #650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that this document, filed on February 18, 2025, through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Joshua L. Solomon*

**Local Rule 7.1(a)(2) Certification**

Defense counsel conferred in good faith with counsel for the government in an effort to resolve or narrow the issues described herein. No agreement was reached.

*/s/ Joshua L. Solomon*