UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KINGSLEY R. CHIN,<br>ADITYA HUMAD<br><br>Defendants. | No. 1:21-cr-10256-IT |

**GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION TO
CONTINUE TRIAL AND FOR A HEARING CONCERNING *BRADY* VIOLATIONS**

The Court should deny Defendants' *Motion to Continue Trial and For Hearing Concerning Brady Violations* because the information disclosed by the government is not material exculpatory or impeachment evidence, and the Defendants have suffered no prejudice. Dkt. No. 238. As described in the government's previous response, the Defendants' Motion largely concerns two categories of documents: *first,* whitepapers, presentations, and letters submitted to the government by attorneys for third-party surgeons (including surgeons identified as unindicted co-conspirators), and *second*, raw agent notes of interviews and communications with witnesses and coconspirators produced by the government in response to the Defendants' requests. *See* Dkt. No. 240. Beyond these two categories of material, the government also has identified and produced a handful of reports and other records, as is customary in the course of trial preparation in any case.

None of these materials bear the significance that the Defendants ascribe to them. As described further below, these materials are largely cumulative of previously produced materials and contain little new information (as opposed to attorney argument and advocacy). Moreover, Defendants have had the material for months or weeks in advance of trial, permitting them adequate time to incorporate the information into their defense strategy. *See United States v.*

1

*Urciuoli*, 470 F. Supp. 2d 109, 115 (D.R.I. 2007) ("The only requirement is that *Brady* material be provided far enough in advance of trial to permit a defendant to make effective use of it."). This is especially so when viewed in conjunction with the breadth of the October 5, 2021 automatic discovery production in this case—which included the bulk of the interview reports for which underlying notes were provided later.

The production of these materials is not grounds for evidentiary exclusions, continuance of the trial, or other sanctions. And because the defendants identify no disputed facts material to a decision on the relief they seek, their request for an evidentiary hearing should likewise be denied. *United States v. Staula*, 80 F.3d 596, 603 (1st Cir. 1996) (Selya, J.) (criminal defendant is not entitled to an evidentiary hearing outright; hearing is required only if the moving party makes a threshold showing that material facts are in dispute and that, if such disputes were resolved in his favor, he would be entitled to relief).

## BACKGROUND

**A. The Whitepapers, Letters, and Presentations Submitted by Counsel for Third-Party Surgeons are Attorney Advocacy and In Any Event are Cumulative of Previously Produced Materials**

On October 9, 2024—five months before trial—the government produced approximately 120-pages of documents to the defense. This production included advocacy materials provided to the government by attorneys for third-party spine-surgeons who used SpineFrontier products, had consulting agreements with and were paid by SpineFrontier, and who the government has identified as unindicted co-conspirators: (i) a "whitepaper" submitted to the government by counsel to Dr. Jeffrey Carlson (Def's Mot., Ex. D), (ii) a letter and a presentation submitted to the government by counsel to Dr. Roger Sung (Def's Mot. Ex. C), and (iii) a letter submitted to the

2

government by former counsel to Dr. John Atwater.[1] In the course of further reviewing its files, on January 13, 2025—still more than two months prior to trial—the government produced an additional presentation (Def's Mot. Ex. F) and a letter accompanied by an appendix (Def's Mot. Ex. G) from Dr. Sung's counsel.

Broadly speaking, in each of these items, counsel for the surgeons deny their clients culpability in an alleged kickback scheme, argue that the consulting arrangements between their clients and SpineFrontier were legitimate, claim their clients performed the consulting work for which SpineFrontier paid them, and describe their opinions of the challenges that the government would face in pursuing civil litigation or criminal charges against their clients. Based on these *arguments*, the Defendants describe these documents as containing "extensive *Brady* material." Def's Mot. at 7.

