# Exhibit 1

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry   08/08/2018

    Jeffrey Carlson, date of birth (DOB) ▇▇▇▇ 1966, home address ▇▇ ▇▇▇▇▇▇▇▇ Newport News, Virginia, was interviewed pursuant to a proffer agreement at the US Attorney's Office in Boston, MA. Also present for the interview was AUSA Abraham George, AUSA David Derusha, and Carlson's attorneys Brandon Santos and John Adams. After being advised of the identity of the interviewing Agent and the nature of the interview, Carlson provided the following information:

    Carlson graduated from the University of Maryland with a pre-med degree in zoology in 1989. Carlson then went to medical school at George Washington University and graduated in 1993. After graduating from medical school, Carlson did a one year internship at Dartmouth, and then an orthopedic residency through Harvard affiliated hospitals in Boston, MA. Carlson completed the residency in 1999, and then completed his studies with a one year spinal surgery fellowship at Harvard.

    After completing the spinal surgery fellowship in 2000, Carlson took a job in Newport News, Virginia. Carlson started as an associate at Orthopedic Surgery and Sports Medicine where he specialized in spinal surgery. After approximately two years, Carlson was promoted to partner. Eventually the practice changed names to Orthopedic and Spine Center (OSC). OSC has five orthopedic surgeons and two pain management specialists. The partners share the overhead costs but get to keep the revenue that they each bring in. This is known as "eat what you kill." Carlson will typically operate 2-3 days per week, but never on Thursdays. He estimated that he does 6-12 surgeries per day when he operates. In a year, he does 400-500 surgeries. These surgeries consist primarily of spine surgery, however he also does carpal tunnel and knee replacement surgeries. Carlson estimated that 70% the surgeries that he performs are for the spine, and the rest is a mix of carpal tunnel and knee replacement.

    On days that Carlson operates, he typically begins around 7:30 AM, and can go as late as 11 pm depending on the number of surgeries that are scheduled. Carlson has had privileges at Mary Immaculate hospital and Riverside hospital. In addition, at one point Carlson and approximately 20 other doctors formed a joint venture with Riverside hospital to open a

Investigation on  07/27/2018  at  Boston, Massachusetts, United States (In Person)

File #  209A-BS-6566377                                          Date drafted  08/02/2018

by  DUPONT TERRENCE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

INT-RPT00000050

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Jeffrey Carlson , On 07/27/2018 , Page 2 of 7

surgery center called the Peninsula Surgery Center. Some of the surgeons who formed the joint venture with Carlson were from OSC. The joint venture did not end up being profitable, and a few years ago Riverside bought out the doctors who were in the joint venture. Carlson believed this was done for profitability reasons, not compliance concerns. Since that time, Carlson has only operated at Mary Immaculate hospital.

Carlson has primarily used Spine Frontier (SF) and Synthes products in the spinal surgeries that he has performed. In addition to using SF and Synthes products, Carlson has also done consulting for both companies. Carlson has also consulted for BioStructure, ZymoGenetics, and Globas. He was paid approximately $500 for his consulting work, except for the agreement with Globas which ended up being a royalty agreement. Carlson consulted with Globas to help build an implant system. For Synthes, Carlson did a few ad hoc projects including a study and some teaching. The majority of the consulting work that Carlson did was for SF.

Carlson first became aware of SF in late 2012 when he was approached by Walter Wood, who was a sales representative for SF. Wood showed Carlson a few of the SF products, including the lumbar pedicle screw and the cervical plate. Around this time, Synthes was bought by Depuy and decided to stop making the pedicle screw that Carlson had been using. Carlson liked the design of the SF pedicle screw and thought that it could be "revolutionary." Carlson believed that with some tweaking the SF pedicle screw could be designed to allow for lumbar fusion surgeries to be done as outpatient procedures. Carlson and Dr. Mark McFarland, who was another surgeon from OSC, traveled to Boston in January 2013 for a "VIP" visit to SF. Carlson paid for his own travel to Boston for this visit. There were other doctors from various practices around the country who were also at the visit. Carlson remembered Kingsley Chin and Aditya Humad pitching the doctors on the new technology that SF was in the process of developing. During the visit, the doctors were able to test the SF products on cadavers. Chin and Humad also told the doctors that there would be an opportunity to consult for SF. After leaving SF, Carlson was excited to start using their products. Before he could start using the products he had to get them approved at Mary Immaculate hospital.

