UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KINGSLEY R. CHIN,<br>ADITYA HUMAD<br><br>　　　　　　　　Defendants. | No. 1:21-cr-10256-IT |

GOVERNMENT'S OPPOSITION TO
DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE EVIDENCE
CONCERNING USE OF DEFINITIVE NEURODIAGNOSTICS AND YEHSS

The government submits this opposition to the Defendants' Motion *in Limine*, Dkt. No. 251, to preclude evidence concerning Definitive NeuroDiagnostics, LLC ("DND") and Your Extra Hands Surgical Services ("YEHSS"), two medical services companies Dr. John Atwater owned. The evidence at trial will show that Defendants Kingsley Chin and Aditya Humad offered and paid kickbacks to Dr. Atwater in the form of (i) sham consulting via Impartial Medical Expert, LLC ("IME") and SpineFrontier, (ii) Defendant Chin's *quid pro quo* use of Dr. Atwater's neuromonitoring company, DND, and (iii) sham management fees to Dr. Atwater disguised as legitimate payments to YEHSS, Dr. Atwater's surgical services company. Critically, the Defendants intermingled their payments for IME, DND, and YEHSS. Similarly, their negotiations with Dr. Atwater concerning the payments for IME, DND, and YEHSS were intertwined. As such, the evidence concerning the bribes the Defendants paid to Dr. Atwater for DND and YEHSS is intrinsic to the Indictment, and the Court should admit it. But even if the Court were to find the information extrinsic to the charged crimes, it should nevertheless admit this evidence under Fed.

R. Evid. 404(b), as it is relevant to intent, plan, knowledge, and lack of mistake or lack of good faith under Rule 404(b).

## BACKGROUND

**A. Dr. Atwater's Consulting Arrangement With SpineFrontier/IME**

Initially, Dr. Atwater discussed entering into an agreement to be a consultant directly with SpineFrontier (i.e., unmediated by IME). Ex. 1 at 3 (Dr. Atwater Civil Settlement Agr.) [USAO_0000564]. On or about October 17, 2013, Dr. Atwater signed a consulting agreement with IME, and on October 21, 2013, Vanessa Dudley (Dr. Chin's then girlfriend) countersigned the consulting agreement on IME's behalf. Ex. 2 at 6 [JGA000833, -8399]. Dr. Atwater first received payment from IME in December 2013, in the amount of $582.60. Ex. 3 at 1 [JGA000039]. The government anticipates Dr. Atwater will testify that he received his IME surgical "consulting" payments through his company, YEHSS. Moreover, an employee of Dr. Atwater's at YEHSS, Kyle Black, handled submitting Dr. Atwater's "consulting" time to IME. *See, e.g.,* Ex. 4 at 1 ("I have logged the hours in the online IME sheet; however, I wanted to include the details as well.") [SF-ATW-00002000]. After Kyle Black left YEHSS, Dr. Atwater entered his IME hours himself. Ex. 5 ("Dear mr huma[d,] Please give me info on how to log my time on the ime website. I had Kyle do it for me but he has moved on.") [SF-ATW-00001850]. The government anticipates Dr. Atwater will testify that he reported consulting hours to SpineFrontier materially in excess of the number of hours he actually spent engaged in consulting activities, and SpineFrontier paid Dr. Atwater for consulting hours he did not work. Ex. 1 at 3 [USAO_0000564]. Further, Dr. Atwater stated that he calculated his consulting hours "based on guidelines SpineFrontier communicated to him through its officer, Aditya Humad, namely that Dr. Atwater could bill a flat rate of 1 hour whenever he used one of SpineFrontier's cervical spine medical

2

devices, and a flat rate of 2 hours whenever he used one of SpineFrontier's lumbar spine medical devices, ostensibly for "evaluations" of those products." Ex. 1 at 3 [USAO_0000564].

