# Exhibit 3

2/24/2019                                                                 AOL Mail - Message View

< 212 Results for **adtiya humad**

### Fwd: Spinefrontier Case Report - Dr Atwater

**From:** John Atwater <imhotspine@aol.com>
  **To:** Aditya Humad <AdityaHumad@spinefrontier.com>
  **Date:** Fri, May 29, 2015 8:25 pm

Dear Aditya

Here is the accounting payments to Yehss from spinal frontier for managing Sid and independent medical payments consulting. We are not privy to the independent contract that spinal frontier had with mr Kissinger. . Are you including that in our Yehss payments because the 20 k that you referenced a month is not supported by our data. Could some checks have been misplaced or is this a more accurate picture of our financial relationship.

Sent from my iPhone

Begin forwarded message:

**From:** Brett Verplank <brett.verplank@yehss.com>
**Date:** May 29, 2015 at 6:49:40 PM EDT
**To:** John Atwater <imhotspine@aol.com>
**Subject: Re: Spinefrontier Case Report - Dr Atwater**

Below is all the funds we received from Spine Frontier.

| Money received from All dates for Spine Frontier, Inc. | | | |
|---|---|---|---|
| Date | Type | No. | Total |
| 2013-12-30 | Payment | 4057 | 582.60 |
| 2014-03-25 | Payment | 4386 | 3,200.00 |
| 2014-04-25 | Payment | 4514 | 3,200.00 |
| 2014-05-27 | Payment | 4649 | 3,200.00 |
| 2014-05-27 | Payment | 8070 | 1,425.00 |
| 2014-06-24 | Payment | 4808 | 3,200.00 |
| 2014-06-25 | Payment | 8083 | 2,375.00 |
| 2014-07-17 | Payment | 8096 | 1,662.50 |
| 2014-08-01 | Payment | 4945 | 3,200.00 |
| 2014-08-13 | Payment | 8108 | 2,850.00 |
| 2014-08-25 | Payment | 5086 | 3,200.00 |
| 2014-09-24 | Payment | 5249 | 3,200.00 |
| 2014-10-14 | Payment | 8149 | 950.00 |
| 2014-10-24 | Payment | 5383 | 3,200.00 |
| 2015-01-30 | Payment | 8210 | 1,425.00 |
| 2015-03-31 | Payment | ACH | 4,275.00 |
| TOTAL | | | 41,145.10 |

Thank you,

Brett Verplank
Financial Manager
YEHSS, LLC
Phone: 309-310-2635
EFax: 309-323-0442
Email: brett.verplank@yehss.com

**From:** "John Atwater" <imhotspine@aol.com>
**To:** "Brett Verplank" <brett.verplank@yehss.com>
**Sent:** Friday, May 29, 2015 6:32:50 PM
**Subject:** Fwd: Spinefrontier Case Report - Dr Atwater

Can U confirm this for me. I'm feeling bad about how much they payed us to manage their line and did

Sent from my iPhone

Begin forwarded message:



## Your Extra Hands Surgical Services, LLC
Service Agreement
With
## SpineFrontier

Your Extra Hands Surgical Services, LLC (YEHSS) will provide *SpineFrontier* a surgical first assistant and /or a certified surgical tech to assist, as a "Sales Representative" on all cases with Dr. Atwater involving *SpineFrontier* products at the following facilities:

- St. Joseph Hospital, Bloomington, IL
- Advocate BroMenn Hospital, Normal, IL
- Presence Health, Urbana, IL
- Gibson City Hospital, Gibson City, IL
- The Center for Outpatient Medicine, Bloomington, IL
- Unity Point / Methodist Hospital, Peoria, IL

1. YEHSS will manage and provide day-to-day supervision of Mr. Rylan Miyat.
2. YEHSS will work with Dr. Atwater's and other local surgeon's offices to ensure that *SpineFrontier* products are available at the right location and time for the assigned *SpineFrontier* cases.
3. YEHSS will assist *SpineFrontier* in an attempting to acquire and maintain pricing agreements with the previously mentioned facilities.
4. YEHSS will acquire approved and fully authorized Purchase Orders for the services provided.
5. YEHSS will assist in ensuring that Mr. Miyat is meeting the requirements of the "<u>Sales Representative Agreement</u>" between *SpineFrontier* and Mr. Rylan Miyat.
6. YEHSS at its own expense, shall procure and maintain in full force and effect during the Term, corporate and individual professional liability insurance for the acts and omissions of its employees, with limits of liabilities in the amounts not less than One Million Dollars ($1,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) in the aggregate.

