Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES

v.

KINGSLEY R. CHIN and
ADITYA HUMAD,
*Defendants*.

No. 1:21-cr-10256-IT

### DEFENDANTS' [Proposed] REPLY IN SUPPORT OF THEIR MOTION TO CONTINUE TRIAL AND FOR HEARING CONCERNING *BRADY* VIOLATIONS

Defendants Kingsley Chin and Aditya Humad respectfully submit this Reply in support of their request for a continuance to prepare for trial on the government's ever-changing theories and for an evidentiary hearing about whether the government's late production of a mountain of *Brady* material resulted from outrageous government conduct that warrants dismissal of the remaining charges.

In light of delayed productions, material changes to the charges, and specious positions the government has taken, and maintains in its Opposition, neither the defense nor the Court can have confidence that the government appreciates, much less has fulfilled, its *Brady* obligations. For example, exculpatory "attorney advocacy" – which comprises only a portion of the late disclosures Defendants identified – *is Brady* material. And the government's late and ongoing production of agent notes is not merely an act of prosecutorial grace where, as here, those notes are inconsistent with and contain exculpatory information absent from earlier-produced interview reports.

Moreover, as explained below, efforts by the government to dismiss charges and the late production of *Brady* material have continued even after the defendants filed their motion. The government's case has materially changed and, if the Court permits it to go forward at all,

defendants need additional time to adapt and prepare. For example, the defendants need time to work with an expert witness whose testimony could now address the enormous value of intellectual property, including patents, which flowed from the consulting program, especially as compared to the modest amount of allegedly improper payments from that program.

### Key Flaws in the Government's Opposition

Rather than address the prejudice that defendants described in their moving papers concerning the need to change their preparation for trial, in its Opposition, the government responds superficially about how the mountain of late *Brady* material can inform targeted cross-examination in a narrowed case. *See* Opposition at 8 ("the differences are cross-examination material"), 10 ("the government has significantly narrowed and streamlined its case-in-chief"). As defendants recently uncovered gaps in *Brady* material, however, the government sought the dismissal of count after count after count of the Indictment, along with dismissing the corporate defendant at the core of this case, SpineFrontier. In doing so, the government has disavowed the Indictment, as returned by the Grand Jury, that expressly alleged that that SpineFrontier's consulting program was a "sham" in its entirety, which defendants "designed" to pay bribes; that IME was also a "sham"; and that SpineFrontier concealed its crimes by failing to make Sunshine Act disclosures, even though it fully and publicly disclosed all the payments ever at issue.

When the government argues that the defendants can now simply conduct cross-examinations in a narrowed case, the government disregards the defendants' constitutional rights to due process and their need to build defenses to what amounts to a materially different case. *See United States v. Conley*, 415 F.3d 183, 188 (1st Cir. 2005) ("[T]he government's suppression of evidence favorable to the accused violates due process where the evidence is material to guilt.") (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963))). Tellingly, the government does not and cannot

deny that, over the past several weeks, it has made ongoing and massive late productions of *Brady* material, including after the defendants filed this motion. Most recently, even after defendants filed their motion for a continuance, the government produced additional large volumes of agent notes corresponding to earlier-produced reports of interviews, which it had withheld even from its January and early February productions of notes. Some of these notes, produced as late as February 22, 2025, reveal striking inaccuracies in the earlier-produced reports, including omissions of exculpatory information that the witnesses provided during their interviews but that were left out of the reports provided to defendants.

The government may be right that the narrowed version of its case may shorten its list of potential witnesses, but the new theories change dramatically how defendants must defend themselves and are now preparing to do so. For example, in the Indictment that the Grand Jury returned, the total amount of payments to surgeons identified as alleged co-conspirators ("Surgeons 1 to 7") exceeded $2.4 million. As the government has distanced itself from witnesses who undermine their case and dismissed related counts, the total amount of payments to those surgeons that remain at issue is approximately $500,000. Yet the consulting program's feedback that improved product innovation and patient care provided many millions of dollars in value, reflected among other things in more than 50 relevant patents held by SpineFrontier or its affiliates. Accordingly, the disparity between this appropriate value from innovations so far exceeds the payments at issue that defendants are in the process of engaging Philip Green and Chris DeBaere of Archway Research Group as expert witnesses to testify concerning the value of the technology improvements and related patents to which the consulting program contributed. These expert witnesses have stated they could have one of them prepared to testify by the July 21, 2025 tentative date for a continued trial.

Remarkably, despite compromising the defendants' ability to defend themselves, the government minimizes the impact of its delayed productions and disregards the outrageous threats and pressure used on witnesses to build this case, which otherwise did not exist, and which is being reflected in the government's now attempting to side-line certain witnesses who were the subjects of specific substantive counts in the Indictment. The government insists, even now, that plainly exculpatory information, such as statements by some alleged co-conspirators (or their counsel) that they did not knowingly participate in any criminal activity and evidence about the circumstances under which other alleged co-conspirators avoided any criminal charges, reached civil settlements, and became cooperating witnesses against the defendants, is not *Brady* material that the government must disclose—and should have disclosed years ago. It has similarly refused to agree to a continuance that would allow defendants to prepare an expert witness who can address matters that are now newly relevant because of the government's recent changes to the charges.

## Discussion

I.     **A Continuance Is the Only Reasonable Alternative to a Dismissal Based on the Government's Late *Brady* Disclosures and Remaining Gaps in Such Productions.**

Defendants' motion detailed extensive amounts of late-disclosed *Brady* material, most of which the government had available to it even before its October 2021 deadline for disclosure, but chose to hold until weeks before trial. The late-disclosed *Brady* material has continued to come in even since defendants filed their motion. The most recent productions reveal particularly pernicious disclosure failures, in that they exposed that the government had earlier provided misleading reports of what witnesses would say.

In their opening brief, defendants pointed out that the government had withheld agent notes for approximately 20 interviews of witnesses for which it had earlier produced reports. On Friday, February 22, 2025, the government produced notes for most of those reports. Several of the notes

reveal that the reports were highly misleading in multiple respects. For example, one of the remaining substantive counts charging a violation of the Anti-Kickback Statute concerns Dr. John Atwater. On February 22, 2025, the government produced notes of a 2019 interview of Dr. Atwater, apparently taken by an FBI agent who (approximately a month after the interview) prepared the report of the interview that the government had earlier produced to defendants. A comparison reveals extraordinary inconsistencies between the contemporaneous notes, which were withheld until February 22, and later report. Indeed, given the obvious exculpatory nature of much of what was omitted from the report, it is difficult to view the discrepancies as other than an intentional effort by the agent to leave out information that would help the defense. Some of the most egregious discrepancies include (but are by no means limited to) the following:

- Dr. Atwater identified his consulting agreement with SpineFrontier, and the notes reflect him saying "***did not affect reason to use SF***," and "opportunity to try new products and potentially to design new products ***was why used SF***." (Exhibit A hereto, at 5 (emphases added).) Those statements were omitted from the agent's report that had been provided to defendants. (*See* Exhibit B hereto.)

- The notes reflect Dr. Atwater telling the government: "Was sold on SF by KC/***Not consulting*** & management." (Exhibit A, at 9.) This statement that Dr. Chin did *not* use the SpineFrontier consulting agreement when "selling" SpineFrontier to Dr. Atwater was omitted from the agent's report. In fact, removing the exculpatory portion of what Dr. Atwater said, the report stated only that "Chin sold him on the idea of evaluating SF products." (Exhibit B hereto, at 5.)

- Both the notes and the report describe involvement by Dr. Atwater's counsel, Greg Hunzinker, in an agreement for surgical-support services between SpineFrontier and a company that Dr. Atwater owns called YEHSS, in a manner that attempts to blame others for problems that Dr Atwater reports with that agreement. The notes reflect that Dr. Atwater, at a different point in the interview, told the government that Hunzinger was also asked to review the IME consulting agreement between SpineFrontier and Dr. Atwater that is actually at issue in this case, and that "Hunziker ***approved agreement***. Oct 8 2013" (Exhibit A, at 9 (emphasis added).) Hunziker's approval of the consulting agreement was omitted entirely from the report of the interview.

- The notes reflect that Dr. Atwater told the government, when discussing the IME agreement, that he "understood that you could not simply bill 2 hrs for just doing a surgery." (*Id.* at 9.) That admission by Dr. Atwater that he was acting contrary to the requirements of his agreement with IME was omitted from the report.

- In an exchange about whether Dr. Atwater knew *at the time of his conduct* that he was doing something wrong, or whether he realized it only after the fact – which is relevant, of course, to whether he was knowingly participating in criminal activity as a co-conspirator, as the government charges – the notes reflect inconsistencies in his responses. They report, "***Didn't realize*** until after KB [Kyle Black] left that should have been giving more feedback. Realized in ***hindsight*** it was wrong. *Now* Knows it was wrong/also knew it was wrong at time." (Exhibit A, at 11-12 (emphases added).) The report omitted Dr. Atwater's statements to the effect that he did not know he was doing something wrong until after the fact and in hindsight, including only "He knew it was wrong at the time and continued to submit the hours." (Exhibit B, at 6.)

- The notes reflect that at several points in the interview, Dr. Atwater stated that he viewed the problem with his consulting as one of "documentation." For example, the notes say, "SF consulting was ***not thoroughly documented***. Feels bad that ***it*** happened. They only cared about him submitting hours. Had to know he wasn't ***documenting*** appropriately." (Exhibit A, at 12 (emphases added).) The report of the interview included the statement about Dr. Atwater "feeling bad" and his opinion that SpineFrontier "had to know," but without Dr. Atwater's qualifications that he was discussing insufficient documentation: "SF had to know that Dr. Atwater was not providing appropriate feedback for the amount of consulting hours that he was being paid. Looking back, Dr. Atwater feels bad that this happened." (Exhibit B, at 6.)

By way of further examples, the government also produced on February 22, after defendants filed their motion, other notes of interviews reflecting additional omissions of exculpatory information from earlier-produced reports of interviews. The recently produced notes about another interview of Dr. Atwater the following year, and an interview with another government cooperating witness, Jason Montone revealed the following:

- In contrast to the government's theory that defendants' use of a surgical-support company owned by Dr. Atwater, YEHSS, was a form of kickback in kind by defendants to Dr. Atwater, because YEHSS billed more than the value of its services, an interview of Dr. Atwater suggested that Dr. Atwater saw overbilling by YEHSS as resulting from YEHSS's failures to perform

adequately, as opposed to an arrangement intended to serve as a kickback. For example, in the notes of the 2020 interview, Dr. Atwater described the issue of YEHSS charging too much for its services as resulting from the fact that YEHSS just "did not deliver" on what it had promised. (Exhibit C hereto, at 6.) In fact, that view of overpayments to YEHSS resulting from performance failures by YEHSS, rather than from knowing *quid pro quos*, came in the context of the government discussing with Dr. Atwater a particular document that can be better understood as exculpatory in light of Dr. Atwater's explanation. Yet the report of the interview omitted not only that explanation, but left out entirely that the government and Dr. Atwater were discussing that particular document during the interview. (*See* Exhibit D hereto.)[1]

- Inconsistent with the government's theory that Dr. Atwater conspired to accept consulting payments in exchange for his use of SpineFrontier products, the notes of his 2020 interview reflect him telling the government that he "still did some cases going forward," even after he stopped consulting. (Exhibit C, at 10.) That statement does not appear in the earlier-provided report of the interview.

- With respect to Dr. Montone, another supposed co-conspirator, contemporaneous notes of one of his interviews included a statement that he "***didn't think*** it was [hospital] policy to require" disclosure of his consulting arrangement with SpineFrontier, which removes any suggestion that his non-disclosure to the hospital could itself reflect consciousness of wrongdoing. (Exhibit E hereto, at 4 (emphasis added).) In the report of the interview, however, which the agent drafted two weeks later, the agent changed that statement from what his contemporaneous notes say, to read instead that Dr. Montone "***did not know if*** their policy required that disclosure" – a far less exculpatory version as to Dr. Montone's mindset than the actual stated belief that it was *not* required. (Exhibit F hereto, at 2 (emphasis added).)

- Dr. Montone, like Dr. Atwater, also apparently viewed problems with consulting as ones of paperwork, telling the government, according to the agent's notes, that "Balzer [who handled reporting on consulting for Dr. Montone] not always good with paperwork." (Exhibit E, at 9.) Similar to what the agent did with respect to Dr. Atwater and documentation, the agent left that statement out of the report that was earlier provided to defendants.

- The government reviewed with Dr. Montone categories of possible consulting activities set forth in his consulting agreement, with Montone reporting, according to the earlier-produced report, that he did not generally do the activities listed or provide meaningful consulting work, other than

---

[1] The government's recent disclosure of its intention to use at trial the arrangement with YEHSS as supposed evidence of kickbacks in kind is the subject of a motion *in limine*. (*See* D.E. 251.)

providing information that allowed SpineFrontier to modify certain instruments for Montone's own use (as described in the report, "to suit MONTONE's liking." (Exhibit F, at 5.)) The recently produced notes, however, reflect Montone having provided far more substantive work and value, including him having said that he "Thinks he did participate in design of SF products." (Exhibit E, at 10.) That statement, too, was left out of the report.

By providing misleading reports of interviews conducted years ago, which varied from contemporaneous notes of those interviews in the ways set forth above (and others), the government buried such exculpatory information about two of the alleged co-conspirators whom it still intends to call as witnesses at trial.

