## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES

v.

KINGSLEY R. CHIN and
ADITYA HUMAD,
*Defendants*.

No. 1:21-cr-10256-IT

Leave to file granted on March 4, 2025

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO CONTINUE
## TRIAL AND FOR HEARING CONCERNING *BRADY* VIOLATIONS

Defendants Kingsley Chin and Aditya Humad respectfully submit this Reply in support of their request for a continuance to prepare for trial on the government's ever-changing theories and for an evidentiary hearing about whether the government's late production of a mountain of *Brady* material resulted from outrageous government conduct that warrants dismissal of the remaining charges.

In light of delayed productions, material changes to the charges, and specious positions the government has taken, and maintains in its Opposition, neither the defense nor the Court can have confidence that the government appreciates, much less has fulfilled, its *Brady* obligations. For example, exculpatory "attorney advocacy" – which comprises only a portion of the late disclosures Defendants identified – *is Brady* material. And the government's late and ongoing production of agent notes is not merely an act of prosecutorial grace where, as here, those notes are inconsistent with and contain exculpatory information absent from earlier-produced interview reports.

Moreover, as explained below, efforts by the government to dismiss charges and the late production of *Brady* material have continued even after the defendants filed their motion. The government's case has materially changed and, if the Court permits it to go forward at all,

defendants need additional time to adapt and prepare. For example, the defendants need time to work with an expert witness whose testimony could now address the enormous value of intellectual property, including patents, which flowed from the consulting program, especially as compared to the modest amount of allegedly improper payments from that program.

<strong>Key Flaws in the Government's Opposition</strong>

Rather than address the prejudice that defendants described in their moving papers concerning the need to change their preparation for trial, in its Opposition, the government responds superficially about how the mountain of late *Brady* material can inform targeted cross-examination in a narrowed case. *See* Opposition at 8 ("the differences are cross-examination material"), 10 ("the government has significantly narrowed and streamlined its case-in-chief"). As defendants recently uncovered gaps in *Brady* material, however, the government sought the dismissal of count after count after count of the Indictment, along with dismissing the corporate defendant at the core of this case, SpineFrontier. In doing so, the government has disavowed the Indictment, as returned by the Grand Jury, that expressly alleged that that SpineFrontier's consulting program was a "sham" in its entirety, which defendants "designed" to pay bribes; that IME was also a "sham"; and that SpineFrontier concealed its crimes by failing to make Sunshine Act disclosures, even though it fully and publicly disclosed all the payments ever at issue.

When the government argues that the defendants can now simply conduct cross-examinations in a narrowed case, the government disregards the defendants' constitutional rights to due process and their need to build defenses to what amounts to a materially different case. *See United States v. Conley*, 415 F.3d 183, 188 (1st Cir. 2005) ("[T]he government's suppression of evidence favorable to the accused violates due process where the evidence is material to guilt.") (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963))). Tellingly, the government does not and cannot

deny that, over the past several weeks, it has made ongoing and massive late productions of *Brady*
material, including after the defendants filed this motion. Most recently, even after defendants filed
their motion for a continuance, the government produced additional large volumes of agent notes
corresponding to earlier-produced reports of interviews, which it had withheld even from its
January and early February productions of notes. Some of these notes, produced as late as February
22, 2025, reveal striking inaccuracies in the earlier-produced reports, including omissions of
exculpatory information that the witnesses provided during their interviews but that were left out
of the reports provided to defendants.

The government may be right that the narrowed version of its case may shorten its list of
potential witnesses, but the new theories change dramatically how defendants must defend
themselves and are now preparing to do so. For example, in the Indictment that the Grand Jury
returned, the total amount of payments to surgeons identified as alleged co-conspirators
("Surgeons 1 to 7") exceeded $2.4 million. As the government has distanced itself from witnesses
who undermine their case and dismissed related counts, the total amount of payments to those
surgeons that remain at issue is approximately $500,000. Yet the consulting program's feedback
that improved product innovation and patient care provided many millions of dollars in value,
reflected among other things in more than 50 relevant patents held by SpineFrontier or its affiliates.
Accordingly, the disparity between this appropriate value from innovations so far exceeds the
payments at issue that defendants are in the process of engaging Philip Green and Chris DeBaere
of Archway Research Group as expert witnesses to testify concerning the value of the technology
improvements and related patents to which the consulting program contributed. These expert
witnesses have stated they could have one of them prepared to testify by the July 21, 2025 tentative
date for a continued trial.

