# EXHIBIT B

FD-302 (Rev. 5-8-10)



FEDERAL BUREAU OF INVESTIGATION

Date of entry  05/09/2019

    Dr. John Atwater, date of birth (DOB) ▓▓▓▓▓▓▓, was interviewed at the US Attorney's Office in Boston, MA, pursuant to a proffer agreement. Also present for the interview were AUSAs Abraham George, Patrick Callahan, David Derusha, as well as Atwater's attorney, Martin Merritt. After being advised of the identity of the interviewing Agent and the nature of the interview, Atwater provided the following information:

*(Agent Note: SA Dupont left the interview part way through and the remainder of the interview was documented by HHS OIG SA Meaghan Fleury. During the interview, Atwater was shown the following documents: Gabriel00003268, YEH000037, USAO-COM-000115, YEH000086, JGA000029, JGA000744, JGA000090, JGA000126, JGA000131, JGA0002564, JGA0001555, JGA000323-324, YEH000082)*

    Atwater attended Yale University for undergraduate studies and graduated in 1989. He then attended the University of Virginia Medical school and graduated in 1993. Atwater then did a one year internship at Johns Hopkins, before doing his residency at Howard in 1994. In 1998, Atwater completed his residency and did a one year spine fellowship at Leatherman in Louisville, Kentucky.

    In 1999, Atwater was offered and accepted a job at McLean County Orthopedics (MCO) in Bloomington, Illinois. After approximately two years, Atwater was made a partner in the practice and given a 10% ownership stake. There were approximately 10 other partners at MCO. The revenue at MCO was based on an "eat what you kill" basis, except for ancillary services such as MRIs, ect., which were shared evenly by the partners. Approximately 95% of the surgeries done by Atwater were elective spine related surgeries. The other 5% of surgeries performed by Atwater were for emergencies when he was on call. Between 2010 to 2014, Atwater estimated that his annual income was approximately $800,000 - $1,000,000. About 90% of this income was derived from his surgical practice, and the other 10% was derived from his various business ventures.

    Atwater had privileges at Bromen Hospital, St. Joseph's Hospital, Gibson City Hospital, the Center for Outpatient Medicine (TCOM), Presence Hospital, and Peoria Day Surgery. Atwater saw all types of patients at

Investigation on  04/11/2019  at  Boston, Massachusetts, United States (In Person)

File # 209A-BS-6566377                                                  Date drafted  04/16/2019

by  DUPONT TERRENCE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. John Atwater , On 04/11/2019 , Page 2 of 6

these hospitals, including private insurance and medicare or medicaid. Atwater only did occasional surgeries at Peoria Day Surgery and TCOM. He also had a 4% ownership stake in TCOM.

In October 2014, Atwater and his family moved to Vero Beach, Florida. Atwater took a job at Vero Orthopedics Vero Neurology (VOVN). Atwater moved to Florida in part because his wife wanted to move to a warmer climate. Atwater worked at VOVN for a few years before opening his own practice under the name Ortho Spine Care America. For a period of time Dr. Hussamey was a partner, however they recently dissolved the partnership. Atwater's practice has had a few different names, but he currently bills under "John Atwater MD." Atwater has privileges in Florida at Indian River Medical Center, Advanced Center for Surgery, and Grove Surgery Center. Atwater is a part owner of Indian River Medical Center. Atwater estimated that between 2014 to 2016, he earned $400,000 from his surgical practice, and approximately $1,000,000 from his various business ventures. In 2017, Atwater broke even on his surgical practice, but still made $1,000,000 from his businesses.

Atwater attributed the increase in revenue from his businesses to a purchase he made of another neuromonitoring company. Atwater also changed billing companies after 2014 and this helped to increase the revenue of his neuromonitoring company, which is called DND. He also owns a company called Your Extra Hands Surgical Services (YEHSS), however YEHSS does not generate as much income as DND.

Atwater did not remember receiving formal compliance training, however he was generally aware of the anti-kickback statute, Stark law, and Sunshine Act. He also generally understood that the government could sue for false health care claims. Most of his compliance related knowledge came from working in the industry, in particular his time at McLean County Orthopedics. Atwater also learned some compliance rules while operating his DND. Atwater tried to get an exemption from the state of Illinois that would allow him to use DND during his own surgeries. During this process, Dr. Atwater consulted with an attorney who happened to be the father of another partner form Mclean County Orthopedics, Dr. Craig Carmichael. Atwater was denied the exemption and ended up using a different neuromonitoring company that was owned by Dr. Carmichael.

