# EXHIBIT D

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry 02/12/2020

Dr. JOHN ATWATER, date of birth (DOB) ▓▓▓▓▓▓▓, was interviewed at the US Attorney's office in Boston, Massachusetts. Also present for the interview were AUSA's Abraham George, David Derusha, and Patrick Callahan, as well as ATWATER's attorney Mindy Sauter. After being advised of the identity of the interviewing Agent and the nature of the interview, ATWATER provided the following information:

ATWATER is not a part owner in Indian River, he is a part owner in the Advanced Center for Medicine.

KYLE BLACK asked for a raise in 2014 to $250,000 but ATWATER was only able to offer him a raise to $179,000. YOUR EXTRA HANDS SURGICAL SERVICES (YEHSS) continued to have financial difficulty and in 2015 ATWATER asked BLACK to take a pay decrease. The surgical assistants had already taken a pay decrease and ATWATER thought it would be fair for BLACK to take a decrease as well. BLACK did not want to take a pay decrease and ended up leaving YEHSS. ATWATER thought it was hypocritical of BLACK to ask the other employees to take a pay decrease when he was not willing to take one himself. YEHSS was barely breaking even at the time and for a few months ATWATER put in $10,000 to $15,000 of his own money to cover payroll. ATWATER estimated that he put in $50,000 total to cover payroll in 2015. For one month Dr. GREICO and BLACK also put in some of their own money to cover payroll. ATWATER quickly re-payed BLACK for the money that he put in.

ATWATER's wife did not want him to get involved with KINGSLEY CHIN. She met him once and got a bad vibe from CHIN. Anytime ATWATER brought up CHIN in front of his wife she told him to stay away. This is one of the reasons that ATWATER never invested with CHIN even though he frequently asked ATWATER to invest. ATWATER also did not like that CHIN was so controlling and this deterred him from investing.

Investigation on 01/09/2020 at Boston, Massachusetts, United States (In Person)

File # 209A-BS-6566377     Date drafted 01/10/2020

by DUPONT TERRENCE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. Atwater , On 01/09/2020 , Page 2 of 8

    CHIN only does LOP cases and private insurance, he does not have a Medicare or Medicaid number. CHIN told ATWATER that LOP cases are how he makes his money. ATWATER did not know how CHIN found his LOP patients. ATWATER has done some LOP cases in the past, but he has not done any for CHIN. ATWATER usually receives LOP referrals from a chiropractor who initially treats the patient. ATWATER has always been paid for the LOP cases that he did. At one time CHIN offered to purchase ATWATER's outstanding receivables for LOP cases at a cost of twice the Medicare rate. ATWATER did not end up selling his receivables to CHIN. The decision about what medical device product to use in a surgery did not change for ATWATER if he was doing a traditional case or an LOP case. He has never been paid, or paid someone else, a referral fee for an LOP case. He is not aware of CHIN paying referral fees either.

    ATWATER first did a SF case in approximately June of 2013 after being approached by SF sales rep NATHAN FRANCOIS. ATWATER did not remember much about the sales pitch by FRANCOIS but he did remember hearing about the SF consulting program. ATWATER continued to use other device companies like Nuvasive in addition to SF going forward. ATWATER first met CHIN and HUMAD at the annual NAS conference in September of 2013. After this conference, ATWATER connected BLACK with SF. BLACK and HUMAD then came up with the YEHSS agreement. The YEHSS agreement came about partially because FRANCOIS quit SF and SF did not have a sales rep in the area. BLACK and HUMAD came up with the idea to have YEHSS employees RYLAN MIYAT and SID KESSINGER act as SF sales reps on ATWATER's SF cases. They also came up with the service agreement for YEHSS to manage MIYAT and KESSINGER for $3,200 a month. ATWATER remembered seeing emails between HUMAD and BLACK discussing the arrangement. ATWATER was not involved in the discussions about the creation of the agreement, but he did approve the contract before it was put into effect. ATWATER remembered telling BLACK that if his attorney, GREG HUNZIKER, approved the contract, then it was fine with him. HUNZIKER did bless the contract, but only what was actually written in the contract. HUNZIKER was unaware of what was actually being done in practice. ATWATER also thought that HUNZIKER asked a partner for a second opinion, however he did not think HUNZIKER ever received a second opinion.

