# EXHIBIT F

FD-302 (Rev. 5-8-10)



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry _____02/25/2020_____

JASON MONTONE, date of birth (DOB) ▓▓▓▓▓▓▓, was interviewed
telephonically. Also present for the interview was AUSA Patrick Callahan, as
well as MONTONE's attorneys John Kelly and Brian Bewley. After being advised
of the identity of the interviewing Agent and the nature of the interview,
MONTONE provided the following information:

MONTONE consulted for Life Spine (LS) before consulting with Spine
Frontier (SF). JOHN BALZER brought the consulting opportunity with LS to
MONTONE in approximately 2012. At the time, MONTONE was not too busy and
took the opportunity to start consulting. Initially MONTONE was paid hourly
by LS, however at some point the agreement changed to a royalty agreement.
MONTONE believed that his consulting with LS ended in 2015. MONTONE's
consulting with LS consisted of product reviews in the lab, discussion time
with engineers, and product evaluations on a per case basis. LS was much
better than SF at sending engineers or company representatives for his
cases. MONTONE remembered having a LS representative present much more
frequently than with SF. For labs and meetings with engineers, LS would send
MONTONE a work report that detailed what was discussed during the meeting.
MONTONE would sign the work report and send it back to LS. For case
evaluations, MONTONE was required to fill in an evaluation form and send it
to LS after each case. MONTONE believed that his office staff faxed the
evaluations to LS from his office. MONTONE did not have a blank check to
evaluate the same product as much as he wanted at LS like he did at SF.
MONTONE considered all the consulting hours with LS to be legitimate hours.
He estimated for case evaluations he would only bill one hour for each case.
In total, MONTONE likely had less than 100 total consulting hours with LS.

MONTONE's royalty agreement with LS was based on the usage of the
products that he consulted on, however it did not include MONTONE's usage.
The royalty agreement was for a specified period of time and was not
indefinite. MONTONE remembered consulting with the LS engineers on an L5-S1

| Investigation on | 02/11/2020 | at | Boston, Massachusetts, United States (Phone) | | |
|---|---|---|---|---|---|
| File # | 209A-BS-6566377 | | | Date drafted | 02/12/2020 |
| by | DUPONT TERRENCE | | | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

INT-RPT_0000196

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Jason Montone                 , On  02/11/2020 , Page  2 of 7

clamp, the Avatar pedicle screws, and the Aileron fusion system. MONTONE did
not come up with patents for these devices, he only helped the engineers
with the design. MONTONE received a 2% royalty on the usage of these
devices, excluding his own usage. MONTONE understood at the time that a
doctor could not receive payment for merely using a product, however he did
not understand the seriousness of it. MONTONE remembered interacting with
ROGER REDMAN, RITAL PATEL, MIKE BUTLER, and RICK GRIBER from LS.

LS was much better at creating a proper atmosphere for consulting than
SF. LS also seemed to actually care about MONTONE's feedback. Unlike LS, SF
never made changes to implant devices based on MONTONE's feedback. SF only
modified a few instruments for MONTONE, including the awl, rasp, and
compressor for the Inspan device.

In addition to SF and LS, JOHN BALZER also introduce MONTONE to K2M,
Xspine, OSI, Grafton, and Bacterin. BALZER brought SF to MONTONE at
MONTONE's request. MONTONE was looking for a new device company that would
be better than LS at cases that were more than two levels. MONTONE asked
BALZER to find a new company that would also offer consulting opportunities.
MONTONE ended up doing a six case trial with SF and liked their products. He
also knew from the beginning that he could get paid to consult with SF.
BALZER told MONTONE that SF would pay him 10% of the revenue of his usage
for consulting. MONTONE understood the 10% number to also be a cap on how
much he would make consulting with SF. It would not make sense for SF to pay
him more than 10% of revenue because then the company wouldn't be
profitable. BALZER said that SF's MO was to pay consultants to use their
product. In the beginning, MONTONE had the expectation that he would do some
real consulting, however this quickly evolved into him doing nothing.
MONTONE did not get the impression from SF that they expected him to do too
much.

The six case trial was done to determine if the hospital would approve
the product for use and to determine if MONTONE liked the product. MONTONE
did not have any involvement in negotiating the pricing arrangements for
products, that was handled by BALZER. MONTONE did not disclose to North
Kansas City Hospital (NKCH) that he was consulting for SF and he did not
know if their policy required that disclosure. There was a gap from the six
week case trial to when MONTONE started using SF full time because of the
length of time of the approval process at NKCH.

