UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) KINGSLEY R. CHIN, and<br>(2) ADITYA HUMAD,<br><br>Defendants. | Criminal No. 21-cr-10256<br><br>Violations:<br><br><u>Count One</u>: Conspiracy to Violate the Anti-Kickback Statute<br>(18 U.S.C. § 371)<br><br><u>Counts Two through Four</u>: Violations of the Anti-Kickback Statute<br>(42 U.S.C. § 1320a-7b(b)(2))<br><br><u>Forfeiture Allegations</u>:<br>(18 U.S.C. § 982(a)(7)) |

### SUPERSEDING INDICTMENT

At times relevant to this Superseding Indictment:

### General Allegations

*The Defendants*

1.      Defendant Kingsley R. CHIN, MD was a Florida resident, and the founder, principal owner, President, Chief Executive Officer, and a Director of SpineFrontier, Inc. (SpineFrontier).

2.      Defendant Aditya S. HUMAD was a Massachusetts resident, and SpineFrontier's Chief Financial Officer and Vice President of Business Development.

*SpineFrontier, Inc. & Impartial Medical Expert, LLC*

3.      SpineFrontier, Inc. was a Delaware corporation with a principal place of business at 350 Main Street, Malden, Massachusetts 02148. SpineFrontier designed, manufactured,

1

marketed, and sold spinal medical products, including in the District of Massachusetts. Surgeons used these products in spine surgeries that Federal health care programs paid for throughout the United States.

4.  Impartial Medical Expert, LLC (IME) was a Delaware corporation that identified its business address as 3296 N. Federal Highway #11631, Fort Lauderdale, Florida, which was a post office box. Beginning in or around approximately October 2013, IME purported to manage the process pursuant to which SpineFrontier's surgeons submitted hours and received payments from or on behalf of SpineFrontier for purported consulting. CHIN was the principal owner of IME.

*Co-Conspirator Surgeons & The Co-Conspirator Distributor*

5.  Surgeon 1, Dr. Jason Montone, was a spine surgeon who practiced medicine in Missouri and Kansas and used SpineFrontier products in spine surgeries.

6.  Surgeon 2 was a spine surgeon who practiced medicine in New York and used SpineFrontier products in spine surgeries.

7.  Surgeon 3 was a spine surgeon who practiced medicine in Illinois and Florida and used SpineFrontier products in spine surgeries.

8.  John Balzer, Distributor 1, was the owner and operator of a distribution company, BIOinnovations LLC, who distributed SpineFrontier products in Kansas and Missouri and worked with Surgeon 1.

*The Medicare and Medicaid Programs*

9.  Medicare is a federally funded health care program that provides benefits to

individuals who are sixty-five years of age or older or disabled. Medicare is subdivided into multiple Parts. Medicare Part A covers health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covers physician services and outpatient care.

10. The Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services, administers Medicare. Individuals who qualify for Medicare benefits are commonly referred to as Medicare "beneficiaries."

11. Medicaid is a jointly funded federal and state health care program that provides certain health benefits to the disabled, as well as to individuals and families with low incomes and resources. At the federal level, CMS administers Medicaid. CMS is responsible for overseeing the Medicaid program in participating states, including Massachusetts and Missouri. Individuals who qualify for Medicaid benefits are commonly referred to as Medicaid "beneficiaries."

12. Medicare and Medicaid are each a "health care benefit program" within the meaning of 18 U.S.C. § 24(b), and each is a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f), the federal Anti-Kickback Statute (AKS).

*Veterans Health Administration*

13. The Veterans Health Administration (VHA) is a health care program administered by the Department of Veterans Affairs. 38 U.S.C. §§ 1701-1788. VHA provides health care for veterans and certain family members.

14. VHA is a "health care benefit program" within the meaning of 18 U.S.C. § 24(b)

3

and is a "Federal health care program" for purposes of the AKS.

*The Sunshine Act*

15.     As of March 31, 2013, the Physician Payments Sunshine Act, 42 U.S.C. § 1320a-7h(a)(1)(A), required medical product manufacturers, such as SpineFrontier, to disclose to CMS any payment or transfer of value made to a physician, including surgeons, or a hospital, as well as any physician ownership or investment in the covered manufacturer.

