UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>KINGSLEY R. CHIN,<br>*Defendant*. | No. 1:21-cr-10256-IT |

**DEFENDANT KINGSLEY CHIN'S MOTION *IN LIMINE* TO PRECLUDE GOVERNMENT'S EVIDENCE OF ALLEGED "OTHER BAD ACTS"**

Pursuant to Fed. R. Evid. 403 and 404(b), Dr. Chin respectfully moves this Court for an order precluding other supposed "bad acts" evidence that the government has stated it intends to introduce at trial. As described below, contrary to the government's limited proffer, the evidence has no "intrinsic" bearing on any charges or on any cognizable predicate for admissibility under Rule 404(b).

In an April 2, 2025 letter (attached hereto as <u>Exhibit A</u>), the government informed Dr. Chin of the following:

> Please note the government may seek to introduce evidence as intrinsic to the charges set forth in the Indictment. Specifically, the government intends to introduce evidence that the defendants utilized Definitive NeuroDiagnostics, Dr. John Atwater's neuromonitoring business, in exchange or reward for Dr. Atwater's use of SpineFrontier products. The government also intends to introduce evidence that the defendants utilized another company owned by Dr. Atwater, Your Extra Hands Surgical Services ("YEHSS") in exchange or reward for Dr. Atwater's use of SpineFrontier products.

In addition to taking the position that such evidence is admissible as "intrinsic" to the charged crimes, the government also purported to reserve the right to use such evidence pursuant to Fed. R. Evid. 404(b), writing: "In the alternative, or in the event the Court deems the evidence not intrinsic, the government intends to offer the evidence pursuant to 404(b)."

### *The Court Should Preclude the Government's Intended Use of Evidence Concerning Dr. Atwater's Companies*

Dr. Chin interprets the above-quoted paragraph as the government alleging that "defendants utilized" services that Dr. Atwater's companies provided as an indirect form of inducement to Dr. Atwater for him to use SpineFrontier products. Thus, the government is apparently planning to inject an entirely new theory of supposed kickbacks that was not mentioned, or even alluded to, in the Indictment. Indeed, the government made this same disclosure prior to the recent severance and continuation of the trials, which gave rise to an earlier motion *in limine* on the topic. Yet, since sending its April 2 letter, the government has obtained a Superseding Indictment that still does not refer to Definitive NeuroDiagnostics or YEHSS, or otherwise expand its theory of kickbacks beyond the sole theory that the defendants violated the Anti-Kickback Statute through the SpineFrontier consulting program.

The government's proffered evidence offers a thinly-veiled effort at proving propensity of defendants to engage in kickback-type activity, rather than any cognizable ground for admissibility. The *entire* charged kickback theory – in both the original and Superseding Indictments – is the allegation that the SpineFrontier consulting program, by which doctors served as paid consultants concerning SpineFrontier's products, was a "sham," such that the consulting payments were actually "bribes" to induce physicians to use SpineFrontier products. The Superseding Indictment, as with the original, is explicit in setting forth that theory, and *only* that theory, of the AKS violations it charges. With the exception of at most the concluding paragraph that merely asserts that SpineFrontier received millions of dollars in revenue from the sales of its products, every one of the paragraphs in the Indictment under the heading "Overview of the Conspiracy" is about the consulting program and cash payments made to doctors pursuant to it. (*See* Superseding Indictment ¶¶ 23-29.) Similarly, all three remaining substantive counts under the Anti-Kickback Statute

(Counts Two through Four) charge violations based expressly on cash payments derived from the consulting program, including by alleging the specific dollar amounts of such consulting payments. In short, nowhere in the Superseding Indictment is there any allegation of the existence of an additional scheme or plan that would be shown by the defendants' use of services provided by companies owned, in part, by Dr. Atwater as an indirect *quid pro quo* for Dr. Atwater's use of SpineFrontier products.[1]

The government's theories of admission, whether under Rule 404(b) or otherwise, would likely confuse a jury about speculative matters. The services to which the government refers, in contrast to the products actually at issue in this case, are not services provided or sold by SpineFrontier. Specifically, Definitive NeuroDiagnostics ("DND") provides neuromonitoring services that surgeons may choose to use while performing a surgery. The government acknowledges that DND is owned (at least in part) by Dr. Atwater, and not owned or controlled in any way by the defendants here. Thus, the neuromonitoring services to which the government's letter refers, in contrast to SpineFrontier's spinal implant products, are not sold by SpineFrontier or any entities related to it. Similarly, YEHSS is a surgical-support company that entered into a contract to provide surgical-support services *to* SpineFrontier. According to information the government has provided in discovery, Dr. Atwater owns most, but not the entirety, of YEHSS's

