UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>KINGSLEY R. CHIN,<br>*Defendant*. | No. 1:21-cr-10256-IT |

### DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE TESTIMONY BY SCOTT LAWRENCE OR ANY OTHER REPRESENTATIVE OF CMS AND, IN THE ALTERNATIVE TO COMPEL THE PRODUCTION OF A FULL EXPERT DISCLOSURE

Pursuant to Fed. R. Evid. 702, Rule 16 of the Federal Rules of Criminal Procedure, and *Daubert*, Defendant Kingsley Chin respectfully moves for an order precluding testimony by Scott Lawrence or any future late-identified representative of the Centers for Medicare & Medicaid Services ("CMS") that would be based on their specialized skills, knowledge, or opinions. Though Lawrence joined the prosecution team and had been twice included on its list of witnesses, the government never met the prerequisites for using him as an expert witness. Instead, when pressed to do so, the government removed his name from their most recent witness list, and now states a plan to call an unnamed representative or representatives of CMS. If the Court is still willing to entertain an untimely-disclosed expert witness such as Lawrence or one of his present or former CMS colleagues, before allowing the government to rely on any of them as a witness at trial, the Court should compel the production of a full expert disclosure and conduct a *Daubert* hearing.

### Background

On February 10, 2025, the government disclosed, for the first time, its intention to rely on Scott Lawrence as a witness at trial. The total disclosure concerning him was: "Centers for

Medicare and Medicaid Services." On February 28, 2025, the government provided another witness list that still included Lawrence, again simply stating "Centers for Medicare and Medicaid Services." During meet and confer efforts, the government acknowledged that Lawrence was not a percipient witness and, indeed, has had no roles related to SpineFrontier until being selected as a witness for trial. The government also agreed to provide a Curriculum Vitae for Lawrence (and later for an unidentified substitute), but otherwise refused to make an ordinary expert disclosure. Instead, the government conducted a limited "interview" of Lawrence and provided a Memorandum of Interview.

The CV confirms that Lawrence is a professional expert witness, not a fact witness here. A copy of the CV is attached hereto as Exhibit A. Buried in the middle of the 8-page CV is the following on page 3:

> **01/07/2019 - Present**
> **Hours per week - varies**
> **Materiality/Fact Expert for CMS**
> • Provide expert testimony/advice regarding materiality in legal cases brought by the agency with regard to the False Claims Act and Anti-Kickback Statute issues. Testimony and advice is requested by the Office of General Counsel, the Department of Justice, States Attorneys, and counsels to the Inspector General.

Exh. A at 3. On the next page, Lawrence further confirms his role as an expert:

> **04/18/2016 - present**
> **Hours per week - 40**
> **Subject Matter Expert – Chiropractic**

*Id.* at 4. On the next page, the CV also provides:

> **Multiple Attorneys, Insurance Agencies, Government Panels**
> **09/1994 - Present**
> **Hours per week:** varies
> **Independent Expert Witness**
> **Duties, Accomplishments and Related Skills:**
> **1994 TO PRESENT**

> - Independent Expert Witness/Professional Mentor - for legal firms, Department of Justice, Veterans Affairs, healthcare accounting firms, State licensing agencies, and insurance companies.
> Responsibilities:
> • Qualified as defense and plaintiff expert in trials and hearings regarding fraud, abuse, and malpractice issues regarding healthcare.
> • Lead multiple projects involving complex and/or high profile data regarding healthcare standards issues, (predominantly in legal settings - trials and state disciplinary hearings). These also include projects for the Department of Justice …

*Id.* at 5. Perhaps most telling, the CV touts his view of his success as an expert witness:

> Nearly perfect record **convincing the fact finder**, final decision maker regarding the position taken, resulting in many zero ($0) dollar verdicts for defense cases; awards greater than ten million ($40,000,000) [sic] dollars for plaintiff cases; and legal, regulatory, and/or disciplinary action taken in line with offered recommendations, with no appeals.
> • Researched and produced more than one thousand (1,000) legal documents that have been heavily scrutinized by the requesting party, the opposing party, and/or the fact finder.
>
> \*       \*       \*       \*
>
> Expert Witness work since 1994 and average four or five (5) cases per month with obvious peaks and valleys in time commitments based upon my patient schedule and the size of the case, but I have been involved in the large-scale projects since 2000.
>
> Since beginning at CMS in April of 2016, this work has reduced.

