# EXHIBIT B



**Department of Veterans Affairs**
**Office of Inspector General**
**Criminal Investigations Division**
**Boston Resident Agency**
**200 Springs Road, Bldg. 16**
**Bedford, MA 01730**

## MEMORANDUM OF INTERVIEW

| | |
|---|---|
| Date: | 03/10/2025 |
| Appr: | RJB   ROBERT BOSKEN *Digitally signed by ROBERT BOSKEN Date: 2025.03.10 17:35:34 -04'00'* |

| | |
|---|---|
| Case File: | 2016-00521-IN-0141 |
| Date of Interview: | 03/06/2025 |
| Time: | ~11:30 AM |
| Place of Interview: | Via Zoom Video Teleconference |
| Person Interviewed: | Dr. Scott Lawrence |
| Interviewed By: | Abraham George, Assistant U.S. Attorney |
| | Christopher Looney, Assistant U.S. Attorney |
| | Daniel Mancini, Special Agent, VA OIG   DANIEL MANCINI *Digitally signed by DANIEL MANCINI Date: 2025.03.11 08:27:27 -04'00'* |

On March 6, 2025, Assistant U.S. Attorney (AUSA) Abraham George, AUSA Christopher Looney, and U.S. Department of Veterans Affairs Office of Inspector General Special Agent Daniel Mancini interviewed Dr. Scott Lawrence (Lawrence). The interview was conducted via Zoom Video Teleconference. Lawrence was introduced to government personnel and given background on the purpose of the interview. The following is a non-verbatim summary of the interview. Lawrence provided the following information, in part:

Lawrence attended the University of Miami, the State University of New York, and Palmer College of Chiropractic. Lawrence graduated from Palmer College of Chiropractic in Davenport, Iowa with a Bachelor of Science, and a doctoral degree in 1987. Lawrence then got licensed, started practicing, and started a private chiropractic practice with one other doctor. The other doctor is also his wife. Lawrence currently lived in Maryland and still owned the private practice, which was described as a general chiropractic practice, treating all ages and types of conditions. Lawrence's patients had a wide variety of payors to include Medicare, private insurance, automobile insurance, and workers compensation. Lawrence did not have any Maryland Medicaid patients.

Lawrence began working at the Centers for Medicare and Medicaid Services (CMS) in April 2016. Lawrence's initial position at CMS was in the Center for Program Integrity (CPI), where he handled prior authorization, Medicare Part B, and Medicare Part A. Lawrence was recruited by CMS because he had been doing medical legal work since 1994 and also had a security clearance. Lawrence was hired because CMS needed a chiropractor to work on a project. Lawrence was now a Subject Matter Expert for chiropractic within CMS.

FOR OFFICIAL USE ONLY
(Public Availability to be Determined Under 5 USC 552 and 552a)

File Number:   2016-00521-IN-0141
Case Name:    SPINEFRONTIER, et al

Lawrence described Medicare as basically a large insurance company broken into parts. Medicare Part A was hospital care, nursing homes, home health, and hospice. Medicare Part B was physicians, practitioners, durable medical equipment, and supplies. Medicare Part C was Medicare Advantage health insurance plans. Medicare Part D covered prescriptions.

In approximately 2020, Lawrence stopped working at CPI and became Deputy Director for the division within CMS that updated the physician fee schedule. For approximately the past year, Lawrence has worked in the Center for Clinical Standards and Quality as the Chief Data Officer for the Quality Improvement Office (QIO). CMS had quality improvement to help improve healthcare quality around the country. Lawrence has been helping develop a new version of this program, which was writing the thirteenth iteration/scope of work for the program.

Lawrence testified for the government in one prior criminal trial and had depositions before as well. All cases for which Lawrence provided past testimony involved the Anti-Kickback Statute. Additionally, Lawrence had also consulted on various cases in the past.

Lawrence generally had knowledge of CMS payment policies as well as payment processing policies. Lawrence was familiar with spine surgeries.

Lawrence described how CMS paid for spine surgery claims for Medicare beneficiaries. Medicare paid for a claim for services in a hospital setting using two sets of codes: a facility fee, and a professional fee.

The professional fee covered the service that the physician furnished to the patient, which would be the surgery. CMS determined in very deep detail what was "baked" into the payment value. Things like work time, work intensity, direct, and indirect costs were all considered. Direct costs were not necessarily costs of the doctor. For example, rent/lease of a building was not held by a doctor if the doctor was performing the service at a facility. The professional fee was Medicare Part B.

The facility fee was separate and rent as well as facility costs were considered with this. The facility fee was Medicare Part A. Lawrence believed this generally included the cost of the spinal implants for spine surgeries but was not one hundred percent certain. Basically, all supplies used for a certain procedure were "baked" into the codes. Lawrence would review the certain codes for spinal implants to be one hundred percent sure.

The claims for spinal surgeries would be submitted electronically and there would be various fields on the form. CMS would determine whether to pay the claim or not pay the claim for spinal surgeries. There were separate forms for professional claims and facility claims. If the initial form looked correct in the system, it would go through for processing. At this point, there could also be "edits," or the claim could be kicked back. If the claim continued through, it would be processed to be paid. CMS trusted doctors to submit accurate claims. This was because doctors were advised of the rules for enrollment prior to enrolling in Medicare. When a doctor requested to be enrolled in Medicare, they agreed to follow the rules of Medicare and agreed/attested to following those

FOR OFFICIAL USE ONLY
(Public Availability to be Determined Under 5 USC 552 and 552a)

File Number:    2016-00521-IN-0141
Case Name:      SPINEFRONTIER, et al

rules. To shut payments off for a doctor, something would have to be proven. Unproved allegations would not stop payment. One reason CMS was a trust-based system was because of the volume of claims received. CMS processed approximately 1.3 billion claims per year.

There were a couple systems in place for quality control. CMS developed a pre-pay system that pointed out statistical outliers prior to the claims being paid. Prior to this system, CMS would pay the claim, then investigate. There were also "edits" for things that should not happen or could not possibly happen such as contradictory or duplicative claims. This could suspend the claim to give Medicare and/or contractors a chance to review what happened.

Lawrence had knowledge of the Anti-Kickback Statute. Lawrence described if a physician was incentivized with money with the intent to induce the physician to do or not to do something, it would be a violation of the Anti-Kickback Statute. Lawrence pointed out that CMS did not know if a doctor had received a kickback when a claim was submitted because there was no tracking mechanism on outside motivation for a doctor to act in a certain way or use a certain product. If CMS knew that a claim was induced by a kickback or attempted inducement, CMS would consider that to be inappropriate or tainted and would not pay the claim. This was because CMS did not want patients to get care for something they did not need and wanted to ensure doctors were practicing ethically and were not influenced by outside factors.

Lawrence was testifying on behalf of CMS and was unsure if he was considered an expert witness. Lawrence had no prior knowledge of the defendants in this case.

The interview ended at approximately 12:15 PM.