P42AOmn1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA, *et*
3   *al., ex rel.* URI BASSAN,

4               Plaintiffs,

5           v.                          15 Civ. 4179 (CM)

6   OMNICARE, INC.,

7               Defendant.
    ------------------------------x
8   UNITED STATES OF AMERICA,

9               Plaintiff,

10          v.                          Trial

11  OMNICARE, INC. and CVS HEALTH
    CORP.,
12
                Defendants.
13  ------------------------------x
                                        New York, N.Y.
14                                      April 2, 2025
                                        9:53 a.m.
15

16

17  Before:

18                  HON. COLLEEN MCMAHON,

19                                      District Judge
                                        -and a Jury-
20

21

22

23

24

25

P42AOmn1

APPEARANCES

MATTHEW D. PODOLSKY
        Acting United States Attorney for
        the Southern District of New York
BY:   JEAN-DAVID BARNEA
        SAMUEL H. DOLINGER
        MONICA P. FOLCH
        JENNIFER A. JUDE
        LUCAS E. ISSACHAROFF
        JEREMY M. LISS
        JEFFREY K. POWELL
        Assistant United States Attorneys

WILLIAMS & CONNOLLY LLP
        Attorneys for Defendants
BY:   BETH A. STEWART
        ENU A. MAINIGI
        SUZANNE SALGADO
        TYLER INFINGER
        WILLIAM ASHWORTH
        DAVID RANDALL J. RISKIN
        BENJAMIN N. HAZELWOOD
        ASHLEY S. ALEXANDER
        HOLLY CONLEY

ALSO PRESENT:

RUPA PALLA, USAO Paralegal Specialist
JESSICA FLORES, USAO Paralegal Specialist
RAHEL BAHIBLA, Paralegal
SALLY EVANS, Paralegal
MATT SIMMONS, Technical Assistant

P42AOmn1

1          (Trial resumed; jury not present)

2          THE COURT:  Case on trial continued.  Parties present.

3    The jurors are not present.  I don't think we've got them all

4    yet.  Traffic is not great this morning.  I will say that.

5          What's the problem this morning?  There's always a

6    problem, so.

7          MS. SALGADO:  Yes, your Honor.  Suzanne Salgado here

8    to raise a problem.  I'll be brief.

9          THE COURT:  Hi.

10          MS. SALGADO:  So last night we got some disclosed

11    demonstratives and revised summary exhibits for witnesses going

12    today, one of which after this next witness.  So if your Honor

13    would like, we would like to address briefly.

14          THE COURT:  Hand them to me.

15          MS. SALGADO:  Yes.  Would your Honor like the motion

16    as well?

17          THE COURT:  Would I like the what?

18          MS. SALGADO:  The motion we filed on this issue.

19          THE COURT:  I'm not reading anything.  You're going to

20    argue it.  I'm going to decide.  That's it.  I don't have time

21    to read your motions that you filed.  Why are you filing

22    motions in the middle of the trial?  It's ridiculous.

23          MS. SALGADO:  Your Honor, one addresses --

24          THE COURT:  Give me the number.

25          MS. SALGADO:  This is Jodi Sullivan, a witness who is

P42AOmn1

1    coming --

2                THE COURT:  I'm sorry.  Government Exhibit 1706.  I

3    don't care who the witness is.  What's the problem with this?

4                MS. SALGADO:  The problem is this is patient

5    dispensing data.  The government disclosed it as a

6    demonstrative to a fact witness, Jodi Sullivan, who as we

7    understand, has never worked at Omnicare, has no knowledge --

8                THE COURT:  Sounds like great cross to me.

9                MS. SALGADO:  We are concerned.  She's been an expert

10   for the government in prior cases.  This, as we understand it,

11   is from their expert's report, and she has no knowledge about

12   it.  We would just ask for a proffer on what she intends to say

13   about it and how she's going to --

14               THE COURT:  Be my guest.  What is she going to say?

15   Stand up.

16               MR. ISSACHAROFF:  Thank you, your Honor.  She was

17   disclosed to discuss the claims dispensing data and --

18               THE COURT:  What will she say about this document?

19   Has she ever seen it before in her life?

20               MR. ISSACHAROFF:  She has seen PDE and dispensing data

21   in her job.  She sees it every day.  It's in her job --

22               THE COURT:  But she sees things that look like this?

23               MR. ISSACHAROFF:  Things that look like that, yes,

24   your Honor.

25               THE COURT:  And what's she going to say?

P42AOmn1

```
 1           MR. ISSACHAROFF:  She's going to say this is the type
 2    of claims data in one field, one color, and dispensing data in
 3    another, and PDE data that's ultimately submitted to the
 4    government.  This is taken from Omnicare's claims data that's
 5    in evidence in this case.
 6           THE COURT:  And she's going to say this is what we
 7    sent to government, this is what they audit?
 8           MR. ISSACHAROFF:  Yes.
 9           THE COURT:  Fine.  It comes in.  Next?
10           MR. ASHWORTH:  Yes, your Honor.  The next issue --
11    there are a number --
12           THE COURT:  Government Exhibit 1707, that's the next
13    thing in that folder.
14           MR. ISSACHAROFF:  That's the same, your Honor.  I
15    assume.
16           MS. SALGADO:  Same issue.
17           THE COURT:  Fine.  Same issue.  Great.  Next?
18           MR. ASHWORTH:  Yes, your Honor.  On the certain
19    documents that are underlying one of the summary exhibits
20    1606B.  At the pretrial conference, if your Honor will recall,
21    there was a discussion about redacting those documents that
22    contained all kinds of information that is before the time
23    period of unrelated settlements, etc.
24           So we were trying to work with the government to get
25    to an agreement on redactions to that series of documents.  We
```

P42AOmn1

1    got some documents last night.  They still have things in

2    them --

3                THE COURT:  Then they can't come in.  Until you agree,

4    and I'm not going to be the one to decide.  Either you agree or

5    the government cannot introduce them.  That's the end of that.

6    Next?

7                Ms. Jude, I'm not kidding.

8                MS. JUDE:  No, your Honor.  We sent redacted versions

9    even this morning that implemented --

10               THE COURT:  It's a little late.

11               MS. JUDE:  Well, we only got --

12               THE COURT:  The final pretrial conference was a while

13   ago.

14               MS. JUDE:  They have had the exhibits since Friday,

15   and we got this objection last night after trial.  We

16   implemented redactions.  We sent them to them.  I think at

17   2:00 a.m., we got another e-mail saying these aren't redacted

18   enough.  We made redactions this morning.  And I have not heard

19   anything about whether those are acceptable.

20               THE COURT:  Fine.  You can talk at a break.  I'm not

21   going to make these decisions.  Either you agree or the

22   government does not introduce.  That's the end of it.

23               And, by the way, if you disagree in bad faith, I'll

24   take it out on you, so...

25               MS. FOLCH:  Your Honor, finally, the last issue here

P42AOmn1

1    is that we have a concern that Ms. Mainigi in her opening and

2    in her cross-examination of Mr. Bassan is constantly referring

3    to this side as SDNY, as opposed to the government.

4            THE COURT:  Yeah.  I don't understand.  First of all,

5    SDNY is an acronym that most people don't understand.

6            Use the word "the government."  I refer to them as the

7    government.  They're the government.  Okay?  Don't say SDNY.

8    Don't even say Southern District of New York.  They're the

9    government.  And they're entitled to be addressed as the

10   government.

11           MS. MAINIGI:  Your Honor, the issue is the distinction

12   between CMS and --

13           THE COURT:  They are the government.

14           MS. MAINIGI:  And the position that they are taking.

15           THE COURT:  They are the government.  Okay?  Your

16   position is that the government is taking inconsistent

17   positions.  Fine.

18           MS. MAINIGI:  Correct, your Honor.

19           THE COURT:  This is the government.  That's how we

20   address the United States Attorneys in this district.  We refer

21   to the United States Attorney's Office as the government.  The

22   ubiquitous government.  And you are going to say that the

23   government is standing up in front of you, ladies and

24   gentlemen, and they are saying that we have submitted

25   fraudulent claims.  Well, there's a lot of pieces to the

P42AOmn1

1    government, ladies and gentlemen of the jury, and the pieces

2    that matter in this case, which are the pieces that Medicare

3    and Medicaid and TRICARE, they didn't think we were filing

4    false claims.  Okay?  Fine.  You can do that.  I know you can

5    do that.  You're very experienced and you're very good.  So

6    please do them the courtesy of referring to them as the

7    government.  And they are not the witness' lawyers.  Okay?

8            MS. MAINIGI:  Understood, your Honor.

9            MR. O'NEIL:  Down one juror.

10            THE COURT:  Okay.

11            MR. BARNEA:  Your Honor, would this be a good time to

12    get the witness on the stand?

13            THE COURT:  It would be a great time.

14            MR. BARNEA:  Okay.  You'll be happy to know, your

15    Honor, that I found my thickest copy of the bankruptcy code so

16    now I can put the microphone a little bit closer to my mouth.

17            THE COURT:  Excellent.  I know from sad experience how

18    thick that bankruptcy book is.  And I use the word thick in

19    every conceivable...

20            Come on back up, Mr. Hardy.

21            THE WITNESS:  Yes, ma'am.

22            THE COURT:  I've missed you.

23            THE WITNESS:  I missed you, too.

24            THE COURT:  Which one is missing?

25            MR. O'NEIL:  Ten.

P42AOmn1

1          THE COURT:  Does she come down from upstate?  I've got

2     them.  She comes in from White Plains.

3          LAW CLERK:  She comes in from the Bronx.

4          THE COURT:  Juror No. 10?

5          MR. O'NEIL:  Not your 10.

6          THE COURT:  No.  Juror No. 10, Kimberly Mason.  She

7     comes in from White Plains.

8          LAW CLERK:  No, this is Nancy Defrias.  Originally

9     Juror No. 66.

10          THE COURT:  Okay.

11          (Pause)

12     Jim, we've checked all the phones?  We checked the

13     phones upstairs and no message?

14          MR. O'NEIL:  The jurors are here.  They're coming in,

15     in just a moment.

16          THE COURT:  She's here?  Okay.  Great.

17          (Continued on next page)

18

19

20

21

22

23

24

25

P42AOmn1                          Hardy - Direct

1              (In open court; jury present)

2              THE COURT:  Good morning, everybody.

3              JURORS:  Good morning.

4              THE COURT:  Okay.  Have a seat.  Guess who's back?

5    Mr. Hardy.

6              And, sir, you're still under oath.

7              You may inquire.

8              MR. BARNEA:  Thank you, your Honor.

9    JEFFREY CHAD HARDY, resumed.

10   DIRECT EXAMINATION CONTINUED

11   BY MR. BARNEA:

12   Q.  Good morning, Mr. Hardy.

13   A.  Good morning.

14   Q.  We talked yesterday about -- that's too loud.

15        We talked yesterday about how rollover works in

16   OmniDX.  What information did you base your description on?

17   A.  It would be based on the materials I reviewed, screenshots

18   I was provided.

19   Q.  And manuals?

20   A.  Yes, the system manuals.

21   Q.  And are the screenshots in these manuals from actual

22   prescription dispensing by actual Omnicare pharmacies?

23   A.  No.  They're from what we call -- sorry.

24        No, they're from what we call a test system.

25   Q.  And what is a test system?

P42AOmn1                          Hardy - Direct

1   A.  It's a version of the computer system that we would use,

2   you know, in the pharmacies.  But it doesn't have actual

3   patients or real prescriptions in it.

4   Q.  Is it possible that dispensing by actual Omnicare

5   pharmacies using the live OmniDX system would look slightly

6   different?

7   A.  Yes.

8   Q.  In what ways?

9   A.  Well, for instance, some of the screenshots we looked at

10  yesterday didn't have a prescribed quantity in those examples.

11  Of course, some of them didn't have like an RX issue date on

12  them.  In the live system, those fields could be populated.

13  Q.  Is it possible they're also system configurations that are

14  slightly different in the live system from the test system

15  that -- from the screenshots that you saw?

16  A.  Yes, that's also possible.

17  Q.  Would any such configuration changes, to your knowledge,

18  effect your opinion in this case?

19  A.  No.

20  Q.  And would the same be true for the testimony you'll give us

21  later this morning about the Oasis system?

22  A.  Yes, the same would be true.

23  Q.  All right.  So yesterday we talked a little bit about the

24  retirement field in OmniDX.  Let's switch to a different topic.

25  The cycle fill feature of OmniDX.

P42AOmn1                          Hardy - Direct

1              What is cycle fill?

2    A.  Cycle fill is a process used to fill prescriptions for a

3    bunch of patients at facility at the same time.

4    Q.  And why would a long-term care pharmacy like Omnicare use a

5    feature like cycle fill?

6    A.  For productivity.  If they have a lot of prescriptions that

7    they need to work on, they use this type of process to organize

8    those prescriptions into groups, if you will, so that they can

9    fill them more efficiently and deliver them.

10   Q.  Did OmniDX cycle fill feature cause prescriptions to

11   rollover?

12   A.  Yes.

13   Q.  And which prescriptions rollover in an OmniDX cycle fill

14   transaction?

15   A.  Any prescriptions that are expired or out of refills that

16   were processed through the cycle fill system, that were left on

17   the cycle fill list, and were processed through the cycle fill

18   system.

19   Q.  Does coding a facility as retirement Y or N effect whether

20   OmniDX cycle fill will rollover prescriptions?

21   A.  No.  It does not.

22   Q.  Are OmniDX users notified that prescriptions are rolling

23   over while they are running a cycle fill?

24   A.  No, they are not, to my knowledge.

25   Q.  What happens when a prescription rolls over in OmniDX cycle

P42AOmn1                        Hardy - Direct

1   fill?

2   A.  Can you repeat the question?  I'm sorry.

3   Q.  What happens when a prescription rolls over in OmniDX cycle

4   fill?

5   A.  When a prescription rolls over, much like we talked about

6   before with the other orders, the prescription would get a new

7   prescription number assigned, the number of refills in that

8   prescription would reset.  The first fill date we talked about

9   before, that fill date would reset to the date that the

10  prescription rolled over as well.

11  Q.  Is there a way for OmniDX users to see which prescriptions

12  in a cycle fill are expiring or have no refills left?

13  A.  Not to my knowledge.

14  Q.  Is there a report that OmniDX users can create that would

15  enable them to find out which prescriptions might be rolling

16  over?

17  A.  Yes.  It's called physician call back report.

18  Q.  And what is a physician call back report?

19  A.  It's a report that you can -- that the user can generate or

20  the system -- you can set up, like it's automatically print, so

21  it's a printed, it's a printed report is my understanding.  And

22  that report would show prescriptions on it that are low, like

23  one refill left, zero refills left on it, or prescriptions that

24  were expired.

25  Q.  Let's take a look at the page from the OmniDX manual and

1    let's look at the top part of this slide.

2            What does it say about how OmniDX users could request

3    a physician call back report?

4    A.  It says the physician call back report may also be

5    generated if any of the orders due to be refilled are going to

6    run out of allowable refills.

7    Q.  And it says may.  To your understanding, does the OmniDX

8    computer system force users to create a physician call back

9    report when they run a cycle fill?

10   A.  No, it does not.

11   Q.  Did you have any concerns about this process, this

12   particular part of the process in terms of software design?

13   A.  Yes.  Much like we kind of have the cycle fill list, what I

14   would like to see or like to have seen is a kind of physician

15   call back list in the system that's built into the computer

16   system, such that any of the prescriptions that would, you

17   know, normally print on that call back report were removed from

18   the cycle fill list until they had, you know, appropriate

19   authorization to be added back into that list.

20   Q.  Can you give an example of what you would envision the

21   system that you're talking about, how it would work?

22   A.  Yeah.  So any prescription that would print on the

23   physician call back report, instead it would -- those

24   prescriptions that are in the cycle fill would default to being

25   removed out of that cycle fill list and put on it in a separate

P42AOmn1                          Hardy - Direct

1    list in the computer system.  And that way, if you continued to

2    process the cycle fill, you know, you wouldn't have any

3    prescriptions that were rolling over without appropriate

4    authorization.

5    Q.  What happened, what would happen -- what happens if an

6    OmniDX user processes a cycle fill, but does not receive or

7    review a physician call back report?

8              THE COURT:  Don't drop your voice, please.

9              MR. BARNEA:  Sorry.

10   Q.  What happens if an OmniDX user processes a cycle fill, but

11   does not receive or review a physician call back report?

12   A.  The cycle fill would continue to be able to process that.

13   Any prescriptions that were expired or out of refills would

14   automatically rollover to a new prescription number and it

15   would allow them to be filled.

16   Q.  At the bottom part of the screen we see an example of part

17   of a physician call back report.  Can you walk us through what

18   we're looking at here?

19   A.  Yeah.  So this is just an example, one medication for one

20   patient.  You can see it shows you the prescription number

21   there, the RX order number, the description of the drug of

22   course.  And then at the right side you can see how it's

23   showing the allowed refills and refills used for this

24   particular prescription.

25   Q.  So this prescription has one refill left and that's why

1  it's on the call back report?

2  A.  Correct.

3  Q.  Does the physician call back report display all

4  prescriptions in a cycle fill that are expired or out of

5  refills?

6  A.  No.  My understanding is that if the system defaulted the

7  number of refills -- you know how we had talked about that

8  yesterday.  If the system defaults the number of refills, for

9  example, then those would not show on that report.  It only

10 shows if the retirement was set to Y, as we talked about

11 yesterday with the facility, or if the user had manually filled

12 in the number of refills, for example.

13 Q.  So if retirement was set to N and the user did not put in a

14 number of refills, those prescriptions would not show up on the

15 physician call back report; is that right?

16 A.  That's correct.

17 Q.  If a user of OmniDX reviews a physician call back report

18 and concludes that some prescriptions should not be refilled,

19 what are they supposed to do?

20 A.  They would have to manually go to an area of the cycle fill

21 program and they would have to remove each of those

22 prescriptions individually.

23 Q.  Let's take a look at another screenshot.

24      What are we looking at here?

25 A.  This is an example of that screen that we just talked

P42AOmn1                        Hardy - Direct

1    about.  So you can see it's, you know, an edit cycle refills

2    screen.

3    Q.  And can you read the instructions here at the top that have

4    been highlighted?

5    A.  Yeah.  It says:  If there are orders that must be

6    eliminated from the cycle refilling list, you can remove them

7    using the edit function.  If the list is perfect, skip this

8    function.

9    Q.  Do you have any concerns about this particular aspect of

10   the process in terms of software design?

11   A.  Yes.  I think, I think in general, the cycle fill program

12   should -- the default behavior should be to remove those

13   prescriptions that need authorization from the list.  And that

14   would make it, you know, that would make it better in my

15   opinion.

16   Q.  And did you have any concerns about having to remove them

17   one by one or using this particular function?

18   A.  Yes.  So like we mentioned before, in order to remove -- if

19   you had let's say 20 prescriptions that needed to be removed

20   from this list, you would have to remove each of them

21   individually.  So you would have to, you know, look at the

22   printed report and you would have to type in each of the

23   prescription numbers to manually remove each of those.  And to

24   me, that's a fairly cumbersome process.  If, you know, if

25   you're in a busy pharmacy.

P42AOmn1                        Hardy - Direct

1   Q.  Let's take a look at another flowchart.

2           Can you walk us through what we're looking at here?

3   A.  Yes.  So this is a -- just to kind of summarize the cycle

4   fill process.  So as we talked about, the cycle fill process in

5   the computer system, by default, if nothing is removed

6   manually, will rollover any prescriptions that are expired or

7   out of refills.

8           And then optionally, the user can generate and print a

9   physician call back report.  However, that report only shows

10  prescriptions if the retirement field is set to Y or if the

11  users in manually -- or if the retirement field is set to N and

12  the users manually entered in a number of refills.

13  Q.  So do you have any overall concerns with the rollover

14  function in cycle fill in terms of software design?

15  A.  Yes.  I think it made it easy.  It made it very easy for

16  the staff to rollover prescriptions and it made it difficult

17  for them to remove prescriptions that would have rolled over

18  from.

19  Q.  Are you also familiar with a feature in OmniDX called

20  psEDI?

21  A.  Yes.

22  Q.  And what is that?

23  A.  This is an area of the system that allows OmniDX to

24  communicate with an automated tablet counter or pill counter.

25  Q.  And can the psEDI fill feature also result in prescription

P42AOmn1                          Hardy - Direct

1    rollovers for prescriptions that are expired or out of date?

2    A.  My understanding is yes.

3    Q.  All right.  Finally, let's turn to Omnicare's other

4    dispensing system called Oasis.

5           Does the Oasis system also rollover prescriptions?

6    A.  Yes.

7    Q.  What feature of Oasis controls rollover?

8    A.  The settings in the customer class.

9    Q.  And what is a customer class in Oasis?

10   A.  Typically when a facility is set up, they would assign a

11   customer class to that facility and then any patients that are

12   added to that facility would have that customer class assigned.

13   And that class controls various functions, you know, for that

14   patient that has that customer class assigned to them.

15   Q.  Let's take a look at that next screenshot.

16          What does it show here?

17   A.  So this is a maintained customer class screen, how they

18   would configure a customer class, if you will.  You can see at

19   the top in this case, this customer class was set up and

20   labeled assisted living customers.  And so you can also see

21   there are some other fields here that anyone configuring this

22   customer class would have access to choose.

23   Q.  And let's look at the two fields on the left side that are

24   highlighted.  Prescribed quantity required and max refill

25   required.

P42AOmn1                     Hardy - Direct

1           Let's start with max refill required.  Can you tell us
2    what that is.
3    A.  Yeah, so similar to OmniDX, this is a field that would
4    control if a refill is required -- if the user is required to
5    put refill in on a prescription.
6    Q.  What about prescribed quantity required?
7    A.  Essentially the same.  Similar relationship that we talked
8    about with OmniDX here in Oasis.  If you set, you know,
9    depending on how you set this, that becomes a required field or
10   not.
11   Q.  Can you just remind us what the relationship is between
12   refills and a prescribed quantity?
13   A.  Yeah.  It's kind of an either or.  You either fill in the
14   prescribed quantity or you fill in the number of refills.  If
15   one of these is, you know, set to Y, system requires you to.
16   Q.  So what does it mean for let's say -- let's talk about max
17   refills.  What does it mean for max refills to be set to, max
18   refill required to be set to Y?
19   A.  If that's set to Y, then that field is not optional.  It's
20   a required field when you're entering a prescription and it
21   would not allow the prescription to roll over once those
22   refills were exhausted.
23   Q.  And what does it mean for max refills to be set to N?
24   A.  If they're set to N, then the field is optional and when
25   those refills are expired, it would -- sorry.  When the refills

1    are out, it would roll that prescription over.

2    Q.  Okay.  So if both of these fields that are highlighted here

3    are set to N, do Oasis users need to enter a number of refills

4    for prescriptions?

5    A.  I'm sorry.  Could you repeat?

6    Q.  Sure.  If both of these fields are set to N, do Oasis users

7    have to enter a number of refills for prescriptions?

8    A.  No.

9    Q.  Let's look at another screenshot here.  What information do

10   Oasis users need to enter when entering a prescription and

11   let's start with the top half of the screen.

12   A.  Sure.  So this is kind of similar to OmniDX.  Of course

13   Oasis is a different computer system so things look a little

14   bit different.  But this is where they would go and kind of

15   enter a prescription.  So at the top we can see the

16   prescription number, the prescriber.  Again, this is a test

17   system like we talked about before.  So there's -- we haven't

18   actually entered a medication order, but it would go like under

19   the product area with a dose there.

20   Q.  Okay.  And let's look at the bottom of the screen.  Do you

21   see where it says max rfl refills slash refills remaining.

22   What is that field?

23   A.  Similar to OmniDX, this is where the, you know -- this is

24   where the maximum number of refills.  My understanding is this

25   would often be defaulted from the system, but so if the system

1    was say 999 or whatever that might be, it would default that

2    number on the max refill side.  And then you can see that

3    little slash there.

4           So that slash, there are actually two numbers that

5    would show here.  On the left would be that max number of

6    refills for that prescription and on the right would be the

7    refills remaining.  So as you fill a prescription, that number

8    would go down.

9    Q.  And what about -- and max dispensed quantity, that's what

10   we were talking about earlier.  That's the other way of

11   expressing a total quantity for drugs; is that right?

12   A.  Right.  That prescribed quantity.  The total quantity on a

13   prescription.

14   Q.  Can a user enter a number of refills manually even if -- I

15   already asked that question.  Sorry.

16          So I think you anticipated one of my questions.  How

17   is the max refill field populated when a user doesn't enter

18   anything in the max refills field?

19   A.  Yeah.  My understanding is it would default from the

20   system.  And from some of the materials I reviewed, I believe

21   that that was like 999.

22   Q.  So 999 refills is the default number in the system?

23   A.  Yes.

24   Q.  And so if you had a prescription that had 999 refills on

25   it, based on the system in practical terms, would that number

1    ever get down to zero?

2    A.  No, not in practical terms.

3    Q.  Does Oasis have a setting whereby prescription orders

4    expire after an extended period of time, such as one year as we

5    talked about in OmniDX?

6    A.  Yes.  It's this quantity of -- it's called like a quantity

7    of days field.  Similar to that max allowable days we talked

8    about in OmniDX.

9    Q.  And that's what we're looking at here on the bottom

10   right-hand side of the screen?

11   A.  Yes.

12   Q.  And does it work similar to OmniDX in that respect?

13   A.  My understanding is yes.  So that was, you know, 365, the

14   prescription would expire from a year from the day it's

15   written.

16   Q.  So what happens when a user tries to refill an expired

17   prescription where max refills and max dispensed quantity are

18   left blank and the settings we discussed on the other screen

19   are set to N?

20   A.  The prescription would roll over once those are exhausted,

21   once the refills or the dispensed quantity, prescribed quantity

22   is exhausted.

23   Q.  And what happens when a prescription rolls over in Oasis?

24   A.  It would be similar to OmniDX, it would be assigned a new

25   prescription number.  And it would continue to be filled.  It

P42AOmn1                        Hardy - Direct

1    would get a, you know, you would reset the number of refills

2    again.  You would reset, you know, date, the start date on the

3    prescription to the date that it rolled over.

4    Q.  Let's go back to the Oasis settings page.

5           When are these two fields, the prescribed quantity

6    required and max refill required fields set for a given

7    facility?

8    A.  When the pharmacy first adds that facility to their system.

9    And they assign -- I'm sorry.  When they first add a customer

10   class that's going to be assigned to a facility.

11   Q.  Does Oasis display the settings for these fields to users

12   processing prescription orders and refills?

13   A.  Not to my knowledge.

14   Q.  How would an Oasis user find out if a particular facility

15   was coded as Y and N for these fields?

16   A.  They would have to have access to this maintained customer

17   class screen and they would have to look at it and see how

18   these fields were set.

19   Q.  Let's take a look at the last flowchart.

20          What does it show in the first row?

21   A.  So this shows, as we've discussed, if the prescribed

22   quantity or the max refills required is set to N, then the

23   system would default the number -- could default the number of

24   refills and rollover would be allowed in all those situations.

25   Q.  And what are we looking at in the second row?

P42AOmn1                          Hardy - Cross

1    A.   This is why you have the prescribed quantity or max refills

2    as set to Y in a customer class or if the user manually enters

3    a number of refills, then the system would prevent rollover

4    from occurring.

5    Q.   And what was your concern, if any, about rollover in Oasis

6    in terms of system design?

7    A.   I think similar to OmniDX, it made it relatively easy for

8    prescriptions to roll over and more difficult on the staff to

9    realize when prescriptions were going to roll over.

10             MR. BARNEA:   Thank you.   No further questions.

11             THE COURT:   Okay.

12   CROSS-EXAMINATION

13   BY MR. HAZELWOOD:

14   Q.   Good morning, Mr. Hardy.

15   A.   Good morning.

16   Q.   Ms. Alexander has just placed a copy of your deposition --

17             THE COURT:   Could you please speak up.

18             MR. HAZELWOOD:   Yes, my apologies, your Honor.

19   Q.   Benjamin Hazelwood for Omnicare.

20             Mr. Hardy, Ms. Alexander has just placed a copy of

21   your deposition transcription next to you in case we need it.

22   A.   Okay.

23   Q.   You can leave it there for now, but in case we need it?

24   A.   Thank you.

25   Q.   Mr. Hardy, you are a pharmacist, correct?

P42AOmn1                       Hardy - Cross

1    A.  I am.

2    Q.  And just to be clear, you're not a medical doctor; is that

3    right?

4    A.  That's correct.

5    Q.  So you're not here opining today about medical treatment,

6    correct?

7    A.  Correct.

8    Q.  And you're also not giving any opinion about the operations

9    of assisted living facilities, correct?

10   A.  I'm sorry, Mr. Hazelwood.  I couldn't understand what you

11   said.

12   Q.  My apologies.  You're not here giving opinions about the

13   operations of assisted living facilities, correct?

14   A.  Correct.

15   Q.  You never worked at Omnicare did you, Mr. Hardy?

16   A.  No, I have not.

17   Q.  And you testified about the OmniDX computer system both

18   yesterday and this morning, correct?

19   A.  Yes.

20   Q.  But you have never actually used OmniDX?

21   A.  That is correct.

22   Q.  And, similarly, you gave testimony this morning about the

23   Oasis computer system; do you remember that?

24   A.  Yes.

25   Q.  But you also have never actually used Oasis, correct?

P42AOmn1                        Hardy - Cross

1    A.  That's correct.

2    Q.  And you've also never seen anybody else using the OmniDX

3    computer system, correct?

4    A.  You mean like live seen them?

5    Q.  Exactly.

6    A.  That's correct.

7    Q.  And similarly you've never seen anybody live using the

8    Oasis computer system, correct?

9    A.  That's correct.

10   Q.  Have you ever remotely watched someone who is actively

11   using the OmniDX computer system?

12   A.  No.

13   Q.  And for Oasis, have you ever remotely watched somebody who

14   is actively using the Oasis computer system?

15   A.  No.

16   Q.  Fair to say you've never been trained on how to use the

17   OmniDX computer system?

18   A.  That is fair to say, yes.

19   Q.  And similarly, as to Oasis, you've never been trained as to

20   how to use that computer system?

21   A.  That is correct.

22   Q.  And am I right that you're not opining here today about how

23   pharmacy staff at Omnicare entered particular prescriptions

24   into those computer systems?

25   A.  That is correct.

P42AOmn1                        Hardy - Cross

1    Q.  And similarly, you did not review any of the prescriptions

2    that Omnicare received for particular patients, correct?

3    A.  That is correct.

4    Q.  Now, you just testified both this morning and at the end of

5    the day yesterday about rollover functionality in both OmniDX

6    and Oasis; do you remember that testimony?

7    A.  Yes.

8    Q.  But you are not aware, sir, of any long-term care facility

9    that was ever set up in either system to have rollover when it

10   should not have; is that correct?

11   A.  I haven't seen any specific configuration of any of the

12   Omnicare systems.  I think that's what you're asking, like if

13   I've seen the way it was actually set up at any facilities.

14   Q.  Right.  And my question is whether you're aware of any

15   particular long-term care facility that was set up to allow for

16   rollover when it should not have been?

17   A.  I don't know if it was or was not.

18   Q.  You just don't know?

19   A.  Right.  Correct.

20   Q.  And just to be clear, you're also not opining about how

21   Omnicare pharmacy staff were trained to enter prescriptions

22   into Omnicare's computer systems, correct?

23   A.  I don't have any direct knowledge of that.

24   Q.  And you're not offering any expert opinion as to how

25   Omnicare pharmacy staff were trained to enter prescriptions

P42AOmn1                    Hardy - Cross

1    into the computer systems, correct?

2    A.   Yeah.  I don't know exactly how they were or were not

3    trained.

4    Q.   And you're not offering any opinion on that subject either,

5    correct?

6    A.   Correct.

7    Q.   Similarly, you're not offering any opinion about how

8    Omnicare pharmacy staff were trained to use those computer

9    systems to refill medications, correct?

10   A.   Correct.

11   Q.   Mr. Hardy, we talked yesterday, you and Mr. Barnea, about

12   your pharmacy experience; do you remember that?

13   A.   Yes.

14   Q.   Just to be clear, though, you have never dispensed

15   medication in a long-term care pharmacy, correct?

16   A.   That is correct.

17   Q.   And you've never managed a long-term care pharmacy either,

18   correct?

19   A.   No.  That's correct.  But if I could add to that, I mean, I

20   haven't worked in a specialty pharmacy either, for instance.

21   But I still do a lot of pharmacy computer systems work with

22   specialty pharmacies.  I just wanted to clarify.

23   Q.   I understand.  And just to be clear, you have never

24   dispensed medication in a long-term care pharmacy?

25   A.   That is correct.

P42AOmn1                          Hardy - Cross

1   Q.  And you've never managed a long-term care pharmacy?

2   A.  That is correct, yes.

3   Q.  And fair to say you don't have experience as a long-term

4   care pharmacist?

5   A.  That is fair to say, yes.

6   Q.  Is it fair to say there could be all kinds of nuances of a

7   long-term care pharmacy that you don't know because you didn't

8   personally practice long-term care?

9   A.  You mean like pharmacy practices, yes.

10  Q.  Because you didn't do it, there may be nuances about it

11  that you're not familiar with?

12  A.  There could be, yes.

13  Q.  So let's talk a little bit about rollover.  And I think I

14  heard you say this, but correct me if I'm getting something

15  wrong.

16          Is it fair to say that rollover is a computer function

17  that allows an existing prescription to continue to be refilled

18  without requiring entry of a new prescription?

19  A.  Yes.

20  Q.  Now, you're aware that it is common for a long-term care

21  pharmacy to have rollover functionality available, correct?

22  A.  Yes.  I'm aware that it's used.

23  Q.  And my question was whether you're aware that it's common

24  for long-term care pharmacy systems to have rollover

25  functionality?

P42AOmn1                        Hardy - Cross

1   A.  As I understand, you know, I'm not -- I don't understand

2   all the state, you know, specific state rules or laws, but, you

3   know, where rollover is allowed, you know, per those rules for

4   those different facilities, it would seem appropriate to use

5   it, appropriate function to use.

6   Q.  And I understand, and I'm not talking specifically about

7   where it's appropriate to use.  I'm saying in the pharmacy

8   system itself.

9   A.  Mm-hmm.

10  Q.  You're aware it's common for that pharmacy system to have

11  rollover functionality available?

12  A.  Yes.

13  Q.  And, in fact, not just common, you are aware that it's

14  industry standard for a long-term care pharmacy dispensing

15  system to have rollover functionality that could be used?

16         MR. BARNEA:  Objection.

17  A.  I don't --

18         THE COURT:  Overruled.

19  A.  I don't know if it is or isn't.

20  Q.  Your testimony is you don't know if it is or isn't?

21         THE COURT:  That's what he said.  You don't have to

22  say it again.  Okay?  Move on.

23  Q.  Mr. Hardy, this is not the first time that we have met,

24  correct?

25  A.  Correct.

P42AOmn1                          Hardy - Cross

1   Q.  I took your deposition about a year and a half ago roughly?

2   A.  Yes.

3   Q.  And government lawyer was present at that deposition,

4   correct?

5   A.  Yes.

6   Q.  And I asked you some questions?

7   A.  Correct, yes.

8   Q.  And you, obviously, you gave answers during that

9   deposition?

10  A.  I did.

11  Q.  And you were under oath at the time, correct?

12  A.  Correct.

13  Q.  Just like you are today and like you were yesterday?

14          THE COURT:  Yes.  Just like he is.  We put him under

15  oath.  Would you please ask your question.

16  Q.  Mr. Hardy, you have your deposition transcript in front of

17  you.  I would ask you to turn to page 11.

