```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA, et
 3   al., ex rel. URI BASSAN,

 4                   Plaintiffs,

 5          v.                              15 Civ. 4179 (CM)

 6   OMNICARE, INC.,

 7                   Defendant.
     ------------------------------x
 8   UNITED STATES OF AMERICA,

 9                   Plaintiff,

10          v.                              Trial

11   OMNICARE, INC. and CVS HEALTH
     CORP.,
12
                     Defendants.
13   ------------------------------x
                                            New York, N.Y.
14                                          April 3, 2025
                                            9:50 a.m.
15

16

17   Before:

18                   HON. COLLEEN MCMAHON,

19                                          District Judge
                                            -and a Jury-
20

21

22

23

24

25
```

1                                    APPEARANCES

2    MATTHEW D. PODOLSKY
            Acting United States Attorney for
3           the Southern District of New York
     BY:    JEAN-DAVID BARNEA
4           SAMUEL H. DOLINGER
            MONICA P. FOLCH
5           JENNIFER A. JUDE
            LUCAS E. ISSACHAROFF
6           JEREMY M. LISS
            JEFFREY K. POWELL
7           Assistant United States Attorneys

8    WILLIAMS & CONNOLLY LLP
            Attorneys for Defendants
9    BY:    BETH A. STEWART
            ENU A. MAINIGI
10          SUZANNE SALGADO
            TYLER INFINGER
11          WILLIAM ASHWORTH
            DAVID RANDALL J. RISKIN
12          BENJAMIN N. HAZELWOOD
            HOLLY CONLEY

13

14   ALSO PRESENT:

15   RUPA PALLA, USAO Paralegal Specialist
     JESSICA FLORES, USAO Paralegal Specialist
16   RAHEL BAHIBLA, Paralegal
     SALLY EVANS, Paralegal
17   MATT SIMMONS, Technical Assistant

18

19

20

21

22

23

24

25

1            (Trial continued; jury not present)

2            MS. MAINIGI:  Your Honor, we had two brief issues we

3    wanted to raise.

4            THE COURT:  You're sitting here.  I'm trying not to

5    waste time.

6            MS. MAINIGI:  I apologize, your Honor.

7            THE COURT:  Case on trial.  Parties present.  The

8    jurors are not present.

9            What are the issues?

10           MS. MAINIGI:  The first issue relates to Jody

11   Sullivan.  We are concerned, and we want to re-raise the issue

12   that she is an undisclosed materiality expert.  She was asked

13   multiple times yesterday what she would do at CMS or what CMS

14   would do when faced with certain hypothetical situations.

15           THE COURT:  She is not an undisclosed expert.  She is

16   a fact witness who is telling us how the government would

17   behave in certain circumstances, which is her job.  So I have

18   your argument.  You have your exception.

19           Next.

20           MS. MAINIGI:  If I could just add the fact that she is

21   not on any documents that the government produced.  She is

22   being offered to counteract the expected testimony of the

23   people that actually were involved with the audit.  She was not

24   involved with the @Pepsi audits at all.  They are the ones --

25           THE COURT:  Ms. Mainigi, that is your cross.  It goes

1    to the weight.

2            MS. MAINIGI:  But speculating --

3            THE COURT:  I'm sorry.  She is not speculating.  It's

4    her job.  She tells you what the government would do.  You're

5    going to prove or you're going to establish or you're going to

6    draw the inference that she is wrong; that she doesn't know

7    what she's talking about.  But that's it.  It's over.  Done.

8    She is not an undisclosed expert.

9            Next.

10           MS. MAINIGI:  She was --

11           THE COURT:  She is -- okay.  Next.

12           MS. MAINIGI:  The next issue is Mr. Nace, which

13    Mr. Riskin will handle, your Honor.

14           THE COURT:  Yes.

15           MR. RISKIN:  Two issues regarding Dr. Nace.  The first

16    is we have an objection to the demonstrative that the

17    government disclosed last night.  My colleague is going to hand

18    it up to you.

19           THE COURT:  Should be on the deck.  If you have an

20    objection to the demonstrative, put it up here so it's the

21    first thing I see when I come here is we're going to have to do

22    something about this.  What's the problem?

23           MR. RISKIN:  Thank you, your Honor.

24           If you turn to the second page, this is a list of

25    classes of medication, and the way this demonstrative is put

1   forth, in the left-hand side of the page, you see there's a

2   column called Drugs Omnicare Improperly Dispensed.

3          MS. FOLCH:  Your Honor, I'm sorry.  I can cut this off

4   by saying we are going to switch that one out, so it is --

5          THE COURT:  You're going to say dispensed, not

6   improperly dispensed.

7          MR. RISKIN:  Thank you.

8          That's the first I've heard of it, but, your Honor, I

9   do think this ties into a bigger issue, which is, given this

10  demonstrative, given the reference to known adverse effects of

11  these drugs, it does suggest that Dr. Nace is going to come up

12  and talk about hypothetical risk.

13         THE COURT:  He's going to.  Indeed, he is.  He is

14  going to, and I'm going to allow it.

15         MR. RISKIN:  Your Honor, there is no basis in his

16  testimony.  He didn't review any individual prescriptions.  He

17  didn't review any individual patients.  He has no idea about

18  any dispenses.

19         THE COURT:  Excuse me.  He is someone who is capable

20  of testifying about the kinds of known adverse risks that we

21  hear about in the advertisement for quetiapine fumarate:

22  Glycemia, hyperlipidemia and increased mortality.  Come on.

23  I'm allowing that testimony to come in.  And you have your

24  objection.

25         MR. RISKIN:  Thank you, your Honor.

1              One additional issue, and we don't know if it is an

2    issue, but let me raise it.  Dr. Nace's report discusses not in

3    his opinion section issues regarding assisted living facilities

4    system.

5              THE COURT:  You should have made a motion before the

6    trial.  You didn't make a motion before the trial.  On that

7    basis, I am not going to disallow.  I'll listen to questions.

8    You can raise an objection.  I'll rule on the objection.  But

9    if you wanted whole classes of testimony out, we had pretrial

10   motions.  We had in limine motions.  I'm not prepared to do

11   this.  That's why I do so much work before a trial.

12             MR. RISKIN:  I understand, your Honor.

13             To give a little bit more context, this was not a

14   disclosed opinion.  This only came up in the government's

15   opposition to our motion in limine when they said that we

16   didn't oppose that part of his opinion.  But his opinions, his

17   report does not disclose this as an aspect of what he's been

18   going to put on the stand for.  So we had no opportunity to

19   oppose this.

20             MS. FOLCH:  Your Honor, that's inaccurate.  His report

21   has extensive discussion about what ALFs are, and his rebuttal

22   report also discusses the extent of care provided at ALFs.  So

23   all of this information was disclosed to the defendants, and

24   they did not move in limine.  That's why we want pointed it out

25   in the *Daubert*.

1            MR. RISKIN:  Your Honor, certainly the rebuttal report

2     is not testimony for the case in chief that was disclosed to

3     rebut experts that Omnicare had dis --

4            THE COURT:  You are incorrect about that.  You are

5     incorrect about that.  And I am sorry, he testifies.  If you

6     have an objection to a question, stand up and object, and I'll

7     rule.  The odds are I will rule against you.

8            MR. RISKIN:  Thank you, your Honor.

9            THE COURT:  Get the jurors in here.  Where is the

10    witness?  Get the witness on the stand.

11           MS. FOLCH:  Your Honor, I'm sorry, I think there is

12    perhaps --

13           THE COURT:  Have them lined up at the door, please.

14           MS. FOLCH:  I apologize.  Defendants have said they

15    object to our use of their demonstrative at opening of the list

16    of drugs.  We see no basis for that objection.

17           MR. RISKIN:  Your Honor --

18           THE COURT:  He didn't just make an objection on that

19    ground.  If he doesn't object, you don't have to tell me what

20    he objects to.

21           MR. RISKIN:  We do object.

22           THE COURT:  Guess what?  It's your demonstrative.

23    They can use it.

24

25                 (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (Jury present)

2          THE COURT:  Good morning everyone.  What an icky day.

3   But we're here.  Ms. Sullivan is back on the stand, and she is

4   under oath.  Would you please proceed.

5          MR. ISSACHAROFF:  Thank you, your Honor.

6   JOHANNA SULLIVAN, resumed.

7   DIRECT EXAMINATION CONTINUED

8   BY MR. ISSACHAROFF:

9   Q.  Good morning, Ms. Sullivan.

10  A.  Good morning.

11  Q.  Ms. Flores, can we please pull GX-1706.

12         Ms. Sullivan, when we left off, I believe we were

13  looking at this exhibit.  Can we focus in on the green columns.

14         Can you remind us all what the significance of these

15  green of the data in these green columns is?

16  A.  So this is data columns from the Omnicare dispensing data.

17  Q.  And who would this data have -- who would Omnicare have

18  submitted this data to?

19  A.  So Omnicare would have submitted this to the pharmacy

20  benefit manager for the purposes of payment.

21  Q.  Is that something that we've referred to as claims data?

22  A.  Yes.

23  Q.  And specifically I think we were talking about the fact

24  that there were two different prescription numbers in the

25  second column.  Do you see that?

 1  A.  Yes.

 2  Q.  And that there were two different dates that the

 3  prescription was written in the sixth column corresponding to

 4  those two prescription numbers?

 5  A.  Yes.

 6  Q.  And the fill number ticks up to eleven and then ticks over

 7  to zero and then resumes counting up?

 8  A.  Yes.

 9  Q.  Looking at all of this data together, in your work at CMS,

10  how would you interpret this data?

11  A.  So, if we were verifying this data, what we would look for

12  is two original prescriptions:  One for date of 12/11/2009 and

13  one for the date of 11/12/2010, both with 11 authorized

14  refills.

15  Q.  That's what you would be looking for, but let's go back.

16  This is claims data submitted by Omnicare to a PBM for payment.

17  Would the PBM in the ordinary course of part of its payments

18  process have any way of knowing whether Omnicare had those two

19  original prescriptions corresponding to those dates?

20  A.  They would not.

21  Q.  They would be -- you referred to it earlier as a

22  trust-based system.  Is this part of that trust-based system?

23  A.  Correct.  Drug claims are inherently a trust-based system.

24  Q.  And in your work at CMS, if there was in fact no

25  prescription or, you know, or no second prescription

1    corresponding to November 12, 2010, would you view any of the

2    data on this screen as inaccurate?

3    A.  Everything with the second prescription number would be

4    inaccurate due to unauthorized prescription.

5    Q.  Ms. Flores, let's turn now to the yellow columns.

6              So we talked about this claims data that we were just

7    looking at gets submitted to the PBMs.  What happens with the

8    data at that point?

9    A.  So the data ends up being submitted from the PBM or the

10   Medicare sponsor to CMS for submission into the IDR, which is

11   the data repository, our system of records for CMS.

12   Q.  Let's refresh on a couple of points.  I apologize, I should

13   have done this at the beginning.

14             Can you remind us what a PBM is?

15   A.  PBM is a pharmacy benefit manager.  That is the group that

16   contracts with pharmacies, manages a drug formulary, and pays

17   the drug claims.

18   Q.  I think you said that would get submitted to sponsors.  And

19   who are the sponsors in the Part D program?

20   A.  So the sponsors in the Part D program are the insurance

21   plans that CMS has the contract with.  So it may not be the

22   PBM.  It may be somebody like United or Humana, WellCare,

23   groups like that.

24   Q.  And then we talked about data ultimately being submitted to

25   CMS at the Center for Medicare and Medicaid Services.  We

1  talked yesterday about PDE records or PDE data.  What would --
2  what part would that play in the process?
3  A.  So a PDE record is a prescription drug event record, and it
4  is essentially a drug claim, but it is not a hundred percent of
5  the doctor-drug claim fields.  It is the required fields that
6  CMS requires to be sent to them.  So we call them PDE records
7  instead of drug claims because they're not a hundred percent of
8  the fields.
9  Q.  And what's the significance of these yellow columns in the
10  exhibit that we're looking at?
11  A.  So these yellow columns came directly from the prescription
12  drug event records, PDE records, and they were matched by the
13  Rx number to the dispensing data in Omnicare's data.
14  Q.  So the first column claim from date, does that match up to
15  the dates of the claims that we were just looking at in the
16  green Omnicare claims data?
17  A.  Yes.
18  Q.  And then the second column is the -- well, can you tell us
19  what the second column is?
20  A.  So the second column is the NPI identifier, which is a
21  numerical identifier for prescribers, providers that CMS uses.
22  And basically you can look up this number, and you see what
23  doctor it was, what their specialty is, where their address is,
24  you know, those kind of things.
25  Q.  It's a unique identifier for the doctor or nurse

1   practitioner who wrote this prescription?

2   A.   Correct.

3   Q.   And then the third line, what's the third column here?

4   A.   So the third line is the Rx number.  So this corresponds to

5   that column in the green data that was those two prescription

6   numbers that we were looking at.

7   Q.   And then the fourth column here?

8   A.   The fourth column is the fill number.  So this corresponds

9   to that same column in the green data of what fill they were

10  on, zero through 11, yeah.

11  Q.   What would be the source of this data that was ultimately

12  submitted to CMS for the federal government?

13  A.   This came from Omnicare's data, but it's, again, a synopsis

14  of that claim data.

15  Q.   So the plan sponsor or the PBM that's submitting this to

16  the federal government, are they taking any independent steps

17  to verify that this data corresponds to the underlying

18  prescription?

19  A.   They do not verify prescriptions for this data.  They do

20  verify -- go through normal claim processes to submit to CMS.

21  Q.   And looking at these fields -- sorry, do you work with PDE

22  data regularly in the course of your responsibilities at CMS?

23  A.   On a daily basis, yes.

24  Q.   And if you were in the course of your work for CMS, how

25  would you interpret this PDE data?

1    A.    So if I was looking at this PDE data, I would say this

2    patient got, you know, a continuing prescription from one

3    prescriber, a unique prescriber, and that they, you know, got

4    one year, a year of medication with refills.  And then they got

5    a second medication that was in November with a unique Rx

6    number, so there was, you know, a continuation with a new

7    original Rx.

8    Q.    And what specific data fields are you relying on to look

9    for that second new -- that would signal that there should be a

10   second new prescription for you?

11   A.    In the PDE records, we would look at the Rx number, so the

12   change in the Rx number, and then we would look at that zero in

13   the Rx fill number, so that shows an original fill.  And so

14   that would indicate that that was the start of a new

15   prescription when you see the zero.

16   Q.    In your work at CMS, if there was no second prescription,

17   would you view any of this data as -- this PDE data as

18   inaccurate?

19   A.    Yes.  Everything with the second prescription would be

20   inaccurate, and it would be unsupported, and we would request

21   that these PDE records be eliminated.

22   Q.    And does CMS receive this same type of information each

23   time Omnicare submits a claim for dispensing prescription drugs

24   to Medicare Part D beneficiaries?

25            MS. SALGADO:  Objection, your Honor.  I'm going to

1    make a continuing objection to the speculative testimony and

2    what Omnicare submits.  I don't believe this witness has seen

3    that.

4         THE COURT:  That's a speaking objection.  You'll

5    strike it from the record.  Ladies and gentlemen, pretend you

6    never heard that.  The objection is overruled.  And don't do

7    that again.

8         Next.

9         Do you want to read back the question then, please.

10        (Question read back)

11        THE COURT:  Answer the question.

12   A.  So we would get this type of data in the PDE records for

13   every paid claim.  We would not see unpaid claims or denied

14   claims.

15   Q.  Thank you.

16        Ms. Flores, we can pull this down.

17        Ms. Sullivan, other than -- we've been talking a lot

18   about Medicare Part D.  Other than Part D, what, if any, other

19   ways could a pharmacy like Omnicare submit a claim for

20   prescription drugs that ultimately went to Medicare?

21   A.  So some drugs are covered under the Medicare Part B or C

22   programs, the medical programs, and that's because the D

23   program came later, and so there's some things that were

24   already covered under medical.  So there are a few things that

25   are covered under those medical programs.

1    Q.  Can you remind us -- let's focus on Medicare Part B.  Can

2    you remind us what Medicare Part B is?

3    A.  Medicare Part B is what we call traditional Medicare, so

4    it's where you enroll directly through Medicare, and Medicare

5    pays the claim directly.  It covers things like physician

6    visits, labs, x-rays, but it also does cover some outpatient

7    devices and drugs.

8    Q.  Could that include prescription drugs?

9    A.  Yes, it does include some prescription drugs.

10   Q.  How would a pharmacy like Omnicare submit a claim for

11   payment to Medicare Part B for these types of prescription

12   drugs?

13   A.  They would have to enroll in Medicare, and then they would

14   have to complete an electronic data exchange form that allows

15   them to submit claims electronically and then to be paid

16   through electronic fund transfers.

17   Q.  I think you indicated this earlier, but would those claims

18   for payment go through PBMs and Part B sponsors like in

19   Medicare Part D?

20   A.  No.  In these Medicare would pay this claim directly, so

21   traditional Medicare, Medicare pays directly.  In the D

22   program, we go through the sponsors.

23   Q.  Ms. Flores, can we please pull up GX-1602.

24        Ms. Sullivan, I'm showing you Government Exhibit 1602.

25   If you look at the top row, what is this exhibit called?

 1   A.  Omnicare certifications and agreements relating to Medicare

 2   and Medicaid programs.

 3   Q.  What kind of exhibit is this?

 4   A.  This is a summary exhibit.

 5   Q.  What is a summary exhibit?

 6   A.  A summary exhibit gives a summary of a lot of different

 7   documents, so kind of a brief explanation of the lengthy

 8   documents.

 9   Q.  Did you create this summary exhibit yourself?

10   A.  I did not.

11   Q.  Did you decide what information it would contain?

12   A.  I did not.

13   Q.  Are you aware that there could be other documents in the

14   record related to this that are not contained in this summary

15   exhibit?

16   A.  I'm not aware of any other documents.

17   Q.  Did you verify that the information in this exhibit

18   reflects what is in the underlying documents referenced in it?

19   A.  I did.

20   Q.  And how did you do that?

21   A.  So I pulled up each of these individual source documents

22   and read through it and compared it to the information that was

23   in here in the columns and the detail and verified that that

24   was correct.

25   Q.  And in the course of doing that, did you identify anything

```
 1   inaccurate about this summary chart?
 2   A.  Yes.
 3   Q.  Ms. Flores, can we please pull up entries 9 and 15.
 4           Ms. Sullivan, did you identify anything in particular
 5   with respect to these two entries?
 6   A.  So in these two entries, the documents 918 and 926 that 9
 7   and 15 were based on were exactly the same document.  So these
 8   two were duplicative in that there was only one source
 9   document.
10   Q.  For the rest of the time we deal with this chart, let's go
11   ahead and pretend entry 15 doesn't exist and strike it from our
12   minds.  Is that okay?
13   A.  Yes.
14   Q.  I just want to go back briefly.  I was asking you about
15   your knowledge of potentially other related documents in the
16   record that aren't reflected in this chart.  Do you have any
17   knowledge one way or another whether there are or are not other
18   such documents?
19   A.  No, I don't have any knowledge of that.  I'm sorry if I was
20   unclear.
21   Q.  Thank you.
22           Ms. Flores, let's go back to the first page.  Let's
23   look at the second row here, the second header row just below
24   what you previously read.  What kinds of documents are -- what
25   is the first type of document that is summarized in this
```

1    exhibit?

2    A.   Medicare electronic data interchange enrollment forms

3    (Part B).

4    Q.   That sounds pretty exciting.  Can you tell us what is a

5    Medicare electronic data interchange enrollment form?

6    A.   That was one of the two forms that I talked about to enroll

7    in traditional Medicare.  It is --

8              THE COURT:  Start over again.

9    A.   Sorry.  This is one of the two forms that I was talking

10   about previously to enroll in traditional Medicare for Medicare

11   claims payment.  It's an agreement to send your claims

12   electronically for the purposes of payment.

13   Q.   And who would fill out this type of form?

14   A.   The provider who is going to submit the claims or their

15   authorized representative.

16   Q.   And who specifically filled out the forms, signs the forms

17   that are summarized in this chart?

18   A.   Omnicare pharmacies.

19   Q.   Ms. Flores, could you please kind of scroll through the

20   first four pages of this exhibit.

21             Ms. Sullivan, how many of these enrollment forms are

22   listed in this part of the summary chart?

23   A.   So it says 36, but as we discussed, there was a

24   duplication, so it really was 35.

25   Q.   Thank you.

 1            Ms. Flores, let's go back to page 1.

 2            I was asking you earlier about who specifically fills

 3   out these forms.

 4            Can we highlight the second column, please?

 5            What does this column indicate?

 6   A.  It is the specific entity that was in that form that is

 7   indicated in that row.

 8   Q.  I don't know what -- what is, say, Three Forks Apothecary

 9   LLC or NCS Healthcare of New Mexico?  What are these?

10   A.  Those are business names.  A lot of times you have a

11   business name for a pharmacy and then you have a doing business

12   as and you have another name they are known by.  So the

13   business name may not match what they call themselves by.

14   Q.  But are these all Omnicare pharmacies?

15   A.  They are.

16   Q.  Thank you.

17            And we can pull this down, Ms. Flores.  I don't think

18   we need to zoom in, but can you tell me what's in the next

19   column?

20   A.  It is the state that the Omnicare pharmacy was located in.

21   Q.  And then the year of certification column.  What's

22   reflected this that column?

23   A.  Sorry.  2014, all of these were assigned in 2014.

24   Q.  Ms. Flores, can we pull up the source column.

25            What is reflected in the source column?

1  A.  So these are all exhibits and the exhibit numbers that this

2  information is based on.

3  Q.  Thank you.

4          Ms. Flores, can we highlight the detail field.  Now

5  this one is not broken down by row, why is that?

6  A.  These were all the same form.  So they had the same

7  information in each form.

8  Q.  And Ms. Sullivan, can you read that first sentence?

9  A.  The provider agrees to the following provisions for

10  submitting Medicare claims electronically.

11  Q.  Who is the provider in this sentence?

12  A.  The provider would be the pharmacy in this instance.

13  Q.  That would be the Omnicare pharmacy that's signing it?

14  A.  Correct.

15  Q.  And can you read paragraphs 7, 8 and 12.  Let's start

16  with -- I'm sorry, can you please read paragraph 7?

17  A.  Number 7.  That it will submit claims that are accurate,

18  complete, and truthful.

19  Q.  And what's your understanding of what claims means in this

20  paragraph?

21  A.  It would be drug claims because it's a pharmacy that would

22  be submitting, and so it's, you know, that they would be

23  accurate, complete and truthful.

24  Q.  When you say drug claims, is that the same type of claims

25  data that we were looking at previously?

1    A.  Yes.

2    Q.  Can you please read paragraph 8?

3    A.  That it will retain all original source documentation and

4    medical records pertaining to any such particular Medicare

5    claim for a period of at least 6 years, 3 months after the bill

6    is paid.

7    Q.  Can you please read paragraph 12?

8    A.  That it will acknowledge that all claims will be paid from

9    federal funds, and that the submission of such claims is a

10   claim for payment under the Medicare program, and that anyone

11   who misrepresents or falsifies or causes to be misrepresented

12   or falsified any record or other information relating to that

13   claim that is required pursuant to this agreement may, upon

14   conviction, be subject to a fine and/or imprisonment under

15   applicable federal law.

16   Q.  Does that language appear in each of the enrollment forms

17   on this chart?

18   A.  It does.

19   Q.  If you look at the bottom paragraph, you don't need to read

20   it, but what are the Omnicare -- what, if anything, are the

21   Omnicare pharmacies committing to do by signing these forms?

22   A.  They are certifying that the person who signs the form has

23   the authority, the legal authority to enroll it and to agree to

24   these terms.

25   Q.  And specifically if you look at the third and fourth lines

1    of that paragraph, is there a commitment that's made?

2    A.  Yes, to commit the provider to abide by the laws,

3    regulations and the program instructions of Medicare.

4    Q.  Thank you.  Ms. Flores, let's turn to page 4 of the summary

5    chart and pull up entry 33.

6          Let's look at an example of one of these forms from

7    Omnicare of Tyler in Texas.

8          Ms. Sullivan, what Government Exhibit does the chart

9    say corresponds to this agreement?

10   A.  GX-0948.

11   Q.  Ms. Flores, can we please pull up GX-948.  And let's pull

12   up the paragraph A.

13         Ms. Sullivan, is that the same language that you read

14   us earlier at the top of -- just under -- yes, just that.

15   Thank you

16   A.  Yes.

17   Q.  And let's now pull up paragraphs 7 through 12.

18         And is the language in paragraph 7, 8 and 12 the same

19   as you read to us previously?

20   A.  It is.

21   Q.  Thank you.

22         Ms. Sullivan, let's go down to -- Ms. Flores, let's go

23   down to the second page and pull up paragraph C.

