# Exhibit A

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among (a) the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS") and the Defense Health Agency ("DHA"), acting on behalf of the TRICARE Program (collectively, the "United States"); (b) defendants KICVentures LLC ("KICVentures"), SpineFrontier, Inc. ("SpineFrontier"), Impartial Medical Expert, LLC ("IME"), KIC Management Group, Inc. ("KIC Management"), Kingsley Chin, M.D. ("Chin"), Aditya Humad ("Humad"), and Vanessa Dudley ("Dudley") (collectively, "Defendants"); and (c) relators Charles Birchall, Jr. ("Birchall"), John Miller ("Miller"), and Walter Bennett ("Bennett") (collectively, "Relators"), through their authorized representatives. Collectively, all of the above will be referred to as "the Parties."

### RECITALS

A.    SpineFrontier, KICVentures, and KIC Management are Delaware corporations with principal places of business in Malden, Massachusetts. SpineFrontier manufactured, designed, marketed, and sold medical devices in the United States. IME, a Delaware corporation with a business address in Florida, described itself as a consultant referral firm. SpineFrontier and IME were owned and operated by KICVentures and managed by KIC Management. Chin, a Florida resident, was the founder and principal owner of SpineFrontier, KICVentures, and KIC Management. Humad, a Massachusetts resident, was KICVentures' Chief Financial Officer and served in various capacities for SpineFrontier, including President and Chief Financial Officer. Dudley, a Florida resident, was IME's Business Administrator.

B.    On July 2, 2015, Birchall filed a *qui tam* action in the United States District Court for the District of Massachusetts pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b), against, *inter alia*, KICVentures, SpineFrontier, KIC Management, IME, and

Chin captioned *United States ex rel. Birchall v. SpineFrontier Inc., et al.*, No. 1:15-cv-12877 (D. Mass.) ("the Birchall Civil Action").

C.     On July 15, 2015, Miller and Bennett filed a *qui tam* action in the United States District Court for the District of Massachusetts pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b), against, *inter alia*, KICVentures, SpineFrontier, IME, Chin, and Humad captioned *United States ex rel. Miller, et al. v. Impartial Medical Experts, LLC, et al.*, No. 1:15-cv-12908 (D. Mass.) ("the Miller Civil Action").

D.     On February 7, 2020, the United States intervened with respect to Counts One, Two, and Three in the Birchall Civil Action against KICVentures, SpineFrontier, KIC Management, IME, and Chin. On that date, the United States also intervened with respect to Counts I, II, and III in the Miller Civil Action against KICVentures, SpineFrontier, IME, Chin, and Humad. On March 5, 2020, the United States filed its Complaint in Intervention against SpineFrontier, IME, KIC Management, KICVentures, Chin, Humad, and Dudley in the Birchall and Miller Civil Actions (collectively, "Civil Actions"), filed as Docket Number 58 in the Birchall Civil Action and Docket Number 67 in the Miller Civil Action ("United States' Complaint in Intervention").

E.     The United States contends that the Defendants submitted or caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395lll ("Medicare"), and the TRICARE Program, 10 U.S.C. §§ 1071–1110b ("TRICARE").

F.     The United States contends that it has certain civil claims against the Defendants arising from their submission, or causing the submission of, false claims to Medicare and TRICARE from March 1, 2013 through December 31, 2018, as alleged in the United States' Complaint in Intervention (referred to below as the "Covered Conduct").

G.     The Defendants agree not to make or permit to be made any public statement denying, directly or indirectly, any of the Covered Conduct or creating the impression that the Covered Conduct is without factual basis. Nothing in this paragraph affects the Defendants' (i) testimonial obligations; (ii) right to take legal or factual positions in litigation or other legal proceedings in which the United States is not a party; or (iii) right to take legal or factual positions in the criminal matter of *United States v. Kingsley Chin, Aditya Humad, and SpineFrontier, Inc.*, No. 21-cr-10256 (D. Mass.) ("Criminal Matter").

H.     Relators claim entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relators' reasonable expenses, attorneys' fees and costs.

In consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.     The Defendants shall pay to the United States the sums specified in this Paragraph (collectively, the "Settlement Amount"), under the terms and conditions specified herein, by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the United States Department of Justice.

a.     Within ten (10) calendar days of the Effective Date (as defined in Paragraph 26 below): (i) KICVentures, SpineFrontier, KIC Management, and IME, jointly and severally, shall pay Thirty Thousand Dollars ($30,000.00); (ii) Humad shall pay Fifty Thousand Dollars ($50,000.00); and (iii) Chin shall pay Ten Thousand Dollars ($10,000.00) (each an Initial Payment and collectively the Initial Payments).

b.     During the five (5) years following March 20, 2023 ("Total Contingency Period"):  (i) KICVentures shall pay Eight Hundred Fifty-Five Thousand Dollars ($855,000.00), plus interest at four and one-eighths percent (4.125%) per annum, pursuant to the payment

schedule attached as Exhibit A-1; (ii) Humad shall pay One Hundred Thousand Dollars ($100,000.00), plus interest at four and one-eighths percent (4.125%) per annum, pursuant to the payment schedule attached as Exhibit A-2; and (iii) Chin shall pay Forty Thousand Dollars ($40,000.00), plus interest at four and one-eighths percent (4.125%) per annum, pursuant to the payment schedule attached as Exhibit A-3 (each a "Payment Over Time" and collectively the "Payments Over Time"). The Payments Over Time may be prepaid, in whole or in part, without penalty or premium.

       c.      For each period of three hundred sixty-five (365) calendar days ("Annual Contingency Period") during the Total Contingency Period, KICVentures shall pay to the United States five percent (5%) of the total gross revenue of KICVentures and the entities that consolidated into KICVentures as of March 20, 2023, which are listed in Exhibit B hereto (each a "KICVentures Entity" and collectively, "KICVentures Entities") that exceeds Nine Million Dollars ($9,000,000.00) during that Annual Contingency Period ("Revenue Payment"). Within fourteen (14) calendar days following the March 20 end of each Annual Contingency Period, KICVentures shall submit, for itself and any other KICVentures Entity, annual independently reviewed[1] or audited financial statements and any other supporting documentation ("Annual Financials") for the purposes of calculating any Revenue Payment. Within twenty-one (21) calendar days following the March 20 end of each Annual Contingency Period, KICVentures shall pay any Revenue Payment to the United States.

       d.      For each Annual Contingency Period within the Total Contingency Period: (i) Humad shall pay to the United States fifty percent (50%) of his Gross Income (defined herein

---

[1] An "independently reviewed" financial statement is a financial statement in which an independent practitioner, operating under a limited assurance agreement, performs primarily inquiry and analytical procedures to obtain sufficient appropriate evidence as the basis for a conclusion that the financial statement as a whole is free from material misstatement, in accordance with International Standard on Review Engagements 2400.

to include all income from whatever source derived, pursuant to 26 U.S.C. § 61) that exceeds One Hundred Twenty Thousand Dollars ($120,000.00) during the Annual Contingency Period; (ii) Dudley shall pay to the United States fifty percent (50%) of her Gross Income that exceeds One Hundred Thousand Dollars ($100,000.00) during the Annual Contingency Period; and (iii) Chin shall pay to the United States seventy-five percent (75%) of his Gross Income that exceeds Four Hundred Fifty Thousand Dollars ($450,000.00) during the Annual Contingency Period. Notwithstanding the prior sentence, if Chin does not own the property located at 3328 NE 16th Court, Fort Lauderdale, Florida 33305 (a/k/a Las Olas by the Sea Ext 3-8 B Lot 20 Blk 11), at any time during an Annual Contingency Period, then for that Annual Contingency Period and all subsequent Annual Contingency Periods, Chin shall pay to the United States fifty percent (50%) of his Gross Income that exceeds One Hundred Fifty Thousand Dollars ($150,000.00) during the Annual Contingency Period. Within thirty (30) calendar days following the March 20 end of each Annual Contingency Period, Humad, Dudley, and Chin each shall email the undersigned counsel for the United States (or anyone else they identify to receive service) a written summary, including a signed certification confirming the accuracy of its contents subject to 18 U.S.C. § 1001, that specifies the Gross Income each received during that Annual Contingency Period and the calculation of the amount due to the United States under this subparagraph ("Annual Report"). Within sixty (60) calendar days following the March 20 end of each Annual Contingency Period, Humad, Dudley, and Chin shall pay any amounts due under this subparagraph to the United States.