While replete with legal advocacy and attorney driven inferences, these documents contain little new objective factual information. The letter from Dr. Carlson's lawyer (Def's Mot., Ex. D), for example, contains *100 footnotes*, sourcing the factual assertions made in the letter to either public sources or documentary evidence—all of which the government produced to the Defendants *years ago*. *See* Def's Mot. Ex., D. The few assertions that are not explicitly tied to record evidence concern Dr. Carlson's delivery of feedback to SpineFrontier's engineers and are introduced with the phrase: "As [Dr. Carlson] explained during the proffer…" *Id.* at 5. And, indeed, the letter's assertions about Dr. Carlson's consulting work largely track the proffer report that the government produced to the Defendants in 2021. *Compare* Exhibit 1, Carlson 2018.07.27 Report at 3 with Def's Mot. Ex. D at 5. In short, the letter is not new and groundbreaking exculpatory material; it

---

[1] Only Dr. Atwater is referenced in the Indictment and appears on the government's witness list.

is largely a compilation and recitation of evidence that the government already had produced to the defendants.

Much the same for the materials from Dr. Sung's counsel. On June 12, 2020, Dr. Sung's counsel submitted a letter to the government reciting a detailed chronology of Dr. Sung's alleged consulting work. Def.'s Mot., Ex. G. Dr. Sung's counsel supported this alleged consulting work with reference to documents listed in a 49-page appendix. Again, the documents—that is, the evidentiary material supporting the attorneys' arguments—in the appendix were produced to the Defendants in 2021.

The Defendants' motion focuses, in particular, on the April 20, 2020 letter from Dr. Sung's counsel, which they summarize in five paragraphs as follows:

> *[Sung's counsel's] letter explained, with facts in support of each point:*
>
> *(1) that "the consulting payments received by Dr. Sung most definitely do not correspond to his use of SpineFrontier products";*
>
> *(2) that the timing of Dr. Sung's use of SpineFrontier's products and the beginning of the consulting arrangement belied the government's claim that the promise of consulting payments was an inducement to begin using SpineFrontier products;*
>
> *(3) that "SpineFrontier itself did not believe that Dr. Sung required consulting payments to continue using SpineFrontier's product";*
>
> *(4) that Dr. Sung had "spent hundreds of hours and made valuable contributions in his consulting work – contributions that actually led to changes in the device"; and,*
>
> *(5) that the payments from SpineFrontier were a very small portion of Dr. Sung's income, such that "[s]imply put, Dr. Sung did not need SpineFrontier's money" and "used SpineFrontier products because he believed they helped his patients."*

Def's Motion at 7. But these factual representations are either directly attributed to documents already in the Defendants' possession or reflect an inference that Dr. Sung's counsel seeks to draw from those materials—in other words, this letter contains little to no new *factual information*.

4

The first two paragraphs make factual assertions concerning the date that Dr. Sung began using SpineFrontier's products, the value of the SpineFrontier products that Dr. Sung used, the date that Dr. Sung began consulting with SpineFrontier, and the amount that SpineFrontier had paid Dr. Sung for his consulting. Each of these facts are known to the Defendants—who owned and operated SpineFrontier. They are also readily discernible from documents produced by SpineFrontier to the government during the investigation, which the government thereafter produced back to the Defendants in discovery. *See* SIK-00013332; SIK-00000758; USAO-VD-0001754. Beyond these objective facts, Dr. Sung's lawyers argue a mere inference: that these facts are inconsistent with the government's theory in the parallel civil case. *See* Dkt. No. 238, Ex. B.

The third paragraph is much the same. Dr. Sung's counsel notes Dr. Sung's absence from an internal SpineFrontier report, the "WHY Report," and draws from that absence the inference that "SpineFrontier itself did not believe that Dr. Sung required consulting payments to continue using SpineFrontier's product." Dkt. No. 239, Ex. B. But once again the objective factual information is reflected in a SpineFrontier document (the "WHY Report") produced in discovery years ago, (Exhibit 2, SF-HUM-00016090)—and described in detail in the government's civil case against the defendants. *See United States v. SpineFrontier et al.*, No. 15-cv-12877, Dkt. No. 58 (Complaint in Intervention), ¶ 145.