After the SF products were approved by the Mary Immaculate hospital board, Carlson began transitioning from Synthes products to SF. He started by using the SF lumbar pedicle screw and cervical plate. Initially, he did not like the SF cervical plate, however SF worked with him to change the design to add a locking screw. After SF made this change, Carlson has not had any issues with the cervical plate. Even though he uses SF products in the majority of his procedures, he still uses Synthes products for scoliosis, thoracic, and upper cervical procedures.

Carlson was also excited about the consulting agreement with SF. He liked the idea of being part of a small business that could potentially change the way spinal surgeries were done. Carlson liked SF because Chin and the engineers seemed receptive to his ideas. In the past when Carlson had consulted with Synthes, he felt that they just ignored his ideas. He liked that Chin was a surgeon and could better understand what surgeons were looking for in products. Carlson had also overlapped with Chin at Harvard for a period of time and considered him to be an acquaintance. Carlson believed that he started consulting for SF shortly after the VIP meeting at SF. He followed the consulting agreement as a guide to what hours he could bill SF. He did not remember Chin or Humad specifically telling him how to bill consulting hours. Carlson knew that he could not bill consulting hours for time that was spent in the operating room. He only billed for the time that he spent discussing the SF products with SF employees before or after a surgery. Carlson was generally aware of the Anti-kickback statute from working in the medical industry. His understanding of the Anti-kickback statute is what made him think that he could not bill for the time spent in the operating room.

The majority of the feedback and product design from Carlson was given to the SF sales rep verbally. There may have been some feedback provided in email. A SF sales rep would be present for any surgery where Carlson used SF products. Walter Wood was Carlson's sales rep until approximately 2015 when Amanda Dalton replaced Wood. Dalton is still Carlson's sales rep. Depending on Carlson's schedule for the day, he would talk with the sales rep before or after a procedure to give feedback. There were many instances in which the sales rep would be with Carlson for the entire day. He only billed for the time that he actually gave feedback, which could be a couple hours in some instances. The sales reps would also occasionally come to Carlson's office on Thursday's to discuss the SF products. Carlson would also bill this time as consulting. An engineer from SF would come to Newport News, Virginia approximately one time per quarter. Carlson would also have maybe one telephone call per quarter with an engineer. He worked with different SF engineers over the years, including Sarah Cook and Jeremy LNU.

Carlson provided feedback and product design on a few different SF products. The first year of his consulting was focused on making changes to the cervical screw system. After the product design was updated, Carlson continued to provide feedback on the product. He also helped to develop the Awl, which was used to drill a pilot hole for the pedicle screw. Additionally, Carlson provided feedback on three different plates, pedicle screws, and other lumbar equipment.

The initial consulting agreement was directly with SF. There was a specific form that Carlson submitted to SF every six weeks with his consulting hours. After approximately one year of submitting his hours directly to SF, Carlson was told by Humad that his hours should now be submitted through a web portal called IME. Carlson thought the reason for the switch to IME was to allow consultants to enter their time online through the portal. Carlson found it much easier to use the online portal rather than the old way of submitting hours on the sheets provided by SF. He was aware of the Sunshine Act reporting requirement and did not think that SF was trying to get around it by switching to IME. At the time of the switch to IME, Carlson did not know the ownership structure. He now believes that it may be owned by KIC Ventures.

Carlson received the IME consulting agreement through email from Humad. He did not remember any specific conversations with Humad about the change to IME. He did remember reviewing the agreement when he received it from Humad. Carlson took the paragraph in the agreement *(Bates: JRC1372)* that stated feedback for a lumbar procedure should be two hours and a cervical procedure should be one hour, to mean that the feedback should be given contemporaneously to the procedure, within those specified hours. Carlson did not remember any conversations with Humad or Chin about the specifics of the IME agreement.

Carlson would submit his consulting hours through the IME portal on a monthly basis. At the end of every month, he would look at his schedule from the month and submit his hours based on his calendar and his memory. He did not track the hours on a day to day basis and only tallied the hours at the end of the month. Carlson would know based on his calendar who from SF was present on a particular day and how many hours of feedback was provided. He considered it to be a good faith estimate based on his memory and the calendar, and not a minute by minute accounting of his hours. Carlson was not aware that he was the number one paid consultant for SF. He never had any discussions with other surgeons about how many hours they were billing. Along with his hours, Carlson would sometimes submit a comment. He was never told by anyone at SF that he was required to enter a comment and he assumed it was optional. The comments entered by Carlson were not meant to constitute actual feedback. A few times that he wrote comments he was looking for a response from SF about feedback that he had given. Although SF was more receptive to his ideas than other companies, there were instances where they did not respond quickly.