### B. The Relationship Between Dr. Atwater's Surgical Services Company, YEHSS, and SpineFrontier/IME

YEHSS was a company Dr. Atwater owned that was based in Normal, Illinois. Ex. 1 at 1. [USAO_0000564]. YEHSS was in the business of hiring and contracting out surgical assistants and technicians to healthcare providers, primarily hospitals and outpatient clinics. Ex. 1 at 1 [USAO_0000564]. On November 14, 2013, Dr. Atwater, on behalf of YEHSS, and Defendant Humad, on behalf of SpineFrontier, entered into an agreement pursuant to which YEHSS would "manage" a YEHSS employee who would act as a sales representative for Dr. Atwater solely in surgeries he performed with SpineFrontier products. Ex. 6 at 1, 2 [SF-ATW-0001456, --1457]. That agreement was updated on or about February 5, 2014, and signed by Kyle Black, YEHSS's Executive Director and Christopher Chang, SpineFrontier's General Manager. Ex. 7 at 1, 2 [SF-HUM-00218839-40]. Pursuant to the YEHSS-SpineFrontier agreement, SpineFrontier agreed to pay YEHSS $3,200 per month to manage the YEHSS employee, who SpineFrontier would separately pay another $2,500 to act as SpineFrontier's sales representative in Dr. Atwater's SpineFrontier cases. Ex. 7 at 1 [SF-HUM-00218839]. The YEHSS-SpineFrontier agreement specifically stated that YEHSS would earn the $3,200/month management fee from SpineFrontier *solely* from Dr. Atwater's SpineFrontier cases—i.e., for any other case, and there were many more non-SpineFrontier cases—YEHSS did nothing, and yet still received $3,200 per month.

Specifically, notwithstanding the written language of the YEHSS-SpineFrontier contract, YEHSS "did not provide services commensurate with SpineFrontier's payments to it. Nevertheless, SpineFrontier paid YEHSS $3,200 per month from March 2014 through October 2014." Ex. 1 at 2 [USAO_0000564]. The government expects Dr. Atwater to testify that YEHSS

3

did little to no work for SpineFrontier, and the $3,200 per month payment was simply a creative, but illegal, means to pay Dr. Atwater to use, and continue to use, SpineFrontier products.

### C. The Relationship Between Dr. Atwater's Neuromonitoring Company, DND, and SpineFrontier/IME

Finally, Dr. Atwater owned a neuromonitoring company, DND, also based in Normal, Illinois. DND was an interoperative monitoring ("IOM") company. During spine procedures some spine surgeons opt to have continuous monitoring of the patient's nerves, to ensure that the procedure does not inadvertently injure a patient's nerves. SpineFrontier agreed to use Dr. Atwater's IOM company, DND, in order to induce Dr. Atwater's use of SpineFrontier products and entered into an agreement to that effect. *See* Ex. 8 at 2 ("Dr. Chin told Dr. Atwater that he would be happy to begin using DND [] as his neuromonitoring service.") [USAO-MA-ATWATER-00000015, -0016]; *see also* Ex. 9 at 1, 10 (DND-LESS Neurologics, LLC agreement signed by Aditya Humad, on behalf of KIC Management Group, and Dr. Atwater, on behalf of DND) [USAO-MA-ATWATER-0000029-38]. At one point in March 2015, Defendant Chin's assistant, Seth Jacknowitz, informed Defendants Chin and Humad that Dr. Atwater told him that "he hasn't received a check for IME and neuro work and said in so many words, 'No pay, no cases.'" Ex. 10 at 1 [SF-HUM-00125658]. SpineFrontier created a "WHY Report," in which company employees listed the reasons why surgeons used SpineFrontier products. Ex. 11 at 1 [SF-MCF-0015192]. For Dr. Atwater, the "WHY Report" stated: "consulting, said we would use his neural monitoring company [DND] and Kyle Black's PA-on-demand service [YEHSS]") Ex. 11 (attachment) [SF-MCF-0015193]. The government anticipates that Dr. Atwater will testify that he told SpineFrontier that he conditioned his continued use of the company's products on Defendant Chin's use of DND.

### D. Defendants Chin and Humad Negotiated Payments With Dr. Atwater For SpineFrontier/IME, YEHSS, and DND on a Collective Basis

In the Fall of 2014, Dr. Atwater moved to Florida, from Illinois. Through his employee, Kyle Black, Dr. Atwater proposed that the Illinois-based YEHSS representative continue to act as Dr. Atwater's SpineFrontier sales representative in his Florida cases, notwithstanding that the YEHSS representative lived in Illinois. In essence, Dr. Atwater wanted to continue to receive the $3,200 per month YEHSS "management" fee from SpineFrontier. Defendants Chin and Humad discussed this and determined that they would not agree to continuing to pay the management fee. Defendant Chin stated, instead, that SpineFrontier could drop the $3,200 management fee because, "We are giving Dr Atwater business with his neuromonitoring plus consulting." Ex. 12 at 2 [SIK-00009831]. In January 2015, Dr. Atwater continued to negotiate monies SpineFrontier owed him. On or about January 15, 2015, Black wrote to Humad and demanded payment for YEHSS and IME services. Ex. 13 at 2 ("We are showing that SpineFrontier owes YEHSS $9,600.00 *plus* IME monies. The last payment we received was $3,200 for September 2014 – check #5383.") (emphasis added) [JGA000139].