**Invoicing:** During the 12 month Term and any Renewal Terms, but subject to the terms of this Agreement, *SpineFrontier* shall pay, and *YEHSS* shall accept, as compensation in full for the Management Services previously mentioned a fee of Three Thousand and two hundred dollars ($3200.00) every month for the services

performed by the *SpineFrontier* "Sales Representative" and *YEHSS* Management Team. Invoices are payable to *YEHSS* no more than 3 days after the 20th day of the month preceding the date of the invoice.

**Payment to Sales Representative:** During the term of the "*Sales Representative Agreement*", between Mr. Rylan Miyat and *SpineFrontier*, Mr. Miyat shall directly receive two thousand and five hundred dollars ($2,500) per month as a monthly coverage fee / commission as outlined in Exhibit C in the "*Sales Representative Agreement*", between Mr. Rylan Miyat and *SpineFrontier* for sales generated (measured by valid POs received) from surgeon users as listed in Exhibit B using products supplied by SpineFrontier. In addition, a case coverage fee of $100 per surgery for any other surgeons in the region as requested by *SpineFrontier* using products supplied by SpineFrontier (measured by valid POs received). Payment will be made directly to Mr. Miyat.

**Termination:** When and if, the "*Sales Representative Agreement*", between Mr. Rylan Miyat and *SpineFrontier* terminates or is terminated, this Service Agreement will also terminate thirty (30) days after the date of notification. Payment will be expected and paid for any outstanding invoices.

**Effective Date:** The effective date of this agreement is December 1, 2013.

**Business Relationship:** The business relationship between the parties that is covered by this Service Agreement includes the following services: *SpineFrontier* "Sales Representative" and *YEHSS* Management services as outlined above.

---

Your Extra Hands Surgical Services, LLC
("Your Extra Hands Surgical Services")

By: _____
    signature

Name: Kyle J. Black

Title: Executive Director

Date: _____

Address for notices to be sent:

Executive Director
Your Extra Hands Surgical Services, LLC
1604 Visa Drive, Suite 2
Normal, IL 61761

Tel No.: 309.846.4716
Fax No.: 309.454.7348

SpineFrontier
("Receiving Party")

By: *[signature]*
    signature

Name: ADITYA HUMAD
    please print or type

Title: CFO

Date: 11/15/13

Address for notices to be sent:*
— Same as SpineFrontier main —

Tel No.: 978 232 3990 *

Fax No.: 978 232 3991 *

2/24/2019                      AOL Mail - Message View

< 212 Results for **adtiya humad**

### RE: Support for Ohio and other docs

**From:** Aditya Humad <AdityaHumad@spinefrontier.com>
    **To:** 'John Atwater' <imhotspine@aol.com>; Dr. Kingsley Chin <KingsleyChin@spinefrontier.com>
    **Cc:** Jake Lubinski <JakeLubinski@Spinefrontier.com>
**Date:** Tue, Jun 28, 2016 1:35 pm

Dr Atwater -

Jake and I will give you a call within 30 minutes to discuss the candidate in Ohio and payment rates.

Thanks
Aditya

Aditya Humad
President
Chief Financial Officer

SpineFrontier, Inc.
350 Main Street, 3rd Floor
Malden, MA 02148
www.spinefrontier.com
P: 978.232.3990
F: 978.232.3991
D: 978.236.7984
M: [redacted]

-----Original Message-----
From: John Atwater [mailto:imhotspine@aol.com]
Sent: Tuesday, June 28, 2016 12:57 PM
To: Aditya Humad <AdityaHumad@spinefrontier.com>; Dr. Kingsley Chin <KingsleyChin@spinefrontier.com>
Subject: Support for Ohio and other docs

Can we revisit this program because I have people available to cover cases. Even though we had additional compensation to a specific first assistant covering the cases, we could do either a per diem rate or per case rate dependent on lumbar vs cervical for them.