All of the notes and reports discussed here were prepared by one particular FBI agent, Terrence Dupont. Some of the changes from notes to reports are so blatant as to suggest that he purposefully sought to omit or downplay exculpatory statements by the witnesses. In fact, Agent Dupont was also responsible for several of the late-disclosed reports and notes of interviews addressed in defendants' opening papers.[2] Tellingly, the government has left Agent Dupont off its witness list, in favor of other agents whom it intends to call as trial witnesses. The still-evolving picture about the unreliability of earlier-produced reports of interviews now gives rise to the need for defendants to conduct a close analysis of all of that particular agent's notes compared to reports,

---

[2] This 2019 interview of Dr. Atwater discussed above, and the discrepancies between the notes and the report of that interview, are particularly telling in this regard in light of the fact that a *different* agent replaced Agent Dupont mid-interview. (*See* Exhibit 2, at 1 ("SA Dupont left the interview part way through and the remainder of the interview was documented by HHS OIG SA Meaghan Fleury.").) As a result, there are two separate sets of notes and two separate reports, covering the two separate parts of the 2019 Dr. Atwater interview. Dr. Atwater apparently repeated some of the above-referenced exculpatory statements that he made to Agent Dupont (but by no means all of them) during the second part of the interview that Agent Dupont did not attend. The report and notes of the second part of the interview reflect, for example, Dr. Atwater suggesting that he did not think he was doing anything wrong "at the time," and that he believed his failures were ones of "documentation." The fact that the agent covering the second part included as relevant such information – statements that defendants now know Dr. Atwater apparently offered multiple times during different parts of the interview – further suggests that Agent Dupont acted intentionally in choosing to omit such relevant and exculpatory statements when preparing his report of the first part of the interview.

a time-consuming and laborious process that defendants should not be forced to undertake in the weeks before trial.

In fact, even the latest productions still leave obvious gaps in *Brady* material, including, for example, with respect to Dr. Atwater. Among the late-produced *Brady* materials was a letter from Dr. Atwater's counsel following Dr. Atwater's meeting with he government, in which counsel distanced Dr. Atwater from his own initial, exculpatory statements to the government because of the prosecutor having "pointed out the government's concern" and "explained it to him at the proffer session," leading to Dr. Atwater realizing the jeopardy he was in and offering to cooperate fully with the government to protect himself. Even putting aside that the government did not produce this letter until three years after its deadline, the most recent productions fail to provide information about the statements prosecutors made to Dr. Atwater that apparently caused him to dramatically change his story and decide that he should begin cooperating against the defendants. While the results of the government's pressure on Dr. Atwater are coming to light, the underlying information about how the government applied that pressure remain undisclosed.

More generally, given the enormous volume of late-disclosed *Brady* material that has arrived in the last several weeks, defendants are now burdened with having to attempt to review, analyze, and prepare to address all late-produced material, as they are also engaged in other, more typical trial-preparation activities in the weeks before trial – an impossible task that they will not be able to complete in time to make use of all the relevant (and exculpatory) material that they should have been given far earlier. Indeed, as of this reply, defendants have not even been able to get through all material produced before their motion for continuance, let alone the material produced even more recently.

Furthermore, in light of remaining gaps in productions and positions that the government

has taken, and maintains even now, neither the defense nor the Court can conclude that the government has fulfilled its *Brady* obligations. In a misguided effort to minimize its *Brady* violations, the government's opposition characterized some of the withheld material as mere "whitepapers" or other forms of "attorney advocacy." (ECF No. 266, at 2-8.) The prosecution erroneously contends that if an unindicted co-conspirator flatly denies, directly or indirectly through his counsel, that he or she participated in the charged conspiracy, that fact is somehow not exculpatory or otherwise material to the defense. As discussed in defendants' opening brief, the prosecution has previously made that same baseless argument. The defense responded, (and in both a discovery letter and their opening brief, cited) to cases holding that attorney proffers are discoverable and, if exculpatory, *Brady* material. In its opposition, the government continues to ignore relevant case law, citing instead two cases that ruled a witness could not be impeached at trial by statements of an attorney. (ECF 266, at 6.) One of those cases, *United States v. Cuevas Pimental*, 815 F. Supp. 81 (D. Conn. 1993), concerned Fed. R. Evid. 613(b), not *Brady*. Indeed, the word *Brady* never appears in the decision. And *SEC v. Arrowood*, No. 14-CV-0082, 2014 U.S. Dist. LEXIS 68669 (N.D. Ga. May 19, 2014), cited *Cuevas Pimental* without adding anything to it. The issue on this motion, however, which the government does not meaningfully address, is whether the defense was entitled to all of this exculpatory evidence, which the government has possessed for years, so that it could conduct any necessary investigation and prepare for trial – and if so, why the prosecution waited for years to produce it, in violation of *Brady*, the Federal Rules, and this Court's orders.

"The customary remedy for a Brady violation that surfaces mid-trial is a continuance and a concomitant opportunity to analyze the new information and, if necessary, recall witnesses." *United States v. Mathur*, 624 F.3d 498, 506 (1st Cir. 2010) ("the able district court, concerned about

whether the late disclosure might inhibit that effort, went to great lengths to ensure that the defendant had a full and fair opportunity to use the new material"). "A continuance affords time to study the newly emergent information, consider its possible ramifications, change trial strategy (if necessary), assess any potential prejudice, and determine how best to use the information." *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir. 1993). While the length of a continuance from late-produced *Brady* material and changes to a prosecution is case-specific, the defense should be "given sufficient lead time to utilize the evidence effectively," and "in cases of delayed disclosure, a court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted." *United States v. Devin*, 918 F.2d 280, 290 (1st Cir. 1990).

The defense has created a record showing late and incomplete productions of substantial *Brady* material by the government and the need for a continuance in fairness to the defendants. At the outset of the case, the Court ordered the government to produce then-existing *Brady* material by October 2021, along with warnings to the government of consequences for failure to do so. The Court worked with the parties to identify a potential new start date for trial, July 21, 2025. Under the circumstances, the government has failed to explain why such a continuance is not appropriate to allow defendants to prepare their defense against whichever charges remain at the start of trial.

## II.    Fundamental Fairness Requires that the Defendants Have Sufficient Time to Prepare Expert Testimony that Has Recently Emerged as Critical Based on the Government's Latest Changes to the Charges.

Defendants are entitled to retain and present expert testimony on issues that have arisen based on late-*Brady* disclosures and the government's changes to the charges. Expert witnesses can provide important testimony in cases arising under Anti-Kickback Statute. In *United States ex rel. Witkin v. Medtronic, Inc*., No. 1:11-CV-10790-IT, 2024 WL 1892405, at *15 (D. Mass. Mar. 31, 2024), this Court explained the role that expert testimony and surrounding circumstances can

play for the defense, including opinions that bear on the fair value of payments compared to supposed bribes, which can also bear on willfulness and conspiratorial intent issues:

> To the extent Medtronic attempts to question McNamara's credibility generally and offers an expert who reaches a different conclusion, that is a determination for the trier of fact, not the court. "So long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." *Milward v. Acuity Specialty Prod. Grp., Inc*., 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks and citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. (quoting *Daubert v. Merrell Dow. Pharm., Inc*., 509 U.S. 579, 596 (1993)). Thus, because resolution of this fair-market-value dispute would require the court to choose between the well-grounded opinions of competing experts, summary judgment is inappropriate on the issue.

*Id*. at *15. Such concerns for the proper functioning of the adversarial process and the implications for depriving a party of the use of expert testimony, should weigh even more heavily in the context of a criminal prosecution where defendants' liberty is at stake.

The recent changes in the government's case, made as it reveals years-long *Brady* violations, include its reduction of payments at issue from $2.4 million to only about $500,000, based on the Indictment's own allegations of payments. The target continues to move as the government moved to dismiss yet another count, involving yet another surgeon, after defendants filed their continuance motion. As defendants work to adjust to the new scope of the case, they have also calculated that SpineFrontier's revenue linked to the surgeons who supposedly received "bribes" and who are the subject of the three remaining counts, appears to be under 7%, compared to over 30% when all six substantive counts remained at issue. Thus, while the government suggests that its "narrowing" of the case should only make things easier for defendants, this "narrowing" has had a significant substantive effect on the nature of the allegations and the manner in which defendants will defend themselves. In particular, the defense believes that expert testimony can now play a critical role at trial, helping to establish that innovations from the

consulting program were far more valuable than the marginal sales, if any, that the government now intends to link to the limited remaining alleged "bribes." Enormous value created by legitimate consulting work as compared to minimal marginal sales, if any, now at issue, speaks to the defendants' actual intent in using consultants for an intellectual property-driven business, and is thus particularly important to *mens rea* issues that will be central to this case at trial. In the limited time since the government has shifted its case from  the charges in the Indictment – including most recently by dismissing yet another count involving one particular surgeon – defendants have worked to prepare their defense, including by identifying specific expert witnesses who could be available to address value issues concerning more than 50 patents for the potential new trial date of July 21, 2025, but the preparation of such analyses and testimony could not be ready for the currently scheduled trial date.

This Court should grant a continuance to allow defendants to pursue an effective defense strategy for use of expert testimony that has recently become possible because of the government's substantial reduction, by more than 75%, of the total amount of payments at issue.

### III.    An Evidentiary Hearing is Required to Address the Pattern of *Brady* Violations (and Ongoing Disclosures) and Improper Pressure by a Former AUSA and Other Government Agents on Fact Witnesses.

The record on this motion, and ongoing disclosures and efforts by the government to change the nature of the case, warrant an evidentiary hearing concerning how a mountain of *Brady* material remained withheld so long and how multiple witnesses no longer support the charges. In one of the few cases out there concerning comparable government misconduct, the court emphasized the importance of its evidentiary hearing and what it revealed, and dismissed charges albeit without prejudice:

> [T]he Government recommends almost a "harmless error" approach as a sanction for this egregious error, contending that no harsh remedy should follow because all underlying documents were finally produced to the defendants.

The Court rejects this notion. Absolutely no justification exists for revising documents that are being turned over to an adversary in litigation once the issue has been raised, particularly without notice of revision to the opposition … even though the effect of the alterations was minimal. Similarly, there is no justification for creating documents during this time period, without indicating so, no matter what the motive.

The Government's argument overlooks one critical consequence that would have resulted *if the Government's representations and the documents had been accepted at face value: there would have been no hearing, and the truth would have never been known.* As tragic as are the events which transpired during the evidentiary hearing, it would have been even worse for the Court to have denied the defendants a hearing. *The fact that all the relevant documents were finally produced only occurred because of the Omni defendants' strenuous efforts*.

*    *    *    *

The Court is equally troubled by the consistent pattern of false testimony and lack of candor exhibited by various Government representatives who played prominent roles in this tax investigation. The details have already been recounted. This Court has considered carefully the large volume of disturbing testimony on a whole range of issues.

*    *    *    *

Thus, in exercising the supervisory power entrusted to it to ensure the smooth and proper administration of justice, the Court has determined that the indictment should be dismissed. Twenty-eight days of hearings produced example after example of conduct unbecoming to the Government. Innocent misrecollection by witnesses is a common occurrence and is excusable, but the cumulative effect of the evidence presented here adds up to more than innocent misrecollection. Defendants should not be forced to conduct lengthy hearings to learn the basic essential facts needed as a predicate to a pretrial motion. Courts should not be forced to question whether government witnesses are testifying truthfully and fully. The Government's conduct was patently egregious and cannot be tolerated or condoned. Its manner of proceeding shocks the Court's conscience. The indictment must be dismissed as a prophylactic sanction for the consistent course of entrenched and flagrant misconduct. *United States v. Birdman*, 602 F.2d 547, 559 (3d Cir.1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668, 445 U.S. 906, 100 S.Ct. 1084, 63 L.Ed.2d 322 (1980).

…[T]he indictment will be dismissed without prejudice. Although defendants have certain rights which have been violated here, they have no concomitant right to bar forever investigation into their alleged criminal conduct. *United States v. Lawson*, 502 F.Supp. at 172. The Court recognizes that the passage of time may have caused

14

> the statute of limitations to run as to certain tax years charged in the Indictment. This fact does not affect the decision to dismiss the Indictment without prejudice.

*United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1439-40 (D. Md. 1986). Here, the defendants seek (at least at this time) the far less drastic remedies of a continuance to allow them adequate time to adjust to significant changes in the case and to mountains of late-disclosed *Brady* information, and an evidentiary hearing on the scope of and reasons for *Brady* issues. Pressure tactics that the government employed when developing its case early on appear not to have worked in the long run, at least concerning certain witnesses, or have combined with late *Brady* disclosures to present unacceptable risks to the government, leading to efforts by the government to avoid testimony by witnesses through the dropping of charges shortly before trial. When such odd developments occur and only unravel shortly before trial, the Court should allow an evidentiary hearing to avoid a situation in which the truth would "never be known." *Id.*

### Conclusion

For the reasons set forth herein, defendants respectfully request that the Court allow this motion and continue the March 17, 2025 trial date in this matter until July 21, 2025, the date for which all parties have confirmed their availability. Defendants also respectfully request that an evidentiary hearing be held (and suggest it could be held on March 17, 2025, in lieu of the currently scheduled start of jury selection), to address whether the government's concealment of *Brady* issues, combined with threats and pressure on fact witnesses, amount to outrageous government conduct that warrants dismissal.

Respectfully submitted,

**KINGSLEY CHIN**

By his attorneys,

/s/ *Joshua Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

**ADITYA HUMAD**

By his attorneys,

/s/ *William Fick*
Daniel N. Marx (BBO #674523)
William W. Fick (BBO #650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

## Certificate of Service

I, William W. Fick, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 4, 2025.

/s/ *William W. Fick*

# EXHIBIT A

the G.
Dave D.
(4) Martin Merritt
Pat C.

4/11/19          Dr. Atwater

⇒ Yale College → 1989 graduated
UVA Med School 1993 graduated
1993-1994 Jth Hopkins intern
1994-1998 Howard residency
1998-1999 Spine fellowship Louisville, KY (Leatherman)
1999 - 2014 private practice Bloomington, IL
Oct 2014 → present Vero Beach, FL

10% ownership
→ Midwest (only) Orthopedics → partner after 2 yrs
⇒ Possibly 12 partners
⇒ Spine related, elective 95% / 5% back roll, for
                                        fractures, ect.
→ Eat what you kill, except for ancillary revenue
such as MRI ect.