Remarkably, despite compromising the defendants' ability to defend themselves, the government minimizes the impact of its delayed productions and disregards the outrageous threats and pressure used on witnesses to build this case, which otherwise did not exist, and which is being reflected in the government's now attempting to side-line certain witnesses who were the subjects of specific substantive counts in the Indictment. The government insists, even now, that plainly exculpatory information, such as statements by some alleged co-conspirators (or their counsel) that they did not knowingly participate in any criminal activity and evidence about the circumstances under which other alleged co-conspirators avoided any criminal charges, reached civil settlements, and became cooperating witnesses against the defendants, is not *Brady* material that the government must disclose—and should have disclosed years ago. It has similarly refused to agree to a continuance that would allow defendants to prepare an expert witness who can address matters that are now newly relevant because of the government's recent changes to the charges.

## Discussion

I.    **A Continuance Is the Only Reasonable Alternative to a Dismissal Based on the Government's Late *Brady* Disclosures and Remaining Gaps in Such Productions.**

Defendants' motion detailed extensive amounts of late-disclosed *Brady* material, most of which the government had available to it even before its October 2021 deadline for disclosure, but chose to hold until weeks before trial. The late-disclosed *Brady* material has continued to come in even since defendants filed their motion. The most recent productions reveal particularly pernicious disclosure failures, in that they exposed that the government had earlier provided misleading reports of what witnesses would say.

In their opening brief, defendants pointed out that the government had withheld agent notes for approximately 20 interviews of witnesses for which it had earlier produced reports. On Friday, February 22, 2025, the government produced notes for most of those reports. Several of the notes

reveal that the reports were highly misleading in multiple respects. For example, one of the remaining substantive counts charging a violation of the Anti-Kickback Statute concerns Dr. John Atwater. On February 22, 2025, the government produced notes of a 2019 interview of Dr. Atwater, apparently taken by an FBI agent who (approximately a month after the interview) prepared the report of the interview that the government had earlier produced to defendants. A comparison reveals extraordinary inconsistencies between the contemporaneous notes, which were withheld until February 22, and later report. Indeed, given the obvious exculpatory nature of much of what was omitted from the report, it is difficult to view the discrepancies as other than an intentional effort by the agent to leave out information that would help the defense. Some of the most egregious discrepancies include (but are by no means limited to) the following:

- Dr. Atwater identified his consulting agreement with SpineFrontier, and the notes reflect him saying "***did not affect reason to use SF***," and "opportunity to try new products and potentially to design new products ***was why used SF***." (Exhibit A hereto, at 5 (emphases added).) Those statements were omitted from the agent's report that had been provided to defendants. (*See* Exhibit B hereto.)

- The notes reflect Dr. Atwater telling the government: "Was sold on SF by KC/***Not consulting*** & management." (Exhibit A, at 9.) This statement that Dr. Chin did *not* use the SpineFrontier consulting agreement when "selling" SpineFrontier to Dr. Atwater was omitted from the agent's report. In fact, removing the exculpatory portion of what Dr. Atwater said, the report stated only that "Chin sold him on the idea of evaluating SF products." (Exhibit B hereto, at 5.)

- Both the notes and the report describe involvement by Dr. Atwater's counsel, Greg Hunzinker, in an agreement for surgical-support services between SpineFrontier and a company that Dr. Atwater owns called YEHSS, in a manner that attempts to blame others for problems that Dr Atwater reports with that agreement. The notes reflect that Dr. Atwater, at a different point in the interview, told the government that Hunzinger was also asked to review the IME consulting agreement between SpineFrontier and Dr. Atwater that is actually at issue in this case, and that "Hunziker ***approved agreement***. Oct 8 2013" (Exhibit A, at 9 (emphasis added).) Hunziker's approval of the consulting agreement was omitted entirely from the report of the interview.