YEHSS was founded in approximately 2007 by Atwater and a group of surgical techs. Initially, Atwater owned 51% and the remaining 49% was split by the other partners. After a few years, Atwater bought out the other partners because of a dispute over who would pay for overhead costs. Atwater owned 100% of YEHSS until he brought in Dr. Greico to be a 10% partner. This is the current ownership structure of YEHSS. Currently,

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. John Atwater , On 04/11/2019 , Page 3 of 6

YEHSS has four administrative employees and six to seven surgical assistants. YEHSS has bank accounts at PNC Bank.

Kyle Black, who was the executive director of YEHSS, was hired around the time that Atwater bought out the other partners. Black had been recommended to Atwater by one of his former partners as someone who could help grow YEHSS's business. Shortly after hiring Black, Atwater learned that Black had previously been accused of misusing prescription drugs with his father in law in Kentucky. Black told Atwater that he had been cleared of any wrongdoing. Atwater kept Black as the executive director and was pleased with his overall work performance. Black was a hard worker and appeared to be aggressively pursing new business opportunities. Atwater did hear grumblings from his staff that they did not trust Black. In particular, surgical tech Sid Kessinger was very distrustful of Black. Kessinger did not have much respect for Black. Kessinger and Black would sometimes travel together to visit other doctors to try and grow YEHSS's business. Kessinger said at one point that Black did not seem to have a real understanding of the business and said things in front of prospective doctors that did not make sense. Black had been making approximately $179,000 a year, however in 2015 he requested a raise to $250,000. YEHSS was barely breaking even at this point and Atwater refused Black's request. Black ended up leaving YEHSS sometime after his salary request was denied.

Atwater founded DND in the early 2000s prior to founding YEHSS. He owns 99% of DND, and the other 1% is owned by Dr. Greico. Neuromonitoring is the process by which electrodes are placed on the muscles of a patient to get a baseline of activity while the patient is under anesthesia. The neuromonitoring system monitors a patients activity during surgery and notifies a surgeon if a blood vessel were to be cut inadvertently. Neuromonitoring is necessary based on the area of practice for a particular surgeon. For example, in Atwater's opinion, doing a lateral spine surgery without neuromonitoring would be below the standard level of care. There are individuals who are trained to interpret the output of a neuromonitoring device. The people who interpret the output are based in different parts of the county. If they notice an issue during a surgery, there is a way to notify the technician who is in the operating room. Medicare pays for the professional interpretation of neuromonitoring. Atwater uses neuromonitoring in all of his cases, however he does not use DND. Atwater estimated that alerts from a neuromonitoring system made him alter his surgery in only two cases.

Atwater fist met Kingsley Chin in 2013 at a National American Spine meeting. Atwater had previously heard of Chin from his work at Stryker, where Chin helped develop the Mantis System. Chin owned a few different

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. John Atwater  , On  04/11/2019  , Page  4  of  6

companies under the KIC Ventures umbrella. Atwater was aware of Spine Frontier (SF), AxioMed, IME, and Sensedriver. Vanessa Dudley, who was Chin's wife, worked for IME. Chin and Humad both asked Atwater to invest in Chin's companies, however he declined. Atwater did not start using SF products until after a meeting he had with Dr. Gabriel and Chin. Dr. Gabriel had lived in southern Illinois for a while before moving to Ohio. He was a big proponent of SF. Atwater also believed that Dr. Gabriel had an ownership interest in SF. Prior to using SF, Atwater used Nuvasive, Medtronic, Depuy, and Synthes among others. Atwater had a consulting agreement with Nuvasive where he took part in speaker programs.

Chin switched to DND in 2014. Atwater did not know if Chin used DND exclusively. Chin used DND from 2014-2016, however in 2016 DND no longer had the resources to cover Chin's surgeries in Florida. It was tough to recruit neuromonitoring technicians in Florida, and Chin did not do enough surgeries to justify hiring a technician in Florida.

Around the time that Atwater started using SF products, he signed a consulting agreement with SF. YEHSS also formed an agreement with SF where a YEHSS surgical tech would act as a SF rep for Atwater. SF had a difficult time finding a full time sales rep for Atwater's area, and it made sense to use Atwater's surgical techs on days that they were not scheduled as a surgical tech. Atwater only remembered Kessinger and Rylan Miyat signing on as SF sales reps. Kessinger did the vast majority of Atwater's cases because Miyat left YEHSS shortly after signing up as a sales rep. The agreement between SF and YEHSS was for YEHSS to be paid $3,200 a month to manage Kessinger or Miyat. Kessinger and Miyat would also receive a separate monthly payment from SF to cover Atwater's cases. Atwater did not believe that a FMV analysis was conducted on the $3,200 management fee. Black negotiated the YEHSS contract with SF. Black initiated, wrote, and signed the contract with SF. Black and Humad negotiated the $3,200 management fee and the services that would be provided to SF. At the time, Black was aware that YEHSS was barely breaking even as a company and he was likely chasing additional revenue for YEHSS.