    ATWATER was aware that the agreement with SF would pay YEHSS $3,200 to manage MIYAT or KESSINGER. ATWATER also thought that BLACK would be

responsible for trying to get SF approved in additional hospitals. In the beginning ATWATER thought that the agreement was legitimate, however he came to realize that YEHSS was not doing enough work to justify the $3,200 monthly payment. ATWATER would occasionally ask BLACK if he was doing anything for the SF agreement and BLACK would list the things that he supposedly did. In regards to the agreement for MIYAT, BLACK did not do much because MIYAT left YEHSS quickly. With the agreement for KESSINGER, ATWATER believed that BLACK was aggressive in reaching out to other surgeons and hospitals on behalf of SF. ATWATER did not have a way of verifying what BLACK was doing, he just relied on what BLACK said. However, ATWATER was aware that BLACK had arranged for SF products to be approved at Gibson City Hospital and Presence Hospital. BLACK also told ATWATER that he would arrange for the SF products to be ready for KESSINGER for ATWATER's cases. ATWATER did not know if BLACK actually did this or if KESSINGER did this on his own.

ATWATER essentially thought of the YEHSS as a distributor for SF. ATWATER believed that after April 2015 there was not too much for BLACK to do to justify the $3,200 payment. ATWATER thought that the majority of BLACK's work for SF would have occured in February, March, and April. In May, ATWATER started to realize that there was not a justification for the $3,200 payment. ATWATER came to this realization after noticing that BLACK had not expanded the SF business outside of the surgeries that ATWATER was already doing. BLACK did not find any other surgeons in the area to use SF products and only covered SF cases for ATWATER, and this made ATWATER nervous about the agreement. ATWATER continued to accept money from SF after realizing that YEHSS was not doing enough to justify the payment. In hindsight, ATWATER realized that he should not have continued to accept the payments, or they should have done a fair market analysis to determine a proper lower payment. ATWATER knew that it was wrong to accept payment if YEHSS was not providing services.

Looking at documents YEH-000086 and JGA-000351, ATWATER did not remember talking to BLACK about pitching other surgeons on the YEHSS-SF model even though it was something that CHIN wanted. In the email ATWATER was saying that if you cut out the sales rep and save money on the commissions, then those cost savings could be passed on to the facility. CHIN wanted to cut out the distributor to save on commissions.

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Atwater    , On  01/09/2020  , Page  4 of 8

Looking at the service agreement with SF (SF-HUM-00218840), ATWATER agreed that if item numbers 1-5 of the agreement were already being done by KESSINGER or MIYAT then it would be a bogus agreement. ATWATER had the understanding that BLACK was doing things for SF. Looking at each bullet point, ATWATER stated:

- #1 - BLACK never said that he was managing KESSINGER
- #2 - ATWATER did not actually know if BLACK or KESSINGER arranged for the SF products to be available for each case. ATWATER would notify BLACK when he booked a new SF case so he assumed BLACK was responsible for coordinating the products
- #3 - BLACK told ATWATER he was working on pricing agreements
- #4 - ATWATER was aware of one instance where BLACK followed up on a purchase order for SF
- #5 - ATWATER had no idea what BLACK did to ensure KESSINGER was meeting the requirements of his sales representative agreement
- #6 - YEHSS already had insurance and this was not applicable

ATWATER moved to Florida in October 2014. ATWATER would still inform BLACK when he scheduled his SF cases in Florida. ATWATER thought that BLACK may have been arranging for SF products to be available for ATWATER in Florida. While in Florida, ATWATER's SF cases were covered by Andre Laloo, who was a SF sales rep. As with the cases covered by KESSINGER, ATWATER did not know if BLACK or the sales rep actually did all of the work. There was a period of time in early 2015 where BLACK and ATWATER were trying to get paid by SF for the YEHSS agreement after ATWATER had moved to Florda. ATWATER's neuromonitoring business, DND, was also owed money by CHIN for cases where he used DND. Eventually ATWATER realized that the money that he thought was owed to YEHSS after October 2014 was too much and should be written off. ATWATER realized that there was not enough work done to justify the payments, especially after he moved to Florida. However, nobody from SF ever told ATWATER that YEHSS was not doing enough to justify the money they were being paid.