INT-RPT_0000197

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Jason Montone                    , On  02/11/2020  , Page  3 of 7


MONTONE did not remember talking to HUMAD before the six week trial. He believed his first call with HUMAD occurred in late 2012 or early 2013. During this conversation, HUMAD reiterated to MONTONE what BALZER had said. SF would pay MONTONE 10% of the revenue generated by the usage of his products to consult for SF. HUMAD did not give specifics on what the expectation for product feedback would be. The primary purpose of the call was to get MONTONE to use the product, and make him aware of the money he would receive in consulting. MONTONE said the gist of this call was "let's do business."

MONTONE understood that he could not consult for SF by just evaluating their products outside of his cases. SF would not have approved that consulting, they wanted him to use the product in his cases. SF always wanted a high volume of product usage by MONTONE and they were much more pushy than other companies. MONTONE was told this by BALZER. SF did not threaten MONTONE or require him to do a certain number of cases, but if he were to slow down on cases he would have been pushed to do more.

MONTONE stated that he did not remember if PETER PRINOS was at the March 2013 lab with Dr. GABRIEL at DOCTORS HOSPITAL. MONTONE remembered GARCIA, DR. LOWRY, AND KEVIN CHAPPUIS being there. MONTONE thought that he had previously met PRINOS during one of the six trial cases from 2012.

Regarding an email (SF-MON-00001778) that was sent to MONTONE from HUMAD on March 11, 2013, MONTONE remembered talking to CHIN about increasing the annual consulting cap to $300,000. During this call, CHIN told MONTONE that the more SF products that he used, the more money he could make in consulting. CHIN wanted MONTONE to use all of the different SF products. CHIN was pretty blunt on this call and MONTONE considered it to be a hard sell. MONTONE came away from this call thinking that CHIN wanted to pay him to use SF products. CHIN did not bring up what SF was looking for in terms of feedback, or what was required for consulting documentation. CHIN just said that they have great pedicle screws and he wanted MONTONE to look at all the SF products.

MONTONE did not remember a specific conversation with PRINOS where he said he would use SF exclusively. MONTONE was willing to use SF predominantly, and one of the reasons was because he was getting paid in consulting. PRINOS may have been exaggerating a bit to try and take credit

209A-BS-6566377

Continuation of FD-302 of <u>(U) Interview of Dr. Jason Montone</u> , On <u>02/11/2020</u> , Page <u>4 of 7</u>

for bringing MONTONE on board. MONTONE did remember having conversations with PRINOS about using SF bone graft. Bone graft is made by a few distributors but sold by all of the spine companies. There is basically no difference in the bone graft that is sold by each company. MONTONE agreed to start using the SF bone graft because of the consulting agreement.

MONTONE did not remember the specific call that was referenced in an email (SF-MON-00003353) between CHIN and HUMAD from April 24, 2013. MONTONE did not remember telling CHIN that there would be a gradual increase in his usage. CHIN may have been referring to MONTONE's usage at Doctor's Hospital because MONTONE was already using SF at NKCH. SF was "hot and heavy" to get MONTONE into DH because SF wanted to get list price for their products. It was rare for a device company to get list price on a product. MONTONE did not learn about the pricing discrepancies at DH until after he started there. BALZER had been trying to get MONTONE there for a while. MONTONE agreed that he likely started at DH around the end of April, 2013, as was referenced in an email from PRINOS (SF-MON-00000726).

MONTONE did not remember why he had not signed the clinical advisor agreement right away (SF-MON-00002104). There was no specific reason, he may have just been slow to get around to it. MONTONE remembered seeing the consulting agreement as well as the Exhibit A from the agreement. BALZER told MONTONE that he would get paid consulting hours for the six case study, even though MONTONE was not signed up as a consultant at the time. The hours for the six case study were paid in May of 2013. MONTONE did not fill out an evaluation or time sheet for the cases and did not provide close to 10 hours of feedback. MONTONE would have given feedback in the OR or possibly afterwards to PRINOS. There were no formal meetings with anyone from SF before or after the cases and no work reports like with LS. MONTONE was basically paid to use the product.

BAZLER would put MONTONE's consulting hours on the submission sheets and send them to SF. MONTONE may have gone over the hours with BALZER for the first few submissions, but after that MONTONE just signed the sheets after BALZER filled in the hours. Looking at his first submission to SF, MONTONE stated that he spent significantly less than 75 hours giving feedback. MONTONE thought that BALZER talked to HUMAD about how many hours to submit. HUMAD was ultimately responsible for telling BALZER how many hours to submit. MONTONE remembered BALZER saying on more than one occasion that

209A-BS-6566377

Continuation of FD-302 of  (U) Interview of Dr. Jason Montone          , On  02/11/2020  , Page  5 of 7

HUMAD had told him how many hours to bill. MONTONE did not know if this was
the case for every submission. BALZER also said that HUMAD would determine
payment based on how much revenue MONTONE generated for SF. HUMAD said it
would be based on how much hardware MONTONE put in.