*Background on Spine Surgeries and Their Reimbursement*

16.     Often, there were two types of payments and reimbursements associated with spine surgeries: one for the costs of the surgical procedure, and the other for the skilled labor provided by the surgeon.

17.     Hospitals and surgical centers where surgeons perform spine surgeries typically submitted a bill to a patient and a claim for reimbursement to an insurance carrier, including Federal health care programs, for the costs associated with a surgery, including the costs of spinal products used during procedures.

18.     Surgeons typically submitted, or caused to be submitted, a separate bill to patients and a claim to an insurance carrier, including Federal health care programs, for the surgeons' services rendered during the surgical procedure.

19.     Spinal implant devices such as screws, rods, cages, and plates were often kept in trays or kits that were held on a consignment basis at a hospital or surgical center.  The costs of spinal implants could be significant.  The prices of SpineFrontier's products varied, ranging from hundreds to thousands of dollars.

4

20. When a surgeon selected and used a specific spinal implant in a surgery, the hospital or surgical center ordered a replenishment implant and paid the implant manufacturer for the implant used in the procedure. Often, a hospital or surgical center sent replenishment orders to an implant manufacturer like SpineFrontier on a surgery-by-surgery basis so that the kits or trays from which the surgeon used the implant are complete and ready to be used in a future surgery.

### Object and Purpose of the Conspiracy

21. The object of the conspiracy was to pay bribes in connection with the use of SpineFrontier products in health care services reimbursed in whole or in part by Federal health care programs, including Medicare, Medicaid, and VHA.

22. The purpose of the conspiracy was for CHIN, HUMAD, and their co-conspirators, known and unknown to the Grand Jury, to enrich themselves.

### Overview of the Conspiracy

23. Between in or about late 2012 and at least in or about March 2017, CHIN, HUMAD, and their co-conspirators paid and directed the payment of hundreds of thousands of dollars in bribes to surgeons, including Surgeons 1-3, pursuant to a sham consulting program that paid those surgeons between approximately $250 and $1,000 for each hour the surgeon supposedly spent performing consulting services.

24. Surgeons 1-3 participated in SpineFrontier's sham consulting program by accepting payments for purported consulting work they did not in fact perform. Rather, they

5

accepted these sham consulting payments as a bribe and reward for their continued selection and usage of SpineFrontier products.

25. During the course of the conspiracy, CHIN and HUMAD conspired to pay significant amounts of money in sham consulting payments, including hundreds of thousands of dollars in sham payments to Surgeons 1-3, in exchange for their using SpineFrontier products.

26. Although SpineFrontier's surgeon-consulting program was purportedly directed at gathering from surgeons technical feedback about SpineFrontier's products, CHIN and HUMAD in fact designed and used the program, and the bribes they paid to surgeons, as a vehicle to induce those surgeons to order and use SpineFrontier's products, and to reward their selection and use of SpineFrontier's products, in surgeries paid for entirely or in part by health care benefit programs, including Federal health care programs such as Medicare, Medicaid, and VHA.

27. During the course of the conspiracy, CHIN, HUMAD, and their co-conspirators paid surgeons as if the surgeons had spent hundreds of hours evaluating products, discussing industry trends, and educating medical residents, when they had not.

28. In fact, multiple surgeons, including Surgeons 1-3, frequently spent only a small fraction of their reported time, if any at all, performing actual consulting activities for SpineFrontier. Instead, on numerous occasions, HUMAD determined the amount of bribes SpineFrontier would pay surgeons by reviewing how many surgeries the surgeons performed using SpineFrontier's products and how much revenue those surgeries generated for SpineFrontier.