---

[1] Indeed, the government must be aware that efforts to broaden the criminal charges to reach activities of YEHSS or Definitive NeuroDiagnostics would pose serious statute of limitations issues. *See*, *e.g.*, *United States v. Ratcliff*, 245 F.3d 1246, 1253 (11th Cir. 2001) (dismissing all charges on statute of limitations grounds where superseding indictment amended the scope of conspiracy charges, explaining that "the result in this case turns on whether the superseding indictment against Ratcliff broadened or substantially amended the original charges" (quotation marks and editing omitted)); *United States v. Polanco*, No. CRIM. 07-344(DRD), 2008 WL 2891076, at *2 (D.P.R. Apr. 4, 2008) (citing to First Circuit precedent establishing that superseding indictment is timely only to the extent it "neither materially broadens nor substantially amends the charges").

equity. The services YEHSS provided included marketing services and outsourced case coverage, which allowed SpineFrontier to avoid hiring a representative to cover surgeries in a location where SpineFrontier did not have an employed representative.

Dr. Atwater has apparently told the government that YEHSS did not provide enough value to SpineFrontier to justify the fee that SpineFrontier paid to YEHSS. The defense is unaware of Dr. Atwater making any such admission with respect to DND's neuromonitoring services. To the contrary, while Dr. Chin apparently used DND's neuromonitoring on occasion in surgeries he personally performed, DND ultimately stopped supporting Dr. Chin's surgeries because he was not performing enough surgeries for DND to maintain adequate staffing in Dr. Chin's area. As for Dr. Atwater's admission that YEHSS failed to perform for SpineFrontier – "did not deliver" for SpineFrontier, in Dr. Atwater's words as recorded in government agent notes – even he does not appear to claim that SpineFrontier was motivated to hire YEHSS as some sort of indirect *quid pro quo* to Dr. Atwater personally. Indeed, there is no information of which Dr. Chin is aware in the discovery record that would even allow a factfinder to assess whether the relatively small payments to YEHSS that the government alleges (approximately $24,000 total in *top-line* revenue) were profitable to YEHSS, much less profitable to such a degree that they would have materially benefitted Dr. Atwater personally by virtue of his majority, but partial equity ownership of YEHSS. In any event, such a theory of kickback is different from the consulting payments, and is simply not part of the Indictment, either as originally framed or in the operative Superseding Indictment. This case is, and has always been, about alleged kickbacks in the form of consulting payments made to surgeons buying SpineFrontier products.

In its opposition to the earlier motion *in limine* on this topic (before all such motions were withdrawn to be resubmitted in light of the severance and new trial dates), the government

4

presented pieces of cherry-picked evidence that it claims suggest an illicit arrangement between SpineFrontier and DND or YEHSS. That evidence primarily focuses on what Dr. Atwater has apparently said were *his* motivations and actions that *he* took, such as threatening a salesperson that if outstanding invoices for previous work were not paid, he would not do any more cases with SpineFrontier. (*See, e.g.*, ECF No. 274, at 4.) The government did not reveal in that opposition, however, that Dr. Atwater had also said that "he did not have any intention of following through on" the threat, and that despite speaking to Dr. Chin about unpaid bills, he never made that threat to Dr. Chin. (*See* Exhibit B hereto, at 7.) Dr. Atwater also told the government that *his* subordinate, YEHSS's executive director, "*initiated*, wrote, and signed the contract" between YEHSS and SpineFrontier. (*See* Exhibit C hereto, at 4 (emphasis added).) Dr. Atwater also told the government that when the YEHSS agreement was put in place, Dr. Atwater believed that YEHSS "would actually provide the services that were outlined in the agreement." (*Id.*) In contrast, nothing in the government's submission has suggested that SpineFrontier's intention (much less Dr. Chin's ) was to use YEHSS (or DND) in exchange for Dr. Atwater buying SpineFrontier products.