*Id.* at 5-6 (emphasis added).

The Memorandum of Interview also confirms that Lawrence, a chiropractor, was proposed here as an expert witness, not a fact witness. A copy of the Memorandum of Interview is attached hereto as Exhibit B. The summary of Lawrence's responses at the government's interview appears riddled with opinions and legal conclusions, a history focused on chiropractic practice for the relevant time period, a lack of any connection whatsoever to SpineFrontier's activities, and otherwise unsupported and unsupportable assertions lacking a genuine evidentiary foundation. In pertinent part, the following appears in the Memorandum of Interview:

> ….Lawrence's patients had a wide variety of payors to include Medicare, private insurance, automobile insurance, and workers compensation. Lawrence did not have any Maryland Medicaid patients.

3

Lawrence began working at the Centers for Medicare and Medicaid Services (CMS) in April 2016. Lawrence's initial position at CMS was in the Center for Program Integrity (CPI), where he handled prior authorization, Medicare Part B, and Medicare Part A. **Lawrence was recruited by CMS because he had been doing medical legal work since 1994** and also had a security clearance. Lawrence was hired because **CMS needed a chiropractor to work on a project. Lawrence was now a Subject Matter Expert for chiropractic within CMS**.

Lawrence described Medicare as basically a large insurance company broken into parts. Medicare Part A was hospital care, nursing homes, home health, and hospice. Medicare Part B was physicians, practitioners, durable medical equipment, and supplies. Medicare Part C was Medicare Advantage health insurance plans. Medicare Part D covered prescriptions.

*<u>In approximately 2020</u>*, Lawrence stopped working at CPI and **became Deputy Director for the division within CMS that updated the physician fee schedule**. For approximately the **past year**, Lawrence has **worked in the Center for Clinical Standards and Quality as the Chief Data Officer for the Quality Improvement Office** (QIO). CMS had quality improvement to help improve healthcare quality around the country. Lawrence has been helping develop a new version of this program, which was writing the thirteenth iteration/scope of work for the program.

**Lawrence testified for the government in one prior criminal trial and had depositions before as well. All cases for which Lawrence provided past testimony involved the Anti-Kickback Statute.** Additionally, Lawrence had also consulted on various cases in the past.

Lawrence generally had knowledge of CMS payment policies as well as payment processing policies. Lawrence was familiar with spine surgeries.

Lawrence described how CMS paid for spine surgery claims for Medicare beneficiaries. Medicare paid for a claim for services in a hospital setting using two sets of codes: a facility fee, and a professional fee.

The professional fee covered the service that the physician furnished to the patient, which would be the surgery. **CMS determined in very deep detail what was "baked" into the payment value**. Things like work time, work intensity, direct, and indirect costs were all considered. Direct costs were **not necessarily costs** of the doctor. For example, rent/lease of a building was not held by a doctor if the doctor was performing the service at a facility. The professional fee was Medicare Part B.

The facility fee was separate and rent as well as facility costs were considered with this. The facility fee was Medicare Part A. **Lawrence *<u>believed</u>* this generally included the cost of the spinal implants for spine surgeries but was not one