18  A.  Okay.

19          THE COURT:  No.  The witness has not indicated that he

20  has a failure of recollection.  There is therefore no reason

21  for him to read his deposition.

22          If you wish to impeach him, you don't ask him to open

23  his deposition transcript.  You say:  At your deposition, were

24  you asked the following question and did you give the following

25  answer.  You give your opponent the page and line.  You then

P42AOmn1                        Hardy - Cross

1  read it into the record.  Okay?

2          MR. HAZELWOOD:  My apologies.

3          THE COURT:  That's how it is done.  We learned that in

4  law school.  We haven't come up with a better method.

5          MR. HAZELWOOD:  I skipped a step.  I apologize, your

6  Honor.

7  Q.  Mr. Hardy, at your deposition were you asked the following

8  question and did you give the following answer?

9          THE COURT:  Page and line.

10         MR. HAZELWOOD:  Page 11, line 16 to 20.

11 "Q.  If you have a long-term care pharmacy information system,

12 it's industry standard for there to be rollover functionality

13 that could be used.

14 "A.  Yes.

15         THE COURT:  Were you asked that question and did you

16 give that answer, sir?

17         THE WITNESS:  Yes.

18 BY MR. HAZELWOOD:

19 Q.  Now, Mr. Hardy, the reason that rollover functionality is

20 industry standard is that long-term care pharmacies sometimes

21 need to dispense based on chart orders, correct?

22 A.  I understand that there are chart orders that are used in

23 long-term care pharmacy, yes.

24 Q.  And my question for you is that fact that you just stated

25 is the reason that rollover functionality is industry standard

P42AOmn1                        Hardy - Cross

1   in long-term care pharmacy dispensing systems, correct?

2   A.  I think if it follows state rules and facilities, yes, it's

3   fine to use that function.  I hope I answered your question.

4   I'm sorry.

5   Q.  You did.  Thank you.

6   A.  Okay.

7   Q.  And a chart order, just to be clear, is an order for

8   medication that's enforced until the prescriber discontinues

9   it; isn't that right?

10  A.  In general, yes.  I would say that, you know, there may be

11  state rules that define them a little bit differently.  I don't

12  know if they are or aren't.  But I just want to clarify that

13  maybe a chart order isn't the same in every single state.

14  Q.  But you are not familiar with the contents of those state

15  rules here?

16  A.  That is correct, yes.

17  Q.  So there may be such rules, there may not be, you just

18  don't know?

19  A.  Yes, that is correct.

20  Q.  You're aware that a chart order often does not include a

21  limitation on the number of refills for particular medications,

22  correct?

23          MR. BARNEA:  Objection.

24  A.  Yes, my --

25          THE COURT:  Ground?

P42AOmn1                          Hardy - Cross

1          MR. BARNEA:  He's asking the witness about things that

2     the witness has already said that he doesn't know very much

3     about.

4          THE COURT:  Well, then the witness can certainly tell

5     us he doesn't know anything about it.  The objection is

6     overruled.

7     Q.  Do you need me to ask that again?  Sorry.

8     A.  Please.  Thank you.

9     Q.  So the question was you're aware that a chart order often

10    does not include a limitation on the number of refills for

11    particular medications, correct?

12    A.  Like I said, I'm not aware of the rules surrounding that,

13    so I wouldn't know if it does or doesn't.

14    Q.  You're aware that a chart order often does not include a

15    limitation on the total quantity for particular medications,

16    correct?

17    A.  In general, yes.  But, again, you know, as I mentioned

18    before, there may be, you know, there may be different state

19    rules around it.  I don't know.  That allow or don't allow that

20    for a chart order, for instance.

21    Q.  You're aware of the general practice and you're not aware

22    of the specific state rules that may or may not allow

23    otherwise?

24    A.  That's correct.

25         THE COURT:  Sir, he's going to ask you a lot of

P42AOmn1                          Hardy - Cross

1    questions that could be answered yes or no, and it would be

2    convenient for us all if you would answer yes or no.  And if

3    the lawyers for the government think you need to expand,

4    they'll have an opportunity to have you do that.

5              THE WITNESS:  Okay.

6    BY MR. HAZELWOOD:

7    Q.  So when a prescriber uses a chart order without a refill or

8    a quantity limit, a long-term care pharmacy is allowed to

9    continue to fill that medication as the prescriber has ordered,

10   correct?

11   A.  Correct.

12   Q.  Now, I think you said this but just to be clear you're

13   aware that the use of chart orders is something that can depend

14   on the pharmacy regulations in each state, correct?

15   A.  Yes.

16   Q.  And so you would agree that the decision whether to use

17   rollover functionality should vary based on the applicable

18   state regulations?

19   A.  Yes.  And the facility.  You know, there's different

20   regulations for different facilities.

21   Q.  The regulations may treat different types of facilities

22   differently?

23   A.  Yes.

24   Q.  Including with respect to particular state facility

25   licenses that may be treated one way in one state and a

P42AOmn1                          Hardy - Cross

1    different way in a different state?

2    A.   Sure.  That seems appropriate.

3    Q.   Mr. Hardy, if chart orders were acceptable for assisted

4    living facilities in a particular state, then you would agree

5    it would be appropriate to use rollover functionality for

6    assisted living facilities in that state, correct?

7    A.   Yes.

8    Q.   And similarly, if chart orders were acceptable for

9    dispensing to assisted living facilities in every state you

10   would agree it would be appropriate to use rollover

11   functionality for assisted living facilities in every state,

12   correct?

13   A.   Yes.

14   Q.   Let's talk a little bit about cycle fill, which I know you

15   spoke about this morning.

16   A.   Yes.

17   Q.   You understand that a cycle fill means a long-term care

18   pharmacy refilling a number of medications for a number of

19   residents of the same long-term care facility at the same time?

20   A.   Yes.

21   Q.   And you would agree that cycle fill is a good tool for a

22   long-term care pharmacy to have available, correct?

23   A.   I do.

24   Q.   Cycle fill is a common tool that long-term care pharmacies

25   use, correct?

P42AOmn1                          Hardy - Cross

1    A.  As I understand, yes.

2    Q.  And you're aware that processing a cycle fill takes a

3    significant amount of work for a long-term care pharmacy,

4    correct?

5    A.  Yes.

6    Q.  Now, you understand that before an Omnicare pharmacy would

7    process a cycle fill, it would send a list of medications to

8    the facility to let the facility know which medications the

9    pharmacy was planning to send?

10   A.  You mean like a printed, kind of printed and fax list when

11   you say send?

12   Q.  Exactly.

13   A.  Yes.

14   Q.  And then the facility would send that list back to the

15   pharmacy indicating any changes to the list of medications it

16   did or did not want, correct?

17   A.  As I understand, yes.

18   Q.  And so if a resident of that facility no longer needed a

19   medication, the facility could cross that out, correct?

20            MR. BARNEA:  Objection.  This is way beyond the scope

21   of the direct.

22            MR. HAZELWOOD:  It is not, your Honor.

23            THE COURT:  It's fine.  Go on, please.

24   A.  Could you repeat, please.

25   Q.  Sure.  So the facility could send back that list indicating

P42AOmn1                           Hardy - Cross

1    that certain medications were not needed for various reasons?

2    A.  That's my understanding.  I think we talked about -- I

3    think you showed me a, I think, an example of that at our -- at

4    my deposition.  Is that correct?  I'm trying to remember where

5    I recall seeing that.  I didn't see that in any of the

6    materials that I reviewed.  I think it was something that you

7    might have shown me.  I'm just trying to remember if that's

8    correct or not.

9    Q.  And you're aware that that was a part of the process, that

10   this list of medications was sent to the facility and the

11   facility would send it back with changes if there were any?

12   A.  Yes.

13   Q.  And then you also understand that as an Omnicare pharmacy

14   was processing a cycle fill, OmniDX could generate a report of

15   medications that were out of refills and scheduled to be

16   included in that upcoming cycle fill, correct?

17   A.  Correct.

18   Q.  And you understand Omnicare pharmacy staff were expected

19   then to use that list to contact prescribers for authorization

20   to refill those medications, correct?

21   A.  I can't say what the staff was expected or not expected to

22   do.

23   Q.  So, again, I would like to direct your attention to the

24   deposition again.

25              MR. HAZELWOOD:  And for counsel and for your Honor,

P42AOmn1                          Hardy - Cross

1    I'm referring to pages 184 to 185.

2              The relevant question --

3              THE COURT:  Did you ask the following question and did

4    you give the following answer.

5              MR. HAZELWOOD:  I apologize.

6    Q.  At that deposition, were you asked the following question

7    and did you give the following answer?

8    "Q.  You understand that this is the report pharmacy staff were

9    expected to use to then reach out to the relevant physicians

10   that you see listed here and determine should the patient get a

11   refill of this, and if so, can you get us the additional

12   authorization that we need?

13   "A.  Yes.

14             THE COURT:  Were you asked that question and did you

15   give that answer, sir?

16             THE WITNESS:  Yes. I did but I would like to clarify.

17             THE COURT:  No.  That's what the government lawyers

18   are for.

19             THE WITNESS:  Okay sorry.

20             THE COURT:  Okay.  That's what they're for.

21             THE WITNESS:  I'm new at this.  I'm sorry.

22             THE COURT:  That's okay.

23             MR. HAZELWOOD:  You're doing great.

24   Q.  And you have no reason to doubt that Omnicare pharmacy

25   staff did in fact remove medications from the cycle fill if

1  they could not obtain authorization for additional refills,

2  correct?

3  A.  I have no reason to know that they did either way.

4  Q.  Now, you testified a little while ago about your view that

5  the way cycle fill was programmed in OmniDX could have been

6  programmed differently; do you remember that?

7  A.  Yes.

8  Q.  But just to be clear, you have never personally worked on

9  any long-term care cycle fill functionality in a pharmacy

10  dispensing system, correct?

11  A.  That's correct.

12  Q.  And you have never personally dispensed a cycle fill to a

13  long-term care facility, correct?

14  A.  That's correct.

15  Q.  And you've never personally conducted a psEDI cycle fill

16  either, correct?

17  A.  That's correct.

18  Q.  And you have never managed a pharmacy that dispensed a

19  cycle fill to a long-term care facility?

20  A.  That's correct.

21          MR. HAZELWOOD:  Give me one moment, your Honor.

22          THE COURT:  Sure.

23  Q.  I promise I was just trying to make this move faster for

24  you, Mr. Hardy.

25  A.  Appreciate it.

P42AOmn1                          Hardy - Cross

1    Q.  You testified, I believe it was yesterday, that your view

2    was that rollover functionality should not have been used for

3    dispensing -- let me strike that.

4          I believe you testified yesterday that your view that

5    rollover functionality was not intended at Omnicare to be used

6    for dispensing at assisted living facilities; is that fair?

7    A.  I believe so.

8    Q.  But that testimony is based on an assumption that rollover

9    was not permitted for assisted living facilities, correct?

10          MR. BARNEA:  Objection.  Misstates his testimony.

11          THE COURT:  Well, if it misstates his testimony, he'll

12   tell us.  You aren't the witness, so you can't tell us that.

13          MR. BARNEA:  Okay.

14   A.  Can you repeat?  I'm sorry.

15   Q.  Sure.  Your testimony as to -- your testimony yesterday as

16   to where you understood rollover functionality was intended to

17   be used was based on an assumption you made that rollover is

18   not permitted for assisted living facilities; is that correct?

19   A.  I don't know if it is or isn't.

20   Q.  You just don't know either way whether it's permitted for

21   assisted living facilities or not?

22   A.  Yeah, because I don't know the state rules, you know, state

23   rules or facilities specific rules surrounding.

24   Q.  And you don't personally know whether chart orders are

25   generally allowed or not allowed for dispensing to assisted

1    living facilities, correct?

2    A.  It would be the same.  I don't know the state rules.  So,

3    no.

4    Q.  You testified also about the process for entering

5    medications in OmniDX at the order entry phase; do you remember

6    that?

7    A.  Yes.

8    Q.  Now, I just want to be clear.  Even if a facility was coded

9    to activate rollover functionality, you understand that

10    pharmacy staff could still enter any refill limits for a

11    particular medication being entered for that facility, correct?

12    A.  Well, I understand from a system perspective that the field

13    was available for them to enter.  I don't know if they did or

14    did not.

15    Q.  I understand.  You don't know if they did that every time

16    or --

17    A.  Right.  I don't know.

18    Q.  But you do understand that if the pharmacy staff entered a

19    refill limit, even if rollover was activated for that facility,

20    that particular medication would not roll over in OmniDX,

21    correct?

22    A.  You mean outside of the cycle fill process?

23    Q.  Outside of the cycle fill process.

24    A.  That is correct.

25    Q.  And similarly, we talked about Oasis, but you understand

P42AOmn1                    Hardy - Redirect

1   even if a facility in the Oasis computer system was coded to

2   activate rollover functionality, pharmacy staff could enter a

3   refill limit for a particular medication going to that

4   facility, correct?

5   A.  Yes.

6   Q.  And similarly to what we talked about with OmniDX, you

7   understand that if pharmacy staff entered that refill limit,

8   that medication would not roll over in Oasis, even if rollover

9   was activated for that facility, correct?

10  A.  Yes.

11          MR. HAZELWOOD:  Your Honor, one moment to consult.

12          THE COURT:  Sure.

13          MR. HAZELWOOD:  I have no further questions,

14  Mr. Hardy.  Thank you very much.

15          THE WITNESS:  Thank you, Mr. Hazelwood.

16          THE COURT:  Excellent.  Okay.

17          MR. BARNEA:  Little bit of redirect.

18          THE COURT:  Redirect.

19          MR. BARNEA:  Ms. Palla, could you put our slides back

20  up.

21  REDIRECT EXAMINATION

22  BY MR. BARNEA:

23  Q.  Mr. Hardy, you were asked just now about whether you know

24  how Omnicare employees were trained in using the systems, and

25  you said you don't know specifically, you know, what kind of

P42AOmn1                        Hardy - Redirect

1   training they underwent; do you remember that testimony?

2   A.  Yes.

3   Q.  What materials did you review that relate to what

4   information Omnicare employees might have about these systems?

5   A.  Well, there were --

6               MR. HAZELWOOD:  Objection, your Honor.  That does

7   exceed the scope of my cross, which was limited to --

8               THE COURT:  Excuse me.  I'm aware of what the rules

9   are.

10              The objection is sustained.

11  Q.  Did you review any manuals about the OmniDX and Oasis

12  training systems?

13  A.  Yes.

14              MR. HAZELWOOD:  Same objection, your Honor.

15              THE COURT:  Overruled.  Go on.

16  Q.  Let's look at a page from one of those manuals that we

17  looked at a little bit earlier.

18              What does this page say about the retirement setting

19  with respect to assisted living facilities?

20              THE COURT:  Is this in evidence?

21              MR. BARNEA:  Yes.

22              THE COURT:  Thank you.

23  A.  It says if this facility is an assisted living facility or

24  retirement home, enter Y; if not, enter N.

25  Q.  And enter Y, what is the consequence of entering Y in this

P42AOmn1                         Hardy - Redirect

1  retirement field?

2  A.  So this would control the rollover functionality.  It would

3  make the number of -- we talked about before, it would make the

4  number of refills, allowable refills required or the prescribed

5  quantity, and it would force the user to fill that in.  And

6  then if that prescription ran out of refills, then it would

7  give them an alert and stop them from filling that

8  prescription.

9  Q.  So if a user of OmniDX entered Y for an assisted living

10  facility, would they be able to roll over a prescription?

11  A.  Outside of cycle fill, no.

12  Q.  Now, you were asked a few questions about chart orders; do

13  you remember that?

14  A.  Yes.

15  Q.  And to your understanding, what types of facilities, if you

16  have any understanding, use chart orders generally?

17  A.  Again, I don't understand all the state rules around it,

18  but in general my understanding is skilled -- like skilled

19  nursing facility or a facility that has kind of 24/7 care, like

20  they have nursing or --

21          MR. HAZELWOOD:  Objection, your Honor.  Scope of his

22  report.

23          THE COURT:  Overruled.

24          I'm sorry.  Your cross opened up a whole lot of stuff.

25          MR. HAZELWOOD:  Your Honor, just to be clear, he

P42AOmn1                                Hardy - Redirect

1    testified --

2                  THE COURT:  Please.  Ask the question again.

3    Q.  And I believe you were asked questions about facilities

4    that use chart orders and whether they can always use a

5    rollover functionality; do you remember those questions?

6    A.  Yes.

7    Q.  And is it your understanding that in all states, a facility

8    that uses chart orders can use a rollover functionality because

9    those chart orders are valid for an indefinite period of time?

10   A.  No.  It's my understanding it varies by the state rules,

11   and for different types of facilities.

12   Q.  So not all facilities that use chart orders can use

13   rollover in your understanding?

14   A.  That's my understanding.

15                 THE COURT:  I'm sure you said something at the end of

16   that, but I have no idea what it was.

17   Q.  I said so not all facilities that use chart orders can

18   permissibly use rollover in your understanding?

19   A.  Yes.

20   Q.  And I believe if you turn to page 184 of your deposition,

21   you were asked a question about that testimony and you said --

22                 MR. HAZELWOOD:  Objection, your Honor.

23                 THE COURT:  Excuse me.  Ground?

24                 MR. HAZELWOOD:  He's reading a page of the witness's

25   deposition apparently.

P42AOmn1                          Hardy - Redirect

1            THE COURT:  You can't show -- there's no failure of

2     recollection.  There is no reason to show him anything.  And

3     certainly not from his deposition.  He's your witness.

4            MR. BARNEA:  I'm sorry, your Honor.  The witness tried

5     to offer an explanation about his deposition testimony when

6     Mr. Hazelwood asked him a question.

7            THE COURT:  Then ask him to offer the explanation.

8     Don't tell him to look at his deposition.

9            MR. BARNEA:  Okay.

10    Q.  You were asked about your testimony at your deposition and

11    you wanted to offer a clarification regarding your testimony on

12    page 184.

13           THE COURT:  No, not at page 184.  He never said about

14    page 184.

15           Sir, please, the clarification I wouldn't let you make

16    before, you can do it now.  Okay?

17           THE WITNESS:  Okay.

18    Q.  Go ahead.

19    A.  I'm sorry.  Can you --

20           THE COURT:  You wanted to add something to one of your

21    answers about your deposition testimony, you wanted to add

22    something to your answer.

23           MR. BARNEA:  And I just --

24           THE COURT:  And I told you that was for the government

25    lawyers to ask you.

1          THE WITNESS:  I don't remember what it was.

2          THE COURT:  You don't remember what it was.

3          Now you can refresh his recollection.

4          THE WITNESS:  Sorry.

5          THE COURT:  Take a look at page 184 of your

6    deposition.

7    BY MR. BARNEA:

8    Q.  Mr. Hardy, would you like to look at page 184.

9    A.  I'm sorry.

10   Q.  And tell us what you were planning to say about that

11   testimony?

12          MR. BARNEA:  Thank you, your Honor.

13   A.  Okay.  I'm on 184.

14   Q.  And you were read that testimony earlier and then at the

15   end you said you wanted to offer some kind of clarification

16   about it.

17   A.  Let me, just give me a moment to read through this here.

18          Oh, I see.  It was regarding the pharmacy staff, what

19   they were expected to do.  And that I did want to offer

20   clarification on.  Because I never saw any materials that said

21   what the pharmacy staff were or were not supposed to do with

22   regards to the report.  Other than the materials that I'm shown

23   today and we've reviewed.

24          MR. BARNEA:  No further questions.

25          THE COURT:  Thank you.  Anything else?

P42AOmn1                            Hagen - Direct

1              MR. HAZELWOOD:  No, your Honor.

2              THE WITNESS:  Am I in trouble?

3              THE COURT:  You're not in trouble.  Not only are you

4    not in trouble, but I think you get to leave really soon.

5              Anything else?

6              MR. HAZELWOOD:  No, your Honor.

7              THE COURT:  You get to leave now.

8              (Witness excused)

9              Call your next witness, please.

10             MR. BARNEA:  The government calls Deanna Hagen.

11             THE COURT:  What was the name again?

12             MR. BARNEA:  Deanna Hagen.  H-A-G-E-N.

13             THE COURT:  Ms. Hagen, won't you come up here, please.

14             Could you swear the witness.  And I ask you to stand

15   up on the platform and raise your right hand.

16   DEANNA HAGEN,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19             THE WITNESS:  Deanna Hagen, D-E-A-N-N-A, H-A-G-E-N.

20             THE COURT:  Ms. Hagen, take a seat.

21             Make yourself comfortable.  We need you to speak into

22   that microphone and you're talking to the ladies and gentlemen

23   in the jury box.  You may inquire.

24   DIRECT EXAMINATION

25   BY MR. BARNEA:

P42AOmn1                      Hagen - Direct

1    Q.  Good morning, Ms. Hagen.

2    A.  Good morning, sir.

3    Q.  My name is JD Barnea.  I'm an Assistant U.S. Attorney in

4    the Southern District of New York.  Nice to meet you.

5    A.  Nice to meet you as well.

6    Q.  Do you currently work for Omnicare?

7    A.  I do.

8    Q.  And you have worked for Omnicare for more than 20 years,

9    right?

10   A.  Yes, sir.  I have.

11   Q.  Sorry.  We're trying to get this off the screen.

12          And in that time, you've held several different

13   positions in the company, right?

14   A.  Yes, sir.

15   Q.  You started out as a pharmacy physician with a pharmacy in

16   Ohio that was later bought by Omnicare, right?

17   A.  Yes.

18   Q.  And you then became the operations manager for that

19   pharmacy, right?

20   A.  Not of the pharmacy that was bought by -- not at the

21   pharmacy before it was bought by Omnicare.  But after it was

22   bought by Omnicare, I did.  I was an operations manager, yes.

23   Q.  And after that, you were in Omnicare's regional operations

24   support group for a while, right?

25   A.  Yes, sir.

P42AOmn1                         Hagen - Direct

1    Q.  And, in that role, you were responsible for helping

2    pharmacies that Omnicare bought transition to using one of

3    Omnicare software systems, right?

4    A.  Yes.

5    Q.  And that system was called OmniDX, right?

6    A.  Correct.

7    Q.  I am trying to make sure you can see me.

8    A.  Hey there.

9    Q.  Then you became an operations manager for Omnicare, right?

10   A.  Yes.  That was my title.

11   Q.  And when your title changed, you continued doing the same

12   type of work, but you covered pharmacies in more states, right?

13   A.  Yes.

14   Q.  And then, finally, you became a senior operations manager

15   at Omnicare, right?

16   A.  Yes, sir.

17   Q.  And you started in that role around 2010; is that right?

18   A.  I think it was around then.  It was just really a title

19   change.

20   Q.  Is that still your job today?

21   A.  Yes.

22   Q.  And in that job, you cover operations support for all of

23   Omnicare's system -- all of Omnicare's pharmacies around the

24   country, right?

25   A.  Correct.

P42Qomn2                         Hagen - Direct

1    BY MR. BARNEA:    (Continued)

2    Q.  Over the years people at Omnicare have come to you for help

3    with questions about OmniDx specifically, right?

4    A.  They -- OmniDx.  It could be anything.  I would take a lot

5    of support questions and anything from maybe printer to

6    something with OmniDx or anything in between.

7    Q.  Some people have referred to you as the DX queen.  Have you

8    heard that?

9    A.  I have heard that.

10   Q.  Your majesty.  You are knowledgeable about -- you are

11   knowledgeable with order processing on OmniDx, right?

12   A.  Yes.

13   Q.  And order processing means how to enter a prescription into

14   the OmniDx dispensing system, right?

15   A.  Yes.

16   Q.  Before we start talking about specific documents, let's

17   discuss some terminology.  You've heard of prescriptions

18   rolling over at Omnicare, right?

19   A.  Yes.

20   Q.  When a prescription rolls over, it is automatically

21   assigned a new prescription number after one year, right?

22   A.  It could -- rollover could happen.  All it is, it's a

23   regeneration of a new Rx number.  It could be for the reason

24   you stated or it could be because of prescription transferred

25   to another pharmacy.

P42Qomn2                          Hagen - Direct

1    Q.  And OmniDx rolled over certain prescriptions, right?

2    A.  Certain prescriptions, yes.

3    Q.  And Omnicare long-term care is called Oasis, right?

4    A.  Yes.

5    Q.  And Oasis also rolled over certain prescriptions, right?

6    A.  I don't know much to say about Oasis.  I am definitely not

7    Oasis savvy.

8    Q.  Let's look quickly at one document.  Can we look at

9    Government Exhibit 131.  By the way, I should tell you, we have

10   a binder of the documents for you to look at in paper, but

11   we'll also put it up on the screen.

12           If we could just look at the middle email on this

13   page.  The one below that, sorry.  There's two middle emails.

14   This is an email to you from February 28, 2016, which we're

15   going to look at in a little more depth later.  It's to you,

16   right?

17           "Hi Dee"?

18   A.  I go by Dee, yes.

19   Q.  "Hi, Dee.  Can you put together a document for Oasis and Dx

20   outlining the steps necessary to stop rollover?"

21           Do you see that?

22   A.  Yes.

23   Q.  So Oasis does rollover, right?

24   A.  Yes.

25   Q.  We will come back to that a little bit later.

P42Qomn2                         Hagen - Direct

```
1            You've also heard of cycle fill, right?
2    A.  Yes.
3    Q.  In cycle fill, all the patients at a particular facility
4    get their prescriptions refilled at the same time on a regular
5    schedule, right?
6    A.  That's pretty close, yes.
7    Q.  I'm just a lawyer.
8            You worked on cycle fills when you were a pharmacy
9    technician, right?
10   A.  I did.
11   Q.  You also heard of psEDI, right?
12   A.  I have heard of psEDI, correct.
13   Q.  And psEDI is a computer interface between OmniDx and a
14   medication packaging machine, right?
15   A.  Yes.
16   Q.  And psEDI can also do a type of cycle fill, right?
17   A.  PsEDI is an interface.  The system does the -- the
18   operating system does the cycle, but the psEDI is just
19   basically I think an interface like a language that tells the
20   packaging machine how to package it.
21   Q.  And when you are using the psEDI system, a certain type of
22   cycle fill with can occur, right?
23   A.  Yes.  I've never personally done psEDI, but I have a basic
24   understanding of how it works.
25   Q.  Let's start by talking about rollover in OmniDx.  Not cycle
```

P42Qomn2                              Hagen - Direct

1    fill, just regular rollover, okay?

2    A.  Okay.

3    Q.  A user setting up a new facility in OmniDx can specify a

4    default number of refills for prescription orders from that

5    facility, right?

6    A.  Correct.

7    Q.  And that number could be anything from zero to 99, right?

8    A.  I believe so, yes.

9    Q.  And for some facilities, Omnicare pharmacies set that

10   default number at 99, right?

11   A.  I believe they did.  There was other system parameters as

12   well, not just the one in the facility master.

13            THE COURT:  But he's only asking you about that one

14   right now, okay?  So let's limit it to what he's asking.

15            Ask your next question.

16   Q.  Some facilities set it at 99, right?

17   A.  Yes.

18   Q.  And you would agree that without proper safeguards,

19   OmniDx rollover presented a risk of unauthorized refills,

20   right?

21   A.  No, because the refills, the rollover process is just a

22   regeneration of an Rx number.  Those are also associated with

23   what we call physician's order sheets.  Those are signed

24   prescription orders from the physician that are associated with

25   it.  So the -- it might get a new generated Rx number for

P42Qomn2                              Hagen - Direct

1    recordkeeping, but there is an associated order to go with

2    that.

3    Q.  But there was a risk of unauthorized refills, right?

4    A.  We had manual processes in place to handle that.  It was

5    manual, but there was a couple different ways that we handled

6    it.

7    Q.  Was your deposition taken in this case?

8    A.  Yes.

9    Q.  Were you asked the following questions and did you give the

10   following answers at your deposition?  And I'm going to read

11   parts of page 216 and 217.  On 216, I'm going to read from

12   lines 1 through 13.

13            THE COURT:  Let's start with that, please.

14   Q.  **"I guess I'm trying -- I'm trying to understand what you**

15   **meant here by unauthorized refills."**

16            THE COURT:  Hang on.  We have to start with the

17   question.  We always start with the question.

18            MR. BARNEA:  That is the question.

19            THE COURT:  If that's a question, then say "Question."

20   Q.  "Question:  I guess I'm just trying -- I'm trying to

21   understand what you meant here by 'unauthorized fills'?  Did

22   you have an understanding of what fills would be authorized and

23   which fills would be unauthorized?

24   "A.  No, my understanding of this is putting a process in place

25   to make sure we do not.

P42Qomn2                          Hagen - Direct

1    "Q.  Do not what?

2    "A.  Let out any unauthorized fills."

3              And then going on to the next page starting on page.

4              THE COURT:  Well, were you asked those questions and

5    did you give those answers, ma'am?

6              When your -- at your deposition, did the lawyer ask

7    you those questions and is that how you answered them?

8              THE WITNESS:  Yes, I can't --

9              THE COURT:  Thank you very much.

10             Next page.

11   Q.  Next page, starting on line 8 through 15.

12   "Q.  And what is your understanding of what the risk is?

13   "A.  Filling the prescription that did not have any remaining

14   quantity.

15   "Q.  Or remaining refills?

16   "A.  Or remaining refills."

17             So did you give that testimony at your deposition?

18   A.  I did.

19   Q.  So you helped to create policies telling pharmacies that

20   they had to get written approvals from prescribers before

21   refilling an expired prescription, right?

22   A.  Yes.

23   Q.  Let's look at an email that you wrote in May of 2013.  This

24   is Government Exhibit 313.  We'll put it up on the screen.  If

25   you'd like to look at it in paper, it's in the binder next to

1   you as well.

2           On the first page, if we can blow that up a little

3   bit, the email itself, so we can read it a little bit.

4           You emailed someone named Todd -- I'm going to

5   mispronounce this -- is it Zisek?

6   A.  Zisek.

7   Q.  Zisek, okay.

8           And you asked for his help with putting together a

9   how-to document for refill authorization requests in Oasis,

10  right?

11  A.  Correct.

12  Q.  And you told Mr. Zisek that you're attaching the package

13  that you had already created on this topic for OmniDx, right?

14  A.  Correct.

15  Q.  Let's look at what you attached starting with the

16  next-to-last attachment which is on pages 14 and 15 of this

17  document.

18          So we have -- let's look at the top of the first page

19  on the left here.

20          Ms. Palla, can you highlight that for us?  That's

21  great.

22          Can you read the top of the document through the stop

23  before it gets to A and B?

24          THE COURT:  You want her to read it out loud or to

25  herself?

P42Qomn2                           Hagen - Direct

1              MR. BARNEA:  Out loud.

2    A.   "OmniDx.  Refill authorization requests (RAR)

3    non-controlled medications for retail/AL models."

4    Q.   Let's stop there.  What does AL stand for?  Is that

5    assisted living?

6    A.   That would be assisted living.

7    Q.   And retail means customers that use ordinary prescriptions,

8    right?

9    A.   Yes.

10   Q.   And this is a document that you drafted or helped to draft,

11   right?

12   A.   Correct.

13   Q.   Let's zoom out of that part of the document and go back to

14   the main document.

15              The document goes on to outline two approaches for

16   getting refill authorizations for those types of customers,

17   right?

18   A.   Yes.

19   Q.   Assisted living customers and retail customers, right?

20   A.   Correct.

21   Q.   One is called a proactive approach.  Do you see that on the

22   left?

23   A.   Yes, sir.

24   Q.   And on the other, which I think is on the next page, is a

25   reactive approach?

1   A.  Correct.

2   Q.  Let's talk about the proactive approach first.  That is

3   outlined on section Roman numeral III on the second page we're

4   looking at here?

5   A.  Okay.

6   Q.  Can you take a quick look and just make sure you are

7   familiar with what we're talking about?

8           Ms. Palla, if you could highlight Section III?

9           THE COURT:  Thanks for making that bigger.

10  Q.  This proactive process starts with the pharmacy regularly

11  running a report showing which prescriptions are about to

12  expire or run out of refills, right?

13  A.  Correct.

14  Q.  Then the pharmacy can get in touch with the prescribers and

15  ask them to authorize more refills, right?

16  A.  Yes, sir.

17  Q.  Let's look at section Roman numeral IV.

18          Ms. Palla, could you blow that up next?

19          Can you please read the underlined portion?

20  A.  "Signed POS's must meet state law and regulation

21  requirements if they are recognized as legal orders in lieu of

22  prescriptions.  Pharmacists-In-Charge are responsible for

23  compliance with applicable state law if signed POS's are an

24  acceptable alternative to legal prescriptions."

25  Q.  And POS's are physician order sheets, right?

P42Qomn2                        Hagen - Direct

1    A.  Correct.

2    Q.  This says that Omnicare pharmacies have to make sure they

3    follow state law on whether physician order sheets are

4    acceptable in lieu of regular prescriptions, right?

5    A.  Yes.

6    Q.  Let's look at Section V.

7            If you could blow that up, Ms. Palla, the bottom of

8    the page.

9            This says that pharmacies should only process a refill

10   after they get the signed authorizations from the prescriber,

11   right?

12   A.  Yes.

13   Q.  Let's turn to the next page, page 16 of this document.

14   Here it describes a reactive approach, right?

15   A.  Yes.

16   Q.  In that approach, the pharmacy tries -- maybe we could blow

17   that up so we can see it a little bit better.

18   A.  Thank you.

19   Q.  In that approach, the pharmacy tries to process the refill.

20   Then it sees that there's no refills left, and then it contacts

21   the prescriber for an authorization, right?

22   A.  Correct.

23   Q.  But the pharmacy is not supposed to fill the order until it

24   gets that physician's authorization under this approach either,

25   right?

P42Qomn2                         Hagen - Direct

1   A.   Absolutely.

2   Q.   This approach is reactive because the OmniDx is waiting

3   until they're trying to refill the prescription, right?

4   A.   Right.

5   Q.   Let's turn to the attachment of this email which is on page

6   7 of the document.  If we could blow up the top half of the

7   document.

8            This is an April 2013 memo from Doug Ackley.  Do you

9   see that?

10  A.   Yes, sir.

11  Q.   He's an area director with Omnicare, right?

12  A.   Correct.

13  Q.   It says in the first sentence that only has to operate

14  "within the legal bounds of pharmacy laws and regulations in

15  the state of Ohio."

16           Do you see that?

17  A.   Yes, sir.

18  Q.   And then can you read the next sentence starting with

19  "keeping this in mind"?

20  A.   "Keeping this in mind, we remind you that for any

21  medication - something - (non-controlled substances or

22  over-the-counter products) to be dispensed to a resident

23  residing in assisted living facilities, we need a valid

24  prescription."

25  Q.   Let's skip a couple sentences.

1              Can you read the sentence starting with "We can no

2    longer"?

3    A.   "We can no longer accept a telephone order slip or a signed

4    physician order form as an indication for refills unless all

5    the components of a valid prescription are present."

6    Q.   Then can you read the following sentence with "once a

7    prescription runs out"?

8    A.   "Once a prescription runs out of refills, a new

9    prescription must be obtained before the medication is sent."

10   Q.   So according to this memo, Ohio law requires assisted

11   living facility residents to have a valid prescription, not a

12   physician order form, right?

13   A.   That would depend on the type of assisted living it was.

14   There were different licensing types.  So it would apply to

15   some, but not all.

16   Q.   But this memo just says assisted living facilities, right?

17   A.   That's what Doug says, but --

18             THE COURT:  Okay.  That's what that says.  Next

19   question.

20   Q.   And under Ohio law, once a prescription for an assisted

21   living facility residents runs out of refills, they need a new

22   prescription, right?