24         Is this the same -- is the language under C signature

25   the same certification language we were looking at previously?

 1   A.  It is.

 2   Q.  And who specifically signed this enrollment form?

 3   A.  Omnicare pharmacy of Texas 2.

 4   Q.  Thank you.

 5        Ms. Flores, let's go back to the summary exhibit and

 6   turn to page 5.

 7        Ms. Sullivan, what's in the second row header on this

 8   page?

 9   A.  Medicare provider enrollment agreements.

10   Q.  And what are Medicare provider enrollment agreements?

11   A.  So this is the second form that I was talking about to

12   enroll in Medicare.  So this is the actual enrollment form.

13   The other one was the data exchange form.  This is the

14   enrollment form where they sign up to bill traditional

15   Medicare.

16   Q.  Thank you.

17        Let's look at the second column on this page.  Is this

18   the specific -- what's reflected in this column?

19   A.  So that is the Omnicare pharmacy that the form was specific

20   to.

21   Q.  Thank you.

22        And, Ms. Flores, can we highlight the detail fields

23   here.

24        Ms. Sullivan, can you please read paragraph 3?

25   A.  I agree to abide by the Medicare laws, regulations and

1   program instructions that apply to this supplier.

2   Q.  Can I pause you right there.  Who is the supplier?

3   A.  It would be the Omnicare pharmacy.

4   Q.  Thank you.  Can you keep reading?

5   A.  The Medicare laws, regulations and program instructions are

6   available through the Medicare contractor.  I understand that

7   payment of a claim by Medicare is conditioned upon the claim

8   and the underlying transaction complying with such laws,

9   regulations, and program instructions (including, but not

10  limited to, the federal antikickback statute and the Stark

11  law), and on the supplier's compliance with all applicable

12  conditions of participation in Medicare.

13  Q.  Thank you.  Can you please read paragraph 6?

14  A.  I will not knowingly present or cause to be presented a

15  false or fraudulent claim for payment by Medicare, and I will

16  not submit claims with deliberate ignorance or reckless

17  disregard of their truth or falsity.

18  Q.  Did you confirm that each of the agreements, the enrollment

19  agreements reflected in this chart contain this language?

20  A.  I did.

21  Q.  And were each of those agreements signed by the Omnicare

22  pharmacy listed in that second column?

23  A.  They were.

24  Q.  Thank you.  Let's take a look at one of these agreements.

25          Ms. Flores, can you please pull up GX-919.

1           What's the title of this document?

2    A.   Medicare enrollment application.

3    Q.   And, Ms. Flores, can we please turn to page 5 and look at

4    the middle of that page.

5           Ms. Sullivan, what Omnicare pharmacy entered into this

6    specific agreement?

7    A.   So this is Omnicare of Haywood.

8    Q.   Thank you.

9           Ms. Flores, if you could turn us to the 12th page and

10   highlight paragraphs 3 through 6.

11          Ms. Sullivan, do you see some of the language you just

12   read to us in paragraph 3 and paragraph 6 on this page?

13   A.   I do.

14   Q.   Ms. Flores, let's turn back to our summary chart and go to

15   page 6.

16          Ms. Sullivan, what kind of agreements are in this

17   portion of the summary exhibit?

18   A.   Medicare Part D participating pharmacy agreements.

19   Q.   I have to ask, what are Medicare Part D participating

20   pharmacy agreements?

21   A.   So to enroll in Medicare Part D, you do have to enroll, but

22   it's not a single process because we have all of the Medicare

23   Part D plans.  So they have to enroll with a specific pharmacy

24   benefit manager and have a contract with them that is specific

25   to Medicare Part D.

1    Q.  Let's look at the first one, entry 42.  Who signed this

2    agreement?

3    A.  Omnicare, Inc., the national group.

4    Q.  Ms. Flores, let's pull up the detail field.

5            Ms. Sullivan, can you please read paragraph 2.4?

6    A.  Participating pharmacy will render pharmacy services to the

7    member only upon receipt of a valid prescription or order

8    (valid in accordance with the applicable law of the state in

9    which it is issued) from a licensed physician or other licensed

10   healthcare professional who is legally authorized to issue such

11   a prescription.

12   Q.  Thank you.

13           And the participating pharmacy here would be?

14   A.  Omnicare.

15   Q.  Can you please read the first sentence of paragraph 2.11?

16   A.  Participating pharmacy agrees to comply with applicable

17   Medicare laws, rules and regulations and Centers for Medicare

18   and Medicaid Services (CMS) instructions.  Notwithstanding

19   any --

20   Q.  That's it.  Sorry, just the first sentence.  Thank you.

21   Trying to keep this a little shorter.

22           Can you please summarize for us what paragraph 3.5

23   requires?

24   A.  They agree to submit accurate, complete and truthful

25   claims.

 1   Q.  And, again, when we say submit claims, is that the same

 2   type of claims data that we were previously looking at?

 3   A.  It is.

 4   Q.  Thank you.  Can you please read the first two sentences of

 5   paragraph 4.4?

 6   A.  Participating pharmacy and to the extent applicable,

 7   Omnicare, shall keep and maintain patient records in an

 8   accurate and timely manner.  Records pertaining to adult

 9   members shall be kept for at least ten years from the date of

10   service.

11   Q.  Thank you.  And did you confirm that the provisions we just

12   read, and I guess the other provisions in this detail field,

13   are in the agreement that is cited here?

14   A.  I did.

15   Q.  Did you look at the other agreements that are included in

16   this section of the summary chart?

17   A.  I did.

18   Q.  Do similar provisions to these appear in all of those

19   agreements?

20   A.  They do.

21   Q.  Finally, let's turn to page 9 of this summary chart.

22           What types of documents are in this section of the

23   chart?

24   A.  Medicaid enrollment agreements.

25   Q.  What are Medicaid enrollment agreements -- actually, I'm

1   sorry, let me ask first, what is Medicaid?

2   A.  So Medicaid is a federal healthcare program that is for

3   low-income patients, and it is administered by the state.

4   Q.  Thank you.  And so what are Medicaid enrollment agreements?

5   A.  So those are specific enrollment agreements to bill the

6   Medicaid program in that specific state for services.

7   Q.  And do the enrollment agreements in this section of the

8   chart differ state by state?

9   A.  They do because they're each -- each state has their own

10  unique format.

11  Q.  And can you characterize the extent to which they differ or

12  are similar?

13  A.  They're all fairly similar, it's just the wording may be a

14  little different or in the form -- just in a different place in

15  the form.

16  Q.  And who signed the Medicaid enrollment agreements that are

17  summarized in this portion of the chart?

18  A.  Omnicare of Atlanta.

19  Q.  For this specific entry, yes.  What about all of the

20  entries in this portion of the chart?

21  A.  Yes, Omnicare pharmacies.

22  Q.  Thank you.

23          We're starting on entry 45 here.  Ms. Flores, can we

24  scroll through to the end.  That runs entries 45 through 54.

25          How many Medicaid enrollment agreements are summarized

1   in this portion of the chart?

2   A.   So that would be nine.

3   Q.   I think it might be ten.

4   A.   Yes, might be ten.  Too early for math.

5   Q.   Ms. Flores, can we go to page 14 and let's look at one

6   particular example, so entry 50.

7           This is an agreement signed by between Omnicare of

8   Henderson and the Kentucky Medicaid program, is that right?

9   A.   Yes.

10  Q.   And can we pull up the detail fields.

11          Again, who is the provider here?

12  A.   Omnicare pharmacy.

13  Q.   And can you just summarize for us what paragraph 1 requires

14  of this Omnicare pharmacy?

15  A.   They agree to maintain the records for a minimum of five

16  years or -- or as required by state or federal laws.

17  Q.   What kinds of records would that be?

18  A.   So it would be the records supporting the claim.  So in a

19  pharmacy it would be the prescriptions.

20  Q.   Can you summarize for us what paragraph 7 requires?

21  A.   Seven is the agreement to assume responsibility for

22  accurate, timely submission of claims and payment -- and

23  agreeing that the payment of those is from federal and state

24  funds, and that false claims, statements or documents may

25  prosecuted.

1    Q.  Thank you.  When they talk about submission of claims, is

2    that the same type of claims data that we were looking at

3    previously?

4    A.  It is.

5    Q.  Did you verify that this language is in the underlying

6    agreement?

7    A.  Yes.

8    Q.  Did you do that for the other Medicaid enrollment

9    agreements as well?

10    A.  I did.

11    Q.  Is the language we just looked at broadly similar to

12    language that appears in the other Medicaid enrollment

13    agreements captured on this chart?

14    A.  It is.

15              MR. ISSACHAROFF:  Just one moment, your Honor.

16              No further questions at this time.

17    CROSS-EXAMINATION

18    BY MS. SALGADO:

19              THE COURT:  Okay.  Good morning.

20    Q.  Good morning.  My colleague is going to hand up some items

21    to the witness.

22              THE COURT:  You need to use the microphone, and you

23    need to speak up and introduce yourself for the court reporter.

24    Q.  Good morning.  My name is Suzzane Salgado.

25              Good morning, Ms. Sullivan.

 1    A.  Good morning.

 2    Q.  My colleague has handed you documents we may review.  I'll

 3    direct you to them if we get to that point.

 4            Ms. Sullivan, you discussed the Medicare Part D claims

 5    submission process, correct?

 6    A.  I did.

 7    Q.  And certifications in certain contracts related to this

 8    process, right?

 9    A.  Yes.

10    Q.  I'd like to talk a little bit more about those contractual

11    relationships between the entities in Part D.

12            Matt, if you could put up the demonstrative, please.

13            Do you generally understand what this demonstrative

14    represents, Ms. Sullivan?

15    A.  I do.

16    Q.  On the pharmacy left, we have CMS, right?

17    A.  Yes.

18    Q.  And they run Medicare Part D?

19    A.  Yes.

20    Q.  And CMS contracts directly with the Part D plans we've been

21    talking about, correct?

22    A.  Yes, our term is sponsor, but yes.

23    Q.  Got it.  Thank you.

24            And these sponsors of Part D plans are insurance

25    companies, right?

1    A.   Correct.

2    Q.   Like United HealthCare or Aetna or Cigna, correct?

3    A.   Correct.

4    Q.   And those Part D plans separately contract with pharmacy

5    benefit managers or PBMs, correct?

6    A.   Correct.

7    Q.   And PBMs would be entities like Caremark or Express

8    Scripts, right?

9    A.   Yes.

10   Q.   And then the PBMs are the ones who contract directly with

11   pharmacies like Omnicare, correct?

12   A.   Correct.

13   Q.   So CMS would be several steps up the chain in these

14   contractual relationships from Omnicare, correct?

15   A.   Correct.

16   Q.   And there's no contract directly between CMS and Omnicare

17   and for this Medicare Part D process?

18   A.   Correct.

19   Q.   So more about the claims process, you testified about how

20   electronic notifications are sent to CMS about each specific

21   drug dispense, right?  I'm referring to the data, the PDE data

22   you talked about.

23   A.   Okay.  I wasn't sure what you meant by notifications.  We

24   do receive the PDE records for the final paid claims.

25   Q.   Right.  And, again, that's for prescription drug events,

1  right that's what PDE stands for?

2  A.  It is what it stands for.

3  Q.  And pharmacies like Omnicare don't generate that PDE data

4  that is submitted to CMS, right?

5  A.  They generate the drug claim that the PDE record is based

6  on.

7  Q.  So pharmacies generate pharmacy claims that are sent to

8  PBMs, right?

9  A.  Correct.

10  Q.  And that data is from the point of sale in that moment in

11  time?

12  A.  Yes.

13  Q.  And then the PBMs generate and submit PDE data to the

14  government, right?

15  A.  Correct.

16  Q.  And those are two different sets of data, right?

17  A.  Yes, but it is based on the drug claim.  It is a synopsis

18  of the drug claim.

19  Q.  There's some overlap, but they're two separate sets of

20  data, is that fair?

21  A.  It's the same data.  It's just a synopsis of it.  It's the

22  official record of the claim.

23  Q.  Okay.  And one is the pharmacy claim data that Omnicare

24  sends to the sponsors, right?

25  A.  Yes.

1    Q.  And the other is the PDE data that the Part D sponsor

2    submits to CMS?

3    A.  Yes.

4    Q.  Let's pull up the demonstrative in which this issue was

5    discussed.  I think it's the government's 1706, if you could

6    pull that up, Matt, please.

7           You explained that this chart contains information

8    from both of those sources, right?

9    A.  Yes, the data that was matched from the sets.

10   Q.  And as you explained, the columns in green came from that

11   pharmacy claims data, right?

12   A.  Yes.

13   Q.  And that's the kind of information that Omnicare would

14   submit to Part D, the Part D sponsors, excuse me.

15   A.  To the PBMs, yes.

16   Q.  And then the yellow columns came from the PDE data from the

17   Part D sponsors to CMS, right?

18   A.  Yes.

19   Q.  And I think you mentioned that the PDE data that CMS gets

20   contains certain standard data fields, right?

21   A.  Yes.

22   Q.  Are you aware there are 37 such fields?

23   A.  Roughly.  I don't know the number right offhand.

24   Q.  Something around there?

25   A.  Something around there, yes.

1    Q.  And CMS determines what field it requires Part D plan

2    sponsors to submit, right?

3    A.  Correct.

4    Q.  And those elements are publicly available?

5    A.  Yes.

6    Q.  And they're posted online even by CMS?

7    A.  The templates, yes.

8    Q.  And you included some of those fields here in yellow,

9    right, not all of them?

10   A.  I didn't create the chart.  This was just -- but yes.

11   Q.  Okay.  We'll get there.  Thank you.

12          And then you have -- okay, so we talked about there's

13   some overlap between these data sets.

14          Let's focus on the green columns.  As you explained,

15   this information would have come from the claims data from

16   Omnicare, right?

17   A.  Right.

18   Q.  And it includes fields like I think it's patient DOB is

19   that patient date of birth?

20   A.  That is.

21   Q.  Are you aware that that information is also included in the

22   PDE data that CMS requires --

23   A.  Yes.

24   Q.  -- for Part D sponsors?  Thank you.

25          Another one of the green fields is quantity dispensed,

1    right?

2    A.   Yes.

3    Q.   Because it's in green, we're talking about the data that

4    Omnicare submits here, correct?

5    A.   Yes.

6    Q.   But it also could be in the yellow field because it's also

7    a field that CMS requires from Part D sponsors, right?

8    A.   Correct.

9    Q.   Now, another one of the green fields is a fill number,

10    correct?

11    A.   Yes.

12    Q.   Meaning, the number of times the prescription was filled,

13    right?

14    A.   The fill number.

15    Q.   Excuse me, which fill it is.

16    A.   It is which fill it is.

17    Q.   Thank you.

18         And, again, this information comes -- is a field in

19    the data Omnicare submitted, but it's also a field that Part D

20    sponsors submit to CMS, right?

21    A.   Correct.

22    Q.   There's another field refill authorization.  Do you see

23    that?

24    A.   Yes.

25    Q.   What does that mean?

1  A.  It's refills authorized, and it is the amount of refills

2  that were on the original prescription.

3  Q.  And this information is required to be sent in what

4  Omnicare sends to Part D sponsors, right?

5  A.  Yes.

6  Q.  But the PDE data that CMS requires Part D sponsors to send,

7  it does not have a field for refill limit, right?

8  A.  We don't have the refills authorized field in the PDE

9  records.

10  Q.  CMS does not require refills authorized to be in the data

11  that it gets from the Part D sponsors, correct?

12  A.  Correct.

13  Q.  And no refill limit field, correct?

14  A.  No.

15  Q.  And it doesn't ask for a quantity limit either, correct?

16  A.  A quantity limit, I'm not sure what you mean.

17  Q.  We'll stick with refill limit.  There's no refill limit or

18  refill authorization field that CMS requires, correct?

19  A.  The only things we have is the fill number.

20  Q.  Even though it's data that Omnicare submits to the Part D

21  sponsors, correct?

22  A.  Correct.

23  Q.  And coming back to this demonstrative, I believe you said

24  you didn't create this document, is that right?

25  A.  No.

```
 1   Q.  Who did?

 2   A.  A data analyst.

 3   Q.  Do you know who?

 4   A.  Yes.

 5   Q.  Who?

 6   A.  Hugo Hua.  I'm not sure if I said his name correctly.

 7   Q.  Who is that?

 8   A.  He's a data analyst working with the prosecution.

 9   Q.  Did he create it for you?

10   A.  He created it for the prosecution, but I was involved in

11   the discussion and creation of the chart.

12   Q.  What was your involvement in the creation?

13   A.  They wanted me aware of the process that it was created so

14   I could testify to it.

15   Q.  And this was before it was created, you were involved in

16   it?

17   A.  Yes.

18   Q.  Did you review the underlying data?

19   A.  I did.

20   Q.  Did you review all of the underlying data in this

21   particular demonstrative?

22   A.  I did see the underlying data for the patient involved in

23   this for all -- for this case.

24   Q.  For all of the --

25   A.  For this, for this demonstrative.
```

1   Q.  So just to clarify, what information did you review?

2   A.  So I saw the data pulled from the dispensing data for this

3   and then the PDE records.

4   Q.  When you say "this," you're referring to this document,

5   1706?

6   A.  Yes.

7   Q.  Did you review dispensing data beyond that that underlies

8   1706?

9   A.  I did not.

10  Q.  Did you review other types of data or the underlying

11  prescriptions beyond those for 1706?

12  A.  I did not.

13  Q.  To clarify, did you review the underlying prescriptions for

14  1706?

15  A.  I did not.

16  Q.  Are you aware that this spreadsheet was used in a modified

17  form by some of plaintiff's experts?

18  A.  I'm not.

19  Q.  You have testified as an expert for the government in

20  different cases than this one, right?

21  A.  Yes.

22  Q.  But you are not testifying here as an expert, correct?

23  A.  I don't really know how I'm submitted in different cases.

24  Q.  So you don't know if you're providing expert opinions in

25  this case or not?

```
 1              MR. ISSACHAROFF:  Objection, your Honor.

 2              THE COURT:  The objection is sustained.  I'll tell you

 3    when somebody has been qualified as an expert.

 4              Move on, please.  And I'll tell you what that means.

 5    Q.  You work as a contractor -- excuse me, you worked at a

 6    contractor, not at CMS itself, correct?

 7    A.  Correct.

 8    Q.  And you are not testifying as an expert in this case,

 9    correct?

10              THE COURT:  The objection is sustained.

11    Q.  You have not worked at Omnicare, have you?

12    A.  No.

13    Q.  And you are not providing opinions on prescription claims

14    that Omnicare actually submitted here, correct?

15    A.  No.

16    Q.  No, you are not?

17    A.  No, I am not providing that.

18    Q.  You are not providing any opinions on the dispensings at

19    issue in this case, are you?

20    A.  I am not.

21    Q.  And you are not providing opinions on the validity of the

22    actual prescriptions related to the dispensing at issue in this

23    case, correct?

24    A.  I am not, yes.

25    Q.  Yesterday the government showed you some language from the
```

1   Code of Federal Regulations.  Do you remember that?

2   A.  Yes.

3   Q.  Generally.

4   A.  Generally, yeah.

5   Q.  And do you recall generally that you looked at language

6   that said a Part D sponsor may only provide benefits if the

7   drugs are dispensed with a valid prescription?

8   A.  Yes.

9   Q.  The regulations make clear, don't they, that what

10  constitutes a valid prescription depends on state law, correct?

11  A.  Correct.

12  Q.  And that can vary state to state?

13  A.  Yes.

14  Q.  And the specific regulations you were discussing yesterday

15  have not always been on the books, right?

16  A.  I'm not sure what you mean.

17  Q.  Those regulations were not effective until April 12 of

18  2012, correct?

19  A.  I don't know the date that that started.

20  Q.  In your testimony yesterday, you were asked how CMS

21  enforced requirements, and referred to the trust-based system

22  that you referred to today as well, right?

23  A.  Yes.

24  Q.  And you understand that conducting audits is one way that

25  CMS enforces those requirements, correct?

 1    A.  Correct.

 2    Q.  And, in addition, PBMs also have the ability to conduct

 3    audits regarding Part D claims, correct?

 4    A.  Correct.

 5    Q.  And you're aware that CMS conducts many types of audits

 6    regarding Part D claims, right?

 7    A.  Correct.

 8    Q.  Are you aware that one of those CMS audits is called a

 9    Part D improper payment measure or @pep D audit?

10    A.  I'm aware of the name, but I haven't worked on that

11    personally.

12    Q.  So you have not been involved in @pep D audits, correct?

13    A.  No.

14    Q.  CMS uses other contractors to do those kinds of audits,

15    right?

16    A.  I'm sure there's a contractor involved, but I don't know

17    which one.

18    Q.  And so you have never conducted a @pep D audit related to

19    dispenses from Omnicare, correct?

20    A.  Correct.

21    Q.  Or any other long-term care pharmacy, right?

22    A.  I've never worked on a @pep D audit, so...

23    Q.  Do you understand that @pep D audits are designed to

24    identify improper payments in the Medicare Part D program?

25             MR. ISSACHAROFF:  Objection, your Honor.  Beyond the

 1   scope.
 2           THE COURT:  The objection is sustained.
 3   Q.  In addition to audits, you understand that CMS can bring
 4   administrative enforcement action against Part D sponsors,
 5   right?
 6   A.  Correct.
 7           MR. ISSACHAROFF:  Objection, your Honor.  Beyond the
 8   scope.
 9           THE COURT:  Overruled.
10   Q.  CMS has the authority to impose various kinds of sanctions
11   against Part D sponsors, correct?
12   A.  Correct.
13   Q.  Are you aware that those enforcement actions are often
14   posted publicly online?
15   A.  Yes.
16   Q.  You could turn to your binder, tab 1 towards the back?
17   A.  Which tab?
18   Q.  It should be towards the back.  I believe it's a
19   handwritten tab, tab 1, please.
20           MR. ISSACHAROFF:  Objection, your Honor.  This isn't
21   in evidence or impeachment.  This is just a new exhibit.
22           THE COURT:  I don't know what it is.  I don't know if
23   there's going to be an effort made to introduce it into
24   evidence, which is perfectly appropriate.  I don't know what's
25   about to happen.

```
 1              MR. ISSACHAROFF:  Thank you, your Honor.

 2              THE COURT:  I really can't read their mind.

 3              What's the number of this one again?

 4              MS. SALGADO:  It's tab 1 towards the back of the

 5  binder, your Honor.

 6              THE COURT:  I found it.

 7  Q.  And you said you're aware that CMS can take enforcement

 8  actions against downstream entities like pharmacies as well,

 9  right?

10  A.  Yes.

11  Q.  Are you familiar with this example of an enforcement action

12  against a pharmacy?

13  A.  I'm reading it.  Give me a minute.

14              MR. ISSACHAROFF:  Objection.  Beyond the scope.

15              THE COURT:  The objection is sustained.  Move on,

16  please.

17  Q.  Are you putting aside -- putting aside this document, are

18  you familiar with actions where HHS, Health and Human Services,

19  in which the CMS sits, has taken action against pharmacies for

20  fraudulent Medicare claims based on drugs that were billed but

21  not actually dispensed?

22              MR. ISSACHAROFF:  Objection, still --

23              THE COURT:  Overruled.

24  Q.  You can answer.

25  A.  So in the example you were showing me, it's Office of
```

 1   Inspector --

 2              THE COURT:  We're not talking about the example.

 3              THE WITNESS:  Okay.

 4              THE COURT:  In your experience, are you aware of HHS's

 5   undertaking and enforcement action against someone for

 6   dispensing drugs without a proper prescription?

 7              THE WITNESS:  I --

 8              THE COURT:  Do you know if that has ever happened?

 9              THE WITNESS:  I'm trying to find out more

10   specifically.

11              THE COURT:  That's the question is:  Do you know if

12   that has ever happened?  That's the question.

13              THE WITNESS:  So do you mean CMS or do you -- and are

14   you talking about --

15              THE COURT:  Anything in the Department of Health and

16   Human Services.

17              THE WITNESS:  Okay.

18   A.  Anything in that department, yes.

19   Q.  What are you aware of?

20   A.  So the Office of Inspector General is under the HHS as

21   well, and they are the enforcement group that investigates

22   these claims.

23   Q.  Right.  And are you aware of enforcement actions -- excuse

24   me -- are you aware that several of these enforcement actions

25   are brought against pharmacies because they billed for

1    medications that were never actually dispensed?

2    A.  Yes, that is a type of enforcement action that can occur.

3    Q.  Are you aware that that's a large portion of the type of

4    action?

5             MR. ISSACHAROFF:  Objection.

6             THE COURT:  The objection is sustained.

7             Ladies and gentlemen, I already told you this case

8    does not involve any allegations that a claim is being made for

9    medication that was not dispensed.