    e.    During the Total Contingency Period, KICVentures shall provide thirty (30) calendar days' advance, written notice to the United States of any sale, transfer, merger, joint venture, or liquidation of any Qualifying Asset (defined below) that individually or collectively has a fair market value of at least Fifty Thousand Dollars ($50,000.00) ("Sale Event"). As referred to herein, a Qualifying Asset is any entity, intellectual property, real estate, or other asset owned

directly or indirectly by any KICVentures Entity, including inventory, but excluding inventory sold in the ordinary course of business by KICVentures directly to hospital(s), surgery center(s), and/or physician(s). Any sale of any Qualifying Asset during the Total Contingency Period shall be in an arm's length transaction using best efforts to sell the Qualifying Asset at the maximum price. Within fourteen (14) calendar days of the closing of each Sale Event, KICVentures shall pay to the United States fifty percent (50%) of the following amount: (i) the greater of the total proceeds from the Sale Event and the fair market value of the Qualifying Assets, less (ii) any associated federal, state, and local tax payments and transaction fees directly incurred by KICVentures in effectuating the Sale Event.

    f.  If Chin directly or indirectly, including by or through KIC Investments Ltd., sells any property located in Jamaica ("Jamaica Property") during the Total Contingency Period, then within fourteen (14) calendar days of the closing of the sale of the Jamaica Property, Chin shall pay to the United States one-third of the following amount:  (i) the total sale price of the Jamaica Property, less (ii) any associated federal, state, and local tax payments and transaction fees directly incurred by the seller in effectuating the sale of the Jamaica Property and any balance remaining at the time of the sale on the mortgage that existed as of March 20, 2023, on the Jamaica Property. Chin represents, warrants, and agrees that, between March 20, 2023, and the date of sale of the Jamaica Property, the Jamaica Property shall not be encumbered in any way, including but not limited to any mortgages, lines of credit, or other debts or liens, other than those encumbrances identified in Chin's Financial Disclosures (defined in Paragraph 6 below). Any sale of the Jamaica Property during the Total Contingency Period shall be in an arm's length transaction using best efforts to sell the property at the maximum price. Best efforts shall include, but not be limited to, continuously listing the property for sale at a price recommended by a licensed real estate broker

and, if necessary, reducing the listing price of the property at least quarterly in an amount that is deemed by a licensed real estate broker to be reasonably necessary to sell the property.

       g.     All payments by Defendants under subparagraphs (a)–(f) up to Seventy-Eight Million Two Hundred Forty-Four Thousand Twenty-Five Dollars ($78,244,025.00) are restitution to the United States.

       h.     The total amount of all payments by Defendants under subparagraphs (a)–(f) shall not exceed a total amount of Two Hundred Thirty-Four Million Seven Hundred Thirty-Two Thousand Seventy-Five Dollars ($234,732,075.00).

      2.     Subject to the exceptions in Paragraph 4 (concerning reserved claims) below, and subject to Paragraph 6 (concerning disclosure of assets) below, Paragraph 12 (concerning default) below, and Paragraph 15 (concerning bankruptcy) below, and upon the United States' receipt of the Settlement Amount, the United States releases the Defendants from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729–3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801–3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

      3.     Subject to the exceptions set forth in this Paragraph and Paragraph 4 below, and subject to Paragraph 6 (concerning disclosure of assets) below, Paragraph 12 (concerning default) below, and Paragraph 15 (concerning bankruptcy) below, and upon the United States' receipt of the Settlement Amount, Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, release the Defendants from any civil monetary claim the Relators have on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729–3733. The Relators expressly reserve their right to pursue their claims for attorneys' fees, costs, and

reasonable expenses pursuant to 31 U.S.C. § 3730(d)(1) and claims for relief from retaliatory actions pursuant to 31 U.S.C. § 3730(h) against the Defendants.

4.    Notwithstanding the releases given in Paragraph 2 above, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

    a.    Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

    b.    Any criminal liability;

    c.    Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory or permissive exclusion from Federal health care programs;

    d.    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

    e.    Any liability based upon obligations created by this Agreement;

    f.    Any liability of individuals other than Chin, Humad, and Dudley;

    g.    Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

    h.    Any liability for failure to deliver goods or services due; and

    i.    Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

5.    Relators and their heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). In connection with this Agreement and this Civil Action, Relators and their heirs, successors, attorneys, agents, and

assigns agree that neither this Agreement, any intervention by the United States in the Civil Action in order to dismiss the Civil Action, nor any dismissal of the Civil Action, shall waive or otherwise affect the ability of the United States to contend that provisions in the False Claims Act, including 31 U.S.C. §§ 3730(d)(3) and 3730(e), bar Relators from sharing in the proceeds of this Agreement. Moreover, the United States and Relators and their heirs, successors, attorneys, agents, and assigns agree that they each retain all of their rights pursuant to the False Claims Act on the issue of the share percentage, if any, that Relators should receive of any proceeds of the settlement of their claim(s) and that no agreements concerning any Relators' share have been reached to date.