The claims in the fourth paragraph closely mirror the assertion in Dr. Sung's counsel's June 12, 2020 letter. But as discussed above, these claims—that "there is no dispute that [Dr. Sung] spent hundreds of hours and made valuable contributions in his consulting work"—are attorney assertion based upon documents produced by the government and in the Defendants' possession. It is not new factual evidence or information.

5

Finally, the fifth paragraph of the April 2020 letter makes anodyne assertions: that Dr. Sung was too wealthy to accept bribes and that bribing him was unnecessary because he liked SpineFrontier's products. Putting aside that this is not a defense, Dr. Sung's wealth clearly has been well-known to Defendants Chin and Humad since before the government ever became aware of SpineFrontier; Dr. Sung invested hundreds of thousands of dollars into the Chin-owned and -controlled companies that Humad managed.

In these letters and presentations, lawyers for these surgeons have done what lawyers do: present the government with a counter-*narrative* to the government's allegations. But that narrative is the advocacy work of lawyers arguing inferences to help their clients avoid civil litigation or criminal charges. The underlying facts—regarding work that was (or was not) performed), amounts that were paid, etc.—are set forth in the evidentiary documents that these letters and presentations reference.

At most, these materials, which track previously produced records, provide marginal information for cross-examination and impeachment of these witnesses at trial. But even assuming Drs. Sung and Carlson were government witnesses—and they are not—that argument also fails. Under the Federal Rules of Evidence, a witness may only be impeached by his/her own statements. Fed. R. Evid. 613. A witness cannot be impeached by statements made by that witness's attorney. *See also United States v. Cuevas Pimentel*, 815 F. Supp. 81 (D. Conn. 1993); *SEC v. Arrowood*, No. 14-CV-0082, 2014 U.S. Dist. LEXIS 68669, *2-3 (N.D. Ga. May 19, 2014) (following *Cuevas Pimentel*).

The court in *United States v. Cuevas Pimentel*, 815 F. Supp. 81 (D. Conn. 1993) examined the issue of whether a defendant could impeach a government witness by introducing evidence of prior statements made by that witness's attorney, the precise issue presented here. Defendant

Cuevas was charged in a drug conspiracy with two other defendants, including Espinosa. At a detention hearing, Espinosa's lawyer told the court that Espinosa: (1) played a minor role in the alleged drug transaction; (2) was not in the state at the time the deal occurred; and (3) denied being a drug dealer. Espinosa thereafter pled guilty to the charges and agreed to testify against Cuevas. *Id.* at 82. Counsel for Cuevas advised he planned to impeach Espinosa's testimony by introducing transcripts of his attorney's statements and the government moved to exclude on the grounds that statements of an attorney could not be used to impeach a client's testimony. *Id.* at 82-83. The Court agreed that Rule 613 made no provision for the attribution of statements of others to a witness; it therefore did not permit an attorney's statements to be introduced as prior inconsistent statements of the attorney's client. *Id.* at 84.

Further, it goes without saying that compelling a witness to speak about discussions with his or her attorney that may have factored into the attorney's written advocacy is utterly impermissible—it would destroy the attorney-client relationship and create a chilling and harmful precedent for white-collar defendants everywhere.

In the event the Defendants contend that the information requires additional investigation, the defendants have had the underlying factual records from the white papers and presentations—that is, the objective information that is the subject of the government's *Brady* obligations—for years. The Defendants have also been on notice that Dr. Sung and Dr. Carlson maintained they provided consulting services to SpineFrontier since October 2021—when interview reports of both Drs. were produced to the defense. Further, this is not a scenario where the identity of the surgeons was unknown. The Defendants knew Drs. Sung, Carlson, and Atwater consulted with SpineFrontier, and the scope of that work was knowable to the Defendants, as they owned and ran the company. The whitepapers, letters, and presentations by attorneys for third-parties—which

7

they have now had for weeks or months—provide, at best, only limited and marginal additional information and do not warrant continuance of the trial.