At one point, Carlson noticed that the hours he had submitted to IME were getting reduced. He may have asked about the hours being reduced but does not remember getting a response. Carlson assumed it was their

prerogative to pay him the hours that they thought was appropriate. He was never questioned about the substance or quality of his feedback. The SF reps, engineers, and even Humad told Carlson that he provided good feedback. IME was sometimes late paying Carlson for his consulting hours. When he started to notice that the payments were late, he asked Humad for a contact at IME. Humad gave Carlson Vanessa Dudley's contact information to ask about payments. When Carlson emailed Dudley about a late payment, he would receive payment shortly thereafter.

In early 2013, around the same time that Carlson became a consultant with SF, he loaned $500,000 to SF as an investment. The terms of the loan was 10% annual interest over 10 years. One of the reasons that Carlson made the loan was to be a member on the Strategic Advisory Board (SAB) at SF. Carlson wanted to be involved in the company and thought that it would be worthwhile to make the loan. There was no connection between Carlson making the loan and signing the consulting agreement. If he did not make the loan he could have still been a consultant. Carlson believed that he received a loan payment in 2013 and 2014, but none after 2014.

Eventually Carlson was asked to move the loan to a different investment vehicle. It was either Chin or Humad who asked Carlson to sign the new loan agreement that moved the loan from SF. He was told that some hospitals had concerns about doctors making loans to SF. Carlson disclosed to Mary Immaculate hospital that he was consulting with SF and had also made a loan to them. Carlson disclosed this on a financial disclosure form every year with Mary Immaculate hospital. The form did not ask for the amount of the loan. Mary Immaculate hospital did not have a problem with Carlson's consulting or loan with SF. There were various changes made to the loan, and Carlson did not really understand the ramifications of the changes. He generally understood that one of the changes to the loan would be that if the company was sold or had an IPO, he would get paid out. Carlson thought of it as a financial interest in the company, and not necessarily a loan. At one point Chin even said that the company might be listed on the Frankfurt stock exchange, however this never materialized. One of the reasons Carlson signed the changes to the loan agreement was he was skeptical he would ever get paid back the original loan. The loan was eventually moved to company called Medinvus. Carlson assumed this was one of Chin's companies.

Chin would occasionally make comments that Carlson and other surgeons should use more SF products to raise the value of SF. Chin had the mentality of a CEO and Carlson assumed this is why he would make comments like that. Carlson did not think that it was an issue for him because at the time that Chin made that comment, Carlson had a loan to SF and not an investment. Looking back Carlson realized that comments like that could be

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Jeffrey Carlson , On 07/27/2018 , Page 6 of 7

problematic, particularly if Carlson was invested in SF. He was generally aware of the OIG guidance on Physician Owned Distributors (PODs).

Humad set up an LLC called Wave LLC for Carlson to receive payments from SF. The first interest payment from the loan to SF went directly to Carlson, but the second payment was made to Wave LLC.

Carlson has testified numerous times as an expert witness at trial or in depositions for personal injury cases. He estimated that he is hired at least once per month as an expert witness. He has also been deposed one time in a medical malpractice case in which he was the defendant, but he settled the case.

Carlson estimated that his net worth was approximately 3 million dollars in 2013, and is currently 5 million dollars.

*(During the interview Carlson was shown the below documents and asked to comment.)*

**JRC1224 - JRC1228 -** This was the original consulting agreement that Carlson signed with SF.

**JRC1349 -** This was an email from Humad that was sent to the members of the SAB. The email included financial statements that listed sales broken down by surgeon. Carlson did not know why he was sent this information.

**JRC1357, JRC1358 -** Information related to the original $500,000 loan that Carlson made to SF.

**JRC1371 - JRC1381 -** Email from Humad with new consulting agreement through IME.

**JRC1036 -** Carlson printed this IME submission sheet off of the IME portal. This is an example of what he would submit to IME with his consulting hours.

**JRC1046 -** Another example of an IME submission sheet that Carlson printed off the IME portal.

**JRC1051, JRC1078 -** Carlson wrote a comment on these IME submission sheets asking for a faster return on his ideas. It would sometimes take SF a month to get back to him on his ideas.

**JRC1387 -** This is an example of the types of things Chin would say as owner of SF. He had the mindset of a businessman. Carlson did not take it to mean that he had to use more SF products.

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Jeffrey Carlson , On 07/27/2018 , Page 7 of 7

**JRC1468, JRC1478 -** These were additional documents related to the loan change. Medinvus was the name of the company that the loan was moved to. Carlson believed it was a SF or KIC company.