Finally, on or about April 16, 2015, Dr. Atwater and Defendants Chin and Humad reached a comprehensive agreement on payments SpineFrontier and Defendant Chin owed to Dr. Atwater. Defendant Humad sent Dr. Atwater and Defendant Chin the below email, which plainly illustrates that Defendants Chin and Humad, on the one hand, and Dr. Atwater, on the other, negotiated kickbacks from the former to the latter on a global basis.

```
From:       Aditya Humad <AdityaHumad@kicventures.com>
To:         Dr. Kingsley Chin
CC:         'Dr. John G Atwater'; 'Impartial Medical Experts'; Jake Lubinski; 'Kyle Black';
            SethJacknowitz@spinefrontier.com812
Sent:       4/16/2015 2:10:00 PM
Subject:    RE: IME
```

Dear Dr Atwater,

Appreciate the call, and glad we had a chance to clear up all open issues.

Below is a summary from our conversation:

1. Agreed on 9 hours approved for the 5 case evaluations done with IME for February, and process/expectations going forward for cervical/lumbar case evaluations and to get you more involved with training/courses/labs once we get ramped up on all products. Seth will follow-up with you for the upcoming cases you mentioned

2. Agreed to terminate YEHSS contract for Rep/Mgmt with monthly fee since October per prior emails since we were no longer having Sid cover cases or doing business in IL.

3. We are in due diligence process to secure funding for growth of the LESS Institute, and expect to clear DND monitoring balances then. Will continue to make some partial payments in interim to reduce balance as we have been. Will revisit the discussion with yourself and Kingsley to further expand with DND as LESS Institute expands with ASCs in other locations.

Hope this helps put the issues behind us, open lines of communication and start working closely together.

Ex. 14 at 1 [SF-ATW-00001869].

## ARGUMENT

### I.   Evidence Pertaining to DND and YEHSS is Intrinsic to the Charged Crimes

It is axiomatic that evidence intrinsic to the charged crime is not governed by the dictates of Fed. R. Evid. 404(b), and is admissible unless otherwise excluded by another evidentiary rule. *United States v. Epstein*, 426 F.3d 431, 438-39 (1st Cir. 2005). As the First Circuit stated in *Epstein*, "Rule 404(b), by its very terms, excludes only extrinsic evidence—evidence of other crimes, wrongs, or acts—whose probative value exclusively depends upon a forbidden inference of criminal propensity. Evidence intrinsic to the crime for which the defendant is on trial, accordingly, is not governed by Rule 404(b)." *Epstein*, 426 F.3d at 439 (citing *United States v. Manning*, 79 F.3d 212, 218 (1st Cir. 1996)).

6

In *Epstein*, the government introduced the co-defendant Handel's 1099 tax return into evidence. The return indicated that Handel earned approximately $30,000 in business income from his (fraudulent) appraisals. "However, the return did not indicate approximately $15,000 that Handel received in the name of his wife." *Id.* at 438. On appeal, Handel argued that his tax return was extrinsic evidence that should have been ruled out under Rule 404(b). *Id*. at 439. But the First Circuit affirmed the district judge's finding that, "Handel's tax return was intertwined with the crime because the tax return reports the income that he received from the fraudulent scheme." *Id*.

Similarly, here evidence of the kickbacks the Defendants paid to Dr. Atwater for DND and YEHSS were intertwined with the kickbacks Defendants Chin and Humad offered and paid Dr. Atwater for supposed "consulting," via IME. Indeed, as detailed in the Background section, *supra*, the Defendants and Dr. Atwater negotiated a comprehensive resolution to the various outstanding issues surrounding his "entitlement" to various streams of kickback payments. Defendant Humad's April 16, 2015 email to Defendant Chin, Dr. Atwater, and others, makes it clear that the parties (i.e., the Defendants and SpineFrontier on the one hand, and Dr. Atwater and his entities on the other) treated the *overall relationship* as an intermingled whole, not separate parts. Ex. 14 at 1 [SF-ATW-00001869].[1] Having done so, the Defendants should not now be permitted to draw self-serving evidentiary lines. Accordingly, evidence concerning DND and YEHSS is intrinsic to the charged crime, not subject to Rule 404(b), and the Court should admit it.