JGA 000074

2/24/2019                        AOL Mail - Message View

< 212 Results for adtiya humad

### Re: Support for Ohio and other docs

From: John Atwater <imhotspine@aol.com>
To: Aditya Humad <AdityaHumad@spinefrontier.com>
Date: Tue, Jun 28, 2016 2:58 pm

I call after 5

Sent from my iPhone

> On Jun 28, 2016, at 1:35 PM, Aditya Humad <AdityaHumad@spinefrontier.com> wrote:
>
> Dr Atwater -
>
> Jake and I will give you a call within 30 minutes to discuss the candidate in Ohio and payment rates.
>
> Thanks
> Aditya
>
> Aditya Humad
> President
> Chief Financial Officer
>
>
> SpineFrontier, Inc.
> 350 Main Street, 3rd Floor
> Malden, MA 02148
> www.spinefrontier.com
> P: 978.232.3990
> F: 978.232.3991
> D: 978.236.7984
> M: 
>
> -----Original Message-----
> From: John Atwater [mailto:imhotspine@aol.com]
> Sent: Tuesday, June 28, 2016 12:57 PM
> To: Aditya Humad <AdityaHumad@spinefrontier.com>; Dr. Kingsley Chin <KingsleyChin@spinefrontier.com>
> Subject: Support for Ohio and other docs
>
> Can we revisit this program because I have people available to cover cases. Even though we had additional compensation to a specific first assistant covering the cases, we could do either a per diem rate or per case rate dependent on lumbar vs cervical for them.
>

2/24/2019          AOL Mail - Message View

< 212 Results for **adtiya humad**

### Re: Support for Ohio and other docs

**From:** Aditya Humad <AdityaHumad@spinefrontier.com>
    **To:** John Atwater <imhotspine@aol.com>
    **Cc:** Jake Lubinski <JakeLubinski@Spinefrontier.com>
  **Date:** Tue, Jun 28, 2016 3:15 pm

Ok thanks

On Jun 28, 2016, at 2:58 PM, John Atwater <imhotspine@aol.com> wrote:

I call after 5

Sent from my iPhone

> On Jun 28, 2016, at 1:35 PM, Aditya Humad <AdityaHumad@spinefrontier.com> wrote:
>
> Dr Atwater -
>
> Jake and I will give you a call within 30 minutes to discuss the candidate in Ohio and payment rates.
>
> Thanks
> Aditya
>
> Aditya Humad
> President
> Chief Financial Officer
>
>
> SpineFrontier, Inc.
> 350 Main Street, 3rd Floor
> Malden, MA 02148
> www.spinefrontier.com
> P: 978.232.3990
> F: 978.232.3991
> D: 978.236.7984
> M:
>
> -----Original Message-----
> From: John Atwater [mailto:imhotspine@aol.com]
> Sent: Tuesday, June 28, 2016 12:57 PM
> To: Aditya Humad <AdityaHumad@spinefrontier.com>; Dr. Kingsley Chin <KingsleyChin@spinefrontier.com>
> Subject: Support for Ohio and other docs
>
> Can we revisit this program because I have people available to cover cases. Even though we had additional compensation to a specific first assistant covering the cases, we could do either a per diem rate or per case rate dependent on lumbar vs cervical for them.

2/24/2019                                          AOL Mail - Message View

< 212 Results for adtiya humad

### SpineCare America - ASC Assignment

**From:** Aditya Humad <AdityaHumad@kicventures.com>
**To:** John Atwater <imhotspine@aol.com>
**Cc:** Jared Tanz <JaredTanz@kicventures.com>; 'Nitesh Vaswani' <nitesh.v@bostonfagroup.com>; Barbara M. Comabella <BarbaraComabella@ThelessInstitute.com>
**Date:** Mon, Oct 15, 2018 2:08 pm

📎 ASSIGNMENT OF ASC RE...pdf (171 KB)

Dr Atwater,

Thanks for the call this weekend.

Attached is our standard purchase agreement of LOP ASC receivables for SpineCare America in Vero Beach. One executed, we would connect our billing team with your legal affairs manager so they have all required case/attorney information for review on any AR being purchased.