                                        same for all hospitals
⇒ Brokaw Hospital (All types of insurance except for possibly
(Advocate Brokaw)     Medicare, private, ect.          mj) →
St. Joseph's Hospital, Gibson City, TCOM
Presence Hospital, Peoria Day Surgery     part owner (4%,
                    (occasional) like Tran
                    possibly    no Medicare

                                        Oct
Vero Orthopedics, Vero Neurology → took job in 2014
⇒ In 2017, opened Ortho Spine Care America, owner,
Dr. Hussamy his partner, but recently dissolved partnership.
"John Atwater MD" bill under
FL             (or self)              no surgeries,
privileges
(part owner) → Indian River Medical Center, Longwood (Ft. Pierce),
          Advanced Center for Surgery / Grove Surgery Center

inage

Keller

→ 2010 - 2014            ~~~~ 93% fr spine practice
Spine practice + business (annual revenue apprx $800 - 1 mill

→ 2014 → ~~~~ + 2016
Revenue was 450k from practice + 1 mill for business
2017 - present → break even for practice but 1 mill
from Neuromonitoring / bought efficient comp), also
charged billing comp. Medical Practice Solutions, Dallas, TX
→ previous biller was MMMS [2014]  ↳

→ Doesn't remember recent formal compliance training
→ generally aware of anti-kickback statute + Stark
→ Dr. Craig Carmichael, partner → McLean County
   ↳ had separate neuromonitoring company, he took all of
Atwater's Neuromonitoring cases. Dr. Atwater's company ~~~~
DNS took other clients.
→ tried to get exception to use own neuromonitoring company
But was denied. All cases then went to Dr. Carmichael.
→ Dr. Carmichael's dad is attorney, got advised on antikickback side
→ because of Stark law for tax at McLean
→ aware of Sunshine Act
→ billed proper, was accurate for Nuvasive, ~~~~
~~~~
→ generally aware Govt could sue for false claims

EHSS → owns 90%, Greico owns 10%
→ Initially owned 51%, then ~~~~ 2-10-15? HH at 10/many
49%. Owned 100% until Greico purchased 10%
→ former partners did not want to contribute to overhead,
→ Bloomington, IL / currently 4 admin + 6 or 7 surgical assistants
→ founded August 2007



→ Kyle Black, essentially CEO, title was Practice Director
  ↳ concern after around time of divorce from former partners
→ former partners interviewed Kyle & thought they needed someone to drive business
→ after hiring Black, was told by Black that he had been accused of misusing prescriptions with his father in law. Said he was cleared of wrongdoing.
→ Work performance was good, hardworker, aggressive to grow business
  ↳ rumbles from staff to keep an eye on him.
    ↳ wife also had bad feeling about KB
      ↳ Sid Kessinger never trusted KB
        ↳ best surgical assistant, knew the business, said KB did not know the business.
→ SK would also travel & talk to other doctors to grow business, paid a little extra for this.
→ KB requested increase in base salary, could not afford to pay, barely breaking even. August of 2015, refused to take pay cut. KB had raise 174,000, asked for 250,000
→ bills insurance for first assistants only, private pay as hospital employees.
→ for actual YEHSS 1st assistants, bill private insurance, or for Medicare bill hospital
→ SK and Might were the only surgical assistants to be YF reps.
→ YEHSS has bank accounts at PNC Bank
→ DUD recurrently funded in early 2000s prior to YEHSS. Owns 99%, Dr. Greco has 1% now.
→ Brown & St. Josephs are primary hospitals for DUD.
  ↳ also Champaign, Gibson City, and Mattoon

→ Neuromonitoring (NM) is placing electrodes in the muscles to set bundle of action per the patient while under anesthesia. Would tell surgeon if something not visual ect.

→ Necessity is based on area of practice; for example any surgery that touches spine. All spine surgeries pretty much.

Uses NM mainly, not own company.

→ Medicare pays for the professional interpretation of DNB cases.

⤷ physicians are outsourced to interpret.

⤷ based in Tx, other areas

→ 50 → 75 per hour, time of interpretation.

→ NM raises red flags; this is usually based on type of surgery.

→ 2 cases in which Attendr did something different in surgical plans.

→ believes that doing a lateral surgery w/o NM that is below standard of care.

→ Chin used DNB for 2014-2016; In 2016 no longer had resources to cover Chin's cases / Chin was not very busy. Tough to recruit technologists, who are in operating room.

⤷ Victor Fells would have communicated this to Chin

⤷ knew that Chin was using NM prior to 2014, + switched

⤷ to DNB in 2014

⤷ doesn't know if this was exclusive

→ Asked to meet with Chin's companies by KC + AH

⤷ never did. KIC is the umbrella company over SF, Ax, Mel

→ Vanessa Daly is employed by IME              IME, Secretive,

⤷ KC wife

→ first met KC in 2013 at National American Spine Meeting

⤷ head of KC works with Stryker. He designed Mantis System

USAO_0007318

Gabriel 00003268

→ Dr. Gabriel was big proponent of SF. Chm operation
Dr. Gabriels Neck at some time.
    ↳ was in Southern IL for a while before moving to Ohio
    ↳ Figured Gabriel had some interest in SF because
he said he was helping design things.

→ did not use SF prior to meeting Gabriel to KCS
→ used a lot of Nuvasive & Medtronic (DePuy /
Synthes / Amedica → offered consulting but did not take it.
- consulting agreement with Nuvasive

YEH 000037

→ consulting agreement with SF / → did not offer reason to use SF.
→ opportunity to try new products & potential to design new products,
was why he used SF.

→ Consulting with Egis, Nuvasive, Precision Spine

→ 2 aspect, to YEHSS agreement with SF
    ↳ SK + RM would bring in products to OR, & could
    act as Sales rep. for Dr. Atwater cases.
        ↳ also cases when SF reps Kevin Doran + Nathan Francois
        covered his cases.
    ↳ never had legal opinion on $3,200 part of
    agreements. Believes it was for KCB to manage SK to
    ensure he was at surgery + trained
        ↳ Contract for KCB to manage SK / Did not perform
    FMV analysis / KCB + AH discussed what the cost of mangmt
    fee would be.
→ Looking back does not know if it was FMV. Probably High

→ KB would speak to Dr. Sibley abt SF
2-3 times
↳ talked to Dr. Bechman 1 time abt SF
↳ spoke to hospitals abt getting SF products in
Gibson City & Provena (2 times each)
↳ Coordination of cases for his SF cases, doesnt
remember specifics
↳ Compensation is high, but should have been compensated,
maybe $1,000 month

USAO-COM-000115
→ Health Alliance is insurer, not going to reimburse surgical
assistants any longer.
→ This did not have anything to do with getting SF agreement

YEH000086
→ The model was to have no reps in operating room SF
to have surgical assists who told patients it save $$.
→

→ When agent has signal, thought that KB would actually
provide services. Realized maybe a couple not sure if it didn't
feel comfortable that they were just paid to mark, [illegible] this
was when he was in Florida. / Realized that
→

→ KB was going after the extra money; the wrong want
to YEHSS to pay overhead costs

JGA 000029

→ realized that they got paid $320 after he had moved to Florida.

→ when KB tried to recover more money from SF, realized that they had gotten paid a lot to change nothing.

→ Led to believe that there was a legal opinion from Humana to KB. Hamel said he attorneys approved it.

→ Found out that KB did not get legal opinion.

→ May 8 2014, KB sent emails stating that Drs did not want legal opinion / Attacker not on email

→ Jan 2014 emails between Hamel to KB stated that contract was approved. / Attacker was on this email

Jan 2014 →Did have concern that $3,200 could be a kickback
→ had misgivings abt arrangement after a few months [Did not follow up other than disc?]
→ Arrangement with SF in fall of 2013 with Ryan
    ↳ sent to Hunziker, he sent to other firm, didn't give opinion.
→ SF wanted to replace SF rep (AH) in Jan 2014

→JGA 000744 → Nov 13 VEHSS agreement for RM
    ↳ took this to Hunziker, did not give legal opinion,

→AH to Hunziker spoke abt IME & VEHSS agreement in Jan 14

→ After that call, KB sends email stg that Hunziker signed off (Lauren does not copy Hunziker)

→ Atueln this it is Issued by Hunzker to Skc starts.

→ Then in May 2014 attg w/ Hunziker asking if they still not open from Regone Woods.
    KB tells her that Atuehr to Green dint want legal opinion. This kills it. Not annd

→ KB told Hunziker not to call Hund.
    ↳ initiated contact
    ↳ write it
    ↳ signed it.
    ↳ he put in $3,200, how compm mes in) brely even.

→ at one point told KC thy nee jumg up a tas on the neuromonity side.

→ Essentily SF hired KB to marge Skc.

→ KB was not dog a lot for SF, but was dog a lot for YEHSS on other dutus.

→ By May of 2014 that he realized KB was not dog ayh commercil with the $3,200.

→ One of the reasons he used SF products was the consulty agreents. ILC + YEHSS

USAO_0007322

⇒ also liked product + would have used the product otherwise
⇒ was sold on SF by KC / Not Consulting arrangment
⇒ Consulting + Magnet played a role, not entire role.

_____

IME

⇒ GA000090 - IME agreement
⇒ signed agreement
⇒ met Vanessa Daly sent in PE
⇒ Kingsly Chin pitched him on eudracy product
   ↳ Hanziker approved agreemt.
      Oct 8 2013
   ⇒ met in summer or fall of 2013
      ↳ Doesn't know if he did cases before signing
Consulting agreemt.
   ⇒ Save opin on developmt ideas, spoke to engineers
⇒ only did work for SF through IME ; thought
   he would do work for other companies but never happened
   ↳ never realized that IME ⇒ had SF as a client

⇒ Thought that he could log hours, for the given eudracy product
   or talking to engineers. Thought that the IME would would
   have much to approve.

upon further
thought
did he
a have son
just one case
ideas sm ?
did one case?
   ⇒ Understood that you could not simply bill 2 hrs for just
   doing a surgery. But could bill for the speaking to
   engineer inside or outside the operating room.

   ⇒ 3 times that an engineer was in OR room ; also had calls
   with engineers on phone

engineer
in room

JGA 000126 → except if when engineer was in room
this conversation would have been 1-2 hrs

engineer
in room

JGA 000131 → billet portion email was ideas that
Attendr had for SF protocols, possibly 1 hr
⎣ would try to keep records + consistency.

engineer
in room

JGA 003264 → re reminders mostly Sarah Cole, the
billet portions were his ___ feedback. possibly 2 hrs nurse
did ___ cases on this day nurse to speak
to.

→ KB would have given NB INE to log hours
→ Carmela Lipman Nurse → did not send any feedback
or consistency to Lipman.

→ would tell KB what to put into INE, maybe on
phone

→ understood that labor would be 2 hrs. Even if
case took 5 hrs to do and evaluate, understood he
would only get 2 hrs

Ime Portal Documents →
Nov/2015 → 6 hrs covid time = true he say things about
→ thought

→ Was told by Hamel that the amount they approve is
based on the number of cases done.
⎣ unless there are ___ other circumstances For ___ work

USAO_0007324

→ Frustrated because they did not seem to take in his feedback. Did not notice that they were making the changes that he suggested.

JGA 001555

understood that he would get $250 per cervical case and $___ per lumbar.

↳ believes that Hurd told him he would get based on number of cases done,

→ if he spent time outside of actively doing the case discussing, he would have put that time in separate from the cervical or lumbar time.

JGA 000323-324

→ Believes this was around the time that Andre Like a new SP rep came in. The training time was the time spent in the OR or before + after to train the rep.

→ No discussion on INE issues = No discussion outside of OR with anyone.

→ Should have filled out INE forms himself with feedback →

→ Did not give appropriate feedback @ on cases that were billed.

→ Disagreed until after KB left that should have been ___ ___

→ realized in hindsight it was wr___ ~~told~~ KB told
~~act~~ now knows it was wrong // also knew it was
wrong at time.

→ AH never asked for me feedback / nor did anyone
from SP.

5) Nervous consulting was given to specter programs.

→ SF consulting was not thoroughly documented, feels bad
that it happened.

↳ ___ ___ cared about how ___ ___.
↳ Had to know the exact documentation ___.

→ ~~No differ___~~ Nothing different between a regular
survey ___ SP project, and using SP project to ___.

4 FEH 000082 → this is the document where
KB said Huizhou evaluated contract

# EXHIBIT B

FD-302 (Rev. 5-8-10)

**OFFICIAL RECORD**

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/09/2019

Dr. John Atwater, date of birth (DOB) ███████, was interviewed at the US Attorney's Office in Boston, MA, pursuant to a proffer agreement. Also present for the interview were AUSAs Abraham George, Patrick Callahan, David Derusha, as well as Atwater's attorney, Martin Merritt. After being advised of the identity of the interviewing Agent and the nature of the interview, Atwater provided the following information:

*(Agent Note: SA Dupont left the interview part way through and the remainder of the interview was documented by HHS OIG SA Meaghan Fleury. During the interview, Atwater was shown the following documents: Gabriel00003268, YEH000037, USAO-COM-000115, YEH000086, JGA000029, JGA000744, JGA000090, JGA000126, JGA000131, JGA0002564, JGA0001555, JGA000323-324, YEH000082)*

Atwater attended Yale University for undergraduate studies and graduated in 1989. He then attended the University of Virginia Medical school and graduated in 1993. Atwater then did a one year internship at Johns Hopkins, before doing his residency at Howard in 1994. In 1998, Atwater completed his residency and did a one year spine fellowship at Leatherman in Louisville, Kentucky.

In 1999, Atwater was offered and accepted a job at McLean County Orthopedics (MCO) in Bloomington, Illinois. After approximately two years, Atwater was made a partner in the practice and given a 10% ownership stake. There were approximately 10 other partners at MCO. The revenue at MCO was based on an "eat what you kill" basis, except for ancillary services such as MRIs, ect., which were shared evenly by the partners. Approximately 95% of the surgeries done by Atwater were elective spine related surgeries. The other 5% of surgeries performed by Atwater were for emergencies when he was on call. Between 2010 to 2014, Atwater estimated that his annual income was approximately $800,000 - $1,000,000. About 90% of this income was derived from his surgical practice, and the other 10% was derived from his various business ventures.

Atwater had privileges at Bromen Hospital, St. Joseph's Hospital, Gibson City Hospital, the Center for Outpatient Medicine (TCOM), Presence Hospital, and Peoria Day Surgery. Atwater saw all types of patients at

| Investigation on | 04/11/2019 | at | Boston, Massachusetts, United States (In Person) |
|---|---|---|---|

| File # | 209A-BS-6566377 | | Date drafted | 04/16/2019 |
|---|---|---|---|---|

| by | DUPONT TERRENCE |
|---|---|

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. John Atwater _____ , On  04/11/2019 , Page  2 of 6

these hospitals, including private insurance and medicare or medicaid.
Atwater only did occasional surgeries at Peoria Day Surgery and TCOM. He
also had a 4% ownership stake in TCOM.

In October 2014, Atwater and his family moved to Vero Beach, Florida.
Atwater took a job at Vero Orthopedics Vero Neurology (VOVN). Atwater
moved to Florida in part because his wife wanted to move to a warmer