- The notes reflect that Dr. Atwater told the government, when discussing the IME agreement, that he "understood that you could not simply bill 2 hrs for just doing a surgery." (*Id.* at 9.) That admission by Dr. Atwater that he was acting contrary to the requirements of his agreement with IME was omitted from the report.

- In an exchange about whether Dr. Atwater knew *at the time of his conduct* that he was doing something wrong, or whether he realized it only after the fact – which is relevant, of course, to whether he was knowingly participating in criminal activity as a co-conspirator, as the government charges – the notes reflect inconsistencies in his responses. They report, "***Didn't realize*** until after KB [Kyle Black] left that should have been giving more feedback. Realized in ***hindsight*** it was wrong. *Now* Knows it was wrong/also knew it was wrong at time." (Exhibit A, at 11-12 (emphases added).) The report omitted Dr. Atwater's statements to the effect that he did not know he was doing something wrong until after the fact and in hindsight, including only "He knew it was wrong at the time and continued to submit the hours." (Exhibit B, at 6.)

- The notes reflect that at several points in the interview, Dr. Atwater stated that he viewed the problem with his consulting as one of "documentation." For example, the notes say, "SF consulting was ***not thoroughly documented***. Feels bad that ***it*** happened. They only cared about him submitting hours. Had to know he wasn't ***documenting*** appropriately." (Exhibit A, at 12 (emphases added).) The report of the interview included the statement about Dr. Atwater "feeling bad" and his opinion that SpineFrontier "had to know," but without Dr. Atwater's qualifications that he was discussing insufficient documentation: "SF had to know that Dr. Atwater was not providing appropriate feedback for the amount of consulting hours that he was being paid. Looking back, Dr. Atwater feels bad that this happened." (Exhibit B, at 6.)

By way of further examples, the government also produced on February 22, after defendants filed their motion, other notes of interviews reflecting additional omissions of exculpatory information from earlier-produced reports of interviews. The recently produced notes about another interview of Dr. Atwater the following year, and an interview with another government cooperating witness, Jason Montone revealed the following:

- In contrast to the government's theory that defendants' use of a surgical-support company owned by Dr. Atwater, YEHSS, was a form of kickback in kind by defendants to Dr. Atwater, because YEHSS billed more than the value of its services, an interview of Dr. Atwater suggested that Dr. Atwater saw overbilling by YEHSS as resulting from YEHSS's failures to perform

adequately, as opposed to an arrangement intended to serve as a kickback. For example, in the notes of the 2020 interview, Dr. Atwater described the issue of YEHSS charging too much for its services as resulting from the fact that YEHSS just "did not deliver" on what it had promised. (Exhibit C hereto, at 6.) In fact, that view of overpayments to YEHSS resulting from performance failures by YEHSS, rather than from knowing *quid pro quos*, came in the context of the government discussing with Dr. Atwater a particular document that can be better understood as exculpatory in light of Dr. Atwater's explanation. Yet the report of the interview omitted not only that explanation, but left out entirely that the government and Dr. Atwater were discussing that particular document during the interview. (*See* Exhibit D hereto.)[1]

- Inconsistent with the government's theory that Dr. Atwater conspired to accept consulting payments in exchange for his use of SpineFrontier products, the notes of his 2020 interview reflect him telling the government that he "still did some cases going forward," even after he stopped consulting. (Exhibit C, at 10.) That statement does not appear in the earlier-provided report of the interview.

- With respect to Dr. Montone, another supposed co-conspirator, contemporaneous notes of one of his interviews included a statement that he "***didn't think*** it was [hospital] policy to require" disclosure of his consulting arrangement with SpineFrontier, which removes any suggestion that his non-disclosure to the hospital could itself reflect consciousness of wrongdoing. (Exhibit E hereto, at 4 (emphasis added).) In the report of the interview, however, which the agent drafted two weeks later, the agent changed that statement from what his contemporaneous notes say, to read instead that Dr. Montone "***did not know if*** their policy required that disclosure" – a far less exculpatory version as to Dr. Montone's mindset than the actual stated belief that it was *not* required. (Exhibit F hereto, at 2 (emphasis added).)