At the time the agreement was signed, Atwater believed that Black would actually provide the services that were outlined in the agreement with SF. After a couple of months Atwater realized that YEHSS was being paid more than FMV for the services that were being provided. Atwater started to have concerns that the $3,200 payment could be considered a kickback. By May of 2014, Dr. Atwater realized that Black was not doing anything close to $3,200 worth of services for SF. At one point there was a dispute with

SF over money that was owed to YEHSS, and Black tried to collect the additional money from YEHSS. During this process, Atwater realized that YEHSS was getting paid a lot of money from SF.

Atwater was aware that Black spoke to other doctors a handful of times about SF, including Dr. Sibeley and Dr. Rachman. Black also dealt with some of the local hospitals, Praveena and Gibson City, to get SF products approved at those hospitals. Black would also coordinate Atwater's SF cases with Kessinger. Atwater estimated that maybe the compensation should have been $1,000 a month. Atwater believed that Black put this arrangement together because he was going after extra money to help pay YEHSS's operating expenses. Atwater did not personally receive money from this arrangement, however it did help the bottom line at YEHSS. The total money paid to YEHSS from SF was approximately $20,000. Atwater was also aware that YEHSS was paid $3,200 after he had moved to Florida and stopped doing SF cases.

Atwater was led to believe by Black and Humad that there was a legal opinion blessing the agreement between SF and YEHSS. When the arrangement was first proposed in the fall of 2013, Atwater sent the agreement to his attorney, Greg Hunziker, to review. Hunziker did not give an opinion on the agreement and sent it to another law firm, McGuire Woods, to review. In January 2014, Humad and Hunziker spoke about the consulting and YEHSS agreements. After that call, Black sent an email stating that Hunziker had signed off on the agreement, however he did not copy Hunziker. Eventually, Dr. Atwater learned that the contract had not been approved by Hunziker or McGuire Woods. In May 2014, Black sent an email to an attorney from McGuire Woods stating that Dr. Atwater no longer needed a legal opinion, however he did not copy Dr. Atwater on the email. Therefore, Atwater was under the impression that the agreement had been approved.

In addition to the agreement between YEHSS and SF, Atwater also had a consulting agreement with SF (through IME). Atwater admitted that one of the reasons that he used SF products was because of the consulting agreements for himself and YEHSS. He liked the SF products and would have used them otherwise, however the consulting agreements did play a role in his decision to use the products. Atwater did not remember if he had used SF products prior to signing up as a consultant. Atwater believed that he signed up as a consultant in the fall of 2013 after meeting with Chin. Chin sold him on the idea of evaluating SF products. Atwater knew that Dudley worked for IME, but he did not know that SF was the only client of IME. He only did work for SF through IME.

Atwater's understanding of the consulting agreement was that he could log hours for the time he spent evaluating products and IME would decide

how much to approve. Atwater would submit hours for the time he spent evaluating a product. The majority of the time that Atwater submitted to IME was for time spent evaluating the products during surgery. His understanding was that even if it took him five hours to do a lumbar surgery, he would get paid two hours of consulting. Atwater was told by Humad that the amount of hours he was approved for was based on the number of SF cases that he did during that time period. He understood that he would receive $250 for a cervical case and $500 for a lumbar case. Atwater did nothing different from a normal surgery when he did a SF surgery where he evaluated the product.

Atwater could remember three times that an engineer from SF came out to Illinois for a case. Atwater also occasionally spoke to the SF engineers on the phone. Emails, (JGA000126, JGA000131, JGA000264), were examples of feedback that Atwater would have provided to an engineer when they came for a case. They spoke for between 1-2 hours. For all the other cases where a SF engineer was not present, Atwater would provide Black the information to enter into the IME portal. This would include any feedback that Atwater had for SF. The feedback would be entered into the comments section of the IME portal. The consulting hours would be entered into the IME portal based on the procedure that was performed. The amount of time entered in the "cervical" or "lumbar" section of the IME portal reflected the hours spent evaluating the products during those respective procedures. If Atwater spent additional time outside the operating room discussing the products with an engineer that time would have been entered into the "discuss time" section of the portal.

Atwater admitted that he did not give appropriate feedback on the cases that he submitted consulting hours. He knew it was wrong at the time and continued to submit the hours. He should have been more diligent about submitting the hours himself and ensuring that the proper feedback was provided. Atwater was frustrated with SF because it did not seem like they were interested in his feedback. He did not notice any changes that were made to SF products based on his feedback. Neither Humad, nor anyone else from SF, ever told him that his feedback was inadequate. SF had to know that Dr. Atwater was not providing appropriate feedback for the amount of consulting hours that he was being paid. Looking back, Dr. Atwater feels bad that this happened.