In March 2015, BLACK was still trying to collect the YEHSS money for the months after ATWATER moved to Florida (SF-ATW-00001882). Part of BLACK's argument was that they had never formally executed a termination of the original agreement and therefore YEHSS was still owed the money. After reviewing the email, ATWATER did not know why BLACK stated that KESSINGER was prepared to assist ATWATER in Florida. KESSINGER never had any intention of moving to Florida and ATWATER did not remember asking KESSINGER to come

to Florida. KESSINGER could have potentially helped on a one off basis if needed, however this never happened.

In April 2015, ATWATER and HUMAD had a conversation about the money that was owed to ATWATER, YEHSS, and DND from SF. ATWATER had been owed IME payments for consulting hours that he had submitted for February 2015. HUMAD told ATWATER that he would get paid one hour for cervical cases and two hours for lumbar cases that he did in February 2015. HUMAD also said that LESS did not have the money to pay the full DND balance so they would start to make payments and try to pay it off as revenue grew. ATWATER agreed to write off the YEHSS money that he and BLACK were trying to collect after October 2014. JGA-000222 was an email that HUMAD sent to ATWATER after they had this phone conversation.

The check marks on ATWATER's SF consulting agreement (JGA 000834) are not his handwriting. ATWATER initially thought when he signed the IME agreement (JGA 000834) that he might consult on other companies products, but he eventually realized that it was only going to be SF. ATWATER realized this a couple months into the IME agreement. The handwriting on the document is not his handwriting however it is his signature. ATWATER was interested in being an expert witness and training, among other things, when he signed the agreement. ATWATER remembered first hearing about IME at the September NAS meeting when CHIN mentioned it. CHIN had said he would have someone send ATWATER the IME stuff. IME was presented to him as an independent 3rd party. ATWATER was also not aware that IME was charging a 5% fee but he is not surprised because CHIN is an opportunist. This arrangement would be wrong if IME was owned by SF and had no other clients.

ATWATER would tell BLACK his IME hours and BLACK would enter the numbers into the IME portal. ATWATER would relay to BLACK the number of hours that he did in a given period. There may have been one time where ATWATER told BLACK to include some information other than hours in the portal submission. Looking at an email from BLACK on November 6, 2013 (JGA 000744), ATWATER did not remember submitting hours in 2013. ATWATER was not paid the $1,000-$1,500 that was referenced in the email. ATWATER also did not know exactly what HUMAD told BLACK, but it doesn't surprise ATWATER that BLACK said they could log hours every time ATWATER did a case. ATWATER remembered CHIN and HUMAD saying to always log hours when consulting. At the time, ATWATER was not aware that time in the operating room was not supposed to be billed.

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. Atwater , On 01/09/2020 , Page 6 of 8

ATWATER understood that HUMAD would check the cases that were performed by ATWATER before approving the hours for a given period of time.

ATWATER did not remember how he knew prior to the April 2015 call with HUMAD that he should bill by case. ATWATER would give the hours to BLACK based on how long a case actually took. For example, if a lumbar case took four hours, ATWATER would bill for four hours and not two hours. ATWATER realized that he was not actually consulting for the entire time he was doing a case, and therefore the hours he submitted were greater than the actual time he spent consulting. ATWATER knew that it was wrong to bill for more hours than he actually did consulting.  ATWATER estimated that for any given case only 5-10% of time was actually spent consulting. For a four hour case, that would mean less than 30 minutes was spent consulting. ATWATER remembered for his first SF case at Gibson City Hospital he actually billed 6 hours consulting on a case that only took 4 hours. He also billed 6 hours training time for this same case because he was training KESSINGER during the case. That meant for a 4 hour case ATWATER billed 12 hours of consulting. ATWATER knew this was wrong and considered it to be "milking the system."

From February 2014 to February 2015, the hours submitted by ATWATER were never addressed. April 2015 was the first time that ATWATER remembered talking to SF about how many hours to bill. This is where he was told to bill one hour for cervical cases and two hours for lumbar cases. Going forward ATWATER tried to follow this guidance, but may not have followed it perfectly. ATWATER did not notice that SF was cutting his hours in 2015. Nobody from SF complained about the quality of ATWATER's feedback, or the lack thereof.