In 2013, MONTONE did not submit any written feedback or have any phone
calls with engineers that he could remember. There may have been one or two
in person meetings with engineers, however not more than that. MONTONE and
BALZER frequently had clinical discussions in the OR, however this was just
the nature of their relationship. Some of the clinical talk would have
related to SF, however not more than one to two hours per month. It was
mostly general clinical discussions about the procedure and not specific to
SF. MONTONE stated that his actual consulting time was probably closer to
10% of what he submitted to SF, not the previously stated 50% estimate.
MONTONE was never asked by SF for more feedback or questioned about a lack
of feedback. SF also switched to IME in 2013 and BALZER put the numbers on
those submission sheets as well.

Regarding SF-MON-00002117, which was an IME submission sheet, MONTONE
never had a "comprehensive monthly review with engineer." It was a lie for
that box to be checked on the submission sheet. The hours that were
submitted were not real and were only put in to fill out the sheet. MONTONE
never checked to see if he was actually receiving 10% of revenue from SF, he
left that up to BALZER to figure out. It was not feasible to give legitimate
feedback on the same product numerous times. There was only so much that
could be evaluated with a product, other than tracking long term success
rates. Looking at the consulting agreement that he signed, MONTONE stated
that he never spoke at a trade show, never participated in a clinical board,
never talked about market trends, did not collect data or publish research,
and none of his design ideas for implant devices were implemented. SF only
modified the Rasp/Awl and compressor instruments to suit MONTONE's liking.
MONTONE may have assisted with training new SF employees if they were
visiting on one of his cases, however this would have been less than 5 hours
total if he did it at all in 2013.

In 2014, MONTONE did less actual consulting than he did in 2013. He also
stopped keeping track of his hours by 2014. There may have only been two
visits by engineers in 2014. MONTONE felt guilty in 2014 about the
consulting arrangement and did not want it to look illegal. MONTONE wanted

209A-BS-6566377

Continuation of FD-302 of  (U)  Interview of Dr. Jason Montone _____ , On  02/11/2020 , Page  6 of 7

it to become a legitimate consulting arrangement, however it never changed
and MONTONE continued to partake in it. MONTONE never thought that this
could lead to prison, however he knew that it was wrong and there could be
consequences. MONTONE remembered telling BALZER that he was uncomfortable
with the arrangement and he asked BALZER to talk to HUMAD about it. MONTONE
was concerned that he was being paid based on his usage and he thought this
would raise red flags. BALZER told MONTONE that he spoke to HUMAD, and HUMAD
said it was better to do it this way because if you are using the product
you are evaluating it. MONTONE did not agree with this logic and thought it
was stupid.

MONTONE also had a meeting with HUMAD in Kansas City at a Starbucks in
2014. HUMAD told MONTONE that he would be in area for a wedding and wanted
to meet. HUMAD pitched MONTONE on opening a LESS Institute in Kansas City,
however MONTONE was not interested. During this meeting, MONTONE told HUMAD
that he was not pleased with the consulting arrangement. MONTONE told HUMAD
he wanted more involvement from SF and more direction on what they wanted
from him. HUMAD did not say much and politely took in what MONTONE had to
say. HUMAD did not seem surprised by what MONTONE was saying. HUMAD said
they would try to send the engineers out more often. MONTONE could only
compare the arrangement to LS where they always told him what they were
looking for. SF didn't even try to make it not look like a sham arrangement.

Shortly after meeting with HUMAD, an engineer from SF came out to Kansas
City and talked about doing a study with MONTONE. The email on 9/13/2014
(SF-MON-0000226) from Alana Lacey, was in reference to that meeting. MONTONE
had said he would collect all the data for a study but would need help
writing the paper. Nothing ever materialized and SF did not seem to be
genuinely interested. They never gave him any direction on what they were
looking for.

BALZER was licensed as a bone bank and could store certain biologics. Dbm
strips were 5 centimeters and would cover go from one level to the next.
Regarding MONTONE's patient Laura Francis, whose bill for SF products was
$95,000 from a 6/10/2013 procedure, MONTONE stated that he would use 12
strips in a two level surgery. He would stack strips on top of each other.
Additional strips would not harm a patient, however it was fair to say that
it was not medically necessary to use 12 strips in a two level fusion.
MONTONE would not have been able to use that many at NKCH. MONTONE could

209A-BS-6566377

Continuation of FD-302 of (U) Interview of Dr. Jason Montone , On 02/11/2020 , Page 7 of 7

only use one strip per level at NKCH, however he has never seen a clinical justification for using just one strip.

MONTONE made inaccurate statements in his December 2018 interview with the government. MONTONE corrected the following: MONTONE had spoken to BALZER about the government investigation and they discussed what they would say when interviewed; MONTONE did not feel like he had earned the consulting money from SF; He did not track the hours that were submitted to SF, only briefly in the beginning; and he did not tell the government about the 10% arrangement with SF in his initial interview.