29. During the course of the conspiracy, CHIN, HUMAD, and their co-conspirators paid, at least, the following bribe amounts:

| Surgeon | Approximate Amount Paid |
|---|---|
| Surgeon 1 | $379,719 |
| Surgeon 2 | $125,288 |
| Surgeon 3 | $35,625 |
| **Total:** | **$540,632** |

30. SpineFrontier received millions in net revenue from the sales of its products used by Surgeons 1-3.

## Manner and Means of the Conspiracy

31. Among the manner and means by which CHIN, HUMAD, and co-conspirators known and unknown to the Grand Jury carried out the conspiracy were the following:

    a.    Paying surgeons, including Surgeons 1-3, to serve as sham consultants;

    b.    Paying surgeons, including Surgeons 1-3, to use SpineFrontier products in services provided to patients reimbursed in whole or in part by Federal health care programs, including Medicare, Medicaid, and VHA;

    c.    Using IME as a vehicle to funnel bribe payments to surgeons, including Surgeons 1-3;

    d.    Directing surgeons, including Surgeons 1-3, to bill SpineFrontier, via IME, for purported consulting hours based not on time spent consulting, but on the number and type of surgeries the surgeon performed, including surgeries paid for by Federal health care programs;

e. Selecting surgeons, including Surgeons 1-3, to participate in the SpineFrontier consulting program based not on their background, qualifications, education, and experience, but instead on their ability and willingness to use SpineFrontier's products in their surgeries, including surgeries paid for in whole or in part by Federal health care programs;

f. Adjusting the amount of the bribe based upon the type of procedure performed by the surgeons, including Surgeons 1-3;

g. Adjusting the amount of the bribe based upon the number of procedures performed by the surgeons, including Surgeons 1-3;

h. Paying surgeons, including Surgeons 1-3, for reported consulting hours despite the sham nature of those reported hours;

i. Creating records and documents, including purportedly legitimate contracts, designed to make the sham consulting program appear legitimate;

j. Misrepresenting, concealing, and hiding acts performed in furtherance of the conspiracy.

## Overt Acts in Furtherance of the Conspiracy

32. From in or about 2012 through at least in or about March 2017, CHIN, HUMAD, and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

a. Chin informed Surgeon 1 that the more products Surgeon 1 used across different SpineFrontier product lines, the better Surgeon 1's financial opportunities would be.

8

b.  On or about March 11, 2013, HUMAD sent an email to Surgeon 1, copied to CHIN, and attached a Clinical Advisor / Consulting Agreement that stated Surgeon 1 could bill SpineFrontier up to 600 hours and $300,000 annually based on Surgeon 1's "increased interest and availability for feedback on several" SpineFrontier products. CHIN responded to HUMAD: "Thxs."

c.  HUMAD told Surgeon 2 that SpineFrontier would approve more of Surgeon 2's submitted consulting hours if he used more expensive SpineFrontier products.

d.  On or about September 13, 2015, CHIN emailed HUMAD and others and stated, in part, "I want to show this to the CAB [Clinical Advisory Board] to them [sic] hear what they think about us setting these targets for them to hit and show how each target number could translate into IME monthly consulting fees as a reward." In that same email, CHIN also stated "[e]ach surgeon has the ability to find us at least $25K per week that is better than trying to raise money."

e.  On or about September 14, 2015, HUMAD forwarded CHIN's email to an employee and directed her to compile the information requested in CHIN's September 13, 2015 email. HUMAD stated, "Pls see me in my office first thing this morning to discuss the report below if any questions – need done by noon[.]"

f.  HUMAD had a conversation with Surgeon 3 in which HUMAD informed Surgeon 3 that SpineFrontier would compensate him based on the number and type of surgeries Surgeon 3 performed with SpineFrontier's products. At no time did HUMAD, CHIN, or anyone else from SpineFrontier ask Surgeon 3 how much time he had spent consulting.