Furthermore, in arguing that the YEHSS agreement was "intrinsic" to the crime actually alleged, the government elides over the minimal overlap between YEHSS and the consulting payments. Even accepting as true for present purposes the "facts" that the government negotiated with Dr. Atwater as part of its settlement agreement with him, Dr. Atwater began discussing a consulting arrangement with SpineFrontier in June 2013. (*See* ECF No. 274-1, at 3.) The Superseding Indictment alleges that he consulted for years, with consulting payments to Dr. Atwater (identified as Surgeon 3) continuing into at least 2016. (*See* Superseding Indictment ¶ 36.) The SpineFrontier/YEHSS contract, in contrast, did not begin until February or March 2014, and lasted until only October 2014. (*See* ECF No. 274-1, at 2.) Nor did the "facts" that the government

5

purchased from Dr. Atwater through its settlement agreement with him even include an assertion that the YEHSS contract (or any DND services, for that matter) were a *quid pro quo* for Dr. Atwater's use of SpineFrontier products. Rather, when Dr. Atwater agreed in the settlement agreement to particular facts and to helping the government in this prosecution, Dr. Atwater went no further than to say that YEHSS's charges were not "commensurate" with the services it ultimately provided to SpineFrontier. (*Id.*) The government even submitted evidence with its earlier opposition, that *SpineFrontier* terminated the YEHSS agreement because Dr. Atwater had moved to Florida, and SpineFrontier had "determined that YHESS [sic] coverage in FL logistically made no sense." (ECF No. 274-8, at ECF p. 41.) SpineFrontier even effected that termination over the objection of YEHSS's Executive Director. (*Id.* at ECF p. 38). Dr. Atwater eventually overruled the Executive Director and agreed with the October 2014 contract termination in light of YEHSS's inability to perform, (ECF No. 274-14, at 1), all of which is inconsistent with the government's theory that the YEHSS payments were a form of kickback to Dr. Atwater personally.

Most importantly, nothing in the Indictment or Superseding Indictment so much as hints at violations of the Anti-Kickback Statute through anything other than consulting payments, much less through contracts with YEHSS or DND specifically. Permitting the government to introduce evidence concerning this tangent would amount to an impermissible and prejudicial variance from the violations set forth in the Indictment. Contrary to the April 2 letter in which the government informed defendants of the government's intention to introduce this tangent, the use of certain ancillary surgical services that *other* companies (not SpineFrontier) supplied is in no way "intrinsic" to the charges concerning SpineFrontier's alleged use of consulting payments to sell its products.

In making its pitch, the government's April 2 letter cited to *United States v. Epstein*, 426 F.3d 431, 438-39 (1st Cir. 2005), in which the Court of Appeals found no error in the government's use of the defendant's tax return, which included some, but also omitted some, of the income from the fraudulent scheme that was actually charged. The First Circuit found no reversible error based on the view that the tax return was "part and parcel of the crime," and thus "intrinsic" to it, because it both proved that the defendant received income from the underlying scheme (to the extent the tax return disclosed some income) and showed the defendant's awareness that the conduct was illegal (to the extent it did not disclose all income). *Id.* at 439. In contrast here, there is no sense in which "defendants utilizing" Dr. Atwater's companies' services is relevant to – much less "intrinsic" to – an alleged scheme to use the SpineFrontier consulting program to make payments to doctors.

The government's desire to bring YEHSS and DND into this case should be seen for what it is: the government hopes to suggest that there was additional wrongdoing beyond that which the Indictment actually charges through the consulting program, for the purpose of suggesting to the jury a propensity by the defendants to engage in wrongdoing. Indeed, in its April 2 letter, the government stated in a single sentence that it will seek to introduce the evidence at issue pursuant to Fed. R. Evid. 404(b) in the alternative, if the evidence is deemed extrinsic to the crimes charged.

Rule 404(b) does not, however, make the proffered evidence any more admissible. Before evidence of other crimes, wrongs, or bad acts may be admitted pursuant to Rule 404(b): (1) the evidence must be "specially probative of an issue" in the case – such as intent or knowledge – without including propensity as a necessary link in the inferential chain; and (2) even if such "special relevance" is found, it is nonetheless inadmissible if its probative value is "substantially outweighed by the danger of, *inter alia*, unfair prejudice, confusion of the issues, or misleading

7

the jury." *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996) (quotation marks omitted); *see also* Fed. R. Evid. 403. Evidence in criminal trials must be "strictly relevant to the particular offense charged." *Williams v. New York*, 337 U.S. 241, 247 (1949).