4

> **hundred percent certain. Basically, all supplies used for a certain procedure were "baked" into the codes**. Lawrence would review the certain codes for spinal implants to be one hundred percent sure.
>
> The claims for spinal surgeries would be submitted electronically and there would be various fields on the form. CMS would determine whether to pay the claim or not pay the claim for spinal surgeries. There were separate forms for professional claims and facility claims. If the initial form looked correct in the system, it would go through for processing. At this point, there could also be "edits," or the claim could be kicked back. If the claim continued through, it would be processed to be paid. **CMS trusted doctors to submit accurate claims.** This was because doctors were advised of the rules for enrollment prior to enrolling in Medicare. When a doctor requested to be enrolled in Medicare, they agreed to follow the rules of Medicare and agreed/attested to following those rules. **To shut payments off for a doctor, something would have to be proven. Unproved allegations would not stop payment. One reason CMS was a trust-based system was because of the volume of claims received.** CMS processed approximately 1.3 billion claims per year.
>
> There were a couple systems in place for quality control. CMS developed a pre-pay system that pointed out statistical outliers prior to the claims being paid. Prior to this system, CMS would pay the claim, then investigate. There were also "edits" for things that should not happen or could not possibly happen such as contradictory or duplicative claims. This **could** suspend the claim to give Medicare and/or contractors a chance to review what happened.
>
> **Lawrence had knowledge of the Anti-Kickback Statute.** *<u>Lawrence described if a physician was incentivized with money with the intent to induce the physician to do or not to do something, it would be a violation of the Anti-Kickback Statute.</u>* **Lawrence pointed out that CMS did not know if a doctor had received a kickback when a claim was submitted because there was no tracking mechanism on outside motivation for a doctor to act in a certain way or use a certain product. If CMS knew that a claim was induced by a kickback or attempted inducement,** <u>CMS would consider</u> **that to be inappropriate or tainted and would not pay the claim. This was because** <u>CMS did not want</u> **patients to get care for something they did not need and wanted to ensure doctors were** <u>*practicing ethically*</u> **and were not influenced by outside factors.**
>
> **Lawrence was testifying on behalf of CMS and was unsure if he was considered an expert witness. Lawrence had no prior knowledge of the defendants in this case.**

(Emphases added).

In an email dated February 28, 2025, the government vaguely described, among other things, that Lawrence's testimony would include references to: "1) CMS's reimbursement process generally, and specifically with respect to spine surgeries and associated professional services; and 2) how CMS handles *kickback-tainted* procedures and claims," suggesting some sort of specialized testimony concerning a concept of kickback "taint." (Emphasis added).

On March 6, 2025, Lawrence sent an email to the government, confirming that his testimony also relates in part to his opinions about billing codes:

> I have checked, and **it is likely** with the CPT codes not the DRG (i.e., professional code (Part B), not the facility fee (Part A). I would still like the codes, if possible.
> Thanks,
> Scott

A copy of this email is attached hereto as Exhibit C (emphasis added). Defense counsel repeatedly requested full expert disclosures by the government.

Faced with these deficiencies of its disclosures and other challenges in using Lawrence at trial since CMS apparently terminated him, the government has now suggested it would call some other CMS witness(es) for these topics without even identifying any of them by name, asserting as a basis for the change that Lawrence no longer works for CMS.

## Discussion

### I.     Lawrence is Not a Competent Fact or Expert Witness in this Case.

The government conceded that Lawrence lacked any personal knowledge about SpineFrontier matters. Lacking information connecting Lawrence to SpineFrontier, the government must have planned to use him as an expert witness, just as Lawrence has held himself out for decades as an expert for hire. Lawrence faces all the potential problems that can preclude expert testimony, including an inadequate background as a chiropractor rather than orthopedic spine surgeon, the lack of fit to the pending matter because his role at CMS occurred

6

*after* the events at issue, and the use of unreasonable methodologies to reach opinions, which includes offering subjective views on documents and opinions about the law. These deficiencies trigger the Court's gatekeeper role. Faced with these problems, the government has amended its witness list, removing Lawrence's name, instead indicating that it intended to call one or more CMS representatives.

Courts routinely perform in criminal cases the gatekeeper function that the Supreme Court established in *Daubert v. Merrell Dow*, 509 U.S. 579 (1993), and expanded in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), to preclude unreliable or otherwise defective expert testimony. *See*, *e.g.*, *United States v. Monteiro*, 407 F. Supp. 2d 351, 355 (D. Mass. 2006) (allowing, after "a six-day evidentiary hearing," a motion *in limine* in a criminal case, albeit without prejudice, criticizing the proposed expert witness's failure to follow protocol, the lack of peer review, and an overstatement to 100% certainty that could not be justified and could confuse a jury); *United States v. Frabizio*, 445 F. Supp. 2d 152, 156 (D. Mass. 2006) ("After three days of hearings and multiple briefings on the *Daubert* issue, I have serious doubts as to whether a person visually studying the images in this case can distinguish real pictures from manipulated or wholly virtual ones with the level of confidence required in a criminal prosecution."), *decision clarified on reconsideration*, 463 F. Supp. 2d 111 (D. Mass. 2006).