23   A.   Correct.

24   Q.   Now let's look at an email for more than a year later,

25   which is Government Exhibit 67.

P42Qomn2                              Hagen - Direct

1           We can pull that up, Ms. Palla.  If we can blow up the

2     text.

3           This email is dated June 26, 2014, right?

4     A.  Yes.

5     Q.  This email is from Jerry Berndt, a regional compliance

6     officer to you, right?

7     A.  Correct.

8     Q.  He says there is litigation involving Omnicare and the Utah

9     Board of Pharmacy, right?

10    A.  Yes, sir.

11    Q.  He tells you that one of the issues in this litigation is

12    the "one-year rollover to a new prescription automatically

13    without pharmacist verification," right?

14    A.  Yes.

15    Q.  And he asks you if there's a way to stop this from

16    happening, right?

17    A.  Yes.

18    Q.  And he wants there to be a hard stop of eleven refills or

19    365 days for any prescription, right?

20    A.  Yes.  He want it to go back to PV1.

21    Q.  And he wants there to be a hard stop of eleven refills or

22    365 days for any prescription, right?

23    A.  Yes.

24    Q.  Let's look at another email chain from around the same

25    time, which is Government Exhibit 167.  If you look at the

P42Qomn2                      Hagen - Direct

1    first page at the top, you're on this email chain, but let's

2    start at the end of the document, which is the original email,

3    okay?  You sort of get added halfway through the email chain,

4    but I just wanted to show you that part first.  Let's go to

5    page 10.  Ms. Palla, can you highlight the bottom email.

6              So the first email in this chain is on the last page

7    of the exhibit.  This email is from Ashley Butcher who is the

8    executive assistant to Mike Wood, Omnicare's VP of operations.

9    Do you see that?

10   A.  Yes, sir.

11   Q.  It's dated May 28, 2014, right?

12   A.  Yes.

13   Q.  She writes to Jody Jordan, who is a manager in Omnicare IT

14   support, right?

15   A.  Yes.

16   Q.  Ms. Butch asks Ms. Jordan, "How can we turn off the

17   DX-system in the auto rollover of the Rx rollovers every year?

18   Is there a way that we can prompt the system to request a new

19   Rx from the prescriber after the one-year mark?"

20             Is that what she wrote?

21   A.  That's what she wrote.

22   Q.  I don't know the best way to do this here.  If you flip

23   back for a few pages, you will see the two of them go back and

24   forth with lots of Omnicare screenshots for several pages.

25   Then the email gets forwarded to you on the bottom of page 2.

1          Ms. Palla, if you can just scroll up and let us see

2    that happening, and then we can go up to page 2.  Can you do

3    that?  Yeah.

4          You see there are a lot of screenshots and sort of

5    technical questions being asked and answered?

6    A.  Yes.

7    Q.  Let's go to the bottom of page 2.

8          If you look at the bottom of page 2, Ms. Jordan

9    forwards the entire email chain to you.  Do you see that?

10   A.  Yes.

11   Q.  It's right at the bottom of the screen.

12        Ms. Palla, can you zoom in on that?

13        She doesn't write anything.  She just forwards it.

14   A.  Just forwards it.

15   Q.  Then you forward the email to Ms. Berndt.  Can we look at

16   that middle email?  To Mr. Berndt.  Sorry.  And you copy

17   Kathleen Early.  Do you see that?

18   A.  Yes.

19   Q.  Ms. Early was your boss for awhile, right?

20   A.  Yes.

21   Q.  Do you know if she was your boss at this time?

22   A.  I believe she was.

23   Q.  And then at the top of page 2, if we can look at the next

24   email in the chain, Mr. Berndt writes to Sue Neuber?

25   A.  Neuber, correct.

P42Qomn2                          Hagen - Direct

1   Q.  Who is Omnicare senior director of operational integration,

2   right?

3   A.  I don't see -- I don't know what Sue's role is.  I thought

4   she was compliance.

5   Q.  Well, whatever her role is, Mr. Berndt says, "The one-year

6   rollover is an issue again with the NV BOP."  That's the Nevada

7   Board of Pharmacy, right?

8   A.  Yes, sir.

9   Q.  He continues, "This is a DX-site."  He means this

10  particular pharmacy is OmniDx, right?

11  A.  Correct.

12  Q.  Then he says, "The site has had a court order served to the

13  GM PIC and pharmacy with possible revocation of licenses."

14          And GM is general manager.  And PIC is a

15  pharmacist-in-charge, right?

16  A.  Yes.

17  Q.  It continues:  "We are in current litigation with the state

18  to resolve the issues and are pretty sure we have saved the

19  licenses from being revoked.  The rollover issue is one of the

20  issues that has to be corrected as soon as possible."

21          Did I read that correctly?

22  A.  I believe you did.

23  Q.  So now let's go to the bottom of the first page of this

24  document?

25          THE COURT:  Do you have a question for her?  Because

P42Qomn2                      Hagen - Direct

1    if you're just going to stand there and read emails, I'm going

2    to stop you.  Because the emails are in evidence, and you're

3    free to argue from them at the end of the case.  But if you

4    have a question for this lady, ask it to her.  Otherwise, she's

5    wasting her time and ours.

6              MR. BARNEA:  Thank you, your Honor.

7    Q.  On the bottom of the first page, let's look at that email.

8    Ms. Neuber adds you back into the conversation at the cc. line.

9    Do you see that?

10   A.  Yes.

11   Q.  And she asks you for data about how many prescriptions are

12   being affected by this issue.  Do you see that?

13   A.  She is asking Todd and Bernie, yes.  She's not asking me.

14   Q.  Can you read that first sentence of her email?

15   A.  She says, "We need data pulled for both systems -- for the

16   number of Rx's that auto roll in SNF."

17             MS. CONLEY:  Objection, your Honor.

18             THE COURT:  The objection is sustained.

19             Folks, you're going to take your morning break right

20   now.  Don't discuss the case.  Keep an open mind.

21             Ma'am, could I ask you to leave the courtroom for a

22   minute?

23             (Juror and witness temporarily excused)

24             (Continued on next page)

25

P42Qomn2

```
 1                THE COURT:  Let me explain something to the
 2    government.
 3                You put a witness on the stand.  You ask the witness
 4    questions.  You don't stand there and read emails and say "Did
 5    I read that correctly?"  Because the next time you do it,
 6    you're sitting down.  You're done with that witness.  Done.
 7    Over.  Finished.  You have five minutes to revise your outline.
 8                You say:  And did there come a time when you and your
 9    supervisors had an issue about X?
10                And did you have a discussion with so and so?
11                And what did you say?
12                And did you say blah?
13                And she says yes or no.
14                And you don't stand there and read the emails.  And if
15    that's what you're planning to do, I will stop you the next
16    time, and you will be done with the witness.
17                And that goes for you and that goes for you.  That
18    goes for everybody, all right?
19                Summary witnesses get a little bit more leeway.
20    You've got a fact witness here.  You cannot just read her
21    emails, and say, "Did I read that correctly?"  That is not a
22    proper question, and I will not allow it.  The emails are in
23    evidence.
24                See, that's why we did that at the beginning of the
25    case before you all came in.  You will be allowed to talk about
```

1    them in your closing statement.  They are already there, but

2    you are not going to put somebody on the stand who should be

3    out doing her job, and you read email after email after email

4    into evidence.  Not going to happen in my courtroom.

5              I'll see you in five minutes.

6              (Recess)

7              THE COURT:  The jurors are having a very hard time

8    understanding you, in particular, because you keep dropping

9    your voice.  But they have now complained, okay?  They've

10   complained.  They want people to keep their voices up.  You

11   actually don't need a microphone.  I am not really close to a

12   microphone, but you can hear every word I say because I keep my

13   voice up.  And I don't drop it at the end of a sentence, and I

14   keep it going forward.  I don't even need this, so I know the

15   room has decent enough acoustics.  And you're like six feet

16   from them, so they have complained.

17             MR. BARNEA:  Okay.

18             THE COURT:  To Cam and Diana, okay?  So we really need

19   to accommodate them.

20             Now I'm going to say this again.

21             You can -- could you take your witness back out?

22             MS. MAINIGI:  Sorry, your Honor.

23             THE COURT:  No.  No, I understand.

24             MS. CONLEY:  Ms. Conley.

25             MS. MAINIGI:  We can have her step over there.

P42Qomn2

```
 1                THE COURT:  And close that door.

 2                Everything that is in the admitted exhibits is in

 3      evidence.  You don't have to do anything more to get it into

 4      evidence.  You put a witness on the stand to have the witness

 5      tell you a story or to make specific evidentiary points with

 6      the witness.  Not to say am I a good reader, which is literally

 7      the only question you've asked for the last 15 minutes.  I

 8      don't care about your reading skills.  Your reading skills do

 9      not have to be proved in this case.

10                So you can ask her:  There came a time that she and

11      her supervisor had a conversation, and you can ask her, "And in

12      that conversation" -- because you can lead her -- "and in that

13      conversation, isn't it the case that you -- that somebody told

14      you that in Ohio you had to do X," and she has to say that.

15                And if she doesn't remember, she could be given the

16      email to refresh her recollection.  And if she says something

17      that's at odds with something she said in the email, you can

18      impeach her with her statement, not with somebody else's

19      statement.  And that's how you can use the emails with this

20      witness.  And that's it.

21                So if everybody's plan for those 65 hours that you

22      wanted was to put a witness on the stand and start reading

23      every email that that witness was involved in and saying and

24      "Did I read that correctly?" maybe there are judges in this

25      district who allow that.  I don't.  That is not proper trial
```

P42Qomn2

1    procedure.

2            Okay.  Bring the witness back.  I really resent having

3    to teach trial practice from the bench.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P42Qomn2

```
 1                    (Witness resumed)
 2                    THE COURT:  Let's get the jurors.
 3                    (Jury present)
 4                    THE COURT:  Have a seat, please.  We got the message.
 5      We heard loud and clear that you're not hearing loud and clear.
 6      So we're really going to work hard on keeping our voices up.
 7      If you have a problem, just go like this (indicating).
 8                    MR. BARNEA:  Thank you, your Honor.
 9                    THE COURT:  Ma'am, you're still under oath.  You may
10      inquire.
11      DEANNA HAGEN, resumed.
12      DIRECT EXAMINATION CONTINUED
13      BY MR. BARNEA:
14      Q.  We were just talking about an ongoing issue with the Nevada
15      Board of Pharmacy.  Do you remember that?
16      A.  Yes.
17      Q.  And did you consider the -- and the issue at the Nevada
18      Board of Pharmacy was that prescriptions were being rolled over
19      inappropriately, right?
20      A.  That's what Jerry described in his email or Scott, I can't
21      remember, and I don't see the document.
22      Q.  Mr. Neuber?
23      A.  Sue Neuber?  Ms. Neuber.
24      Q.  Oh, Mr. Berndt?  Yes.
25      A.  Mr. Berndt, okay.
```

P42Qomn2

```
1    Q.  And you considered this -- and you stated in an email that
2    this was a fatal flaw in OmniDx.  Did you say that?
3    A.  I did say that.
4    Q.  In fact, in your view, all prescriptions should "die at 365
5    days."  Do you remember saying that in an email?
6    A.  I did say that.
7    Q.  All right.  Do you remember a similar issue being brought
8    up by Kim Kunk.  Do you know who Ms. Kunk is?
9    A.  I do know who Kim Kunk is.  I don't recall that now.
10    Q.  Let's take a look at Government Exhibit 316 and see if that
11    helps you refresh --
12           THE COURT:  Well, no, don't show it to the jury.  She
13    needs her recollection refreshed.  You show it to her and ask
14    her if it jogs your memory.
15    Q.  Ms. Palla, can you just pull it up?
16    A.  I can look it up.
17           THE COURT:  No.  No.  That's okay.
18           What exhibit would you like her to look at to refresh
19    her recollection.  She has a book of exhibits here.
20    Q.  Government Exhibit 316.
21           THE COURT:  Can you look at Government Exhibit 316 if
22    it's in here?  It is.  Very good.
23    A.  316?
24    Q.  Yes.
25           THE COURT:  3-1-6.  If you can look at that and see if
```

P42Qomn2

1    that jogs your memory that there was a similar issue that came

2    up with Kim Kunk.

3    Q.  On the bottom of page 2?

4    A.  Where she emailed --

5          THE COURT:  The question is:  Does that jog your

6    memory that there was a similar conversation that you were

7    involved in with Kim Kunk?

8    A.  I don't recall that, no.

9          THE COURT:  She doesn't recall it.  Fine.  Okay.

10   Q.  Can I show her the email now?

11         THE COURT:  No.  Ladies and gentlemen, there are -- I

12   told you that before the trial I met with these people for

13   hours and hours.  I mean, it's the best thing that they did.

14   They really did astonishingly wonderful job for us all.  And we

15   got all of the exhibits into evidence.  So all these emails

16   that they're talking about, they're in evidence.

17         Over the course of the trial, you may see some of them

18   because they're used to impeach a witness or something like

19   that.  And at the end of the case, they are going to be able to

20   talk to you about anything that's in evidence, including all of

21   these emails.

22         I am real technical about these hypertechnical

23   evidentiary things that we do on the witness stand.  So I'm not

24   just going to have him like read you emails, and then say, "Did

25   I read that right?"  I don't allow that in my courtroom.  I

P42Qomn2

1    don't allow a lot of things in my courtroom.  And so the fact

2    that there are allusions to emails that you may not be seeing

3    right now, you may see them later, and you will undoubtedly see

4    them later because I think there are literally hundreds,

5    hundreds of emails that have been admitted into evidence

6    already, and we don't have to waste time with you sitting here

7    doing that.

8              Please go on.

9    BY MR. BARNEA:

10   Q.  Do you recall in October of 2015 another person named

11   Janine Wolfram who was the general manager of Omnicare in

12   Salisbury bringing up a similar issue about rollovers at an

13   assisted living facility?

14   A.  Yes, in Maryland.

15   Q.  And she was complaining that rollovers should not happen in

16   assisted living facilities, right?

17   A.  I think that was her complaint.

18   Q.  And you agreed with her that rollovers are not supposed to

19   be allowed in assisted living facilities or any type of

20   community setting, is that right?

21   A.  I agreed that based on the type of assisted living, yes.

22   Q.  You agreed that --

23   A.  Depending on -- it depends on the state and the law and the

24   license type.

25   Q.  You agreed that, "We are not supposed to allow rollovers

P42Qomn2

1    for ALF or any type of a community setting."  Did you say that

2    in an email?

3    A.  I did say that.  I was incorrect, but I did say that.

4    Q.  And your boss, Ms. Early, wrote in response to that,

5    "Correct, we are not supposed to be," right?

6    A.  I don't recall what Kathleen wrote.  I don't have that in

7    front of me, I'm sorry.

8    Q.  Can you turn to Government Exhibit 204, Government Exhibit

9    204 at the top of page 4.

10           THE COURT:  See if that refreshes your recollection

11    that that was your supervisor's response.

12    A.  Is it GX-204?

13    Q.  GX-204 and the top of 204.

14           THE COURT:  Thank you, ma'am.

15    A.  And what page?

16    Q.  The top of page 4 or the fourth page, I'm sorry.

17    A.  Yes.  I found it.

18    Q.  And she told you her response to you saying that these

19    should not be for -- the rollovers should not be used for ALFs,

20    "Correct, we are not supposed to be."  Is that right?

21    A.  That's what she said, yes.

22    Q.  And the conversation also involved Mary Hozlock, right, who

23    is part of the IT department at Omnicare?

24    A.  Yes.

25    Q.  And Ms. Hozlock told you that the rollover was happening

P42Qomn2

1    improperly because of a setting, the retirement setting in

2    field 17 in OmniDx, is that right?

3    A.  Yes, that's what she said that.  The facility was probably

4    not set up correctly.

5    Q.  And as part of that conversation, there was some concern

6    that even if you were to fix the setting, it might not solve

7    all the problems because there could be previous prescriptions

8    that had already been entered that would continue to roll over,

9    is that right?

10   A.  I don't know that that was my assumption, no.

11          THE COURT:  No.  The question was, was that part of

12   the conversation?

13   Q.  If you look at the rest of the emails going up

14   chronologically?

15   A.  Was it something I said?  Can you tell me which --

16   Q.  It's at the top of page 3 and the bottom of page 2.

17   A.  Okay, that's what Mary said, correct?

18          THE COURT:  Yes.  His question was:  Did marry

19   Hozlock, right?

20          MR. BARNEA:  Yes, correct.

21          THE COURT:  Did Mary Hozlock express that point of

22   view in the course of this conversation?

23          THE WITNESS:  Yes.

24          THE COURT:  Yes, she did.  Okay.  Next question.

25   Q.  So and then when discussing the issue of the facility may

P42Qomn2

1    not have been set up correctly and there may be prescriptions

2    that are being rolled over kind of continuously, did you say,

3    "I imagine the scope of this is huge"?

4    A.  I did say that.

5    Q.  And you also proposed that there would be a way to make

6    sure every single assisted living facility was flagged

7    correctly in field 17 as retirement Y, is that right?

8    A.  The letter Y.

9    Q.  Yes.  So your solution was to make sure every assisted

10   living facility was flagged as Y in the retirement field,

11   right?

12   A.  Yes, that would not be a good idea, but that's what I said

13   at 10:00 that night.

14   Q.  You also, if you look at the prior page, said that you are

15   not even sure if signed physician order sheets should be

16   allowed for ALFs?

17   A.  Yes.  That was a question.  I'm not a pharmacist, and I

18   know that the rules are different in different states for

19   different facilities, so I was guessing and asking my boss.

20   Q.  Right.  But you expressed your own opinions in this email,

21   right?

22   A.  Yes.

23   Q.  And your views you weren't -- you thought that perhaps at a

24   time there was that ALFs could accept physician order sheets,

25   but you didn't think that that was appropriate, right?

P42Qomn2

1    A.  I said I was fuzzy on it; I didn't know.

2    Q.  You didn't think it was an approved practice because --

3    A.  Yeah, I was not sure.

4    Q.  All right.  Let's switch gears and talk about cycle fill in

5    Omnicare?

6    A.  Okay.

7    Q.  And we discussed earlier OmniDx cycle fill and rollover

8    prescription, right?

9    A.  Yes.

10   Q.  But those prescriptions can be removed from the cycle fill

11   from what you would call a manual process, right?

12   A.  Yes.

13   Q.  And that manual process involved creating something called

14   a physician call back report, right?

15   A.  That was one of the ways, yes.

16   Q.  And a physician call back report is a list of all

17   prescriptions in a given order that are about to expire or run

18   out of refills, right?

19   A.  Yes.

20            THE COURT:  You're dropping your voice.

21            MR. BARNEA:  I think it's that I'm looking at my

22   paper, so I'm moving my face away from the microphone, but

23   thank you, your Honor.

24   Q.  Once someone gets this report, they can call the prescriber

25   for each of those prescriptions and ask for new authorizations,

P42Qomn2

```
 1    right?
 2    A.  Yes, sir.
 3    Q.  And that's call chasing the scripts?
 4    A.  We would call it chasing the scripts.
 5    Q.  And the psEDI feature in OmniDx can also do a type of cycle
 6    fill, right?
 7    A.  Yes.
 8    Q.  Cycle fills that can be associated with the psEDI feature,
 9    right?
10    A.  Yes.
11    Q.  And, again, psEDI is the computer interface between OmniDx
12    and the packaging machine, right?
13    A.  Right.  Very good.
14    Q.  There was also a physician call back report available for
15    psEDI cycle fill, right?
16    A.  Yes, sir.
17    Q.  Some pharmacies complained that the physician call back
18    reports were not accurate, right?
19    A.  Some complained that, that is true.
20    Q.  Other pharmacies complained that the manual process of
21    using the call back report was "very burdensome," right?
22    A.  I don't recall that, but I do recall people saying that the
23    psEDI report could give them incorrect results.
24    Q.  But you don't remember them saying that it was very
25    burdensome?
```

P42Qomn2

1    A.  I don't recall right now.  I'm sure that any manual process

2    people are going to complain about it, so you're probably

3    right.

4    Q.  If you would take a look at Government Exhibit 78 at the

5    bottom of page 1 and top of page 2, can you tell me whether

6    that helps you remember whether someone called it very

7    burdensome?

8    A.  Which page?  Sorry.

9    Q.  Bottom of page 1 to top of page 2.

10   A.  From Bill Glaser?

11   Q.  Exhibit 78.  Paragraph three.

12   A.  Oh, where Stephanie said it was burdensome.  Okay.

13   Q.  Very burdensome, right?

14   A.  She did say that, yes.

15   Q.  And, in fact, she said that it became so burdensome in her

16   pharmacy in Cincinnati, that they stopped using it in her

17   pharmacy, right?

18   A.  She said that, yes.

19   Q.  And you personally had some concerns about the physician

20   call back report, didn't you?

21            I'm not referring to this particular email.  I'm

22   asking a general question.

23   A.  I never had any issues with the physician call back report

24   personally when I ran it.

25   Q.  But you had concerns about the process, the physician call

P42Qomn2

1    back report process?

2    A.  Any time anybody escalates a concern to me, I'm going to

3    pass it off to the right people to make sure it's looked into.

4    Q.  Did you call the process of using the physician call back

5    report manual and tedious?

6    A.  Yes.

7    Q.  And you thought that it should be fixed through a

8    programming change to OmniDx, right.

9    A.  It would be nice if it was not manual, but we have lots of

10   manual processes.

11   Q.  So -- and you thought that the software should have been

12   updated as far back as 2012 and 2013, right?

13   A.  Probably, yes.

14   Q.  And, in fact, there had been discussions about fixing this

15   issue with OmniDx for several years before that, right?

16   A.  Yes, I believe there was a ticket or a task into update the

17   software so that we wouldn't have to do it manually.

18   Q.  And that ticket for update, the software was back from

19   2008, right?

20   A.  I believe it was 2008.

21   Q.  And yet the software was not fixed, not in 2012, not in

22   2009, not 2010, 2012, 2013, 2014, is that right?

23   A.  Yeah.  I don't know how they prioritize tickets and things

24   like that since there's manual processes in place.

25   Q.  And instead of fixing the software at some point, they had

P42Qomn2

1    you write up a formal correction of how to do this manual fix

2    for cycle fill, right?

3    A.  Right, trying to standardize one.  There were several

4    different ways to do it.  Some people put stop dates in.  Some

5    people just used a zero fills report.  Some people used

6    physician call back report.  You know, just trying to get a way

7    that everybody was doing it the same way.  I mean, we all

8    wanted the same glazed ham.  I put my glaze on this way.  They

9    made their own sauce, but we all still had the same goal, just

10   doing it different ways.

11   Q.  But some people didn't use the physician call back report

12   at all, right?

13   A.  They might not have used the physician call back report,

14   but they had other processes in place.  Like, I think one of

15   our pharmacies out in California, they started putting DC dates

16   in the orders which kind of worked for them, but it caused

17   other problems like then all of a sudden with the DC date in

18   there, the order wouldn't print on the medical record, so it

19   caused a different problem.  Still trying to do the right

20   thing, just maybe not the best way sometimes.

21   Q.  Well, you don't know that everyone did the right thing in

22   every pharmacy, do you?

23   A.  I would have no visibility into that.

24   Q.  In fact, even after you sent out your standardized memo

25   trying to tell people how they ought to use the physician call

P42Qomn2

1    back report, you continued to get messages saying that people

2    were not using it or that they were having trouble with it,

3    right?

4    A.  Every now and then someone would struggle.

5    Q.  You don't know whether people around the country were

6    actually doing what they were supposed to do in terms of

7    flagging prescriptions that shouldn't be renewed using OmniDx

8    cycle fill, do you?

9    A.  That was completely out of the scope of my role.

10    Q.  And even after you wrote a memo explaining to people what

11    steps they might be able to take steps using what you called a

12    manual and burdensome approach, you still don't know whether

13    people were actually using that across the country in the

14    Omnicare --

15    A.  Right, right my --

16          THE COURT:  No.  We got that.  Okay.

17    Q.  And that's because, in part, the reason this issue

18    persisted for so many years is because Omnicare never dedicated

19    the resources to actually fixing the problems in the Omnicare

20    computer system, right?

21    A.  No.  We still relied on our manual processes.

22          MR. BARNEA:  Thank you.  No further questions.

23

24

25

P42Qomn2                          Hagen - Cross

1    CROSS-EXAMINATION

2    BY MS. CONLEY:

3    Q.  Good afternoon, Ms. Hagen.  I'm Ms. Conley.  I wanted to

4    have Ms. Alexander pass out the exhibit.

5              Ms. Hagen, the government lawyer asked you whether you

6    felt Omnicare failed to dedicate adequate resources --

7              THE COURT:  Wait a minute.

8              Make it quite clear, Ms. Conley, when you're done with

9    your question.

10             And if you wouldn't mind waiting a beat after she

11   stops before you answer.

12             THE WITNESS:  Absolutely.

13             MS. CONLEY:  Apologies.  I'll slow down.

14   Q.  The government lawyer just suggested that Omnicare failed

15   to dedicate adequate resources to address problems with

16   Omnicare's computer system.  Do you agree with that?

17   A.  Absolutely not.

18   Q.  What do you think generally about the work that Omnicare

19   employees did over the course of time at the company?

20   A.  I have been with the company or, you know, nearly 30 years.

21   I've been in a good amount of pharmacies, and every single

22   person I've come across in our pharmacies, we've got pictures

23   of the people we care for.  Everybody in there is honestly

24   trying to do the very best they can for this country's most

25   fragile population.  These are people that can't go to CVS.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P42Qomn2                          Hagen - Cross

 1  They can't do those things.  So we have a lot of very good

 2  processes in place to take care of those people.

 3  Q.  So how long have you been with Omnicare now?

 4  A.  I started in pharmacy, I started in 1991, but Omnicare was

 5  bought -- I mean the pharmacy I was at was bought by Omnicare

 6  in 1996, so I start working at an Omnicare pharmacy in 1997.

 7  Q.  How did you just get into pharmacy generally?

 8  A.  I was with a friend of mine, and we went into a pharmacy so

 9  she could pick up her prescription, and they had a sign there

10  that they were hiring or somebody to work the Ohio lottery

11  ticket booth.  So I applied, and I got that job $3.50 an hour.

12  That's where I started.  That's how I got in.

13  Q.  Then you transitioned there into the actual pharmacy beyond

14  the lottery?

15  A.  Yeah.  The lottery ticket booth was built into the retail

16  pharmacy, so it was like all one big countertop.  When the

17  retail pharmacy was busy, I would go over and help.  So when a

18  position opened up in their long-term care side, I got that

19  job.

20  Q.  What was your role in that long-term care job?

21  A.  I was pharmacy technician.

22  Q.  Did you see the medication orders that were coming in from

23  the facilities that you served?

24  A.  Yeah.

25  Q.  What type of facilities did you serve in Ohio?

P42Qomn2                          Hagen - Cross

1    A.   In at Howard --

2              MR. BARNEA:  Objection.  This goes far beyond the

3    scope of the direct.

4              THE COURT:  Yes, but remember this is their witness

5    too, who I think was --

6              MR. BARNEA:  No, she's not on their list.

7              THE COURT:  In that case, you're limited to the scope

8    of direct.

9              MS. CONLEY:  Your Honor, we addressed this with

10   government counsel last week and --

11             THE COURT:  We're not having a conversation here.  We

12   are not having a conversation.

13             MS. CONLEY:  Understood, your Honor.

14   Q.   Do you remember Mr. Barnea asked you about Ohio law and

15   whether they could accept physician order sheets?

16   A.   Yes, I remember.

17   Q.   What is your understanding under Ohio law if physician

18   order sheets can be accepted?

19   A.   Physician order sheets can absolutely be accepted.  Again,

20   with this type of business, it's not like retail where you walk

21   in and hand them over your prescriptions.  We have what we call

22   physician order sheets.  At the bottom of that sheet is a place

23   for the doctor to sign.  If the license for that facility

24   allows for it, then we can have those type of order -- we call

25   them orders.

P42Qomn2                          Hagen - Cross

1    Q.  Mr. Barnea also discussed with you the process of rollover,

2    right?

3    A.  Yes.

4    Q.  Could any order in OmniDx roll over?

5    A.  No, not all of them.

6    Q.  How would one determine whether an order in OmniDx could

7    roll over?

8    A.  Well, it could be the system setup.  It also if you're

9    getting a prescription or an order, if there's a written number

10   of refills on there, you enter the refills, and then when those

11   are exhausted, the system stops you and says you're out of

12   refills.  Do you want to get out of this one or do you want to

13   send a note to the prescriber?

14   Q.  You said it was also something that could be done in

15   facility setup.  How did that work?

16   A.   In the facility setup, there was -- depending on the

17   license type, again, we're going back to the license, but if it

18   was a facility that could not get rollovers, there was a flag

19   called a retirement flag.

20            It did a lot of other things besides just that, but if

21   it was set to yes, then it treated it like a retail, and then

22   it would stop you when you were entering a prescription at the

23   physician, at the dispensing quantity and at the number of

24   refills, and you had to enter something.

25   Q.  And so who made the decision as to how that retirement flag

```
 1   would be set up in the system for a particular facility?

 2                 MR. BARNEA:  Objection.

 3                 THE COURT:  Ms. Conley, keep your voice up.

 4                 MS. CONLEY:  My apologies, your Honor.

 5                 THE COURT:  Overruled.

 6   A.   The pharmacy would because they would get the contract and

 7   know what kind of license it was so they would set the facility

 8   up based on that.

 9   Q.   Did that make sense to you that that was a function that

10   was then at the pharmacy level?

11   A.   Absolutely, yeah.

12   Q.   Did corporate operations have a role in that setup?

13   A.   Not a role.  You had to have access to set up a facility.

14   If a pharmacy didn't have access or they were in a pinch, we

15   would help them, but we only set up the shell.  Basically they

16   would tell us what to fill in in the little fields, and we

17   would fill it in based on the information they gave us.

18   Q.   Mr. Barnea asked you about a situation where a woman named

19   Janine Wolfram raised an issue about whether rollovers were

20   permitted in assisted living facilities in Maryland.  Do you

21   recall that?

22   A.   I do.

23   Q.   Do you recall who Janine Wolfram is?

24   A.   Yes.  She was the general manager in one of our pharmacies

25   in Maryland.
```

P42Qomn2                          Hagen - Cross

1    Q.  In your understanding, did you have an understanding at the

2    time as to what the rules and regulations were for whether

3    assisted living facilities in Maryland were permitted to use

4    physician order sheets?

5    A.  No.

6    Q.  Were the statements that you made in the email about the

7    situation that Ms. Wolfram raised based on an assumption that

8    Ms. Wolfram said about the physician order sheets used in ALFs

9    in Maryland were true?

10              MR. BARNEA:  Objection.  Leading.

11              THE COURT:  Objection sustained.

12   Q.  If you look at Government Exhibit 204 that you looked at

13   with Mr. Barnea.

14   A.  In their book?

15   Q.  Yes, their book.

16   A.  204?  Okay.

17              (Continued on next page)

18

19

20

21

22

23

24

25

P42AOmn3                        Hagen - Cross

1    A.   Okay.

2    Q.   And this is the e-mail, right, that addresses the question

3    from Ms. Wolfram, right?

4    A.   Yes.

5    Q.   So if Ms. Wolfram was wrong about what was an acceptable

6    form of an order in assisted living facility in Maryland, would

7    that impact the remainder of your assessment of the issue as

8    reflected in Government Exhibit 204?

9               MR. BARNEA:   Objection.

10              THE COURT:   Ground.

11              MR. BARNEA:   Calls for speculation.

12              THE COURT:   Overruled.

13              MR. BARNEA:   And leading.

14              THE WITNESS:   Does that mean I answer?

15              THE COURT:   That means you answer.

16   A.   It would have.  Like, I always defer to the people in that

17   state because I don't know the rules.  So I would just go based

18   on what her assumption is.  So if she assumed one way, I would

19   react to that.

20   Q.   You can look at tab two of your binder, please.

21   A.   Tab two of the binder.

22   Q.   Maryland statutes.

23              MR. BARNEA:   Objection.

24              THE COURT:   Ground?  There's no question pending.  How

25   could you object?

P42AOmn3                         Hagen - Cross

1          MR. BARNEA:  She's asking her to look at Maryland

2     statutes.

3          THE COURT:  I don't care what she's doing.  She's

4     asking her to look at something.  We'll listen to the question.

5     When you hear the question, you may well have an objection.

6     A.  Okay.  It says --

7          THE COURT:  No.  No.  Not it says.  Just look at it.

8          THE WITNESS:  Okay.  I just want to make sure.

9          THE COURT:  No.  No.  She's going to ask a question

10    now.

11    BY MS. CONLEY:

12    Q.  Have you had time to review that?

13    A.  I'm reading on --

14         THE COURT:  Why don't you ask your question.  I would

15    like to hear your question.

16    Q.  Do you agree with Ms. Wolfram that Maryland doesn't allow

17    for the use of chart orders in assisted living facilities?

18         THE COURT:  Sustained.  Move on.

19    Q.  The government attorney highlighted that you had assessed

20    the scope of a potential issue as huge; do you recall that

21    discussion?

22    A.  Yes.

23    Q.  If states such as Maryland actually permitted dispensing

24    based on chart orders, would that impact your assessment of the

25    scope?

P42AOmn3                          Hagen - Cross

1    A.  Yeah, I would --

2                MR. BARNEA:  Objection.

3                THE COURT:  The objection is overruled.  There's

4    nothing wrong with that question.  Answer the question.

5    A.  I would have been wrong because --

6                THE COURT:  No, no.  The question IS s or no.  You

7    know, would that have impacted your assessment?

8                THE WITNESS:  Yes, it would have.

9                THE COURT:  Fine.  If she wants you to explain, she'll

10   ask you to explain.

11               THE WITNESS:  Sorry.

12   BY MS. CONLEY:

13   Q.  Could you please explain, Ms. Hagen?

14   A.  Because if a state allowed for rollovers or the chart

15   orders, like it says here, then there would have been no issue

16   at all.  And I would have been incorrect in my first assumption

17   back then.  I'm sorry.

18   Q.  Do you think there's anything wrong with rollover

19   generally?

20   A.  No.  No.  Because rollover is just a regeneration of a

21   number.  That's what rollover is.  It's the orders, the active,

22   valid orders associated with it that matter, that make it a

23   valid prescription.

24   Q.  When you wrote fatal flaw in the e-mail that Mr. Barnea

25   asked you about, were you referring to the concept of rollover

P42AOmn3                         Hagen - Cross

1    generally?

2    A.   No.

3    Q.   Mr. Barnea also asked you many questions about the psEDI

4    functionality; do you recall that?

5    A.   Yes.

6    Q.   And you said the psEDI functionality was tied to a certain

7    type of dispensing?

8    A.   Yes.

9    Q.   What type of dispensing is that?

10   A.   PsEDI tells this big -- what they call ATC machine.  I

11   don't know what ATC stands for.  But it's a machine that takes

12   all of my morning meds and puts it in a little pouch.  So the

13   psEDI tells the ATC machine oh, put these three pills in a

14   morning pouch, put these two in a noon pouch, and it comes out

15   in a nice strip so it's easier to dispense.

16   Q.   Was that a functionality that was in use at many facilities

17   or pharmacies at Omnicare?

18   A.   No, no.  ATC wasn't that big of a widely -- I was at a

19   decent sized pharmacy; we didn't even have one.

20   Q.   And Mr. Barnea asked you about various discussions that you

21   had with different people within the company as to how to

22   address dispensing of psEDI and how to ensure that there were

23   stops in place; do you recall that discussion?

24   A.   Yes.

25   Q.   And what was your impression of what the pharmacies were

P42AOmn3                              Hagen - Cross

1    trying to do in connection with the psEDI functionality?