10            So let's move off this topic and on to something

11   that's relevant, which this is not.

12            MS. SALGADO:  Understood, your Honor.

13   BY MS. SALGADO:

14   Q.  Ms. Sullivan, let's turn to the summary exhibit that you've

15   been discussing with the government.  I'm referring to exhibit

16   1602.  Do you have that still?  We'll bring it up on the screen

17   here.  It's this one we were talking about at the end of your

18   testimony?

19   A.  Yes.

20   Q.  And as you stated, it contains excerpts from various

21   Omnicare certifications and agreements relating to Medicare and

22   Medicaid programs, right?

23   A.  Right.

24   Q.  And as you stated, you're not the one who compiled the

25   certifications referenced in here, correct?

1    A.  Correct.

2    Q.  The lawyers for the government put together this exhibit,

3    right?

4    A.  I'm not sure who exactly on the legal team put it together,

5    but ...

6            THE COURT:  Keep your voice up, please.  Thank you.

7    Q.  Please, I didn't mean to interrupt.

8    A.  I'm not aware of who specifically on the legal team created

9    it.

10   Q.  Understood.  But you understood that the legal team decided

11   which ones to include, right?

12   A.  Again, I was not involved in creation of it, so I can't

13   say.

14   Q.  And you were not involved in the decisions of what to

15   excerpt, right?

16   A.  I said that previously, yes.

17   Q.  And you were not involved in the decision of which ones to

18   exclude, right?

19   A.  I am not aware of any of that, so ...

20   Q.  Let's look closely at a few of these entries, please.  So

21   starting with these first four pages, as you explained, these

22   agreements relate to Medicare Part B, right?

23   A.  Correct.

24   Q.  And in general I think you explained Medicare Part B covers

25   medical care, while Medicare Part D covers prescription drugs,

1    right?

2    A.  Generally, but some drugs are covered under the Medicare

3    Part B program, and some devices that are typically run by

4    pharmacies such as glucose strips are covered under the B

5    program as well.

6    Q.  Right.  The only kinds of drugs covered by Medicare Part B

7    are a narrow category like you just described where they're

8    administered in a physician's office or used with durable

9    medical equipment, right?

10   A.  There are some drugs that are covered under Medicare

11   Part B.

12   Q.  Are they the ones that I just described?

13   A.  There are some additional.

14   Q.  Which ones?

15   A.  Do you want me to give --

16   Q.  Okay, we'll move on.

17   A.  -- the whole list?  Yeah.

18   Q.  Well, how about this, are typically drugs like blood

19   pressure medications or cholesterol medications are not covered

20   by Medicare Part D?

21   A.  Are not or are?

22   Q.  Medicare Part B.

23         THE COURT:  You said D.

24   Q.  I apologize.  Keeping everyone on their toes.  B, D, you

25   know.  You made an it clear D is for drugs.

1          Let me restate the question.  Drugs like blood

2    pressure medications or cholesterol medications are typically

3    not covered by Medicare Part B?

4    A.  Correct.

5    Q.  Thank you.  And you explained that these Medicare Part B

6    entries have 36 entries in total, but you noted that one

7    duplicated, so 35 overall, right?

8    A.  Correct.

9    Q.  And this whole exhibit has 54 entries or, excuse me, yes,

10   54, but taking out that duplicate, that would be 53, right?

11   A.  Yes.

12   Q.  So these Medicare Part B agreements make up 35 of the 53

13   agreements in this entire Exhibit, right?

14   A.  Yes.

15   Q.  And looking at a couple particular entries, looking at rows

16   10 and 11 here, these relate to or, excuse me, both Omnicare

17   Pharmacy of the Midwest, LLC is a certified Omnicare entity or

18   pharmacy, do you see that?

19   A.  Yes.

20   Q.  So these are different agreements but for the same

21   pharmacy, right?

22   A.  Yes, they were different documents.

23   Q.  Right.  So, again, now we're sort of down one pharmacy.  So

24   34 pharmacies included in these 36 entries, right?

25   A.  Yes, they were for the same pharmacy.  They were just

1    different documents.

2    Q.  And it looks like some of the other entries have different

3    pharmacies but in the same state, right?

4    A.  I didn't really compare it from that.  I just compared the

5    accuracy of the document to the information listed.

6    Q.  Are you aware that the exhibit only had excerpts of

7    certifications from pharmacies in 24 states total?

8    A.  I didn't count the states.

9    Q.  And as to the years, I believe you said that each of the

10   certifications is from 2014, right?

11   A.  Through the 54 entries there were different dates, but the

12   ones on this screen were 2014.

13   Q.  If you could just look through those first four pages, can

14   you just confirm it's 2014 for each of the Part B agreements in

15   the --

16          THE COURT:  The agreement -- the document says what it

17   says.

18          MS. SALGADO:  Okay.

19          THE COURT:  I'm not going to have her sit here and

20   count dates.  Move on.

21   Q.  Let's turn to page 5, please.  These are the Medicare

22   provider enrollment agreements are you with me?

23   A.  Yes.

24   Q.  And this is the only page of the agreement, excuse me, of

25   the exhibit that includes excerpts from these types of

1    agreements, right?

2    A.  I believe so.  I would have to go back and look.  There

3    were 17 pages on this.

4    Q.  You have the document I believe in your binder if you need

5    to reference it, but we don't need to look at it for this

6    question:  On here, certification, you see it says 2010, 2015

7    and 2016 are the only dates listed here?

8    A.  2010, 2015 and 2016.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Those are the only dates.

2          THE COURT:  As I said, the document speaks for itself.

3   You don't need a witness on the stand to do this.  You can

4   argue at the end of the case that the document doesn't show

5   enough because it only represents a few years.  Please move on

6   and ask the lady some questions that only she can answer.

7   Q.  Let's look at row 38, please.  You discussed this entry

8   with the government.

9          Do you recall?

10  A.  Yes.

11  Q.  And you recalled looking at the Medicare enrollment

12  application that underlies this entry?

13  A.  Yes.

14  Q.  Let's turn to that at GX-919.  We will pull it up on the

15  screen and it's in your binder, if you would like to refer to

16  it.

17         If you turn to the page ending 389, I believe you did

18  not review this page with the government, correct?

19  A.  Sorry.  I'm trying to get the pages.  This is the page that

20  they showed me previously.

21  Q.  I think it was showed and I think you talked about the next

22  page.  I just want to clarify what's shown here.  The first

23  header under type of supplier has instructions to check the

24  appropriate box to identify the type of supplier you are

25  enrolling as with Medicare.

1              Do you see that?

2   A.   Yes.

3   Q.   And it says that if you're more than one type of supplier

4   you have to submit a separate application for each type, right?

5   A.   Yes.

6   Q.   And you see that the box for pharmacy is checked here,

7   correct?

8   A.   Correct.

9   Q.   So this document relates to the pharmacy's enrollment with

10  Medicare as a pharmacy?

11  A.   Yes.

12  Q.   Let's look at the next entry in the summary exhibit, row

13  39.  That's for a different pharmacy.  Roeschen's Healthcare

14  LLC d/b/a Omnicare in Milwaukee.

15             Do you see that?

16  A.   Yes.

17  Q.   We will look that underlying source for that entry, which

18  is GX-931, or tab 6 in your binder.  If we can turn to the page

19  ending 382.

20             Do you see that same header there?

21  A.   Sorry.  I am trying.

22  Q.   It's up on the screen in front of you as well.

23  A.   OK.  Yes.

24  Q.   Do you see like the last contract under type of supplier,

25  it has those same instructions, to check the appropriate box to

1    identify the type of supplier you are enrolling as with

2    Medicare?

3    A.   Yes.

4    Q.   Again, if there were more than one type of supplier, you

5    have to submit a separate application for each type?

6    A.   Yes.

7    Q.   Do you see that below that, the check box here is for mass

8    immunization roster biller only, right?

9    A.   Correct.

10   Q.   The pharmacy box is not checked?

11   A.   Yes.

12   Q.   So this specific exhibit is not related to the pharmacy's

13   enrollment with Medicare as a pharmacy, correct?

14   A.   It would be for immunizations issued.

15   Q.   And are you aware that there is not another application for

16   this pharmacy with the pharmacy box checked in this exhibit?

17   A.   I didn't review things from that perspective.  I just

18   verified the information was correct that was in the chart.

19   Q.   And are you aware that several other agreements also only

20   have this mass immunizations box checked and not the pharmacy

21   box checked?

22   A.   I did see that there were some that had.  I didn't count

23   how many.

24   Q.   Let's turn to the next section, starting on page 6 of the

25   summary exhibit.  If we could just quickly tab through these

1   three pages.  These are rows 42, 43, and 44 are what cover this

2   section.  The first row, 44 -- excuse me.  42 shows a

3   certification from 2015, right?

4   A.  Yes.

5   Q.  This exhibit does not contain certifications before 2011 or

6   after 2015, is that right?

7   A.  Again, that wasn't really the perspective I was looking at

8   it from.  Each line says what year it was, and I did confirm

9   that was correct.

10  Q.  We will turn to the last section.  On page 9, regarding

11  Medicaid enrollment agreements, you said that each state has

12  its own Medicaid enrollment agreement with a particular

13  pharmacy, correct?

14  A.  Yes.

15  Q.  And these are year-long agreements, is that right?

16  A.  Yes.  They would usually be reviewed, renewed annually.

17  Q.  But each contract is good for one year?

18  A.  Typically, yes.

19  Q.  As you stated earlier, this section has 10 such agreements,

20  right?

21  A.  Yes.

22  Q.  And so this contains ten Medicaid enrollment agreements for

23  10 particular years for 10 particular states, right?

24  A.  Yes.

25          MS. SALGADO:  Give me one moment.  No further

```
 1    questions.  Thank you.

 2              THE COURT:  Thank you.

 3              MR. ISSACHAROFF:  Very brief redirect, your Honor.

 4              Ms. Flores, can we pull up 1602, please.

 5    REDIRECT EXAMINATION

 6    BY MR. ISSACHAROFF:

 7    Q.  Ms. Sullivan, you were asked about the Medicare electronic

 8    data interchange enrollment form.  I don't have it up in front

 9    of me.  I'm sure I'm mangling the term.

10              No.  I was right.  The Medicare electronic data

11    interchange enrollment forms for part B are in this portion

12    of the chart, is that right?

13    A.  Yes.

14    Q.  Would every pharmacy that bills Medicare directly under

15    part B sign this?

16    A.  Yes.

17    Q.  Would they sign it each year?

18    A.  Yes.

19    Q.  And are these agreements standardized so that each one

20    signed in a particular year would be -- would contain the same

21    language?

22    A.  Yes.  They might modify them from year to year, but the

23    ones within a year would be the same.

24    Q.  And are you familiar with Omnicare?

25    A.  Yes.
```

1    Q.  Are you familiar that it's a nationwide pharmacy?

2              THE COURT:  Can you not lead, please.  Thank you.

3              MR. ISSACHAROFF:  Sorry.

4    Q.  What is the geographic scope of Omnicare's practice, in

5    your understanding?

6    A.  It's a national long-term-care pharmacy.

7    Q.  Do you have any understanding of approximately how many

8    pharmacies it operates nationwide?

9    A.  I don't know.  It's very large.

10   Q.  So each of these Omnicare pharmacies -- is it your

11   understanding that --

12             THE COURT:  No, not:  Is it your understanding that.

13             MR. ISSACHAROFF:  Thank you, your Honor.

14   Q.  It's very large nationwide, you said.  And I believe you

15   testified all pharmacies that participate in Medicare part B to

16   bill the government directly would sign versions of these

17   forms?

18             MS. SALGADO:  Objection, your Honor.

19             THE COURT:  Overruled.

20             Is that what you testified ma'am, yes or no?

21             THE WITNESS:  The pharmacies, but in some cases it

22   might be the corporate office, depending on what kind of

23   contract it is and what agency.

24   Q.  Given the scope of Omnicare's operations and geographic

25   scope, very rough ballpark, how many of these agreements would

1   you expect Omnicare to have signed from 2010 to 2018

2   nationwide?

3           MS. SALGADO:  Objection.  Foundation.

4           THE COURT:  Objection sustained.  The objection is

5   absolutely sustained.

6           MR. ISSACHAROFF:  Thank you, your Honor.

7   Q.  And then we were looking at the Medicaid enrollment forms

8   that began on page 9 of the chart.

9           Does every pharmacy that bills Medicaid directly sign

10  an enrollment agreement similar to these?

11  A.  Yes.

12          MR. ISSACHAROFF:  No further questions.

13          MS. SALGADO:  No further questions, your Honor.

14          THE COURT:  Thank you, Ms. Sullivan.  You may leave.

15          THE WITNESS:  Thank you.

16          (Witness excused)

17          THE COURT:  Next witness.

18          MR. ISSACHAROFF:  Arianne Spaccorelli, your Honor.

19  ARIANNE SPACCARELLI,

20      called as a witness by the Government,

21      having been duly sworn, testified as follows:

22          THE COURT:  Thank you very much, ma'am.

23          You may inquire.

24  DIRECT EXAMINATION

25  BY MR. ISSACHAROFF:

1   Q.  Good morning, Ms. Spaccorelli.  Where are you currently

2   employed?

3   A.  The Center for Medicare and Medicaid Services.

4   Q.  How long have you worked with CMS?

5   A.  I have worked there for 14 years.

6          THE COURT:  Keep your voice up.  She is doing great.

7   Keep your voice up.

8          MR. ISSACHAROFF:  Thank you.

9   Q.  Can you tell me a little bit about your educational

10  background.

11  A.  After college, I went to the University of Maryland College

12  of Law, where I received my juris doctor and a certificate in

13  healthcare law and policy.

14  Q.  Where did you work following your law degree?

15  A.  I worked at the University of Maryland Center for Health

16  and Homeland Security.

17  Q.  For approximately how long?

18  A.  About two years.

19  Q.  And after that, where did you work?

20  A.  I worked for the Department of Health and Human Services

21  Office of Inspector General.

22  Q.  Approximately when did you work there?

23  A.  I worked there from about fall of 2009 until December 2010.

24  Q.  What was your role at the Office of the Inspector General?

25  A.  I was an analyst in the Office of Evaluation and

```
 1  Investigations.
 2  Q.  Did you have any particular focus in that role?
 3  A.  I worked on fraud, waste, and abuse cases, looking at the
 4  efficacy of programs under Department of Health and Human
 5  Services.  Mostly Medicare and Medicaid programs in CMS.
 6  Q.  Where did you work after you left the Office of the
 7  Inspector General?
 8  A.  I went to work for CMS at the Medicare Drug Benefit Group,
 9  Division of Benefit Purchasing and Monitoring.
10  Q.  In what role did you join CMS?
11  A.  I came on as a health insurance specialist.  I was -- I
12  worked the contract lead for part D.
13  Q.  What did you do as a contract lead for part D?
14  A.  Well, I was in charge of both writing the contracts
15  coordinating the contract-execution process between CMS and
16  part D sponsors, and I was in charge of the team reviewing the
17  contracting section of Medicare part D sponsor applications.
18  Q.  Can you tell us what are Medicare part D sponsors?
19  A.  Part D sponsors are insurance companies that contract with
20  CMS to provide the Medicare prescription drug benefit to
21  Medicare beneficiaries.
22  Q.  Can you give us an example of some of those sponsors?
23  A.  Sure.  United HealthCare, Humana, CVS Aetna are some of the
24  big sponsors.
25  Q.  What is this contracting process that you talked about?
```

1    A.   The contracting process is the process by which CMS

2    contracts with Medicare part D plan sponsors.  They actually

3    execute contracts every year with us after they have submitted

4    their bids.  And we also evaluate new sponsors who apply to

5    become sponsor to the qualified -- to make sure they are

6    qualified to work as part D sponsors.

7    Q.   At some point did your role at CMS change at any point?

8    A.   Yes.  I began working as the application lead in addition

9    to being the contracting lead, and in that capacity I was in

10   charge of the entire application process.  I prepared the

11   application, I coordinated all the review teams in addition to

12   the contracting team review, and I also worked on compliance

13   work with part D sponsors.

14   Q.   So what's this application process?

15   A.   The application process is the process that we use to

16   qualify insurance companies to be part D sponsors.  Any

17   organization that is looking for a new contract with CMS or to

18   expand their contract has to file an application in February of

19   the year before they want their new contract, and they submit

20   information to us showing they are qualified to be sponsors.

21   Q.   What types of information would be submitted as part of

22   this application process?

23   A.   It includes -- the information we look at is their

24   information about their licensure status to make sure they are

25   licensed to operate insurance.  We look at their pharmacy

1    networks, and we also look at their contracts between

2    themselves and their pharmacy benefit managers and the contract

3    templates that they or their pharmacy benefit managers use to

4    contract with pharmacies.

5    Q.  Let's take those in turn.  What are pharmacy benefit

6    managers?

7    A.  Pharmacy benefit managers, PBMs, are organizations that

8    operate the prescription drug benefit on a day-to-day basis on

9    behalf of insurance companies with part D sponsors and others.

10   They process claims.  They manage networks.  They might manage

11   the formulary for the insurance company as well.

12   Q.  Can you give us some examples of PBMs.

13   A.  Express Scripts is one, CVS Caremark is another, Optum Rx

14   is another large one.

15   Q.  You mentioned, I think, pharmacy network contract

16   templates, is that right?

17   A.  Yes.

18   Q.  What are pharmacy network contract templates?

19   A.  So in order to provide prescription drugs benefits, plans

20   have to contract with large numbers of pharmacies.  They

21   contract with tens of thousands of pharmacies.  And we actually

22   look at the templates, the standard -- what we call the

23   standard terms and conditions that they use to contract with

24   those pharmacies, and, generally speaking, the pharmacies will

25   sign those standard terms and conditions with maybe some

1    variations if they have to negotiate particular terms for a

2    large chain.  But we can't look at all of the contracts because

3    there are tens of thousands of them, so we just look at the

4    standard terms and conditions when they are applying to become

5    part D sponsors.

6    Q.  Do you have an understanding of what time -- what types of

7    terms might be specially negotiated?

8    A.  Generally, it's pricing terms that are specially

9    negotiated, large chains of particular pharmacies might be able

10   to negotiate more favorable pricing terms.

11   Q.  Would any terms around compliance obligations be specially

12   negotiated?

13   A.  Generally, no.  The compliance obligations are standard

14   throughout the pharmacy network contracts, and, in particular

15   for part D, they are pretty standard because CMS requires there

16   to be certain terms and conditions in those contracts.

17   Q.  You testified that the application process, the types of

18   documents submitted includes the contracts between CMS and the

19   part D sponsors itself, correct?

20   A.  Correct.

21   Q.  And then it includes the contracts between the part D

22   sponsors and their PBMs, correct?

23   A.  That does include the contracts between the sponsors and

24   the PBMs, yes.

25   Q.  That includes the standard templates that the contracts

1    between the PBMs and the pharmacies and their networks are

2    based upon also, correct?

3    A.  Yes, it does.  It includes the standard templates that the

4    PBMs use for their pharmacy contracting.

5    Q.  Why does CMS require all these contracts going all the way

6    down to be submitted as part of the application process?

7    A.  We require those contracts because CMS doesn't directly

8    work with the pharmacies and the PBMs, and we need to be

9    assured that those contracts comply with our requirements and

10   that the pharmacies and the PBMs have agreed to abide by the

11   part D regulations and the requirements of the part D program.

12   Q.  Once it has all of these documents going down from CMS to

13   the level of the pharmacy, what do you do in your role as CMS?

14   What do you do with that information?

15   A.  We actually review those contracts and contract templates.

16   When the applicants, the sponsors, submit them, they submit

17   what we call crosswalks, which are tables that include all the

18   required elements that would have to meet the contract, and the

19   applicants, the sponsors, will list where in each contract or

20   contract template those elements appear so that we can then

21   review them.  So we actually read the contracting documents

22   using those crosswalks to check to see if the required elements

23   are there.

24   Q.  Other than the pharmacy network contracts, are there any

25   other types of documents submitted in the application process

1    relevant to pharmacies?

2    A.   Well, the pharmacy contract templates generally include the

3    PBM's pharmacy manuals because those are incorporated into the

4    contract by reference.  The manuals have the instructions for

5    pharmacies to use when they are submitting claims, and the

6    manuals tell them how to -- how they are expected to operate as

7    network pharmacies for the plans.

8    Q.   You used the term that those manuals are incorporated into

9    the contracts by reference.  Could you explain for any

10   nonlawyers what that means.

11   A.   Sure.  It just means, in the contract, the agreement

12   itself, it will say, for instance, the pharmacy agrees to

13   comply with the requirements of the pharmacy benefit manual,

14   and the pharmacy benefit manual then will often have some of

15   the required terms as well as instructions for how the pharmacy

16   needs to submit claims and what documentation they need to

17   maintain.

18   Q.   After you became the contracting and then application

19   leads, did your role at CMS change at any point?

20   A.   Yes.  I became a senior technical adviser.

21   Q.   What were your responsibilities in that role?

22   A.   I stepped back from the day-to-day management of the

23   application and contracting process, and I was -- I had more of

24   an oversight role of those, as well as taking on more of a role

25   with compliance work, and I also continued to be the lead for

1    any compliance issues or other issues that arose between plan

2    sponsor relationships with their pharmacy benefit managers or

3    their other downstream contractors, including pharmacies.

4    Q.  When did that happen?

5    A.  That happened in 2022.

6    Q.  You mentioned earlier that this application process is

7    designed to ensure that the program requirements are

8    incorporated into all of these different types of contracts, is

9    that correct?

10   A.  That's correct.

11   Q.  I'd like to ask you about some of those program

12   requirements.

13          How, if at all, does CMS communicate these program

14   requirements to pharmacies like Omnicare?

15   A.  The requirements are in our regulation, so that's publicly

16   available for all -- for everyone, and they include a

17   requirement that the pharmacies agree to comply with part D

18   requirements, so we would expect pharmacies to look at those.

19   We also have the Medicare prescription drug benefit manual,

20   which provides guidance to plans and others about how to

21   operate how the prescription drug benefit needs to be operated.

22   Q.  I think you said they would include requirements to comply

23   with federal regulations.  What would include those

24   requirements?

25   A.  The regulation requires the contracts between plan sponsors

1    and their downstream contractors, including pharmacies, to

2    include a provision where the downstream contractor or the

3    pharmacy agrees to abide by all federal laws and regulations

4    and CMS instructions.

5    Q.   What, if any, federal laws or regulations does Medicare

6    part D have regarding whether prescription drugs are eligible

7    for coverage?

8    A.   They are requirements of being a covered part D drug,

9    principally that the drug must be provided -- if it's a

10   prescription drug, it must be provided upon a valid

11   prescription.

12   Q.   What is a valid prescription?

13   A.   A valid prescription is a prescription that is -- that

14   meets also requirements of state law for a drug to be

15   dispensed.  It has to be written by a prescriber who is

16   authorized under state law and has to contain the required

17   elements that state law dictates be included in a prescription.

18   Q.   Where did those requirements about the drugs must be

19   dispensed upon a valid prescription and that the prescription

20   must be valid under state law, where did those requirements

21   come from?

22   A.   The requirement -- I'm sorry.  The requirement for valid

23   prescription -- you're asking about the requirement for valid

24   prescription under part D?

25   Q.   Yes.

1    A.    That comes from the part D regulation that's actually in

2    the CMS regulation for part D.

3          MR. ISSACHAROFF:   Ms. Flores, can you please pull up

4    GX-1457.

5    Q.    Is this the part D regulation that you're referring to?

6    A.    It's the Federal Register from 2012 where I believe -- when

7    we published that requirement, first published that

8    requirement.

9          MR. ISSACHAROFF:   Ms. Flores, let's go to page 99.

10   Let's pull up those valid prescription paragraphs above and

11   below that heading.

12   Q.    Is this the requirements that you were just referring to

13   about valid prescriptions?

14   A.    Yes, they are.  The first paragraph is the definition of a

15   valid prescription and the second paragraph is where CMS put

16   out that a part D sponsor may only provide benefits for part D

17   drugs when they are dispensed upon a valid prescription.

18   Q.    Why is it that the prescription has to comply with

19   applicable state law requirements?

20   A.    States regulate the practice of pharmacy.  CMS and the

21   Federal Government have a lesser role in regulating the

22   practice of pharmacies, so any prescription drugs that are

23   dispensed have to be done under state law.  So CMS and the

24   Federal Government defer to the states on what those

25   requirements are.

1   Q.  If you look at the bottom paragraph it refers to, the part

2   D sponsor may only provide benefits.

3         You see that?

4   A.  Yes, I do.

5   Q.  Let me ask you about this, those requirements and this

6   definition here.  If a pharmacy submitted a claim for

7   prescription drugs that it dispensed without getting a

8   prescription for those drugs, what would CMS expect a plan

9   sponsor to do?