6. The Defendants have provided sworn financial disclosures and supporting documents (together "Financial Disclosures") to the United States, and the United States has relied on the accuracy and completeness of those Financial Disclosures in reaching this Agreement. The Defendants warrant that the Financial Disclosures are complete, accurate, and current as of the Effective Date of this Agreement. If the United States learns of asset(s) in which any Defendant had an interest of any kind as of the Effective Date of this Agreement (including, but not limited to, promises by insurers or other third parties to satisfy any of the Defendant's obligations under this Agreement) that were not disclosed in the Financial Disclosures, or if the United States learns of any false statement or misrepresentation by any Defendant on, or in connection with, the Financial Disclosures, and if such nondisclosure, false statement, or misrepresentation changes the estimated net worth set forth in the Financial Disclosures by Fifty Thousand Dollars ($50,000.00) or more, the United States may at its option: (a) rescind this Agreement and reinstate its suit or file suit based on the Covered Conduct or (b) collect the full Settlement Amount in accordance with the Agreement plus one hundred percent (100%) of the net value of the Defendant's previously undisclosed assets. The Defendants agree not to contest any collection action undertaken by the United States pursuant to this provision, and agree that they will immediately

pay the United States the greater of (i) a ten percent (10%) surcharge of the amount collected in the collection action, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action. In the event that the United States, pursuant to this Paragraph rescinds this Agreement, the Defendants waive and agree not to plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that (a) are filed by the United States within one hundred twenty (120) calendar days of written notification to the Defendants that this Agreement has been rescinded, and (b) relate to the Covered Conduct, except to the extent these defenses were available on the Effective Date.

7.      The Defendants waive and shall not assert any defenses the Defendants may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

8.      The Defendants fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that the Defendants have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct, the Civil Actions, or the United States' investigation or prosecution of the Covered Conduct or the Civil Actions, with the exception of any claims by Chin, Humad, or SpineFrontier related to the investigation or prosecution of the Criminal Matter.

9.      The Defendants fully and finally release Relators from any claims that the Defendants have asserted, could have asserted, or may assert in the future against Relators, related

10

to the Covered Conduct, the Civil Actions, or the Relators' investigation or prosecution of the Covered Conduct or the Civil Actions except as to Relators' claims for attorneys' fees, costs, and reasonable expenses pursuant to 31 U.S.C. § 3730(d)(1), and claims for relief from retaliatory actions pursuant to 31 U.S.C. § 3730(h).

10.    The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (e.g., Medicare Administrative Contractor, fiscal intermediary, or carrier), TRICARE, or any state payer, related to the Covered Conduct; and Defendants agree not to resubmit to any Medicare contractor, TRICARE, or any state payer any previously denied claims related to the Covered Conduct, agree not to appeal any such denials of claims, and agree to withdraw any such pending appeals.

11.    Defendants agree to the following:

a.    <u>Unallowable Costs Defined</u>:    All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395–1395lll and 1396–1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of the Defendants, their present or former officers, directors, employees, shareholders, and agents in connection with:

(1)    the matters covered by this Agreement;

(2)    the United States' audit(s) and civil and criminal investigation(s) of the matters covered by this Agreement;

(3)    Defendants' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and criminal investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(4)    the negotiation and performance of this Agreement; and

11

(5)    the payments Defendants make to the United States pursuant to this Agreement and any payments that Defendants may make to Relators, including costs and attorneys' fees;

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program ("FEHBP") (hereinafter referred to as "Unallowable Costs").

b.    <u>Future Treatment of Unallowable Costs</u>:  Unallowable Costs shall be separately determined and accounted for by the Defendants, and the Defendants shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by the Defendants to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c.    <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: The Defendants further agree that within ninety (90) days of the Effective Date they shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by the Defendants, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. The Defendants agree that the United States, at a minimum, shall be entitled to recoup from the Defendants any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable

Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by the Defendants on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on the Defendants' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine the Defendants' books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

12.     The Settlement Amount represents the amount the United States is willing to accept in compromise of its civil claims arising from the Covered Conduct due solely to the Defendants' financial condition as reflected in the Financial Disclosures referenced in Paragraph 6 above.

a.      In the event that the Defendants fail to pay the Settlement Amount as provided in Paragraph 1 above, the Defendants shall be in Default of their payment obligations ("Default"). The United States will provide a written Notice of Default, and the Defendants shall have an opportunity to cure such Default within fourteen (14) calendar days from the date of receipt of the Notice of Default by making the payment due under the payment schedule and paying any additional interest accruing under the Agreement up to the date of payment. Notice of Default will be delivered to the Defendants, or to such other representative as the Defendants shall designate in advance in writing. If the Defendants fail to cure the Default within fourteen (14) calendar days of receiving the Notice of Default and in the absence of an agreement with the United States to a modified payment schedule ("Uncured Default"), the remaining unpaid balance of the Settlement Amount shall become immediately due and payable, and interest on the remaining unpaid balance

shall thereafter accrue at the rate of twelve percent (12%) per annum, compounded daily from the date of Default, on the remaining unpaid total (principal and interest balance).

b.    In the event of Uncured Default, the Defendants agree that the United States, at its sole discretion, may (i) retain any payments previously made, rescind this Agreement and pursue the Civil Actions or bring any civil and/or administrative claim, action, or proceeding against the Defendants for the claims that would otherwise be covered by the releases provided in Paragraph 2 above, with any recovery reduced by the amount of any payments previously made by the Defendants to the United States under this Agreement; (ii) take any action to enforce this Agreement in a new action or by reinstating the Civil Actions; (iii) offset the remaining unpaid balance from any amounts due and owing to the Defendants and/or affiliated companies by any department, agency, or agent of the United States at the time of Default or subsequently; and/or (iv) exercise any other right granted by law, or under the terms of this Agreement, or recognizable at common law or in equity. The United States shall be entitled to any other rights granted by law or in equity by reason of Default, including referral of this matter for private collection. In the event the United States pursues a collection action, the Defendants agree immediately to pay the United States the greater of (i) a ten percent (10%) surcharge of the amount collected, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action. In the event that the United States opts to rescind this Agreement pursuant to this Paragraph, the Defendants waive and agree not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims that are (i) filed by the United States against the Defendants within one hundred twenty (120) days of written notification that this Agreement has been rescinded, and (ii) relate to the Covered Conduct, except to the extent these defenses were available on the Effective Date. Defendants agree not to contest any offset, recoupment, and /or collection action undertaken by the United

14

States pursuant to this Paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

      c.     In the event of Uncured Default, OIG-HHS may exclude the Defendants from participating in all Federal health care programs until the Defendants pay the Settlement Amount, with interest, as set forth above ("Exclusion for Default"). OIG-HHS will provide written notice of any such exclusion to the Defendants. The Defendants waive any further notice of the exclusion under 42 U.S.C. § 1320a-7(b)(7), and agree not to contest such exclusion either administratively or in any state or federal court. Reinstatement to program participation is not automatic. If at the end of the period of exclusion, the Defendants wish to apply for reinstatement, they must submit written requests for reinstatement to OIG-HHS in accordance with the provisions of 42 C.F.R. §§ 1001.3001–.3005. The Defendants will not be reinstated unless and until OIG-HHS approves such requests for reinstatement. The option for Exclusion for Default is in addition to, and not in lieu of, the options identified in this Agreement or otherwise available.

      13.     This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 14 (waiver for beneficiaries paragraph), below.

      14.     The Defendants agree that they waive and shall not seek payment for any of the healthcare billings covered by this Agreement from any healthcare beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

      15.     In exchange for valuable consideration provided in this Agreement, the Defendants and Relators acknowledge the following:

      a.     The Defendants have reviewed their financial situations and warrant that they are solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I) and shall

remain solvent for at least ninety-one (91) days following payment to the United States of the Settlement Amount.

b.      In evaluating whether to execute this Agreement, the Parties intend that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to the Defendants, within the meaning of 11 U.S.C. § 547(c)(1), and the Parties conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange.

c.      The mutual promises, covenants, and obligations set forth herein are intended by the Parties to, and do in fact, constitute a reasonably equivalent exchange of value.