### B. Agent Notes were Produced at the Defendants' Request and, Again, Are Largely Cumulative of Previously Produced Materials

In its automatic discovery, produced in October 2021, the government produced voluminous early *Jencks* material. This included:

- Approximately 150 reports of interviews with more than 80 witnesses;
- Approximately 1,508 pages of grand jury testimony;
- Transcripts of approximately six sworn statements;
- Plea and cooperation agreements, civil settlement agreements, and immunity agreements.

In response to requests from the Defendants, on February 3, 2025, still approximately six weeks out from trial, the government produced the raw agent notes taken at the time of the interviews that subsequently converted into formal interview reports.[2] These notes total approximately 1,300 pages and are largely duplicative of the information contained in the reports. While there are some minor inconsistencies and omissions between a small subset of the notes and the reports, or in some cases, information that is not reflected verbatim in the reports, , the differences are cross-examination material for government agents if they testify or if they are called by the defense.[3] None of the cited differences can be used to impeach the government's witnesses

---

[2] In their motion, the Defendants note that "[t]here are also approximately 20 memoranda of interviews for which no notes have yet been provided." Def.'s Mot. at 16. Upon learning of this, the government promptly identified and produced the notes to these reports. The government believes that the production of notes is now complete. Along with the production of interview notes, the government created and produced an index identifying which notes corresponded with each previously produced report, for defendants' ease of reference.

[3] Of course, that does not necessarily mean that the reports were factually incorrect, the underlying information, after all, are notes—not a transcript.

8

as agent reports and notes are not statements of the interviewee. *See United States v. Gonzalez-Melendez*, 594 F.3d 28, 35 (1st Cir. 2010) (a 302 form was not a "written statement of a witness," within the meaning of 18 U.S.C. § 3500(e)(1), and further the 302 was not a "substantially verbatim recital of an oral statement made by a witness," within the meaning of 18 U.S.C. § 3500(e)(2)).

### C. Additional Recently Produced Materials

In addition to material described above, the government has produced a handful of additional records that it has identified in the run-up to trial. Some, including those identified on the Appendix to the Defendant's motion, are innocuous: interview reports or submissions by counsel concerning individuals who the government has neither identified as Defendants Chin and Humad's unindicted co-conspirators nor disclosed as potential trial witnesses. *See* Def's Motion, App'x 1 (identifying notes and/or interview reports concerning, *e.g.*, Dr. Anthony Alastra (a SpineFrontier surgeon), Julie Genest (a SpineFrontier sales support manager), Danielle Ruggiero (physician's assistant to Dr. J. Shiau, who is not named as a co-conspirator). Based upon the content of the reports and their attenuated relationship to the government's case in chief (at best), it would be surprising if the Defendants elected to call these individuals as witnesses. In the event they choose to, the Defendants have now had plenty of time to contact the witnesses and three weeks still remain before trial.

The government acknowledges it recently produced a small number of reports of either anticipated witnesses (two of whom entered cooperation agreements) or individuals identified as co-conspirators. But again, this category amounts to handful of pages of reports, which are largely consistent with previously produced reports concerning the same individuals. For example, the information cited from the John Balzer report is *Giglio* information for Dr. Jason Montone—who

9

notably pled guilty to obstruction in connection with related conduct. *United States v. Jason Montone*, No. 2020-cr-10159-WGY.

The government had intended to provide the then-existing interview reports with automatic discovery in October of 2021. As soon as the government realized the handful of reports were inadvertently not produced, it promptly produced them. There was nothing intentional or strategic about the later production of these reports—which was still in advance of the *Jencks* deadline set by this Court and well in advance of trial.

### D. The Narrowing of the Government's Case

In preparation for trial, the government has significantly narrowed and streamlined its case-in-chief. On January 17, 2025, the government dismissed two counts of the indictment pertaining to Drs. Sung and Kushwaha and dismissed corporate defendant SpineFrontier from the case entirely. Since then, the government has confirmed that it does not intend to present evidence at trial concerning Drs. Sung and Kushwaha as to the conspiracy count (Count One). Contrary to what the Defendants suggest, the dismissals were a strategic decision that had nothing to do with the production of the Dr. Sung white papers or other materials.[4]

The government also informed the defense today that it intends to dismiss Count Four, charging Defendants Chin and Humad with paying kickbacks to Dr. Shehadi. As with Drs. Sung and Kushwaha, moving to dismiss counts in the leadup to trial is the government's prerogative, and is not uncommon. With respect to Dr. Shehadi in particular, the dismissal of Count Four should come as no surprise and in any event, it narrows the case against the Defendants.[5]

---

[4] Indeed, the government dismissed the count regarding Dr. Kushwaha despite there being no attorney white papers, presentations, or letters, pertaining to him.