---

[1] To take another relevant example of the Defendants' intermingling, not only did IME pay the $3,200 per month YEHSS "management" fee, but IME and Vanessa Dudley also appeared to have paid monies Defendant Chin owed to DND. *See* Ex. 15 at 1 (Dudley: "I have a check in the amount of $5000 ready to send to DND Neuro.") [SF-ATW-00004288].

## II. Even Assuming the DND and YEHSS Evidence is Extrinsic, it is Nevertheless Admissible Under Rules 404(b) and 403

Federal Rule Evidence 404(b) governs the admissibility of evidence of "other crime[s], wrong[s], or act[s]." Fed. R. Evid. 404(b)(1). Generally, although Rule 404(b) prohibits such evidence "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," the Rule allows for the introduction of such evidence for other purposes. Specifically, Rule 404(b)(2) permits a party to admit evidence of other crimes, wrongs, or acts "for another purpose, such as proving motive, opportunity, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "A proposal by the government to introduce evidence of a defendant's other bad acts is subject to a two-part test." *United States v. Bain*, 874 F.3d 1, 26 (1st Cir. 2017) (citing *United States v. Hicks*, 575 F.3d 130, 142) (1st Cir. 2009)). First, the court must determine if the proffered evidence has "special relevance, i.e., a non-propensity relevance." *Id*. Evidence has special relevance if "it is relevant for any purpose apart from showing propensity to commit a crime." *United States v. Doe, a/k/a Rashide Campbell*, 741 F.3d 217, 229 (1st Cir. 2013) (citing *United States v. Rodriguez-Berrios*, 573 F.3d 55, 64 (1st Cir. 2009). If the government can demonstrate "special relevance," the court then evaluates whether it should nevertheless be excluded under Rule 403. *Bain*, 874 F.3d at 26.

Here, the evidence concerning the DND and YEHSS schemes has special relevance that does not go to propensity. *First*, as described above, the Defendants commingled their kickbacks through IME to Dr. Atwater along with their kickbacks to Dr. Atwater via DND and YEHSS. With respect to YEHSS especially, Dr. Atwater used a YEHSS employee to process and submit his IME consulting, to interact with the Defendants concerning all three schemes (IME, DND, YEHSS), and to negotiate a comprehensive monetary resolution with the Defendants.

*Second*, even assuming there had been no intermingling at all, the evidence concerning DND and YEHSS are relevant to the Defendants' motive and intent. The Defendants intended to induce Dr. Atwater to use SpineFrontier's products and utilized multiple vehicles to achieve that goal (IME, DND, YEHSS). The Defendants' focus on separating the streams of kickback payments and prohibiting evidence of DND and YEHSS ignores the forest for the trees—the purpose of all three was to induce Dr. Atwater's use of SpineFrontier's products.

*Third*, there was a common plan regarding the way the Defendants carried out each of the schemes. As with the "consulting scheme," the Defendants cloaked their *illegal arrangement* in the guise of a *legitimate contract* for both the DND and YEHSS schemes. And as with the IME scheme, the Defendants papered their DND and YEHSS schemes with contracts that differed from the actual arrangements in practice. *See* Ex. 7 (YEHSS agreement) and Ex. 9 (DND agreement).

*Fourth*, the Defendants' use of DND and YEHSS to pay Dr. Atwater kickbacks, and to do so in a similar manner to the sham consulting arrangement via IME, expressly demonstrates the lack of accident, mistake, or good faith on the Defendants' part. In each instance, the Defendants masked their illegal arrangements as legal contracts to evade the law and any consequences. The use of the same sleight of a hand (a contract saying one thing, their actions saying another) makes clear that the Defendants acted purposely, and not in good faith.

In short, the evidence concerning DND and YEHSS has special relevance concerning the Defendants' motive, intent, common plan, and lack of accident or good faith.

Finally, the Court should not exclude evidence of the DND and YEHSS schemes under Rule 403. In a case where the government expects the Defendants' primary defense to be lack of intent and/or good faith, evidence of the Defendants' motive, intent, plan, and lack of good faith, as described above, provides significant probative value. Nor is there a danger of *unfair* prejudice.

9

Fed R. Evid. 403. It is not unfairly prejudicial to the defense to permit the government to introduce evidence that sheds a bright light on the Defendants' motive, intent, common plan, and lack of good faith. Again, the Defendants themselves intermingled the IME, DND, and YEHSS schemes—the jury is entitled to assess evidence of the same.