Let me know if any questions.

Thanks,
Aditya

Aditya Humad
Managing Partner & CFO

**K⌀C**Ventures
*Investing to Improve Health*

KICVentures.com
350 Main Street, 2nd Floor
Malden, MA 02148
O: 978.236.7984
M:

## ASSIGNMENT OF MEDICAL RECEIVABLES

THIS ASSIGNMENT OF MEDICAL RECEIVABLES (hereinafter referred to as "Agreement") is made between SpineCare America, PC ("Assignor") and Surgical Management and Billing, LLC ("Assignee").

Recitals:

**WHEREAS**, Assignor is related to a surgery center where medical services have been provided to certain patient(s) ("Patients") involved in personal injury claims and/or lawsuits under a letter of protection; and

**WHEREAS**, Patient(s) owe Assignor certain outstanding facility charges related to medical services performed at Assignor's surgery center (the "Services"), exclusive of charges payable by funds legislatively appropriated to any federal or state health care program such as Medicare, Medicaid, CHAMPUS, and/or TRICARE, (collectively referred to as the "Account Receivable(s)"); and

**WHEREAS**, the Account Receivable(s) and all related rights (including, but not limited to, all of Assignor's rights under any letters of protection thereto and/or thereunder and all of Assignor's rights as a secured party thereof) are referred to herein as the "Assigned Assets"; and

**WHEREAS**, Assignor desires to assign to Assignee, and Assignee desires to accept the assignment of, all of Assignor's rights, title, and interest in, to, and under the Assigned Assets;

**NOW THEREFORE**, the parties hereto agree as follows:

1. Recitals. The foregoing recitals are true and correct and are incorporated herein by reference.

2. Assignment. Assignor hereby sells, transfers, sets over and assigns to Assignee all of Assignor's rights, title, and interest in, to, and under the Assigned Assets. Such assignment includes, without limitation, the transfer to Assignee of the sole and exclusive right to:

   a. Demand and receive payment of the obligations represented by the Account Receivable on the Letter of Protection ("LOP") only—and no patient will be balanced billed;

   b. Issue payment instructions with respect to the payment of the obligations represented by the Account Receivable;

   c. Enforce any security interest or other rights the Assignor may have in the Assigned Asset; and

   d. Enforce all other rights and remedies of Assignor under the Assigned Assets (including, without limitation, all rights and remedies of a secured creditor under the applicable Uniform Commercial Code or other applicable law to the extent of any security interest arising under or in connection with the Assigned Assets). The Assignee shall not be deemed by anything contained herein, or in any other agreement among the Assignee, the Assignor, and Patient or his/her attorney, to have

Page 1 of 10

Assignee's Initials

Assignor's Initials

JGA 000078

assumed any liabilities whatsoever relating to, or arising out of, directly or indirectly, any Assigned Asset.

3. Warranties/Outstanding Medical Charges.

Assignor represents and warrants to Assignee that:

a. Assignor is the sole and exclusive owner of, and has valid title to, the Account Receivable(s), which is free and clear of any liens and/or encumbrances.

b. All bills and invoices which were the basis for the Account Receivables are true and accurate in all respects and were generated with usual and customary amounts for the Services.

c. All Services rendered and billed and listed as charges were necessary (with respect to the applicable Patient), that the amounts charged for the Services were reasonable at the time and place of the Services provided, and related to injuries sustained in the accidents or other occurrences which are the basis of claims or litigation, and the proceeds from which are subject to Letters of Protection ("LOP") and/or Liens securing the Account Receivables in the total amount of Account Receivables reflected on the invoice(s) therefor.

d. The undersigned representative of Assignor is in charge of records of Assignor.

e. Accompanying this Agreement are records that provide an itemized statement of the Service and the charge for the Service that Assignor provided to each Patient on the dates specified therein. The attached records are kept by Assignor in the regular course of business. The information contained in the records was transmitted in the regular course of business by Assignor or an employee or representative of Assignor who had personal knowledge of the information. The records were made at or near the time or reasonably soon after the time that the Service was provided. The records are the original or an exact duplicate of the original. The Service provided was necessary and the amount charged for the Service was reasonable at the time and place that the Service was provided.