climate. Atwater worked at VOVN for a few years before opening his own
practice under the name Ortho Spine Care America. For a period of time Dr.
Hussamey was a partner, however they recently dissolved the partnership.
Atwater's practice has had a few different names, but he currently bills
under "John Atwater MD." Atwater has privileges in Florida at Indian River
Medical Center, Advanced Center for Surgery, and Grove Surgery Center.
Atwater is a part owner of Indian River Medical Center. Atwater estimated
that between 2014 to 2016, he earned $400,000 from his surgical practice,
and approximately $1,000,000 from his various business ventures. In 2017,
Atwater broke even on his surgical practice, but still made $1,000,000
from his businesses.

Atwater attributed the increase in revenue from his businesses to a
purchase he made of another neuromonitoring company. Atwater also changed
billing companies after 2014 and this helped to increase the revenue of
his neuromonitoring company, which is called DND. He also owns a company
called Your Extra Hands Surgical Services (YEHSS), however YEHSS does not
generate as much income as DND.

Atwater did not remember receiving formal compliance training, however
he was generally aware of the anti-kickback statute, Stark law, and
Sunshine Act. He also generally understood that the government could sue
for false health care claims. Most of his compliance related knowledge
came from working in the industry, in particular his time at McLean County
Orthopedics. Atwater also learned some compliance rules while operating
his DND. Atwater tried to get an exemption from the state of Illinois that
would allow him to use DND during his own surgeries. During this process,
Dr. Atwater consulted with an attorney who happened to be the father of
another partner form Mclean County Orthopedics, Dr. Craig Carmichael.
Atwater was denied the exemption and ended up using a different
neuromonitoring company that was owned by Dr. Carmichael.

YEHSS was founded in approximately 2007 by Atwater and a group of
surgical techs. Initially, Atwater owned 51% and the remaining 49% was
split by the other partners. After a few years, Atwater bought out the
other partners because of a dispute over who would pay for overhead costs.
Atwater owned 100% of YEHSS until he brought in Dr. Greico to be a 10%
partner. This is the current ownership structure of YEHSS. Currently,

INT-RPT00000449

FD-302a (Rev. 05-08-10)

209A-BS-6566377

Continuation of FD-302 of _(U) Interview of Dr. John Atwater_____ , On _04/11/2019_ , Page _3_ of _6_

YEHSS has four administrative employees and six to seven surgical
assistants.  YEHSS has bank accounts at PNC Bank.

   Kyle Black, who was the executive director of YEHSS, was hired around
the time that Atwater bought out the other partners. Black had been
recommended to Atwater by one of his former partners as someone who could
help grow YEHSS's business. Shortly after hiring Black, Atwater learned
that Black had previously been accused of misusing prescription drugs with
his father in law in Kentucky. Black told Atwater that he had been cleared
of any wrongdoing. Atwater kept Black as the executive director and was
pleased with his overall work performance. Black was a hard worker and
appeared to be aggressively pursing new business opportunities. Atwater
did hear grumblings from his staff that they did not trust Black. In
particular, surgical tech Sid Kessinger was very distrustful of Black.
Kessinger did not have much respect for Black. Kessinger and Black would
sometimes travel together to visit other doctors to try and grow YEHSS's
business. Kessinger said at one point that Black did not seem to have a
real understanding of the business and said things in front of prospective
doctors that did not make sense. Black had been making approximately
$179,000 a year, however in 2015 he requested a raise to $250,000. YEHSS
was barely breaking even at this point and Atwater refused Black's
request. Black ended up leaving YEHSS sometime after his salary request
was denied.

   Atwater founded DND in the early 2000s prior to founding YEHSS. He owns
99% of DND, and the other 1% is owned by Dr. Greico. Neuromonitoring is
the process by which electrodes are placed on the muscles of a patient to
get a baseline of activity while the patient is under anesthesia. The
neuromonitoring system monitors a patients activity during surgery and
notifies a surgeon if a blood vessel were to be cut inadvertently.
Neuromonitoring is necessary based on the area of practice for a
particular surgeon. For example, in Atwater's opinion, doing a lateral
spine surgery without neuromonitoring would be below the standard level of
care. There are individuals who are trained to interpret the output of a
neuromonitoring device. The people who interpret the output are based in
different parts of the county. If they notice an issue during a surgery,
there is a way to notify the technician who is in the operating room.
Medicare pays for the professional interpretation of neuromonitoring.
Atwater uses neuromonitoring in all of his cases, however he does not use
DND. Atwater estimated that alerts from a neuromonitoring system made him
alter his surgery in only two cases.

   Atwater fist met Kingsley Chin in 2013 at a National American Spine
meeting. Atwater had previously heard of Chin from his work at Stryker,
where Chin helped develop the Mantis System. Chin owned a few different

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. John Atwater _____ , On  04/11/2019 , Page  4 of 6

companies under the KIC Ventures umbrella. Atwater was aware of Spine Frontier (SF), AxioMed, IME, and Sensedriver. Vanessa Dudley, who was Chin's wife, worked for IME. Chin and Humad both asked Atwater to invest in Chin's companies, however he declined. Atwater did not start using SF products until after a meeting he had with Dr. Gabriel and Chin. Dr. Gabriel had lived in southern Illinois for a while before moving to Ohio. He was a big proponent of SF. Atwater also believed that Dr. Gabriel had an ownership interest in SF. Prior to using SF, Atwater used Nuvasive, Medtronic, Depuy, and Synthes among others. Atwater had a consulting agreement with Nuvasive where he took part in speaker programs.

Chin switched to DND in 2014. Atwater did not know if Chin used DND exclusively. Chin used DND from 2014-2016, however in 2016 DND no longer had the resources to cover Chin's surgeries in Florida. It was tough to recruit neuromonitoring technicians in Florida, and Chin did not do enough surgeries to justify hiring a technician in Florida.

Around the time that Atwater started using SF products, he signed a consulting agreement with SF. YEHSS also formed an agreement with SF where a YEHSS surgical tech would act as a SF rep for Atwater. SF had a difficult time finding a full time sales rep for Atwater's area, and it made sense to use Atwater's surgical techs on days that they were not scheduled as a surgical tech. Atwater only remembered Kessinger and Rylan Miyat signing on as SF sales reps. Kessinger did the vast majority of Atwater's cases because Miyat left YEHSS shortly after signing up as a sales rep. The agreement between SF and YEHSS was for YEHSS to be paid $3,200 a month to manage Kessinger or Miyat. Kessinger and Miyat would also receive a separate monthly payment from SF to cover Atwater's cases. Atwater did not believe that a FMV analysis was conducted on the $3,200 management fee. Black negotiated the YEHSS contract with SF. Black initiated, wrote, and signed the contract with SF. Black and Humad negotiated the $3,200 management fee and the services that would be provided to SF. At the time, Black was aware that YEHSS was barely breaking even as a company and he was likely chasing additional revenue for YEHSS.

At the time the agreement was signed, Atwater believed that Black would actually provide the services that were outlined in the agreement with SF. After a couple of months Atwater realized that YEHSS was being paid more than FMV for the services that were being provided. Atwater started to have concerns that the $3,200 payment could be considered a kickback. By May of 2014, Dr. Atwater realized that Black was not doing anything close to $3,200 worth of services for SF. At one point there was a dispute with

FD-302a (Rev. 05-08-10)

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. John Atwater _____, On 04/11/2019 , Page 5 of 6

SF over money that was owed to YEHSS, and Black tried to collect the additional money from YEHSS. During this process, Atwater realized that YEHSS was getting paid a lot of money from SF.

Atwater was aware that Black spoke to other doctors a handful of times about SF, including Dr. Sibeley and Dr. Rachman. Black also dealt with some of the local hospitals, Praveena and Gibson City, to get SF products approved at those hospitals. Black would also coordinate Atwater's SF cases with Kessinger. Atwater estimated that maybe the compensation should have been $1,000 a month. Atwater believed that Black put this arrangement together because he was going after extra money to help pay YEHSS's operating expenses. Atwater did not personally receive money from this arrangement, however it did help the bottom line at YEHSS. The total money paid to YEHSS from SF was approximately $20,000. Atwater was also aware that YEHSS was paid $3,200 after he had moved to Florida and stopped doing SF cases.

Atwater was led to believe by Black and Humad that there was a legal opinion blessing the agreement between SF and YEHSS. When the arrangement was first proposed in the fall of 2013, Atwater sent the agreement to his attorney, Greg Hunziker, to review. Hunziker did not give an opinion on the agreement and sent it to another law firm, McGuire Woods, to review. In January 2014, Humad and Hunziker spoke about the consulting and YEHSS agreements. After that call, Black sent an email stating that Hunziker had signed off on the agreement, however he did not copy Hunziker. Eventually, Dr. Atwater learned that the contract had not been approved by Hunziker or McGuire Woods. In May 2014, Black sent an email to an attorney from McGuire Woods stating that Dr. Atwater no longer needed a legal opinion, however he did not copy Dr. Atwater on the email. Therefore, Atwater was under the impression that the agreement had been approved.

In addition to the agreement between YEHSS and SF, Atwater also had a consulting agreement with SF (through IME). Atwater admitted that one of the reasons that he used SF products was because of the consulting agreements for himself and YEHSS. He liked the SF products and would have used them otherwise, however the consulting agreements did play a role in his decision to use the products. Atwater did not remember if he had used SF products prior to signing up as a consultant. Atwater believed that he signed up as a consultant in the fall of 2013 after meeting with Chin. Chin sold him on the idea of evaluating SF products. Atwater knew that Dudley worked for IME, but he did not know that SF was the only client of IME. He only did work for SF through IME.

Atwater's understanding of the consulting agreement was that he could log hours for the time he spent evaluating products and IME would decide

INT-RPT00000452

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. John Atwater _____ , On 04/11/2019 , Page 6 of 6

how much to approve. Atwater would submit hours for the time he spent
evaluating a product. The majority of the time that Atwater submitted to
IME was for time spent evaluating the products during surgery.  His
understanding was that even if it took him five hours to do a lumbar
surgery, he would get paid two hours of consulting. Atwater was told by
Humad that the amount of hours he was approved for was based on the number
of SF cases that he did during that time period. He understood that he
would receive $250 for a cervical case and $500 for a lumbar case. Atwater
did nothing different from a normal surgery when he did a SF surgery where
he evaluated the product.

   Atwater could remember three times that an engineer from SF came out to
Illinois for a case. Atwater also occasionally spoke to the SF engineers
on the phone. Emails, (JGA000126, JGA000131, JGA000264), were examples of
feedback that Atwater would have provided to an engineer when they came
for a case. They spoke for between 1-2 hours. For all the other cases
where a SF engineer was not present, Atwater would provide Black the
information to enter into the IME portal. This would include any feedback
that Atwater had for SF. The feedback would be entered into the comments
section of the IME portal. The consulting hours would be entered into the
IME portal based on the procedure that was performed. The amount of time
entered in the "cervical" or "lumbar" section of the IME portal reflected
the hours spent evaluating the products during those respective
procedures. If Atwater spent additional time outside the operating room
discussing the products with an engineer that time would have been entered
into the "discuss time" section of the portal.

   Atwater admitted that he did not give appropriate feedback on the cases
that he submitted consulting hours. He knew it was wrong at the time and
continued to submit the hours. He should have been more diligent about
submitting the hours himself and ensuring that the proper feedback was
provided. Atwater was frustrated with SF because it did not seem like they
were interested in his feedback. He did not notice any changes that were
made to SF products based on his feedback. Neither Humad, nor anyone else
from SF, ever told him that his feedback was inadequate. SF had to know
that Dr. Atwater was not providing appropriate feedback for the amount of
consulting hours that he was being paid. Looking back, Dr. Atwater feels
bad that this happened.

# EXHIBIT C

1/9/20        Mindy Santer  atthy

Dr. Atwater

→ Not part owner Tricta Rena
  └ part owner Almond Center for Medicare

                2014          to 250k → went to 179k
→ In 2015, when KB asked for raise, (other 4 EMSS employees
took pay decreases because of financial difficulty)

                    ↗ KB refused pay decrease in 2015
  then in 2015              then Left

→ KB did put in his own money to pay payroll along with
  Owners (Atwater, Greico, KB) 1 time (maybe 15k)
              └→ Atwater put 10-15k a couple months in 2015 (50k)
                  └ to cover payroll                    total

→ Now there are automated DND machines that don't require
  monitor. Nuvasive offers his. Actually more expensive

→ wife didn't want to be involved with KC after meeting him,
  said don't do business with KC → Also said same thing
  ~~the~~ about KB

      → One reason never invested with KC
        └→ KC also wanted to control everything

→ All KC does is LOP cases; doesn't have Medicare or Medicaid
  └ said this is how he    │ license + bill
  makes his money.          │

→ Atwater does some LOP cases
  └ usually referred by chiropractor who is already with patient

→ Atty refers to chris → then goes to Atwater
→ has always been paid for LoP cases, gets paid
more than regular
   → KC wanted to pay Atwater 2x Medicare in
LoP, ex by the recievistle.
→ decision abt what device company to use did change, if
it was LoP case.
or been    → Never paid referral fee for LoP case; never heard that
   KC did.

YEHSS _____ First met AH & KC
                    Sept 2013

→ thinks offer NAS needy, connected KB to SF.