- Dr. Montone, like Dr. Atwater, also apparently viewed problems with consulting as ones of paperwork, telling the government, according to the agent's notes, that "Balzer [who handled reporting on consulting for Dr. Montone] not always good with paperwork." (Exhibit E, at 9.) Similar to what the agent did with respect to Dr. Atwater and documentation, the agent left that statement out of the report that was earlier provided to defendants.

- The government reviewed with Dr. Montone categories of possible consulting activities set forth in his consulting agreement, with Montone reporting, according to the earlier-produced report, that he did not generally do the activities listed or provide meaningful consulting work, other than

---

[1] The government's recent disclosure of its intention to use at trial the arrangement with YEHSS as supposed evidence of kickbacks in kind is the subject of a motion *in limine*. (*See* D.E. 251.)

providing information that allowed SpineFrontier to modify certain instruments for Montone's own use (as described in the report, "to suit MONTONE's liking." (Exhibit F, at 5.)) The recently produced notes, however, reflect Montone having provided far more substantive work and value, including him having said that he "Thinks he did participate in design of SF products." (Exhibit E, at 10.) That statement, too, was left out of the report.

By providing misleading reports of interviews conducted years ago, which varied from contemporaneous notes of those interviews in the ways set forth above (and others), the government buried such exculpatory information about two of the alleged co-conspirators whom it still intends to call as witnesses at trial.

All of the notes and reports discussed here were prepared by one particular FBI agent, Terrence Dupont. Some of the changes from notes to reports are so blatant as to suggest that he purposefully sought to omit or downplay exculpatory statements by the witnesses. In fact, Agent Dupont was also responsible for several of the late-disclosed reports and notes of interviews addressed in defendants' opening papers.[2] Tellingly, the government has left Agent Dupont off its witness list, in favor of other agents whom it intends to call as trial witnesses. The still-evolving picture about the unreliability of earlier-produced reports of interviews now gives rise to the need for defendants to conduct a close analysis of all of that particular agent's notes compared to reports,

---

[2] This 2019 interview of Dr. Atwater discussed above, and the discrepancies between the notes and the report of that interview, are particularly telling in this regard in light of the fact that a *different* agent replaced Agent Dupont mid-interview. (*See* Exhibit 2, at 1 ("SA Dupont left the interview part way through and the remainder of the interview was documented by HHS OIG SA Meaghan Fleury.").) As a result, there are two separate sets of notes and two separate reports, covering the two separate parts of the 2019 Dr. Atwater interview. Dr. Atwater apparently repeated some of the above-referenced exculpatory statements that he made to Agent Dupont (but by no means all of them) during the second part of the interview that Agent Dupont did not attend. The report and notes of the second part of the interview reflect, for example, Dr. Atwater suggesting that he did not think he was doing anything wrong "at the time," and that he believed his failures were ones of "documentation." The fact that the agent covering the second part included as relevant such information – statements that defendants now know Dr. Atwater apparently offered multiple times during different parts of the interview – further suggests that Agent Dupont acted intentionally in choosing to omit such relevant and exculpatory statements when preparing his report of the first part of the interview.

a time-consuming and laborious process that defendants should not be forced to undertake in the weeks before trial.

In fact, even the latest productions still leave obvious gaps in *Brady* material, including, for example, with respect to Dr. Atwater. Among the late-produced *Brady* materials was a letter from Dr. Atwater's counsel following Dr. Atwater's meeting with he government, in which counsel distanced Dr. Atwater from his own initial, exculpatory statements to the government because of the prosecutor having "pointed out the government's concern" and "explained it to him at the proffer session," leading to Dr. Atwater realizing the jeopardy he was in and offering to cooperate fully with the government to protect himself. Even putting aside that the government did not produce this letter until three years after its deadline, the most recent productions fail to provide information about the statements prosecutors made to Dr. Atwater that apparently caused him to dramatically change his story and decide that he should begin cooperating against the defendants. While the results of the government's pressure on Dr. Atwater are coming to light, the underlying information about how the government applied that pressure remain undisclosed.