When ATWATER did cases in Florida there was usually an engineer present for the case. This was partly because SF rep LALOO was new and did not feel comfortable covering cases without an engineer. ATWATER estimated there were engineers present for approximately 75% of his cases in Florida. The amount of consulting that ATWATER did inside the operating room did not change if an engineer was present or not. If ATWATER met with an engineer outside of the operating room, that time was billed under the "discuss time" portion of the IME portal, not the "product time" category. ATWATER stopped consulting in approximately August or September of 2015. After this point, ATWATER did not talk much to CHIN or HUMAD. ATWATER didn't think he could do much more

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. Atwater , On 01/09/2020 , Page 7 of 8

consulting and it would not be right for him to continue to consult on the same product. SF never questioned ATWATER's consulting, but he thought it was wrong and was uncomfortable with the arrangement.

Looking at an email from JULIE GENEST, dated March 30, 2015 (JGA 000155), ATWATER stated that this came after he had submitted 21 hours but only had 9 hours approved. Eventually ATWATER did have a conversation with HUMAD regarding his IME hours. This was the same conversation where they discussed the YEHSS and DND payments as well. HUMAD sent a follow up email to this conversation on April 16, 2015 (JGA 000223) summarizing what he and ATWATER discussed. In this email chain, CHIN stated implied that there was oversight by SF of the consulting program. This was not true, there was no oversight by SF and ATWATER was never questioned about his consulting. Additionally, it was not true that IME was an "independent vehicle."

ATWATER initially talked to CHIN at the NAS meeting about his neuromonitoring business, DND, however CHIN was not interested. CHIN eventually started using ATWATER's DND business for his cases in Florida at LESS INSTITUTE (LESS). ATWATER knew that CHIN owned LESS (USAO-MA-ATWATER-00000019). In 2015, LESS was behind on payments to DND so ATWATER spoke to SF sales rep SETH JACKNOWITZ (USAO-MA-ATWATER-000000019). During the call, ATWATER told JACKNOWITZ that he would not use SF products until LESS started paying the DND bills. ATWATER considered this a threat, although he did not have any intention of following through on it. ATWATER realized that this was wrong and amounted to a quid pro quo. Looking back he regretted making that statement. ATWATER also talked to CHIN about paying the LESS bills, however he did not make the same threat to CHIN. He assumed by saying it to JACKNOWITZ it would get passed up to SF management. ATWATER did not remember telling anyone else besides JACKNOWITZ of this threat. ATWATER did not recall the name AMANDA DALTON. Around this time CHIN wanted ATWATER to do more SF cases, and that may have had some effect because LESS did pay some of the DND bills. CHIN's use of DND did not increase in 2015, although he may have made statements that he would use DND more (USAO-MA-ATWATER-00000088, SF-ATW-00003013). LESS would pay $700 per case for DND's services. In late 2016 or early 2017, DND stopped providing service for CHIN. It did not make business sense for DND to continue with CHIN. DND is still owed $6,000 from LESS (SF-ATW-00001965).

ATWATER thought that BLACK and HUMAD had a close relationship because

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. Atwater , On 01/09/2020 , Page 8 of 8

they frequently talked. At one point BLACK tried to get his wife a job at SF but it did not end up happening. Also, after he left YEHSS, BLACK considered taking a job offer from SF but decided against it. HUMAD told ATWATER that BLACK did a great job and they wanted to hire him. ATWATER was surprised by this and did not give BLACK a good recommendation to HUMAD.

ATWATER is aware of other spinal device companies, Precision Spine and Spineology, that also pay consulting on a per case basis. ATWATER has not been paid under those models but he has seen the consulting contracts. In those consulting agreements, a surgeon could be paid on a one off basis to evaluate a product, however you could not bill for the same product over and over again. There was a limit to how many times you could evaluate the same product, which ATWATER thought was five. This makes sense because after evaluating a product five times there is not much new feedback that could be obtained.

ATWATER has not had any communication with CHIN since the phone call they had last year. ATWATER has had no communications with ATWATER in the last year. ATWATER did speak to LALOO about the investigation because he is a family friend. He had reached out to LALOO to help find a log of all the SF cases that he did. ATWATER also reached out to FRANCOUIS to find similar info about his Illinois cases. ATWATER last spoke to BLACK when BLACK left YEHSS. KESSINGER told ATWATER that he had been to Boston regarding the investigation but did not provide any substance.