9

g.  By at least on or about the following dates, Surgeons 1-3 entered into sham consulting agreements with SpineFrontier, through IME, in addition to other pre-existing sham direct consulting agreements with SpineFrontier:

| Overt Act | Surgeon | Date of IME Written Contract |
|---|---|---|
| i. | Surgeon 1 | December 1, 2013 |
| ii. | Surgeon 2 | February 27, 2013 |
| iii. | Surgeon 3 | October 17, 2013 |

k.  On or about the following dates, among others, the surgeon listed below submitted, or caused to be submitted, a request for payment to SpineFrontier, directly and through IME, for consulting hours purportedly worked. As a result, CHIN and HUMAD, directly and through IME, paid or caused to be paid bribes to the surgeons, and during the same period, the surgeons performed a procedure reimbursed in whole or in part by a Federal health care program:

| Overt Act | Surgeon | Service Period | Request for Payment | Federal Health Care Program |
|---|---|---|---|---|
| i. | Surgeon 1 | May 1, 2013 – June 15, 2013 | June 15, 2013 | Medicare |
| ii. | Surgeon 2 | March 1, 2016 – March 31, 2016 | April 7, 2016 | VHA |
| iii. | Surgeon 3 | October 1, 2015 – October 31, 2015 | November 24, 2015 | Medicare |

## COUNT ONE
### Conspiracy to Violate the Anti-Kickback Statute
### (18 U.S.C. § 371)

The Grand Jury charges:

33. The Grand Jury re-alleges and incorporates by reference paragraphs 1-32 of this Superseding Indictment.

34. Between at least in or about late 2012 and at least in or about March 2017, in the District of Massachusetts and elsewhere, the defendants

(1) KINGSLEY R. CHIN, and
(2) ADITYA HUMAD,

conspired with each other and with others known and unknown to the Grand Jury to commit an offense against the United States, to wit, violation of the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b)(2), that is, to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash or in kind, that is, bribes, to induce the purchase of, lease of, order of, arranging for use of, or recommendation of goods, services, and items, namely, SpineFrontier spinal implants and products, for which payment may be made in whole or in part by a Federal health care program.

All in violation of Title 18, United States Code, Section 371.

COUNTS TWO—FOUR
Violations of the Anti-Kickback Statute
(42 U.S.C. §§ 1320a-7b(b)(1)(B), (b)(2)(B))

35.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-32 of this Superseding Indictment.

36.    Between approximately in or about late 2012 and at least in or about March 2017, in the District of Massachusetts and elsewhere, the defendants,

(1) KINGSLEY R. CHIN, and
(2) ADITYA HUMAD,

did knowingly and willfully offer and pay remuneration to each Surgeon listed in the table below, directly and indirectly, overtly and covertly, in cash and in kind, that is, bribes, to induce the purchase of, lease of, order of, and arranging for use of, and recommendation of goods, services and items, namely, SpineFrontier spinal implants and products, for which payment may be made in whole or in part by a Federal health care program.

| Count | Surgeon | Payments |
|---|---|---|
| 2 | Surgeon 1 | Defendants offered and paid Surgeon 1 bribes totaling approximately $379,719, including a payment of $14,250 on or about September 4, 2015. |
| 3 | Surgeon 2 | Defendants offered and paid Surgeon 2 bribes totaling approximately $125,288, including a payment of $2,375 on or about March 13, 2017. |
| 4 | Surgeon 3 | Defendants offered and paid Surgeon 3 bribes totaling approximately $35,625, including a payment of $4,750 on or about January 19, 2016. |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

## KICKBACK AND KICKBACK CONSPIRACY FORFEITURE ALLEGATIONS
(18 U.S.C. § 982(a)(7))

37. Upon conviction of one or more of the offenses set forth in Counts One through Four, the defendants,

> (1) KINGSLEY R. CHIN, and
> (2) ADITYA HUMAD, and

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offense.

38. If any of the property described in Paragraph 37, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(7), as a result of any act or omission of the defendants—

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 37 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

_____
ABRAHAM R. GEORGE
CHRISTOPHER LOONEY
MACKENZIE A. QUEENIN
Assistant United States Attorneys

DISTRICT OF MASSACHUSETTS, April __, 2025.

A TRUE BILL

_____
FOREPERSON

District of Massachusetts: April __1__, 2025
Returned into the District Court by the Grand Jurors and filed.

*Aaron Hutchins*
DEPUTY CLERK