Here, the government's one-sentence notice that it would seek to admit such evidence under Rule 404(b), in the alternative, comes nowhere close to satisfying its burden to provide defendants with sufficient notice of properly-available 404(b) evidence. The government's letter does not even articulate what the "special relevance" would be under Rule 404(b), and thus how this evidence could qualify under Rules 404(b) and 403. Nor does it provided other detail that Rule 404(b) requires. Rule 404(b) requires, among other things, that the government "(A) provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it," and "(B) *articulate in the notice* the permitted purpose for which the prosecutor intends to offer the evidence *and the reasoning* that supports the purpose" (emphases added). The government has provided nothing of the sort. As the First Circuit has explained:

> [W]e think that the court was warranted in having concerns about the extent to which [404(b) issues] would have to be litigated during the course of the trial. This is not a situation where the "extrinsic act" is conceded by all to have taken place. Indeed, Gilbert vehemently denies [it]. It is thus nearly certain that there would be a mini-trial on whether [it] actually took place.… We think the potential for confusion of the issues and for unfair prejudice in such a scenario is manifest.

*U.S. v. Gilbert*, 229 F.3d 15, 24 (1st Cir. 2000).[2]

---

[2] Because the government's April 2 letter does not provide the notice that Rule 404(b) requires, the government has not satisfied its obligation to admit such evidence under that rule. Even if one were to look to the argument that the government made in response to the prior motion *in limine* – which it opted not to include in its April 2 notice under Rule 404(b) – its attempt to justify admission would still fail. That opposition contained little more than conclusory assertions and regurgitations of the arguments that the DND and YEHSS contracts were themselves supposed kickbacks. For purposes of Rule 404(b), the government's obligation would be to show how these other acts are relevant, beyond propensity, to the government's effort to prove that the consulting program specifically was a "sham." The government's mere assertion that the YEHSS and DND contracts were, somehow, designed to serve as kickbacks to Dr. Atwater

8

Furthermore, given the nature of the neuromonitoring and other surgery-support services at issue, fair presentation of such matters would likely require lengthy exploration of, and perhaps even expert testimony as to, the function of such services, whether they were actually needed for the surgeries at issue, their value to surgeons during surgery, and the extent to which Dr. Atwater personally benefited from their use. The government's proposed evidence would create a trial within a trial on such medical issues. Because this is a case about the SpineFrontier consulting program, and nothing more, expansion of this case to include supposed kickbacks in the form of "utilizing" other companies' services would be highly prejudicial to defendants, even if there were "special relevance" that the government has not adequately articulated in its notice to defendants. The Court should preclude the government from referencing or introducing the proffered evidence about involvement of DND and YEHSS.

## Conclusion

For the reasons set forth herein, defendants respectfully request that the Court preclude the government from presenting the proffered evidence concerning Definitive NeuroDiagnostics and YEHSS. At the very least, the Court should preclude the government from referencing any such evidence until a showing of special relevance is made during the trial and the defense has an opportunity to address that specific showing on an evidentiary record.

---

personally (notwithstanding the substantial evidence to the contrary and the lack of evidence of such an intent by defendants), does not satisfy its Rule 404(b) obligation to "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." In short, the government's rote uses of such labels as "intent" and "motive" with respect to the YEHSS and DND contracts are little more than conclusory assertions that come nowhere close to satisfying the government's obligation to justify Rule 404(b) evidence as relevant to charges concerning the consulting program specifically. At most, Dr. Atwater's description of events suggests that YEHSS and DND may have constituted other bad acts by him, but not with Dr. Chin's knowing participation.

Respectfully submitted,

**KINGSLEY CHIN**

By their attorneys,

/s/ *Joshua L. Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

## CERTIFICATE OF SERVICE

The undersigned certifies that this document, filed on April 11, 2025, through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Joshua L. Solomon

## **Local Rule 7.1(a)(2) Certification**

Defense counsel conferred in good faith with counsel for the government in an effort to resolve or narrow the issues described herein. The parties resolved some of the issues (which, to that extent, is thus omitted from this motion), but did not resolve the matters raised herein.

/s/ Joshua L. Solomon