Traditionally, *Daubert* considers (1) the qualifications or background of the proffered expert, (2) the fit or relevance of the opinions to the case, and (3) the reliability of the methodology used to reach opinions. *See Monteiro*, 407 F. Supp. 2d at 355. With respect to non-scientific expert testimony based on experience, the *Frabizio* court explained:

> Where, as here, the expert relies on his experience to justify his methodology, the Court must examine the experience underlying his conclusions. As the Advisory Committee noted in amending Federal Rule of Evidence 702, "no one denies that an expert might draw a conclusion from a set of observations

7

based on extensive and specialized experience." Fed.R.Evid. 702 advisory committee's notes to 2000 Amendment (*quoting Kumho Tire*, 526 U.S. at 156, 119 S.Ct. 1167). At the same time:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'

*Id*. (citing *Daubert v. Merrell Dow*, 43 F.3d 1311, 1319 (9th Cir.1995)).

*Frabizio*, 445 F. Supp. 2d at 163.

### A. The Government's Disclosures for Lawrence as a CMS Representatives and its Amended Witness List Fail to Reflect the Qualifications of Anyone Timely Disclosed to Serve as an Expert Witness Concerning Orthopedic Spine Surgeon Billing Practices.

According to Lawrence's CV, after a long career as a chiropractor and expert in insurance-related personal injury matters, Lawrence recently worked for CMS, initially as a chiropractic expert and, beginning in 2020, in some apparent general capacity. But Lawrence is a chiropractor not an orthopedic spine surgeon, and he did any non-chiropractic work for CMS only *after* the time period at issue in the Indictment. Hence, serious questions about his experience undermine his ability to testify here. Similarly, the government's disclosure of an amended witness list fails to show the necessary qualifications of any timely-disclosed expert witness.

Courts do not generally allow proposed expert witnesses to exceed the focus of their professional wingspan. As the court explained in *United States v. Vista Hospice Care, Inc.*, No. 3:07-CV-00604-M, 2016 WL 3449833 (N.D. Tex. June 20, 2016):

> "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009). Dr. Steinberg has no specialized knowledge,

8

> training, or experience that supports his conclusions about Defendants' business practices, and it would not be helpful to a jury for him to surmise how such practices may have impacted the conduct of Defendants' employees and others. *Daubert*, 509 U.S. at 579 ("The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation."). Thus, Dr. Steinberg would not be allowed to testify that, among other things, "pressure from corporate would have caused ineligible patients to be admitted." Steinberg Rept. at 31.

*Id.* at *15; *see Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989) (affirming grant of new trial based on use at trial of chiropractor's testimony about future back surgery beyond his expertise).

Here, the government's limited disclosures cannot show how a witness such as Lawrence can offer relevant expert testimony despite providing general services for CMS at the wrong time and interacting with CMS in private practice only as a chiropractor. The government has not (timely) identified anyone else adequately by name and background to show the requisite qualifications. Hence, this Court should preclude the government from calling Lawrence or any other CMS representative as an expert witness to testifying about their specialized knowledge or experience. At the very least, this Court should conduct a *Daubert* hearing before allowing any such person to testify and establishing a permissible scope of testimony, if any.

### B. The Proposed Testimony Does Not Fit the Case Because it is Irrelevant.

In part, the government has planned to use Lawrence or a future late-identified CMS representative to testify to opinions about practices at and views of CMS, including potentially on materiality and so-called "kickback-taint" issues. Apparently Lawrence would base his testimony on a role at CMS between sometime in or after 2020 and through 2024, even though the events underlying the charges occurred prior to that, primarily between 2012 and early 2017. The government has not shown how Lawrence's experience working for CMS *after* the events at issue is relevant. The government has made no disclosure about anyone else that would be in a

9

position to provide information any more relevant to issues in this case given how old the events at issue are.