2    A.  I -- yes, there were a lot of manual processes.  Some

3    people had different ones.  But it was -- they all have the

4    same goal.  I mean, it's just pharmacy 101.

5            You have an order.  If you have to have refills and

6    you don't have refills, you call the doctor and get them.  I

7    mean, some people would set the stuff aside.  They would run

8    the label.  They would set the ones that didn't have refills

9    aside.  Me, when I was in the pharmacy, I just didn't run them.

10   I had my own way.  Some people went ahead.  And if there were

11   bingo cards, which is a card with all the little bubbles and

12   one pill in each bubble, they would go ahead and fill them just

13   for efficiency, and then put like a bright yellow piece of

14   paper on it and rubber band it and set it aside.  And if the

15   refill authorization came in, you pull the piece of paper off,

16   you stick it in the tote, it goes to the facility.

17           If you don't get the refill authorization back, you

18   pull it.  And then you have to have that -- you have to call

19   the facility and let them know that that med is not coming.

20   Q.  The government highlighted that there was a ticket in for a

21   potential automation of this process for a number of years; is

22   that -- do you recall that?

23   A.  Yes.

24   Q.  And that automation was not necessarily prioritized in the

25   earlier part of the timeframe?

P42AOmn3                        Hagen - Cross

1   A.  Right.

2   Q.  Do you have a reaction to that?

3   A.  We had -- there was a lot of tickets in I'm assuming for

4   different enhancements to the systems.  I mean, we have two

5   different systems at Omnicare, and, you know, limited

6   resources.  But, no, because we had several manual processes in

7   place.  We had everything from the manual process we laid out

8   to the actual software user guides that took you -- also took

9   you through the steps.  I mean, there was many safety checks in

10  place.

11  Q.  And Mr. Barnea also asked you about cycle fill; do you

12  recall that?

13  A.  Yeah.

14  Q.  And he asked you about a physician call back report used in

15  cycle fill?

16  A.  Yes.

17  Q.  Can you explain to me the process of cycle fill and how the

18  physician call back report fits into that process?

19  A.  Yes.  So with cycle fill, psEDI or any type of cycle fill,

20  the first thing that happens is we try to get in front of it

21  because we want to make sure the cycle goes out on time because

22  if we don't get our cycle out on time, the patient doesn't

23  start on time.

24          So a week and a half maybe before we run the physician

25  call back report, and the physician call back report is

P42AOmn3                        Hagen - Cross

1    complex.  There's many multivalued fields in there.  If you

2    don't fill it out, you might have problems with it.  But it's a

3    good report.

4              And you fill that report out, you run it, and you

5    start calling on your refills.  And at the same time, you're

6    also sending out the cycle fill preview report.  So that has a

7    report of all of the medications slated to go to the facility

8    for the patients.  It's all of the medications we plan on

9    sending.  And the facility has to review that and sign off on

10   it that, yes, they want all of those meds.

11             Then while we're working the cycle fill, the physician

12   call back report, we're starting to fill meds and everything to

13   get them ready for the cycle.

14   Q.  Okay.  The cycle fill preview report that you mentioned

15   that went to the facility, is that the only type of

16   communication that went back and forth between Omnicare and the

17   facilities?

18   A.  Oh, my gosh, no.  We're talking to facilities multiple

19   times every day.  They're faxing us orders.  They're calling

20   us.  If we have questions, we're faxing them.  We're calling

21   them.  We get communication through them through e-mail.  For

22   medication stuff besides the authorization report, we're

23   sending out their medical records, which is medical records is

24   kind of a general term.  There's different forms we send out.

25   The POS, which we explained earlier, and then there's a MAR,

1    medication administration record, where it's a list of all like

2    their medications that they are supposed to be taking and what

3    time and the directions on it so that the caregiver can check

4    off and sometimes -- so we're sending them out and then they

5    review the medication orders there again.  And they can write

6    on those say they might discontinue something.  They might have

7    a change in order.  They fax those back to us.

8            Usually, our medical records team, they take those,

9    they review them.  If there's a new medication on there or a

10   change or anything, they send that back up to the front to

11   order entry so that they can enter that or call on it if

12   needed.

13           Gosh, communication -- consultant pharmacists.  We

14   also have consultant pharmacists that go into the facilities on

15   a routine.  Some can be once a month.  Some can be every three

16   months, but they also meet with the facility staff and they go

17   through all of the patient charts one by one.  The consultant

18   pharmacists are very skilled in the geriatric, that type of

19   care.  So they go through and, you know, maybe there's two

20   drugs somebody is on that they can switch to one.  So there's

21   cost savings, less drugs for somebody to take, so they're

22   communicating with them that way, too.

23   Q.  So in the course of the running the cycle, did you have

24   confidence that the Omnicare pharmacies had a good viewpoint

25   into the current medication regimen of the residents at the

P42AOmn3                          Hagen - Cross

1    facilities?

2    A.   Absolutely.

3    Q.   Were these processes for cycle fill documented in various

4    places?

5    A.   Yes.

6    Q.   And where were those?

7    A.   Where I got most of my information was the OmniDX user

8    guide.  When I started there in '97, it was available to me.

9    That's how I learned it.  And there was manual processes that I

10   learned.  And when I was asked, I shared that information and I

11   asked other people how they did it to see if they had a better

12   way than I did.  And some did, some didn't.

13   Q.   And where would an employee at Omnicare find the DX user

14   manual in the 2010 through 2018 time period?

15   A.   Well, all the pharmacies I went in, believe it or not, we

16   had them in binders.  But you could also get them on our

17   intranet.  And but not just user guides.  We also had a thing

18   called release notes.  So every couple times a year when they

19   sent out like software enhancements, new functionality in the

20   software, we would get what they call release notes and it

21   would just kind of go through what the new feature was and step

22   by step how it worked.

23            MS. CONLEY:  If we could put GX 513 up on the screen

24   and just take a look at page 804 of that, please.

25            MR. BARNEA:  Objection.  We didn't show the witness

1    this document in our direct.

2              THE COURT:  That doesn't necessarily mean that it's

3    beyond the scope.  I'm so sorry.

4              MS. ALEXANDER:  This is about the cycle fill process

5    and the DX user guide that explains how it was, Mr. Barnea.

6              THE COURT:  Thank you.  Show her the document.

7              THE WITNESS:  This brings me back.

8              THE COURT:  Okay.  Ask your question.

9    Q.  And is this the --

10             THE COURT:  What is this?  How about:  What is this?

11   Since it's your client.  What is this?  Great question.

12   Q.  What is this?

13   A.  This is a page out of the OmniDX user guide.

14   Q.  And what does this page of the OmniDX user guide discuss?

15   A.  It is showing you how to run one of the cycle fill edit

16   reports, which was another report we had for -- to catch the

17   orders.

18   Q.  And does this also discuss the physician call back report

19   that you were discussing?

20   A.  It is not the same thing as the physician call back report.

21   It's an additional report.

22   Q.  Is the physician call back report also in this document?

23   A.  I think, yes, there's reference to the physician call back

24   report in this user guide.  In this paragraph.

25   Q.  Where do you see that?

P42AOmn3                        Hagen - Cross

1    A.  Right above the top screenshot in the third paragraph of

2    that.  A third report, the physician call back report may also

3    be generated if any of the orders due to be refilled are going

4    to run out of allowable refills.  The report also allows you to

5    call the physician back to see if the order should be renewed.

6    Q.  In your experience, would a pharmacist in charge of each of

7    the facilities have access to this OmniDX user guide?

8    A.  Everybody in the pharmacy would have access to this

9    information.

10   Q.  So, for example, if there was a PIC in Omnicare of

11   Albuquerque, they would have access to this?

12   A.  Oh, yeah.

13   Q.  Would you expect the pharmacist in charge of a pharmacist

14   that ran cycle fill to have an understanding of the OmniDX user

15   guide?

16   A.  Absolutely.

17   Q.  And you would have -- would you have an understanding that

18   the pharmacist in charge of a pharmacy that ran cycle fill

19   would know how that process worked and the importance of the

20   physician call back report?

21            MR. BARNEA:  Objection.

22            THE COURT:  The objection is sustained.  Leading

23   question.

24   Q.  What was your understanding of what the pharmacist in

25   charge of a facility, of a pharmacy, should know about the

P42AOmn3                           Hagen - Cross

1    cycle fill process if that pharmacy ran cycle fill?

2    A.  I would expect that the pharmacist in charge knew how it

3    worked with the laws and regulations of their state and how it

4    supported prescription dispensing.

5    Q.  Were there other policies and procedures about cycle fill?

6    A.  Yes.

7    Q.  And did there come a time when you were asked to update

8    some policies about cycle fill?

9    A.  Yes.

10   Q.  Do you recall that in one of those, in an e-mail where you

11   sent some of your work products, you noted that you were

12   physically sick to your stomach and you thought you wanted to

13   die?

14   A.  Yes.

15   Q.  Was that a reflection of anything you thought about cycle

16   fill?

17   A.  No.  That didn't have anything to do with cycle fill.  That

18   was just -- it was late at night.  I knew my boss needed it

19   right away.  She has very high expectations.  I was very

20   nervous about my -- I wanted to do a good job.

21   Q.  So there -- was there anything about what you said that was

22   intended to indicate that you thought that if cycle fill was

23   not being run in a compliant manner?

24   A.  No.  Not at all.

25   Q.  Did you ever have any concerns about the pharmacy's

P42AOmn3                        Hagen - Cross

1    abilities to run a cycle fill in a compliant manner?

2    A.  No.  I mean, I've done it myself and I know that if you

3    follow the steps, it can be done correctly.

4    Q.  Did you ever have any concerns at all about Omnicare

5    pharmacy staff appropriately carrying out their professional

6    duties?

7    A.  Never.  Never.

8    Q.  From your vantage point, having both been a pharmacy

9    technician in Omnicare pharmacies and working in operations,

10   did you feel like Omnicare's systems appropriately supported

11   the pharmacy staff and what they needed to do?

12              MR. BARNEA:  Objection.

13              THE COURT:  Ground?

14              MR. BARNEA:  Leading.

15              THE COURT:  No, it's not.  Overruled.

16   A.  Could you repeat the question, please.

17              THE COURT:  Read it back, please.

18              (Record read)

19   A.  Yes.  I mean, were there things that would have been cooler

20   to have if they were automated?  Sure.  But we had all the

21   tools we needed to be successful.

22   Q.  Did you ever feel like Omnicare failed to take action where

23   action was needed?

24   A.  No.  No.  We reacted appropriately I believe with every

25   situation that was brought to our attention.

P42AOmn3                         Hagen - Redirect

```
 1              MS. CONLEY:  No further questions at this time.
 2              MR. BARNEA:  Just a few questions on redirect, your
 3    Honor.
 4              THE COURT:  Okay.  Great.
 5              THE WITNESS:  Hi, there.
 6              MR. BARNEA:  Hi again.
 7    REDIRECT EXAMINATION
 8    BY MR. BARNEA:
 9    Q.  You just told Ms. Conley that you thought that the folks
10    who worked in the pharmacies, the pharmacists there, they knew
11    state law the best for the states where they worked in, right?
12    A.  I believe that, yes.
13    Q.  And so Ms. Wolfram in Maryland, she told you that she did
14    not think that ALFs should be allowed rollover in her state of
15    Maryland; is that right?
16    A.  That's what she said, yes.
17    Q.  And the memo that we saw earlier from the -- I can't
18    remember the title of the gentleman in Ohio wrote that ALFs
19    shouldn't be allowed to use rollover in Ohio under Ohio law; is
20    that right?
21    A.  I think that's what he put in there, yes.
22    Q.  Okay.  And so -- and you think that those are the people
23    who know the state law best, right, the people who actually
24    work in those states, right?
25    A.  Yes.
```

P42AOmn3                    Hagen - Redirect

1    Q.  Now, I think you said that it is important for there to be

2    a valid order for all prescriptions and that is an important

3    part of what an Omnicare pharmacist is supposed to make sure is

4    there?

5    A.  Yes.

6    Q.  And is it also important for there to be -- it is also

7    important, I'm sorry, for there to be a valid order in place

8    for any refills or rollovers of prescriptions; is that correct?

9    A.  I don't understand your question.

10   Q.  If a prescription is rolling over, it is important for

11   there to be an authorization in place from a prescriber to

12   allow that next --

13   A.  Right, right.

14   Q.  -- rollover to be there.  Okay.

15          And you also -- sorry.

16   A.  You're fine.

17   Q.  Now, do you know that in fact -- sorry, speaking back about

18   that people know more about their states, those are the experts

19   on their states, the Omnicare employees.

20          Do you know that, in fact, hundreds of Omnicare

21   pharmacists have said that their states shouldn't have allowed

22   rollover for ALFs?

23          MS. CONLEY:  Objection, your Honor.  Hearsay.

24          THE COURT:  Ground?

25          MS. CONLEY:  Hearsay.  And there's no foundation or

P42AOmn3                          Hagen - Redirect

 1   support.

 2                THE COURT:  Wait a minute.

 3                THE WITNESS:  Do I answer that?

 4                THE COURT:  No.  Could you let me read for one second.

 5                THE WITNESS:  Sure.

 6                THE COURT:  Overruled.

 7   A.  I don't know that.

 8                THE COURT:  Next question.

 9                MR. BARNEA:  Okay.

10   Q.  You mentioned the different ways that Omnicare employees

11   might use manual workarounds to try to prevent the rollover in

12   cycle fill; do you recall that testimony?

13   A.  Yes.

14   Q.  Do you know that some Omnicare employees didn't use any of

15   those mechanisms at all and just relied on the Omnicare OmniDX

16   computer system and whenever it allowed a rollover to happen,

17   they just let it go through?

18   A.  I do not know that, no.

19   Q.  You also mentioned that people who worked at Omnicare

20   pharmacies had access to Omnicare's manuals for the computer

21   systems, right?

22   A.  Yes, sir.  They did.

23   Q.  And it was your expectation that they read those manuals

24   and followed the instructions in those manuals, right?

25   A.  Not my expectation.  My assumption.

P42AOmn3                          Hagen - Redirect

1    Q.  Okay.

2              MR. BARNEA:  Can we look at Government Exhibit 515 at

3    page 229, Ms. Rupa.

4              THE COURT:  Is that in one of her binders or going to

5    come up on the screen?

6              MR. BARNEA:  No, it's not.

7              MS. CONLEY:  Your Honor, I believe that's outside the

8    scope.  I used 513.  If they're introducing another exhibit.

9              THE COURT:  No.  No.  No.

10             THE WITNESS:  I'm not sure where you want me to look

11   at.

12             THE COURT:  On the screen.

13             MR. BARNEA:  Up on your screen in a minute.

14             THE WITNESS:  That's easier.

15             MR. BARNEA:  Government Exhibit 515 at page 229.

16        And if you could highlight the middle of the page

17   where it says retirement question mark and that paragraph.

18   Q.  Are you familiar with this manual and with this instruction

19   in one of the OmniDX manuals?

20        If you would like we can look at the first page

21   just --

22             THE COURT:  You asked her a question.  Are you

23   familiar with this document and this particular part of the

24   document?

25             THE WITNESS:  I'm familiar with the user guide.  I

P42AOmn3                      Hagen - Redirect

1    don't recall this verbiage per se right now.

2    Q.  So you don't recall the manual says if a facility is an ALF

3    or retirement home, Y should be entered in the retirement

4    field?

5    A.  That's what it says, yes.

6    Q.  And was that your understanding of what the instruction was

7    that Omnicare employees were supposed to follow in OmniDX?

8    A.  No.  My assumption, I mean, like I've said, an ALF is a

9    very general term.

10   Q.  I didn't ask you that.  I asked you was it your

11   understanding that this was the instruction in the manual that

12   it was your expectation that Omnicare employees were expected

13   to follow?

14           THE COURT:  Even I am confused by the question.

15           Okay.  I think what he's asking is if this is in the

16   manual, is it your expectation that Omnicare employees would

17   follow that instruction?

18           THE WITNESS:  They would use it as a guide.  I'm sure

19   that they might have questions.  I mean, it's not black and

20   white.

21           THE COURT:  Okay.  It's kind of a yes or no question.

22   Would it be your expectation they would follow that if in fact

23   it's in the guide?

24           THE WITNESS:  They would use it as a guide, yes.

25           THE COURT:  Thank you.

P42AOmn3                         Hagen - Redirect

1    BY MR. BARNEA:

2    Q.  Does this say -- does this instruction give any leeway to

3    the Omnicare employees?  Does it tell them that they can enter

4    Y or N depending on what they think, or does it say if a

5    facility is an ALF or retirement home, enter Y?

6    A.  It says if an ALF or retirement home enter yes, if not,

7    enter N.

8               THE COURT:  It says what it says.

9               MR. BARNEA:  I agree.

10              THE COURT:  It speaks for itself.  Don't argue.  Move

11   on.

12              MR. BARNEA:  Let me just consult for one second.

13   Q.  So do you recall that in a survey relating to Oasis that

14   there were thousands of Omnicare pharmacies around the country

15   that said that their pharmacies were coded incorrectly in terms

16   of allowing rollover?

17   A.  I do not recall that.

18   Q.  But you did say in one of the e-mails we looked at earlier

19   that you thought OmniDX had a fatal flaw; did you not?

20   A.  I said fatal flaw, but it wasn't regarding the rollovers.

21   It was just regarding -- I did use poor choice of words there.

22   But it wasn't a fatal flaw.  I mean, it was still working as it

23   was supposed to.

24   Q.  It was not about rollovers that you used the term fatal

25   flaw?

P42AOmn3                         Hagen - Recross

1    A.  I used it in that paragraph.

2                THE COURT:  Okay.  That's all he asked.

3                MR. BARNEA:  No further questions.

4                THE COURT:  Thank you.

5                Anything else for this witness?

6                MS. CONLEY:  Yes, briefly, your Honor.

7    RECROSS EXAMINATION

8    BY MS. CONLEY:

9    Q.  Ms. Hagan, do you understand that assisted living

10   facilities are not all the same?

11   A.  I do understand that.

12   Q.  And in terms of what they can accept and how rollovers

13   should be coded, how does that impact that decision?

14   A.  It depends on the license type and it does vary by state.

15               So, again, ALF is a very general term.  And back to

16   that user guide, that was not written by anybody in pharmacy,

17   but a software company.  ALF is -- can be -- okay, they can

18   have a license type in say Ohio that allows for the physician

19   order sheets and the rollovers.  The ones that don't are the

20   ones that need to be set up with a retirement flag and that's

21   set to yes so that they do not.

22   Q.  Going back to Maryland, was Ms. Wolfram a pharmacist?

23   A.  No.  She was not a pharmacist.

24   Q.  Do you understand that she got Maryland law wrong?

25   A.  She did.

P42AOmn3                          Hagen - Recross

1          MS. CONLEY:  Thank you, Ms. Hagen.

2          THE WITNESS:  I did too.

3          THE COURT:  I think you can step down.

4          THE WITNESS:  Thank you.

5          (Witness excused)

6          MS. JUDE:  The government calls Steven Perez.

7          THE COURT:  Mr. Perez, come on up here.  Stand in the

8    witness box and raise your right hand.

9    STEVEN PEREZ,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12         THE WITNESS:  Steven Perez, S-T-E-V-E-N, P-E-R-E-Z.

13         THE COURT:  Have a seat.

14         THE WITNESS:  Thank you.

15         THE COURT:  Make yourself comfortable.  Use that

16   microphone and you're speaking to the folks in the jury box.

17         MS. JUDE:  Your Honor, we are going to look at many

18   documents that have redactions and I wonder if a redaction --

19         THE COURT:  Probably a good time.

20         Folks, there are a bunch of documents in this case

21   that have information.  It's primarily patient personal

22   information, people's names, their social security numbers,

23   things like that.  And the parties have taken the time to do

24   the right thing and they've basically blacked out that stuff.

25   Okay?

P42AOmn3                              Perez - Direct

```
 1              If you see a document and there's parts of it that has
 2      been blacked out, it's been blacked out for a reason.  Whatever
 3      is under the black out has nothing to do with the case.  You
 4      shouldn't worry about why the stuff is blacked out.  You
 5      shouldn't speculate what will be under the blacking out.  Just
 6      focus on what's on the page that you can read because that's
 7      the part that's pertinent to this case.  All right?  And it
 8      doesn't violate anybody's privacy.
 9              Okay.  Go.
10      DIRECT EXAMINATION
11      BY MS. JUDE:
12      Q.  Sir, where do you work?
13      A.  The U.S. Department of Health and Human Services, Office of
14      Inspector General.
15      Q.  Is that times called HHS OIG?
16      A.  Yes.
17      Q.  And what's your job title there?
18      A.  Special agent.
19      Q.  Could you very briefly describe your job responsibilities
20      as a special agent?
21      A.  As a special agent, I'm in charge of civil and criminal
22      investigations pertaining to fraud, waste, and abuse for
23      Department of Health and Human Services programs.
24      Q.  Were you asked by the government to testify as a summary
25      witness at this trial?
```

P42AOmn3                        Perez - Direct

1   A.  Yes.

2   Q.  Are you going to show the jury certain documents related to

3   this case?

4   A.  Yes.

5   Q.  Prior to being asked to serve as a summary witness, had you

6   done any work related to this case?

7   A.  No.

8   Q.  How much background do you have on this case?

9   A.  None.

10          MS. JUDE:  Okay.  I first would like to pull up --

11          THE COURT:  Excuse me.

12          By that question, I take it you mean you weren't

13  involved in the events that gave rise to this lawsuit; you

14  never worked at Omnicare.  Is that what you mean by that?

15          MS. JUDE:  Well, he is not a case agent who worked on

16  the case for us.

17          THE COURT:  Okay.  You didn't work for the government?

18          MS. JUDE:  That's right.  He is just --

19          THE COURT:  I didn't understand your question at all.

20          MS. JUDE:  Yeah.  I know on some of the criminal cases

21  it's the case agent, so I just --

22          THE COURT:  We're not in a criminal case.

23          MS. JUDE:  Okay.

24          I would like to first show you Government Exhibit 1603

25  if we could pull that up.  You also have a binder if you would

P42AOmn3                          Perez - Direct

1    like to look at the physical copy.

2    Q.  Agent Perez, what is this?

3    A.  This is a summary chart given to me by the government

4    referencing statements concerning pharmacy law.

5    Q.  Did you have any involvement in creating this exhibit?

6    A.  No.

7    Q.  When were you provided a copy of it?

8    A.  I was provided a copy a few weeks prior to trial.

9    Q.  And what were you asked to do with this exhibit?

10   A.  I was asked to review and verify the information on the

11   summary chart referencing the source documents given to me by

12   the government as well.

13   Q.  And are those the source documents that are cited in that

14   far right column?

15   A.  Yes.

16   Q.  And did the government give you copies of those exhibits

17   for the purpose of verifying?

18   A.  Yes.

19   Q.  And just to be clear, this is not a summary of all

20   documentary evidence on this topic in the case; it's just a

21   selection, right?

22   A.  Correct.

23   Q.  I'm going to ask you about a few of the columns.  But

24   first, how many entries are in this particular chart?

25   A.  This particular chart, there are 75 entries.

P42AOmn3                          Perez - Direct

1    Q.  And is it in chronological order?

2    A.  Yes.

3    Q.  Are most of the documents that are in this e-mails?

4    A.  Yes.

5    Q.  Are there some other types of documents as well?

6    A.  Yes, there are.

7    Q.  What are examples of the other types of documents?

8    A.  Some of the other documents are memorandums and policy

9    memorandums.

10   Q.  And is the type of document listed in the document column?

11   A.  Yes.

12   Q.  What is the sender column?

13   A.  The sender column is the individual who sent the

14   correspondence.

15   Q.  And do you know where the job title information is from if

16   there is any listed?

17   A.  Yes.  To my understanding, the job title information was

18   referenced and verified by looking at the source document

19   e-mails.

20   Q.  And was that by looking at like signature blocks of the

21   e-mails?

22   A.  Correct.

23   Q.  And what's the recipient column?

24   A.  The recipient column is the individual who received the

25   correspondence.

P42AOmn3                     Perez - Direct

1   Q.   What's the state column?

2   A.   The state column is the state in which the correspondence

3   is in reference to.

4            MS. JUDE:  Okay.  Ms. Palla, could we go to the next

5   page.  You can scroll down if you like.  And can we blow up row

6   nine, please.

7   Q.   Could you reed this information to the jury, please?

8   A.   Yes.  Entry nine.  The date entered was February 9th, 2012.

9   The sender is Valley Sauer, corporate compliance review,

10  Omnicare.  The recipient is Lana Reed, home pharmacy services.

11  Document type is an e-mail.  There is no state referenced.  And

12  the detail states:  In most states, assisted living and MRDD

13  facilities are considered retail so the retail rules would

14  apply.  In order for it to be a valid script, it would need to

15  contain all the required elements.  Patient and physician info,

16  drug info, including quantity and refills.

17  Q.   And, Agent Perez, what's your understanding as to why

18  there's no state listed in the state box?

19  A.   To my understanding, there's no state in the state box

20  because the detail is in reference to multiple states.

21           MS. JUDE:  Okay.  Let's go back to the first page of

22  the summary exhibit, please.

23  Q.   I see that entries one, two, and three, all have the same

24  exhibit as their source on the far right.  Can you explain to

25  the jury why that is?

P42AOmn3                          Perez - Direct

1   A.   It's my understanding, entries one, two, and three have the

2   same source document because they're all part of the same

3   e-mail chain.

4   Q.   And is that why the shading is the same for all of these,

5   they're like a light shaded color rather than the dark that's

6   underneath?

7   A.   Correct.

8   Q.   Are most of the e-mails summarized in this chart between

9   Omnicare and CVS employees?

10  A.   Yes.

11  Q.   And what's the date range that this chart encompasses?

12  A.   For this chart, the date range is February 17th, 2011, to

13  December 10th, 2018.

14  Q.   And could you flip through and just list all of the states

15  that are referenced in the state column of this chart, please?

16  A.   Yes. New York, Ohio, California, Colorado, Louisiana,

17  Illinois, Arkansas, Pennsylvania, Louisiana, Rhode Island,

18  Arizona, Missouri, Minnesota, Colorado, Oklahoma, Nevada, New

19  Mexico, Virginia, Washington, Idaho, Oregon, Florida, New

20  Jersey.

21  Q.   Thank you.  I want to ask you about a few of the specific

22  entries.

23        MS. JUDE:  Can we go to the third page of the chart

24  and blow up entry 14, please.

25  Q.   And could you present this to the jury, please.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P42AOmn3                        Perez - Direct

1   A.  Yes.  Entry 14.  Date entered was July 18th, 2012.  Sender

2   was Suzanne Neuber, senior director, operations, Omnicare.

3   Recipient is Jennifer Krusa, division compliance officer,

4   specialty divisions Omnicare.  Document type is an e-mail.

5   There is no state referenced.  And the detail reads:

6   Guidelines should include...all retail, think ALF and redacted

7   RXs must follow retail RX rules, actual number of refills and

8   no rolling of the RX number.

9           MS. JUDE:  Great.  Let's put that down and blow up

10  number 16, please.

11  Q.  Could you present this as well.

12  A.  Entry 16.  Date entered was September 20th, 2012.  Sender

13  was Cindy O'Bryant, central division compliance manager,

14  Omnicare.  Recipient was William Glaser, reginal compliance

15  officer, Omnicare.  Document type is an e-mail.  State

16  reference is Ohio.  Detail reads:  The reference I got from Jim

17  Amend, the Ohio BOP inspector for assisted living is

18  OAC4729-5-30 (A) (D) and (E).  In my conversation with him he

19  stated AL is not institutional and should be treated as retail

20  in Ohio meaning prescriptions for everything, no POs and hard

21  prescriptions should be redacted.

22          MS. JUDE:  Thank you.  Let's do to the next page in

23  the chart and blow up entry 21, please.

24  Q.  And could you present this one.

25  A.  Yes.  Entry 21.  Date entered was December 19th, 2012.

P42AOmn3                          Perez - Direct

1    Sender was Joann Predina, compliance specialist, Ohio State

2    Board of Pharmacy.  Recipient was Randy McGladrie Sr., director

3    strategic accounts, customer facing technology, Omnicare.

4    Document type is e-mail.  State reference is Ohio.  Detail

5    reads:  Assisted living would need to follow outpatient rules

6    and SNF would be inpatient or OSBP, and all would be outpatient

7    for redacted.  So the prescribing system would need to generate

8    two types of order formats, I would guess.  The outpatient

9    needs quantity, refill, etc., while inpatient does not.

10   Q.   Thank you.  And what's your understanding of what OSBP

11   means?

12   A.   It's my understanding OSBP stands for the Ohio State Board

13   of Pharmacy.

14   Q.   And I see that the sender is from the Ohio State Board of

15   Pharmacy; is that right?

16   A.   Correct.

17   Q.   And do you understand SNF to mean skilled nursing facility?

18   A.   Correct.

19          MS. JUDE:  All right.  Let's take this one down and go

20   to the next page of the chart and look at entry 29, please.

21   Q.   And could you present this one as well.

22   A.   Entry 29.  Date entered was October 22nd, 2013.  Sender is

23   William Glaser.  Recipient is Carlo Gaglio.  Document type is

24   an e-mail.  State and reference is Illinois.  And detail reads:

25   Our understanding of the regulations is as follows:  Licensed

P42AOmn3                          Perez - Direct

1   as an ALF or Cila's...must have a retail prescription for

2   delivery of medication.

3          MS. JUDE:  And let's put that down and look at 32 on

4   the same page.

5   Q.  And could you read this one as well?

6          MR. ASHWORTH:  Your Honor, I'll just object to the

7   continued reading of e-mails.

8          THE COURT:  And I said that this is a different type

9   of witness and your objection is noted and overruled.

10  Q.  Proceed.

11  A.  Entry 32.  Date is December 13th, 2013.  Sender is Danny

12  Donato, RSA director Louisiana and Arkansas, Omnicare.

13  Recipient is Jessica Bullington, general manager, pharmacy

14  solutions, Omnicare.  Document type is e-mail.  State in

15  reference is Arkansas.  Detail reads:  Since this is an ALF

16  make sure you have new prescriptions for any new orders sent

17  out as you should do for all ALF residents...make sure the ALF

18  and resident are aware that you are required by law to have a

19  valid prescription in order to fill prescription medication.

20         MS. JUDE:  Thank you.  Could you pull up 33,

21  Ms. Palla.

22  Q.  And could you present this one.

23  A.  Entry 33.  Date entered was December 24th, 2013.  Sender is

24  Aldo Angoletta, pharmacist, Omnicare.  Recipient is Michelle

25  Dupuy.  Document type is e-mail.  State in reference is

P42AOmn3                        Perez - Direct

1  California.  And detail reads:  Almost all of Omnicare

2  Sacramento's business is ALF/RCFE/clinic/independent living

3  situations and under California SBOP law we must process these

4  orders as prescriptions, which require a quantity and refills

5  authorized.

6  Q.  And does SBOP stand for State Board of Pharmacy?

7  A.  Yes.

8           MS. JUDE:  Let's go to the next page of the chart and

9  look at entry 35, please.

10 Q.  Could you present this one as well.

11 A.  Entry 35.  Date entered is March 19th, 2014.  Sender is

12 William Irvin, regional compliance officer, Omnicare.

13 Recipient is Andrew Tsapatsaris, general manager, Omnicare of

14 Pittsburgh.  Document type is e-mail.  State in reference is

15 Pennsylvania.  And detail reads:  It is clear in the

16 regulations that a prescriber must provide a prescription and

17 not a chart order for residents in the ALR setting.  Bottom

18 line is that ALR residents are viewed the same as any other

19 community resident and therefore must have a valid prescription

20 to obtain medication from the pharmacy.  The dispensing

21 pharmacy, to Andy's point, must follow the dispensing rules as

22 they would for any community prescription.

23 Q.  And does ALR stand for assisted living residence?

24 A.  Yes.

25           THE COURT:  Why don't you ask him what ALR stands for

P42AOmn3                          Perez - Direct

```
1    instead of --

2              MS. JUDE:  I will do that, your Honor.

3              THE COURT:  Thank you.

4              MS. JUDE:  Let's go to the next page of the chart.

5    And look at entry 44, please.

6    Q.  And could you read this to the jury.

7    A.  Entry 44.  Date entered was January 29th, 2015.  Sender is

8    Brian Soper, assisted living supervisor, Omnicare.  Recipient

9    is Raquel Raby and others, compliance, controlled substance and

10   order entry department supervisor, Omnicare.  Document type is

11   e-mail.  State in reference is Arizona.  And detail reads:  A

12   lot of the AL homes want the function to take a telephone order

13   and send it to the pharmacy for us to fill.  That cannot

14   happen.  Even when a telephone order is sent to the pharmacy we

15   cannot dispense anything off of it without a doctor signature,

16   quantity refills.

17             MS. JUDE:  Thank you.  Could we go to the next page of

18   the chart, Ms. Palla.  And could you blow up entry 51, please.

19   Q.  And, Agent Perez, could you read this, but only read the

20   first line of the detail and then we're going to pull up that

21   document, okay?

22   A.  Okay.  Entry 51.  Date entered is June 10th, 2015.  Sender

23   is Jennifer Krusa.  Recipient is Toby Yontef.  Document type is

24   the talking points, attachment to an e-mail.  Detail reads:  In

25   document entitled ALF medication order talking points:  To
```

P42AOmn3                        Perez - Direct

1    maintain compliance all admission and/or new non-schedule II

2    medication orders, including OTC products, require one of the

3    following.

4              MS. JUDE:  And then Ms. Rupa, can we pull up Exhibit

5    83 at page six, please.  And could we highlight the title and 1

6    through little a., as well as 2 up until little a.

7    Q.  And could you read the highlighted text to the jury,

8    please.

9    A.  ALF medication order talking points.  Noncontrolled

10   medications.  Redacted.

11             1. to maintain compliance all admission and/or new

12   non-schedule II medication orders, including OTC products,

13   require one of the following:

14             A., a valid, signed prescription.

15             2., a prescriber signed POS will be valid for a one

16   time order only unless the prescriber indicates the quantity

17   and number of refills.

18   Q.  Thank you.

19             MS. JUDE:  Let's go back to the chart on page ten of

20   the chart.  And could you put up GX 65 side by side with this,

21   Ms. Palla, at page two.  And let's blow up entry 57.

22   Q.  And could you read this to the jury.

23   A.  Entry 57.  Date is December 16th, 2015.  Sender is Tom

24   Weiss, business capabilities architect, Omnicare.  Recipient is

25   nonapplicable.  Document type is a business case document,

P42AOmn3                          Perez - Direct

1    attachment to e-mail.  There's no state referenced.  Then the

2    detail reads:  Business case document regarding RX renewal

3    improvements supporting ALF growth.  In the ALF and independent

4    living setting, we need to renew prescriptions by contacting

5    the doctor.  Since an ALF setting is subject to the compliance

6    constraints of a retail setting, every prescribed RX in a true

7    ALF setting is subject to the process for obtaining a renewal

8    of an expired RX.

9              MS. JUDE:  Thanks.  Let's go back to the chart, page

10   ten of the chart, please.

11             And could we look at row 60, please.

12   Q.  Could you present this to the jury?

13   A.  Entry 60.  Date is October 28th, 2016.  Sender is Nancy

14   Losben.  Recipient is Patty Schwartz, ASR, Omnicare, King of

15   Prussia.  Document type is an e-mail.  No state is referenced.

16   Detail is:  For ALF, we do need a prescription or have to call

17   the doctor and get an oral RX.  We need RX's for all ALF

18   facilities in all states.  Verbal orders are for skilled

19   patients only.  ALF is retail business.  We need RXs.