10         MR. ASHWORTH:  Objection.  Expert testimony.

11         THE COURT:  The objection is overruled.  This is where

12   she works.  She can tell us about what happens where she works.

13   That is not expert testimony.

14   A.  I'm sorry.  Could you repeat the question.

15         MR. ISSACHAROFF:  Could we read it back.

16         THE COURT:  Read it back, please.

17         (Record read)

18   A.  That would not be a valid claim under part D, so if the

19   plans sponsor knew that there was not a valid prescription, we

20   would expect them not to pay.  And if they later discovered

21   that there had not been a valid prescription, we would expect

22   them to reverse the claim and attempt to get the money back.

23   Q.  If a pharmacy submitted a claim for drugs that it dispensed

24   based on a prescription that was not valid under state law,

25   what would CMS expect a plan sponsor to do?

1    A.  Well, again, that wouldn't be a valid claim for benefits

2    under part D.  So if the plan knew about it, they should not

3    pay the claim.  And if they found out later about it, they

4    should reverse the claim and try to get the money back.

5    Q.  If a pharmacy submitted a claim for drugs that it dispensed

6    based on a prescription that was expired under state law, what

7    would CMS expect a plan sponsor to do?

8    A.  Again, expired prescription under state law wouldn't be a

9    valid prescription under state law, so the same answer.  We

10   would expect the plan not to pay, and if they paid, they would

11   be expected to reverse the claim.

12   Q.  If a pharmacy submitted a claim for a drug refill that it

13   dispensed based on a prescription that did not authorize any

14   refills, what would CMS expect a plan sponsor to do?

15   A.  Again, that wouldn't be dispensing a drug on a valid

16   prescription, so it wouldn't be a valid part D claim.  The plan

17   shouldn't pay if they know.  And when they find out, they

18   should reverse the claim.

19   Q.  If a pharmacy submitted a claim for drugs that it dispensed

20   based on prescriptions that had run out of refills, say a sixth

21   refill of a prescription that only authorized five refills,

22   what would CMS expect the plan sponsor to do?

23   A.  Well, again, that wouldn't be a valid claim for services

24   because there wouldn't be a valid prescription.  The plan

25   shouldn't pay the claim if they know, and they should reverse

1    it if they find out.

2          MR. ISSACHAROFF:  Ms. Flores, we can pull this down.

3    Q.  Ms. Spaccorelli, what, if any, rules does Medicare part D

4    have relating to what records part D sponsors must maintain?

5    A.  We require part D sponsors to maintain records relevant to

6    part D payment and the administration of the part D benefit and

7    require that they be retained for about 10 years.  I'm sorry.

8    For exactly 10 years.

9    Q.  What types of records would that constitute?

10   A.  This would -- for sponsors it would include their payment

11   records, the claims records they received from the pharmacies,

12   and it would include any records they collected on audit, such

13   as medical records or prescriptions.

14   Q.  Let's talk about prescriptions.  Who specifically would be

15   expected to maintain copies of prescriptions?

16   A.  Since the plan sponsors don't receive the prescriptions,

17   they aren't generally required -- they are not required to

18   retain those records unless they obtain them through audit.

19   But the requirement to retain records is a requirement that is

20   required -- that has to be in the contracts with PBMs, pharmacy

21   benefit managers and pharmacies, and we would -- those

22   prescriptions would have to be retained by the pharmacies

23   because the pharmacies received those prescriptions.

24   Q.  I want to back up a little bit and take that in pieces.

25          So we were talking first about rules that apply to

1    part D sponsors, and then you mentioned contracts with PBMs and

2    pharmacies.

3           How does this requirement apply to pharmacies through

4    those contracts?

5    A.  The regulation, the part D regulation, requires the

6    contracts between the plans and the pharmacies or the PBMs and

7    the pharmacies to include a provision where the pharmacy agrees

8    to maintain books and records relevant to the part D benefit

9    for 10 years.  So that provision is in every contract that plan

10   sponsors or PBMs have with part D network pharmacies.

11   Q.  Those books and records that pharmacies are required to

12   maintain, does that include prescriptions?

13   A.  It does include prescriptions, yes.

14   Q.  Are there different ways that prescriptions can make their

15   way to a pharmacy?

16   A.  Yes.  They can make their way through a physical

17   prescription that that patient brings to the pharmacy.  They

18   can be called in by a prescriber or the prescriber's employee

19   or agent.  And they can be faxed in or they can be transmitted

20   electronically via E-Prescribing.

21   Q.  Let's take those in turn.

22          In the instance where a patient walks in and hands the

23   pharmacy a physical prescription, what type of record -- what

24   type of documentation would the pharmacy be expected to

25   maintain?

1    A.  They would be expected to maintain that actual physical

2    prescription or a scanned copy of that prescription that they

3    entered into their recordkeeping system.

4    Q.  What if a prescription were sent into the pharmacy by fax

5    from the prescriber?

6    A.  They would be expected to maintain the actual fax or,

7    again, a scanned copy of the fax that they entered into their

8    recordkeeping system.

9    Q.  Then you mentioned that prescriptions could be sent in

10   electronically.  What would the pharmacy be expected to

11   maintain then?

12   A.  When a prescription is sent electronically, there is

13   actually an electronic record that's sent in the E-Prescribing

14   system, and that would be -- that the pharmacy would need to

15   maintain that record in their computer system.

16   Q.  Then I think you also mentioned that prescription could be

17   called in by phone.  What kind of record would exist in that

18   case?

19   A.  When it's called in by phone, the pharmacist notes down

20   what's being called in and the required elements of the

21   prescription at the time that it's called in, so they either do

22   that physically, or nowadays it's usually via in a computer.

23   And the record -- those notes that the pharmacist entered are

24   actually the record that they need to keep, maintain.

25   Q.  All of these different forms of records, can you remind us

1  how long the pharmacy is required to maintain these for?

2  A.  They have to retain them for 10 years.

3  Q.  Again, how would pharmacies be aware of this requirement to

4  maintain these types of records for 10 years?

5          MR. ASHWORTH:  Objection.  Foundation.

6          THE COURT:  Overruled.

7  A.  This requirement is required to be in all the contracts by

8  the part D regulation and it is in all of the part D network

9  contracts that pharmacies would sign.

10  Q.  What types of pharmacies does this requirement apply to?

11  A.  Any part D network pharmacy.  That would include the retail

12  pharmacy that anybody would walk into, it would include mail

13  order pharmacies and long-term-care pharmacies.

14  Q.  Does the Center for Medicare and Medicaid Service, CMS,

15  check each time a claim is submitted that the pharmacy has a

16  valid prescription that that claim is based on?

17  A.  CMS doesn't take the claims, but the part D plan sponsor or

18  their PBM doesn't receive those prescriptions.  They rely on

19  the pharmacy to submit a claim, and they rely on the pharmacy

20  when they submit that claim that it is -- that the dispensing

21  was upon a valid prescription when they submitted that claim.

22  Q.  Do any of these plan sponsors or PBMs check after the fact

23  to make sure that there was a valid prescription?

24  A.  Plan sponsors are required to monitor their downstream

25  contractors, including pharmacies, on an ongoing basis.  So

1  they all have audit programs where they check claims records

2  from the pharmacies, and they -- that includes going in to look

3  whether they have prescriptions.

4  Q.  Why would they be looking at the prescriptions on file at

5  the pharmacy?

6  A.  They would look at the prescriptions to make sure that the

7  claim represented a valid dispensing event under part D that

8  was properly paid for.  So they are checking to see that it was

9  written by a prescriber and that there was a prescription, that

10  the amount of the drug and the dosage were correct.

11  Q.  We talked earlier about different types of provisions or

12  requirements that CMS requires to be included in contracts

13  between PBMs and the pharmacies within their networks, is that

14  right?

15  A.  Yes, yes.

16  Q.  Remind me again, what is a PBM?

17  A.  A PBM is a pharmacy benefit manager.

18  Q.  What types of contractual provisions does CMS require to be

19  included in contracts between PBMs and pharmacies?

20  A.  We require -- I referenced before, we require the contracts

21  to include a provision where the pharmacies agree to abide by

22  all federal laws and regulations and CMS instructions.  We also

23  require that the pharmacies agree to maintain records for 10

24  years and that they will make those records available to

25  government inspection.  There are also provisions required with

1  respect to submitting claims or bills to the plan through their

2  claims adjudication system.

3          MR. ISSACHAROFF:  Let's take a closer look at one of

4  those PBM pharmacy contracts.

5          Ms. Flores, can you please pull up GX-902.

6  Q.  Ms. Spaccorelli, do you recognize this document?

7  A.  Yes, I do.

8  Q.  What is it?

9  A.  It's a pharmacy provider agreement from a PBM, MeridianRX,

10  that provides -- that works for some part D sponsors.

11  Q.  How would this contract apply to pharmacies that are in

12  MeridianRX's network?

13  A.  Well, they would sign this contract and so the provisions

14  would apply to the services they provide to the Meridian

15  clients.

16  Q.  What kind of pharmacies would this contract apply to?

17  A.  Well, this is the pharmacy-provider agreement, so this is

18  signed by all the different kinds of pharmacies, so retail

19  pharmacies, mail-order pharmacies, and long-term-care

20  pharmacies.

21          MR. ISSACHAROFF:  Ms. Flores, could you please go to

22  page 21.  Let's highlight that signature area.

23  Q.  Ms. Spaccorelli, who specifically signed this contract with

24  MeridianRX?

25  A.  It was signed by Timothy Hopkins on behalf of Omnicare.

1          MR. ISSACHAROFF:  Ms. Flores, could you go to page 23.

2    Q.   What is this part of the contract?

3    A.   This is the Medicare part D addendum to the contract, so it

4    governed the services provided to part D plans when Meridian --

5    when the pharmacies are filling scripts for part D

6    beneficiaries.

7    Q.   Would this replace the requirements in the rest of the

8    contract?

9    A.   No.  It supplements the requirements.  The Meridian, when

10   they are contracting with pharmacies, are contracting for

11   all -- typically, all their -- what we call a book of business,

12   so all the plans they work for, including an employer plan, a

13   commercial plan, and Medicare plans.  So they include a

14   Medicare part D addendum for -- when a patient goes to a

15   pharmacy, the pharmacy knows that it's a Medicare part D

16   beneficiary, and the part D addendum is where the pharmacy

17   agrees to comply with part D requirements.

18   Q.   Is this type of Medicare part D addendum typical of

19   contracts between PBMs and their network pharmacies?

20          MR. ASHWORTH:  Objection.

21          THE COURT:  Overruled.

22   A.   Yes.  Most PBM pharmacy contracts that include part D

23   services have a Medicare part D addendum.

24          MR. ISSACHAROFF:  Ms. Flores, could you please go to

25   page 25 and highlight paragraph 2.

1  Q.  What does paragraph 2 require Omnicare to do under this

2  contract?

3  A.  It requires Omnicare, as the member pharmacy, to certify

4  based on their best knowledge, information, and belief the

5  accuracy and completeness and truthfulness of the claims data

6  or billing data they submit to Meridian for part D claims.

7  Q.  What is claims data?

8  A.  Claims data is the information that's actually on the claim

9  or the bill that the pharmacy submits for payment, so it would

10 include information about the drug dispensed, that prescriber,

11 the patient, and the dosage.

12 Q.  Based upon your work at CMS reviewing contracts between

13 PBMs and pharmacies, is this a pretty standard provision?

14         MR. ASHWORTH:  Objection.  Foundation.

15         THE COURT:  Overruled.

16 A.  Provisions like this are in many of the contracts.  It's

17 not a required provision from CMS.  CMS requires -- when it's

18 referencing this provision, 423.505(k)(3), that's a requirement

19 for plans and PBMs submitting data to CMS.  But most of the

20 contract -- pharmacy contracts include provisions like this so

21 that the plans and PBMs can rely on the information submitted

22 by the pharmacies.

23 Q.  Let's back up.  You mentioned 42 C.F.R. 423.505(k)(3).

24 What does require plans and PBMs submitting data to CMS to do?

25         MR. ASHWORTH:  Objection.

1          THE COURT:  Overruled.

2  A.   It requires plans and PBMs to certify to CMS the accuracy

3  and completeness of the claims data they submit to CMS.

4  Q.   That claims data that they submit to CMS, is all of that

5  generated by the plan sponsors or PBMs themselves?

6  A.   Most of it is actually generated based on information

7  submitted by the pharmacies to the plans in the PBMs, and the

8  plans and PBMs then submit it to us in the form of a

9  prescription drug-event record.

10  Q.   How does this provision in this contract here relate to

11  that situation?

12  A.   This provision is -- allows -- is how the PBM is

13  contracting with the pharmacy to be sure the pharmacy is

14  providing them truthful data so that the PBM and the plan can

15  then provide truthful data to CMS.

16          MR. ISSACHAROFF:  Ms. Flores, could you please go to

17  page 26 and highlight paragraph 8.

18  Q.   Can you please tell us, in your own words, what paragraph 8

19  requires?

20  A.   It requires Omnicare, as the member pharmacy, to comply

21  with all applicable federal and state laws, regulations, and

22  CMS instructions.

23  Q.   Is this a standard provision in PBM pharmacy contracts?

24  A.   Yes.

25          MR. ASHWORTH:  Objection.

1              THE COURT:  Overruled.

2    A.  Yes, it is a required provision.  CMS requires it to be in

3    all the pharmacy contracts.

4    Q.  When you say it's a required provision, in your work at

5    CMS, is this the type of thing that you would be checking PBM

6    pharmacy contracts to make sure it contains?

7    A.  Yes.  It's one of the elements we check when they submit --

8    when sponsors submit an application to CMS, we check to see

9    that their pharmacy-contract templates include this provision.

10   Q.  All applicable federal and state laws, regulations, and CMS

11   instructions, would that include the federal regulation about

12   valid prescription that we looked at earlier?

13   A.  Yes, it would.

14             MR. ISSACHAROFF:  Ms. Flores, could you please

15   highlight paragraph 11 on this page.

16   Q.  What does paragraph 11 require Omnicare to do?

17   A.  It requires Omnicare, as the member pharmacy, to agree to

18   maintain books, records, and documents related to the

19   performance of its obligations under this contract for 10

20   years.

21   Q.  What types of books, records, and documents would that

22   include?

23   A.  It would include prescriptions, claims records, and any

24   invoicing records.

25   Q.  Is this a provision that is typical in PBM pharmacy

1    contracts, in your experience, at CMS?

2    A.    Yes.    It's actually a required provision.    It has to be in

3    all the pharmacy contracts for part D.

4    Q.    So this is specifically something that you would look for

5    to make sure it's included in every PBM pharmacy contract

6    that's submitted to CMS?

7    A.    Yes, it is.

8    Q.    You mentioned earlier that pharmacy benefits manager, or

9    PBM, manuals would also be submitted to CMS as part of the

10   plan-sponsor application process, is that right?

11   A.    Yes.

12   Q.    Can you remind me, what are these PBM manuals?

13   A.    The manuals are the documents where the PBM provides

14   instructions to their network pharmacies about how to provide

15   services to their plans.    So how to submit claims, what

16   information they need to maintain, and other requirements of

17   being a network pharmacy.

18   Q.    And how, if at all, do these manuals bind the pharmacies?

19   A.    As I said before, usually the contracts require the

20   pharmacies to comply with the manuals.    So the manuals are part

21   of the contract that pharmacies sign with the plan sponsors

22   that are PBMs.

23   Q.    What kinds of pharmacies would these manuals apply to?

24   A.    Any network pharmacy.    That would include retail pharmacies

25   and long-term-care pharmacies.

1          MR. ISSACHAROFF:  Let's look at a couple of examples.

2          Ms. Flores, Can you please pull up GX-1174.

3          Your Honor, GX-1174, 1175, and 1119, which are the

4  next three I'm going to look at, were all admitted subject to a

5  foundation objection.  I'd like to offer them into evidence.

6  And if there is no objection, I don't need to go through them

7  all.

8          MR. ASHWORTH:  If I could just have a moment, your

9  Honor.

10         THE COURT:  Sure.

11         MR. ASHWORTH:  Counsel, you're talking about these

12  three collectively?

13         MR. ISSACHAROFF:  1174, 1119, and 1175.

14         MR. ASHWORTH:  Are you going to lay the foundation

15  with this witness?

16         MR. ISSACHAROFF:  I am, if I need to.

17         MR. ASHWORTH:  Maybe you can lay the foundation for

18  one, and we can go from there.

19         MR. ISSACHAROFF:  OK.

20  Q.  Let's look at this.

21         Ms. Spaccorelli, what is this document?

22  A.  This is a provider manual for Prime Therapeutics, which is

23  a pharmacy benefit manager that works for some part D sponsors.

24         MR. ISSACHAROFF:  Ms. Flores, can you please go to the

25  bottom of page 2.

1    Q.   When did this manual go into effect?

2    A.   September 2016.

3    Q.   Is this the kind of PBM pharmacy manual that we were just

4    talking about?

5    A.   Yes, it is.

6    Q.   Are you familiar with this document specifically?

7    A.   Yes, I am.

8    Q.   How are you familiar with it?

9    A.   Well, I reviewed it in preparing for my testimony, but it

10   was also submitted to CMS as part of a part D application, a

11   few part D applications by clients of Prime Therapeutics that

12   were seeking to become part D sponsors.

13   Q.   How do you know that this was submitted?

14   A.   When I was preparing for this testimony and looking at this

15   exhibit, I consulted CMS's Health Plan Management System, or

16   HPMS, which is our system of record where we store information

17   from applications, and I looked for clients of Prime

18   Therapeutics that applied.  This is the 2016 contract, so I

19   looked for applications from 2017, for the 2018 plan year, and

20   I found this document in those applications.

21   Q.   What is the Health Plan Management System?

22   A.   It's a computer system that CMS uses to maintain records

23   related to the -- to the part D program and it includes all the

24   applications submitted by sponsors.

25   Q.   Is the Health Plan Management System kept in the course of

1  CMS's regularly conducted activities?

2  A.  Yes, it is.

3  Q.  Do you regularly interact with this system as part of your

4  responsibilities at CMS?

5  A.  Yes, I do.

6  Q.  Are records like this one entered into the Health Plan

7  Management System by a person with knowledge of the contents of

8  the document?

9  A.  Yes.  It's submitted by the plan sponsors when they apply,

10  so they have knowledge of the document.

11  Q.  And are these types of records within the Health Plan

12  Management System entered in, at, or near the time that they

13  were created?

14  A.  They are entered in when a part D sponsor applies, and the

15  part D sponsor will submit the most recent PBM manual for that

16  contract year.

17          MR. ISSACHAROFF:  Your Honor, I would like to offer

18  GX-1174 into evidence.

19          MR. ASHWORTH:  No objection, your Honor.

20          THE COURT:  Admitted.

21          (Government Exhibit 1174 received in evidence)

22          MR. ISSACHAROFF:  Counsel, I just want to flag that

23  for GX-1119 and 1175, those documents themselves were not

24  entered into the system, but the witness can testify about

25  their substantial similarity.

1          Do you want me to go through it, or can we admit those

2    as well?

3          MR. ASHWORTH:  I am not sure I understand.

4          THE COURT:  I am not sure I understand.

5          Just do it.

6          MR. ISSACHAROFF:  Ms. Flores, can we pull up GX-1175.

7          I'm sorry, Ms. Flores.  Can we pull up GX-1119.

8    Q.  Do you recognize this document?

9    A.  Yes, I do.

10   Q.  What is it?

11   A.  It's a pharmacy provider manual for Humana Pharmacy

12   Solutions, which is the PBM that Humana uses, and it's from

13   2014.

14   Q.  Is this the same kind of PBM manual that we have been

15   discussing?

16   A.  Yes, it is.

17   Q.  Do you know whether this document was submitted to CMS?

18   A.  It was not submitted to CMS as part of an application.

19   Q.  Was any document substantially similar to this one

20   submitted to CMS?

21   A.  Yes, it was.  The 2013 manual was submitted to CMS when

22   some Humana plans applied to be part D sponsors in 2013.

23   Q.  How do you know that the 2013 manual was submitted to CMS?

24   A.  When I was preparing for this testimony, in reviewing this

25   document, I looked to see if this document had been submitted

1   in the Health Plan Management System.  I saw that it hadn't.

2   But I looked in the years immediately prior, in 2013, and I

3   found the Humana Pharmacy Solutions 2013 manual that was

4   submitted with some applications that Humana filed that year to

5   be a part D sponsor in 2014.

6   Q.  Did you compare that 2013 manual to this 2014 manual?

7   A.  Yes, I did.

8   Q.  And what did you find?

9   A.  Well, I compared it both just reading it myself and using

10  Adobe Document Compare, and I found that the provisions

11  relating to records management were substantially the same and

12  that other provisions were substantially the same.  There were

13  changes around formatting, some wording changes, and some

14  stylistic changes.  But the substantive requirements were

15  substantially the same.

16          MR. ISSACHAROFF:  Your Honor, I would like to offer

17  GX-1119 into evidence.

18          MR. ASHWORTH:  I will object to this one, your Honor.

19  It sounds like it never made its way to CMS.

20          THE COURT:  The objection is overruled.

21          MR. ISSACHAROFF:  Thank you, your Honor.

22          (Government Exhibit 1119 received in evidence)

23          MR. ISSACHAROFF:  Ms. Flores, can you please pull up

24  GX-1175.

25          Can you scroll down to the bottom of page 2.

1    Q.  Ms. Spaccorelli, what is this document?

2    A.  It's the Prime Therapeutics provider manual from

3    March 2018.

4    Q.  Is this the same kind of PBM pharmacy network manual that

5    we have been discussing?

6    A.  Yes, it is.

7    Q.  Do you know whether this document was submitted to CMS?

8    A.  The March 2018 version was not submitted to CMS as part of

9    an application.

10   Q.  Do you know whether any substantially similar version of

11   this document was submitted to CMS?

12   A.  Yes.  The December 2018 version.  So the version that was

13   updated, I guess, seven months after this manual was submitted

14   to CMS in 2019 by clients of Prime Therapeutics that were

15   applying to be part D sponsors.

16   Q.  How do you know that the December 2018 manual was submitted

17   to CMS?

18   A.  When I was preparing this testimony, I consulted the Health

19   Plan Management System, and I checked to see what manuals were

20   submitted in 2019, and I saw that the December 2018 version of

21   this manual was submitted by some clients at Prime

22   Therapeutics.

23   Q.  What did you do to compare the March and December 2018

24   manuals?

25   A.  I looked at it just myself, and I ran a document compare in

 1  Adobe, and they were substantially similar.  There were very

 2  minor changes between them.

 3          MR. ISSACHAROFF:  Your Honor, I would like to offer

 4  GX-1175 into evidence.

 5          MR. ASHWORTH:  Same objection.

 6          THE COURT:  Overruled.  That means it's admitted.

 7          (Government Exhibit 1175 received in evidence)

 8          MR. ISSACHAROFF:  Thank you, your Honor.

 9          Ms. Flores, can you please put up GX-1607.

10  Q.  Ms. Spaccorelli, do you recognize this document?

11  A.  Yes, I do.

12  Q.  What is it?

13  A.  It's a table that includes a list of the various PBM

14  manuals that I believe were entered into evidence for this

15  trial, and it has -- it lists certain provisions of those

16  manuals along with where those provisions are found in those

17  manuals.

18  Q.  Does it contain any types of documents other than PBM

19  manuals?

20  A.  Yes.  It includes -- it refers to a few audit manuals.

21  Q.  Let's come to those later.

22          Have you reviewed each of the underlying exhibits

23  referenced in this chart?

24  A.  Yes, I have.

25  Q.  Does the chart accurately reflect the underlying exhibits?

 1   A.  Yes, it does.

 2   Q.  Do the excerpts quoted in the detail column accurately

 3   quote the underlying exhibits?

 4   A.  Yes.  The quotes are accurate.

 5   Q.  Did you put this chart together yourself?

 6   A.  No, I did not.

 7   Q.  And do you understand that this does not necessarily

 8   include all such PBM manuals that are entered into evidence in

 9   this case?

10   A.  Yes, I understand that.

11   Q.  If we look at -- it's a little bit hard to make out, but if

12   we, say, look at entries 4 and 5 here, do you see that there

13   are different colors between the rows?

14   A.  Yes.

15   Q.  What's the significance of those different colors?

16   A.  I believe that was put in so that anybody reviewing it

17   could see when there is a change in the documents.  So if you

18   look at 4, it's the Catalyst manual from 2012.  And then

19   starting at 5, all those excerpts are from the 2013 manual for

20   Catamaran.

21            MR. ISSACHAROFF:  Let's look at one manual in detail.

22            Ms. Flores, can you please turn to page 4, entry 20.

23   Q.  What manual does this entry correspond to?

24   A.  It's from the CVS Caremark 2016 manual.

25   Q.  What is CVS Caremark?

1   A.  CVS Caremark is a PBM that works for a large number of part

2   D sponsors.

3   Q.  And what is the significance of this manual for a pharmacy

4   like Omnicare?