d.      The Parties do not intend to hinder, delay, or defraud any entity to which the Defendants were or became indebted to on or after the date of any transfer contemplated in this Agreement, within the meaning of 11 U.S.C. § 548(a)(1).

e.      If any of the Defendants' payments or obligations under this Agreement are avoided for any reason (including but not limited to, through the exercise of a trustee's avoidance powers under the Bankruptcy Code) or if, before the Settlement Amount is paid in full, the Defendants or a third party commences a case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors seeking any order for relief of the Defendants' debts, or to adjudicate any of the Defendants as bankrupt or insolvent; or seeking appointment of a receiver, trustee, custodian, or other similar official for the Defendants or for all or any substantial part of any the Defendant's assets:

(i)      The United States may rescind the releases in this Agreement and bring any civil and/or administrative claim, action, or proceeding against the Defendants for the claims that would otherwise be covered by the releases provided in Paragraph 2 above;

(ii)    The United States has an undisputed, noncontingent, and liquidated allowed claim against the Defendants in the amount of Two Hundred Thirty-Four Million Seven Hundred Thirty-Two Thousand Seventy-Six Dollars ($234,732,076.00), less any payments received pursuant to Paragraph 1 above, provided, however, that such payments are not otherwise avoided and recovered from the United States by the Defendants, a receiver, trustee, custodian, or other similar official for the Defendants;

(iii)    If any payments are avoided and recovered by a receiver, trustee, creditor, custodian, or similar official, the United States shall not be responsible for the return of any amounts already paid by the United States to Relators; and

(iv)    If, notwithstanding subparagraph (iii), any amounts already paid by the United States to any of the Relators are recovered from the United States in an action or proceeding filed by a receiver, trustee, creditor, custodian, or similar official in or in connection with a bankruptcy case that is filed within two years of the Effective Date or of any payment made under Paragraph 1 above, such Relator shall, within thirty (30) days of written notice from the United States to the undersigned counsel for such Relator, return to the United States all amounts recovered from the United States.

f.    The Defendants agree that any civil and/or administrative claim, action, or proceeding brought by the United States under Paragraph 15(e) is not subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) because it would be an exercise of the United States' police and regulatory power. The Defendants shall not argue or otherwise contend that the United States' claim, action, or proceeding is subject to an automatic stay and, to the extent necessary, consent to relief from the automatic stay for cause under 11 U.S.C. § 362(d)(1). The Defendants waive and shall not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any such civil or administrative claim, action, or proceeding

brought by the United States within one hundred twenty (120) calendar days of written notification to the Defendants that the releases have been rescinded pursuant to this Paragraph, except to the extent such defenses were available on the Effective Date.

16.    Upon receipt of the Initial Payments described in Paragraph 1(a) above, the Parties shall promptly sign and file in the Civil Actions a Joint Stipulation of Dismissal of the Claims Against the Defendants in the Civil Actions pursuant to Rule 41(a)(1). The Joint Stipulation of Dismissal shall be with prejudice as to the United States' and the Relators' claims in the Civil Actions against the Defendants as to the Covered Conduct and consistent with the terms and conditions of this Agreement.  The Joint Stipulation of Dismissal shall be without prejudice to the United States and with prejudice to the Relators as to all other claims against the Defendants in the Civil Actions.

17.    Except as reserved by Relators in Paragraph 3 above, each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

18.    Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

19.    This Agreement is governed by the laws of the United States. The exclusive venue for any dispute relating to this Agreement is the United States District Court for the District of Massachusetts. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

20.    This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties. Forbearance by the

United States from pursuing any remedy or relief available to it under this Agreement shall not constitute a waiver of rights under this Agreement.

21.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

22.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

23.     This Agreement is binding on the Defendants' successors, transferees, heirs, and assigns.

24.     This Agreement is binding on the Relators' successors, transferees, heirs, and assigns.

25.     All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

26.     This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date"). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

[SIGNATURE PAGE(S) FOLLOW]

<u>THE UNITED STATES OF AMERICA</u>

DATED: 11/27/2023      BY: _____

DOUGLAS ROSENTHAL
CHRISTOPHER TERRANOVA
Trial Attorneys
Commercial Litigation Branch
Civil Division
United States Department of Justice


DATED: 11/27/2023      BY: _____

STEVEN SHAROBEM
Assistant United States Attorney
United States Attorney's Office
District of Massachusetts