[5] This past summer, the government produced Dr. Shehadi's testimony before the Ohio Medical Board. In his testimony, Dr. Shehadi at best minimized his culpability and testified inconsistently with his prior grand jury testimony.

10

Notably, on February 10, 2025, the government disclosed its witness list to the Defendants, which includes only fifteen witnesses—several of whom are law enforcement officers or representatives of the victim-agencies in this case. Much of the recently disclosed materials undeniably concern witnesses who the Defendants *know* will not be a part of the upcoming trial. The narrowing of the case against the Defendants is clearly not grounds for a continuance of the trial date in this case that has been pending for nearly three-and-a-half years.

## ARGUMENT

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government has an "'affirmative duty to disclose evidence favorable to a defendant,' be it exculpatory or impeachment evidence." *United States v. Flores-Rivera*, 787 F.3d 1, 17 (1st Cir. 2015) (citation omitted). A *Brady* violation occurs only if evidence "favorable to the accused, either because it is exculpatory, or because it is impeaching," has been suppressed by the government either willfully or inadvertently, and the defendant has been prejudiced. *Flores-Rivera v. United States*, 16 F. 4th 963, 968 (1st Cir. 2021) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

*Brady* mandates that the government disclose information that is material to guilt or punishment. *United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011). "'Suppressed impeachment evidence is immaterial under *Brady*, however, if the evidence is cumulative or impeaches a collateral issue.'" *United States v. Aviles-Colon*, 536 F.3d 1, 19 (1st Cir. 2008) (quoting *Strickler*, 527 U.S. at 290)). *Brady* only "applies to material that was known to the prosecution but unknown to the defense." *See generally United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002); *see United States v. Rodriguez*, 162 F.3d 135, 147 (1st Cir. 1998). If the evidence is immaterial or duplicative, the Court need not analyze any *Brady* claims any further.

The Defendants have not and cannot meet their heavy burden of demonstrating there has been a *Brady* violation here. But even assuming *arguendo* that the information disclosed was material exculpatory evidence or impeachment evidence, and assuming further that it was *not* largely cumulative of materials previously produced (a significant portion of which relied on information the Defendants themselves had in their possession prior to the Indictment), the Defendants have not been prejudiced. *See United States v. Tsarnaev*, No. 13-cr-10200, 2013 WL 6196279, at *1 (D. Mass. Nov. 27, 2013) ("*Brady* information need only be disclosed 'in adequate time for the information to be used effectively by the defense at trial'") (quoting *United States v. Brassard*, 212 F.3d 54, 56 (1st Cir. 2000)). Even as of the time of this filing, trial is still three weeks away. Indeed, courts have not considered exculpatory evidence improperly "suppressed" within the meaning of *Brady* even when the government has disclosed the evidence immediately before or even during trial. *See United States v. Douglas*, 525 F.3d 225, 245–46 (2d Cir. 2008); *United States v. Barrera*, 950 F. Supp. 2d 461, 476 (E.D.N.Y. 2013) ("[I]t is the government's responsibility to determine what evidence is material and when such evidence should be disclosed in time for its effective use.") (internal quotation and citation omitted). The Defendants' motion alleging *Brady* violations fails on all prongs.

## CONCLUSION

For all of the reasons described herein, the defendants' motion should be denied. The trial of this 2021 case should proceed as scheduled.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

*/s/ Mackenzie A. Queenin*
ABRAHAM R. GEORGE
CHRISTOPHER R. LOONEY
MACKENZIE A. QUEENIN
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Mackenzie Queenin*

Dated: February 24, 2025