### III. Defendants' Arguments Concerning the DND and YEHSS Evidence Do Not Hold Up

Aside from the points the government already has addressed, the Defendants make a grab bag of other arguments in a last-ditch effort to keep out the evidence concerning DND and YEHSS. The Defendants argue that the information would "likely confuse the jury about speculative matters," Dkt. No. 251 at 2, constitute a "prejudicial variance from . . . the Indictment," Dkt. No. 251 at 3, cause a "trial within a trial on medical issues," Dkt. No. 251 at 6, require "expert testimony as to the function of" surgery-support or neuromonitoring services, Dkt. No. 251 at 6, and the Defendants also complain that the government provided insufficient notice. Dkt. No. 251 at 6. None of the Defendants arguments hold up upon even cursory review.

*First*, there is no need for a minitrial. The testimony concerning the nature of the kickbacks the Defendants provided to Dr. Atwater via YEHSS and DND will be simple, quick, and easily digestible. The government expects Dr. Atwater to testify that YEHSS did little to no work for the $3,200/month YEHSS fee, and that he stated that he would not use SpineFrontier products until his DND bills were paid.[2]

---

[2] The Defendants cite *United States v. Gilbert*, 229 F.3d 15, 24 (1st Cir. 2000), in support of their argument that the DND and YEHSS evidence will require a minitrial. But *Gilbert* concerned whether evidence of the defendant's alleged murder of her ex-husband was admissible under Rule 404(b), where she was charged with capital murder for the deaths of four patients at the VA. *Id*. at 1. This case has no relevance to the facts here.

*Second*, there is no prejudicial variance.  As explained above, the DND and YEHSS evidence is intrinsic to the crime, and even were it not, the proffered evidence is specially relevant for the reasons the government outlined above (motive, intent, plan, lack of good faith).

*Third*, there is no reason for expert testimony concerning surgery-support or neuromonitoring services—the medical necessity (or not) of such services is irrelevant to the question of whether the Defendants acted with an illegal intent to induce claims.[3]  *See* Gov't's Mot. *In Limine* to Preclude Any Evidence or Argument Concerning Lack of Patient Harm or Absence of Medically Unnecessary Services.  Dkt. No. 245 at 2 (citing, e.g., *United States v. Eggleston*, 823 Fed. App'x 340, 344 (6th Cir. 2020) (citations omitted) (the AKS "makes no distinction between kickbacks earned from medically necessary services and those earned from unnecessary ones").

*Fourth*, there is no notice problem.  The government provided notice of its position on the YEHSS and DND evidence well in advance of trial, and at the time required by the Court's pre-trial Order.  The government informed the Defendants that the DND and YEHSS evidence was intrinsic to the crimes charged, and that if not, it still was admissible pursuant to Rule 404(b).  Nothing more was required.

---

[3] Although they make a fleeting reference to it, nor are the fair market values of surgery-support or neuromonitoring services relevant.  Dkt. No. 251 at 3.  If the Defendants paid remuneration with the intent to induce, it is of no moment that the payments were fair market value—the AKS does not immunize otherwise illegal conduct simply because it constitutes fair market value. *See United States v. Marlin Med. Solutions, LLC*, 579 F. Supp. 3d 876, 893 (W.D. Tex. 2022) ("Importantly, the presence of a legitimate business purpose for the arrangement or a fair market value payment will not legitimize a payment if there is *also* an illegal purpose.") (internal citations and quotations omitted); *United States v. Sutter Health*, No. 14-cv-04100, 2021 WL 9182522, at *10 (N.D. Cal. Mar. 17, 2021) ("The AKS does not have a fair market value requirement as an element of the offense[.]").  In any event, with respect to YEHSS at least, there obviously is no fair market value in paying for services that YEHSS and Dr. Atwater did not provide.

## CONCLUSION

For the foregoing reasons, the government respectfully requests the Court deny the Defendants' Motion *in Limine*.

Dated: March 3, 2025

LEAH B. FOLEY
United States Attorney

*/s/ Abraham R. George*
ABRAHAM R. GEORGE
CHRISTOPHER LOONEY
MACKENZIE A. QUEENIN
Assistant U.S. Attorneys
1 Courthouse Way
John Joseph Moakley U.S. Courthouse
Boston, MA 02210
(617) 748-3100

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system on March 3, 2025, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) (with paper copies to be sent to those indicated as non-registered participants).

Dated: March 3, 2025

*/s/ Abraham R. George*
ABRAHAM R. GEORGE
Assistant United States Attorney