f. Assignor expressly warrants and guarantees the authenticity and accuracy of the total amount due and owing under the Account Receivable set forth on "Exhibit A", and further that the individual receivable(s) listed on "Exhibit A" are protected by LOPs and/or Medical Liens *only*, and that no insurance has been billed (other than Personal Injury Protection insurance so long as the same has been declared and disclosed to Assignee). If payment from any source is received by the Assignor, then Assignee has the right of a full refund of the purchase price plus compounding interest at 2% per month from the date of purchase to the date of demand for repayment.

g. There are no claims pending or threatened against Assignor (including claims of set-off(s)) relating to the Services and/or treatment that give rise the Account Receivable, nor is there any basis for any such claim;

Page **2** of **10**

Assignee's Initials

Assignor's Initials

h. There exist no disputes with regard to the validity or collectability of the Account Receivable, nor is there any basis for any such dispute;

i. To best of Assignor's knowledge, neither the Patient nor his/her attorney named in any Assigned Asset attached hereto and/or referenced herein is in breach of any provision of the Assigned Assets; and

j. An "Eligible Account Receivable" (as used throughout this document) is an account receivable with respect to which all of the applicable representations and warranties of Assignor are true and correct; Assignor has delivered to Assignee true and complete copies of all of the corresponding medical invoices (which invoices indicate the date of service, amount billed to the Patient, Patient name and DOB, and scope of Services, together with any notes further describing the Services); the Patient's case is still open; has sufficient coverages to warrant the Services and/or treatment rendered by the Assignor to Patient; has a valid LOP or Medical Lien signed by the Patient, the Patient's attorney, or both; and has not been settled, negotiated, or paid to anyone other than the Assignee. In the event an account receivable is determined to not be an Eligible Account Receivable following the assignment to Assignee, Assignor shall replace said ineligible account receivable with a new account of equal or greater value.

k. For each Assigned Asset, Assignor shall have obtained from the Patient a valid and HIPAA-compliant authorization to disclose Protected Health Information, as that term is defined by HIPAA ("PHI"), pertaining to any Account Receivable prior to disclosing any PHI to Assignee. In the alternative, Assignor agrees to enter into a Business Associate Agreement with Assignee in furtherance of this Agreement prior to exchanging any PHI. HIPAA means the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the American Recovery and Reinvestment Act of 2009, Public Law 111-5 ("ARRA"), the Privacy Rule, and the Security Rule, 45 CFR Parts 160 and 164, and any subsequent amendments thereto; and

l. Each Assigned Asset has been originated, maintained, and serviced by Assignor in compliance with applicable local, state, and federal laws. Without limiting the foregoing, Assignor specifically represents and warrants as follows:

> i. Assignor has not and will not submit any claim to any Payment Program in connection with any referrals that violates any applicable self-referral Law, including without limitation the Federal Ethics in Patient Referrals Act, 42 U.S.C. § 1395nn (known as the "Stark Law"), or any applicable state self-referral Law. "Payment Program" means Medicare, TRICARE, Medicaid, Worker's Compensation, Blue Cross/Blue Shield programs, and all other health maintenance organizations, preferred provider organizations, health benefit plans, health insurance plans, and other third-party reimbursement and payment programs that pay for all or some claims with revenue legislatively appropriated to federal or state health care programs;

ii. Assignor has and will comply with all disclosure requirements of all applicable self-referral Laws, including without limitation the Stark Law and any applicable state self-referral Law;

iii. Assignor has not and will not knowingly or willfully solicit, receive, pay or offer to pay any remuneration, directly or indirectly, overtly or covertly, in cash or kind for the purpose of making or receiving any referral which violates any applicable anti-kickback Law, including without limitation the Federal Health Care Program Anti- Kickback Statute, 42 U.S.C. § 1320a-7b(b) (known as the "Anti- Kickback Statute"), or any applicable state anti-kickback Law. Assignor has not and will not submit any claim for payment to any Payment Program in violation of any Laws relating to false claim or fraud, including without limitation, the Federal False Claim Act, 31U.S.C. § 3729, or any applicable state false claim or fraud Law;

iv. There is no Payment Program survey, review or investigation in progress with respect to Assignor or its business including, without limitation, a review or investigation by any state or federal office of inspector general or any private payor's special investigative unit;

v. Assignor has not and will not engage in any discounting or fee forgiving practices that would violate any Payment Program obligations to collect co-payments, co-insurance, or any other patient responsibility portion of a bill.

k. Assignor agrees to and shall assign Account Receivables mutually agreed upon by Assignor and Assignee.