   → thus AH & KB came up with YEHSS agreement
   → Grand Ritter sales rep Nathan Francus got + SF
   needed rep in area.
   → emails between AH & KB talking abt arrangmnt,
including setting up Service agreent pay YEHSS & pay Siebwing

→ first did SF cases in June 2017, with Nathan
as sales rep. NF had originly pitched Atwater,
   but time using SF to Nuvasive to other companies
→ YEHSS arrangemnt handled strictly by KB
   → KB came to Atwater said he + AH worked out this
deal do you approve.
   → understood SF would pay YESS employees as sales rep.
   → Asked KB paid to + find other hosp. etc to
get SF in [ thought arrangent was legit in begining ]
   → remembers speaking to KB say, → set approval
from Hunsaker, if he said ok then it is ok.

→ would occasionally ask LeB if he did any, & LeB
w'd say he did this Dr., this Hosp. ect.

→ thinks Henziker blessed it, but asked target partner to take
a second look, & second look never happen.
→ Stressing is to the contract, not what LeB actually
did.

## YEH 000086

→ doesn't reveal tdy to LeB abt exptly this model to other
surgeons.
→ Atwater was saying if no sales rep, product could be
cheaper because no commission.
→

→ the agreemt with Ryja, LeB did not do much bcoz
Ryja left quickly

→ with agreemt for Sid, LeB was aggressive in reach'g out
to other surgeons & hospitals. Thinks this was Feb, March, April
⌐ thinks this because LeB told him, no other
verificatn.
→ LeB said he also arranged for SF products to be there for Sid

→ Does know that LeB talked to Gibson Clay & Presence to see SF
products in.
→ After April, did less SF cases so not much
for KB to do so justify $3,200
→ over time realized there was justificatn for $3,200

→ looked at KB role with TEHSS + SF as a distributor

→ wanted to hire a distributor to do KB role with SF.

→ thought KB is doing stuff, but reduced not to $3,2-- level.

⤷ didnt think KB was being successful because nobody new started using SF products Sessions Atwater

⤷ made him think we are not ~~to~~ earning $3,200

(realization) ⤷ ~~factless~~ KB never got SF products into facility    Atwater did not adopt

→ SF did not want a distributor in place of KB because way more expensive.

have privileges

JGA 000712 → Unity Point no priviliges so no SF products being used.

→ also Springfield → Rockford never panned out

JF HLR- 00788410 ⤷ 1-5 of agreement → if a sales rep did either things already, then this contract ~~be~~ is not valid, bogus

⤷ KB said he was doing #3

#4 ⤷ remembers email where purchase order was sent to KB, any time

#1 → KB never said managing Sid

#2 → Doesnt know if KB or Sid did this; probably KB when seeing new surgery, Sid notices who actually arranged it.

#5 → No idea

#6 → TEHSS already had insurance

→ ~~Sid~~ Sid never covered SF cases for anyone other Than Atwater

→ continued to accept money after redesign not enough was
done because knew was KB & Sid were doing some
things but not enough.

→ in hindsight should not have taken $3,200
or much less amount.

→ knew it was wrong to take money if not providing
① services.

→ KB was trying to get his wife employed at SF.
↳ stated to doubt what KB was doing was
sincere.

KC »

JGA 000351  → want to expand market of VEHSS
to Chicago
↳ Attuctr did not pitch this idea to anyone

SF-ATW-0002345
↳ Attuctr moved to FL in Oct. 2014
→ KB visited Attuctr in FL, ~~that~~ New Years 2015

→ because no other doctors were going signed p, meds have reasons
and wanted to shift to distributor.

KBs*
SF opposed
in FL hospital
→ after moving to FL, thinks KD is still helped to get
product to Attuctr in FL. There was a sales rep in FL seeing
cases. Attuctr would contact KDA, schedule SF cons, not sure who actually
did all the work
→ In 2015, realized that the money owed after Oct was
too much & and should be written off.

→ and got
products
thru.

JGA 000202

→ AH said in April 2015 that he would get paid 1 hr for cervical + 2 hr for lumbar cases, in Feb. 2015.

→ LESS Institute had no money so they could not pay DND bills, would try to pay as they could it, were given.
↳ would make some payments then more after getting funding.

JGA 000153

↳ get what is owed from DND first

→ KB was doing some work for SF when Atwater was in FL, but not enough to justify payments.

SF-ATW-00001882

↳ Sid had no intention to move to FL; could have helped on a one of basis, if needed to cover cases.
↳ Not sure why KB said Dr. Atwater had requested.
↳ Did not remember asking Sid to come to FL, not sure why KB said this.

JGA 000039

↳ Really damed on him that they had not done much work to justify money they were paid.
↳ they did not deliver.
↳ when he first saw had numbers

→ thought that AH + KB had close relationship, they talked a lot. AH wanted to hire KB after he left YEHSS

→ Nobody from SF said YEHSS was not doing enough to justify $3,000

Late Summer 2015

→ AH said KD did a good job + wanted to hire KB
after he left YEHSS.

    ↳ Atwater did not give KB a good recommendation.

→ Surprised that SF wanted to hire KB after what had
happened.

## YEH 000082

    ↳ thinks Hunziker did say contract on its face is ok, they did
not talk abt how it worked n practice.

## YEH 000037

    → Not Atwaters check marks

→ Doesn't remember much abt NF pitching consult,
does not stand out.

## JGA 000834 → initially thought might consult on other
products, eventually realized it was just going to be SF.

    ↳ couple months in.

    ↳ signature is his, but not handwriting

→ interested n being an expert witness, doing, ed.
at time of agreement.

NAS

→ Sept. Kingsley said send Dr. Atwater IME stuff

→ para 2.2b

    ↳ didn't know there was a 5% fee, KC is an
opportunist, not surprised, ~~but this present~~ but realizing

    ↳ IME was presented as independent 3rd party.

    → that if IME was essentially SF then this is wrong

JGA 000744 → doesnt remember submitting Lens
in 2013.
  ↳ not paid $1,500 - $1,500

  → Attorney told KB hours, KB entered into portal
   ↳ would say did X number if hours, mostly just
   hours. One time said make sure to include
   this (in email)

  → doesnt know ~~if AH~~ what AH told KB, & would'nt
  be surprised given his conversation with AH.
   ↳ AH + KC always said to log hours ~~when~~ ~~at~~
  ~~portal~~ wherever consulting

  → didnt know at the Mkt OR time billent rout.

  → AH was looking at cases pertinent to space hours.

  → ① Decision John consulty was on a per case basis,
  ~~Spine~~ Spineology also did on per case basis.
   ↳ Has not been paid under this model but seen contracts.
  ~~→ has not~~ ↳ but on this case it was a one off
  evaluation, would not do over + over again (limited to 5 times)
  per product.
   (↳ makes sense that after 5 times ~~wont~~ no consultion
   → also fill out evaluation form

JGA 000138
  ↳ Seth Jackowitz was sales rep in 2015
  ↳ doesnt recall how Knew prior to April 2015 call with AH
  to S,H by case.

4 hours surgery would say to bill 4 hours, but
didn't actually consult

⇒ would give hours to KB based on length of
surgery ~~but~~ but he did not actually consult for those
hours.

⇒ hours were greater than actual time spent consulting

⇒ sometimes would ~~not~~ with engineer after

⇒ knew it was wrong to bill for more than actually
consulted

~~milk~~
the system ⇒ First case SF, Gibson city, Lumbar fusion, 4 hr case,
said it was 6 hrs. consulting + 6 hr ~~we example~~ tray, so total of
12 hrs billed, ~~even~~ chose counted hours, knew was wrong

⇒ Was not consulting entire time of surgery; impossible to
do // ~~do~~. In OR, maybe 5-10% of time was actual
consulting, so at most 30 mins during 4 hr surgery.
Knew it was wrong.

⇒ ~~SF~~ ~~~~ Feb 2014 - Feb 2015 never addressed the
hours that Atticus was submitting
⇒ Feb 2015 was first time they questioned his
billing. They said they would bill 1 cervical 2 lumbar.
↳ based on # of cases.
↳ going forward followed this guidance
⇒ Didn't notice that SF was cutting his hours in
2015

⇒ SF never complained about not receiving feedback -
lack of consulting

In FL

→ Engineers were to spen ~75% of cases, partly becam
(Andre was new to writes to have an engineer.
↳ some amount of consulty in OR as if they have
there + not.
   ↳ conversations outside of OR was under
discuss time. Not product time.

- Stopped Aug/Sept. 2015, they did not seem to see his feedback

→ Did not talk much with AH/KC after stopped consly;
  still did some cases going forward.
↳ didn't think he need do much more consulty
   ↳ wouldn't be right to continue to consult on some
      product + keep billy. Company never questioned but
      he thought it was wrong + was uncomfortable with
      arrangement.

JGA 000155
      ↳ KB might have had conversation with AH prior
to Attorney hang counsel with AH
      ↳ this is before call with AH
   ↳ this came about after sobriety 21 hrs + was
going word that 9 would be approved.

JGA 000273
      ↳ No oversight by SF, they never questioned him
or received feedback from SF about his consulty. This
was not true.   IME was not doing independent
analysis (vehicle)

DND

→ talked to KC at NAJ about neuromonitoring, he was
not interested at time.
→ he had trouble with his people so gave DND a
chance

~~UAT~~ USAO-MA-ATWATER-00000016

USAO-MA-ATWATER-00000015
→ knew LESS was owed by KC

ATWATER-00000093-95 → May 8, 2015 - he had not
seen paid for DND business. Put it out there that
he would not use SF, this was a threat, didn't have
intention of following through on it. Regrets saying it, realizes
it was quid pro quo.
    → Around this time KC wanted him to use more
SF. Had some effect → paid some DND bills

→ knew this was wrong.

→ talked to KC about not getting paid for DND; didn't
tell KC that he would stop using SF → said this to Sara,
assumed it went to higher ups at SF.

SF-ATW-0003013
    → things business stayed the same, did not increase
→ he would pay $700

ATWATER-00000088

→ stopped services for KC in late 2016 early 2017.
→ DND stopped because didn't make business sense

<u>SF - ATW - 0000 1965</u>
→ paid 6500 to still owed 64

<u>SF - ATW - 0000 2413</u>
↳ doesn't recall Amanda Dalton
↳ doesn't remember telling anyone else besides Seth Jehonney
that would sign up SF access paid for DND

→ no communicat since last telly to KC
→ no communic. with AH in last year
→ ~~Barbara~~
→ Andre is a family friend, helped find by at all
~~Andre~~ accesses; also ~~signed~~ reached out to Nathan
Francom to get into that cases.

- last spoke to KB re day he left company

→ Sid Kessyer said he had been to Bush → No Substance

# EXHIBIT D

FD-302 (Rev. 5-8-10)

### FEDERAL BUREAU OF INVESTIGATION

Date of entry     02/12/2020

Dr. JOHN ATWATER, date of birth (DOB) ████████, was interviewed at the US Attorney's office in Boston, Massachusetts. Also present for the interview were AUSA's Abraham George, David Derusha, and Patrick Callahan, as well as ATWATER's attorney Mindy Sauter. After being advised of the identity of the interviewing Agent and the nature of the interview, ATWATER provided the following information:

ATWATER is not a part owner in Indian River, he is a part owner in the Advanced Center for Medicine.

KYLE BLACK asked for a raise in 2014 to $250,000 but ATWATER was only able to offer him a raise to $179,000. YOUR EXTRA HANDS SURGICAL SERVICES (YEHSS) continued to have financial difficulty and in 2015 ATWATER asked BLACK to take a pay decrease. The surgical assistants had already taken a pay decrease and ATWATER thought it would be fair for BLACK to take a decrease as well. BLACK did not want to take a pay decrease and ended up leaving YEHSS. ATWATER thought it was hypocritical of BLACK to ask the other employees to take a pay decrease when he was not willing to take one himself. YEHSS was barely breaking even at the time and for a few months ATWATER put in $10,000 to $15,000 of his own money to cover payroll. ATWATER estimated that he put in $50,000 total to cover payroll in 2015. For one month Dr. GREICO and BLACK also put in some of their own money to cover payroll. ATWATER quickly re-payed BLACK for the money that he put in.

ATWATER's wife did not want him to get involved with KINGSLEY CHIN. She met him once and got a bad vibe from CHIN. Anytime ATWATER brought up CHIN in front of his wife she told him to stay away. This is one of the reasons that ATWATER never invested with CHIN even though he frequently asked ATWATER to invest. ATWATER also did not like that CHIN was so controlling and this deterred him from investing.

| Investigation on | 01/09/2020 | at | Boston, Massachusetts, United States (In Person) | | |
|---|---|---|---|---|---|
| File # | 209A-BS-6566377 | | | Date drafted | 01/10/2020 |
| by | DUPONT TERRENCE | | | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

INT-RPT00000651

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Atwater                                , On  01/09/2020 , Page  2 of 8

CHIN only does LOP cases and private insurance, he does not have a Medicare or Medicaid number. CHIN told ATWATER that LOP cases are how he makes his money. ATWATER did not know how CHIN found his LOP patients. ATWATER has done some LOP cases in the past, but he has not done any for CHIN. ATWATER usually receives LOP referrals from a chiropractor who initially treats the patient. ATWATER has always been paid for the LOP cases that he did. At one time CHIN offered to purchase ATWATER's outstanding receivables for LOP cases at a cost of twice the Medicare rate. ATWATER did not end up selling his receivables to CHIN. The decision about what medical device product to use in a surgery did not change for ATWATER if he was doing a traditional case or an LOP case. He has never been paid, or paid someone else, a referral fee for an LOP case. He is not aware of CHIN paying referral fees either.

ATWATER first did a SF case in approximately June of 2013 after being approached by SF sales rep NATHAN FRANCOIS. ATWATER did not remember much about the sales pitch by FRANCOIS but he did remember hearing about the SF consulting program. ATWATER continued to use other device companies like Nuvasive in addition to SF going forward. ATWATER first met CHIN and HUMAD at the annual NAS conference in September of 2013. After this conference, ATWATER connected BLACK with SF. BLACK and HUMAD then came up with the YEHSS agreement. The YEHSS agreement came about partially because FRANCOIS quit SF and SF did not have a sales rep in the area. BLACK and HUMAD came up with the idea to have YEHSS employees RYLAN MIYAT and SID KESSINGER act as SF sales reps on ATWATER's SF cases. They also came up with the service agreement for YEHSS to manage MIYAT and KESSINGER for $3,200 a month. ATWATER remembered seeing emails between HUMAD and BLACK discussing the arrangement. ATWATER was not involved in the discussions about the creation of the agreement, but he did approve the contract before it was put into effect. ATWATER remembered telling BLACK that if his attorney, GREG HUNZIKER, approved the contract, then it was fine with him. HUNZIKER did bless the contract, but only what was actually written in the contract. HUNZIKER was unaware of what was actually being done in practice. ATWATER also thought that HUNZIKER asked a partner for a second opinion, however he did not think HUNZIKER ever received a second opinion.

ATWATER was aware that the agreement with SF would pay YEHSS $3,200 to manage MIYAT or KESSINGER. ATWATER also thought that BLACK would be

FD-302a (Rev. 5-8-10)

209A-BS-6566377

Continuation of FD-302 of  (U)  Interview of Dr. Atwater _____ , On  01/09/2020  , Page  3 of 8