More generally, given the enormous volume of late-disclosed *Brady* material that has arrived in the last several weeks, defendants are now burdened with having to attempt to review, analyze, and prepare to address all late-produced material, as they are also engaged in other, more typical trial-preparation activities in the weeks before trial – an impossible task that they will not be able to complete in time to make use of all the relevant (and exculpatory) material that they should have been given far earlier. Indeed, as of this reply, defendants have not even been able to get through all material produced before their motion for continuance, let alone the material produced even more recently.

Furthermore, in light of remaining gaps in productions and positions that the government

has taken, and maintains even now, neither the defense nor the Court can conclude that the government has fulfilled its *Brady* obligations. In a misguided effort to minimize its *Brady* violations, the government's opposition characterized some of the withheld material as mere "whitepapers" or other forms of "attorney advocacy." (ECF No. 266, at 2-8.) The prosecution erroneously contends that if an unindicted co-conspirator flatly denies, directly or indirectly through his counsel, that he or she participated in the charged conspiracy, that fact is somehow not exculpatory or otherwise material to the defense. As discussed in defendants' opening brief, the prosecution has previously made that same baseless argument. The defense responded, (and in both a discovery letter and their opening brief, cited) to cases holding that attorney proffers are discoverable and, if exculpatory, *Brady* material. In its opposition, the government continues to ignore relevant case law, citing instead two cases that ruled a witness could not be impeached at trial by statements of an attorney. (ECF 266, at 6.) One of those cases, *United States v. Cuevas Pimental*, 815 F. Supp. 81 (D. Conn. 1993), concerned Fed. R. Evid. 613(b), not *Brady*. Indeed, the word *Brady* never appears in the decision. And *SEC v. Arrowood*, No. 14-CV-0082, 2014 U.S. Dist. LEXIS 68669 (N.D. Ga. May 19, 2014), cited *Cuevas Pimental* without adding anything to it. The issue on this motion, however, which the government does not meaningfully address, is whether the defense was entitled to all of this exculpatory evidence, which the government has possessed for years, so that it could conduct any necessary investigation and prepare for trial – and if so, why the prosecution waited for years to produce it, in violation of *Brady*, the Federal Rules, and this Court's orders.

"The customary remedy for a Brady violation that surfaces mid-trial is a continuance and a concomitant opportunity to analyze the new information and, if necessary, recall witnesses." *United States v. Mathur*, 624 F.3d 498, 506 (1st Cir. 2010) ("the able district court, concerned about

whether the late disclosure might inhibit that effort, went to great lengths to ensure that the defendant had a full and fair opportunity to use the new material"). "A continuance affords time to study the newly emergent information, consider its possible ramifications, change trial strategy (if necessary), assess any potential prejudice, and determine how best to use the information." *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir. 1993). While the length of a continuance from late-produced *Brady* material and changes to a prosecution is case-specific, the defense should be "given sufficient lead time to utilize the evidence effectively," and "in cases of delayed disclosure, a court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted." *United States v. Devin*, 918 F.2d 280, 290 (1st Cir. 1990).

The defense has created a record showing late and incomplete productions of substantial *Brady* material by the government and the need for a continuance in fairness to the defendants. At the outset of the case, the Court ordered the government to produce then-existing *Brady* material by October 2021, along with warnings to the government of consequences for failure to do so. The Court worked with the parties to identify a potential new start date for trial, July 21, 2025. Under the circumstances, the government has failed to explain why such a continuance is not appropriate to allow defendants to prepare their defense against whichever charges remain at the start of trial.

## II. Fundamental Fairness Requires that the Defendants Have Sufficient Time to Prepare Expert Testimony that Has Recently Emerged as Critical Based on the Government's Latest Changes to the Charges.