### C. The Government Proposed Reliance on Lawrence, and Now on One or More Unidentified CMS Representatives, to Provide Opinions or Characterizations Based on Unreliable Methodologies.

As vague as the descriptions were of Lawrence's intended testimony, it appeared to suffer from at least two problems. First, the government appeared to highlight Lawrence at least in part as a *legal* expert, which is not allowed. *See Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) (explaining that expert witnesses cannot testify to legal conclusions "because the judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial"). Second, apparently the government resorted to Lawrence to review documents in this case and then offer his views on what they mean and what CMS's views would be in light of Medicare practices with which he is familiar, such as on issues of materiality, which is also not allowed. *See Vista Hospice Care*, 2016 WL 3449833, at *15. The government has made no disclosure of anything more appropriate for another expert witness.

In *Vista Hospice Care*, the court stated: "Insofar as Dr. Steinberg summarized documents and testimony regarding Defendants' marketing and business practices and then opined on how those practices impacted Defendants' employees and the physicians who certified patients for hospice, such testimony is based on improper speculation, which the Court would not allow at trial, and thus the Court will not consider it." *Id.* In more detail, the court explained:

> Further, "characterizations of documentary evidence" are not proper subjects for expert testimony, "because the trier of fact is entirely capable of determining whether or not to draw such conclusions without any technical assistance from...experts." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). A large section of Dr. Steinberg's report summarizes and describes documents produced by Defendants in the course of this litigation. *See, e.g.*, Steinberg Rept. at 28 ("It is clear from VistaCare's documents that they had a formal, company-wide policy to have their Medical Review Team review all

10

> potential live discharges due to medical ineligibility."); *id.* at 31 ("Based on the documents and witness testimony I have reviewed, VistaCare appears to have put immense pressure on its employees to maintain census."). These summaries and characterizations would not be helpful to jurors, who are able [to] make their own determinations about what relevant documents show, and such testimony therefore would not be allowed, and will not be considered here.

*Id.* Likewise, here the government elicited from Lawrence at his "interview" opinions concerning the legal reach of the Anti-Kickback Statute, CMS's views, and other unsubstantiated or speculative commentary or characterizations about the facts. In its role as gatekeeper, this Court should preclude the government from relying on someone who boasts of his ability to "convince" factfinders, rather than prove its charges based on competent evidence. As a result, this Court should either preclude Lawrence or another unidentified CMS witness, or conduct a *Daubert* hearing.

### D. A *Daubert* Hearing Must be Held Before Allowing the Proposed Testimony.

At the very least, Dr. Chin is entitled to a *Daubert* hearing before the government can use testimony by Lawrence or another CMS representative for purposes unrelated to personal observations of SpineFrontier's or Dr. Chin's activities. *See Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25-26 (1st Cir. 2006) (rejecting argument that *Daubert* hearing went too far into a "mini-trial" because it was the "responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis"); *Frabizio*, 445 F. Supp. 2d at 156 (granting a *Daubert* motion after a multi-day evidentiary hearing); *Monteiro*, 407 F. Supp. 2d at 355 (granting a *Daubert* motion after a multi-day evidentiary hearing).

11

## II. In the Alternative, the Court Should Compel the Government to Make a Full Expert Disclosure and *Brady* Disclosure, and Then Assess *Daubert* Issues.

The limited disclosure by the government here is somewhat similar to that in *United States v. Capleton*, 199 F.R.D. 25, 27 (D. Mass. 2001), where this Court compelled the government to produce fulsome discovery concerning a witness that qualified as an expert, even when the government sought to label the witness otherwise. As the Court explained:

> …There is no doubt that Shuler is an expert. First, his testimony, as proffered, requires "specialized knowledge" and does not relate to matters common enough to qualify as lay opinion. The opinions about which Shuler intends to testify, particularly as they are based on his training and experience, require demonstrable expertise. *See Corey*, 207 F.3d at 88-89; *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir.1997).
>
> \*    \*    \*    \*
>
> Second, the Government itself acknowledges that Shuler is an expert. It has provided a summary of his expected testimony in specific response to Defendant's request for "expert witness" information. Indeed, the Government makes multiple references in its discovery letter to Shuler's "training," "experience" and "expertise." To be sure, the Government now argues that Shuler's proposed testimony will be that of a lay, not an expert, witness. In the court's opinion, that argument is simply too late. Were the court to now treat Shuler's opinions as lay testimony, it would contradict the expertise necessary for its proffer and "would encourage the Government to offer all kinds of specialized opinions without pausing first properly to establish the required qualifications of their witnesses." *Figueroa-Lopez*, 125 F.3d at 1246. *See also United States v. Shepard*, 188 F.R.D. 605, 608 (D.Kan.1999) ("Rule 702 is not trumped simply because the witness also perceived the facts on which an opinion is to be rendered."). In short, to the extent the Government intends to use the proffered evidence in its case-in-chief, as it has indicated it will, it must comply with the requirements of Rule 16(a)(1)(E).

*Capleton*, 199 F.R.D. at 27. The *Capleton* Court explained that "[i]n essence, Rule 16(a)(1)(E) mandates the Government to provide a written summary of (1) the expert witness' opinions, (2) the bases and reasons for those opinions, and (3) the qualifications of the expert." *Id.* Accordingly, the Court compelled the government to produce information included in these categories, including the following items:

   • a more complete summary of the opinions [the witness] will offer;

   • copies of any summaries prepared by [the witness] as a result of his analysis of the case;

   • underlying data relied upon by [the witness] when forming his opinion;

   • [the witness's] resume; and

   • a list of cases in which [the witness] has previously testified.

*Id.* at 28. If this Court does not preclude the government from belatedly relying on Lawrence or another CMS representative, the Court should compel such full compliance with Rule 16.

  In addition, now that the government has enlisted someone because of service for CMS onto the prosecution team, the government should be required to produce the outstanding items that it failed to collect from CMS other than through an informal response to an informal request by prosecutors. In a February 5, 2025 Memorandum & Order, this Court refrained from requiring the government to mandate productions from CMS, finding that CMS was not part of the prosecution team at that time and, as a result, "the government ha[d] no *Brady* obligation to seek out potentially exculpatory material in CMS's possession…." D.E. 232. Now that "team" has changed, as the government has selectively accessed and attempted to rely on a CMS employee and CMS practices. *See United States v. Rosenschein*, No. CR 16-4571 JCH, 2019 WL 2298810, at *7 (D.N.M. May 30, 2019) ("[I]n this particular case, NCMEC's actions were somewhat limited. However, they are enough to make NCMEC part of the prosecution team."), *reconsideration denied*, 2020 WL 2750247 (D.N.M. May 27, 2020); *United States v. Burnside*, 824 F. Supp. 1215, 1257 (N.D. Ill. 1993) ("The 'prosecutorial team' concept does not, however, relieve the government of its duty to inquire about *Brady* information when the known facts warrant further inquiry into facts readily available."). Accordingly, for all the reasons and scope set forth in and guided by the motion underlying the February 5, 2025 Memorandum & Order,

now that the government has turned even more so to CMS for the prosecution's case, the government now has obligations to make a fulsome *Brady* search and collection from CMS.

## Conclusion

Based on the foregoing, the government should be precluded from calling Lawrence or another CMS representative as a witness at trial. In the alternative, this Court should compel the government to comply with Fed. R. Crim. P. 16 and fulfill its *Brady* obligations with respect to a full production of discovery concerning Lawrence and CMS.

Respectfully submitted,

**KINGSLEY CHIN**

By their attorneys,

/s/ *Joshua L. Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

## CERTIFICATE OF SERVICE

The undersigned certifies that this document, April 11, 2025, through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Joshua L. Solomon

## Local Rule 7.1(a)(2) Certification

Defense counsel conferred in good faith with counsel for the government in an effort to resolve or narrow the issues described herein. The government agreed to produce a CV for Lawrence or a substitute witness, but would neither withdraw the witness from the government's witness list nor provide all the requisite expert disclosures. No agreement could be reached to resolve or narrow this motion.

/s/ Joshua L. Solomon