20             MS. JUDE:  Thank you.  Let's go to the next page of

21   the chart.  Page 11 and look at entry 63, please.

22   Q.  Could you present this to the jury.

23   A.  Entry 63, date entered is May 25th, 2017.  Sender, Alexa

24   Carter Stransky, consultant pharmacist, Omnicare.  Recipient is

25   Dusty Howard.  Document type is an e-mail.  States in reference

P42AOmn3                          Perez - Direct

1    are Washington, Idaho, Oregon.  Detail reads:  E-mail forwarded

2    using subject clarification for Washington, Idaho, and Oregon.

3    In order to fill an RX in an ALF you have to have a valid

4    prescription, not just an order because it's considered a home

5    like environment, thus it is similar to a retail pharmacy.

6    Q.  And let's look next at entry 66.

7             Could you present this one as well.

8    A.  Entry 66.  Date entered is October 25th, 2017.  Sender is

9    Juanita Walker, pharmacy manager/PIC/senior living hub leader,

10   Omnicare.  Recipient is Carole Larach and others.  Document

11   type is an e-mail.  State in reference is Florida and the

12   detail reads:  We are continuing to find OTC orders rolled over

13   with 99 refills.  Can you please instruct your team that in an

14   ALF setting this is not allowed.  It is my understanding it has

15   always been required to get a new order for OTC items when the

16   refills run out or after one year if prn refills were given.

17            I believe that should say -- that might be a typo.

18            But ALFs fall under the ruling of retail pharmacies

19   and even though we all may not agree with this tedious task, it

20   is the law.

21            MS. JUDE:  Thank you.  And let's look at the exhibit

22   that is cited for this row.  Can we pull up GX 191 and could we

23   put page one side by side with page four, please, Ms. Palla.

24   Q.  Agent Perez, this e-mail that's on the left side, who is it

25   from?  This is the one in the middle.  Top.

1    A.  This e-mail is from Juanita Walker.

2    Q.  And what's her job title?

3    A.  Pharmacy manager/PIC/senior living hub leader.  Vanguard

4    Pharmacy.

5    Q.  I see she has an Omnicare e-mail address; is that right?

6    A.  Correct.

7    Q.  And do you know what PIC means?

8    A.  To my knowledge, no.

9        MS. JUDE:  And could we blow up the e-mail itself.

10   Q.  And could you read the e-mail to the jury just starting

11   with Carole?

12   A.  Carole, please find attached the AHCA rules and regulations

13   regarding OTC medications in an ALF setting.  Thanks.

14       MS. JUDE:  And could we look at the attachment on the

15   right side.  So take down the blow up, please.  And, Ms. Palla,

16   could you blow up the title through the end of that first

17   starred row, please.  Nope.  Just the starred row.  Okay.

18   Yeah.  Thanks.  And could we also put the second starred row

19   underneath that as well.

20   Q.  And, agent, could you read this to the jury.

21   A.  Subject pharmacy receives and fills new telephone RX from

22   facility staff.  Nursing homes.  This is an acceptable practice

23   in a nursing home.  ALFs new verbal RX's should be verified

24   with prescriber and must contain quantity and refill info.

25   Same as a community RX.

1          Subject, the facility requests a refill on an existing

2    order which has run out of refills.  Nursing homes, the

3    physician signature on the monthly POS gives authorization to

4    refill the medication.  Exclusions would include C II medicines

5    and drugs with a specific stop date.  ALFs, a prescription in

6    the ALF is treated as an RX in retail practice.  The prescriber

7    must be contacted for refill authorization.

8          MS. JUDE:  Thank you.  We can put this one down.  And

9    let's turn to another summary exhibit.  GX 1606B, please.

10   Q.  Agent Perez, what is this?

11   A.  GX 1606B is a summary chart referencing State Board of

12   Pharmacy and other state regulator documents.

13   Q.  Did you have any involvement in creating this exhibit?

14   A.  No.

15   Q.  Were you asked to do the same thing with this exhibit by

16   the government?

17   A.  Yes.

18   Q.  Did government counsel give you copies of the exhibits that

19   are cited in the source column of this chart?

20   A.  Yes.

21   Q.  And did you compare those to the chart to verify its

22   accuracy?

23   A.  Yes, I did.

24   Q.  And did you verify its accuracy?

25   A.  Yes.

P42AOmn3                          Perez - Direct

1    Q.  And just to be clear, this is not a summary of all

2    documentary evidence on this topic in the record.  It is just a

3    selection of it, right?

4    A.  Correct.

5              THE COURT:  Well, I don't know why you guys aren't

6    standing up.  Okay.

7              MR. ASHWORTH:  Objection.

8              THE COURT:  Right.  Little late.

9              Find a good place to stop with this witness.  Probably

10   before you get into this exhibit.

11             MS. JUDE:  Sure.  Now is fine, your Honor.

12             THE COURT:  Okay.  Folks, 2:00 we'll start again.

13   Don't discuss the case.  Keep an open mind.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

P42AOmn3                          Perez - Direct

```
 1                (In open court; jury not present)
 2                THE COURT:  You can step down, agent.
 3                I am second to none in my admiration for the United
 4      States Attorney's Office for the Southern District of New York.
 5      But I swear to God, in the first week they teach you guys how
 6      to ask leading questions and they drum it into you.  And I
 7      don't care if it's the civil division or the criminal division,
 8      everybody in that office does nothing but ask leading
 9      questions.  So stop it.
10                MS. JUDE:  I will, your Honor.
11                THE COURT:  Open-ended questions.  This is your
12      witness.  You don't say the answer and then have him say yes.
13                MS. JUDE:  I know.  Just for things like --
14                THE COURT:  I'm not interested.  It's not right.
15                MR. ASHWORTH:  And, your Honor, I just want to be
16      clear, we're going to be good with going on with these reading
17      e-mails and reading documents and all that?
18                THE COURT:  This witness, yes.
19                MR. ASHWORTH:  Okay.  I just ask for a continuing --
20                THE COURT:  With the last witness, no.
21                MR. ASHWORTH:  Understand, your Honor.  Just can we
22      note a continuing objection to that?
23                THE COURT:  You have a continuing objection.  These
24      things are all in evidence.
25                MR. ASHWORTH:  Thank you, your Honor.
```

P42AOmn3                          Perez - Direct

1          THE COURT:  I mean, they're being offered for the

2    purpose of showing that your client was aware from

3    communications from various states that the states took the

4    position that you needed a signed prescription.  That's why

5    these things are being offered, and they're in evidence.

6          (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P42Qomn4

1                          AFTERNOON SESSION

2                              2:00 p.m.

3              (Jury not present)

4              THE COURT:  Let me make a point in this sort of

5      continuing saga of Judge McMahon teaches trial practice.

6              It is perfectly possible and indeed, I submit,

7      permissible when you have a summary witness like this to say:

8      What did you do?

9              I didn't make this chart.  It was made by somebody

10     else.

11             Did you review the chart and all of the information to

12     ensure that all the entries were correct in the chart?  What is

13     this chart?

14             It is a summary of excerpts from 40 emails.  One from

15     each of the boards of pharmacy of each of 40 states to someone

16     at Omnicare.

17             And is there a common thread in the messages in those

18     emails?

19             Yes, indeed there is.

20             What is that common thread?

21             The common thread is that they all say "mmm."

22             Okay.  And then you could read two or three exemplars,

23     but not all 40 of them.  And then you're done.  And you've now

24     saved two hours, two and a half hours.  I mean, you know...

25             MS. JUDE:  We thought a lot about the way to do this

P42Qomn4

1    in the most streamlined way possible.  You know, that last

2    chart had 75 entries, and I think we looked at around a dozen

3    of them.  Those were -- had a common thread, and you're right,

4    we could have asked that of those.  I do think it's valuable to

5    see how it's worded by the employees.

6              THE COURT:  They will.  You will have an opportunity

7    when you sum up, and they'll be able to look at them in the

8    jury room.

9              MS. JUDE:  Yes, your Honor.

10             The charts we are about to do are a little bit more

11   narrative because they do not all have a common thread, and so

12   we do think it's important -- we are also not reading all of

13   them.  We are skipping some that are on the upcoming charts,

14   and I don't expect that we are going to be doing this for

15   hours.

16             THE COURT:  I am very happy to hear that.

17             MS. JUDE:  But, you know, I think what I have heard

18   your Honor say is that this is preferable to trying to do this

19   with any of the fact witnesses, and so ...

20             THE COURT:  Yes, it's preferable to putting on 40 fact

21   witnesses, 40 people from the pharmacy boards.  It absolutely

22   is.  And I have already said you can do it that way.  But, you

23   know, let's try to be as respectful as is humanly possible of

24   the time of these poor jurors.

25             Cam is taking over this afternoon.  We have a case

P42Qomn4              Perez - Direct

1    that is being transferred to another judge, thanks to the MDL

2    panel, and that judge asked that I finish a decision that's

3    almost done.  It's Diana's case, and it's almost done.

4              (Jury present)

5    STEVEN PEREZ, resumed.

6              THE COURT:  Mr. Perez is back on the stand.

7              Sir, you're still under oath.

8              THE COURT:  Ms. Jude.

9    DIRECT EXAMINATION CONTINUED

10   BY MS. JUDE:

11   Q.  Ms. Palla, could we put 1606B back up which we were looking

12   at before the break.

13             Agent Perez, does this chart include all documents on

14   this topic that are in the record of this case?

15   A.  No.

16   Q.  Is it a selection of them?

17   A.  Yes.

18   Q.  I see there's a column Omnicare pharmacy.  What does that

19   refer to?

20   A.  It's my understanding the column titled Omnicare pharmacy

21   outlines the pharmacy in which each correspondence is in

22   reference to.

23   Q.  Did you verify that the information in this summary chart

24   was accurate?

25   A.  Yes.

P42Qomn4              Perez - Direct

1    Q.  Could we put up 1606A, please.

2             Agent Perez, how does 1606A relate to 1606B?

3    A.  1606A relates to 1606B by placing these source documents in

4    chronological order.

5    Q.  How many entries in total are there in 1606A and B?

6    A.  17.

7    Q.  Were you also asked to verify the accuracy of this

8    timeline?

9    A.  Yes.

10   Q.  And did you do that?

11   A.  Yes.

12            MS. JUDE:  Okay.  We have a version of this that we're

13   going to put on this easel, if we may, your Honor.

14            THE COURT:  Sure.

15   Q.  In the meantime, let's go back to 1606B on the screen.

16            Ms. Palla, could we blow up entry 1 on the chart.

17            Agent Perez, could you show the jury where this is on

18   the timeline.

19   A.  Yes, it's a little bit of a strange angle, but it's the

20   first entry on the timeline.

21   Q.  Could you read the row, but just read the first two lines

22   of the detail?

23   A.  Yes.  Actually, one date entered was December 8, 2010.

24   pharmacy in question is Omnicare of Redding.  The state in

25   question is California.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P42Qomn4                Perez - Direct

1          Detail reads:  On December 8, 2010, the California BOP
2     cited and fined Omnicare Redding, California $2,500 for
3     dispensing prescriptions for dangerous drugs without prescriber
4     authorization.
5     Q.  Thank you.  Let's look at entry 2, please.  Could you
6     present this to the jury?
7     A.  Yes.  This is a second input on the timeline.  Date entered
8     was February 13, 2012.  Pharmacy in question is Omnicare of
9     Southern California.  The state in question is California.
10          And the detail reads:  Omnicare's regional service
11     area director notes in an email, our latest California BOP
12     inquiry/inspection brought up the issue of us processing
13     prescriptions for ALFs without an identified quantity on the
14     order.  The initial prescription usually does not indicate
15     quantity to be dispensed.  Omnicare's west division compliance
16     officer responds to this employee's question:  "is it the law
17     that we have to have a quantity on ALF scripts before
18     dispensing" with "Yes, just think of it as retail pharmacy."
19     Q.  Could we look at entry four, please.
20          Could you show the jury where it is on the timeline
21     and present it to them?
22     A.  Entry 4 dated July 19, 2013.  The pharmacy in question is
23     Omnicare of Fort Worth.  The state referenced is Texas.
24          Detail reads:  Texas BOP investigated complaint that
25     Omnicare filled (refilled) a prescription four or five times

1    even though the original prescriptions from the doctors clearly

2    stated no refills.  Omnicare's regional compliance officer

3    states in an email about the investigation: Yes, this will not

4    be pretty.

5    Q.  Let's go to the next page of the chart.  Rather than have

6    you read this, we're going to show this document.

7          First, could you tell the jury the date the pharmacy

8    and where it is on the timeline, please?

9    A.  Yes.  The date is March 7, 2014.  Omnicare pharmacy in

10   question is Omnicare of St. Louis.  State in question is

11   Missouri.

12   Q.  Ms. Palla, could we pull up GX-1300 and put the first two

13   pages next to each other.  Could you blow up the top half of

14   the page on the left down to there.  Perfect.

15          Agent Perez, what type of document is this?

16   A.  This type of document is an administrative letter of

17   warning.

18   Q.  Who is it from?

19   A.  This document is from the Missouri Board of Pharmacy.

20   Q.  What pharmacy was it sent to?

21   A.  Pharmacy it was sent to was Omnicare of St. Louis, formerly

22   known as Interlock Pharmacy Systems.

23   Q.  Could we now look at the bottom half of the same page.

24          Could you read from the beginning through the end of

25   the first bullet.

P42Qomn4          Perez - Direct

A.   Dear Ms. Haley, during its January 2014 meeting, the
Missouri Board of Pharmacy reviewed a recent complaint
regarding Interlock Pharmacy Systems, 345 Dunn Road,
Florissant, Missouri.  A subsequent board investigation
revealed the following compliance violations:  Hard copy
prescriptions less than two years old were stored at an
off-site storage location in violation of Missouri Regulation
20 CSR 2220-2.010(1)(J)5.

Q.   Could you also read the third bullet?

A.   Prescriptions designated for an automatic fill were
assigned a new prescription number and were automatically
dispensed in final verification by a pharmacist in violation of
20 CSR 2220-2.010(1)(B).

Q.   Ms. Palla, could we go back to the chart 1606B and go to
the second page.  Could we blow up entry 6.  Could you show the
jury where this is on the timeline and read it to them?

A.   Yes.  Entry 6 the date is June 27, 2014.  Omnicare pharmacy
is not specified.  The state in reference is Nevada.

     Detail reads:  Email among Omnicare compliance
officers.  The one-year rollover is an issue again with the
Nevada BOP.  This is an OmniDx site.  The site has had a court
order served to the GM, (general manager) PIC (pharmacist in
charge), and pharmacy with possible revocation of licenses.  We
are in current litigation with the state to resolve the issues
and are pretty sure we have saved the licenses from being

P42Qomn4            Perez - Direct

1    revoked.  The rollover issue is one of the issues that has to

2    be corrected as soon as possible.

3    Q.  Could we go to the next page and look at entry 7, please.

4            We don't need to blow this one up, but will you just

5    show the jury where it is on the timeline and give them the

6    date and the pharmacy.

7    A.  Yes.  Entry 7 the date is July 17, 2014.  Omnicare pharmacy

8    in reference is Omnicare of Salt Lake City.  The state in

9    reference is Utah.

10   Q.  We are going to look at one of the sources cited.  Could we

11   go to Exhibits 1302 and page 68 of that exhibit.

12           Could you blow up just that -- the caption down to

13   preliminary statement, please.

14           Could you read the left box of the caption, Agent

15   Perez.

16   A.  In the matter of the licenses of:  Superior Care Pharmacy,

17   Inc. d/b/a Omnicare of Salt Lake City, to practice pharmacy and

18   to redacted in the state of Utah.

19   Q.  And in the paragraph below, do you see the word respondent?

20   A.  Yes.

21   Q.  And who is the respondent in this matter?

22   A.  In this matter, the respondent would be Superior Care

23   Pharmacy doing business as Omnicare of Salt Lake City.

24   Q.  Could we go to page 72 of this exhibit.  Could we blow up

25   paragraph 8.

P42Qomn4          Perez - Direct

1          Could you read this to the jury?

2    A.   8.   The respondent dispensed or otherwise distributed

3    legend drugs beyond a year from the original order date and had

4    the following related practices:

5          A.   Respondent would assign a new prescription number

6    after a year expired but no documentation could be found of any

7    new order.

8          B.   Respondent accepts refill sticker requests from

9    contracted facilities as documentation of a standing order.

10          C.   The respondent had letterhead that stated there is

11    a current and active order to support these requests.   However,

12    it does not appear respondent requires proof of the order or a

13    new prescription.

14          D.   The respondent and respondent's general manager

15    were aware of the practices identified above in paragraph 8

16    through 8C of this petition and required pharmacy personnel to

17    engage in the conduct involved.

18    Q.   Could we go to page 75 of the same exhibit and look at

19    paragraph 15.   Could you read that?

20    A.   15.   Pursuant to Utah Code 58-17b-501, unlawful conduct

21    includes:   8.   Requiring an employed pharmacist, pharmacy

22    intern, pharmacy technician or authorized support personnel to

23    engage in conduct in violation of this chapter;

24          10.   Dispensing a prescription drug to a person who

25    does not have a prescription from a practitioner or to a person

P42Qomn4              Perez - Direct

who the person dispensing the drug knows or should know is

attempting to obtain drugs by fraud or misrepresentation.

Q.  Could we go to page 84, please, of this exhibit.  Could you

blow up this paragraph and read it, including the title to the

jury, and I would say that I am okay with you skipping all of

those numbers since they can see them, okay?

A.  Understood.

      First cause of action:  Violating professional

regulations and rules.

      30.  Because respondent engaged in conduct as alleged

in paragraphs 6(a) through 11(j) of this petition, including

any failure to correct circumstances within the respondent's

control, respondent violated professional regulations and

rules, including, but not limited to, Utah Code.  Therefore,

respondent has engaged in unprofessional conduct under Utah

Code and rules.  Based on the foregoing grounds are established

for sanctioning respondent's licenses as provided under Utah

Code and any other applicable provision.

Q.  Could we lastly go to page 85 of this, and could you blow

up paragraph 31.  Could you read that to the jury?

A.  Second cause of action:  Engaging in unlawful conduct.

      31.  Because respondent engaged in conduct alleged in

the paragraphs 7(h), 7(i), 8 through 8(c) and 8(d) and 11(k),

respondent has engaged in unlawful conduct under Utah Code.

Based on the foregoing grounds are established for making

P42Qomn4              Perez - Direct

1    findings and conclusions of law, issuing orders civilly and/or

2    administratively penalizing and/or otherwise sanctioning

3    respondent as provided under Utah Code and any other relevant

4    provisions.

5    Q.  Could we go to Exhibit 1303 and start at page 3.

6          Agent Perez, what's the title of this document on the

7    right side of the caption?

8    A.  The title of this document is stipulation and order.

9    Q.  Is this a stipulation and order in the same matter as the

10   last exhibit we looked at?

11   A.  Yes, correct.

12   Q.  Could we go to page 7 of this exhibit:  Blow up paragraph

13   12.  Could you read that to the jury?

14   A.  12.  The respondent dispensed or otherwise distributed

15   legend drugs beyond a year from the original order date and had

16   the following related practices:

17          A.  Respondent would assign a new prescription number

18   after a year expired but no documentation could be found of any

19   new order.  The respondent will receive a corporate-wide

20   pharmacy computer systems update in which systems will

21   automatically discontinue activity on prescriptions for

22   non-controlled substances after one year.

23   Q.  Could we go to pages 8 to 9 and, yeah, first read this and

24   then we'll continue on to the next page.

25   A.  16.  Respondent admits that respondent's conduct described

P42Qomn4          Perez - Direct

1    above is unprofessional conduct as defined or otherwise

2    addressed in Utah Code and in Utah Administrative Code.

3    Respondent agrees that the conduct justifies disciplinary

4    action against respondent's licenses pursuant to Utah Code.

5    Respondent agrees that the issuance of the order in this matter

6    constitutes disciplinary action by the division pursuant to

7    Utah Administrative Code.

8    Q.   Could we scroll down and see the rest of that.  Could you

9    continue reading that, Agent?

10   A.   Respondent agrees that an order shall be issued in this

11   matter providing for the following:

12   Q.   Could we blow up little paragraph A.  Could you read that?

13   A.   A.   The respondent's licenses to practice pharmacy and to

14   redacted shall be subject to a term of probation for a period

15   of three years.  The period of probation shall commence when

16   the division director signs the order in this matter.  During

17   the period of probation, respondent's licenses shall be subject

18   to all of the following terms and conditions.  If the board or

19   division later deems any of the conditions unnecessary, such

20   deletions may be made by an amended order issued unilaterally

21   by the division and board."

22   Q.   Finally, could we blow up the little Roman numeral II.

23   Could you read this to the jury?

24   A.   II.   Respondent shall be assessed by the division a fine of

25   $50,000 to the division pursuant to Utah Code.  Of that fine,

P42Qomn4                Perez - Direct

1    $20,000 will be immediately stayed.  The unstayed portion of

2    the fine, $30,000, shall be paid within 180 days of the

3    effective date of this stipulation.  If respondent violates any

4    term or condition of this stipulation and order, the division

5    may take action to lift the suspension on the stayed portion of

6    the fine.

7    Q.  Thank you.

8            Ms. Palla, let's go back to the chart 1606B and the

9    third page specifically:  Could we put GX-1325, page 1 to the

10   right of this side by side.  Could we blow up entry 8.

11           Agent Perez, could you read that entry to the jury.

12   A.  Entry 8.  If you find the date is September 15, 2014.  The

13   Omnicare pharmacy in question is Omnicare of Cincinnati.  The

14   state in reference is Ohio.

15           The detail reads:  Ohio BOP inspection report.  Rx

16   number 176780289 was improperly filled on December 3, 2013 when

17   a prescription for Prednisone 40 milligrams daily 15-day supply

18   with no refills was entered and verified with continued

19   refills.

20   Q.  Thank you.  Let's take down this exhibit but go back to the

21   chart and page 4 of the chart.  Can we blow this up.

22           Could you show the jury where this is on the timeline?

23   A.  Yes.  Entry 9.  The date is October 9, 2014.

24   Q.  Could you read the rest of the entry?

25   A.  Omnicare pharmacy in question is Omnicare of Cincinnati.

P42Qomn4              Perez - Direct

1    The state referenced is Ohio.

2              Detail reads:  Ohio BOP met with Omnicare of

3    Cincinnati surrounding a prescriber complaint about a patient

4    was on meds longer than the prescriber script orders though the

5    patient had no long-term effects.  The problem was identified

6    as related to the psEDI, a dispensing system associated with

7    OmniDx which did not recognize the prescribed quantity or

8    number of refills allowed fields in OmniDx.  Ohio BOP mandated

9    that this functionality be available to prevent Omnicare from

10   filling for quantities beyond what the prescriber authorized.

11   Omnicare had been relying on manual work around to reduce risk

12   in the system, including the physician call back report which

13   is not accurate, and in Cincinnati it became very burdensome to

14   weed through the report, so the pharmacy stopped using it.  The

15   order at issue got through despite all of our workarounds.

16   Ohio BOP required corrective action.  Omnicare's regional

17   compliance officer stated that this issue affects all OmniDx

18   pharmacies at a minimum and urged the company to make

19   appropriate IT/software fixes to reduce our risk of this

20   happening in any one of our pharmacies.  Omnicare of

21   Cincinnati's general manager and pharmacist-in-charge then

22   wrote to Ohio BOP stating that it took corrective action steps

23   to prevent similar improper dispensing issues, include a system

24   based solution is currently in development by Omnicare IT

25   support to add enhancement to the OmniDx psEDI system.  The

P42Qomn4          Perez - Direct

software update will allow the pharmacy staff to enter

prescription orders that will require a hard stop on all

medications dispensed through the ATC system.

Q.  Thank you.

    Could we pull up entry 10.  Could we put GX-1327, page

1 side by side with this.  Could we blow up entry 10.

    And could you show the jury where this is on the

timeline, and then read the entry.

A.  Entry 10, the date is December 31, 2014.  Omnicare pharmacy

in question is Omnicare of St. Louis.  The state in reference

is Missouri.

    The detail reads:  Missouri BOP investigation report

questioning who is authorizing the continued refills for

patients at group homes in St. Louis, including complaints that

patients are delinquent for doctor office visits possibly due

to continually filling prescriptions.  The investigation showed

that Omnicare of St. Louis had, on at least one occasion,

filled a prescription monthly for one year, and then for the

next prescription for this medication used the same

prescription hard copy with a different prescription number.  A

related internal Omnicare email noted that the Missouri BOP

cited Omnicare of St. Louis for our Rx numbers auto rolling

after 12 months after inspectors noticed that the numbers roll

automatically without verification that the order is still

current.

P42Qomn4            Perez - Direct

1    Q.  Thank you.

2             Could we have the chart on the left and GX-49 page 4

3    on the right at the same time, and page 5 of the chart.  Could

4    we blow up entry 11.  And I think this may not be the right

5    page of the exhibit.  It's page 4.  Thank you.

6             Could you show the jury where this is on the timeline

7    and read them the entry.

8    A.  Yes.  Entry 11.  Date is July 1, 2015.  The Omnicare

9    pharmacy in question is non-applicable.  The state in reference

10   is Nevada.

11            And detail reads:  Nevada BOP newsletter attached to

12   Omnicare internal email.  A pharmacy serving a long-term care

13   or skilled nursing facility cannot dispense a medication based

14   on a chart order.  The pharmacy can only dispense medication

15   pursuant to a prescription from a licensed prescriber.

16   Q.  Could we go back to just the chart page 5, and blow up

17   entry 12, Ms. Palla.

18            Could you show the jury where this is on the timeline

19   and read the entry, Agent Perez?

20   A.  Entry 12.  The date is August 6, 2015.  Omnicare pharmacy

21   in question is non-applicable.  The state in reference is

22   Nevada.

23            Detail reads:  General counsel of Nevada BOP writing

24   to Omnicare employee that for non-controlled substances, the

25   prescriber can e-prescribe, write a physical Rx, and/or call in

P42Qomn4              Perez - Direct

the prescription.  That said, a chart order can be used as a

prescription in Nevada, but only if it has all of the required

components of a prescription printed on it.  It must state the

patient's name, the drug, the quantity and all other

information required to be on a prescription, and it must be

signed by the practitioner.  With all of that information and

the prescriber's signature, the chart order can be a

prescription.

Q.  Could we have page 5 of the chart on the left in Government

Exhibit 8, page 5 on the right.  And could we blow up entry 13.

        Agent Perez, could you do the same thing; show the

injury where this is on the timeline, and then read the entry

to them

A.  Entry 13.  The date entered was January 1, 2016.  Omnicare

pharmacy in question is non-applicable.  The state in reference

is Arizona.

        Detail reads:  Arizona BOP newsletter attached to

internal Omnicare email.  A pharmacy may only dispense

prescriptions for ALF patients pursuant to an original, written

prescription order or a valid electronic or oral prescription

order from the prescriber or the prescriber's agent.

Q.  Could we go back to the chart, page 6.  We are going to

skip this one because we already heard from someone from

Omnicare of Albuquerque.

        Let's go to the next page.  Could you blow up entry

P42Qomn4                    Perez - Direct

1  15.

2          Could you read this entry through the first line of

3  the detail, and then we'll look at a document and show the jury

4  where it is.

5  A.   Entry 15.  The date entered was July 11, 2017.  Omnicare

6  pharmacy in question is non-applicable.  The state referenced

7  is Florida.

8          Detail reads:  Guidance from Florida BOP attached to

9  an internal Omnicare email.

10 Q.   Sorry.  I want to show them this document.  Could you pull

11 up 184 at page 15, Ms. Palla.  Could you zoom in on all the

12 text.

13         And could you read this to the jury, Agent Perez?

14 A.   The AHCA 1823 form.

15         1.   This form is required for all new admissions in

16 assisted living facilities throughout Florida.

17         2.   The 1823 form will typically have a list of all

18 current drug orders and a physician's signature.

19         3.   Does this form constitute a valid prescription

20 when the physician signs a form?  The board of pharmacy views

21 residents living in an assisted living facility in Florida to

22 be community-based patient.  CMS does not recognize an assisted

23 living facility as a long-term care facility.  Community based

24 prescriptions must have a patient name, a date, a drug name and

25 strength, a quantity to be dispensed, refill instructions, a

P42Qomn4              Perez - Direct

 1   prescriber's signature plus redacted.

 2          This form does not typically include a dispense

 3   quantity or refill directions; therefore, it does not meet the

 4   BOP standards for a valid prescription.

 5          This form should be considered a summary of current

 6   orders and not a valid prescription.

 7          Third-party audits may take back the entire payments

 8   on any medication that was filled using the 1823 as the

 9   original order.

10          There may be situations where the pharmacy fills

11   several days of non-controlled medication from the signed 1823

12   form until the prescriber can be reached for complete

13   information.  It should be noted, however, that there are no

14   BOP regulations that cover this practice.

15   Q.  Thank you.

16          Ms. Palla, can we go back to the chart, page 7.  Could

17   we blow up entry 16.

18          Agent Perez, could you show the jury where this is on

19   the timeline and read the entry to them.

20   A.  Entry 16.  The date is August 10, 2020.  Omnicare pharmacy

21   in question is Omnicare Atlanta.  State referenced is Georgia.

22          And the details reads:  Emails from the director of

23   the Georgia drugs and narcotics agency to Omnicare employees.

24   The board has not considered assisted living facilities as

25   long-term care facilities like they do nursing homes/skilled

P42Qomn4          Perez - Direct

1    nursing facilities for purposes of board rules.  I have not

2    known a time when any prescriptions could be faxed from an ALF

3    unless the MD themselves were in the facility faxing the

4    prescription to the pharmacy and making all of the proper

5    documentation indicating that they were doing just that.

6    Neither Georgia law nor rule allows a patient or a patient's

7    representative to fax a prescription to a pharmacy to be filled

8    under any circumstances that I know of.  If this is and has

9    been occurring, each prescription received into the pharmacy

10   would be a state violation.  You may wish to look at Georgia

11   law and Georgia Board of Pharmacy rule.  Only a physician or

12   physician's agent under his direct supervision could fax

13   prescriptions to a pharmacy with no intermediaries, including

14   the patient themselves or an ALF.

15   Q.  Thank you.

16            Let's look back at the chart at entry 17 but no need

17   to blow that up.

18            Just could you read the date and the pharmacy to the

19   jury.  Show them where it is on the timeline, and then we'll

20   bring up the underlying document.

21   A.  Entry 17.  The date is September 29, 2020.  Omnicare

22   pharmacy in question is Omnicare of Northern California.  And

23   the state in reference is California.

24   Q.  Ms. Palla, could we bring up GX-1313, the newest version of

25   this with the redactions, and go to page 16.  Could we blow up

P42Qomn4            Perez - Direct

1    the caption.

2            Could you read the left side of the caption box.

3    A.  In the matter of the accusation against:  Evergreen

4    Pharmaceutical of California, Inc. d/b/a Omnicare of Northern

5    California, 8508 South Gild Avenue, Lodi, California, 95240.

6    Q.  That's fine to stop there.

7            Go to page 28 of this document.  Could we blow up

8    paragraph 52 including the title.

9            Could you read this to the jury?

10   A.  Fifth cause for discipline.  (Filling prescriptions with

11   erroneous or uncertain information.)

12           52.  Respondent pharmacy is subject to discipline

13   under Code Section 4301 and Regulation Section 1761(a) in that

14   respondent pharmacy filled prescriptions with incomplete

15   information.  More specifically at the inspection of April 26,

16   2017, it was determined that respondent pharmacy filled

17   prescriptions when it did not have the prescriber's signature

18   and without quantities identified.  Additionally, respondent

19   pharmacy filled prescriptions based on hospital discharge

20   records instead of a prescription for medication.

21   Q.  Could we go to page 1 of this exhibit.

22           What is the title of this document on the right side

23   of the caption block?

24   A.  The title is:  Stipulated settlement and disciplinary order

25   as to respondent Evergreen only.

P42Qomn4              Perez - Direct

1    Q.  And is this in the same matter as what we just looked at?

2    A.  Yes, correct.

3    Q.  And what is the other name for Evergreen Pharmaceutical of

4    California?

5    A.  Evergreen Pharmaceutical of California is doing business as

6    Omnicare of Northern California.

7    Q.  Could we go to page 3 of this exhibit and blow up the

8    culpability section 9 through 11.

9          Could you read this to the jury?

10   A.  Culpability.

11         9.  Respondent understands and agrees that the charges

12   and allegations in accusation number 6753, if proven at a

13   hearing, constitute cause for imposing discipline upon pharmacy

14   license number PHY 54230.

15         10.  For the purpose of resolving the accusation

16   without the expense and uncertainty of further proceedings,

17   respondent agrees that, at a hearing, complainant could

18   establish a factual basis for the charges in the accusation,

19   and that those charges constitute causes for discipline.

20   Respondent hereby gives up its right to contest those charges.

21         11.  Respondent agrees that its pharmacy license is

22   subject to discipline, and it agrees to be bound by the board's

23   probationary terms as set forth in the disciplinary order

24   below.

25   Q.  Thank you.

P42Qomn4                Perez - Direct

1              So let's move on to our final summary exhibit, that's

2    GX-1604B, let's put that up.

3              Agent Perez, what is this document?

4    A.  GX-1604B is a summary chart given to me by the government

5    regarding Omnicare and CVS Communications regarding rollover

6    dispensing unrelated practices.

7    Q.  Did you have any involvement in creating this exhibit?

8    A.  No.

9    Q.  What were you asked to do with it?

10   A.  Similarly to the other two summary charts, I was asked to

11   verify the information on the chart with source documents given

12   to me by the government.

13   Q.  And is this a summary of all documentary evidence on this

14   topic in the case record?

15             MR. ASHWORTH:  Objection.  Leading.

16             THE COURT:  Objection is overruled.  Answer the

17   question.

18   Q.  Is this the exhibit summarizing all of the evidence on this

19   topic in the case?

20   A.  No.

21   Q.  What's the time range covered by the entries in this

22   document?

23   A.  The time range for the summary chart goes from April 13,

24   2011 to 11/28/2018.

25   Q.  How many entries are there in the chart in total.

P42Qomn4              Perez - Direct

1    A.  In total, there are 138 entries.

2    Q.  Did you verify that all the information in this chart was

3    accurate?

4    A.  Yes.

5    Q.  Let's pull up 1606A.

6            How does this exhibit relate to 1606B?

7    A.  Similarly to the other chronological chart, this Exhibit

8    1606A relates to 1604B by --

9    Q.  I'm sorry, we have the wrong one up that's my mistake.

10   1604A.

11           THE COURT:  Thank you.

12   Q.  How does this timeline relate to 1604B?

13   A.  1604A is a selection of government source documents in a

14   chronological order that relate to the summary chart 1604B.

15   Q.  Does the timeline include all of the entries that are in

16   that chart?

17   A.  No.

18   Q.  Were you also asked to -- and did you verify the accuracy

19   of this timeline?

20   A.  Yes, I did.

21           MS. JUDE:  We have a poster board version of this as

22   well if we could please swap this one in for the other one.