5              MR. ASHWORTH:  Objection.  Foundation.

6              THE COURT:  Overruled.

7   A.  As I discussed before, the provider manuals -- the

8   pharmacies agree to abide by the provider manuals in their

9   contracts, so a pharmacy like Omnicare would have agreed, when

10  they signed a contract with CVS Caremark, to comply with the

11  requirements of the manual, and that would be contractually

12  binding on them when they are providing benefits that they --

13  when they are providing drugs that they then seek to charge to

14  CVS Caremark clients.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   Q.  What exhibit does the chart indicate that this entry
2   corresponds to?
3   A.  The records maintenance provision.
4   Q.  I'm sorry, what in the source column, what particular
5   exhibits does the chart indicate that this entry corresponds
6   to?
7   A.  GX-1101.
8   Q.  Ms. Flores, let's go ahead and pull up GX-1101.
9          Ms. Spaccarelli, is this that 2016 CVS Caremark
10  Provider Manual?
11  A.  Yes, it is.
12  Q.  Ms. Flores, could you please go to page 14 and pull up the
13  records maintenance paragraph.
14         Ms. Spaccarelli, what does this paragraph require a
15  pharmacy like Omnicare to do?
16  A.  It requires pharmacies like Omnicare to maintain all the
17  documents and records related to covered items, so drugs
18  dispensed and then billed to CVS Caremark in a readily
19  obtainable location for a minimum of ten years or any longer
20  period required by law.
21  Q.  What kinds of documents or records would this be on this
22  list?
23  A.  **It lists the documents and records, you know, to include**
24  **original prescriptions, signature logs, wholesaler invoices and**
25  **prescriber information.**

1    Q.   You discussed earlier that CVS requires certain provisions

2    to be present in PBM pharmacy networks or manuals, is that

3    correct?

4    A.   Yes.

5    Q.   Is this one of those required provisions?

6    A.   Yes, this is a provision that is required by the CMS

7    regulation for Part D.

8    Q.   Would CMS check specifically for the presence of this

9    provision before approving a sponsor application?

10   A.   Yes, we check for this provision when reviewing sponsor

11   applications.

12   Q.   To what extent is this provision or one like it present in

13   all of the manuals included in the summary chart we were just

14   looking at?

15   A.   One like it is present in all the manuals and summary

16   chart.

17   Q.   Ms. Flores, could you please turn to 1602, page 6.

18              1607.  I'm sorry, you're correct.  Thank you.

19              Let's go to -- we're on page 6.  Could we highlight

20   entry 33.  Scratch that.

21              Can we go to page 1 of this chart.  Let's highlight

22   entry 1.

23              What PBM manual does this entry correspond to?

24   A.   The Catalyst manual from 2012.

25   Q.   What provision of that contract of that manual is included

1   in the detail column?

2   A.  The access to and retention of records provision.

3   Q.  Is that similar to the provision we were just looking at in

4   the CVS Caremark Manual?

5   A.  Yes, it is.

6   Q.  What does this provision require pharmacies like Omnicare

7   to do?

8   A.  It requires pharmacies like Omnicare to maintain records

9   for ten years following each year of the contract, and -- and

10  it -- or five years, whichever period is longer.

11  Q.  So to the extent that the pharmacy was interacting with

12  Medicare Part D, what would the required length of time to

13  maintain documents be?

14  A.  It would be ten years, and this provision actually

15  specifically references the ten years with respect to

16  CVS-related claims for Medicare.

17  Q.  Thank you.

18          Ms. Flores, can we highlight entry 5 on this page.

19  What does this -- what PBM does this correspond to?

20  A.  Catamaran, the 2013 manual.

21  Q.  And what does this -- what does this provision in the

22  detail column require pharmacies like Omnicare to do?

23  A.  It informs pharmacies like Omnicare that Catamaran and its

24  clients retain the right to audit, and it requires the pharmacy

25  to maintain adequate prescription records -- prescription and

1    financial records related to the services they provide, and it

2    requires those records be maintained for a minimum of ten

3    years.

4    Q.  Does it require anything specifically about prescription

5    hard copies being one of those records?

6    A.  Yes, it requires that the actual prescription hard copies

7    be maintained.

8    Q.  Thank you.

9         Ms. Flores, let's go to page 11 and look at entry 57.

10         What PBM does this correspond to?

11   A.  This corresponds to Informed Rx.  It's their 2012 manual.

12   Q.  What is Informed Rx?

13   A.  It was a PBM that served some Part D sponsors, you know, in

14   2012.

15   Q.  And what does the detail field require pharmacies like

16   Omnicare to do?

17   A.  It requires them to maintain adequate prescription records

18   and financial records related to the services they provide

19   under this contract that includes prescription hard copies, and

20   it requires them to maintain it for a minimum of ten years.

21   Q.  Thank you.

22         Ms. Flores, let's turn back to GX-1101, our CVS

23   Caremark Manual.  Could you please pull up page 16 and

24   highlight the paragraph under claims submission.

25         Can you please read the first two sentences under

1    claims submission?

2    A.  Provider must only submit claims for which a prescription

3    for a covered item was written by a prescriber and for which

4    pharmacy services for a covered item were provided to an

5    eligible person.  Submitted claims information must be accurate

6    and complete.

7    Q.  Ms. Flores, could you please go to page 36 and highlight

8    the portion under document requirements.

9         What is this section of the CVS Caremark Manual?

10   A.  This lists out the document requirements for what documents

11   the pharmacies like Omnicare are expected to maintain, and

12   specifically this part lists out the prescription information

13   that they're expected to maintain.

14   Q.  And specifically is this applicable just to maintenance or

15   does this contain any requirements relevant to what has to be

16   present on a prescription when the pharmacy dispenses the

17   medication?

18              MR. ASHWORTH:  Objection.

19              THE COURT:  I don't even understand the question.

20              MR. ASHWORTH:  Neither do I.

21              THE COURT:  Maybe you could rephrase it?

22   Q.  Let me try to rephrase it.

23              At what point do the elements listed here need to be

24   present on the prescription?

25              MR. ASHWORTH:  Objection.  Foundation.

1             THE COURT:  Overruled.

2   A.  They have to be present on the prescription when the

3   pharmacy like Omnicare receives it, and they have to maintain

4   that documentation.

5   Q.  Let's look at the -- specifically the bullets refill

6   instructions.  I'm sorry, let's look at the first several

7   bullets up through there.

8             What kinds of elements have to be present on a

9   prescription?

10  A.  The full name of the patient, the full name and address and

11  NPI, or what's called a national prescriber identifier, which

12  is just the identification number for prescriber, the name and

13  dosage of the medication and refill instructions.

14  Q.  What do the refill instructions mean?

15  A.  Refill instructions are what the prescriber indicates on

16  the prescription with regard to refills, whether any refills

17  are permitted and how many -- and typically how many refills

18  that would be included in that prescription.

19  Q.  This list of specific items on what the required elements

20  of a prescription are, is that required by CMS to be present in

21  these manuals?

22  A.  No, it's not.

23  Q.  Is it commonly present in these manuals?

24  A.  No, it's not present in all the manuals.

25  Q.  How come it isn't, this type of requirement?

1   A.  It occurs in some of them, not all of them.

2   Q.  Does it appear in some other manuals in the summary chart?

3   A.  I believe it appears in the Catamaran -- in some of the

4   Catamaran or Catalyst manuals.

5   Q.  Let's take a look at some of those.  Ms. Flores, could you

6   take us back to GX-1607, and then we'll look at entry 3 on page

7   one.

8           You just referenced the Catalyst manual.  What is

9   required in the detail field here?

10  A.  It requires the patient name, the date of the prescription,

11  the name of the medication, the dosage, refill information, the

12  prescriber's signature and the quantity.

13  Q.  Then does it have any sort of catchall provision?

14  A.  Yes.

15  Q.  What's that?

16  A.  The catchall -- any other additional requirements as

17  mandated by state or federal law that have to be included in

18  the hard copy or prescriptions or physicians orders.

19  Q.  Ms. Flores, let's highlight the detail fields for entry 6.

20          What PBM does this correspond to?

21  A.  This corresponds to Catamaran.

22  Q.  Is this a similar type of requirement of prescription

23  elements?

24  A.  Yes, it lists some of those elements, including the name of

25  the member, the name of the prescriber and refill instructions.

1    Q.  Ms. Flores, let's go to page 7 and highlight the detail

2    field for entry 39.

3          What PBM does this correspond to?

4    A.  Express Scripts.

5    Q.  And what, generally speaking, what does this provision

6    require of pharmacies in Express Scripts network?

7    A.  It requires them to retain records for the greater of six

8    years or what's required by law, and it requires -- it lists

9    some of the requirements that documentation, including the

10   prescription documentation, that has to be maintained.

11   Q.  Let's start with that first provision, so the greater of

12   six years or under applicable law if a pharmacy is submitting a

13   claim to Medicare Part D, what would the period required by

14   applicable law be?

15   A.  Ten years.

16   Q.  And you mentioned that it would include some prescription

17   elements.  Is it similar elements to what we've been looking at

18   previously?

19   A.  Yes, it is.  It's information about the patient, the

20   prescriber, the dosage and refill instructions.

21   Q.  So it specifically includes refill instructions and date of

22   prescription and any other information required by law?

23   A.  Yes, those elements are required by this manual.

24   Q.  Ms. Flores, could you please take us back to GX-1101, on

25   our CVS Caremark Manual, and please bring up page 36.

1           We were previously looking at the requirements -- the

2    required elements for prescription documentation, correct?

3    A.   Correct.

4    Q.   Ms. Flores, can we highlight the third bullet from the

5    bottom this time?

6           Can you please read this?

7    A.   Prescription hard copies must be maintained for a minimum

8    of ten years or such period as required by applicable law.

9    Q.   Can you remind me, this type of PBM manual, who did these

10   requirements apply to?

11   A.   Pharmacies such as Omnicare.

12   Q.   Thank you.

13          I think we've pretty adequately covered the

14   requirements to maintain documents for ten years.

15          Ms. Flores, could you please highlight the next bullet

16   below that one that we were just looking at, second from the

17   bottom.  Or you can do the bottom three and we can take a look

18   at it.

19          Can you please read the second bullet point there in

20   this highlighted field?

21   A.   Prescription records must be updated at a minimum yearly or

22   such shorter period required by applicable law; if applicable

23   law does not specify a time period, Caremark requires that

24   prescription hard copies be updated yearly; updates include

25   contacting the prescriber to authorize the prescription order

1  and documenting on the hard copy or computer where it can be

2  readily retrievable.

3  Q.  What guidance -- what, if any, guidance does this provision

4  provide about the period of time for which a prescription will

5  be accepted as valid by CVS Caremark?

6  A.  It states that CVS Caremark will only accept as valid a

7  prescription that's up to a year old or shorter period if the

8  law requires it be a shorter period.

9  Q.  This type of specific guidance on the length of time for

10  which a prescription is valid, is that required by CVS?

11  A.  No, it's not.

12  Q.  Is it common to have this kind of guidance in a PBM manual?

13  A.  No, it's not.

14  Q.  Does it appear in some other manuals in this summary chart?

15  A.  I don't believe so, no.

16  Q.  Let's take a look at -- Ms. Flores, let's turn back to

17  GX-1607 and take a look at page 1, entry 2.

18        Can you please read the last sentence of that detail

19  field?

20  A.  Documentation must be readily available and retrievable.

21  Hard copy prescriptions must be authorized and updated

22  annually, unless otherwise required by applicable state or

23  federal law in order for refills to be valid post the original

24  hard copy's expiration.

25  Q.  So what does this require or what does this indicate in

1    terms of for what period of time Catalyst Rx will accept

2    prescriptions as valid?

3    A.  It will only -- Catalyst would only accept those

4    prescriptions for up to a year after they're written.

5    Q.  And, Ms. Flores, let's look at page 12.  Can you highlight

6    the detail fields for entry 59.

7            Ms. Spaccarelli, can you please read the second bullet

8    point there?

9    A.  Prescription hard copies must be updated yearly unless

10   state pharmacy law in which provider is located specifically

11   allows a prescription to be refilled after more than one year

12   has passed.

13   Q.  Is this similar to the requirements that we just looked at

14   for CVS Caremark and Catalyst?

15   A.  Yes, it is, except that it allows longer periods.

16   Q.  If it's --

17   A.  If it's allowed by law.

18   Q.  So you said this is not -- this type of specific guidance

19   doesn't feature in every -- it's not mandated by CMS?

20   A.  It isn't mandated by CMS.

21   Q.  And it doesn't appear in every PBM manual?

22   A.  No, it does not.

23   Q.  Now, Ms. Flores, let's turn to page 6, entry 33.

24            What PBM does this apply to?

25   A.  This is the Express Scripts provider manual from 2015.

1   Q.  Can you read the detail field?

2   A.  In the processing and dispensing of prescriptions, network

3   provider must comply with all state and federal prescription

4   documentation and dispensing laws, rules and regulations.

5   Violations are subject to audit and reversal and recoupment of

6   paid claims.

7   Q.  Is this one of those mandatory provisions that we were

8   talking about earlier?

9   A.  No, it's not.

10  Q.  Is a provision like this requiring compliance with all

11  state and federal laws present in every PBM manual that you're

12  aware of?

13  A.  Yes, every PBM manual has to have a provision about

14  complying with state and federal laws.  What's not required is

15  that they don't have to reference specifically prescription

16  that's a broader requirement from CMS.

17  Q.  Would that requirement, would those requirements of state

18  and federal law include requirements about, say, the elements

19  that are present on prescriptions?

20  A.  Yes, it would.

21  Q.  And would those state and federal laws include, say,

22  requirements about the length of time for which a prescription

23  is valid?

24  A.  Yes, it would.

25  Q.  And, again, you said this is the requirement to follow

1    state and federal law is a mandatory provision?

2    A.  Yes, it is.

3    Q.  So regardless of whether there's a specific list of the

4    required elements of a prescription, every PBM manual is

5    required to instruct its pharmacy to follow state law, correct?

6    A.  Yes.

7    Q.  And so every pharmacy that contracts with a PBM for

8    Medicare Part D would have to as part of that contract agree to

9    follow state law requirements relevant to prescription

10    elements, correct?

11    A.  Yes, each pharmacy would have to do that.

12    Q.  And would have to agree to follow state laws regarding the

13    length of time for which prescriptions are valid, correct?

14    A.  Yes.

15    Q.  And very briefly, the -- what are some of the PBMs that are

16    included in this chart?

17    A.  Well, CVS Caremark, Express Scripts, Humana Pharmacy

18    Solutions, Catalyst, I believe Prime was on this -- was Prime

19    on this chart?

20    Q.  We don't have to list them all.  But based on your review

21    of this chart and the underlying documents, is this, you know,

22    most of the PBMs that a pharmacy like Omnicare would contract

23    with?

24    A.  Yeah, this chart represents about 80 or 90 percent of the

25    bulk of the business of Part D providers.  The PBMs represented

1   on this chart have about 90 percent of the business.

2   Q.  And that remaining 10 or 20 percent, they would still have

3   to have at least the mandatory provisions required by CMS?

4   A.  Yes.

5   Q.  And would you expect them to have some of the other types

6   of provisions that we looked at here?

7   A.  Yes, in my experience they do have some or all of the other

8   types of provisions.

9           MR. ISSACHAROFF:  No further questions at this time.

10          THE COURT:  Great.  We're going to stop.  We're going

11  to have lunch.  We're going to resume at 1:30.  We will go to

12  3:30 today, as I told you.  Don't discuss the case.  Keep an

13  open mind.

14          By the way, tomorrow, Friday being a special day,

15  we're going to get you guys lunch, okay?

16          MS. MAINIGI:  Your Honor, tomorrow are we still going

17  to end at 2:00?  We're not?  We're going to keep going?

18          THE COURT:  We're going to keep going.  We got to get

19  this done.

20          MS. MAINIGI:  Thank you for that.

21          THE COURT:  You need to go home.  You haven't been

22  home in so long, I don't think you know where you live.

23          MS. MAINIGI:  I'm with you, your Honor.

24          MS. FOLCH:  Apologies but 10 to or 9:45 to 5:00 then

25  tomorrow?

1             THE COURT:  Yes.

2             MS. FOLCH:  Great.  Thank you.

3             (Luncheon recess)

4             (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          AFTERNOON SESSION

 2                             1:35 p.m.

 3          (Jury present)

 4          THE COURT:  Have a seat.

 5          Ma'am, you are still under oath, and I guess you'll be

 6  starting.

 7  CROSS-EXAMINATION

 8  BY MR. ASHWORTH:

 9  Q.  Good afternoon, Ms. Spaccarelli.  Am I pronouncing it

10  right, Spaccarelli?

11  A.  Yes.

12  Q.  I have a Carlucci.  If I mispronounce your name, I

13  apologize.

14          I'm Will Ashworth, and I represent Omnicare in this

15  case.

16          Ms. Spaccarelli, you testified in your direct

17  examination about CMS requirements in contracts, right?

18  A.  Yes.

19  Q.  And I believe you noted that one way that CMS enforces

20  those requirements is through audits, right?

21  A.  I don't think I spoke about CMS audits, no.

22  Q.  I think you mentioned Part D plan or PBM audits, right?

23  A.  That's correct.

24  Q.  Are you involved in any audits conducted by CMS or

25  contractors of CMS?
```

```
 1   A.  No, I'm not.

 2   Q.  So you're not involved with the Part D improper payment

 3   measure audits?

 4   A.  No, I'm not.

 5   Q.  Let me just to be clear.  Were you involved in the past in

 6   your career at CMS with any audits of prescription

 7   documentation?

 8   A.  No, I was not.

 9   Q.  So we will need to talk to other witnesses at this trial to

10   find out about --

11          THE COURT:  You don't need to say that.  You can just

12   move on.

13   Q.  Moving on.

14          Ms. Spaccarelli, you are not a pharmacist, correct?

15   A.  No, I'm not.

16   Q.  And you don't know what's required under any particular

17   state's law for a valid prescription, right?

18   A.  Not under any particular state's law, no.

19   Q.  In particular, you don't know what elements any particular

20   state requires for a valid prescription, right?