DATED: _____      BY: SUSAN GILLIN Digitally signed by SUSAN GILLIN
Date: 2023.11.07 08:13:03 -05'00'

LISA M. RE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services


DATED: _____      BY: _____

SALVATORE M. MAIDA
General Counsel
Defense Health Agency
United States Department of Defense

20

**THE UNITED STATES OF AMERICA**


DATED: _____    BY: _____
                         DOUGLAS ROSENTHAL
                         CHRISTOPHER TERRANOVA
                         Trial Attorneys
                         Commercial Litigation Branch
                         Civil Division
                         United States Department of Justice


DATED: _____    BY: _____
                         STEVEN SHAROBEM
                         Assistant United States Attorney
                         United States Attorney's Office
                         District of Massachusetts


DATED: _____    BY: _____
                         LISA M. RE
                         Assistant Inspector General for Legal Affairs
                         Office of Counsel to the Inspector General
                         Office of Inspector General
                         United States Department of Health and Human Services


DATED: _11/09/2023_    BY: BLEY.PAUL.NICHO  Digitally signed by
                           LAS.1099873821    BLEY.PAUL.NICHOLAS.10998738
                                             21
                                             Date: 2023.11.09 16:34:50 -05'00'
                       for SALVATORE M. MAIDA
                           General Counsel
                           Defense Health Agency
                           United States Department of Defense

**INDIVIDUAL DEFENDANTS**

DATED: 10/26/23    BY: _____
KINGSLEY CHIN, M.D.

DATED: 10/26/23    BY: _____
VANESSA DUDLEY

DATED: 10/26/23    BY: _____
ADITYA HUMAD

DATED: _____    BY: _____
ROBERT L. PEABODY
Husch Blackwell LLP
Counsel for Kingsley Chin, M.D., and Vanessa Dudley

DATED: _____    BY: _____
SETH B. ORKAND
Robinson & Cole LLP
Counsel for Aditya Humad

21

## INDIVIDUAL DEFENDANTS

DATED: _____        BY: _____
                             KINGSLEY CHIN, M.D.


DATED: _____        BY: _____
                             VANESSA DUDLEY


DATED: _____        BY: _____
                             ADITYA HUMAD


DATED: 10/26/23          BY: _____
                             ROBERT L. PEABODY
                             Husch Blackwell LLP
                             Counsel for Kingsley Chin, M.D., and Vanessa Dudley


DATED: 10/26/23          BY: _____
                             SETH B. ORKAND
                             Robinson & Cole LLP
                             Counsel for Aditya Humad

## CORPORATE DEFENDANTS

DATED: 10/26/23    BY: _____
Kingsley Chin, M.D.
Chief Executive Officer
SpineFrontier, Inc.

DATED: 10/26/23    BY: _____
Kingsley Chin, M.D.
Chief Executive Officer
Impartial Medical Expert, LLC

DATED: 10/26/23    BY: _____
Kingsley Chin, M.D.
Chief Executive Officer
KIC Management Group, Inc.

DATED: 10/26/23    BY: _____
Kingsley Chin, M.D.
Chief Executive Officer
KICVentures LLC

DATED: _____    BY: _____
ROBERT L. PEABODY
Husch Blackwell LLP
Counsel for SpineFrontier, Inc., KICVentures LLC,
Impartial Medical Expert, LLC, and KIC Management
Group, Inc.

## CORPORATE DEFENDANTS

DATED: _____     BY: _____
                          Kingsley Chin, M.D.
                          Chief Executive Officer
                          SpineFrontier, Inc.


DATED: _____     BY: _____
                          Kingsley Chin, M.D.
                          Chief Executive Officer
                          Impartial Medical Expert, LLC


DATED: _____     BY: _____
                          Kingsley Chin, M.D.
                          Chief Executive Officer
                          KIC Management Group, Inc.


DATED: _____     BY: _____
                          Kingsley Chin, M.D.
                          Chief Executive Officer
                          KICVentures LLC


DATED: 10/26/23     BY: _____
                          ROBERT L. PEABODY
                          Husch Blackwell LLP
                          Counsel for SpineFrontier, Inc., KICVentures LLC,
                          Impartial Medical Expert, LLC, and KIC Management
                          Group, Inc.

22

**RELATORS**

DATED: 10/29/23        BY: _____
                            CHARLES BIRCHALL, JR.