4. <u>Payment</u>. In consideration of the assignment of the Assigned Assets pursuant to this Agreement, and subject to Paragraph 3(d) and Paragraph 6, the parties agree that Assignee shall make a payment to Assignor per purchase price schedule in Exhibit B for Assignor's Account Receivables and acceptance of payment by Assignor from Assignee per Exhibit B constitutes an assignment of all rights, including but not limited to invoice settlement and negotiations, providing all documentation supporting billing, LOP, attorney contact information, policy limits, in favor of Assignee for the Assigned Assets. ; The exact accounts, including patient name and Assignor billing amounts, generating Assignor's current portfolio of Account Receivables will be provided to Assignor in a format as attached to this Agreement as "Exhibit A".

5. <u>Future Business Dealings Requirement</u>. Assignor agrees that by entering into this Agreement that Assignor will give Assignee the first right of refusal on any and all future account receivable(s) Assignor generates per the purchase price schedule in Exhibit B for a twenty-four (24) month period from the date of this Agreement.

6. <u>Notice of Assignment</u>. Upon execution of this Agreement, Assignor hereby authorizes Assignee to provide immediate written notice of this Assignment to each Patient's attorney.

Page 4 of 10

Assignee's Initials

Assignor's Initials

7. <u>Transfer of Lien & Payment Remittance</u>. The parties agree that Assignee shall be the sole party to receive, control and deposit compensation received for assigned Account Receivables. Assignor agrees that it shall notify attorneys if requested by Assignee for the patients whose care created the Account Receivable that it has sold and assigned all its interest in the Account Receivable to Assignee, and to remit any and all payments to an address to be determined at the discretion of Assignee. Said notification shall be approved by Assignee as part of this Agreement. The parties further agree that Direct Physicians Billing Services, Inc. (the "Servicer") shall be the sole Assigned Accounts Receivable servicer on behalf of Assignor and Assignee. Any and all payments received for and Account Receivable shall be delivered to the Servicer.

In the event Assignor receives a check on an assigned Account Receivable, Assignor agrees that same will not be deposited in to any of their accounts and will be turned over within three (3) business dates of receipt. Violation of this provision shall subject Assignor a penalty of the amount converted, as well as a 2% penalty.

8. <u>Duty to Cooperate.</u> Assignor, it's agents, employees, members, shareholders, representative and/or doctors agree to use its/their best efforts to maximize the recovery of the Account Receivables, including but not limited to complying with any reasonable request for information or documentation by Assignee, complying in a timely manner with all subpoenas served on Assignor relating to any patient listed on "Exhibit A" or that relates to any supplemental Eligible Accounts Receivable described in Paragraphs 3(e) or 5 and to cooperate in any reasonable manner with counsel for said patients and/or Assignee. Upon reasonable request by Assignee, Assignor shall allow Assignee and its representatives to inspect and audit Assignor's books, records, bank accounts, and other documents as necessary to verify compliance with this Agreement. If the LOP and/or Medical Lien corresponding to any accounts receivable purchased hereunder contains non-assignability language, then Assignor will use its best efforts to assist Assignee in collecting those Accounts Receivable on behalf of Assignee. Alternatively, upon Assignee's request, Assignor shall immediately replace the receivable with a like receivable of the same or similar value or reimburse Assignee the allocated portion of the purchase price of said receivable(s), plus compounding interest at a rate of 2% per month, to be computed from the date of this Agreement. Such replacement and/or refund must occur within ten (10) days from the date on which Assignee requests such replacement or reimbursement.

9. <u>Damages.</u> In the event Assignor is determined to be in breach of any of the provisions of this Agreement, or it is determined that any assigned Account Receivable(s) was not an Eligible Account Receivable, Assignee shall be entitled to its full purchase price upon demand, plus interest, computed at a monthly rate of 2%, compounded, from the date of purchase to the date such amount is paid to Assignee with respect to the Account Receivable(s) subject to the breach/determination of ineligibility.