responsible for trying to get SF approved in additional hospitals. In the beginning ATWATER thought that the agreement was legitimate, however he came to realize that YEHSS was not doing enough work to justify the $3,200 monthly payment. ATWATER would occasionally ask BLACK if he was doing anything for the SF agreement and BLACK would list the things that he supposedly did. In regards to the agreement for MIYAT, BLACK did not do much because MIYAT left YEHSS quickly. With the agreement for KESSINGER, ATWATER believed that BLACK was aggressive in reaching out to other surgeons and hospitals on behalf of SF. ATWATER did not have a way of verifying what BLACK was doing, he just relied on what BLACK said. However, ATWATER was aware that BLACK had arranged for SF products to be approved at Gibson City Hospital and Presence Hospital. BLACK also told ATWATER that he would arrange for the SF products to be ready for KESSINGER for ATWATER's cases. ATWATER did not know if BLACK actually did this or if KESSINGER did this on his own.

ATWATER essentially thought of the YEHSS as a distributor for SF. ATWATER believed that after April 2015 there was not too much for BLACK to do to justify the $3,200 payment. ATWATER thought that the majority of BLACK's work for SF would have occured in February, March, and April. In May, ATWATER started to realize that there was not a justification for the $3,200 payment. ATWATER came to this realization after noticing that BLACK had not expanded the SF business outside of the surgeries that ATWATER was already doing. BLACK did not find any other surgeons in the area to use SF products and only covered SF cases for ATWATER, and this made ATWATER nervous about the agreement. ATWATER continued to accept money from SF after realizing that YEHSS was not doing enough to justify the payment. In hindsight, ATWATER realized that he should not have continued to accept the payments, or they should have done a fair market analysis to determine a proper lower payment. ATWATER knew that it was wrong to accept payment if YEHSS was not providing services.

Looking at documents YEH-000086 and JGA-000351, ATWATER did not remember talking to BLACK about pitching other surgeons on the YEHSS-SF model even though it was something that CHIN wanted. In the email ATWATER was saying that if you cut out the sales rep and save money on the commissions, then those cost savings could be passed on to the facility. CHIN wanted to cut out the distributor to save on commissions.

FD-302a (Rev. 5-8-10)

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Atwater                     , On  01/09/2020  , Page   4 of 8


Looking at the service agreement with SF (SF-HUM-00218840), ATWATER agreed that if item numbers 1-5 of the agreement were already being done by KESSINGER or MIYAT then it would be a bogus agreement. ATWATER had the understanding that BLACK was doing things for SF. Looking at each bullet point, ATWATER stated:

- #1 - BLACK never said that he was managing KESSINGER
- #2 - ATWATER did not actually know if BLACK or KESSINGER arranged for the SF products to be available for each case. ATWATER would notify BLACK when he booked a new SF case so he assumed BLACK was responsible for coordinating the products
- #3 - BLACK told ATWATER he was working on pricing agreements
- #4 - ATWATER was aware of one instance where BLACK followed up on a purchase order for SF
- #5 - ATWATER had no idea what BLACK did to ensure KESSINGER was meeting the requirements of his sales representative agreement
- #6 - YEHSS already had insurance and this was not applicable

ATWATER moved to Florida in October 2014. ATWATER would still inform BLACK when he scheduled his SF cases in Florida. ATWATER thought that BLACK may have been arranging for SF products to be available for ATWATER in Florida. While in Florida, ATWATER's SF cases were covered by Andre Laloo, who was a SF sales rep. As with the cases covered by KESSINGER, ATWATER did not know if BLACK or the sales rep actually did all of the work. There was a period of time in early 2015 where BLACK and ATWATER were trying to get paid by SF for the YEHSS agreement after ATWATER had moved to Florda. ATWATER's neuromonitoring business, DND, was also owed money by CHIN for cases where he used DND. Eventually ATWATER realized that the money that he thought was owed to YEHSS after October 2014 was too much and should be written off. ATWATER realized that there was not enough work done to justify the payments, especially after he moved to Florida. However, nobody from SF ever told ATWATER that YEHSS was not doing enough to justify the money they were being paid.

In March 2015, BLACK was still trying to collect the YEHSS money for the months after ATWATER moved to Florida (SF-ATW-00001882). Part of BLACK's argument was that they had never formally executed a termination of the original agreement and therefore YEHSS was still owed the money. After reviewing the email, ATWATER did not know why BLACK stated that KESSINGER was prepared to assist ATWATER in Florida. KESSINGER never had any intention of moving to Florida and ATWATER did not remember asking KESSINGER to come

INT-RPT00000654

FD-302a (Rev. 5-8-10)

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. Atwater ，On 01/09/2020 ，Page 5 of 8

to Florida. KESSINGER could have potentially helped on a one off basis if needed, however this never happened.

In April 2015, ATWATER and HUMAD had a conversation about the money that was owed to ATWATER, YEHSS, and DND from SF. ATWATER had been owed IME payments for consulting hours that he had submitted for February 2015. HUMAD told ATWATER that he would get paid one hour for cervical cases and two hours for lumbar cases that he did in February 2015. HUMAD also said that LESS did not have the money to pay the full DND balance so they would start to make payments and try to pay it off as revenue grew. ATWATER agreed to write off the YEHSS money that he and BLACK were trying to collect after October 2014. JGA-000222 was an email that HUMAD sent to ATWATER after they had this phone conversation.

The check marks on ATWATER's SF consulting agreement (JGA 000834) are not his handwriting. ATWATER initially thought when he signed the IME agreement (JGA 000834) that he might consult on other companies products, but he eventually realized that it was only going to be SF. ATWATER realized this a couple months into the IME agreement. The handwriting on the document is not his handwriting however it is his signature. ATWATER was interested in being an expert witness and training, among other things, when he signed the agreement. ATWATER remembered first hearing about IME at the September NAS meeting when CHIN mentioned it. CHIN had said he would have someone send ATWATER the IME stuff. IME was presented to him as an independent 3rd party. ATWATER was also not aware that IME was charging a 5% fee but he is not surprised because CHIN is an opportunist. This arrangement would be wrong if IME was owned by SF and had no other clients.

ATWATER would tell BLACK his IME hours and BLACK would enter the numbers into the IME portal. ATWATER would relay to BLACK the number of hours that he did in a given period. There may have been one time where ATWATER told BLACK to include some information other than hours in the portal submission. Looking at an email from BLACK on November 6, 2013 (JGA 000744), ATWATER did not remember submitting hours in 2013. ATWATER was not paid the $1,000-$1,500 that was referenced in the email. ATWATER also did not know exactly what HUMAD told BLACK, but it doesn't surprise ATWATER that BLACK said they could log hours every time ATWATER did a case. ATWATER remembered CHIN and HUMAD saying to always log hours when consulting. At the time, ATWATER was not aware that time in the operating room was not supposed to be billed.

INT-RPT00000655

FD-302a (Rev. 5-8-10)

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Atwater _____ , On  01/09/2020 , Page  6 of 8

ATWATER understood that HUMAD would check the cases that were performed by
ATWATER before approving the hours for a given period of time.

ATWATER did not remember how he knew prior to the April 2015 call with
HUMAD that he should bill by case. ATWATER would give the hours to BLACK
based on how long a case actually took. For example, if a lumbar case took
four hours, ATWATER would bill for four hours and not two hours. ATWATER
realized that he was not actually consulting for the entire time he was
doing a case, and therefore the hours he submitted were greater than the
actual time he spent consulting. ATWATER knew that it was wrong to bill for
more hours than he actually did consulting.  ATWATER estimated that for any
given case only 5-10% of time was actually spent consulting. For a four hour
case, that would mean less than 30 minutes was spent consulting. ATWATER
remembered for his first SF case at Gibson City Hospital he actually billed
6 hours consulting on a case that only took 4 hours. He also billed 6 hours
training time for this same case because he was training KESSINGER during
the case. That meant for a 4 hour case ATWATER billed 12 hours of
consulting. ATWATER knew this was wrong and considered it to be "milking the
system."

From February 2014 to February 2015, the hours submitted by ATWATER were
never addressed. April 2015 was the first time that ATWATER remembered
talking to SF about how many hours to bill. This is where he was told to
bill one hour for cervical cases and two hours for lumbar cases. Going
forward ATWATER tried to follow this guidance, but may not have followed it
perfectly. ATWATER did not notice that SF was cutting his hours in 2015.
Nobody from SF complained about the quality of ATWATER's feedback, or the
lack thereof.

When ATWATER did cases in Florida there was usually an engineer present
for the case. This was partly because SF rep LALOO was new and did not feel
comfortable covering cases without an engineer. ATWATER estimated there were
engineers present for approximately 75% of his cases in Florida. The amount
of consulting that ATWATER did inside the operating room did not change if
an engineer was present or not. If ATWATER met with an engineer outside of
the operating room, that time was billed under the "discuss time" portion of
the IME portal, not the "product time" category. ATWATER stopped consulting
in approximately August or September of 2015. After this point, ATWATER did
not talk much to CHIN or HUMAD. ATWATER didn't think he could do much more

INT-RPT00000656

FD-302a (Rev. 5-8-10)

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. Atwater _____ , On 01/09/2020 , Page 7 of 8

consulting and it would not be right for him to continue to consult on the
same product. SF never questioned ATWATER's consulting, but he thought it
was wrong and was uncomfortable with the arrangement.

Looking at an email from JULIE GENEST, dated March 30, 2015 (JGA 000155),
ATWATER stated that this came after he had submitted 21 hours but only had 9
hours approved. Eventually ATWATER did have a conversation with HUMAD
regarding his IME hours. This was the same conversation where they discussed
the YEHSS and DND payments as well. HUMAD sent a follow up email to this
conversation on April 16, 2015 (JGA 000223) summarizing what he and ATWATER
discussed. In this email chain, CHIN stated implied that there was oversight
by SF of the consulting program. This was not true, there was no oversight
by SF and ATWATER was never questioned about his consulting. Additionally,
it was not true that IME was an "independent vehicle."

ATWATER initially talked to CHIN at the NAS meeting about his
neuromonitoring business, DND, however CHIN was not interested. CHIN
eventually started using ATWATER's DND business for his cases in Florida at
LESS INSTITUTE (LESS). ATWATER knew that CHIN owned LESS (USAO-MA-ATWATER-
00000019). In 2015, LESS was behind on payments to DND so ATWATER spoke to
SF sales rep SETH JACKNOWITZ (USAO-MA-ATWATER-000000019). During the call,
ATWATER told JACKNOWITZ that he would not use SF products until LESS started
paying the DND bills. ATWATER considered this a threat, although he did not
have any intention of following through on it. ATWATER realized that this
was wrong and amounted to a quid pro quo. Looking back he regretted making
that statement. ATWATER also talked to CHIN about paying the LESS bills,
however he did not make the same threat to CHIN. He assumed by saying it to
JACKNOWITZ it would get passed up to SF management. ATWATER did not remember
telling anyone else besides JACKNOWITZ of this threat. ATWATER did not
recall the name AMANDA DALTON. Around this time CHIN wanted ATWATER to do
more SF cases, and that may have had some effect because LESS did pay some
of the DND bills. CHIN's use of DND did not increase in 2015, although he
may have made statements that he would use DND more (USAO-MA-ATWATER-
00000088, SF-ATW-00003013). LESS would pay $700 per case for DND's services.
In late 2016 or early 2017, DND stopped providing service for CHIN. It did
not make business sense for DND to continue with CHIN. DND is still owed
$6,000 from LESS (SF-ATW-00001965).

ATWATER thought that BLACK and HUMAD had a close relationship because

FD-302a (Rev. 5-8-10)

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Atwater                              , On  01/09/2020 , Page  8 of 8

they frequently talked. At one point BLACK tried to get his wife a job at SF
but it did not end up happening. Also, after he left YEHSS, BLACK considered
taking a job offer from SF but decided against it. HUMAD told ATWATER that
BLACK did a great job and they wanted to hire him. ATWATER was surprised by
this and did not give BLACK a good recommendation to HUMAD.

ATWATER is aware of other spinal device companies, Precision Spine and
Spineology, that also pay consulting on a per case basis. ATWATER has not
been paid under those models but he has seen the consulting contracts. In
those consulting agreements, a surgeon could be paid on a one off basis to
evaluate a product, however you could not bill for the same product over and
over again. There was a limit to how many times you could evaluate the same
product, which ATWATER thought was five. This makes sense because after
evaluating a product five times there is not much new feedback that could be
obtained.

ATWATER has not had any communication with CHIN since the phone call they
had last year. ATWATER has had no communications with ATWATER in the last
year. ATWATER did speak to LALOO about the investigation because he is a
family friend. He had reached out to LALOO to help find a log of all the SF
cases that he did. ATWATER also reached out to FRANCOUIS to find similar
info about his Illinois cases. ATWATER last spoke to BLACK when BLACK left
YEHSS. KESSINGER told ATWATER that he had been to Boston regarding the
investigation but did not provide any substance.

INT-RPT00000658

# EXHIBIT E

John Kelly
Brian Bewley

Montere                2/11/2020

→ Consulted Life Spine prior to SF
          ↳ Balzer brought to Montere
   → paid by hour, then changed to royalty agreement
          ended 315 Mgsm
       → gave work reports, sent people out to document
          what was done.
       → Royalty agreement was supposed to be based on usage
          of other Drs. Not Montere's usage

       → summary of time spent and substance of feedback, the
   paid based on hours.