Defendants are entitled to retain and present expert testimony on issues that have arisen based on late-*Brady* disclosures and the government's changes to the charges. Expert witnesses can provide important testimony in cases arising under Anti-Kickback Statute. In *United States ex rel. Witkin v. Medtronic, Inc*., No. 1:11-CV-10790-IT, 2024 WL 1892405, at *15 (D. Mass. Mar. 31, 2024), this Court explained the role that expert testimony and surrounding circumstances can

play for the defense, including opinions that bear on the fair value of payments compared to

supposed bribes, which can also bear on willfulness and conspiratorial intent issues:

> To the extent Medtronic attempts to question McNamara's credibility
> generally and offers an expert who reaches a different conclusion, that is a
> determination for the trier of fact, not the court. "So long as an expert's scientific
> testimony rests upon good grounds, based on what is known, it should be tested by
> the adversarial process, rather than excluded for fear that jurors will not be able to
> handle the scientific complexities." *Milward v. Acuity Specialty Prod. Grp., Inc*.,
> 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks and citation omitted).
> "Vigorous cross-examination, presentation of contrary evidence, and careful
> instruction on the burden of proof are the traditional and appropriate means of
> attacking shaky but admissible evidence." *Id*. (quoting *Daubert v. Merrell Dow.
> Pharm., Inc*., 509 U.S. 579, 596 (1993)). Thus, because resolution of this fair-
> market-value dispute would require the court to choose between the well-grounded
> opinions of competing experts, summary judgment is inappropriate on the issue.

*Id*. at *15. Such concerns for the proper functioning of the adversarial process and the implications

for depriving a party of the use of expert testimony, should weigh even more heavily in the context

of a criminal prosecution where defendants' liberty is at stake.

The recent changes in the government's case, made as it reveals years-long *Brady*

violations, include its reduction of payments at issue from $2.4 million to only about $500,000,

based on the Indictment's own allegations of payments. The target continues to move as the

government moved to dismiss yet another count, involving yet another surgeon, after defendants

filed their continuance motion. As defendants work to adjust to the new scope of the case, they

have also calculated that SpineFrontier's revenue linked to the surgeons who supposedly received

"bribes" and who are the subject of the three remaining counts, appears to be under 7%, compared

to over 30% when all six substantive counts remained at issue. Thus, while the government

suggests that its "narrowing" of the case should only make things easier for defendants, this

"narrowing" has had a significant substantive effect on the nature of the allegations and the manner

in which defendants will defend themselves. In particular, the defense believes that expert

testimony can now play a critical role at trial, helping to establish that innovations from the

consulting program were far more valuable than the marginal sales, if any, that the government now intends to link to the limited remaining alleged "bribes." Enormous value created by legitimate consulting work as compared to minimal marginal sales, if any, now at issue, speaks to the defendants' actual intent in using consultants for an intellectual property-driven business, and is thus particularly important to *mens rea* issues that will be central to this case at trial. In the limited time since the government has shifted its case from the charges in the Indictment – including most recently by dismissing yet another count involving one particular surgeon – defendants have worked to prepare their defense, including by identifying specific expert witnesses who could be available to address value issues concerning more than 50 patents for the potential new trial date of July 21, 2025, but the preparation of such analyses and testimony could not be ready for the currently scheduled trial date.

This Court should grant a continuance to allow defendants to pursue an effective defense strategy for use of expert testimony that has recently become possible because of the government's substantial reduction, by more than 75%, of the total amount of payments at issue.

### III.    An Evidentiary Hearing is Required to Address the Pattern of *Brady* Violations (and Ongoing Disclosures) and Improper Pressure by a Former AUSA and Other Government Agents on Fact Witnesses.

The record on this motion, and ongoing disclosures and efforts by the government to change the nature of the case, warrant an evidentiary hearing concerning how a mountain of *Brady* material remained withheld so long and how multiple witnesses no longer support the charges. In one of the few cases out there concerning comparable government misconduct, the court emphasized the importance of its evidentiary hearing and what it revealed, and dismissed charges albeit without prejudice:

> [T]he Government recommends almost a "harmless error" approach as a sanction for this egregious error, contending that no harsh remedy should follow because all underlying documents were finally produced to the defendants.