23   May we do that, your Honor?

24           THE COURT:  Yes, please.

25           MS. JUDE:  Would it be helpful to move this over here

P42Qomn4              Perez - Direct

```
 1    for you guys?

 2              THE COURT:  Which guys?

 3              MS. JUDE:  For the jury, your Honor.

 4              THE COURT:  I don't know what it's doing back there.

 5    I don't see how the jury could possibly see it.

 6    Q.  Let's move it over here in front of Ms. Folch, if you don't

 7    mind.  We have to make sure Agent Perez can also still see it.

 8              Let's put on the screen the chart 1604B.  And let's

 9    blow up entries 1 through 6.

10              Could you show the jury where this is on the timeline

11    and then read this to them.

12    A.  The first entry on entries 1 through 67.  You could see

13    them?  I don't want to hit anyone with the laser.  You said

14    read them?

15    Q.  Yes, please.

16    A.  Entry 1 is dated April 13, 2011.  The sender is Lisa Toney,

17    technician manager NeighborCare Pharmacy, Omnicare.  The

18    recipient is Kathleen Early, senior director of operations

19    Omnicare.  Document type is email.

20              Detail reads:  I have a special concern with our Dx

21    system concerning our cycle fill facility.  Are you familiar

22    with this flag?  It is showing up on orders with zero refills

23    remaining.  Technically these orders require a new order or

24    signed physician's order, but if cycled, it will fill

25    automatically with no hard stop and will issue a new Rx number.
```

P42Qomn4              Perez - Direct

1    Is there something in our system that is allowing this to
2    happen?  I'm concerned these orders are being filled and we
3    have no valid orders to do so.  Please, please help.
4            On the same day, Kathy Froman of Omnicare emailed
5    Rescot support and stated in response:  Would someone please
6    review the below issue?  If this is happening, we have a
7    compliance issue that needs to be resolved.
8            The following day, Richard King, regional
9    implementation manager Rescot Systems Group Omnicare emailed
10   Jody Jordan, manager product support Rescot Systems Group and
11   said, I thought this was the way cycle fill has always behaved,
12   and that the staff was supposed to follow up on the physician
13   call back report to get more refills prior to the cycle being
14   posted.  Should there be a hard stop so cycle fill does not
15   fill orders with zero refills?  Currently, it seems there is
16   not a hard stop for the cycle process and Kathy Froman is
17   wondering if this is a compliance issue.  What do you think?
18           The following day, Jody Jordan emailed Kathy Froman
19   and said:  There is a switch that can be set for cycle orders
20   so they do not roll over.  The downside, orders will simply not
21   fill.  That is why there is the physician call back report.
22   You can do this one of two ways:  1. Keep the system the way it
23   is.  Really concentrate on what the physician call back report
24   is telling you, so you can get the prescription renewed before
25   the next cycle.  It should be giving you plenty of time.  If

P42Qomn4            Perez - Direct

you miss it, the order will roll over.  2. Set the switch to

prevent rollovers.  The order will still appear on physician

call back report.  Note, it is not company specific.  It will

need to be set at the system level.

      A few days later on April 19, 2011, Stephanie Brown

general manager NeighborCare Portsmouth Omnicare emailed

Rebecca Bryan and said:  I suggest we out -- I believe that

would be a typo.  I suggest we put a hard stop.  This has to be

a compliance issue.

      The following day, Jody Jordan emailed Stephanie Brown

and said:  This decision will affect all companies.  I need a

definitive answer.

Q.  Thank you.

      Let's go to the next page of the chart.

      Let me just ask you, what was the month and the year

of those emails you just read?

A.  That would be April 2011.

Q.  Could we blow up entry 7, please.

      Could you read this to the jury and show them where it

is on the timeline?

A.  Yes.  Entry 7.  The date was September 12, 2011.  The

sender is Dawn Kramer, senior director audit and program

integrity, Omnicare.  The recipient is Jeff Stamps and others.

It's a document email.

      Detail states: I had an alternative thought/solution

P42Qomn4              Perez - Direct

regarding our documentation issues and the challenges I'm

having with the plans/states in getting them to recognize

refill stickers as a legal order, especially when we roll over

to new Rx numbers for years on end without a new signed order.

We continue to struggle with this issue every day.

Q.  Let's go to the next page of the chart.  And could we blow

up 18 through 24, please.

        Could you read these to the jury and show them where

it is on the timeline.  But given that we've got this up for

them, to make it faster, let's just read the detail entries,

okay?

A.  Understood.

        Entries 18 to 24:  You could find them, they were they

start on July 10, 2012.  Entry 18 detail states: Jody mentioned

that if the item appeared on the physician call back report,

that was an indicator that the item did not cycle fill.  I do

not recall that being correct.  The physician call back report

listed every item that did not have refills but the cycle fill

process filled everything anyway that did not use the

prescribed quantity field.

        Entry 19 states:  The Rxs without remaining refills

roll over to a new Rx number and refill automatically.  I

believe they have been doing a manual workaround to avoid those

Rxs from refilling improperly.

        Entry 20.  Correct.  Cycle will roll orders.  It was

P42Qomn4              Perez - Direct

written ten plus years ago under the assumption that someone is

working orders, either getting additional refills approved or

getting meds discontinued prior to running the cycle so the

cycle runs seamlessly.  There is a setting that will prevent

all ALF orders from rolling.

         Entry 21.  Is that setting something that the

individual pharmacies must fix to prevent the ALF Rxs from

rolling on cycle.  If so, where is it?

         Entry 22.  It has to be set by Dx support.  This issue

came up last week at Oxford NC, but they did not want us to set

the record because they didn't want to block ALF orders.

         Entry 23.  Not sure who is running the Ocean cycle

fill workshops/discussions.  Can we add this to their agenda of

things to add to their parked issues.

         Entry 24.  Will do.  Guidelines should include all

retail (think ALF) and redacted Rxs must follow retail Rx

rules.  Actual number of refills and no rolling of the Rx

number.

Q.  Let's go back to the chart and blow up entries 25 through

27.

         Could you do the same thing.  Show the jury where it

is on the timeline and the general date range and read the

detail?

A.  Entry 25 to 27.  You can see it begin on August 23, 2012.

         The first entry, entry 25, reads:  Dx is ancient.  I

P42Qomn4          Perez - Direct

1  am starting to fondly call it T-Rex since it's almost a

2  dinosaur, and it has many glitches when it comes to ATC.

3  Although the facility is set up as an ATC facility, Dx doesn't

4  always catch the countdown for refills.  New orders

5  automatically populate correct day supply, but we've caught

6  several instances where refills are incorrect.

7          Entry 26 reads:  Another glitch with T-Rex is that for

8  ATC, it does not count the pills out of the prescribed quantity

9  with each weekly roll.  This is an issue Rescot is aware of and

10 is not going to fix.  So the machine will keep running the

11 medication even if the script has run out.  We haven't really

12 quite figured out how to handle this at Home Care since we are

13 just now starting to really push the getting an actual script

14 for AL facilities.  Any ideas?

15         Home Care and Beeber are making the push to request

16 valid scripts for all ALF patients instead of using signed

17 POS's.  We are running into an issue with the ATC automation

18 not being able to notify us when the script is out.  Do you

19 have any recommendations?

20 Q.  All of these emails are from 2012?

21 A.  Yes.

22 Q.  Could we go to row 34 on the chart.

23         Could you read this to the jury and show them where it

24 is on the timeline?

25 A.  Entry 34.  The date is 11/28/2012.

P42Qomn4          Perez - Direct

Q.   Just the detail.

A.   Detail reads:  We are still getting quite a few orders that
are being dispensed by the pharmacies off of hospital discharge
paperwork, many of which specifically state zero refills, and
we continue to refill monthly.  Additionally, we are seeing
orders with specific number of refills now exhausted being
rolled over to new Rxs and continually dispensed without a new
order.  I can see in a SNF where this would be an acceptable
practice since we could technically refer back to the signed
POS sheet in audit if we can get our hands on it from the
facility.  However, I don't know how this works for less than
skilled facilities like AL's, group homes, et cetera.
Oftentimes the doctors aren't signing POS sheets in these
settings every month, so we potentially have up to three months
or more without a valid/current dispensing order.

Q.   Let's go to the next page of the chart and blow up 35 to
36, please.

       Agent Perez, could you point this out to the jury on
the timeline, and then just read the detail?

A.   Entry 35 and 36 are both from January 9, 2013.

       Entry 35 detail reads:  We now have many other AL than
we used to and are getting more and more orders similar to what
is attached with no MD signature but a notation that the doctor
gave the facility nurse orders okay for three months or okay
for six months.  I cannot find anywhere that this type of

1     designation is valid for dispensing the drugs, only giving

2     authority to the nurse to administer the drug.  Can we get a

3     compliance clarification on this, please.  I don't want to hold

4     up meds needlessly but I don't want to be dispensing without a

5     legal order either.

6           Entry 36 reads:  The vast majority of plans would not

7     accept this document without the doctor's signature.  This

8     particular order has duration of therapy allowed (three months)

9     which is great.  Most of the time we just see the drugs listed

10    with no quantity, duration of authorization, or refills.

11    Another obstacle we're facing in audits in general.  Today, we

12    do not follow up to get an MD signed copy routinely but only if

13    and when we get an audit.  Right or wrong, that's how we're

14    doing it today.

15    Q.  Thank you.

16          Let's go back to the chart.  We're going to do 37

17    through 42.  Let's just do the first three from this page, and

18    then we can go to the next page and pull those up.

19           Rows 37 through 42.  Do 37 to 39, and we'll come

20    back for the rest.  Could you show the jury on the timeline and

21    read the detail, Agent Perez.

22    A.  Yes.  Entries 37 to 38 spans from April 16, 2013 to

23    April 18, 2013.

24          Entry 37 reads:  Pursuant to documentation and

25    discussion among myself, Dee and Rescot, regarding psEDI and

P42Qomn4            Perez - Direct

1    the abundance of a hard stop of prescriptions with zero

2    quantity remaining.

3    Q.  Sorry, I think you misread the "abundance."  Absence?

4    Start over?

5    A.  I'll start over.  Sorry about that.

6            Pursuant to documentation and discussion among myself,

7    Dee and Rescot, regarding psEDI and the absence of a hard stop

8    of prescriptions with zero quantity remaining, a ticket was

9    received to address in 2008 by Matt Daly.  This ticket was

10   never prioritized especially with the reallocation of Legacy

11   system resources to Ocean.

12           Various options were identified to address.  Physician

13   followup system for refill authorization.  This is a great

14   proactive step, but it does not prevent the orders from being

15   filled through the psEDI process.

16           Entry 38 reads:  We need a P&P for Dx sites chase

17   refills on ALF scripts that have zero fills remaining.  Looking

18   for an every day run this report, send to facility, et cetera.

19           Entry 39 reads:  I had a feeling I would see this

20   again ... Lol.  Smiley face.

21   Q.  Who wrote that final email?

22   A.  The final email entry 39 sender was Deanna Hagen,

23   operations manager, pharmacy operations group Omnicare.

24   Q.  Let's go to the next page where the page continues and pull

25   up the remaining three, which is 40 through 42.

1          Could you continue reading the detail, Agent Perez?

2    A.   Entry 40 reads:  Can you please reach out to Robert Freeze

3    to update the compliance audit related to psEDI.  We will want

4    to make sure that pharmacies have systems in place to stop

5    orders with zero refills remaining in the psEDI module. Please

6    let me know when it is completed so I can cross it off the

7    infamous list.

8          Entry 41 reads:  I will sent Robert an email to get

9    the communication going.  I have something in mind for this.

10   No matter how we slice it though, without Dx programming, it

11   will be manual and tedious.  But that's how we roll, right?

12         Entry 42 reads:  Tuck and roll.  Tuck and roll.

13   Q.   Let's look at 43 through 47 on the chart.  Could you point

14   this out for the jury on the timeline and read the detail

15   please?

16   A.   Yes.  Entry 43 through 47 spans from July 10, 2013 through

17   July 11, 2013.

18         Entry 43 reads:  So when a site rolls over a script

19   (say for Lasix) that is over a year old, how is that covered in

20   a insurance audit?

21         Entry 44 reads:  It is a chronic problem.  The plans

22   will not accept the refill request we rec'd when we rolled it

23   over, of course.  All state boards of pharmacy require a new

24   script after 12 months and the refill sticker doesn't count.

25   In an audit, we have to reach out to the facility for a copy of

P42Qomn4                Perez - Direct

1    a current signed chart order to prove the doctor is still

2    approving/signing off on the order.  It causes us a lot of

3    extra work and lots of times we don't pass the audit.

4            Entry 45 reads:  Well, I knew I should ask you.  I

5    thought of you when I got this question, but then thought it

6    was really a compliance issue first.

7            Entry 46 reads:  Yes, it is also a compliance issue.

8            Entry 47 reads:  I would love for us to have all the

9    documentation we need to pass audits in our possession rather

10   than leaning on the facilities so much.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P42AOmn5                          Perez - Direct

```
 1              MS. JUDE:  Thank you.  Let's look at 51 through 57,
 2    Ms. Palla.  I don't know if you can pull it up across that page
 3    break or you want to do it in two bits, but...
 4              Perfect.
 5    Q.  Could you show the jury where this is on the timeline and
 6    read it to them.  The detail only, please.
 7    A.  Entry is 51 to 57, it begins -- well, it spans all entries
 8    are on 3/19/2014.
 9              Entry 51 reads:  It is clear in the regulations that a
10    prescriber must provide a prescription and not a chart order
11    for residents in the ALR setting.
12              Entry 52 reads:  If the POS has all of the elements of
13    a prescription, would that be considered valid?
14              Entry 53 reads:  The POS will never have all of the
15    elements of a prescription.  Refills are not listed and POS's
16    are not signed monthly.
17              THE COURT:  I'm sorry, POS's are not what?
18              THE WITNESS:  POS's are not signed monthly.
19              THE COURT:  Are not signed monthly.  Thank you.
20    A.  MD address is not on POS.
21              Entry 54:  Bottom line is that ALR residents are
22    viewed the same as any other community resident and therefore
23    must have a valid prescription to obtain medication from the
24    pharmacy.  The dispensing pharmacy, to Andy's point, must
25    follow the dispensing rules as they would for any community
```

P42AOmn5                          Perez - Direct

1    prescription.

2              Entry 55:  Deb needs to be informed that the old way

3    with St. Clair Pharmacy had several physicians upset and

4    concerned that meds were being given that they said they had

5    not ordered in months.  We explained that was the other

6    pharmacy and that was why we were calling for valid

7    prescriptions.

8              Entry 56:  The problem is OCR pharmacies are not

9    consistent with following rules and regulations.  Other OCR

10   pharmacies in PA will accept POS orders in assisted living.

11             Entry 57:  I understand that AL is considered retail,

12   as does the customer.  Issue is we are not consistent

13   throughout the country, and I am not clear as to what the

14   pharmacies are doing differently to be able to fill from the

15   POS.

16             MS. JUDE:  Thank you.  Let's look at 58 through 71,

17   which I think we're going to have to take in a couple of

18   chunks.  And you know what, because this is so long, would you

19   blow up just the detail.

20   Q.  And even though you're doing exactly what I asked of you,

21   agent Perez, would you mind stop identifying what entry, just

22   to make it go faster.

23   A.  Okay.

24   Q.  But please do show where it is on the timeline.

25   A.  Okay.  Entry 58 will begin --

P42AOmn5                          Perez - Direct

```
 1              MS. JUDE:  Rupa, could you move that over a little bit
 2    so we can see the date.  Move to the right.  Thanks.
 3    A.  It's May 28th, 2014.
 4              How can we turn off in the DX system the auto rollover
 5    of the RX rollovers every year?  Is there a way that we can
 6    prompt the system to request a new RX from the prescriber after
 7    the one year mark?
 8              It's a retirement facility.  They automatically stop
 9    at allowable refills which is the same as touching that field.
10    Remember, touching the field is what makes it an override and
11    causes the order to not just rollover.
12              So if we have something in field five or thirteen, the
13    script will automatically rollover and not prompt us to request
14    a new script?  Is that correct?  Because we need it to request
15    a new script after a year.
16              If I understand correctly, if there is a prescribed
17    quantity entered, or value is physically entered into the
18    allowable refills field, then the system will not just roll
19    over when the MAX RX active days is met.  However, prescribed
20    quantity is not required and other than for a retirement
21    facility, the system does not stop at refills allowed.  If the
22    system has allowable refills based on the system defaults, we
23    roll the order without the prompt.  According to Ashley and
24    Dean this is a huge compliance issue.  Is there a way to force
25    input?
```

P42AOmn5                         Perez - Direct

1          Prescribed quantity or allowable refills is required
2     and for all orders in a retirement facility.  SNF orders do not
3     require prescribed quantity nor allowable refills.  SNF orders
4     roll to a new RX numbers until we receive an order to stop the
5     medication because we supposedly receive signed physician
6     orders that allow us to keep filling.
7          In a nutshell, unless the pharmacy adopts a process to
8     manually input a value into the refill field for SNFs or there
9     is a programming change, the system will just roll the RX over.
10          The one year rollover is an issue again with the NV
11    BOP.  This is a DX site.  The site has had a court order served
12    to the GM, PIC, and pharmacy with possible revocation of
13    licenses.  We are in current litigation with the state to
14    resolve the issues and are pretty sure we have saved the
15    licenses from being revoked.  The rollover issue is one of the
16    issues that has to be corrected as soon as possible.  Can you
17    help with getting this one escalated.
18          FYI, we need to evaluate the workload impact.
19          I think this is another fatal flaw in DX.  There is a
20    system set up option for a maximum life of an RX.  It's set at
21    365 for them.  However, it's taunted with the old theory that
22    the pharmacies got signed POs every six months so it was
23    irrelevant to have the script hard stop.  My two cents, have
24    the RX die at 365 days.  Create a report that can be run at any
25    time to identify scripts with a short life span.  Create a

1    process to obtain, house, and process the new scripts.  I would

2    love to see that electronic PO go into a separate queue in DI

3    and then auto generate a new RX number then shoot directly to

4    PV1.  Any hang ups could be worked manually.  But that's

5    future.  One quick workaround could be to flag all of their

6    facilities as retirement, which sets off other rules around

7    script management.  Retail style.

8            We need data pulled for both systems, for the number

9    of RXs that auto roll, new expectations form -- I believe that

10    to be a typo, sorry.  It should be from.

11           New expectations from two BOPs is that the RX roll

12    must go to PV1.  We need to evaluate the workload impact.

13    Q.  And before we take this down, the second to last e-mail,

14    the one that begins "I think this is another fatal flaw in DX,"

15    who is the sender of that e-mail?

16    A.  That would be entry 66, the sender is Deanna Hagen, senior

17    manager of operations, Omnicare.

18           MS. JUDE:  And then could we continue with this chain

19    by going to the next page.  Yes.  And doing the remaining ones,

20    thank you.

21    A.  Is the BOP saying we just need to send to PV1 again or does

22    it really need to be checked against a new script or the old

23    one that is then renewed?

24           In the couple of sites where I have been involved, the

25    BOP inspectors are citing the pharmacies for not having a

P42AOmn5                         Perez - Direct

1    pharmacist review against a current order.

2              Kathleen, per your other e-mail, sounds like we do

3    want to assess how frequently this occurs because of the effort

4    to get a new script as well as the PV1 incremental work.

5              The recent license revocation issue that Jerry is

6    discussing is for Utah, where the Utah board cited Superior

7    Care in Salt Lake City for violating Utah regs that state

8    prescriptions are only good for one year and the pharmacy has

9    to obtain a new prescription after the one year expiration

10   date.

11   Q.  And, Agent Perez, did we look at Utah related Superior Care

12   in Salt Lake City violation documents earlier today?

13   A.  Yes, we did.

14             MS. JUDE:  Okay.  Let's go back to the chart.  And I

15   will just let everybody know that we are in the home stretch.

16             THE COURT:  We'll take a break real soon.

17             MS. JUDE:  We can take a break whenever you like, your

18   Honor.

19             THE COURT:  No.  I would like you to finish this.

20             MS. JUDE:  Okay.  72 through 88.

21   Q.  And could you show the jury on the timeline and then read

22   this entry's detail and then we'll continue on the next page.

23   A.  Yes.

24             Entry 72 begins September 9th, 2014.

25             Today with the Omnicare of Cincinnati team we met with

P42AOmn5                         Perez - Direct

1    the Ohio BOP surrounding a prescriber complaint.  It was caused

2    by the ATS unit and the manual checks that ensure the

3    non-control, Prednisone, refills are managed appropriately.  In

4    this case, the patient was on the meds longer than prescriber's

5    script orders.  The pharmacy received a written warning with 20

6    days to put our action plan together.  I will project it will

7    take about a month for the BOP close out, but driving the

8    Omnicare system change could take significantly longer.

9              MS. JUDE:  And could we go to the next page and blow

10   up the detail for all of these entries.

11   Q.  And could you continue reading this chain, Agent Perez?

12   A.  I found some documentation from 2013 that addresses refills

13   and psEDI, which I think will answer your question.

14             I guess my question is if psEDI fills are capable of

15   recognizing the prescribed quantity or number of refills

16   allowed fields in DX?  The attached RX number had a prescribed

17   quantity and continued to be filled.  If not, then can you

18   recommend the correct process to stop these orders from

19   continuously filling?

20             I attached it again with a different format but listed

21   below is what it says.  OmniDX, refills and psEDI.  For

22   pharmacies using the psEDI module, obtaining refill

23   authorizations prior to processing a fill is mandatory.  The

24   psEDI process in OmniDX will allow orders to be filled without

25   regard to remaining quantity or refills.  However, the

P42AOmn5                          Perez - Direct

1    processes below will help circumvent any unauthorized fills.

2    Prior to running a fill through psEDI, the pharmacy should run

3    the physician call back report.  This will show you which

4    orders for that fill have zero refills or remaining quantity.

5    Call the appropriate prescriber for verbal authorization.  If

6    unable to get verbal authorization, communicate with the

7    facility that the order will not be coming with the fill and

8    why.  Remove the order from the fill by entering a stop date in

9    the order.

10           Candy, I will verify that we are following this

11   process, but it is a very manual set up.  Is there any way to

12   request an upgrade so that the system will recognize the

13   quantity and refills fields?

14           I am really unsure who to solicit, but I am hoping you

15   all can help us get this programming requirement prioritized.

16   Recently one of Omnicare of Cincinnati's prescribers filed a

17   complaint with the Ohio BOP.  Betty Jones, a seasoned

18   compliance specialist with the BOP, came on site related to

19   this complaint and completed a partial inspection, filing a

20   report that requires the pharmacy to take corrective action,

21   inspection report attached.  The PIC will also receive a verbal

22   warning.  The pharmacy's initial corrective action is

23   additional education and removing Prednisone from the ATC,

24   which is not a long-term solution.  A programming change is

25   required as I believe this is an issue in most DX pharmacies.

P42AOmn5                          Perez - Direct

            In contacting several psEDI contacts at other

DX pharmacies, all of us have identified areas in the system

that require enhancement for psEDI dispensing.

            What is, I believe that to be a typo -- recently

happened in Cincinnati is an order got through the system

despite all of our workarounds causing a med error and our

pharmacy to be cited by the Ohio Board of Pharmacy.  I have

verified with several psEDI accounts that the physician call

back report for psEDI is not accurate.  Some accounts are still

trying to use it, but in Cincinnati it became very burdensome

to weed through the report so we stopped using it.

            This was a group home, so a retail environment.  I was

the RPh who checked the order and verified the order with 30

tabs prescribed quantity.  However, DX does not auto populate

in a D/C date with a prescribed quantity and ATC/psEDI does not

read prescribed quantity which allowed this med to continue to

roll.

Q.  And let's continue with this on the next page.  We want to

go through 88.  So let's just do the detail through 86.

            Can you continue reading this?

A.  The drug delivery system, ATC, Vial, Card, etc., is not the

issue.  Education and training is only a stopgap solution.  For

retail RXs it looks like we need software forcing functions for

refills allowed, hard stop.  Zero refills to calculate the D/C

date auto populate.  Next refill date to be blank when zero

P42AOmn5                          Perez - Direct

1    refills.  Can this be done when the home is coded anything

2    other than skilled?

3            PsEDI orders will just roll to a new RX when they are

4    zero refill.  Someone needs to be running the physician call

5    back report with the order type of psEDI only.  When they see

6    orders with one or zero refills remaining, they will need to

7    take action, enter D/C date, suspend the order, request more

8    refills.  In an order entry, the system does not show the next

9    refill date when an order is using psEDI.

10           I was wanting to check in to see where/if any updates

11   in DX will be occurring with psEDI?  I have a final meeting

12   with the board inspector on Wednesday and I'm sure she will be

13   asking for an update since working with Rescot was one of our

14   corrective action plan points.

15           Thank you for your involvement as you are adding just

16   the right additional push.  We have had a lot of trouble

17   getting action on this over the last year.  It is unfortunate

18   that it took a pharmacy in good compliance shape with a solid

19   PIC to get pink slipped before getting this got some action.

20           Other than the ticket mentioned below what other

21   programming requests are active regarding psEDI dispensing?

22           Hi Dee, I am not aware of any.

23           What I'd like is to compile all of the outstanding

24   known issues with psEDI and see what we need to do to address

25   any compliance or patient safety issues.  I thought I

P42AOmn5                         Perez - Direct

1    remembered that sack ram men doe, Jill Diffey, had brought

2    forth issues similar to what is described below.  Also, can we

3    have someone test the physician call back report.  They are

4    saying it isn't accurate.

5          MS. JUDE:  Let's look at the last two entries 87 and

6    88 on the next page, please.

7    Q.  And can you read the detail?

8    A.  I did want to take a minute to emphasize the importance of

9    this IT project.  First, this affects all DX pharmacies at a

10   minimum.  As previously reported, Omnicare of Cincinnati

11   received a pink slip from the Ohio BOP and an action plan was

12   submitted that detailed corrective actions as additional

13   education in the short term, pulling product out to the ATC

14   process.  A long-term solution was also included involving an

15   IT/software fix affecting all pharmacies.  Yesterday Omnicare

16   of Cincinnati received a follow-up visit from the BOP

17   compliance specialist who spent two hours at the pharmacy.  She

18   met with compliance and the pharmacist involved.  She gave an

19   initial verbal warning to the pharmacist with a report being

20   filed with the BOP and potentially further action could be

21   taken.  With the appropriate IT/software fixes we could reduce

22   our risk of this happening in any one of our pharmacies.  So

23   would appreciate prioritization of a complete solution.

24         I am adding Pam Welch from Omnicare of Charleston to

25   communicate the deficiencies in the physician call back report

P42AOmn5                          Perez - Direct

```
 1   with psEDI.  In general, we just find in Cincinnati that there
 2   is no rhyme or reason as to why some orders are on the report,
 3   while others are not, but should be.
 4              MS. JUDE:  Thank you.  Could we pull up --
 5              THE COURT:  No.  We can't pull up anything until we
 6   take a break.
 7              MS. JUDE:  Great.
 8              THE COURT:  Okay.  Let's take a break for ten minutes.
 9   Don't discuss the case.  Keep an open mind.
10              (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

P42AOmn5                         Perez - Direct

```
 1                  (In open court; jury not present)

 2                  THE COURT:  I would wrap this up if I were you.

 3                  (Recess)

 4                  Okay.  Can we get the jurors back.

 5                  Case on trial continued.  The parties are present.

 6      The jurors are not present.

 7                  How much more do you have with this witness?

 8                  MS. JUDE:  I would say less than ten minutes.

 9                  I wore my brightest shirt, your Honor, to try to liven

10      it up.

11                  THE COURT:  Elocution lessons.

12                  (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P42AOmn5                      Perez - Direct

```
 1                  (In open court; jury present)
 2                  THE COURT:  Sir, you may resume your seat.  You're
 3      still under oath.
 4                  MS. JUDE:  Ms. Palla, could we blow up rows 90 through
 5      95 and let's just do the detail.  Sorry, you are missing the
 6      top one.  Ninety through 95.
 7      Q.  Agent Perez, could you point out where this is on the
 8      timeline and then read the entries?
 9      A.  Yes.  Entry 90 starts September 25th, 2014.
10                  On-site audit notice, refill/rollover orders will not
11      be accepted by med impact/SCIO health analytics for this
12      request, under any circumstances.
13                  Hello all, audit is tomorrow and we're still missing a
14      number of scripts.
15                  What is the root cause of these asks?  In other words,
16      what steps do we need to take to mitigate these type of Where's
17      Waldo hunts?  Is the RX not capturing the scripts due to
18      technology issues?  Just trying to understand the why.
19                  We roll scripts over after a year which require us to
20      go back to the facility for so many of the audits.  If the
21      script is new, then we have it in our system.  If the patient
22      has been on it for more than a year and it rolled, then we have
23      nothing on file at the pharmacies.  My complaint for years.
24                  This is still happening.  My God we have been talking
25      about this for years and years.  Isn't this still a big
```

1    compliance issue?  Bottom line, fix the pharmacies and a lot of

2    this will all go away.  I don't know why we can't do that.  I

3    really don't.

4          Yes.  We are under BOP corrective action in Missouri,

5    Utah, and soon California.

6          MS. JUDE:  Let's go the next page of the chart and

7    blow up 96 through 99.

8    Q.  Could you point this out in the timeline and read the

9    detail, Agent Perez?

10   A.  Yes.  Entry 96 through 99 span from December 15th, 2014, to

11   December 16th, 2014.

12         In e-mail with subject SDE DX Sacramento, their psEDI

13   cycle fill orders cannot be filled because of new change.  This

14   site has approximately 4,000 orders that need to be filled

15   today.  One patient will be there in 45 minutes.  They want us

16   to blow in an increase to the number of refills and tell me

17   that the compliance officer will send the auth if needed.  They

18   are demanding a conference call with you.

19         How would you like us to handle this?  As you probably

20   remember, we were asked to add logic to psEDI to prevent orders

21   from filling that were either too old, were out of refills, or

22   did not have sufficient quantity to fill.  Sacramento says they

23   have thousands of orders like this that they are trying to fill

24   today but can't.  I have not seen them all, but this example is

25   out of refills.

P42AOmn5                              Perez - Direct

1          Wow, this is not good.  Chances are, they've been

2    filling them without the correct number of refills all along

3    and now it's a big problem.  However, this was one of the sites

4    that complained that DX allowed invalid refills, what do you

5    say?  I think we back the change out for now to get the orders

6    filled then come up with a solution for them to get into

7    compliance.

8          In e-mail with subject DX upgrade concerns:  Due to a

9    compliance citation, psEDI, ATC, was upgraded to read

10   prescribed quantity.  This information was not relayed out to

11   any pharmacies so many sites are having hundreds to thousands

12   of orders not rolling.  Also, DX did not upgrade the report to

13   give the pharmacy some assistance as to what needs scripts,

14   etc.  You run the report one time and work it to think

15   everything will roll fine, but then you run it the next day and

16   new stuff pops onto it that should have been on the first

17   report.  This is making it extremely difficult to understand

18   which scripts will/won't roll.

19   Q.  That second to last e-mail, the "wow this is not good

20   e-mail," who wrote that?

21   A.  That is entry 98, the sender is Deanna Hagen, senior

22   manager of operations, Omnicare.

23          MS. JUDE:  Could we go to the next page.  I'm sorry.

24   It's this page.  Could we blow up 102, please.

25   Q.  And could you show the jury this on the timeline and read

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P42AOmn5                            Perez - Direct

1    the detail.

2    A.   Entry 102, the date is 3/30/2015.

3            In e-mail with subject dispensing med without valid

4    order:  We have medications that get billed to insurance and

5    delivered out to patients without valid orders.  In fact, we

6    don't even have a signed doctors order.  This has happened

7    multiple times in the past and there doesn't seem to be a fix

8    to stop the error.  When the cycle comes around the medication

9    can get put on cycle and sent if all the right fields are not

10   flagged correctly.  I don't think the pharmacists that are

11   PV1ing even know what to look for to stop the meds from going

12   out.  To give you an example, every prescription for the

13   patient below is fillable with 12 refills and we don't have an

14   order for any of them.

15           MS. JUDE:  Let's go to the next page and look at 108

16   through 110.

17   Q.   And could you read the detail and show the jury where this

18   is on the timeline?

19   A.   Entries 108 to 110 all occur on August 13th, 2015.

20           Oasis does not auto stop an ALF script once the RX

21   number expires after 365 days.  It just rolls the RX and

22   doesn't alert anybody.

23           Application Oasis, reason for request:  Activating the

24   R1 hangup would bog down operational efficiency at PV1 because

25   the majority of orders are for SNF and would not need this to

P42AOmn5                        Perez - Direct

1    occur.  Not having the R1 edit/hangup activated causes a

2    compliance problem where ALF orders are being filled, RX number

3    rolls, with no prompt to have the order reapproved by the

4    prescriber as what is required per state governance.  Short

5    description, enable an auto edit at PV1 for orders whose RX

6    number has reached expiration for ALF patients.

7              Kathleen and I have discussed the situation where

8    Oasis sites are having RX numbers rollover.  After 365 days,

9    but there is no alert given to the pharmacy that the ALF

10   scripts need to be reapproved by the physician.  An alert/PV1

11   hangup can be invoked for all patients/orders but that would be

12   overly cumbersome for the SNF business.  The plan is to enable

13   the same PV1 alert/hangup as I note above, except allow it to

14   be invoked just for the ALF patients.  DX currently manages

15   this via an indicator on the facility and can on the patient,

16   but not required, and alerts at PV1 as well.  Oasis will manage

17   it via the patient.  Thus, if a patient class equals assisted

18   living, it will hang up if RX number rollover is occurring so

19   the pharmacy can obtain approval.  This should be pretty

20   straightforward but just want to get your blessing that both

21   systems are using.

22             MS. JUDE:  Let's go to the next page and blow up 123

23   to 124.  I'm sorry.  Two pages.  Thank you.

24   Q.  And, Agent Perez, could you point out where this is on the

25   timeline and just read 123 and then we'll pull up a document

P42AOmn5                          Perez - Direct

1   for 124, okay?

2   A.   Understood.

3           Entries 123 and 124 are both entered on December 17th,

4   2015.  Sending copy of spreadsheet in e-mail with subject line

5   RE OCR risk tracker-billing.

6   Q.   Thank you.  And who was the sent from and to, this top one?

7   A.   For entry 123 the sender is Robert Freeze, senior director,

8   compliance review.  And the recipient is Thomas Pawlik, CVS

9   Health.

10          MS. JUDE:  And, Rupa, could we pull up the spreadsheet

11  please.

12  Q.   And could you read line 23, just mandate topic, category,

13  and inherent risk, please?

14  A.   Line 23, mandate topic, pharmacy practice.  Category, valid

15  prescriptions-chart orders versus prescription.

16          Inherent risk, dispensing medications without a valid

17  prescription order on file could result in accusations of FCA

18  violations or pharmacy practice act sanctions.

19          MS. JUDE:  And let's look at row 24.

20  Q.   And could you read the first three parts of this.

21  A.   Mandate topic, pharmacy practice.  Category, valid

22  prescriptions-rollover processes.

23          Inherent risk, failure to maintain and verify current

24  prescriptions or orders on file in the pharmacy could lead to

25  inappropriate dispenses, recordkeeping violations, audit take

P42AOmn5                        Perez - Direct

1    backs or accusations of FCA violations.

2            MS. JUDE:  And could we look at 25 as well.

3    Q.  And could you read all of this, please?

4    A.  Mandate topic, pharmacy practice.  Category, valid

5    prescriptions-refill authorizations.  Inherent risk, failure to

6    maintain and verify current prescriptions or orders on file in

7    the pharmacy could lead inappropriate dispenses, recordkeeping

8    violations, audit take backs, or accusations of FCA violations.

9            Report date, 12/1/15.  Priority, one.  Risk finding

10   description, cycle fill dispensing, refill authorization.

11   Cycle fill procedures require authorization or prior

12   acknowledged request from the patient or responsible party

13   permitting the refilling of a prescription.  Pharmacy processes

14   may not always coordinate receipt of signed authorizations for

15   cycle fill dispenses prior to filled cycle fill deliveries to

16   patients.

17           MS. JUDE:  Thank you could.  We go back to the chart

18   and look at 129 and 130.