21   A.  No, not any particular state.

22   Q.  And you have never worked for Caremark, right?

23   A.  No, I have not.

24   Q.  So your testimony about the Caremark documents you were

25   reviewing was your interpretation of that document, right?
```

1    A.  It was, yes.

2    Q.  And you've never worked for any other PBM, right?

3    A.  No, I have not.

4    Q.  So, similarly, when you were talking about other PBM

5    documents and referring to provisions, those are your

6    interpretations of those documents, not those of a PBM, right?

7    A.  That's correct.

8    Q.  Ms. Spaccarelli, you discussed the contracting

9    relationships between various entities in Medicare Part D, and

10   I think that it was clear that for pharmacies like Omnicare,

11   CMS does not review every single contract, right?

12   A.  No, we do not review every single Omnicare contract.

13   Q.  What CMS has is a document called a crosswalk, right?

14   A.  The crosswalk is used for us to review pharmacy contract

15   templates, yes.

16   Q.  Right.  And crosswalks are kind of like a checklist, right?

17   A.  Yes.

18   Q.  So long as the provisions in the crosswalk are in the

19   contracts, CMS does not dictate what else might be in a

20   pharmacy contract, right?

21   A.  No, we do not.

22   Q.  And those contracts actually vary quite a bit from one to

23   the other, right?

24   A.  They vary quite a bit in their requirements other than the

25   ones we require.

1  Q.  Sure.  And we'll talk about the ones you require in a

2  minute.

3          But to take some examples from your direct, the

4  Caremark Provider Manual you discussed in Exhibit 1101, that's

5  over 300 pages long, right?

6  A.  I believe so, yes.

7  Q.  And there's another Prime Provider Manual which was Exhibit

8  1174, which was 48 pages long, right?

9  A.  I believe it's about that long, yes.

10  Q.  So very different levels of requirements in contracts

11  depending on the PBM, right?

12  A.  That's correct, yes.

13  Q.  And you only discussed one contract that Omnicare signed in

14  your direct examination, right?

15  A.  I only saw one contract that Omnicare signed in my direct

16  examination, yes.

17  Q.  Right.  And that was a contract between Omnicare and the

18  PBM Meridian from 2011, right?

19  A.  Yes, that's correct.

20  Q.  So we've talked a little bit about crosswalks, but

21  government counsel didn't actually show you a crosswalk, right?

22  A.  Not in my direct examination, no.

23  Q.  All right.  Well, that's why we have cross-examination.

24          Please take a look at the binder that I provided to

25  you.  And if you look at Government Exhibit 1104.25, the tab is

1    the exhibit number, which is in evidence.  The title there is

2    Appendix 14 crosswalk for long-term care pharmacy access

3    contracts.  Do you see that?

4    A.  Yes, I do.

5    Q.  This is the crosswalk or checklist that is the CMS document

6    that you were referring to on direct that is specific to

7    long-term care pharmacies, right?

8    A.  Yes, it is.

9    Q.  And this is the crosswalk that would apply to Omnicare as a

10   long-term care pharmacy, right?

11   A.  It would apply to our review of sponsor contract templates

12   when we're reviewing applications.

13   Q.  Correct.  And the sponsors would have to identify where in

14   the other contracts in this chain that we've been talking about

15   the provisions in this crosswalk appear, right?

16   A.  That's correct.

17   Q.  And let's take a closer look at a couple provisions.  If

18   you look at the second row, that says language obligating the

19   first tier, downstream, or related entity to abide by all

20   applicable federal laws and regulations and CMS instructions.

21   And Omnicare would be the downstream entity for purposes of

22   this?

23   A.  Yes, Omnicare would be a downstream entity.

24   Q.  In addition to talking about federal laws and regulations,

25   it talks about CMS instructions, right?

1    A.  Yes, it does.

2    Q.  And CMS can give instructions to downstream entities as

3    well as Part D plans, right?

4    A.  We can, yes.

5    Q.  And this section is saying that downstream entities should

6    follow those instructions that they get from CMS, correct?

7    A.  Yes, it is.

8    Q.  And let's now look at the fourth row here and pop that up,

9    please, if you would, Mr. Simmons.

10          You testified on your direct that in your view

11   Omnicare was obligated to retain certain prescription

12   documentation for ten years, is that right?

13   A.  That's correct.

14   Q.  And the source of that is this section of the crosswalk,

15   correct?

16   A.  The source of that is the regulations referenced in the

17   crosswalk, yes.

18   Q.  Fair enough.  The source of that is this regulation

19   referenced in the crosswalk.  That's where you get that

20   ten-year requirement from, right?

21   A.  Yes.

22   Q.  And if we look at what this says, it says:  Language

23   ensuring that the first tier, downstream, or related entity

24   will make its books and other records available in accordance

25   with, and then it cites a couple of regulations, and these

1    regulations give HHS, the comptroller general, or their

2    designees the right to audit, evaluate and inspect any books,

3    contracts, records, computers, or other electronic systems,

4    including medical records and documentation involving

5    transactions related to CMS's contract with the Part D sponsor,

6    and these rights continue for a period of ten years, correct?

7    A.  That's correct.

8    Q.  Okay.  And that's what the crosswalk says about a ten-year

9    requirement, right?

10   A.  Yes.

11   Q.  Now, if we go back from this row, and we just look at the

12   overall crosswalk, the document does not set forth detailed

13   requirements for prescription documentation at long-term care

14   pharmacies, right?

15   A.  No, it doesn't.

16   Q.  For example, it doesn't specify a particular form of

17   prescription, right?

18   A.  No.

19   Q.  And it doesn't specify any particular elements of a

20   prescription, right?

21   A.  No.

22   Q.  And this crosswalk, if we go back to the title page, is

23   specific for long-term care pharmacy contracts, right?

24   A.  This crosswalk is, yes.

25   Q.  Right.  And that's exactly where I was going.  CMS has

1    different crosswalks for retail pharmacy contracts, right?

2    A.   Yes, it does, and they contain many of the same elements.

3    Q.   But they're not exactly the same, are they,

4    Ms. Spaccarelli?

5    A.   Well, these requirements on this page are.  There are some

6    requirements particular to long-term care pharmacies that are

7    in the long-term care pharmacy templates.

8    Q.   Right.  Let's look if we can go forward in this document --

9    actually, we can skip that.

10         You acknowledge this has specific requirements for

11   long-term care pharmacies, correct?

12   A.   Yes, it does.

13   Q.   Those would not be present in the requirements, for

14   example, a retail pharmacy template?

15   A.   That's correct.

16        THE COURT:  Excuse me.  There was actually an

17   objection.

18        MR. ISSACHAROFF:  Objection.

19        THE COURT:  Ground?

20        MR. ISSACHAROFF:  He's asking her to --

21        THE COURT:  The objection is overruled.  If it takes

22   that many words, the objection is overruled.

23   Q.   Let's actually look at a different crosswalk,

24   Ms. Spaccarelli, that's in your binder as 1104.22.  This is

25   what I previewed, which is the crosswalk for retail pharmacy

1    access contracts.  Do you see that?

2    A.   Yes.

3    Q.   And that's talking about the retail pharmacies like the

4    Duane Reade down the street, not long-term care pharmacies,

5    right?

6    A.   Correct.

7    Q.   And these are the requirements for those which are

8    different than the ones in the other crosswalk we reviewed,

9    right?

10   A.   Some of the requirements are different.  Most of them are

11   the same.

12   Q.   Okay.  But there are different requirements overall between

13   the two, correct?

14   A.   There are a few additional requirements for long-term care

15   pharmacy contracts, yes.

16   Q.   Ms. Spaccarelli, you testified about a summary exhibit that

17   the government showed you, which was Government Exhibit 1607.

18   Let's talk a little more about that document.  That document is

19   entitled PBM plan sponsor manuals and guides for pharmacies,

20   correct?

21   A.   Correct.

22   Q.   And the spreadsheet includes selections from about 25 PBM

23   manuals and audit guides, correct?

24   A.   That sounds right.

25   Q.   Ms. Spaccarelli, are you aware that PBMs in this case

1    produced 357 documents?

2    A.  I don't know what the PBMs produced.

3    Q.  Okay.  But government counsel, not you, decided what to

4    include in the summary, right?

5            MR. ISSACHAROFF:  Objection.  Asked and answered.

6            THE COURT:  Overruled.

7    A.  Yes.

8    Q.  And government counsel, not you, decided which provisions

9    to excerpt in the summary, right?

10   A.  Yes.

11   Q.  And you reviewed the underlying documents to confirm the

12   summary was accurate, correct?

13   A.  Yes.

14   Q.  Your summary exhibit does not include any signed contract

15   between a PBM and Omnicare, right?

16   A.  This exhibit does not, no.

17   Q.  That's correct.  And the crosswalk does not require

18   Omnicare to incorporate a PBM provider manual at all, does it?

19   A.  I mean, Omnicare wouldn't because Omnicare doesn't write

20   these contracts.

21   Q.  Well, that's fair.  But the crosswalk -- CMS's requirements

22   for Omnicare do not require Omnicare to agree to the language

23   of any particular provider manual, right?

24   A.  I mean, the crosswalk doesn't, but the actual contracts do.

25   Q.  Okay.  But the crosswalk is what is CMS's requirement,

1    right?

2    A.   The crosswalk lists CMS's requirements for the contracts,

3    yes.

4    Q.   Right.  And then it's the other contracts that you

5    testified about on direct that might incorporate a provider

6    manual, the PBM contracts?

7    A.   Yes.

8    Q.   And you would have to review Omnicare's executed contracts

9    to understand what particular manuals for what particular years

10   are incorporated into those, right?

11   A.   Not really because they -- all of the -- all the Omnicare

12   contracts that they sign with PBMs reflect what the PBM

13   contracts we receive are.

14   Q.   Please finish, ma'am.  I didn't mean to cut you off.

15   A.   I'm finished.

16   Q.   Well, for example, your exhibit has different manuals that

17   are for different PBMs and different years, right?

18   A.   That's correct.

19   Q.   And so you would need to look at, for example, Omnicare's

20   contract with Optum to see what was incorporated for a

21   particular year for that -- for Omnicare, right?

22   A.   That's correct, but the manuals are updated every year, and

23   all the contracts allow for that.

24   Q.   When you say "all the contracts allow for that," what do

25   you mean by that?

1  A.  All the contract templates allow for that when I review all

2  contracts.

3  Q.  I understand they allow for that, but in terms of what

4  specific contracts incorporate what specific provider manuals,

5  you would need to look to see the contracts and the years and

6  match those up, correct?

7  A.  Yes.

8  Q.  All right.  Most of the excerpts in the summary exhibit you

9  testified about are not specific to long-term care pharmacies,

10  right?

11  A.  Most of the elements are required for long-term care

12  pharmacies.  They are not the specific additional requirements

13  that apply to long-term care pharmacies.

14  Q.  Well, let's look at the rows in your spreadsheet,

15  Ms. Spaccarelli, that do reference long-term care.

16          And, Mr. Simmons, can you please pull up 1607.

17          When I looked through this, I counted eight rows out

18  of 82 in your summary that referenced LTC or long-term care.

19  Does that sound about right to you?

20  A.  Sounds about right.

21  Q.  Mr. Simmons, can you take the document and cull out rows 9,

22  51, 53, 55, 56, 60, 73 and 76 and present that excerpt from the

23  summary.

24          So using this much shorter summary, let's walk through

25  some of the provisions that reference long-term care in these

1    provider manuals.  If you look at row 9, that's the Catamaran

2    Provider Manual from 2013.  It states in the third sentence:

3    These orders may be in the form of a standard prescription or

4    copies of signed prescriber's orders from a medical chart.

5            Do you see that?

6    A.  Yes, I do.

7    Q.  So Catamaran there acknowledges long-term care

8    prescriptions may be in the form of signed prescriber's orders

9    from a medical chart, right?

10   A.  Yes.

11   Q.  Now, let's look at another row in your spreadsheet, and

12   this one I don't believe you discussed on direct is row 53.

13   And this is from a Humana Provider Manual from 2013, and it

14   says right there that long-term care orders -- the sentence

15   that begins these orders may be in the form of traditional

16   signed prescriptions, copies of signed prescriber's orders from

17   the member's medical chart or other documentation that contains

18   all required elements of a prescription.  Do you see that?

19   A.  Yes.

20   Q.  So that is what Humana was requiring for long-term care

21   pharmacies in this provider manual, correct?

22   A.  Yes.

23   Q.  And if you look at row 55 and 56, if we just pop those out,

24   you'll see that the language there under the "these orders"

25   sentence is the same as what I just read for the earlier Humana

1   Manual, right?

2   A.  Yes.

3   Q.  And then if you go forward to Informed Rx at row 60, and,

4   Mr. Simmons, please pop that up, similar language there in that

5   "these orders" sentence, correct?

6   A.  Yes.

7   Q.  And then finally, if we could go to rows 73 and 76, which

8   are from Optum Provider Manuals about long-term care, you'll

9   see signed prescriber's orders from a medical chart is also in

10  these provisions, correct?

11  A.  Yes.

12  Q.  And you testified about a number of Humana Provider Manuals

13  on direct, and you also in your summary have a Humana audit

14  guide in row 54, right?

15  A.  Yes.

16  Q.  Let's pop that up, please, Mr. Simmons.  If we could blow

17  out row 54, please.

18          The heading there is documentation requirements for

19  retail hard copy prescriptions, correct?

20  A.  Correct.

21  Q.  Are you aware that Humana also has guidelines for

22  documentation in long-term care pharmacy audits?

23  A.  Yes.

24  Q.  That particular document was not in your summary, correct?

25  A.  No, it was not.

 1   Q.  Let's look at that, and that is in your binder at GX-1107,

 2   which is in evidence.

 3        Now, again, the title here is, it's a Humana document,

 4   guidelines for documentation in long-term care pharmacy audits.

 5   Do you see that?

 6   A.  Yes.

 7   Q.  Are you familiar with this document, Ms. Spaccarelli?

 8   A.  Yes, I've seen it when I was reviewing the -- when I was

 9   reviewing the pharmacy manuals.

10   Q.  If we look at the section entitled:  Prescription hard copy

11   requirements, it says:  For long-term care pharmacy audits,

12   that prescription hard copies must contain the following

13   elements to be considered acceptable, and then it lists a

14   number of elements.  And if you take a look at that list, there

15   is a number 7 duration of therapy that says, duration of

16   therapy; e.g., number of refills, clear start/stop dates or

17   duration written by prescriber.  Do you see that?

18   A.  Yes.

19   Q.  And that doesn't list number of refills as a required

20   element.  It is an e.g. in connection with duration, right?

21   A.  Yes.

22   Q.  And if you go down to the heading examples of acceptable

23   prescription hard copy documentation, there are a bunch of

24   bullet points there, right, Ms. Spaccarelli?

25   A.  Yes.

1    Q.   And the first bullet states:  As an example of acceptable

2    prescription hard copy documentation, a prescription drug

3    order, a chart order, or a medication administration record

4    (MAR) that clearly contains all nine elements outlined above.

5    Prescriber orders written in progress notes may also be

6    acceptable if the notes contain the nine required elements.  Do

7    you see that?

8    A.   Yes.

9    Q.   And that was not in your summary, right?

10   A.   No.

11   Q.   And the fifth bullet says:  A fax request for refills, as

12   long as it contains all nine elements above and is clearly

13   approved by a prescriber.  Note:  A refill sticker alone is not

14   an acceptable form of documentation.  Again, that information

15   not in your summary, correct?

16   A.   Correct.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  And the same would be true for the other elements on this

2    list, including the last one, which is simply a prescriber

3    statement that contains all nine elements above, right?

4    A.  Right.

5    Q.  Let's go down to the paragraph that starts on the second

6    page called cycle fill requirements.  And this provision of the

7    Humana audit guide is talking about cycle fills?

8    A.  Yes.

9    Q.  And, Ms. Spaccorelli, are you familiar with cycle fills

10   from your work in CMS in prescription issues?

11   A.  Yes.  A little.

12   Q.  Well, this doesn't say cycle fills are illegal, does it?

13   A.  No.

14   Q.  What it says is that cycle fills needs certain

15   requirements -- need to meet certain requirements in order to

16   be acceptable, right?

17   A.  That's correct.

18   Q.  And it describes in this section what some of those are.

19   And I will just read one sentence here.  That is this:  If the

20   prescription drug order, chart order, or other acceptable

21   documentation does not include the number of refills or does

22   not contain a stop date, the pharmacy may supply the delivery

23   manifest, a refill request confirmation order, an MAR, progress

24   note, or other documentation that clearly shows the LTC

25   facility received the medication.

```
 1              Did I read that right, mostly?
 2   A.  Yes.
 3   Q.  Again, that information was not contained in your summary
 4   of PBM and audit guide requirements?
 5   A.  No.
 6   Q.  Let's now look in your binder at the document with the tab
 7   proposed Defendant's Exhibit 271.  It's the last document.  And
 8   I want to direct your attention to the top-most email on the
 9   first page of the exhibit.  This is an email from you to Shelly
10   Winston, correct?
11   A.  Yes.
12   Q.  Shelly Winston is another individual you worked with at
13   CMS, correct?
14   A.  Yes.
15   Q.  And you sent this email in the ordinary course of your
16   business at CMS, right?
17   A.  I did.
18              MR. ASHWORTH:  Your Honor, we move to admit this email
19   chain as proposed Defendant's Exhibit 271.
20              THE COURT:  You're offering it?
21              MR. ISSACHAROFF:  We object, your Honor.  We don't
22   understand the basis.
23              THE COURT:  I need it.
24              MR. ASHWORTH:  I think if you look at the top email --
25              THE COURT:  Just a moment.
```

```
 1                MR. ISSACHAROFF:  Just to be clear, this was not on
 2       their exhibit list, your Honor.
 3                MR. ASHWORTH:  It is cross-examination.
 4                THE COURT:  It is cross-examination.
 5                MR. ISSACHAROFF:  It's not impeachment.
 6                THE COURT:  Do you know how cross-examination works?
 7       Obviously, you don't.  OK.  You say it's not impeachment.  I
 8       say it could be.  Admitted.
 9                (Defendant's Exhibit 271 received in evidence)
10                MR. ASHWORTH:   Thank you.
11       Q.  Ms. Spaccorelli, you can see here your top email is
12       responding to a series of emails that Ms. Shelly Winston
13       forwards to you, is that right?
14       A.  Yes.
15       Q.  What is Ms. Winston's role at CMS?
16       A.  At this time, in 2016, she worked in the drug policy group
17       in the Medicare drug benefit group.
18       Q.  And one of the emails she is forwarding you is from an
19       individual named Gary Schoettmer.
20                You see that?
21       A.  Yes.
22       Q.  Who is Mr. Schoettmer?
23       A.  I don't know him.
24       Q.  Let's just place some context, Ms. Spaccorelli, for your
25       email at the top.  If we look at Ms. Winston's email at the
```

1    bottom of the page, she notes:  My only issue is that I

2    wouldn't want a part D sponsor to refuse to give a retail

3    contract to a pharmacy who services an LTC facility but doesn't

4    meet the LTC requirements.  Getting them in network, whether as

5    an LTC or retail pharmacy, is infinitely more important than

6    ensuring they meet the service criteria in the manual.

7             You see that?

8    A.   Yes, I do.

9    Q.   Then Mr. Schoettmer responds to that and he says:  I'm not

10   sure how to do that without appearing contradictory to the

11   manual.  Then he talks about the manual.

12             Right?

13   A.   Yes.  But Mr. Schoettmer does not work for CMS or did not

14   work for CMS at this time.

15   Q.   Sure, understand.  I think it's fair to say he has a

16   concern that what he might be doing should be contradictory to

17   a manual.

18             Is that fair?

19   A.   Again, I don't know who Gary Schoettmer is.  I don't know

20   who he represented at this time.

21   Q.   Let's look at what you say at the very top.  Let's blow up

22   that email.  You say to Ms. Winston:  I mean, I don't know why

23   he cares whether we are contradicting the manual.  We, CMS, who

24   are charged with this stuff, are giving our blessing.

25             You wrote that, right, Ms. Spaccorelli?

1    A.  Yes, I did.

2    Q.  What you were saying there is, why is it a concern if he's

3    contradicting the manual if CMS is saying it's OK?

4              MR. ISSACHAROFF:  Objection, your Honor.

5              THE COURT:  The objection is overruled.  If that's

6    what you meant, you can say that, ma'am.

7    A.  I mean, I'm trying to understand the context of this

8    because, again, this was nine years ago.  But it looks like he

9    is asking whether this is a chain of emails about long-term

10   care -- whether a long-term-care pharmacy is validly contracted

11   to serve members, and his concern is that there is a pharmacy

12   that's a retail pharmacy that's serving members in a

13   long-term-care facility.

14             THE COURT:  Not the issue we are talking about in this

15   case?  Is that what you mean?

16             THE WITNESS:  I don't know what he's getting at.  But

17   that doesn't have anything to do with the requirements of

18   long-term-care pharmacies.  We allow retail pharmacies to serve

19   long-term-care facilities.

20   Q.  But the concept is that when CMS, who is charged with this

21   stuff, gives its blessing, that's significant?

22             MR. ISSACHAROFF:  Objection.

23             THE COURT:  Overruled.

24   A.  With respect to whether a retail pharmacy can serve

25   patients in long-term-care facilities, yes.

1    Q.  You're saying if CMS gives its blessing to other things,

2    then that's somehow different?

3    A.  No.  Our rules do not prohibit retail pharmacies from

4    serving patients in long-term-care facilities, so we are not

5    presenting any exception to our rules in this.

6    Q.  Let me ask you, Ms. Spaccorelli, a couple other questions.

7    You talked about audits by third-party plans.

8              Do you recall that?

9    A.  By plans, yes.

10   Q.  And you said that plan audits would be one way, again, of

11   enforcing CMS's requirements, correct?

12   A.  Plan audits are one way of plans ensuring that pharmacies

13   are complying with CMS requirements so that they can be sure

14   the plans are complying with our requirements.

15   Q.  And you were not involved in any plan or PBM audits

16   yourself, right?

17   A.  No.  I do not conduct audits.

18             MR. ISSACHAROFF:  Your Honor, if we have moved off

19   this exhibit, can we take it down.

20             THE COURT:  The exhibit should come down.  We are done

21   with it.

22             MR. ASHWORTH:  No further questions.  Thank you.

23             THE COURT:  Thank you.

24             Any redirect?

25             MR. ISSACHAROFF:  Yes, your Honor.

```
 1    REDIRECT EXAMINATION

 2    BY MR. ISSACHAROFF:

 3    Q.  Ms. Spaccorelli, you were asked on cross-examination about

 4    interpretation of some of these provisions in the PBM contracts

 5    and manuals, is that correct?

 6    A.  Yes.

 7    Q.  And you were asked basically about whether this was your

 8    interpretation or the PBM's interpretation?

 9    A.  Yes.

10    Q.  Some of the provisions that we have talked about today,

11    those were mandatory provisions that CMS requires to be in the

12    manuals, right?

13    A.  They are.  Some of the provisions are required to be in the

14    manuals by CMS.

15    Q.  Does CMS believe that those mandatory provisions, like

16    following state and federal law or retaining documents for 10

17    years, that those can be reinterpreted by the PBM to change

18    their meaning as required by CMS?