DATED: _____        BY: _____
                            JOHN MILLER

DATED: _____        BY: _____
                            WALTER BENNETT

DATED: _____        BY: _____
                            THOMAS GREENE
                            Greene LLP
                            Counsel for Charles Birchall, Jr.

DATED: _____        BY: _____
                            STEPHEN A. WEISS
                            Seeger Weiss LLP
                            Counsel for John Miller and Walter Bennett

23

**RELATORS**

DATED: _____    BY:    _____
                        CHARLES BIRCHALL, JR.

DATED: __11-13-2023__    BY:    _____
                        JOHN MILLER

DATED: 11/13/2023    BY:    _____
                        WALTER BENNETT

DATED: _____    BY:    _____
                        THOMAS GREENE
                        Greene LLP
                        Counsel for Charles Birchall, Jr.

DATED: 11/11/23    BY:    _____
                        STEPHEN A. WEISS
                        Seeger Weiss LLP
                        Counsel for John Miller and Walter Bennett

**EXHIBIT A-1**
**Payment Schedule for KICVentures' Payments Over Time**

| Payment Due Date | Payment Due | 4.125% Interest | Principal | Balance |
|---|---|---|---|---|
| | | | | $855,000.00 |
| December 31, 2023 | $20,406.85 | $406.85 | $20,000.00 | $835,000.00 |
| March 20, 2024 | $201,443.75 | $34,443.75 | $167,000.00 | $668,000.00 |
| March 20, 2025 | $194,555.00 | $27,555.00 | $167,000.00 | $501,000.00 |
| March 20, 2026 | $187,666.25 | $20,666.25 | $167,000.00 | $334,000.00 |
| March 20, 2027 | $180,777.50 | $13,777.50 | $167,000.00 | $167,000.00 |
| March 20, 2028 | $173,888.75 | $6,888.75 | $167,000.00 | -- |
| **Total** | **$958,738.10** | **$103,738.10** | **$855,000.00** | |

**EXHIBIT A-2**
**Payment Schedule for Humad's Payments Over Time**

| Payment Due Date | Payment Due | 4.125% Interest | Principal | Balance |
|---|---|---|---|---|
| | | | | $100,000.00 |
| December 31, 2023 | $51,017.12 | $1,017.12 | $50,000.00 | $50,000.00 |
| March 20, 2024 | $12,062.50 | $2,062.50 | $10,000.00 | $40,000.00 |
| March 20, 2025 | $11,650.00 | $1,650.00 | $10,000.00 | $30,000.00 |
| March 20, 2026 | $11,237.50 | $1,237.50 | $10,000.00 | $20,000.00 |
| March 20, 2027 | $10,825.00 | $825.00 | $10,000.00 | $10,000.00 |
| March 20, 2028 | $10,412.50 | $412.50 | $10,000.00 | -- |
| **Total** | **$107,204.62** | **$7,204.62** | **$100,000.00** | |

25

**EXHIBIT A-3**
**Payment Schedule for Chin's Payments Over Time**

| Payment Due Date | Payment Due | 4.125% Interest | Principal | Balance |
|---|---|---|---|---|
|  |  |  |  | $40,000.00 |
| March 20, 2024 | $9,650.00 | $1,650.00 | $8,000.00 | $32,000.00 |
| March 20, 2025 | $9,320.00 | $1,320.00 | $8,000.00 | $24,000.00 |
| March 20, 2026 | $8,990.00 | $990.00 | $8,000.00 | $16,000.00 |
| March 20, 2027 | $8,660.00 | $660.00 | $8,000.00 | $8,000.00 |
| March 20, 2028 | $8,330.00 | $330.00 | $8,000.00 | -- |
| **Total** | **$44,950.00** | **$4,950.00** | **$40,000.00** |  |

**EXHIBIT B**
**KICVentures Entities**

1.  KICVentures LLC
2.  Inspan LLC
3.  Sacrix LLC
4.  NanoFUSE Biologics LLC
5.  AxioMed LLC
6.  FacetMotion LLC
7.  MISQuito LLC
8.  Sagitechs LLC
9.  FacetFuse LLC
10. LESspine Innovations Inc.
11. Phalanx LLC
12. LESS Institute of Florida LLC
13. MILES Nutraceuticals LLC
14. KIC Management Group Inc.
15. IME LLC
16. Mediconnects LLC
17. NANISX, LLC