10. <u>Confidentiality.</u> Assignor agrees to keep the contents of this Agreement, and any Exhibit(s) attached hereto and/or referenced herein, confidential and shall not disclose to anyone, or to any entity, the individual and/or collective purchase price of any account receivable(s), unless it receives written authorization from Assignee or is mandated by court order to furnish same. If Assignor does disclose the

Assignee's Initials

Assignor's Initials

contents of this agreement (including but not limited to the purchase price of any medical and/or account receivable(s) referenced herein or attached hereto) to anyone that affects the collection of the receivable in any way, then Assignee, at its complete discretion, can demand a full refund of the purchase price of said receivable(s) with compounding interest at a rate of 2% per month, to be computed from the date in which this agreement was first entered.

11. <u>Sale Treatment; Security Interest</u>.    Assignor agrees to: (i) treat transfers to the Assignee of the Assigned Assets as a sale for all purposes; (ii) not treat any Assigned Asset as an asset on the Assignor's books and records; (iii) not assign or grant any security interest in any Assigned Asset; and (iv) obtain all consents from patients that are required by law in order for the Assignee or its designee to obtain information needed to obtain payment from the proceeds of a patient's related claim or lawsuit.

In the event that, contrary to the mutual intent of the Assignor and the Assignee, the sale and purchase of any Assigned Asset hereunder is not characterized as a sale, then the Assignor hereby grants to the Assignee, effective as of the date hereof, a first priority security interest in and to the Assigned Assets (together with all accounts, chattel paper, and general intangibles related thereto, all rights, remedies, guarantees, security interests, and liens in respect of any of the foregoing, and all products and proceeds of the foregoing, whether now existing or hereafter arising) to secure the repayment of all amounts paid to or for the benefit of the Assignor in connection with this Agreement. This Agreement shall be deemed to be a security agreement for such purposes.

12. <u>Execution in Counterparts</u>.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and both of which when taken together shall constitute one and the same agreement.

13. <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable, such provision shall be fully severable, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected thereby.

14. <u>Amendments.</u>  No modification, waiver or amendment of this Agreement shall be valid unless the same is in writing and signed by the party against whom the enforcement of such modification, waiver or amendment is sought.

15. <u>Governing Law.</u>  The Agreement shall be governed in all respects by the laws of the State of Florida. The parties further agree that any dispute arising therefrom or hereunder shall be litigated in Broward County, Florida.

16. <u>Assignability.</u> This Agreement shall be binding on, and shall inure to the benefit of, the parties hereto. Assignee and any successor or assign thereof may at any time assign or transfer any of its rights or obligations hereunder without notice to or the consent of the Assignor. Assignor shall not assign, transfer, convey, or encumber any of its rights or obligations under this Agreement, and shall not do or fail to do

Assignee's Initials

Assignor's Initials

JGA 000083

anything that interferes with Assignee's rights under this Agreement. Any purported assignment in violation of the foregoing shall be null and void.

17. <u>Power of Attorney and Endorsement and Deposit of Payments</u>. Assignee shall have the right to endorse in the name of Assignor, or any affiliated entity controlled by Assignor through which it does business, or operates under, and deposit checks that it receives from payers on account of Account Receivables that have been funded or assigned to Assignee by Assignor. Assignor hereby grants to Assignee a Power of Attorney sufficient to empower Assignee to discuss collections with Assignor's attorneys, execute or endorse in the name of Assignor, and any controlled affiliates, or other names through which it does business, (i) any financing statement under the UCC, or other document required in order to perfect and/or record the security interest intended to be granted to Assignee under the Agreement on all Account Receivables; or (ii) any document or instrument required in connection the negotiation for its own account, or deposit to its own accounts of payments made payable to a Assignor notwithstanding the prior assignment of the Account Receivable(s) in question upon request.

18. <u>Representation on Authority of Parties/Signatories.</u> Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each party represents and warrants to the other that the execution and delivery of the Assignment and the performance of such party's obligations hereunder have been duly authorized, and that the Assignment is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

THE REMAINDE OF THIS PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the parties have executed this Assignment of Medical Receivables as of the date written above.