          ↳ considerably less than SF, likly less than 100 hr
          ↳ All Legit hours; less hours + discussion time with
             engineers, face to face; also product evaluations on
             a patient basis, maybe one hour each time; not ongoing
             over many years like SF; filled out form from
             LifeSpine. Filled out form after surgery, sent in to
             LifeSpine
          → most of discussions occurred with representatives of LifeSpine
             much more than SF.
          → Made much less with LifeSpine consulting vs SF
          → Didnt have blank check with LifeSpine to evaluate
    as much as he wanted.
   - Royalty → helped develop ouster pedicle screws with
   LifeSpine. Worked with engineers.
             ↳ Also LS S1 clamp design; Alarm; alif
             ↳ and Minimolly invasive cross link design      (cross)
       → did not come up with patents
       → Received royalties for a period of time, for years, not
          indefinite.

→ Maybe 2% Royalty on a few different products;
  Avcter 2, LS S1 plate + Alcon

LifeSpine
people { Rodger Redman, Ritz Patel, CEO Mike Butler
        { Rick Gainer

→ understood cant receive royalties on own usage
→ Knew you couldn't receive payment for product usage;
  maybe didn't understand regulation at that at the time.

→ Not sure if Bolier submitted evaluations; thinks his
  office staff did it. Faxed from Bonbres office
→ Not Spine Surg in 2012, so took opportunity to
  consult.

→ LifeSpine was better at creating a proper atmosphere
  for consulting, Send to see other consulting and feedback
  unlike SF.
        ↳ Never made changes to implant devices,
          based on feedback.
        ↳ only Modified instruments, Awls/Rasps/raspers
                                              Insert
          for Inspan device
→ Dint talk to attorney about consulting agreement before
  signing

→ First met Bolier in 2005 at spine base for practice
  ↳ office manager brought Bolier in to everybody stated
  works together as a rep to surgeon.
→ Bolier introduced K2M, LifeSpine, SF, X Spine, Spinels,
  OSI, Crofton; Bactrin

→ Late 2012 Introduced to SF by Belzer
  ↳ Ingram NKH (1st time using SF)
      ↳ thinks it was 6 case trial

→ Lifespine was not great for 2 level cases because
product was too big.

↳ Belzer knew it small company, asked him to find
a new product that would work better.

  ↳ Montre also wanted to consult with this new
  company as well.

  ↳ Belzer brought SF to Montre based on his request.

  ↳ Montre liked product

→ Thinks he spoke to Scott Bensy prior to
6 case st.; Bensy was the first first cases.

→ Knew it would be paid consulting gig then got so, prior
to 6 case trial. Belzer had the discussion with SF.
Montre did not discuss with SF before 6 case study.
Belzer said he spoke with SF about consulting to
bring it up 15%. Their M.D. was you can't
get paid to use products. Told this by Belzer.

→ Had some expectations that he would do some things for
consulting, turned into nothing. Did not get impression from SF that
he would have to do much.

→ Knew from Belzer he would get 15% of revenue generate for
SF based on his usage.

→ impression was that this 15% would meet 15%, which
was also a "cap".

→ Monture said it told fishy to tie it to a percentage. Bolar said he talked to AH about it, and AH said they would keep it tied to usage because the more you use the more you could redistr.

→ The 6 case study was to get the products approved in the hospital. As long as it didn't cost the hospital would approve.

→ Didn't disclose to NWH about consult/ty; didn't feel it was their policy to require it.

→ Rep would handle logistics of getting price arrangement to approval in hospital.

→ May have been a step to get it approved at NWH

→ Doesn't remember convo with AH before 6 case trial
→ thinks first call with AH was late 2012 — early 2013 by phone.
→ In conversation, AH reiterated Monture could get 10% of what he used. Said more than willing to work with Monture to get going.
   ↳ said he could get 10% of usage.
   ↳ understood they wouldn't approve it he substantive say 2% of revenue.
   ↳ No discussion of hourly rate on this call
   ↳ being call was to say "lets do business"
   ↳ doesn't remember AH give specifics on what he expected for feedback was
      ↳ No expectation for time that was expected or frequency of engineer visits
→ #1 focus of call was usage product, control money he would receive.

USAO_0007465

→ Could not get paid to just e-educate product, had to use it in center.

→ thinks this call with AH was staer mostly w/ Mr Balzer had initial calls with SF to discuss consulting

→ March 1st les, Dr. Gosul at DH
↳ Dr. Gosa there, Kevin Chappius
Dr. Long      / Doesnt remerer Peter Piros, Say the
             St possibly he ran ends on and
             the st trial cases
   → Doesnt remeer specific conversch with pirnos at
   les.

→ knew SF doing mabl high volume st usage. They
were more prod. Than oth crppans. Received feedh
from Balzer abst this. They did not threan him
or say had to do X amnt of cases. But.O
shared form wuld have been pushed to use more.

SF - MON - 0003183
   ↳ 3/5/2013   Pirnos → Monbre
      ↳ dont remerer he st les, St possiS was there

SF - MON - 0201778
   ↳ 3/11/2013   AH → Monbre
      → regard conversatn with KC, revised dnal
      agreet to increase amnl to 2/ to 300k
   → Monbre remind call wtn C4n → he later than
   to use as mny products ; KC said th more prods
   ju use the more mny yu can mk (cont)-17

Hard sell                    Seems Busy

( from KC        Less than 20 min conversation

→ KC was pretty blunt abt it. Montre did not
really chnge the types of surgons that he did. For exmple
did not start doing ~~cardioth~~ cervical cases.

→ KC: More products you use more money you can
make. I care ~~abt~~ ~~any~~ my KC was ☺ pushing
pushing to use products.
   ↳ This is a cc firm call · same as AH call

→ Typically in afternoon or Fridays.

→ No discussion with Chen abt feedback, discussions with engineers,
evaluation forms, ect. No specific, abt product feedback my useful.
Just some looks at all products. Also said we have great
pedicle screws, ect.

3/11/2013 → email re: ~~for~~ conversation with Prinos, doesn't
remember specifically. Was willing to use SF predominately.
→ One of the reasons was because of safety point.
→ Prinos may have been trying to take credit for telling Montre.
→ They wanted him to use all of their products
~~→ Prinos~~
→ Prinos was involved with innovations abt bone graft.
   → bone graft is really niche ☺ → a few ~~comps~~ distribute,
   to ~~the~~ them is ~~rate~~ released. Nothing unique abt
   it between SF + other company's bone graft.
   → agreed to use bone graft from SF because of
consulting
→ Dbm from is a bidosge
→ bidosge ☺ is interchangeable with bonegraft.

USAO_0007467

DBM Form

→ ~~brought~~ rates from cedar; Leptin

→ (could have used SF as NLH once approved by NLH).
   Ls doesn't remember specific to when approved, if before or after
   laS

→ At Dr. Hosp approval was less formal, Dr. basic understood just
approve on own

April 24, 2013    SF-MON 00003353
        LaC → AH
        Said he spoke to Monroe and said there would
Se a gradual increase soon. (might mean at Dr. Hosp) was already
   Ls Doesn't remember this specific call, does remember ty
wanted him to come for VIP trip. but that happen.

- At Dr. Hosp, SF gets List price, Mo Med gets List +
very pressure. Ls hot + heavy to get him into Dr. Hosp &
like pays list    using product. Because of list price
price or car.

        4/24/2014    email
⟮ → Not sure why ~~has EA~~ clinical Advisor Agreement
SF-mon-00002104 was not signed as of this date, Monroe
        may have been lazy to sign it. No specific reason.

4/11/2013 Prins        SF-mon-00000726
        Said Monroe would be staying at Dr. Hosp ~ 2 weeks
   Ls this Sounds right

→ Learned about pricing issues at Dr. Hospital after staying there.
Before had been trying to get Monroe on the trouble.

USAO_0007468

→ Recalls Seny consulty agreed to "Exhibit A"

→ Did get paid for 6 case trial. ~~em~~ Betor said he
   Consulty          was paid for them.
   → Basically paid to use the product. No evalution from
Paul. not ~~to~~ give 10 hors of feedback.

5/22/2013  ↳ Initial $5, no check was for 6 case trial.
   → No time sheet for this
   → feedback would have been in OR or possibly after. Mostly
      OR. Paul was there. Not formal or real time. Debrig
      did do 1s hrs of work. Substality Less. Nothg in
      writing.
   → No work report for SF like LakeSpine

→ Kelzer put hours on SF timesheets. Paul he
did not tell him how my hours to put in. Paul
would just see it and sign.
   → Maybe first few times sat down togor to go
   over the sheet.
→ First submission, 75 hors submitted, spent ~~spalty~~
loss than not actually consultg or givg feedbacn
→ Thinks Betzer tells L AM above how much to
submit.
→ Thinks AM was ~~thing~~ responsible for telg Betzr
how much to bill.
   → B Said more than once AM said how my hors calc
bill. Not sure if this was done for each submission.

→ B Betzr said AM will determe paymt based on how
much revenue he generated. Thinks he knew from begn
→ AM said based on how much hardware you putin

→) thinks there may have been a legit reason because
it takes a while for things to bill.

→ Belen not always good with paperwork

→) In 2013, no written feedback, no calls with engineers
in 2013 that he can remember.

→) In OR, brief conversations with Belen; always talked
clinical 2-5 hrs per month maybe.
justmate of ⎰ some more greater to SF →1-2 hrs per mnth
their relationship ⎱ some just general clinical talk

↳ they engaged clinical talk, not necessarily non stuff

→ Actual consulting time is ~~more~~ probably closer to 15%
than he previously stated 50%

→) Was never asked by SF for more feedback or consulty.
never questioned about lack of feedback.

→) In 2013, maybe only 1 or 2 engineer visits.

→) ~~IME~~ switched from & JP to IME ~~MH~~
→) nurses on IME forms, were generally Belen

SF - mon - on 21 →
    ↳ never had "comprehensive ~~monthly~~ Review with Engineer"
    like was checked on IME sheet. Was not true, P
    checked off.
→) pt has down just to fill a sheet, made up hours.

USAO_0007470

→ ~~Does~~ Not feasible to ~~o~~ get real feedback on same
product numerous times. Only so much you can evaluate.
↳ could track for long term success rates.

→ Belzer was ~~been~~ back + would store certain biologics
↳ Amniotics type of biologic, used to stimulate fusion with
bone graft (Done For soaked in Amniotics)

→ Done 8 strips, 5 catheters, would go from 1 ~~test~~ to ¹ᵒⁿᵉ'ly
the next. So from Level 2 - Level 3 ect.
example given (12 strips in 2 level surgery )
→ would stack strips
→ NKH would not let him put in more than 1 strip per level
↳ not sure clinical reason why 1 strip was enough
→ Never would have used 12 strips at NKH
→ Additional strips would not harm patient.
→ Fair to say more than recessary of strips was used
(12 strips in two levels). Not clinically necessary.

81 @ 95k
5 strips

example given

Patient
Laura Francis
6/10/2013

Never spoke ~~to~~ ~~at~~ at trade show, participate in clinical board,
other than Regul/Anl /response ~~on~~ design ideas, were implanted,
never talked about market trends. No data collection or
research publications ; possibly assisted with tray SF by Ryan
if they were there for case (less than 5 hrs it did in 2013)
Think he did participate in design of STD products

→ Never checked to see if he was actually upaid 15% of revenue.
Left it up to Belzer to figure that out.

- right at begin in 2013 lost track of hours, but reg's ways for 1st time sheet.

-) In 2014, less carefully was acting happing compared to 2013.

→ by 2014 not keeping track
  ↳ knew Baker was getting less from AH & reduced
  Sx approved.
    ↳ Thinking Baker said, there are fewer hours.
       ↳ had LI of times Baker said switch to AH to get
       hours; understood this was the general practice
    → thinks conversation with Baker & AH abt the switch to
    / tie to hours to usage less in 2014.

→ Didn't like how it was, deep down, felt guilty abt it,
wanted it to appear more legitimate (not illegal)
  ↳ wanted it to become legitimate, which lead to
collect shop meeting with AH; however did not change
and continued to do it.
   → didn't think this would lead to jail, but knew
   it was wrong and there could be consequences
→ Notes call with Baker where he said he felt
uncomfortable happened at home on cell phone.
     ↳ Baker said he would talk to AH abt it.
       ↳ called him back & said talked to AH
          ↳ Anthone said this is stupid & doesn't make sense

Some of
→ Time sheets may have been pre-signed, & some may have
been filled in. Baker always gave him the sheets. One
was submitted on computer, but had to get to change

→ In 2014 possibly not more than 2 visits from engineers
→ coffee shop meeting with AH, he said he wanted to one
meet with Mentor.

USAO_0007472

July 2014, Starbucks meeting

→ was at Starbucks in Liberty ; Ahd
→ did not to meet with Hared
   ↳ meeting was one hour
   ↳ AH wanted to talk about LESS hospitals, Mentor
was not really interested.
        ↳ they would you surgery center near him, he could
     bring his patients there.
        ↳ wanted to him have more SF products at LESS
→ During this conversation, said he wasn't pressured with
consulting. Wanted more product from SF, wanted more
direction on what ~~the role~~ role should do. Wanted
SF more involved.
   ↳ AH just took in what he had to say, said maybe can
get engineers out more; bought idea of evaluation from
                     Mentor π
   ↳ which Lespite they told him what they wanted, SF
never did. They didn't want to make it not look like
a sham.
   ↳ AH didn't seem surprised by Mentor items.
   ↳ politely agreed

↳ shortly after an engineer came out cal talked about a study,
but that went away as quickly as it started.

) 5/13/2014 email Akua Lacey    SF-Mon-0000226
→ that Mentor for visits and say OR.
   ↳ ~~text #~~
→ previously AH had said to Bolzer that they wanted him
to maybe do a study. He would collect data would
need help to write. Talked about it but never materialized.

USAO_0007473

→ Stan was supposed to be our helper, but no specifics.

→ Previous December 2018 meeting:
  → had spoken to Baker about what they would say.
    ↳ Inaccurate for him to say they had not talked
  → Also inaccurate for him to say he felt cut, t he earned the money to Mang for SF.
  → Also inaccurate to say he did not estimate the Gel he tracked it. Only tracked it briefly at beging.
  → Did not tell gout. about 10% arrayed with Baker + SF.

# EXHIBIT F

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____02/25/2020_____

        JASON MONTONE, date of birth (DOB) ~~████████~~, was interviewed
telephonically. Also present for the interview was AUSA Patrick Callahan, as
well as MONTONE's attorneys John Kelly and Brian Bewley. After being advised
of the identity of the interviewing Agent and the nature of the interview,
MONTONE provided the following information:

        MONTONE consulted for Life Spine (LS) before consulting with Spine
Frontier (SF). JOHN BALZER brought the consulting opportunity with LS to
MONTONE in approximately 2012. At the time, MONTONE was not too busy and
took the opportunity to start consulting. Initially MONTONE was paid hourly
by LS, however at some point the agreement changed to a royalty agreement.
MONTONE believed that his consulting with LS ended in 2015. MONTONE's