The Court rejects this notion. Absolutely no justification exists for revising documents that are being turned over to an adversary in litigation once the issue has been raised, particularly without notice of revision to the opposition … even though the effect of the alterations was minimal. Similarly, there is no justification for creating documents during this time period, without indicating so, no matter what the motive.

The Government's argument overlooks one critical consequence that would have resulted *if the Government's representations and the documents had been accepted at face value: there would have been no hearing, and the truth would have never been known.* As tragic as are the events which transpired during the evidentiary hearing, it would have been even worse for the Court to have denied the defendants a hearing. *The fact that all the relevant documents were finally produced only occurred because of the Omni defendants' strenuous efforts*.

*    *    *    *

The Court is equally troubled by the consistent pattern of false testimony and lack of candor exhibited by various Government representatives who played prominent roles in this tax investigation. The details have already been recounted. This Court has considered carefully the large volume of disturbing testimony on a whole range of issues.

*    *    *    *

Thus, in exercising the supervisory power entrusted to it to ensure the smooth and proper administration of justice, the Court has determined that the indictment should be dismissed. Twenty-eight days of hearings produced example after example of conduct unbecoming to the Government. Innocent misrecollection by witnesses is a common occurrence and is excusable, but the cumulative effect of the evidence presented here adds up to more than innocent misrecollection. Defendants should not be forced to conduct lengthy hearings to learn the basic essential facts needed as a predicate to a pretrial motion. Courts should not be forced to question whether government witnesses are testifying truthfully and fully. The Government's conduct was patently egregious and cannot be tolerated or condoned. Its manner of proceeding shocks the Court's conscience. The indictment must be dismissed as a prophylactic sanction for the consistent course of entrenched and flagrant misconduct. *United States v. Birdman*, 602 F.2d 547, 559 (3d Cir.1979), cert. denied, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668, 445 U.S. 906, 100 S.Ct. 1084, 63 L.Ed.2d 322 (1980).

…[T]he indictment will be dismissed without prejudice. Although defendants have certain rights which have been violated here, they have no concomitant right to bar forever investigation into their alleged criminal conduct. *United States v. Lawson*, 502 F.Supp. at 172. The Court recognizes that the passage of time may have caused

14

> the statute of limitations to run as to certain tax years charged in the Indictment.
> This fact does not affect the decision to dismiss the Indictment without prejudice.

*United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1439-40 (D. Md. 1986). Here, the defendants seek (at least at this time) the far less drastic remedies of a continuance to allow them adequate time to adjust to significant changes in the case and to mountains of late-disclosed *Brady* information, and an evidentiary hearing on the scope of and reasons for *Brady* issues. Pressure tactics that the government employed when developing its case early on appear not to have worked in the long run, at least concerning certain witnesses, or have combined with late *Brady* disclosures to present unacceptable risks to the government, leading to efforts by the government to avoid testimony by witnesses through the dropping of charges shortly before trial. When such odd developments occur and only unravel shortly before trial, the Court should allow an evidentiary hearing to avoid a situation in which the truth would "never be known." *Id.*

## Conclusion

For the reasons set forth herein, defendants respectfully request that the Court allow this motion and continue the March 17, 2025 trial date in this matter until July 21, 2025, the date for which all parties have confirmed their availability. Defendants also respectfully request that an evidentiary hearing be held (and suggest it could be held on March 17, 2025, in lieu of the currently scheduled start of jury selection), to address whether the government's concealment of *Brady* issues, combined with threats and pressure on fact witnesses, amount to outrageous government conduct that warrants dismissal.

Respectfully submitted,

**KINGSLEY CHIN**

By his attorneys,

/s/ *Joshua Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

**ADITYA HUMAD**

By his attorneys,

/s/ *William Fick*
Daniel N. Marx (BBO #674523)
William W. Fick (BBO #650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com
wfick@fickmarx.com

## Certificate of Service

I, William W. Fick, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 4, 2025.

/s/ *William W. Fick*