19   Q.  And could you read 129 and show the jury where it is on the

20   timeline and then we'll bring up a document for 130.

21   A.  Entry 129 date entered is 3/6/2017.

22           In e-mail with subject OCR IT compliance

23   status/prioritization.  Here are three documents.  The last one

24   is our presentation we made to the VPO's at the last Ops

25   meeting to make sure we start driving a culture of compliance.

P42AOmn5                          Perez - Direct

1    Q.  And who sent and who received that e-mail that's in 129?

2    A.  For entry 129, the sender is Gregory Sciarra, vice

3    president, internal operations LTC, CVS Health.  And the

4    recipient is Thomas Pawlik, CVS Health and others.

5         MS. JUDE:  Ms. Palla, could we pull up Government

6    Exhibit 4 at page eight.  And could we blow up the notes, just

7    that big paragraph under there.  We just need the first big

8    paragraph.  Yep.  Perfect.

9    Q.  Could you read this to the jury, please.

10   A.  Facility location code clean up.

11        In December, system controls were put in place that

12   locked down the facility location codes after the initial entry

13   of the facility.  The reason for this was that it was

14   identified during regulatory reviews that pharmacies were going

15   into these fields and flipping it from an ALF to an SNF so they

16   could force the label and order out the door.  With the

17   lockdown, they are no longer able to do this.  These fields are

18   what prompts the system to not allow filing after an order

19   depletes refills or expires.

20        We need each pharmacy to review and validate all

21   active facilities are entered into the dispensing system

22   correctly.  We will be asking the pharmacies so review the

23   report and confirm this information.

24   Q.  And just for the record, could you reread these fields

25   because I think you said filing.  Just to make sure we have a

P42AOmn5                    Perez - Direct

1   clean record, please.

2   A.  I'm sorry about that.  These fields are what prompts the

3   system to not allow filling after an order depletes refills or

4   expires.

5   Q.  Thank you.

6          MS. JUDE:  Could we go back to the chart for the final

7   entry and do 133 through 137, please.

8   Q.  And could you show the jury where this is and read the

9   detail to them, please.

10  A.  Entries 133 to 137 span from September 26th, 2018, to

11  September 28th, 2018.

12         Regarding the place of service and retirement flag

13  project, my recollection was it stemmed from OmniDX specific

14  system issues.  System changes were implemented to restrict

15  access to these flags in OmniDX, and the project evolved into a

16  retrospective cleanup path to fix what was wrong in OmniDX, and

17  a prospective credentialing effort to make sure new OmniDX

18  facilities were set up properly going forward.  The Oasis

19  subject matter experts we consulted at the time suggested that

20  Oasis was not designed to allow independent configuration of

21  these settings like OmniDX.

22         This is the additional information I got from Dan on

23  why re-credentialing did not need to be done with Oasis

24  facilities.

25         Are you saying that no work was done for the entire

P42AOmn5                          Perez - Cross

1    Oasis system?  Below is a milestone that we closed out and

2    there is no reference that Oasis was not addressed.

3              This is what I got from Zak, feel free to give me a

4    call.

5              As we have all discussed, there are some questions as

6    to why the project was narrowed to DX and what was addressed

7    with Oasis during the initial stages of the project.  Attached

8    is the Oasis information I have after taking over the project

9    and an old tracker when another BCO owned the project.

10   Currently all DX re-credentialed facilities have the PRC and

11   retirement flags set appropriately.  ALF retirement flags set

12   to yes not allowing rollover.  All Oasis facility classes are

13   set up to not allow rollover.

14             MS. JUDE:  One moment, your Honor.

15             No further questions.  Thank you, Agent.

16             THE COURT:  Okay.

17             Thank you.  Go.  Start.

18             MR. ASHWORTH:  Thank you, your Honor.

19   CROSS-EXAMINATION

20   BY MR. ASHWORTH:

21   Q.  Mr. Perez, you have no personal knowledge of any facts

22   related to this case, right, sir?

23   A.  Correct.

24   Q.  You were not involved in any investigation related to this

25   case, right?

P42AOmn5                          Perez - Cross

1   A.  Correct.

2   Q.  You joined HHS in 2023, right?

3   A.  Correct.

4   Q.  And that's after the government's complaint was filed in

5   this case, right?

6   A.  Correct.

7   Q.  You did not select the documents to be included in the

8   summary exhibits, right, sir?

9   A.  No, sir.

10  Q.  Government counsel selected those and gave them to you,

11  right?

12  A.  Yes.

13  Q.  You didn't create the summary exhibits, right?

14  A.  No.

15  Q.  But you did review the exhibits to, I think your term was

16  verify, that each exhibit was a fair and accurate summary of

17  the documents; is that right?

18  A.  Correct.

19  Q.  Now, you, sir, can't speak to whether any of these

20  documents are relevant to any of the allegations in the case,

21  right?

22  A.  Correct.

23  Q.  And the three summaries you testified about on direct

24  reference about 125 documents, right?

25  A.  Correct.

P42AOmn5                        Perez - Cross

1   Q.  And all of those are Government Exhibits.  They use the

2   GX label?

3   A.  Correct.

4   Q.  There are no Defense Exhibits included in any of the

5   summaries, right?

6   A.  Correct.

7   Q.  And are you aware, sir, that there are approximately 270

8   Defense Exhibits admitted into evidence in this trial?

9   A.  I was not.

10   Q.  Okay.  But none of those made the cut for the summaries,

11   right?

12   A.  Correct.

13   Q.  Did you review any documents, sir, other than the summaries

14   themselves and the documents that were underlying each row in

15   the summaries?

16   A.  No, sir.

17   Q.  But you again believe this is a fair and accurate summary

18   of the evidence?

19   A.  Yes, sir.

20   Q.  All right.  Let's talk about some of the specific summaries

21   you discussed on your direct and let's start with GX 1603 and

22   you should have that in the binder we just gave you and if we

23   could pop that up on the screen as well.

24          Please let me know when you're there, sir.

25          The title of this summary is statements concerning

1    pharmacy law.  Correct?

2    A.  Correct.

3    Q.  And this is a summary of Government Exhibits that contain

4    e-mails involving Omnicare personnel, correct?

5    A.  Yes.

6    Q.  And you don't know how anyone at Omnicare actually acted

7    after these statements were made, correct?

8    A.  Correct.

9    Q.  You have no information about whether anyone at Omnicare

10   ever took any action that was inconsistent with any of the

11   statements in this summary, right?

12   A.  Correct.

13   Q.  And you have no information about whether the e-mails

14   accurately describe the law of any state, right, sir?

15   A.  Can you repeat that?  I'm sorry, sir.

16   Q.  Yeah.  You have no information personally about whether any

17   snippet that you included in your summary from an e-mail

18   accurately describes the law of any state?

19   A.  Correct.

20   Q.  You just summarized some snippets from e-mails in

21   Government Exhibits that you say are related to pharmacy law,

22   right?

23   A.  Yes.

24   Q.  But let's look at a few of the particular rows in your

25   summary and some of the underlying documents.  And let's start,

P42AOmn5                              Perez - Cross

1    sir, with row 20 of GX 1603.  Which is on page four.  And you

2    see there you have summarized in quotes a section of an e-mail

3    and the underlying source cite is GX 66; is that right, sir?

4    A.  Yes.

5    Q.  All right.  Let's look at the document to see the statement

6    that is in the summary in your e-mail in context.

7            Please turn with me to GX 66, the actual document in

8    your binder.  Or we can pop it up on the screen.

9    A.  I'll get it on here.

10           MR. ASHWORTH:  And actually, Mr. Simmons, could you

11   please pop it up on the screen, thank you.  We'll go to the

12   second page of this e-mail.

13   Q.  And, sir, you're welcome to look at the binder.  It's also

14   on the screen if that's easier and quicker.  So you see the

15   heading there under Chris Miller, there's a subheading, short

16   cycle program, tracking refill document attached.  And then

17   there's the blurb.

18           And do you recognize the first two sentences there as

19   the sentences you included in row 20 of your summary?

20           MS. JUDE:  Objection, your Honor.

21           THE COURT:  Ground?

22           MS. JUDE:  Outside the scope.  This was not something

23   that was presented to the jury.  This particular row.

24           MR. ASHWORTH:  I'm entitled to test --

25           THE COURT:  I really don't care.  You put the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P42AOmn5                     Perez - Cross

1   documents up.  You may not have specifically asked questions.

2   But anything in any of those summary documents is fair game for

3   cross.  He said he checked everything on those charts and that

4   they were all accurate.  So go right ahead, sir.

5           MR. ASHWORTH:  Thank you, your Honor.

6   Q.  Sir, do you see the first two sentences in this blurb are

7   in your row 20 of your summary?

8   A.  Yes.

9   Q.  But the third sentence is not in row 20 of your summary,

10  right?

11  A.  Correct.

12  Q.  And the first two sentences identify an issue about the

13  short cycle program and the like, and the third sentence reads:

14  The solution will be to check with order entry to identify if

15  they are seeing any inaccurate refill defaults and to double

16  check the facility setups for these types of customers in order

17  to correct and update.

18          Do you see that, sir?

19  A.  Yes, sir.

20  Q.  So the summary in row 20 has two sentences about a problem,

21  but it omits a sentence about the solution, correct?

22  A.  Correct.

23  Q.  And, sir, you don't know how any particular Omnicare

24  facilities were actually setup for particular customers in

25  particular states, right?

P42AOmn5                        Perez - Cross

1    A.  No.

2    Q.  And this, the title of the summary that cites this document

3    again is statements concerning pharmacy law, correct?

4    A.  Correct.

5    Q.  Where in this blurb is there a statement of pharmacy law?

6                MS. JUDE:  Objection.

7                THE COURT:  The objection is sustained.

8                Move on, please.

9                MR. ASHWORTH:  All right.  Let's go to two other rows

10   in your summary.  Let's go to 39 and 40.  If we could pull

11   those up.

12   Q.  And you see, sir, these relate to GX 178, right, sir?

13   A.  Yes, sir.

14   Q.  And let's pull up that document, GX 178, and let's go to

15   page 4963.

16                And you see on page 4963 there are the two e-mails

17   that are in your rows 39 and 40, correct?

18   A.  Yes.

19   Q.  Now, the same e-mail chain references a provision from a

20   Louisiana Board of Pharmacy law book that you do not include in

21   the summary, right, sir?

22   A.  Yes.

23   Q.  Okay.  So let's look at that.  And let's go to the bottom

24   of page 964.  And you see the e-mail from Tracy Chauvin at the

25   bottom.  And she there cites from the Louisiana Board of

P42AOmn5                         Perez - Cross

1    Pharmacy law book.  And it goes on to describe an exclusion

2    where the provisions of this section shall not apply to medical

3    orders written for patients in facilities licensed by the

4    Department of Health and Hospitals.  Do you see that?

5    A.  Yes.

6    Q.  And then there's another description of long-term care

7    facility.  She asks a question:

8              Are all assisted living facilities now licensed by DHH

9    or only level four?  If they are all licensed by DHH, then the

10   exclusion below, until the board alters it, applies.

11             Do you see that?

12   A.  Yes, sir.

13   Q.  And then if you go above that, you have an e-mail from Bob

14   Foley to Tracy Chauvin.

15             If we can pop that up on the screen, please.  And

16   Mr. Foley says:  Yes, all ALFs are now licensed by DHH, so this

17   exclusion would apply.

18             Do you see that?

19   A.  Yes.

20   Q.  And none of that detail is in the summary, right?

21   A.  Correct.

22   Q.  And, sir, you have the two e-mails that where people are

23   disagreeing with what Mr. Foley says, but those two e-mails

24   don't actually cite Louisiana law, right?

25   A.  Yes, sir.

P42AOmn5                          Perez - Cross

1   Q.  And you don't include the e-mails that do cite Louisiana

2   law, right?

3   A.  Correct.

4   Q.  Now, sir, you would agree with me this shows people at

5   Omnicare taking different positions on an issue?

6           MS. JUDE:  Objection.

7           THE COURT:  Excuse me.  Could you read that back for

8   me, please.

9           (Record read)

10          THE COURT:  The objection is overruled.  He can answer

11  the question.

12  A.  Can you repeat that, sir.  I'm sorry.

13  Q.  Sure.  This shows people at Omnicare taking different

14  positions on an issue, right, this e-mail chain?

15  A.  Correct.

16  Q.  And two people take one position, another two people take a

17  different position, right?

18  A.  Yes.

19  Q.  And we can't tell from this e-mail exchange what is right

20  under Louisiana law, right?

21  A.  Correct.

22  Q.  But no one in these e-mails is suggesting that Omnicare

23  just ignore the law, are they?

24          MS. JUDE:  Objection, your Honor.

25          THE COURT:  The objection is sustained.  The e-mails

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P42AOmn5                         Perez - Cross

1    say what they say.

2    Q.   Okay.  Let's look at row 51 of your summary and this one

3    you did testify about on your direct examination.  And the

4    description in that row 51 has a bunch of ellipses, right?

5    A.   Yes, sir.

6    Q.   And, sir, let me ask you, was it you who decided what to

7    cut out of ellipses or is that how it was given to you?

8    A.   That's how it was given to me by the government.

9    Q.   I see.  Okay.

10           So let's look at that document, which I believe was

11   shown to you on direct, which is GX 83.  And the page ends in

12   9279.  And, Mr. Simmons, can you please highlight the snippets

13   that are in row 51 of the summary.

14           So, sir, the highlighted language is what is included

15   in the row of the summary, right?

16   A.   Yes.

17   Q.   And there are a lot of things left out, right?

18   A.   There --

19   Q.   For example, 1b., a faxed prescription request form may be

20   used for a new order.

21           That was left out, right?

22   A.   Correct.

23   Q.   And then d., a prescriber signed physician order sheet,

24   POS, is also something that could be used to maintain

25   compliance.

1              Right?

2    A.   Yes.

3    Q.   But that was left out of your summary?

4    A.   Yes.

5    Q.   And you, again, believe this is a fair and accurate

6    summary?

7    A.   Yes, I do.

8              MR. ASHWORTH:  All right.  Let's do one more on 1603.

9    Let's look at row 11 of GX 1603 and let's pop that up, please.

10   Q.   Now, you see here, there's actually some text in response

11   to request for and then there's a couple of quotes and those,

12   the source is GX 26, right, sir?

13   A.   Yes, sir.

14             MR. ASHWORTH:  Let's pop up GX 26, please.

15             And if we go forward to page 44464, you see at the

16   bottom there is an update on Lassen House.

17             And, Mr. Simmons, could we highlight what is in the

18   summary.

19   Q.   It's just prescription requirements.  Our biggest obstacle

20   is often no quantity written on the prescription.

21             And so that piece is in your summary, right?

22   A.   Yes, sir.

23   Q.   But none of the rest of that e-mail?

24   A.   Correct.

25   Q.   Then we go up.  And you also, sir, have in your summary, if

1    you go up another page, please, Mr. Simmons, 44463.

2              You have some language from Scott Huhn's e-mail in

3    your summary, right?

4    A.  Yes.

5    Q.  And that, again, is a snippet, not the entire e-mail?

6    A.  Yes.

7    Q.  And you don't have anything from the top e-mail.  Let's

8    take a look at that.

9              Sir, I just want to confirm, first of all, that top

10   e-mail, nothing in that top e-mail is in the row of your

11   summary, right?

12   A.  Correct.

13   Q.  So in the top e-mail, Ms. Ervin says:  The Lodi, Redding

14   Chico, Hayward, and Reno pharmacies abide by this regulation

15   and continually train on needing the quantity before

16   dispensing.  Tammy and Aaron met with this facility and was

17   able to have their order form updated to include a spot for

18   quantity.  The concern came in when the account was switched

19   from Santa Rosa to Redding.  I will work with both the Santa

20   Rosa and Sacramento pharmacy to make sure we're compliant going

21   forward.

22             Do you see that?

23   A.  Yes.

24   Q.  And, again, none of that information was in your summary?

25   A.  Correct.

P42AOmn5                          Perez - Cross

1    Q.  And the summary included a statement of the law, but not

2    the statement by Omnicare it was compliant, right?

3    A.  Correct.

4              MR. ASHWORTH:  Let's now -- you can put that down,

5    Mr. Simmons.

6              Let's talk about the next series of exhibits,

7    Government Exhibit 1604A and B.

8    Q.  And in 1604, you showed the jury a big spreadsheet that was

9    a chronology, right?

10   A.  Correct.

11   Q.  And that was a chronology of e-mails, right?

12   A.  Correct.

13   Q.  And it was entitled -- the title included rollover, right?

14   A.  Correct.

15   Q.  But it was not a chronology of rollovers, right, just

16   e-mails?

17             MS. JUDE:  Objection.

18             THE COURT:  Ground?

19             MS. JUDE:  I'm not sure what a -- chronology of

20   rollovers is confusing, your Honor.

21             THE COURT:  Well, if the witness is confused, he can

22   certainly ask for clarification.

23             Do you understand the question, sir.

24             THE WITNESS:  Can you repeat the question?

25             (Continued on next page)

P42Qomn6                          Perez - Cross

1   Q.  Let me ask it this way.  It's not a chronology about how

2   Omnicare dispensed any particular medications, right?

3   A.  No, sir.

4   Q.  And you don't know how Omnicare dispensed any particular

5   medications, right?

6   A.  Not to my knowledge, no, sir.

7   Q.  I'm sorry?

8   A.  Not to my knowledge, no, sir.

9   Q.  And you don't know if a rollover ever happened at any

10  Omnicare pharmacy.  You can't speak to that.

11  A.  I can't speak to that.

12  Q.  And you have no knowledge whether rollover was proper or

13  not in any particular circumstance?

14  A.  I can't speak to that.

15  Q.  Now 1604B, sir, includes about 138 rows, right?

16  A.  Correct.

17  Q.  And those relate to about a total of 49 exhibits, right?

18  A.  Correct.

19  Q.  And some were email chains that you read eight or nine

20  emails in a row.  Sir, are you aware Omnicare produced 22,000

21  email communications in this case?

22  A.  Yes, sir.

23  Q.  You are aware of that?

24  A.  You just told me.

25  Q.  Okay.  Fair enough.  Now you are aware.

P42Qomn6                          Perez - Cross

1            Are you also aware that 2,500 of those email
2    communications referenced the term rollover?
3    A.  Yes, sir.
4    Q.  Okay.  So now you are aware of that?
5    A.  Correct.
6            THE COURT:  You're accepting what he's saying.  He's
7    not a witness.
8            THE WITNESS:  Okay.
9            THE COURT:  So he can't get that kind of information
10   into the record as a witness.  He is asking if you sitting here
11   today, not listening to him, if you know that.
12           THE WITNESS:  Okay.
13           THE COURT:  Was that part of the work you did counting
14   those emails that had a reference to rollover in it?
15           THE WITNESS:  No, your Honor.  I --
16           THE COURT:  Fine.  So let's move on.
17           MR. ASHWORTH:  Okay.  Sounds good.
18           THE COURT:  Remember, nothing he says is evidence.
19   Nothing I say is evidence.  Nothing they say is evidence.
20   Nothing he says is evidence.
21   Q.  Mr. Perez, let's look at row 36 of your summary.
22           This is 1604B.  And could we pop that out, please
23   Mr. Simmons.  Thank you.
24           So that puts an email chain from 2013 right, sir?
25   A.  Yes, sir.

P42Qomn6                          Perez - Cross

1   Q.  And that is an excerpt of an email from Dawn Kramer, right?

2   A.  Yes, sir.

3   Q.  And are you aware, sir, Mr. Kramer is going to be here next

4   week to testify?

5   A.  I was not aware.

6   Q.  And if you -- you again have some elipses in this

7   description of this particular email GX-180, right?

8   A.  Correct.

9   Q.  Let's look at the whole email GX-180 again.  It's in your

10  binder.  We'll put it up on the screen.  And if you look what's

11  in this email, the first sentence is: "The vast majority of

12  plans would not accept this document without the doctor's

13  signature," right?

14  A.  Yes.

15  Q.  But the second sentence in that first paragraph is not in

16  the summary, right?

17  A.  No.

18  Q.  "A few select are accepting the nurse's signature," right?

19  A.  Correct.

20  Q.  And the last paragraph in this email is not in the summary

21  at all, is it?

22  A.  Correct.

23  Q.  And what that says, if we look at the first sentence, "Now,

24  if the nurse called the order over to the RPH and he took the

25  phone order on a phone order template with all the details,

P42Qomn6                         Perez - Cross

1    then they would most oftentimes accept it," right?

2    A.  Yes.

3    Q.  Then skipping one sentence, it says, "There's an LTC

4    pharmacy gap we've been unable to get the payers to grasp."

5         Do you see that?

6    A.  Yes.

7    Q.  Are you aware that Omnicare had discussions with payers

8    about that LTC pharmacy gap and how it was affecting lives?

9         MS. JUDE:  Objection.

10         THE COURT:  Objection sustained.

11         MR. ASHWORTH:  On what basis, your Honor?  I just

12   asked if he was aware.

13         THE COURT:  Sorry.  No foundation.  Way beyond

14   anything that is contemplated by the direct of this witness.

15   Q.  We'll have to wait to hear what witnesses say about --

16         THE COURT:  Yes, we will.  Let's not make a speech.

17   Let's ask the question.

18         MR. ASHWORTH:  Fair enough.

19   Q.  Let's look at row 48, please.

20         That quotes an email from Danielle Strong in 2013,

21   correct

22   A.  Correct.

23   Q.  And that summary notes that Ms. Strong refers to

24   refill/rollovers, right?

25   A.  Yes.

P42Qomn6                         Perez - Cross

1    Q.  Again, you don't know if Ms. Strong has any familiarity

2    with any computer systems and retirement flags, right?

3    A.  No, sir.

4    Q.  So we'll have to wait to hear from Ms. Strong about that.

5              Let me ask you this, sir:  You cited some emails from

6    Dee Hagen in your testimony, correct?

7    A.  Correct.

8    Q.  There were a number of emails from Dee Hagen in this

9    spreadsheet, right?

10   A.  Yes.

11   Q.  Are you aware that Ms. Hagen was the witness who testified

12   just before you?

13   A.  Yes.

14   Q.  And did you know that she explained some of the emails in

15   the summary?

16   A.  I did not.

17   Q.  Okay.  But again, you don't have that context.  All you did

18   is look at the emails and put the emails in a summary, right?

19   A.  Yes, sir.

20   Q.  Let's move forward to the duo of Government Exhibit 1606A

21   and 1606B.  Let's focus on 1606B.  Again, it has the

22   information that backs up the timeline in 1606A, right?  Right,

23   sir?

24   A.  Yes, sir.  I'm sorry.

25   Q.  And the title of this one is:  State board of pharmacy and

P42Qomn6                        Perez - Cross

1    other state regulator documents, right?

2    A.   Correct.

3    Q.   Your summary in 1606B includes 17 entries, correct?

4    A.   Yes, sir.

5    Q.   These entries relate to a total of 15 Omnicare pharmacies,

6    right?

7    A.   Yes, sir.

8    Q.   And, Mr. Perez, are you aware that Omnicare had

9    approximately 160 pharmacies during the relevant period?

10   A.   No, sir.

11   Q.   This summary does not contain any information relating to

12   145 of the 160 pharmacies, correct?

13   A.   Correct, sir.

14   Q.   Are you also aware, sir, that state boards of pharmacy

15   across the country conduct routine inspection of Omnicare

16   pharmacies?

17             MS. JUDE:  Objection.

18             THE COURT:  Overruled.

19   Q.   Your summary does not include --

20             THE COURT:  Excuse me.  He hasn't answered the

21   question.  I overruled the objection, and you didn't wait for

22   the answer to the question.

23             Do you happen to know whether there are routine audits

24   by state boards of pharmacy?

25             THE WITNESS:  In my experience as an agent, I know

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P42Qomn6                         Perez - Cross

1    that state boards of pharmacy conducts regular audits, correct.

2    Q.  And those are typically annual, right sir?

3    A.  That I can't answer.

4    Q.  But your summary does not include any information about

5    audits or inspections by state boards of pharmacy that Omnicare

6    pharmacies passed, right?

7    A.  Correct.

8    Q.  It includes less than 20 incidents related to 15 pharmacies

9    over a nine-year period, right?

10   A.  Correct.

11   Q.  Let's talk about some of the information in this chart, and

12   let's start with row 1 of the summary.  And you see there, this

13   is a BOP citation to Omnicare of Redding.  This relates to an

14   issue that happened between 2008 and 2009, right, sir?

15   A.  Yes, sir.

16   Q.  And you're aware that's before the relevant period in this

17   case?

18   A.  Yes, sir.

19   Q.  Do you know why that was included in the summary even

20   though it's before the relevant period in the case?

21   A.  No, sir.

22   Q.  Okay.  Let's now go to row 2.  So row 2 references a

23   California BOP inquiry and inspection.  And if we look at the

24   source for that, that is an email, right, sir?

25   A.  Yes, sir.

P42Qomn6                          Perez - Cross

1   Q.  And if you look at -- let's look at that email, which is

2   GX-36.  And go down to the first page of the chain.  Actually,

3   there it is, sorry.  Second page now.  Thank you.

4        "Scott" -- this is an email from Neal Faruj (ph) to

5   Scott Huhn.  This is what's your in your summary.

6        Our latest BOP inquiry/inspection brought up the issue

7   of us processing prescriptions for ALFs without identified

8   quantity on the order."  Right, sir?

9   A.  Yes.

10  Q.  Do you know if there was any action taken against Omnicare

11  of Southern California based on this inquiry?

12  A.  No, sir.

13  Q.  All it says is that there was an inquiry, right?

14  A.  Yes, sir.

15  Q.  Okay.  And your summary does not cite any action by the

16  California Board of Pharmacy against Omnicare related to this,

17  right, sir?

18  A.  No, sir.

19  Q.  Let's look at row 4.  And again, that says that the Texas

20  BOP investigated a complaint, and you cite a couple emails

21  there, sir.  Do you know, again, if the Texas Board of Pharmacy

22  took any action against Omnicare related to this incident?

23  A.  No, sir.

24  Q.  There's nothing that is cited in your summary that is any

25  actual action the Texas Board of Pharmacy took, right?

P42Qomn6                          Perez - Cross

1    A.  Correct.

2    Q.  Let's look at row 5.  I think you talked about this one on

3    your direct examination.  And counsel ran you through all the

4    details.  This resulted in a letter of warning, correct?

5    A.  Correct.

6    Q.  Let's look at that letter of warning, which is GX-1300.

7              If you look at the bottom of that page, and I think

8    you were not asked to read this language.  The last sentence

9    says:  "In lieu of disciplinary action at this time, however,

10   the board is hereby issuing this administrative letter of

11   warning to the pharmacy," correct?

12   A.  Correct.

13   Q.  So it's not taking disciplinary action.  It's just doing a

14   letter of warning, right, sir?

15   A.  Correct.

16   Q.  All right.  Now, let's look at row 7.  We can just pop up

17   the row.

18             You were shown a lot of documents related to this

19   issue with Omnicare of Salt Lake City, and you read various

20   language from that.  Do you recall that, sir?

21   A.  Yes, sir.

22   Q.  And do you know whether this related to skilled nursing

23   facilities?

24   A.  I don't understand your question, sir.

25   Q.  Do you know whether this whole incident related to skilled

1    nursing facilities?

2    A.  No, sir.

3    Q.  Do you know whether skilled nursing facilities are at issue

4    in this case?

5    A.  In this case right here?

6           THE COURT:  This case right here.

7    A.  Yes.

8    Q.  You do think skilled nursing facilities are at issue?

9    A.  They've been mentioned multiple times.

10          THE COURT:  I think the question is:  Is the

11   government seeking to recover money that is paid to reimburse

12   for prescriptions that went to skilled nursing facilities.  I

13   think that's the question.

14          MR. ASHWORTH:  That's the question?

15          THE COURT:  You meant to ask.

16          MR. ASHWORTH:  Thank you.  I appreciate it.  Your

17   question is better than mine.

18          THE COURT:  I've had more practice.

19   A.  That I cannot answer.

20   Q.  You don't know whether skilled nursing facilities are at

21   issue in this case?

22   A.  No, sir.

23   Q.  Let's look at row 11.  Okay, row 11 is a statement in a

24   Nevada BOP newsletter, right, sir?

25   A.  Yes, sir.

P42Qomn6                         Perez - Cross

1    Q.  Are you aware of any action that Nevada took against

2    Omnicare related to whatever is in this email?

3    A.  No, sir.

4    Q.  There's no action that's cited in your summary related to

5    that, right, sir?

6    A.  Correct.

7    Q.  Row 13.  This again is another Arizona BOP newsletter,

8    right, sir?

9    A.  Yes, sir.

10   Q.  Do you know if there was any action taken against Omnicare

11   based on this newsletter?

12   A.  No, sir.

13   Q.  Do you know what Omnicare did with the information in this

14   newsletter?

15   A.  No, sir.

16   Q.  Actually, that is in the email that you cite.  Let's look

17   at GX-8.  If we go to the bottom of the document, keep going

18   down, please.  I think it's the Bates number there.  Right

19   below that, Mr. Simmons.

20          One page ahead is the Arizona BOP newsletter you were

21   shown on direct, correct, sir?

22   A.  Yes.

23   Q.  But right above that, if you scroll up, please, Mr. Simmons

24   to 3060, there is a letter that Omnicare drafted about this

25   newsletter to assisted living facilities?  Take a look, please.

P42Qomn6                          Perez - Cross

1   A.   Yes.

2   Q.   And let's look at some language in this letter.  It's the

3   third sentence there. "This article provides clarification that

4   pharmacies cannot accept faxed prescription orders from

5   assisted living facility communities as original written

6   prescriptions, requiring all pharmacies to receive

7   prescriptions directly from your residents' medical providers

8   or their agents.  While we do not believe this approach is

9   aligned with the unique needs of assisted living, we will take

10  the necessary steps to comply with this view."

11       Do you see that?

12  A.   Yes.

13  Q.   And there is also a letter to physicians, if you go one

14  page down.  And if you just pop up that first paragraph, you

15  can see that it has identical language, right, sir?

16  A.   Yes, sir.

17  Q.   Okay.  Let's look now at row 15 of the summary.

18       And you see there, sir, based on your own description,

19  this is guidance, correct?

20  A.   Yes.

21  Q.   Are you aware of the Florida Board of Pharmacy taking any

22  action related to any of the issues in this row in 2017?

23  A.   No.

24  Q.   And your summary certainly does not cite any such action,

25  right?

1    A.  Correct.

2    Q.  So then let's look at number 16.  And this is an email

3    again that involved the director of the Georgia Drugs and

4    Narcotics Agency, right, sir?

5    A.  Yes, sir.

6    Q.  And let's take a closer look at that one, the underlying

7    document, which is GX-1322.  First of all, this relates to

8    2020, right, sir?

9    A.  Yes, sir.

10   Q.  You're aware that that's outside of the relevant period in

11   this case?

12   A.  Yes.

13   Q.  And if you go to the bottom of the email chain, please,

14   Mr. Simmons.  You see it says, "I had a quick question

15   regarding ALFs:  Are they considered to be LTC residents?  I

16   want to make sure that we're within the law to receive faxed C2

17   prescriptions."  You see that?

18   A.  Yes.

19   Q.  And C2 is controlled substances, right?

20   A.  That's my understanding.

21   Q.  And you know that controlled substances are not at issue in

22   this case, right?

23   A.  Correct.

24        MS. JUDE:  Objection, your Honor.  This is not in the

25   exhibit --

P42Qomn6                          Perez - Cross

1           THE COURT:  Overruled.  Why are you wasting my time?

2     Q.  Sir, if you go up in the chain, you see -- actually, let's

3     leave it there.  That information was not included in your

4     summary, right, sir?

5     A.  Correct.

6     Q.  Now, sir, the statements of pharmacy law exhibit you

7     discussed on your direct references what you claimed were

8     pharmacy law statements and emails related to New York, right?

9     A.  Yes.

10    Q.  And feel free to look at 1603, if it's helpful to go along,

11    but I want to cover what the states were that were at issue.

12    One of them was New York, right?

13    A.  Yes.

14    Q.  One of them was California?

15    A.  Correct.

16    Q.  One of them was Colorado, right?

17    A.  Yes.

18    Q.  One of them was Ohio?

19    A.  Yes.

20    Q.  One of them was Louisiana?

21    A.  Yes.

22    Q.  One of them was Illinois?

23    A.  Yes.

24    Q.  One of them was Arkansas?

25    A.  Yes.

P42Qomn6                          Perez - Cross

1   Q.  One of them was Pennsylvania?

2   A.  Yes.

3   Q.  One of them was Rhode Island?

4   A.  Yes.

5   Q.  One of them was Arizona?

6   A.  Yes.

7   Q.  One of them was Missouri?

8   A.  Yes.

9   Q.  One of them was Minnesota?

10  A.  Yes.

11  Q.  One of them was Oklahoma?

12  A.  Yes.

13  Q.  Nevada?

14  A.  Yes.

15  Q.  New Mexico?

16  A.  Yes.

17  Q.  Virginia?

18  A.  Yes.

19  Q.  Washington?

20  A.  Yes.

21  Q.  Idaho?

22  A.  Yes.

23  Q.  Oregon?

24  A.  Yes.

25  Q.  Florida.  I think we had gotten that far and the next one

P42Qomn6                     Perez - Cross

1   is New Jersey, right?

2   A.  Yes, correct.

3   Q.  And the state board of pharmacy and other state regulator

4   document exhibits you discussed on direct referenced the states

5   of California, right?

6   A.  Yes.

7   Q.  New York?

8   A.  Yes.

9   Q.  Texas?

10  A.  Yes.

11  Q.  Missouri?

12  A.  Yes.

13  Q.  Nevada again?

14  A.  Yes.

15  Q.  Utah?

16  A.  Yes.

17  Q.  Ohio?

18  A.  Yes.

19  Q.  Arizona?

20  A.  Yes.

21  Q.  New Mexico?

22  A.  Yes.

23  Q.  Florida?

24  A.  Yes.

25  Q.  And Georgia, correct?

P42Qomn6                         Perez - Cross

1  A.  Yes, correct.

2  Q.  Sir, you're aware this is a False Claims Act suit?

3  A.  Yes.

4  Q.  And the federal government has joined this?

5  A.  Yes.

6  Q.  Are you aware the number of states were given the

7  opportunity to --

8          MS. JUDE:  Objection.

9          THE COURT:  The objection is sustained.  Move on.

10          MR. ASHWORTH:  Your Honor, I'd actually like to

11  sidebar on this because this is a very important issue.

12          THE COURT:  You are not getting a sidebar.  That is

13  not relevant to this case.  You can move on.

14  Q.  Sir, just a few more questions for you.  You did not

15  present any timeline or summary related to any actions by CMS,

16  right?

17  A.  Correct.

18  Q.  You didn't present a timeline or any summary of any

19  guidance created by CMS steering its audits, right?

20  A.  Correct.

21  Q.  You didn't present a summary of any actions that CMS could

22  have taken but chose not to against Omnicare based on the

23  information you presented, right?

24  A.  Correct.

25  Q.  We'll have to wait from others to hear about that, won't

P42Qomn6                           Perez - Redirect

1    we?

2    A.  Yes.

3              MR. ASHWORTH:  No further questions.  Thank you.

4    REDIRECT EXAMINATION

5    BY MS. JUDE:

6    Q.  Just a few questions.

7              Agent Perez, we talked earlier about three summary

8    exhibits the government gave you, right?

9    A.  Yes, correct.

10   Q.  And I think you testified that you were aware that they

11   were just a selection of the documents in this case?

12   A.  Correct.

13   Q.  So there are potentially many other documents that relate

14   to each of these topics that are not in each of the exhibits?