19             MR. ASHWORTH:  Objection.  Leading.

20             THE COURT:  Overruled.

21    A.  No.

22    Q.  You were also asked about these crosswalk documents,

23    GX-1104-22 and GX-1104-25.

24             Let's start with GX-114-25 up.

25             While we are getting that up, generally speaking, you
```

1  were asked about the difference between the retail pharmacy

2  access contract crosswalk and the LTC pharmacy access contract

3  crosswalk, is that correct?

4  A.  Yes.

5  Q.  And you were asked about basically the differences between

6  those two?

7  A.  Yes.

8  Q.  And I think you were trying to explain -- how would those

9  two differ, generally speaking?

10  A.  So there are certain -- because long-term-care pharmacies

11  operate differently, CMS recognizes that and there are some

12  different requirements that either have to be or are allowed to

13  be in long-term-care pharmacy templates, contract templates.

14  Those are around -- primarily around payment.  Long-term-care

15  pharmacies have a longer time to submit bills, generally, than

16  retail pharmacies.  They can't have less than 30 days or more

17  than 90 days.  Retail pharmacies can have shorter times.  And

18  there are also some requirements around service criteria for a

19  level of service that a long-term-care pharmacy is expected to

20  provide, which includes 24-hour prescription boxes, a

21  prescription log at the long-term-care facility, and those were

22  incorporated into the regulation a few years ago, after 2016.

23          MR. ISSACHAROFF:  Are we able to get up 1104-25.

24  Q.  This might take a little while, so why don't I just ask you

25  a couple of questions.  You were asked about language that

1    appeared in both of these crosswalks, the long-term care and

2    the retail, correct?

3    A.  Correct.

4    Q.  Is the requirement that first-tier downstream or related

5    entities abide by all applicable federal laws and regulations

6    in CMS instructions.  Does that appear in the crosswalk for

7    retail pharmacies?

8    A.  Yes, it does.

9    Q.  Does that appear in the crosswalk for LTC pharmacies?

10   A.  Yes, it does.

11   Q.  I was also asking you earlier about the requirements that

12   pharmacies retain prescription records for 10 years.  Does that

13   requirement appear in the retail pharmacy crosswalk?

14   A.  Yes, it does.

15   Q.  Does that requirement appear in the LTC pharmacy crosswalk?

16   A.  Yes, it does.

17   Q.  You were also asked earlier about the obligation of part D

18   sponsors and downstream entities to monitor the compliance of

19   downstream entities like pharmacies, is that correct?

20   A.  Correct.

21   Q.  Is that requirement to monitor the compliance of downstream

22   entities in the retail crosswalk?

23   A.  Yes, it is.

24   Q.  Is it in the LTC crosswalk?

25   A.  Yes, it is.

1    Q.   Now, you were asked a little bit about some of the PBM

2    manuals and about whether -- there were some questions about

3    sort of whether CMS requires PBM manuals to be incorporated

4    into the contracts.

5            Do you recall that?

6    A.   Yes.

7    Q.   And I think you testified no, CMS doesn't require that

8    manuals be incorporated.

9            Is that right?

10   A.   That's correct.

11   Q.   But does CMS require certain elements to be present like

12   the ones we just looked at in the crosswalks?

13   A.   Yes, CMS does.

14   Q.   And could those elements be present in either the contracts

15   themselves or the incorporated manuals?

16   A.   Yes.

17   Q.   And so whether it's one place or the other, those

18   requirements have to appear in contractual binding form,

19   correct?

20   A.   They do, yes.

21   Q.   Now, you were also asked about this idea that we would have

22   to reference which specific contracts incorporated which

23   specific manual.  To your understanding, do contracts between

24   PBM and a pharmacy specify a specific addition of a manual

25   that's incorporated into the contract?

1    A.   No.  They usually specify the manual and provide where that

2    manual can be found and how often -- how it's updated.

3    Q.   If that manual were updated, how would that affect the

4    pharmacy's obligations to follow its provisions?

5    A.   It would automatically be incorporated into the contract

6    when they update it.

7    Q.   In other words, to the extent that a pharmacy like Omnicare

8    was contracted with any of the PBMs whose manuals we reviewed

9    today, they would have to follow at the given time whatever

10   version of the manual is currently in effect?

11   A.   Yes.

12   Q.   Now, I think you were asked to look specifically at

13   GX-1107, which is the Humana LTC pharmacy audit guidelines.

14   Does CMS define long-term-care facility for the purposes of

15   part D?

16   A.   Yes, we do, in the regulation.

17   Q.   What is that definition?

18   A.   I can't quote it exactly, but it defines long-term-care

19   facilities as skilled nursing facilities, or I believe the

20   language is intermediate-care facilities and long-term-care

21   facilities for individuals with mental disease or defect or

22   intellectual disabilities.

23   Q.   Does that definition of LTC facilities include things like

24   assisted-living facilities?

25   A.   No, it does not.

1    Q.  Does CMS define long-term-care pharmacies for the purpose

2    of part D?

3    A.  Yes, we do.

4    Q.  And how does CMS define long-term-care pharmacies?

5    A.  They are defined as pharmacies that serve long-term-care

6    facilities under a long-term-care pharmacy agreement with the

7    sponsor.

8           THE COURT:  Ma'am, keep your voice up.

9           THE WITNESS:  I'm sorry.

10   A.  It's defined as a pharmacy that serves long-term-care

11   facilities under a long-term-care pharmacy agreement with the

12   sponsor.

13   Q.  And the long-term-care facilities that they would serve,

14   that would be the definition that you just gave us about

15   skilled-nursing facilities and the other very specific type of

16   intermediate care, is that right?

17   A.  Yes.  Skilled-nursing facility or intermediate and

18   long-term-care facilities with -- for individuals with mental

19   disease or defect.

20   Q.  To the extent they are related to assisted-living

21   facilities, these sorts of guidelines about LTC pharmacies that

22   are contained in these manuals, this audit guideline, etc., to

23   your understanding, do any of those lessen the requirements

24   that we have talked about here?

25   A.  No, they do not.

1    Q.  Now, specifically you were asked about this Humana,

2    GX-1107.

3            MR. ISSACHAROFF:  If we can pull that up, this Humana

4    audit guidelines.  Let's turn to page 2, the third paragraph,

5    under C.  Cycle fill requirements.  Let's highlight that last

6    paragraph on this page.

7    Q.  Mr. Ashworth read to you the second sentence on this page,

8    is that right?

9    A.  Yes, he did.

10   Q.  And at the end of the types of things that that could be

11   acceptable, they talk about:  If it does not include the number

12   of refills or stop date, the pharmacy may supply these various

13   other type of documentations that clearly show the LTC facility

14   received the medication.

15           Is that your understanding of the purpose of this

16   sentence?

17   A.  Yes, it is.  My understanding is, it's to require -- it's

18   indicating what can serve in lieu of an explicit authorization

19   of refills, what has to be shown in the record.

20   Q.  Let's go ahead and read the next sentence, after the one

21   that Mr. Ashworth read to you.  Can you please read that for

22   us.

23   A.  This documentation must clearly state that the prescriber

24   authorized the member to continue the medication.

25   Q.  Thank you.

1              And let's just finish up with this -- you were asked

2    about this email chain.  I think you were trying to provide

3    what the context of this was.  Can you give us that context.

4    A.  Sure.

5    Q.  To the extent you are able to divine what it is nine years

6    later.

7    A.  So as I'm reading this, there appears to be a dispute

8    between Mr. Schoettmer and Express Scripts over whether retail

9    pharmacies, non-LTC pharmacies, can serve long-term-care

10   facilities, and they came to CMS seeking to have us intervene.

11   And we were telling them that in fact we don't require -- we

12   allow retail pharmacies to provide medications to members in

13   long-term-care facilities.  And the pharmacists seem to have

14   been pointing to -- at that time it was guidance about some of

15   the expectations of long-term-care pharmacies and pointing to

16   that as perhaps indicating that CMS required only

17   long-term-care pharmacies to serve residents of long-term-care

18   facilities, and we were explaining -- we were attempting to

19   explain to him that we do not require -- that we allow retail

20   pharmacies to serve patients at long-term-care facilities.

21   Q.  And for a retail pharmacy to serve patients in

22   long-term-care facilities who are part D beneficiaries, would

23   they have to be bound by one of these contracts and manuals

24   that were subject to the crosswalk that we were just looking at

25   for retail pharmacies?

1    A.   Yes.  They would have signed a network pharmacy agreement

2    with the PBM or plan.  And if it wasn't a long-term-care

3    pharmacy, they would in this case have signed a retail pharmacy

4    contract, and they would be serving that long-term-care

5    facility because the long-term-care facility selected them.

6          When CMS puts out these regs, it is not our intention

7    or within our authority to tell long-term-care facilities how

8    they can serve their residents.  So if a long-term-care

9    facility chooses to arrange with the retail pharmacy to fill

10   their scripts, their prescriptions, we do not interfere with

11   that.

12         Our only requirement is that the plan provide access

13   to the part D benefit and the residents of that facility, and

14   the way they would do that is to have a contract with the

15   retail pharmacy that the long-term-care facility has selected.

16   Q.   So whatever type of pharmacy is serving the residents of

17   the facility who is a Medicare part D beneficiary, are they

18   bound by the requirements that we were looking at in the

19   crosswalks to follow all applicable state and federal laws and

20   regulations and CMS instructions?

21   A.   Yes, they are.

22   Q.   And are they bound by the requirements to retain

23   prescription records for 10 years?

24   A.   Yes, they are.

25   Q.   And are the part D sponsors and the PBMs required to

1    monitor the performances of those pharmacies?

2    A.  Yes, they are.

3    Q.  Lastly, I think you were asked about the specific language

4    in your email.  To your knowledge, has CMS ever blessed any

5    pharmacy dispensing drugs without a valid prescription?

6    A.  No.

7    Q.  Has CMS ever blessed any pharmacy dispensing drugs based on

8    a prescription that didn't meet state-law requirements?

9    A.  No.

10          MR. ISSACHAROFF:  No further questions.

11          THE COURT:  Anything else?

12          MR. ASHWORTH:  Two questions, your Honor.

13   RECROSS EXAMINATION

14   BY MR. ASHWORTH:

15   Q.  Ms. Spaccorelli, government counsel showed you Government

16   Exhibit 1607, that Humana audit guide, in your redirect.

17          You previously told me you don't know how PBM has

18   conducted audits, right?

19   A.  I have never been involved in an PBM audit.

20   Q.  Right.  So you wouldn't know --

21          MR. ISSACHAROFF:  Objection.

22          THE COURT:  Let her finish, please.

23          MR. ASHWORTH:  I apologize.

24   A.  I'm familiar with how they do it because I work with the

25   PBMs and pharmacies on a regular basis.

1    Q.  But you can't speak for now on any particular audit

2    conducted by Humana, that particular audit guide was used?

3    A.  No, I cannot.

4            MR. ASHWORTH:  Thank you.

5            (Witness excused)

6            MS. JUDE:  The government calls Dr. David Nace.

7            THE COURT:  Dr. Nace, won't you come up here, please,

8    and stand in the witness box.

9            THE WITNESS:  Yup.

10   DAVID ANDREW NACE,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13   DIRECT EXAMINATION

14   BY MS. JUDE:

15   Q.  Good afternoon, Dr. Nace.  Where are you employed?

16   A.  So I'm employed with the University of Pittsburgh and also

17   with the UPMC, University of Pittsburgh Medical Center Health

18   System.

19   Q.  What is your job title?

20   A.  So I am the division chief for the Division of Geriatric

21   Medicine at UPMC and the University of Pittsburgh.  I'm the

22   director of long-term care and also the chief medical officer

23   for UPMC senior services.

24   Q.  Has the United States asked you to provide expert opinions

25   in this case?

1    A.  Yes.

2    Q.  Before we get to your opinions, I'd like to go through your

3    professional background.

4             How long have you been practicing medicine?

5    A.  For over three decades now.

6    Q.  Where did you obtain your medical degree?

7    A.  I went to Temple University in Philadelphia.

8    Q.  After you got your medical degree, did you undertake any

9    additional training?

10   A.  I did.

11   Q.  What did you do?

12   A.  So I did an internal medicine residency and then followed

13   by a fellowship in geriatric medicine, which is a study of

14   older adults, and I also completed a master's in public health

15   in epidemiology at the graduate school of public health at the

16   University of Pittsburgh.

17   Q.  Are you licensed to practice medicine in any state?

18   A.  Yes.

19   Q.  Which one?

20   A.  Pennsylvania.

21   Q.  Are you board certified in any specialties?

22   A.  I am.

23   Q.  Which ones?

24   A.  I'm board certified in internal medicine by the American

25   Board of Internal Medicine, I am board certified in geriatric

1   medicine also by that same board, and I have a certificate from

2   the American Board of Post Acute and Long-Term Care Medicine in

3   the field of medical direction and long-term care.

4   Q.  What is geriatric medicine?

5   A.  Geriatric medicine is the study of healthcare for older

6   adults, people generally over the age of 65, and related to

7   problems that they face and also challenges with their aging.

8   Q.  What is medical direction?

9   A.  Medical direction, as it pertains to the certification,

10  relates to the field of long-term care, which would be the

11  skilled-nursing facility side, the assisted-living facility

12  side, and also the independent-living side, and it's the

13  administrative component for oversight of medical care within

14  those environments.

15  Q.  Dr. Nace, how long have you been on the faculty at UPMC?

16  A.  I've been on the faculty since 1995.

17  Q.  I heard you say earlier that you have three different job

18  titles.

19  A.  Yes.

20  Q.  I am going to ask you about each of those in turn.

21          What are your job responsibilities in your role as

22  chief of the division of geriatric medicine?

23  A.  I'm responsible for overseeing the faculty within the

24  division of geriatric medicine.  We have about 28 faculty that

25  report to me, and I oversee our research, educational and

1    clinical care protocols and portfolio.

2    Q.  In what settings does that division of geriatrics that you

3    oversee provide patient care?

4    A.  We provide patient care in three primary areas:  So

5    hospital-based or acute-based care; outpatient care, such as

6    office care; and then long-term care, which includes both

7    skilled-nursing facilities, assisted-living facilities, and

8    also independent-living facilities.

9    Q.  To go to your second job title, what are your job

10   responsibilities as director of long-term care?

11   A.  As director of long-term care I'm responsible for

12   coordinating our long-term care activities; again, across the

13   three domains:  Skilled nursing, assisted living, independent

14   living.  I'm responsible to coordinate with our physicians,

15   nurse practitioners, and physician assistants to promote best

16   practices for care, to address regulatory changes that might

17   come out, and provide other education in that area.

18   Q.  How long have you held that directorship?

19   A.  Since 2001.

20   Q.  To go to the last one, what are your responsibilities as

21   chief medical officer?

22   A.  As chief medical officer for UPMC senior services, I'm the

23   point person for long-term care since I understand that

24   environment.  The health system is heavily outpatient based,

25   heavily hospital based, and I'm the person that helps

1    coordinate the transition points between the acute-care

2    settings and those long-term-care settings.  I also coordinate

3    our senior service activities for community-based aging

4    services.

5    Q.  Are you currently a member of any national organizations

6    that relate to either geriatric care or long-term care?

7    A.  I am.

8    Q.  Which ones?

9    A.  So I am a member of the American Geriatric Society, I am a

10   member of the Post-Acute and Long-Term-Care Medical

11   Association, known as today now as PALTmed, formerly known as

12   AMDA, the Society for Post-Acute and Long-Term-Care Medicine.

13   I'm a member of the American College of Physicians.  I'm a

14   member of the Society of General Internal Medicine.  And I'm

15   also a member of the Society for Healthcare Epidemiology of

16   America, which is an infectious disease society.

17   Q.  One of those was PALTmed.  Could you say more about what

18   PALTmed is?

19   A.  Sure.  PALTmed is the leading organization -- the only

20   organization that represents the physicians, nurse

21   practitioners, physician assistants, and other doctorally

22   trained individuals who provide medical healthcare services to

23   residents of the various long-term-care sites.

24   Q.  Is that a nationwide organization?

25   A.  It is.

1   Q.   What is PALTmed's mission?

2   A.   The mission of PALTmed is to really improve the quality of

3   care and services that are supplied to our country's

4   long-term-care residents in the skilled-nursing side, the

5   assisted-living side, and the independent-living side, and we

6   do that through promotion of quality improvement, education,

7   and public advocacy.

8   Q.   Have you had any leadership positions within PALTmed?

9   A.   I have.

10  Q.   Which ones?

11  A.   I have served on a variety of committees in the

12  organization.  I have been the chair of some of those,

13  including the public policy and advocacy committee.  I have

14  been a board member for the organization, secretary of the

15  board.  I've been on the executive committee.  And I have

16  served as the president of the organization.

17  Q.   When were you the president of PALTmed?

18  A.   I was the president from March of 2020 to March of 2021.

19  Q.   What were your responsibilities as president?

20  A.   As president my responsibilities are to oversee the running

21  of the organization, to guide it in terms of development of

22  educational programs, quality initiatives, defining where we

23  spend our resources in order to try to promote the quality of

24  care in long-term-care sites, and also to ensure that the

25  organization is on sound footing.

1    Q.  Do you have knowledge of LTC-related practices in states

2    other than your home state of Pennsylvania?

3    A.  Yes.

4    Q.  How did you gain that knowledge?

5    A.  I've been heavily involved, both in the American Geriatric

6    Society, but also PALTmed, throughout my career.  As part of

7    that, on the various committees that I have served, on the

8    various leadership positions that I have served, we have dealt

9    extensively with issues around assisted-living,

10   independent-living, and also skilled-nursing facilities.  We

11   have addressed from a variety of different perspectives issues

12   that come around.  I'm familiar with the issues that

13   long-term-care facilities face in all those settings, including

14   the assisted-living setting.

15          As part of the house of delegates we have debated

16   policy issues around assisted living, and through my presidency

17   we have faced some of these issues as well.

18   Q.  Have you participated in the development of federal

19   regulations related to skilled-nursing facilities?

20   A.  I have.

21   Q.  Could you describe in what capacity?

22          MR. RISKIN:  Objection.  Relevance.

23          THE COURT:  Overruled.

24   A.  Yes.  I have served on several capacities to develop

25   regulations for the skilled-nursing facilities, either

1    reviewing the entire set of regulations or focusing on specific

2    updates, and I have provided consultation to CMS in several

3    regards to that.

4    Q.   Have you done any work related to proposals for national

5    standards for assisted-living facilities?

6    A.   Yes.

7    Q.   Could you describe that, please.

8    A.   Yes.   During my presidency, and actually during my time on

9    the board, we have had ongoing conversations with NCAL, which

10   is the National Center for Assisted Living, Argentum, which is

11   another assisted-living organization, and our role was to work

12   together with them.   They represent the assisted-living

13   facilities.   And our goal was really to try to create a set of

14   minimum standards that would be applicable.   Our goal was to

15   try to move them towards agreeing on a voluntary set of

16   standards to improve the care within those facilities.

17   Q.   What was the outcome of those efforts to get a minimum set

18   of standards for assisted-living facilities?

19   A.   Yeah.   Unfortunately, we are unable to get those

20   organizations to agree upon a set of standards, so we weren't

21   able -- we weren't successful in moving that forward.   There

22   was general resistance to setting a set of standards because

23   they had concerns that if these are the standards we have to

24   make sure that we meet them, and it's a level of discomfort for

25   them.

1    Q.  Are there any other ways that you have become familiar with

2    how assisted-living facilities are run across the country other

3    than what you've already mentioned?

4    A.  Yes.

5    Q.  Could you describe those.

6    A.  Yes.  As part of my role within the organizations

7    nationally, I'm regularly working with individuals as part of

8    the assisted-living organizations.  Some of them may be chief

9    medical officers at the corporate level for an assisted-living

10   chain as an example.  I have had interactions on a regular

11   basis with individuals who are administrators or directors of

12   nursing or nurses or nurse aides in the assisted-living

13   environment.

14           On my presentations that I do nationally, and I do a

15   fair number of presentations, I'm always asked to talk about

16   how this impacts not just a skilled-nursing facility side but

17   how it impacts independent living, how it impacts assisted

18   living, and I've also presented at Leading Age and also at one

19   of the Pennsylvania chapters for assisted-living facilities.

20   Q.  Doctor, in addition to this work, do you also see patients?

21   A.  Yes.

22   Q.  How often?

23   A.  I see patients every week on a frequent basis throughout

24   the week, three to four times a week, roughly.

25   Q.  Are they all seeing you for geriatric care?

1    A.   Yes.

2    Q.   Are you currently the medical director of any LTC

3    facilities?

4    A.   I am.

5    Q.   What is the name of that?

6    A.   I'm the facility medical director for Asbury Heights, which

7    is a multilevel campus.  It includes independent living,

8    assisted living, skilled-nursing facility, and assisted-living

9    memory care.

10   Q.   Have you been the medical director for other facilities in

11   the past?

12   A.   I have.

13        MS. JUDE:  At this time, your Honor, the government

14   offers Dr. David Nace as an expert witness in geriatrics and

15   long-term care.

16        MR. RISKIN:  Your Honor, subject to our reservation

17   regarding the *Daubert* ruling, no objection at this time.

18        THE COURT:  Here we have another expert witness,

19   another designated opinion giver.  You have heard his

20   credentials.  Now he will testify.  You decide whether you find

21   his testimony believable and persuasive based on everything you

22   know about him and everything you know about the evidence in

23   this case.

24        Go right ahead.

25   Q.   Dr. Nace, what is a prescription?

1    A.  A prescription is, in the old days, and sometimes still

2    today, a piece of paper.  It can be in electronic form now with

3    electronic health records.  But it's a way of a physician

4    making a determination that a patient should be taking a

5    medication and it specifies what that medication is, how to

6    take it, so it includes the name of the medication, the

7    strength of the medication, the duration that you should be

8    taking it, how you should be taking it.  Is it something you

9    swallow or inject or whatever.  How frequently should you do

10   that.  It also incorporates information about the patient so

11   you know who it's for.  And also information about who is

12   prescribing that so there is a physician name, signature, and

13   license number that are on it.

14   Q.  What's the difference between a prescription medication and

15   a nonprescription or over-the-counter medication?

16   A.  So medicines can be either prescription or nonprescription

17   based, and sometimes they are both.  So we have prescription

18   medicines, which are generally medicines that carry a specific

19   risk, that risk can be rare or common, but because of those

20   risks we feel that they should be controlled in some way,

21   shape, or form.  So they should only be available once you're

22   assessed by somebody who is a medical provider that can

23   diagnose and formulate a treatment plan.

24         Nonprescription medicines are medicines that are often

25   available over the counter at the pharmacy.  Some of them may

1    be prescription too, but they are in lower doses, lower

2    strengths over the counter, and that's done as a protection

3    mechanism so that, for instance, if you cut the dose you cut

4    the risk of side effects.

5         The example here would be Advil or ibuprofen.  We are

6    all familiar with the painkiller.  And the dose that we might

7    prescribe to an individual with a prescription would be 800

8    milligrams or 600 milligrams.  What's available over the

9    counter are 200-milligram tablets.  There is a difference in

10   terms of the strength sometimes in those medications.  They can

11   be only one or the other or a combination of both sometimes.

12   Q.  Does patient use of prescription medication require medical

13   oversight?

14   A.  Yes.

15   Q.  And why?

16   A.  As I said, prescription medicines are made prescription.

17   They are controlled access because those are medications that

18   can have pretty significant side effects, and we want to make

19   sure that there is ongoing monitoring of an individual once

20   those medicines are started.  That's the basis of the

21   prescription process.

22   Q.  Is that medical oversight only necessary when a patient is

23   put on a new drug?

24   A.  No.  And I think one of the things that's important, once

25   you're started on a medicine, you should always really be

1   reevaluated and reassessed.  Do you still continue to need that

2   medication.  Is it still something that's helping you.  Is the

3   dose correct.  Are you getting too much of it.  Are you getting

4   too little of it.  Are you getting some side effects as a

5   result of it.

6   Q.  Did your medical training include training on prescribing?

7   A.  Yes.

8   Q.  What were you taught about that in medical school?

9   A.  It is medical school where we learned about the process of

10  ordering medications and writing a prescription.  We are

11  trained that you should include information around the name of

12  the medicine, the dose, the frequency, how you take it, and

13  making sure that information about the patient and about the

14  prescriber is on that script as well.

15  Q.  Were you taught anything about the need to maintain

16  oversight of that drug's use?

17  A.  Yes.  As part of that prescribing process we are not done

18  when we write the pill, so we still are responsible for the

19  patient, and we still have to make sure that what we are doing

20  is following up and making sure that it is the correct medicine

21  for them, it's effective, and it's not causing trouble.

22  Q.  How do doctors ensure that they are able to maintain this

23  oversight over their patient's use of medications?

24  A.  When I start a medication, I might say I want to see you

25  back in a few months, two weeks, four weeks, two months.  We

1    expect that the person will come back.  But life happens.  You

2    get sick.  There is a funeral.  There is something that

3    happens.  You don't want -- you're not able to make that visit.

4    Transportation breaks down.  The only way that we have, aside

5    from scheduling those times, if something falls through, is

6    have a way to stop that prescription from continuing on.  One

7    of the things is by writing in a duration for that prescription

8    or the number of tablets so that somebody will have to call you

9    back.  The pharmacy would call and say, this is running out.

10   Is it time to refill this.

11   Q.  Why are limitations on prescriptions important?

12   A.  So the limitations on prescriptions fill part of this vital

13   need.  It's a stopgap measure that's put into place.  When you

14   start the medication, I might start the medication for

15   Ms. Jones, and she is already on four other medications and

16   they started a long time ago.  This one is now starting today.

17   I won't know, because taking care of multiple patients, I can't

18   tell you which patient started which medicine at this time.

19   The only way to do that is to put a limit on the quantity or

20   the duration of the medication so that there is at some point,

21   a stopping point, and there is a reminder that comes back to me

22   that says, oh, do you still want the person to take this

23   medicine.  And I can then reassess and reevaluate.  So it's a

24   protection.  It's a stopgap so that the medicine just doesn't

25   continue on forever.

1   Q.  What are maintenance medications?  Are you familiar with

2   that term?

3   A.  Yes.

4   Q.  What are those?

5   A.  Maintenance medicines are medicines that are used to keep a

6   disease under control.  They are meant to be typically

7   chronic-disease medicines.  So somebody has diabetes.  You need

8   to be on medicines to maintain that over time.  High blood

9   pressure.  You need to be able to maintain that over time.

10  That's what maintenance medicines are.

11  Q.  Is it medically appropriate to dispense maintenance

12  medications without ongoing doctor oversight?

13  A.  No.

14  Q.  And why not?

15  A.  The key thing about maintenance medicines is that we need

16  to continue to reassess.  Because you might start on Norvasc or

17  Amlodipine for your blood pressure, but in six months there

18  might be changes in your body, and you don't need as much or

19  you need more.  Your blood pressure is not controlled.  Even

20  though they are maintenance medicines, we need to really kind

21  of be looking at whether they are continuing to help or not.

22          And I think the key point here is no medicine is meant

23  to be a life sentence.  When you start it -- I always tell

24  patients, look, when I start a medicine, I want to follow up

25  and this is how we are going to do that follow-up.  But what

1    I'm concerned about is, I want to make sure that you continue

2    to need it.  So it's easy to start the medicine.  It can be

3    hard, because we don't think of it well enough, to stop the

4    medicine.  But, again, we should have that periodic

5    reassessment to make sure it's most appropriate for the person

6    ongoing.

7    Q.  A few moments ago you mentioned certain limitations on

8    prescriptions, such as a limited duration or quantity.  As a

9    doctor, do you depend on pharmacies to enforce those

10   limitations?

11   A.  Yes.

12   Q.  And how so?

13   A.  So I would expect that if the prescription is running out

14   and the patient calls in for a refill of the prescription, the

15   prescription has run out, the pharmacy will call me and say:  I

16   know you wrote for two refills.  Is it time to refill that.  Do

17   you still want them on that.  That's a prompt for me to look at

18   that person and say, look, we should continue it or we should

19   make a change.

20   Q.  When you get called by the pharmacy, do you ever need the

21   patient to come back in to be reevaluated as to whether they

22   need to be on that medication?

23   A.  Yes.

24   Q.  Are you familiar with the term deprescribing?

25   A.  Yes.

1    Q.  What does that mean?

2    A.  Deprescribing is getting at that issue of trying to not

3    make a medicinal life sentence.  Deprescribing is the active

4    process of looking at medicines and saying, OK, you've been on

5    this medicine for a while, your heartburn is under good

6    control, I think we can -- your heartburn is under good

7    control.  You lost a little bit of weight.  You made some other

8    dietary changes.  You might not need that dose of omeprazole.

9    You might be able to come off of that.

10          So deprescribing is that attempt to look at your

11   medicines and say, maybe we can start to cut back on this, or

12   you don't need as much.  You might not be able to get off, but

13   half the dose of the medicine is better than taking a higher

14   dose of it.  That's one of the most important things that we do

15   when we start a medicine, is looking for opportunities to

16   deprescribe.

17   Q.  As a doctor do you expect the legal limitations on

18   prescriptions will be followed by the pharmacy?

19   A.  Yes.

20   Q.  And does the quality of your care for your patients depend

21   on pharmacies enforcing your limitations?

22   A.  Yes.

23   Q.  When you prescribe maintenance medications for long term or

24   chronic disease, do you ever put a limit on the number of

25   refills or quantity?

1    A.   Yes.

2    Q.   Why do you do that?

3    A.   With maintenance medications I might start the medicine

4    Donepezil, which is Aricept.  It's used to treat dementia.  We

5    start at five milligrams with that.  Then I like to see the

6    person back typically in six to eight weeks to say, is this

7    working.  Is it not working.  The medicine works in one out of

8    four people.  Three out of four it doesn't work.  So if we are

9    six, eight weeks in, and you're at five milligrams, do I need

10   to increase it to 10.  Then six to eight weeks after, going at

11   10, I want to know, is it still doing anything or not.  If it's

12   not, the question is, can we deprescribe it at that point in

13   time.

14          Even medicines that would be for maintenance.  Blood

15   pressure medicines.  I mentioned Amlodipine or Norvasc.  That

16   particular medicine I might start at two and a half milligrams,

17   and I would want to see the person back in a period of time

18   just to see if the blood pressure is well controlled, and make

19   adjustments if it's not, or to see, did they get edema,

20   swelling of the legs, as a complication of it.

21   Q.   Do you ever put such limits after a patient has been on

22   their maintenance medication for a long time?

23   A.   Yes.

24   Q.   Could you explain why.

25   A.   Yeah.  Again, medicines aren't meant always to be forever

1    medicines.  An example here is Alendronate, which is used for

2    the treatment of osteoporosis.  Osteoporosis is a common

3    disease in the older adult population.  It's a thinning of the

4    bones, and it leads to fractures if a person falls.  And

5    fractures are notoriously, particularly of the hip, deadly to

6    patients as they age.

7         With that, we start medicine oftentimes called

8    Alendronate.  That's a medicine that we will usually treat for

9    four to five years, and then we will stop and give a drug

10   holiday, because there are some complications that can occur

11   after four to five years of usage.  The first four years were

12   pretty good.  Starting year four, we start to worry.

13        So if the person is on it for three and a half years,

14   I'm only going to write six more months of that, and I don't

15   want that medicine to keep on going, because I am going to want

16   to actively hold it at that point.

17   Q.  Do both doctors and pharmacists have responsibilities

18   related to the management of a patient's medication?

19   A.  Yes.

20   Q.  What are the doctor's responsibilities?

21   A.  My responsibility with regards to the medications is to

22   assess the person to make sure that I'm coming up with what I

23   think is the cause of the problem and offer potential options

24   for treatment, talk with the patients, go through the risks and

25   benefits so they know and they understand, and then mutually

1    what we are to do is make a decision what course do we want to

2    go.  Do we want to go with this particular medicine.

3          And so we then would go ahead and write a prescription

4    for that and define a treatment plan as to what we want to do

5    in terms of follow-up.  Then we transmit that information to

6    the pharmacy.

7    Q.   Then what are the pharmacist's responsibilities?

8    A.   The pharmacist's responsibilities are to receive that

9    prescription and to make sure that I haven't done anything

10   wrong on the script or I have left anything out.  Is there

11   something important like, did I forget the dose of the

12   medicine.  And then from that point they will -- once they

13   validate the script and understand that it is containing all

14   the elements that it should, they would go ahead and fill that

15   prescription.  They would also monitor the refills and would be

16   able to tell the patient you're out of refills at this point in

17   time.  We need to call your doctor to see if you should get

18   more.

19   Q.   If a pharmacist receives a prescription from the doctor

20   that's incomplete or in some way ambiguous, what should they

21   do?

22   A.   At that point they really need to be calling the physician

23   to figure out what our intent is.  If you're missing this, you

24   can't really guess as to what the doctor is thinking because

25   that could have some pretty significant consequences.

1   Q.  Are there circumstances in which the pharmacist should

2   attempt to discern what the prescriber intended?

3   A.  I'm sorry.  Could you repeat the question.

4   Q.  Yeah.  Are there circumstances in which the pharmacist

5   receiving this incomplete or ambiguous prescription should try

6   to figure out what the doctor meant on his or her own?

7   A.  I don't think the pharmacist should try to pretend to get

8   inside of her head.  It's scary in there.  I'm a physician.

9   I'll admit it.

10          And the issue here is that you can't really make a

11  decision.  Is my intent to continue this.  Is my intent to go

12  with two and a half milligrams or five milligrams.  You really

13  needed to clarify that.  It has to be a clear decision.

14  Q.  Doctor, couldn't it be dangerous to not provide a patient

15  with a prescription medication that he or she has been on for a

16  long time?

17  A.  It depends.  It depends on how long they are off of the

18  medicine.  It depends on what the medicine is for.  If it's a

19  chemotherapy medication, we would want to try and keep those

20  medicines to treat cancer ongoing, and you probably don't want

21  to skip too many of those doses.  If it is a medicine for blood

22  pressure, that's not as critical.

23          As a matter of fact, we know it's normal that as

24  patients, including myself when I've had to take medicines, I

25  don't take them always the way I should.  I'll skip doses.

1    It's normal and it's OK.

2            For the folks in the jury what I want to say is, let

3    your doctors know it.  Don't be afraid.  It's not wrong to say:

4    You know what, I skipped the last week.  It is certainly a

5    possibility that people skip medicines on a regular basis.  We

6    know that as a fact.  It's hard to remember to take the

7    medicines.  I didn't take my Ocuvite today.  I have some eye

8    damage, and I have to take vitamins.  I didn't take it today.

9    I didn't take it yesterday.  Hopefully tomorrow.

10           Yeah.  Long-term medicines, sometimes we will skip

11   them.  For short periods of time that's probably going to be

12   OK.  The cholesterol medicine is an example.  It takes months

13   to years to see the benefits from those.  Medicines for your

14   prostate.  Proscar is a medicine that's often used.  It takes

15   six months to take effect.  If you skip one or two doses or

16   even a month, it's probably not going to make a huge

17   difference.

18           I think it depends on the circumstance what the

19   medicine is, but oftentimes you can skip doses, and you will

20   usually not have too much major issue.  It's possible, but not

21   guaranteed for all types.

22   Q.  But shouldn't the pharmacist err on the side of providing

23   the medication?

24   A.  They can, especially if they know it's an important

25   medicine.  A type 1 diabetic who has to have insulin, the

1  pharmacist should say, yeah, I am going to make sure you get

2  your insulin for that.  And they have ways that they can do

3  that.

4  Q.  And are those like emergency prescribing rules, the ways

5  that they can do that?

6  A.  Yes.  You can give an emergency supply.  You can give a

7  week's supply.  You can give a month's supply.  A short time

8  limit giving you, as the pharmacist, enough time to call the

9  doctor and say, hey, do you really want to continue this.  We

10  need a refill if that's the case.

11  Q.  I am going to switch gears and ask you a little bit about

12  long-term-care facilities.  What are the different types of

13  long-term-care facilities that have geriatric patients?

14  A.  Long-term care is the term that's used for a variety of

15  different settings where we provide long-term care, right.

16  There are skilled-nursing facilities.  I'll preface this to say

17  that sometimes I will lapse into nursing facility or nursing

18  home.  That means skilled-nursing facility.  They are all the

19  same for these purposes.  Those are facilities that are fairly

20  well structured and care for patients who are either long-stay

21  residents who can't go back home or coming out of the hospital

22  who need rehab.

23         Then you have the assisted-living facilities, which

24  are residences where people live who probably can't be at home

25  by themselves.  They need some degree of assistance.

 1          Then there are independent-living facilities, which
 2   are more like the apartment setting.
 3   Q.   Let's first talk about skilled-nursing facilities.  For
 4   which patients is skilled nursing indicated?
 5   A.   Sort of, as I mentioned, when somebody is in the hospital,
 6   we have a way in the hospital of making people weak and frail.
 7   We wake you up in the middle of night to give you medicines.
 8   You get exhausted.  You don't get testing.  We don't get you
 9   out of bed.  We don't feed you sometimes.  It's the nature of
10   the acute-care hospital, and it's the nature of treating acute
11   illness.  It's not uncommon for people to be weak, to be
12   debilitated.  So they need rehabilitation care.  And nursing
13   homes provide probably the vast majority of rehabilitation care
14   in the United States, more so than even acute rehab hospitals,
15   just by the sheer number of them.

16          So the other population that they take care of are
17   those individuals who really can no longer be at home.  They
18   might be bed bound.  The person that has had a stroke and just
19   cannot walk and use their entire right side of their body, and
20   they need full assistance of somebody else to get in the bed or
21   to get out of the bed.
22   Q.   What kind of services does a skilled-nursing facility
23   provide?
24   A.   Skilled-nursing facilities provide skilled services, which
25   are physical therapy, occupational therapy, respiratory therapy

1      sometimes, speech therapy.

2              These are intense sessions where several hours a day

3      are spent providing these services to try to build up a

4      person's strength to get them walking again, to get them to use

5      their arms, even if they have trouble walking, so that they

6      became more independent, to be able to use a walker or a cane

7      or to negotiate steps back at home.

8              There are also advanced wound-care services that are

9      provided under skilled care, and for some individuals there

10     will also be intravenous-medication therapy, that they need

11     antibiotics for a bone infection, so they need six weeks of

12     antibiotics four times a day.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   Is there a specific licensure or regulatory framework that

2    applies to skilled nursing facilities?

3    A.   Yes.

4    Q.   What is that?

5    A.   So we have a set of federal regulations that Medicare has

6    established, which are the minimum criteria that facilities

7    have to follow in order to be licensed as a skilled nursing

8    facility.

9    Q.   And what are some of those requirements that come out of

10   the federal regulations for skilled nursing facilities?

11   A.   The federal requirements stipulate that every person that's

12   admitted to a nursing facility is under the care of a

13   physician, under an attending physician.  And that physician is

14   responsible to see that person following admission.  And then

15   for the first 90 days, every 30-day period they have to see

16   that person.  So those are the minimum requirements.

17           After that first 90-day period, then they have to see

18   the person every 60-day period.  So throughout the course of

19   the year, multiple visits, monthly or at least at a minimum

20   every other month depending on where they are.

21           They also have to assess the person and look at their

22   total plan of care, which includes the rehab services, the

23   medicines, what the diet is, you know, those type of things.

24   And they have to write a meaningful and legible progress note.

25   Legible can be defined many ways.  And they also have to review

1   all the orders for that person and sign them at those visits.

2   Q.  Are skilled nursing facilities required to have a medical

3   director?

4   A.  Yes.

5   Q.  And who is the medical director, a doctor or someone else?

6   A.  So the medical director is different than the attending

7   physician.  So the attending physician is a clinician that is

8   caring for the person.  The medical director is an

9   administrative role, and that particular role is making sure

10  that as the medical director, you ensure that each person is

11  under some physician care; that there is access to physician;

12  that if there's an emergency, somebody can be reached to care

13  for that person.  If that doctor or that patient's doctor is

14  not available, who do we turn to?

15          It also is a role where we look at advising and

16  assisting in the development of and implementation of the

17  resident care plans for that -- and care processes for that

18  facility.  So, you know, we're a facility that takes care of a

19  lot of wounds, so we should have solid wound policies that are

20  based on good evidence and best clinical practices.

21  Q.  Do the federal regulations require a certain level of

22  nursing care?

23  A.  Yes.

24  Q.  And what is that?

25  A.  So within nursing facilities, you have to have actually a

1    registered nurse available throughout the day.  You have to

2    have a registered nurse with at least eight hours of care

3    throughout the day.  The regulations have recently changed,

4    that have enhanced the amount of nursing that's available

5    because we recognize that those patients that are in the

6    skilled nursing facility are really patients that used to be in

7    a hospital 10, 20 years ago.  So people are coming out of the

8    hospital sicker.  They have difficult, challenging

9    multi-complexity, multiple problems.

10          And how do you manage those individuals?  it really

11   requires careful, ongoing, close, direct care by nurses.

12   Q.  Apologies, you may have gone into this a little bit

13   already, but are skilled nursing facilities required to review

14   patients' drug regimen on a regular basis?

15   A.  Yes.  So each skilled nursing facility must have a

16   consultant pharmacist that reviews each individual person's

17   drug regimen every month.  So they have to sit down and look at

18   the medical information that's on that chart from the physician

19   visits that have occurred, any changes that might have occurred

20   from the nursing standpoint, what are the medicines that you're

21   on.  Are these medicines potential for interactions?  Are these

22   medicines ones that we should think about reducing?  The

23   federal regulations actually stipulate some of these medicines

24   should be reduced at certain intervals.  And so they -- the

25   pharmacist will do that for every patient every month and then

1    make recommendations back to the nursing staff saying, oh, this

2    medicine should not be crushed; this should be given in a pill

3    form.  Or it might be a recommendation back to the physician

4    saying, we need a diagnosis for this medicine, or we would

5    suggest that, you know, these two drugs might be interacting,

6    and you should consider stopping one of them or providing some

7    information as to why you think they're necessary.

8    Q.  Dr. Nace, why are skilled nursing facilities required to

9    have a medical director, an attending for every patient, and

10   nurses always available?

11   A.  These are complex patients with complex care needs.

12   They've grown more complex over the last three decades,

13   especially as hospitals have shortened lengths of stay.  And

14   it's really what's required to really kind of try to take good

15   care of these patients, to do best practices around, you know,

16   their -- the maintenance of their medications, around their

17   clinical care processes.

18   Q.  Earlier you mentioned progress notes.  Could you explain to

19   the jury what progress notes are.

20   A.  Yes.  So progress notes are in the old days a piece of

21   paper and sometimes still are in some facilities.  Sometimes

22   it's now a section in an electronic medical record.  It's the

23   physician nurse practitioner or physician assistant who sees a

24   person, does a history and physical, gets the information:  How

25   are you feeling?  What are the symptoms?  Exam.  And then

1    outlines what they think the problems are, what are the key

2    variables in terms of the laboratory findings or x-ray

3    findings, and what is your plan for that patient?  And that's

4    where you -- progress note is where you put that information

5    down so that the other members of the team can look at it and

6    say, oh, you saw this person three times in the last week.

7    This is what you're thinking.  I can see what direction is

8    going on.

9    Q.  And are progress notes required in skilled nursing

10   facilities?

11   A.  Yes.

12   Q.  So is there a minimum set of regulations for skilled

13   nursing facilities that applies across the country?

14   A.  For skilled nursing facilities, yes.

15   Q.  How does medication prescribing work in a skilled facility?

16          THE COURT:  How much more are we going to talk about

17   skilled nursing facilities?  I'm just curious since they --

18   your allegations relate to a different type of facility.

19          MS. JUDE:  Yes, your Honor, it is.

20          THE COURT:  Just curious.

21          MS. JUDE:  I think I have three more questions?

22          THE COURT:  Okay.

23   Q.  How does medication prescribing work in a skilled nursing

24   facility?

25   A.  So in a skilled nursing facility when the physician sees

1    the person and decides they need to start a med, change a med,

2    the physician will hopefully talk with the nursing staff

3    directly and then put a note or an order, excuse me, on the

4    chart.  And they'll write out the information necessary to

5    prescribe that.  So the medication name, dose, route of

6    administration and frequency that it should be administered,

7    and then they'll sign that at that point, and also date it.

8    Q.  Are those orders typically required to have a quantity and

9    refills in a skilled nursing facility?

10   A.  So in a skilled nursing facility, it's slightly different

11   and what happens is that the physician is signing those on a

12   regular ongoing basis every one to two months.  And within the

13   state regulations, it will usually define that these are good

14   for at least a year.  So usually there's not a quantity because

15   we know it's only good for a certain amount of time.

16   Q.  Okay.  I'm going to turn now to independent living

17   facilities.  What kinds of services are provided there?

18   A.  Independent living facilities are apartments.  So they

19   provide the grass cutting and groundskeeping.  They might

20   provide a meal or two per day or three sometimes.  They will

21   provide light housekeeping services, but they don't provide

22   nursing care.  They don't provide any healthcare services.

23   They're really not allowed to within that context.

24   Q.  Do they have any involvement with medication management for

25   the people who live there?