**ASSIGNOR:**                                              **ASSIGNEE:**

_____                                        _____

Name:                                                      Aditya Humad, CFO
SpineCare America PC                                       Surgical Management and Billing, LLC
1355 37th Street,
Vero Beach FL 32960

Exhibit A
Account Receivables

| CLIENT | ATTORNEY | DATE OF SERVICE | BILLING AMOUNT |
|--------|----------|-----------------|----------------|
|        |          |                 |                |
|        |          |                 |                |
|        |          |                 |                |
|        |          |                 |                |
|        |          |                 |                |
|        |          |                 |                |
|        |          |                 |                |

Assignee's Initials

Assignor's Initials

JGA 000086

Exhibit B
ASC Ortho Purchase Price Schedule

| SURGERY PROCEDURES | AR Purchase Price |
|---|---|
| CERVICAL EPIDURAL | $350 |
| CERVICAL EPIDURAL C3-7 MEDIAL BRANCH BLOCKS | $525 |
| CERVICAL EPIDURAL C3-7 MEDIAL BRANCH BLOCKS. C3-7 RHIZOTOMIES | $656 |
| CAUDAL EPIDURAL | $350 |
| CAUDAL EPIDURAL, L3-S1MEDIAL BRANCH BLOCKS | $525 |
| CAUDAL EPIDURAL. L3-S1 MEDIAL BRANCH BLOCKS. L3-S1RHIZOTOMIES | $656 |
| CAUDAL & CERVICAL EPIDURAL, C3-7 & L3-S1, MEDIAL BRANCH BLOCKS | $682 |
| CAUDAL & CERVICAL EPIDURAL, C3-7 & L3-S1, MEDIAL BRANCH BLOCKS & RHIZOTOMIES | $814 |
| ANTERIOR CERVICAL DISCECTOMY WITH DISCOGRAM | $2,881 |
| ANTERIOR CERVICAL DISCECTOMY WITH FUSION AND DISCOGRAM | $3,950 |
| CERVICAL TOTAL DISC REPLACEMENT WITH DISCOGRAM | $3,000 |
| LUMBAR OR THORACIC DISCOGRAM WITH MICRODISCECTOMY | $2,881 |
| LUMBAR OR THORACIC DECOMPRESSION WITH EXTENSION BLOCK | $2,881 |
| LUMBAR DECOMPRESSION ANDINSTRUMENTED FUSION | $3,950 |
| THORACIC/LUMBAR KYPHOPLASTY | $1,750 |
| ARTHROSCOPY | $2,000 |
| CARPAL TUNNEL RELEASE | $500 |
| FRACTURE - CLOSED REDUCTION | $400 |
| FACTURE-OPEN REDUCTION AND INTERNAL FIXATION | $750 |

Page 10 of 10

Assignee's Initials

Assignor's Initials

2/24/2019 AOL Mail - Message View

< 212 Results for **adtiya humad**

## Why Surgeons Are Investing in AxioMed

**From:** Aditya Humad <AdityaHumad@kicventures.com>
**To:** John Atwater <imhotspine@aol.com>
**Date:** Fri, Nov 23, 2018 8:20 am

Dear Dr. Atwater,

Hope you had a great thanksgiving!

I am reaching out to qualified investors and surgeon innovators like yourself to introduce a limited opportunity for ownership in AxioMed with a $50K minimum investment.

Tiger 21, a private investment club for high-net worth investors that collectively manages over $50B in personal assets, found that millionaires believe tech and **healthcare** as the most valuable sectors when investing. The video below describes what makes AxioMed a true disruption in healthcare and an attractive opportunity for investors.

WATCH VIDEO: Evolution to Revolution: Why You Should Invest in AxioMed Viscoelastic Disc Replacement

We invite you to join our global investor base which includes over 20 leading surgeons and multiple distributors who believe this is the most natural spinal disc replacement solution.

May I send you more information and a non-binding pledge sheet to secure your investment?

Best,
Aditya

Aditya Humad
Managing Partner & CFO



KICVentures.com
350 Main Street, 2nd Floor
Malden, MA 02148
O: 978.236.7984
M:

JGA 000088