consulting with LS consisted of product reviews in the lab, discussion time
with engineers, and product evaluations on a per case basis. LS was much
better than SF at sending engineers or company representatives for his
cases. MONTONE remembered having a LS representative present much more
frequently than with SF. For labs and meetings with engineers, LS would send
MONTONE a work report that detailed what was discussed during the meeting.
MONTONE would sign the work report and send it back to LS. For case
evaluations, MONTONE was required to fill in an evaluation form and send it
to LS after each case. MONTONE believed that his office staff faxed the
evaluations to LS from his office. MONTONE did not have a blank check to
evaluate the same product as much as he wanted at LS like he did at SF.
MONTONE considered all the consulting hours with LS to be legitimate hours.
He estimated for case evaluations he would only bill one hour for each case.
In total, MONTONE likely had less than 100 total consulting hours with LS.

        MONTONE's royalty agreement with LS was based on the usage of the
products that he consulted on, however it did not include MONTONE's usage.
The royalty agreement was for a specified period of time and was not
indefinite. MONTONE remembered consulting with the LS engineers on an L5-S1

| | | | |
|---|---|---|---|
| Investigation on | 02/11/2020 | at | Boston, Massachusetts, United States (Phone) |
| File # | 209A-BS-6566377 | | Date drafted  02/12/2020 |
| by | DUPONT TERRENCE | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

INT-RPT_0000196

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Jason Montone          , On  02/11/2020  , Page  2 of 7

clamp, the Avatar pedicle screws, and the Aileron fusion system. MONTONE did not come up with patents for these devices, he only helped the engineers with the design. MONTONE received a 2% royalty on the usage of these devices, excluding his own usage. MONTONE understood at the time that a doctor could not receive payment for merely using a product, however he did not understand the seriousness of it. MONTONE remembered interacting with ROGER REDMAN, RITAL PATEL, MIKE BUTLER, and RICK GRIBER from LS.

LS was much better at creating a proper atmosphere for consulting than SF. LS also seemed to actually care about MONTONE's feedback. Unlike LS, SF never made changes to implant devices based on MONTONE's feedback. SF only modified a few instruments for MONTONE, including the awl, rasp, and compressor for the Inspan device.

In addition to SF and LS, JOHN BALZER also introduce MONTONE to K2M, Xspine, OSI, Grafton, and Bacterin. BALZER brought SF to MONTONE at MONTONE's request. MONTONE was looking for a new device company that would be better than LS at cases that were more than two levels. MONTONE asked BALZER to find a new company that would also offer consulting opportunities. MONTONE ended up doing a six case trial with SF and liked their products. He also knew from the beginning that he could get paid to consult with SF. BALZER told MONTONE that SF would pay him 10% of the revenue of his usage for consulting. MONTONE understood the 10% number to also be a cap on how much he would make consulting with SF. It would not make sense for SF to pay him more than 10% of revenue because then the company wouldn't be profitable. BALZER said that SF's MO was to pay consultants to use their product. In the beginning, MONTONE had the expectation that he would do some real consulting, however this quickly evolved into him doing nothing. MONTONE did not get the impression from SF that they expected him to do too much.

The six case trial was done to determine if the hospital would approve the product for use and to determine if MONTONE liked the product. MONTONE did not have any involvement in negotiating the pricing arrangements for products, that was handled by BALZER. MONTONE did not disclose to North Kansas City Hospital (NKCH) that he was consulting for SF and he did not know if their policy required that disclosure. There was a gap from the six week case trial to when MONTONE started using SF full time because of the length of time of the approval process at NKCH.

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Jason Montone  , On  02/11/2020  , Page  3 of 7

MONTONE did not remember talking to HUMAD before the six week trial. He believed his first call with HUMAD occurred in late 2012 or early 2013. During this conversation, HUMAD reiterated to MONTONE what BALZER had said. SF would pay MONTONE 10% of the revenue generated by the usage of his products to consult for SF. HUMAD did not give specifics on what the expectation for product feedback would be. The primary purpose of the call was to get MONTONE to use the product, and make him aware of the money he would receive in consulting. MONTONE said the gist of this call was "let's do business."

MONTONE understood that he could not consult for SF by just evaluating their products outside of his cases. SF would not have approved that consulting, they wanted him to use the product in his cases. SF always wanted a high volume of product usage by MONTONE and they were much more pushy than other companies. MONTONE was told this by BALZER. SF did not threaten MONTONE or require him to do a certain number of cases, but if he were to slow down on cases he would have been pushed to do more.

MONTONE stated that he did not remember if PETER PRINOS was at the March 2013 lab with Dr. GABRIEL at DOCTORS HOSPITAL. MONTONE remembered GARCIA, DR. LOWRY, AND KEVIN CHAPPUIS being there. MONTONE thought that he had previously met PRINOS during one of the six trial cases from 2012.

Regarding an email (SF-MON-00001778) that was sent to MONTONE from HUMAD on March 11, 2013, MONTONE remembered talking to CHIN about increasing the annual consulting cap to $300,000. During this call, CHIN told MONTONE that the more SF products that he used, the more money he could make in consulting. CHIN wanted MONTONE to use all of the different SF products. CHIN was pretty blunt on this call and MONTONE considered it to be a hard sell. MONTONE came away from this call thinking that CHIN wanted to pay him to use SF products. CHIN did not bring up what SF was looking for in terms of feedback, or what was required for consulting documentation. CHIN just said that they have great pedicle screws and he wanted MONTONE to look at all the SF products.

MONTONE did not remember a specific conversation with PRINOS where he said he would use SF exclusively. MONTONE was willing to use SF predominantly, and one of the reasons was because he was getting paid in consulting. PRINOS may have been exaggerating a bit to try and take credit

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Jason Montone                    , On  02/11/2020  , Page  4 of 7

for bringing MONTONE on board. MONTONE did remember having conversations
with PRINOS about using SF bone graft. Bone graft is made by a few
distributors but sold by all of the spine companies. There is basically no
difference in the bone graft that is sold by each company. MONTONE agreed to
start using the SF bone graft because of the consulting agreement.

MONTONE did not remember the specific call that was referenced in an
email (SF-MON-00003353) between CHIN and HUMAD from April 24, 2013. MONTONE
did not remember telling CHIN that there would be a gradual increase in his
usage. CHIN may have been referring to MONTONE's usage at Doctor's Hospital
because MONTONE was already using SF at NKCH. SF was "hot and heavy" to get
MONTONE into DH because SF wanted to get list price for their products. It
was rare for a device company to get list price on a product. MONTONE did
not learn about the pricing discrepancies at DH until after he started
there. BALZER had been trying to get MONTONE there for a while. MONTONE
agreed that he likely started at DH around the end of April, 2013, as was
referenced in an email from PRINOS (SF-MON-00000726).

MONTONE did not remember why he had not signed the clinical advisor
agreement right away (SF-MON-00002104). There was no specific reason, he may
have just been slow to get around to it. MONTONE remembered seeing the
consulting agreement as well as the Exhibit A from the agreement. BALZER
told MONTONE that he would get paid consulting hours for the six case study,
even though MONTONE was not signed up as a consultant at the time. The hours
for the six case study were paid in May of 2013. MONTONE did not fill out an
evaluation or time sheet for the cases and did not provide close to 10 hours
of feedback. MONTONE would have given feedback in the OR or possibly
afterwards to PRINOS. There were no formal meetings with anyone from SF
before or after the cases and no work reports like with LS. MONTONE was
basically paid to use the product.

BAZLER would put MONTONE's consulting hours on the submission sheets and
send them to SF. MONTONE may have gone over the hours with BALZER for the
first few submissions, but after that MONTONE just signed the sheets after
BALZER filled in the hours. Looking at his first submission to SF, MONTONE
stated that he spent significantly less than 75 hours giving feedback.
MONTONE thought that BALZER talked to HUMAD about how many hours to submit.
HUMAD was ultimately responsible for telling BALZER how many hours to
submit. MONTONE remembered BALZER saying on more than one occasion that

INT-RPT_0000199

FD-302a (Rev. 5-8-10)

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Jason Montone    , On  02/11/2020  , Page  5 of 7

HUMAD had told him how many hours to bill. MONTONE did not know if this was
the case for every submission. BALZER also said that HUMAD would determine
payment based on how much revenue MONTONE generated for SF. HUMAD said it
would be based on how much hardware MONTONE put in.

In 2013, MONTONE did not submit any written feedback or have any phone
calls with engineers that he could remember. There may have been one or two
in person meetings with engineers, however not more than that. MONTONE and
BALZER frequently had clinical discussions in the OR, however this was just
the nature of their relationship. Some of the clinical talk would have
related to SF, however not more than one to two hours per month. It was
mostly general clinical discussions about the procedure and not specific to
SF. MONTONE stated that his actual consulting time was probably closer to
10% of what he submitted to SF, not the previously stated 50% estimate.
MONTONE was never asked by SF for more feedback or questioned about a lack
of feedback. SF also switched to IME in 2013 and BALZER put the numbers on
those submission sheets as well.

Regarding SF-MON-00002117, which was an IME submission sheet, MONTONE
never had a "comprehensive monthly review with engineer." It was a lie for
that box to be checked on the submission sheet. The hours that were
submitted were not real and were only put in to fill out the sheet. MONTONE
never checked to see if he was actually receiving 10% of revenue from SF, he
left that up to BALZER to figure out. It was not feasible to give legitimate
feedback on the same product numerous times. There was only so much that
could be evaluated with a product, other than tracking long term success
rates. Looking at the consulting agreement that he signed, MONTONE stated
that he never spoke at a trade show, never participated in a clinical board,
never talked about market trends, did not collect data or publish research,
and none of his design ideas for implant devices were implemented. SF only
modified the Rasp/Awl and compressor instruments to suit MONTONE's liking.
MONTONE may have assisted with training new SF employees if they were
visiting on one of his cases, however this would have been less than 5 hours
total if he did it at all in 2013.

In 2014, MONTONE did less actual consulting than he did in 2013. He also
stopped keeping track of his hours by 2014. There may have only been two
visits by engineers in 2014. MONTONE felt guilty in 2014 about the
consulting arrangement and did not want it to look illegal. MONTONE wanted

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Jason Montone  , On  02/11/2020  , Page  6 of 7

it to become a legitimate consulting arrangement, however it never changed
and MONTONE continued to partake in it. MONTONE never thought that this
could lead to prison, however he knew that it was wrong and there could be
consequences. MONTONE remembered telling BALZER that he was uncomfortable
with the arrangement and he asked BALZER to talk to HUMAD about it. MONTONE
was concerned that he was being paid based on his usage and he thought this
would raise red flags. BALZER told MONTONE that he spoke to HUMAD, and HUMAD
said it was better to do it this way because if you are using the product
you are evaluating it. MONTONE did not agree with this logic and thought it
was stupid.

MONTONE also had a meeting with HUMAD in Kansas City at a Starbucks in
2014. HUMAD told MONTONE that he would be in area for a wedding and wanted
to meet. HUMAD pitched MONTONE on opening a LESS Institute in Kansas City,
however MONTONE was not interested. During this meeting, MONTONE told HUMAD
that he was not pleased with the consulting arrangement. MONTONE told HUMAD
he wanted more involvement from SF and more direction on what they wanted
from him. HUMAD did not say much and politely took in what MONTONE had to
say. HUMAD did not seem surprised by what MONTONE was saying. HUMAD said
they would try to send the engineers out more often. MONTONE could only
compare the arrangement to LS where they always told him what they were
looking for. SF didn't even try to make it not look like a sham arrangement.

Shortly after meeting with HUMAD, an engineer from SF came out to Kansas
City and talked about doing a study with MONTONE. The email on 9/13/2014
(SF-MON-0000226) from Alana Lacey, was in reference to that meeting. MONTONE
had said he would collect all the data for a study but would need help
writing the paper. Nothing ever materialized and SF did not seem to be
genuinely interested. They never gave him any direction on what they were
looking for.

BALZER was licensed as a bone bank and could store certain biologics. Dbm
strips were 5 centimeters and would cover go from one level to the next.
Regarding MONTONE's patient Laura Francis, whose bill for SF products was
$95,000 from a 6/10/2013 procedure, MONTONE stated that he would use 12
strips in a two level surgery. He would stack strips on top of each other.
Additional strips would not harm a patient, however it was fair to say that
it was not medically necessary to use 12 strips in a two level fusion.
MONTONE would not have been able to use that many at NKCH. MONTONE could

209A-BS-6566377

Continuation of FD-302 of   (U) Interview of Dr. Jason Montone              , On  02/11/2020   , Page   7 of 7

only use one strip per level at NKCH, however he has never seen a clinical justification for using just one strip.

MONTONE made inaccurate statements in his December 2018 interview with the government. MONTONE corrected the following: MONTONE had spoken to BALZER about the government investigation and they discussed what they would say when interviewed; MONTONE did not feel like he had earned the consulting money from SF; He did not track the hours that were submitted to SF, only briefly in the beginning; and he did not tell the government about the 10% arrangement with SF in his initial interview.