15   A.  Yes.

16   Q.  One of those was the BOP documents related to boards of

17   pharmacy and other state regulators chart, right?

18   A.  Yes, correct.

19   Q.  Ms. Palla, could we pull that one up.

20             And I think counsel asked you some questions about

21   this, attempting to point out that for some of these entries

22   they don't specifically reference an action taken by one

23   state's board of pharmacy against an Omnicare pharmacy, right?

24   A.  Correct.

25   Q.  Again, this is a selection of documents in the record and

P42Qomn6                          Perez - Redirect

1    not all of the documents on this topic, correct?

2    A.  Yes, correct.

3    Q.  And I believe counsel specifically asked you to look at

4    entry 5.  Could we go to entry 5?  And mentioned, and I think

5    pulled up document 1300, that this was a letter of warning to

6    Omnicare of St. Louis.  Do you remember that testimony?

7    A.  Yes.

8    Q.  And pointed out that that letter of warning was not

9    disciplinary action, right?

10   A.  Correct.

11   Q.  And the date of that letter of warning, do you remember

12   what that is or could you refer to the chart and tell us what

13   that was?

14   A.  3/7/2014.

15   Q.  And that was sent to Omnicare of St. Louis?

16   A.  Yes.

17   Q.  Could we scroll down to entry 10.  This entry also relates

18   to which -- to Omnicare of St. Louis?

19   A.  Yes.

20   Q.  What's the date of this entry?

21   A.  12/31/2014.

22   Q.  So that's the same year, just about nine months later?

23   A.  Yes.

24   Q.  And this entry states that Omnicare of St. Louis was given

25   a citation by the Missouri Board of Pharmacy for its conduct?

P42Qomn6                         Perez - Redirect

1   A.  Yes.

2   Q.  That's the same conduct that they received a letter of

3   warning for nine months earlier?

4   A.  Yes.

5   Q.  Counsel didn't show that to you during cross-examination,

6   right?

7   A.  No.

8   Q.  Is it common thread of all the documents that are in this

9   chart that there are statements from state regulators to

10  Omnicare of what the law requires?

11          MR. ASHWORTH:  Objection.  Leading.  Improper summary

12  testimony.

13          THE COURT:  Overruled.

14  A.  Yes.

15  Q.  Some of the statements -- let me strike that.

16          Would you agree that for the entries that relate to

17  statements that were not, strictly speaking, disciplinary

18  action, Omnicare was put on notice as to what the board of

19  pharmacy required?

20          MR. ASHWORTH:  Objection.

21          THE COURT:  Objection is overruled.

22  A.  Yes, I would.

23  Q.  Okay.  And I just want to look at one other exhibit that

24  you were shown across.  Could we pull up 83.  Could we go to

25  the talking points that's attached.  I think it's page 4.

1          On cross-examination, you were shown this document and

2     it was highlighted by counsel.  Do you remember that?

3     A.  Yes.

4     Q.  And I believe the implication was that information was

5     purposefully omitted from your chart.  Do you remember being

6     asked about that?

7     A.  Correct.

8     Q.  And I think counsel specifically pointed you to how 1(d)

9     was not included in the chart, that was something that was not

10    highlighted in counsel's presentation.  Do you remember that?

11    A.  Yes.

12    Q.  And do you see that there's an asterisk -- and Ms. Palla

13    could we blow up maybe just the bottom half of this.  Do you

14    see that there's an asterisk there after a prescriber signed

15    physician order sheet POS?

16    A.  I do.

17    Q.  Could you read what the asterisk below says is connected to

18    this?

19    A.  A prescriber signed POS will be valid for a one-time order

20    only unless a prescriber indicates the quantity and number of

21    refills.

22    Q.  That's all.  And that was included in the chart, right?

23    A.  Yes.

24          MS. JUDE:  No further questions.

25          MR. ASHWORTH:  Nothing further.

P42Qomn6                Sullivan - Direct

```
 1              THE COURT:  Good.  Thank you.  You may step down.
 2              (Witness excused)
 3              THE COURT:  Call your next witness.
 4              MR. ISSACHAROFF:  The government calls Johanna
 5    Sullivan.
 6    JOHANNA SULLIVAN,
 7         called as a witness by the Government,
 8         having been duly sworn, testified as follows:
 9              LAW CLERK:  Please state and spell your name into the
10    record.
11              THE WITNESS:  Johanna Sullivan.  I go by Jody.
12    J-O-H-A-N-N-A.  S-U-L-L-I-V-A-N.
13              THE COURT:  Thank you.
14    DIRECT EXAMINATION
15    BY MR. ISSACHAROFF:
16    Q.  My name is Lucas Issacharoff.  I'm an Assistant U.S.
17    Attorney representing the government in this case.
18              Good afternoon, Ms. Sullivan?
19              THE COURT:  Keep your voice up.
20    Q.  Good afternoon, Ms. Sullivan.
21    A.  Good afternoon.
22    Q.  What is your occupation?
23    A.  So I'm a pharmacist by training, but I'm the director of
24    clinical operations for the Investigations MEDIC at Qlarant.
25    Q.  What is the Investigations MEDIC?
```

P42Qomn6                Sullivan - Direct

1    A.  So the Investigations MEDIC is the Medicare C and D for

2    fraud waste and abuse contractor for CMS, which is the center

3    for Medicaid and Medicare Services.

4    Q.  Is there any other term that the Investigations MEDIC is

5    known by?

6    A.  It was previously the NBI MEDIC or National Benefit

7    Integrity MEDIC, and then it was split into two contracts in

8    2019.

9    Q.  They call it the I-MEDIC?

10    A.  The I-MEDIC, yes.

11    Q.  Do you have any specific responsibilities with the I-MEDIC

12    contract?

13    A.  Besides being the director of clinical operations, I'm also

14    key personnel for the contract as a pharmacy specialist.

15    Q.  And what do you do in your -- for the I-MEDIC contract?

16    A.  So I supervise a team of nurses, pharmacists, and pharmacy

17    subject matter experts which are pharmacy technicians by

18    training, and we look at claims data, both drug and medical,

19    and we also look at medical records, prescription records,

20    dispensing data, basically anything related to medical and drug

21    claims.

22    Q.  You mentioned claims data.  What is claims data?

23    A.  So claims data would be data that someone submits and is

24    paid for for a medical service or for a drug.

25    Q.  And in the context of a drug, who would typically submit

P42Qomn6                    Sullivan - Direct

1    claims data?

2    A.  So the dispensing group would submit that claim, so it's

3    typically a pharmacy.

4    Q.  You also mentioned dispensing data.  Is there any other

5    type of data that you work with in your role at I-MEDIC?

6    A.  So I work with really all kinds of data related to that.

7    We have our medical and drug claims from the integrated data

8    repository.  And then we have other things like prescription

9    records in dispensing data and medical records.

10   Q.  Is there any type of data that is typically submitted to

11   CMS in the course of prescription drug claims?

12   A.  Yes, there's what we call the PDE records or prescription

13   drug event records that are submitted to CMS from the Medicare

14   sponsors, and those are in our data repository, and there are

15   official records of the PDE claims.

16   Q.  Do you work with that PDE data?

17   A.  On a daily basis.

18   Q.  Can you tell me about your educational and professional

19   experience before you were at Qlarant?

20   A.  Sure.  I have a Doctor of Pharmacy degree.  I have a post

21   doctoral residency.  And I worked for 30 years as a licensed

22   pharmacist and licensed consultant pharmacist.  And I've worked

23   in a variety of settings.  I've worked for sever BPM or

24   pharmacy benefit managers, managed care.  I've also worked in

25   long-term care.

P42Qomn6                Sullivan - Direct

1    Q.  We talked about I-MEDIC's role in the Medicare program a

2    little bit.  What is Medicare?

3    A.  So Medicare is a national healthcare benefit program run by

4    the federal government.  It is for two types of populations:

5    Elderly, which they define as 65 and over, and then also for

6    people who qualify due to medical disability.

7    Q.  Are there any different parts of Medicare?

8    A.  There are.  There's four different parts.  We go by

9    letters.  So it's Medicare's A, B, C and D.

10   Q.  Very briefly, can you tell me what are those parts?

11   A.  Sure.  Medicare A and B are what we call traditional

12   Medicare.  That's where Medicare is the direct payer.  Medicare

13   A is hospitals and nursing home stays typically.

14            B would be physician visits, labs, x-rays, things like

15   that, medical services, outpatient medical services.

16            C and D are public-private partnerships where CMS pays

17   a Medicare sponsor or Medicare plan to administer the benefit,

18   either medical or drug.

19            C is medical, like A and B, and then D is, simply put,

20   drugs.  So it's the main program that covers outpatient drugs.

21   Q.  Let's focus on part D for now.  Can you just clarify a

22   little bit.  What does Medicare part D; what benefit does

23   Medicare part D provide?

24   A.  It's D is for drugs, easiest way to remember it.  It's

25   essentially all of the drugs for the most part in the Medicare

1    program.  So anything you typically think of, like you go in a

2    pharmacy, pick up your drugs, get those, would be in the

3    Medicare Part D program, so outpatient prescriptions.

4    Q.  What, if any, rules does Medicare Part D have regarding the

5    basis to dispense prescription drugs to a Medicare beneficiary?

6    A.  So there's a lot of things that are related to the Medicare

7    Part D program and how it's defined.  So it essentially goes to

8    what is a Medicare Part D drug, and whether it qualifies as a

9    Medicare Part D drug, and so those are the main requirements

10   that we go by.

11   Q.  Ms. Flores, can you please pull up GX-1457.

12          Ms. Sullivan, what is this document?

13   A.  This is an excerpt from the **Federal Register**.

14   Q.  And what is the *Federal Register*?

15   A.  So it's the system of record for notification of statutes

16   and rules and regulations about healthcare programs.

17   Q.  Ms. Flores, could we please go to page 99 and pull up the

18   paragraphs above and below the 423.104 header?

19          MS. SALGADO:  Your Honor, objection.  It seems as

20   though they're going to ask this witness to read in --

21          THE COURT:  I don't know what they're going to ask.  I

22   haven't heard a question.  I can't read his mind.

23          MS. SALGADO:  Fair enough.

24   Q.  Ms. Sullivan, are you familiar with these regulations?

25   A.  Yes.

P42Qomn6                Sullivan - Direct

1   Q.  And what do they require in terms of the Part D

2   prescription drug benefit?

3   A.  They require that to be a Part D drug, you have to be

4   issued upon a valid prescription, which they define as

5   complying with all applicable state laws, requirements,

6   constituting a valid prescription.

7   Q.  Thank you.

8          Ms. Sullivan does CMS, does the Center for Medicare

9   and Medicaid Services, CMS, check each time a pharmacy submits

10  a claim to ensure that there's a valid prescription?

11  A.  They do not.  It would simply not be feasible to do that

12  because of the volume of claims.

13  Q.  How does CMS ensure that these requirements are enforced or

14  followed?

15         MS. SALGADO:  Objection.  Foundation.

16         THE COURT:  Overruled.

17  A.  So we're considered a trust-based system in that we trust

18  that the claims that will be submitted will be accurate and

19  truthful, and we have to look retrospectively to evaluate those

20  claims to determine after the fact if they're a problem and

21  recoup those.

22  Q.  Let me ask about this requirement.  If CMS knew that a

23  pharmacy submitted a claim without having gotten a

24  prescription, how would that affect whether CMS would pay for

25  it?

P42Qomn6                Sullivan - Direct

1          MS. SALGADO:  Objection, your Honor.

2          THE COURT:  Overruled.

3          MS. SALGADO:  Asks for a legal conclusion.

4          THE COURT:  Overruled.  It does not ask for a legal

5    conclusion.

6    A.  So CMS would not pay knowingly for a prescription, a drug

7    that did not have a valid prescription.

8    Q.  And if CMS knew that a pharmacy submitted a claim based on

9    a prescription that was not valid under state law, how would

10   that affect whether CMS would pay for it?

11         MS. SALGADO:  Same objection, your Honor.  If we could

12   just have a running objection.

13         THE COURT:  It's her job.  This is what she does for a

14   living.  She can testify about this.

15         Please go ahead.

16   A.  So in that situation, CMS would not knowingly pay for a

17   prescription that was not valid.  And, I'm sorry, I forget the

18   situation you told me.

19   Q.  I was asking about the situation in which the prescription

20   was not valid under state law.

21   A.  Yes.  If it was not valid under state law, it would not

22   qualify for Med D payment.

23   Q.  If CMS knew that a pharmacy submitted a claim based upon a

24   prescription that was expired under state law, how would that

25   affect whether CMS would pay for it?

P42Qomn6            Sullivan - Direct

1    A.  An expired prescription would not be valid under state law,

2    and, therefore, it would not be payable under Medicare Part D.

3    Q.  If CMS knew that a pharmacy submitted a claim for refills

4    based on a prescription that did not authorize any refills, how

5    would that affect whether CMS would pay for it?

6    A.  So, again, this would not be a valid prescription because

7    there were no valid refills, and it would not be payable under

8    Medicare Part D.

9    Q.  If CMS knew that a pharmacy submitted a claim for refills

10   based upon a prescription that was out of refills, for example,

11   a sixth refill on a prescription that only authorized five

12   refills how would that affect whether CMS would pay for it?

13   A.  Again, it would not be a valid refill because it was

14   unauthorized, and so it would not be payable under Medicare

15   Part D.

16   Q.  Who gets paid for dispensing prescription drugs to Medicare

17   beneficiaries?

18   A.  So the group that submits the drug claim, it's generally a

19   pharmacy, would be the one that gets paid.

20   Q.  And Ms. Flores, we can pull this exhibit down.

21        Ms. Sullivan, can you walk me through how a pharmacy's

22   dispensation of prescription drugs is paid for through the

23   Medicare system?

24   A.  Yes.  So would you like top down from CMS or from --

25   Q.  Let's start with the, you know, how a bill becomes a law.

1    Let's start with the prescription coming to the pharmacy.

2    A.   Okay.  So a prescription is presented to a pharmacy.  This

3    may be sent electronically by a prescriber or it may have been

4    through a fax or a phone call or a written prescription, and

5    the patient or their agent may bring it into the pharmacy.

6          The drug card or drug insurance is provided.  It gives

7    information that tells the pharmacy where to send the

8    prescription electronically for payment.  And information is

9    entered into the electronic claims processing system.

10   Information from the prescription, like the prescriber, the

11   drug, the strength, the quantity, the refills, things like

12   that, and that drug information that tells them where to go on

13   that drug insurance card, and the patient information, so the

14   name, the date of birth, things like that.  That's all put in

15   electronically.  It's transmitted, and then you get a response

16   back very quickly.  It could be seconds or a minute maybe.

17         And you find out if it's approved and you find out if

18   there's a copay or a co-insurance that you need to collect from

19   the patient, and that is your approval to pay.  It's not an

20   actual fund transfer.  You don't get money transferred back at

21   that point, but that's your approval to go ahead and dispense

22   the medication.  So you go ahead and do so.  And you're paid

23   after the fact by a pharmacy benefit manager.

24   Q.   Let's pause there a minute.

25   A.   Yes.

P42Qomn6                Sullivan - Direct

1   Q.  Because I want to walk back and ask you about a couple

2   steps in that process you just described.  I think at one point

3   you talked about sending the prescription electronically for

4   payment.  Would the pharmacy actually send the prescription to

5   anyone else to receive payment?

6   A.  So they send it to the pharmacy benefit manager, and it's

7   transmitted electronically.

8   Q.  When you say "they send it," are they sending the document

9   itself that contains the prescription?

10  A.  No.  They are inputting information from the prescription,

11  but they don't send the actual prescription.

12  Q.  Would the recipient of that information have -- be able to

13  see whether or not there was an actual prescription

14  corresponding to that information?

15  A.  They would not.

16  Q.  And then I think a little bit later on you started saying

17  you find out whether it's approved, and then you dispense and

18  collect payment.  Who dispenses the drugs and collects the

19  payment here?

20  A.  It would be the pharmacy.

21  Q.  I think we were back at the step where the claim for

22  payment after the drug is dispensed, the claim for payment is

23  submitted to the PBM.  Can you remind me what is a PBM?

24  A.  A PBM is a pharmacy benefit manager.  That's the group that

25  contracts with insurance to manage the drug benefit, so they

P42Qomn6            Sullivan - Direct

1    contract with pharmacies.  They pay the pharmacies, and they

2    manage the formularies about, you know, what drugs are on

3    formulary, what require authorizations or special criteria.

4    Q.  And what does the PBM, the prescription benefit manager,

5    what do they do with the claims information that they receive

6    from the pharmacy at this point?

7    A.  So they would do the payment to the pharmacy for the

8    claims.  They send the paid drug claims to the Medicare

9    sponsor, and then it is sent to CMS --

10            THE COURT:  So sorry.  The timer is doing strange

11   things.  I apologize.  I don't know what it was doing.  My

12   watch thinks I took a hard fall.  It seems to do that from time

13   to time.  I apologize, ma'am.

14   A.  No problem.

15            So the PBM sends that data to the sponsor, Medicare

16   Part D sponsor, and they send it to CMS, and it becomes a

17   prescription drug event record in our official system of

18   record, which is the integrated data repository or IDR.

19   Q.  Let's pause there.  It sounds like we're getting to the

20   good part.  When you say -- when the PBM submits the data to

21   the plan sponsor, and that ultimately gets submitted to CMS,

22   again, does the PBM have an actual copy of the prescription at

23   that point?

24   A.  They do not.

25   Q.  What is the data that they're sending to the plan sponsor

1   or ultimately to CMS, what's that data based on?

2   A.  So it's based on a prescription, and then the demographic

3   information of the patient, who the prescriber is, who the

4   pharmacy is that transmitted the prescription and got paid for

5   the prescription, all of those details, as well as the details

6   of the drug prescription.

7   Q.  I just want to be clear.  When you say it's based on the

8   prescription, is PBM itself looking at the prescription and

9   then transmitting data about it to the plan sponsor?

10  A.  So the PBM does not have the actual prescription.  They

11  have information from the prescription that is in the claim.

12  Q.  Where did they get that information from the prescription?

13  A.  From the pharmacy.

14  Q.  They're relying on the pharmacy to tell them what was on

15  the prescription?

16  A.  Yes.

17  Q.  And they're relying on the pharmacy to tell them that a

18  prescription existed at all?

19  A.  Yes.

20  Q.  Once these PDEs, these prescription drug events get

21  submitted ultimately to CMS and get put into the integrated

22  repository, the system of records that you described, what

23  happens at that point?

24  A.  So then it's, again, our system of record for paid claims

25  in the Part D program, and that is used by groups like the

P42Qomn6              Sullivan - Direct

1    I-MEDIC to do data analysis and also to investigate complaints

2    and law enforcement investigations.

3    Q.  Does this also have any relationship to the payment

4    process?

5    A.  Yes.  It's used by CMS for a year-end reconciliation

6    process between the sponsor and CMS to determine if they need

7    to do additional payments to the sponsor.

8    Q.  Can you tell me just a little bit more about that

9    reconciliation process?

10   A.  Well, real high level, it's a risk contract between CMS and

11   the sponsor.  So if they lose a lot of money, then CMS also

12   shares in that loss.  So if they lost a lot of money, then CMS

13   pays a portion of that money that they lost.  If they saved

14   money and they made a profit, then CMS takes some of the profit

15   as well.

16   Q.  How would a plan sponsor lose money in the context of

17   Part D?

18   A.  So they could pay for excessive claims that were subject to

19   fraud, waste and abuse, or there could be expensive drugs that

20   they were not expecting, you know, that were approved during

21   the year and they did not plan for.

22   Q.  In that first instance where they paid for excessive

23   claims, due to fraud, waste and abuse, CMS would share in the

24   losses due to that?

25   A.  Yes, they would share in losses.  If it is proven to be

1   fraud, then they would ask for those PDE records to be removed,

2   but there's different kinds of waste and abuse as well.

3   Q.  So taking all of this together, when a pharmacy provides a

4   prescription drug to a Part D beneficiary, who ultimately pays

5   for that drug?

6   A.  So CMS is the ultimate payer.  It does come from federal

7   taxpayer dollars through CMS to the sponsor, to the PBM, to the

8   pharmacy.

9   Q.  So let's go back to that very early step of the pharmacy

10  submitting the claims.  How specifically does the pharmacy

11  submit claims data to a prescription benefit manager?

12  A.  So it's done electronically, and it's done through their

13  claims processing system.  It uses an electronic standard

14  process.

15  Q.  Ms. Flores, can you please publish GX-1706 as a

16  demonstrative.

17          Do you recognize this document?

18  A.  I do.

19  Q.  What is it?

20  A.  So this is some data from Omnicare's dispensing system

21  that -- and it was matched to some Medicare Part D PDE records,

22  so it's a compilation of those.

23  Q.  What's the significance of the headers that have different

24  colors?  What's the significance of those different colors?

25  A.  So the green headers are information that came from the

P42Qomn6                Sullivan - Direct

1    Omnicare dispensing system.  The yellow headers are information
2    that matches from the Medicare Part D PDE records.  And then
3    the orange, sort of orange-ish color is some other fields that
4    are kind of there just to describe the -- from the dispensing
5    data, the drug and the pharmacy name.
6    Q.  Let's focus on the green columns right now.  Who would have
7    created the data in these fields?
8    A.  This is from Omnicare's dispensing data, so this would have
9    been submitted and created by Omnicare.
10   Q.  When you say "this would have been submitted by Omnicare,"
11   who would they have submitted this to?
12   A.  They would have submitted it to the PBM for payment.
13   Q.  Can we pull up those -- actually, Ms. Flores, can you
14   please pull up the first column on this chart.
15          Ms. Sullivan, what information is conveyed by this
16   claim field?
17   A.  So this indicates the drug and strength and dose form that
18   was dispensed, so this is Citalopram 10 milligram tablets.
19   Q.  What is Citalopram?
20   A.  It's an antidepressant.
21   Q.  Ms. Flores, can we pull up the second column.
22          Ms. Sullivan, who submitted these claims?
23   A.  Omnicare Minnesota.
24   Q.  Ms. Flores, can we zoom back out and pull up the green
25   headers all together, or the green fields all together.

P42Qomn6                Sullivan - Direct

1              Can you remind me the significance of the fact that

2       these headers are in green?

3       A.   This information came directly from the dispensing data

4       system for Omnicare.

5       Q.   Was this -- and this data was submitted to the PBM's, you

6       said, for payment?

7       A.   Yes, this would be the representative of the claims that

8       were transmitted to PBMs.

9       Q.   Let's focus here on the second column for now.

10             THE COURT:  You need to figure out a good stopping

11      point, so ...

12             MR. ISSACHAROFF:  I don't have a time in front of me,

13      your Honor.  I think once we finish the data will be a great

14      stopping point.

15             THE COURT:  Great.

16      Q.   Can you tell me what the significance of the information in

17      the second column here is?

18      A.   So that's the prescription number.  So each original

19      prescription has a unique prescription number that it is

20      associated with.

21      Q.   And does the prescription number in this column change at

22      any point?

23      A.   It does.

24      Q.   What's the significance of that change?

25      A.   So that would indicate a new original prescription was

P42Qomn6                Sullivan - Direct

1  created at that time.

2  Q.  And so if you were reviewing this data in the course of

3  your work for the I-MEDIC medical consultants, what would you

4  be looking for to correspond with that change in prescription

5  number?

6  A.  If I was just looking at this data set right here, I would

7  expect to have two original prescriptions that -- to correspond

8  to those two prescription numbers.

9  Q.  Let's take a look at the date Rx written column.  Can you

10 tell me how that corresponds to the prescription number we were

11 just looking at?

12 A.  So at the same time it switches from one Rx number to

13 another, there also changes the date Rx written.  That reflects

14 the date the original prescription was written.

15 Q.  Let's look at the fourth column here refills auth.  Is that

16 refills authorized?

17 A.  Yes.

18 Q.  What information is conveyed by this claim filled?

19 A.  That's the original amount of refills.  In the original

20 prescription, they had 11 authorized refills.  To be clear for

21 the Court, when you have a prescription with 11 refills, you

22 have a first fill, which is your zero fill, then you have 11

23 refills, so you would really have 12.

24        THE COURT:  You have an initial prescriptions and 11

25 refills after that.

P42Qomn6              Sullivan - Direct

1           THE WITNESS:  Correct, so yes, so I just -- there

2    would be 12 fills possible.

3    Q.  Let's look at the fill number -- the fill NBR.  What does

4    that -- what would that column tell you if you were looking at

5    this in the course of your work for I-MEDIC?

6    A.  Based on what I was just saying about the original fill,

7    zero would be your original fill, and then one would be your

8    first refill, two would be your second refill, and so on.

9    Q.  Ms. Flores, can we highlight the rows that correspondence

10   to October and November 2010 date of service.

11          Do you see here that the fill number goes from 11 to

12   zero?  What does that signify?

13   A.  So that would signify that they used the last of the eleven

14   refills on the first line, and then they switched to that new

15   prescription, new original prescription with 11 refills on the

16   second line, and that was the first or original fill.

17   Q.  Again, if you were looking at this in the context of your

18   work for the I-MEDIC, and you saw a switch from a fill number

19   of eleven to a fill number of zero, what would you expect to

20   correspond to that?

21   A.  I would expect to be able to trace that back to a new valid

22   original prescription.

23   Q.  Just very briefly, what is the last column that we have

24   pulled up here?

25   A.  It's the prescriber ID field.  It corresponds to what we

P42Qomn6                Sullivan - Direct

1    call the NPI or national provider identifier number.  It's a

2    number that people sign up for.  It's a CMS number that

3    identifies a particular provider, their specialty, that kind of

4    thing.

5    Q.  What would the fact that there is an entry in this column

6    convey to CMS?

7    A.  Well, it's consistent, so I would assume it's the same

8    prescriber that authorized those prescriptions, but it would

9    convey to us that there was a -- that this specific prescriber

10   authorized that prescription.

11            THE COURT:  Okay.  We really need to stop.

12            MR. ISSACHAROFF:  I want to look at the yellow

13   columns.  It will take about two minutes.

14            THE COURT:  Two minutes is fine.

15   Q.  Ms. Flores, can we pull up the yellow columns here back on

16   our chart.

17            Actually, very briefly on the green columns, is

18   this -- what -- does Omnicare submit this type of information

19   each time it submits a claim for payment for dispensing

20   Medicare Part D drugs?

21   A.  Yes, each fill, like what I was talking about original fill

22   and refills, each fill corresponds to a unique drug claim and a

23   unique PDE record.

24            MR. ISSACHAROFF:  You know, your Honor, I think this

25   is a good place to stop.  We could pick this up tomorrow?

P42Qomn6          Sullivan - Direct

1          THE COURT:  Good call.

2          Okay, guys, I'll see you in the morning.  Tomorrow is

3   going to be a little shorter day.  One of the most beloved of

4   my fellow judges died a few months ago, Magistrate Smith up in

5   White Plains, and the memorial service is 5:00 up in White

6   Plains.  We will go to 3:30 and then I've got to get my tush up

7   to White Plains to speak at the memorial.

8          Don't discuss the case tonight.  Keep an open mind.

9   And I'll see you tomorrow.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P42Qomn6              Sullivan - Direct

```
 1                (Jury not present)
 2                THE COURT:  Ma'am, I'll see you in the morning.
 3                (Witness temporarily excused)
 4                THE COURT:  Now let me make this perfectly clear.  It
 5       is absolutely irrelevant as far as I am concerned to the
 6       validity of the government's case whether any or no states
 7       chose to join, and we are not going to get into that.  And you
 8       have your exception.  You have your exception.  Take it to the
 9       Circuit if you're unlucky enough to get there.  But I'm telling
10       you that as far as I am concerned, it is completely and totally
11       irrelevant because you cannot draw from that the inference that
12       no violation took place.
13                MS. MAINIGI:  May I respond, your Honor?
14                THE COURT:  No.
15                MS. MAINIGI:  Can I at least put my objection on the
16       record?
17                THE COURT:  You can put your objection on the record.
18                MS. MAINIGI:  So the government -- I agree with you.
19                THE COURT:  Good.
20                MS. MAINIGI:  But if I could finish, please, your
21       Honor because this is an important issue to us.  And so I agree
22       with you that there are cases that do say that.  But the
23       difference here, your Honor, is that the government has
24       insinuated multiple times that we've violated state pharmacy
25       law.  They have two entire summary exhibits.  The entire
```

P42Qomn6              Sullivan - Direct

1    purpose of which --

2            THE COURT:  The people on the board of pharmacy of

3    various states say that you violated state law.  Yeah, they do

4    have that.  And that, by the way, is a public record, and it's

5    admissible, and it's admissible for the truth, and it's

6    admissible for your knowledge.

7            So I'm terribly sorry, but the government is not

8    making an unsupported allegation here.

9            MS. MAINIGI:  They are, your Honor.  To answer that

10   point, they're creating the insinuation that we have violated

11   state pharmacy law.

12           THE COURT:  It's not an insinuation.  They're flat out

13   saying you're violating state pharmacy law.

14           MS. MAINIGI:  With all due respect, your Honor, I

15   disagree.  That's not what those documents say.

16           However, your Honor, it is absolutely -- they are the

17   ones that are trying to suggest that we violated state pharmacy

18   law.  That is not what those documents say, with all due

19   respect.

20           THE COURT:  Then you tell the jury that the documents

21   that the head of the Board of Pharmacy of New Mexico who cited

22   you for doing exactly what you do and issued some kind of

23   administrative document that you say is a nothing and the

24   government says is a something, doesn't mean you violated state

25   law.  You can say that.

P42Qomn6                Sullivan - Direct

1          But the fact that the state of X did not choose to

2   join this case proves nothing.  No inference can be drawn from

3   it, and I will not allow it to be.  And, by the way, they're

4   never going to see the complaint, so they're never going to

5   know that anybody joined in this case.

6          MS. MAINIGI:  Your Honor, may I just please respond as

7   to the reasons why it is relevant.  It's relevant for two

8   reasons.  Number one --

9          THE COURT:  Quickly please, I've got to go.

10          MS. MAINIGI:  I understand.  It's relevant for

11   materiality, and there's case law support for that.  It's also

12   necessary to rebut the false impression that the government has

13   created about these documents, and there's at least two

14   problems with the documents that they have cited.

15          Number one, there wasn't any sort of finding from the

16   state.

17          Number two they relate to issues that are not relevant

18   in this case, like controlled substances, for instance, and so

19   *Paolitto v. John Brown*, Second Circuit, 151 F.3d 60, 66

20   (2d Cir. 1998) is one of the cases that say even inadmissible

21   evidence may be necessary to rebut an impression that the

22   opposing party's evidence has created.

23          THE COURT:  You take it to the Circuit because I'm not

24   changing my mind.

25          MS. MAINIGI:  I understand, your Honor.  I just want

P42Qomn6            Sullivan - Direct

1    to preserve my objection and the specific reasons why, because

2    the -- all of the documents that the government has cited we

3    could put together summary judgment too that explains exactly

4    why those documents are either irrelevant because they relate

5    to issues outside of this case or the state never had a finding

6    that we violated any sort of state law.  And it is absolutely

7    very relevant when the states had an opportunity to intervene

8    here on a very specific issue, a hypertechnical issue.

9              THE COURT:  You make your point to the jury by

10    pointing out that the documents they have introduced do not

11    establish that you violated state law.  The fact that that

12    particular state then didn't join this lawsuit is proof of

13    nothing.  It proves nothing.  You can draw no logical inference

14    from it.

15              If you believe that the government is creating a

16    misimpression because it is misinterpreting documents in this

17    case, you attack them on the text of the documents.  You do not

18    attack them -- it's no attack circuitously by saying "and, by

19    the way, that state didn't join this lawsuit."  This issue is

20    closed.  As far as I'm concerned, this issue is closed.

21              MS. MAINIGI:  I understand, your Honor.  Can I just

22    respond to what you said?  And it doesn't have to do with the

23    intervention.  How do we actually respond to the government

24    when the witness that they put up is basically reading emails

25    out loud.  When we asked him substantive questions about

P42Qomn6            Sullivan - Direct

1    pharmacy law, he -- we -- either the objection --

2              THE COURT:  He doesn't know anything.

3              MS. MAINIGI:  Exactly.

4              THE COURT:  He read emails from your email chains, and

5    those included emails from various states.  You know that the

6    ultimate issue of state law relevance is going to be duked out

7    with expert witnesses, not that boring, I don't even want to

8    say it, from HHS who put us all to sleep while reading all

9    those emails.

10             So don't tell me you don't know how to do it.  You do

11   know how to do it.  But even if you didn't know how to do it,

12   I'm telling you that the fact that state X did not join the

13   lawsuit is not evidence from which you can draw the inference

14   that the government is lying about a finding by that state of a

15   violation of law, and that is the end of it.

16             MS. MAINIGI:  I understand, your Honor.  Thank you for

17   hearing me out.

18             THE COURT:  I mean, you're a very good trial lawyer.

19   Honestly, you know you are.  And you know how to try this case.

20             MS. MAINIGI:  Your Honor, it is very -- this is the

21   last thing I will say on it, but they put up a guy who doesn't

22   know anything about anything.  He got to HHS OIG in 2023.

23             THE COURT:  The only reason he was put on the stand --

24   I agree, I would have put a case agent on the stand.  I don't

25   know.  Maybe he was fired.  A lot of people have been fired

P42Qomn6            Sullivan - Direct

1    recently from the federal government, but this guy gets on the

2    stand for the sole purpose of placing before the jury a summary

3    group subset of voluminous exhibits that say what they said.

4    And that's the only thing his testimony proves; that there are

5    some exhibits from among the voluminous exhibits submitted in

6    this case that say what they say.  And you make any argument

7    you want about whether they say -- he doesn't say what it

8    means.  He only says they say what they say.

9            MS. MAINIGI:  You're right, your Honor, and it worries

10   me that your Honor has walked away with the impression that we

11   did violate state law because we didn't.

12           THE COURT:  I heard evidence from which that

13   conclusion could flow.  I am not making any findings of fact in

14   this case.  I am not the finder of fact, and I haven't heard

15   all the evidence yet.  So I am keeping an open mind.

16           MS. MAINIGI:  Understood, your Honor.

17           THE COURT:  Thank you.

18           Add 35, right?  Do you have a number?

19           LAW CLERK:  Yes.  One moment.

20           THE COURT:  Add 35 to the government.  Government is

21   227 and a half minutes.  Just pushing four hours.  And 81

22   minutes for the defense.  Okay.

23           I'll see you in the morning.

24           (Trial continued April 3, 2025 at 9:30 a.m.)

25

1                        INDEX OF EXAMINATION

2    Examination  of:                              Page

3    JEFFREY CHAD HARDY

4    Direct By Mr. Barnea . . . . . . . . . . . 262
     Cross By Mr. Hazelwood . . . . . . . . . . 277
5    Redirect By Mr. Barnea . . . . . . . . . . 296

6    DEANNA HAGEN

7    Direct By Mr. Barnea . . . . . . . . . . . 302
     Cross By Ms. Conley  . . . . . . . . . . . 339
8    Redirect By Mr. Barnea . . . . . . . . . . 358
     Recross By Ms. Conley  . . . . . . . . . . 364
9    STEVEN PEREZ

10   Direct By Ms. Jude . . . . . . . . . . . . 366
     Direct By Ms. Jude . . . . . . . . . . . . 387
11   Cross By Mr. Ashworth  . . . . . . . . . . 442
     Redirect By Ms. Jude . . . . . . . . . . .472?
12   JOHANNA SULLIVAN

13   Direct By Mr. Issacharoff  . . . . . . . . 476

14

15

16

17

18

19

20

21

22

23

24

25