```
 1   A.  No.

 2   Q.  Let's talk about assisted living facilities.  Just at a

 3   very high level, could you tell me what the major differences

 4   are between skilled nursing facilities and assisted living

 5   facilities?

 6           MR. RISKIN:  Your Honor, objection.  Outside the

 7   scope.  We're doing our objection from later.

 8           THE COURT:  Oh no, the objection is overruled.

 9           MR. RISKIN:  Thank you, your Honor.

10   Q.  So high-level explanation of the difference between

11   assisted living and skilled nursing.

12   A.  So as we saw in the skilled nursing facilities, this is a

13   population that has pretty significant impairments in their

14   basic activities of living:  So bathing, grooming, dressing,

15   but also getting out of bed, walking, and so there's a greater

16   degree of oversight and supervision.  There are way more staff

17   in a nursing home.  And I'm sure you'll find that surprising

18   because when you think of nursing homes, you don't think they

19   have a lot of staff most of the times, but there are way more

20   staff in a nursing home than there will be within an assisted

21   living facility.

22           The same types will be in assisted living so, you

23   still may have some nurses.  You still may have physician

24   involvement to some degree, but the sheer number of people is

25   different.  Within the assisted living facility, those patients
```

1    are individuals who have some impairments in their activities

2    of daily living perhaps, more in what we call the higher ones

3    so they might have trouble driving or getting out to the

4    grocery store and shopping.  They might have trouble forgetting

5    to take their medicine.  They might have trouble getting the

6    medicine out of the pill box.  They might have trouble with

7    their finances.  So they can't really live independently; they

8    need some assistance.

9          They might not have family to do it or their family

10   might not be able to do it for them.  So they require -- they

11   require a little bit of a lighter degree of assistance, and as

12   a result of that, most of the care is provided by care aides

13   within the facility, and there's not the degree of staffing

14   around the clock there is that we would find in the skilled

15   nursing facilities.

16   Q.  What kind of environment is an assisted living facility?

17   A.  So an assisted living facility are meant to be really

18   residential care facilities with some assistance for the daily

19   activities.

20   Q.  Are they healthcare facilities?

21   A.  So in general we don't consider them to be healthcare

22   facilities.  Pennsylvania is an example.  They are not licensed

23   as a healthcare facility.  And the differentiation is that they

24   have limited scope.  So they -- in most assisted living

25   facilities, the staff can't administer intravenous medications

1    or provide advanced room care.  Assisted living facilities,

2    while you can have an outside company come in for physical

3    therapy, it's not for hours a day like you would see in a

4    nursing facility.

5    Q.  Do assisted living facilities typically provide medical

6    administration?

7    A.  So assisted living facilities will provide support with

8    medication administration, and sometimes they call that

9    medication management, but it is distinctly different.  It's

10   reminding the person to take this medicine, and you're

11   administering it for that particular person.  So, you know, the

12   person that might have bad eyesight and can't figure out how

13   much insulin to draw up in a syringe, so the nurse is there to

14   give that assistance to make sure they're taking the meds at

15   the right times.

16   Q.  Is there a specific licensure or regulatory framework that

17   applies to assisted living facilities?

18   A.  There is no national minimum set of standards that are set

19   aside for assisted living facilities.  The regulations for

20   assisted living facility are based state by state, and there's

21   quite a degree of variability in what is required.

22   Q.  Are assisted living facilities required to have doctors on

23   staff?

24   A.  No.

25   Q.  So are doctors not regularly rounding at an assisted living

1  facility?

2  A.  Typically not.  There are some facilities where a practice

3  might decide this is my calling, and I want to take care of

4  folks within this environment.  But typically it's the person's

5  primary care attending.  The person is admitted to the facility

6  and they still continue to go out to see that physician.

7  Q.  So could that be that physician that they've seen for the

8  last 30 years that they continue to see at office visits?

9  A.  Exactly.  It's typically not a closed medical staff model.

10  Q.  Are assisted living facilities required to have nurses on

11  staff?

12  A.  So state by state variation in nursing requirements.  So,

13  you know, they -- to the extent the nursing will vary state by

14  state as well.

15  Q.  What kinds of staff are responsible for the day-to-day

16  medication administration at an assisted living facility?

17  A.  So if you look at staffing within an assisted living

18  facility, about 15 percent of the staffing nationally is a

19  registered nurse.  Two-thirds, 66 percent are care aides, so

20  individuals who are providing the basic aspects of care.  The

21  people that would administer the medicine would be either the

22  nurse, or because only 15 percent of that work force are the

23  nurses, we have certified medication technicians, CMTs, who are

24  authorized because of some limited training they received to

25  administer the medications.

1    Q.  Exactly what kind of training is required to become a

2    certified medical tech?

3    A.  Typically these are state-based training programs, they can

4    be eight hours in length.  They can vary state by state.  But,

5    you know, typically a short period of time where people

6    understand how to administer the medicine and how to document

7    that they administered the medication.  It's not an in-detail

8    pharmacology course where they get to understand all the

9    nuances of those particular medicines, all the side effects of

10   those medicines, how they might interact.

11   Q.  Dr. Nace, have you heard medication administration referred

12   to as passing medicine before?  Have you ever heard that?

13   A.  Yes.

14   Q.  Is it because the passing out of the medications throughout

15   the facility?

16   A.  So, yes.

17   Q.  Are assisted living facilities required to have progress

18   notes?

19   A.  No.

20   Q.  What are the implications of not having progress notes in

21   those facilities?

22   A.  Well, if you have a -- you know, a resident that is being

23   followed by their primary care physician, they go out to the

24   office.  If there is no information that comes back, which is

25   not unusual, the progress note typically doesn't come back.

1   Most physicians don't dictate the progress note and get it back

2   on their own chart in their office the same day.  There is, you

3   know, the amount of detail in a progress note can be

4   significant, so it could take days.  And that often is not sent

5   back to an assisted living facility if they're seen off site.

6           The implication of that is that the staff at the

7   facility really might not have a full picture of what is going

8   on.  What was actually discussed during the doctor's visits,

9   even if a note is sent back, if there is not a communication

10  between the doctor and the nurse at that point in time, you

11  might not have the nuances of what's with that particular

12  person, why is this person's behavior suddenly changing.  They

13  might see a medication, but they won't have the context to

14  understand necessarily why that medicine change occurred.

15  Q.  Is physician oversight provided by an ALF?

16  A.  Physician oversight provided by an ALF?

17  Q.  No.  Are ALFs required to have a medical director?

18  A.  No.

19  Q.  I've lapsed into ALFs, but you understand I'm talking about

20  assisted living facilities.

21  A.  ALF, yes.

22  Q.  Do some assisted living facilities have a medical director?

23  A.  Yes.

24  Q.  How common is that?

25  A.  So from the studies we've looked at, it is less than

1    25 percent of them.

2    Q.  When an assisted living facility does have a medical

3    director, do they do the same thing as a medical director at a

4    skilled nursing facility?

5    A.  So the roles are different.  There's a substantial amount

6    of rules in a nursing facility, and the medical director has to

7    be much more engaged with the facility, you know, the quality

8    assurance performance improvement committee and looking at, you

9    know, issues around, you know, the P and T.  Pharmacy and

10   therapeutics management within that.  So that's different in

11   nursing homes than the drug regimen review we talked about.

12        P and T functions are essentially looking at, okay,

13   our preferred drugs for these agents will be these medications.

14   Or if we're managing heart failure within these patients, we

15   want to make sure we follow specific protocol.  So it's a

16   different function overall.

17        With assisted living facility, it's typically

18   resolving problems of, you know, is this person appropriate for

19   this environment.  We know this isn't your patient, but we're

20   having trouble with the family interactions with us, and we're

21   not quite sure if we're doing what we should be doing in care

22   of this patient, can you talk with the family here?  So it's a

23   much different level of organization.  And typically assisted

24   living facility won't get committees together to sit down

25   together and review medications or review processes the same

1    way they do in nursing homes.

2    Q.  I think you testified a few moments ago that assisted

3    living facilities' patients often have outside doctors, right?

4    A.  Yes.

5    Q.  Are there doctors required to visit them in the facility?

6    A.  No.

7    Q.  In your experience, how common is it for ALF residents to

8    have their doctor visit them in their facility?

9    A.  It's actually relatively uncommon.

10   Q.  Are there any states that require that assisted living

11   facility residents receive an annual examination of some sort?

12   A.  Yes.

13   Q.  Do most states require this?

14   A.  So, well, many states require a health examination, which

15   sometimes state by state can be done by the nurse.  There are

16   some states, Pennsylvania is an example, that requires a person

17   be seen by a physician prior to entry and then annually.

18   Q.  And in Pennsylvania, what exactly does that annual

19   examination consist of?

20   A.  So there's no defined structure around what the physician

21   is supposed to be doing.  There is a form they complete or that

22   is completed for them that will typically list the medical

23   problems.  It may not be exhaustive.  You know, it will not

24   necessarily include all of them.  As a matter of fact, there

25   are a limited number of lines where you can enter the

1   diagnoses.  They will ask about vaccine information which may

2   or may not be complete, vital signs, general functional status,

3   and then a list of the medications, again, which may or may not

4   be fully completed.  May skip some medications.

5        MS. JUDE:  Your Honor, I'm mindful of an early stop

6   today. I am going to switch topics, I just want to know let you

7   know. Should I continue?

8        THE COURT:  No, if we're going to switch topics, we're

9   close enough to 3:30 that we should (indicating) for the day.

10  I'm sure you're thrilled.

11       Tomorrow morning 9:45.  Don't discuss the case.  Keep

12  an open mind.  You get to vote on whether you want to order

13  pizza or have like sandwiches and salads.  So that's your first

14  vote that you get to take, okay?  But you will have lunch

15  tomorrow.

16       (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1                (Jury not present)

 2                THE COURT:  Dr. Nace, you're free to go.

 3                (Witness excused)

 4                THE COURT:  169 and a half minutes for the government.

 5      29 and a half minutes for the defendant.

 6                I am sorry about this, but this is like a command

 7      performance.  Okay.  See you in the morning.

 8                MS. JUDE:  Your Honor, may I ask one question?  I just

 9      wanted to know, is it the Court's practice to admit impeachment

10      material?  Just for our sort of future planning purposes.

11                THE COURT:  No, not unless you offer it.  If you offer

12      something in evidence, I will make a ruling, okay?  That's --

13      but people can offer things in evidence that they use for

14      impeachment.  It is not forbidden by the rules of evidence.  If

15      they offered something, I admitted it.  It turns out to have

16      very little, if anything, to do with this case.  She took care

17      of that for you.  That's the way it should be done.  But

18      they're not automatically admitted, not unless somebody -- you

19      have to say the magic words to me.  "We offer it," not "we

20      move," by the way.  "We offer it in evidence."  Say the magic

21      words, my ears perk up.

22                MS. FOLCH:  Your Honor, I don't -- I'm not questioning

23      the math here.

24                THE COURT:  Yes, you are.

25                MS. FOLCH:  I'm a little worried because by my count I
```

1    don't think that defense could have possibly done what they did

2    today in 29 minutes, so I --

3            THE COURT:  Did I miss something?  You're absolutely

4    right.  That's only one witness.  My bad.  You're correct.

5    You're absolutely correct.  Okay.  It's 58 minutes, two

6    witnesses.  Sorry.

7            MS. FOLCH:  Thank you, your Honor.

8            (Trial continued April 4, 2025 at 9:45 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    JOHANNA SULLIVAN

 4    Direct By Mr. Issacharoff . . . . . . . . . 510
      Cross By Ms. Salgado . . . . . . . . . . . 532
 5    Redirect By Mr. Issacharoff . . . . . . . . 558

 6    ARIANNE SPACCARELLI

 7    Direct By Mr. Issacharoff . . . . . . . . . 560
      Cross By Mr. Ashworth . . . . . . . . . . . 608
 8    Redirect By Mr. Issacharoff . . . . . . . . 630
      Recross By Mr. Ashworth . . . . . . . . . . 639
 9    DAVID ANDREW NACE

10    Direct By Ms. Jude . . . . . . . . . . . . 640

11                    GOVERNMENT EXHIBITS

12    Exhibit No.                          Received

13     1174   . . . . . . . . . . . . . . . . . 586

14     1119   . . . . . . . . . . . . . . . . . 588

15     1175   . . . . . . . . . . . . . . . . . 590

16                    DEFENDANT EXHIBITS

17    Exhibit No.                          Received

18     271  . . . . . . . . . . . . . . . . . . 626

19

20

21

22

23

24

25
```