**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

UNITED STATES

    v.

KINGSLEY R. CHIN,
      *Defendant*.

No. 1:21-cr-10256-IT

**DEFENDANT KINGSLEY CHIN'S SENTENCING MEMO**

KINGSLEY CHIN
By his attorneys,
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

**Preliminary Statement**

For the reasons discussed below, Dr. Chin respectfully requests that the Court impose a sentence of probation or time served, supervised release for one year, and a mid-Guidelines fine of $4,850. Such a sentence is one that is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to serve the purposes of sentencing under that statute. Over a period of several months before trial, the government abandoned all its original charges against Dr. Chin, in favor of one count in a Superseding Information. The sole charge now focuses on a single incident involving a false statement to a federal agency and generates an agreed-upon total offense level under the Guidelines of 2. Dr. Chin has demonstrated sincere remorse and regret, having experienced several years of still ongoing collateral consequences from the original charges and aberrant conduct surrounding a life focused on service as described below and in numerous support letters from people of all walks of life. As also described below, the guidelines calculation in the Presentence Report ("PSR") results in a presumption of probation.

In short, the sentence that Dr. Chin suggests would serve all purposes and considerations set forth in § 3553(a) that are relevant here, including (i) Dr. Chin's history and characteristics, (§ 3553(a)(1)), addressed in Part I below; (ii) the nature and circumstances of Dr. Chin's offense, (*id.*), addressed in Part II below; (iii) the need for the sentence to reflect the seriousness of the crime, to promote respect for the law, to provide just punishment, and to provide for specific and general deterrence, (*id.* § 3553(a)(2)), addressed in Parts III and IV below; (iv) the kinds of sentences available and appropriate, including as set forth in the Sentencing Guidelines, (*id.* § 3553(a)(3) & (4)), addressed in Parts III and IV below; and (v) the need to avoid unwarranted sentence disparities, (*id.* § 3553(a)(6)), addressed in Part III below.

I.    **Dr. Chin's Background, History and Character.**

In many respects, Dr. Chin's life story is one marked by having overcome extreme disadvantage to achieve success in a career focused on improving the lives of others and advancing medical knowledge and the quality of care for patients. As reflected in part by the letters of support submitted as exhibits to this memorandum, many who know him describe him as intensively motivated to advance health care access, innovative in developing health care options, compassionate, and generous with his time and resources. The concepts of devoting time to underserved populations and "mentoring" others are repeated themes across those letters. Similarly, the letters provide attestations to the various ways that Dr. Chin has demonstrated a decades-long commitment to improving the lives of patients.

Dr. Chin is a 61-year-old Jamaican immigrant and naturalized U.S. citizen, who has lived in this country since his college years. He was raised by his mother, who gave birth to him when she was 17, and by his grandmother, after he experienced as a baby his father abandoning the family. Dr. Chin grew up in poverty. During his early childhood, Dr. Chin, his mother, and his three siblings lived in a single room in a home they rented that was otherwise occupied by someone else. His childhood home had no running water inside. The family used an outhouse and rainwater through an outdoor pipe for cooking and cleaning. Cooking was done using an outdoor firepit. At one point, a storm flooded the house in which he grew up, forcing him to move in with his grandmother in a nearby tenement house, where the family shared a single room with a single bed.

With the help of loved ones, educational opportunities, talent, and hard work, Dr. Chin overcame these modest beginnings. He moved out of his family home as a teenager, when the headmaster of a high school, who recognized both his athletic and academic talent, took him into the headmaster's home so as to permit him to attend that high school, where he played soccer at

an elite level and thrived academically. As a result of discipline and practice, while in high school, the Jamaican national soccer team recruited him. Defying odds, Dr. Chin applied to Columbia University, where he enrolled, played soccer, and continued his academic career. As his family had no ability to pay for college not covered by awards, Dr. Chin participated in Columbia's work-study program. At Columbia, he majored in electrical engineering, with a minor in math. By the end of his time at Columbia, he had become the President of his senior class (the only Black and only Jamaican student ever to have been elected to that position in the school's 200-year history), was named an Ivy League Player of the Year in soccer, and thrived academically, being named to the ETA KAPPA NU Electrical Engineering Honor Society.

After working for several years following college, Dr. Chin attended Harvard Medical School, where he received his MD degree with honors. He has since held multiple professorships, including as an assistant professor at the University of Pennsylvania medical school, where he also became the Chief Orthopedic Spine Surgeon. While Dr. Chin to this day remains a practicing surgeon, he has also focused much of his medical career on inventing new technologies and techniques for spine surgery, guided by a core philosophy of using less-invasive surgical techniques to achieve desired outcomes for patients with less damage and recovery time than traditional surgery. His inventions, techniques, and personal surgical performances have improved the lives of thousands of patients who suffered from painful and in some cases debilitating spinal problems. He has been a mentor to many younger surgeons, particularly those interested in learning and mastering less-invasive surgical practices.

Beyond his professional endeavors, Dr. Chin is a husband and father of three children, ages 12, 13, and 15. Committed to making sure his children have the father that he never had, he has remained a dedicated and present father in the lives of his three children, notwithstanding his

demanding professional obligations as a practicing surgeon, inventor, and business leader. He also continues to support financially his mother in Jamaica, and provides philanthropic support to help others who grew up in similar circumstances as those he experienced. By way of example, and recognizing the role that athletics played in helping him to escape the poverty in which his life started, Dr. Chin has supported financially the local soccer team in his hometown of Buff Bay, Jamaica, his high school soccer team at Titchfield High School, and the Jamaica women's national soccer team.

Ultimately, Dr. Chin's history and character reflect a person who has dedicated extraordinary time and resources to helping others and improving healthcare, including for those in underserved communities. Attached as Exhibits A through U are letters from various persons who know Dr. Chin in different capacities and wrote in an effort to provide the Court with additional information about his history and character.

As Dr. Curtis W. Slipman, a former colleague who served as Director of the Penn Spine Center during Dr. Chin's tenure at UPenn has written, Dr. Chin is a person of "extraordinary character," who has made "transformative contributions to medicine," and is a "compassionate surgeon whose dedication to patients was unmatched." (ECF No. 391, also attached hereto as Exhibit A.) Dr. Slipman powerfully elaborated on his experience with and views of Dr. Chin, particularly with regard to his generosity and kindness toward others:

> After transitioning to private practice, he mentored over 300 surgeons nationwide, elevating standards of care, and published approximately 70 peer-reviewed articles – an exceptional achievement for a non-academic physician. His innovations in minimally invasive spine surgery have reduced recovery times for thousands, reflecting his commitment to patient well-being over personal gain.
>
> One instance stands out vividly. In 2010, Dr. Chin encountered a patient with severe spinal stenosis of the cervical spine, requiring complex decompression surgery. Lacking insurance, she faced dismissal from other providers. Dr. Chin, undeterred, performed the multi-hour procedure pro bono, followed by months of free follow-

up care during her recovery. This restored her mobility and dignity, allowing her to return to her family and work. I am personally aware of numerous such acts, where Dr. Chin prioritized patient need over financial reward, often at great personal cost.

Beyond his professional impact, Dr. Chin's empathy and humility define him. I recall him spending late nights counseling a struggling colleague through personal challenges, seeking no recognition. His devotion to his family and community – through supporting local health clinics and mentoring youth – further illustrates his selflessness. While I recognize the gravity of this case, I understand Dr. Chin has expressed sincere remorse and taken steps to make amends, reflecting his integrity and commitment to accountability.

In my 40 years in medicine, I have rarely met a physician so devoted to others. Dr. Chin's plans to expand free surgical training for underserved communities and continue advancing patient care demonstrate his potential to contribute meaningfully if granted leniency . . . .

(*Id.*) Dr. Slipman concludes: "Dr. Chin's life of service, genuine remorse, and capacity for good make him a compelling candidate for mercy." (*Id.*)

Another colleague-surgeon of Dr. Chin, Dr. June E. Francis, has commented on Dr. Chin's "commitment to improving lives – particularly in underserved and marginalized communities"; described him as "a mentor, an innovator, and a generous humanitarian"; and reported that "[t]hrough charitable medical missions, mentorship of young physicians, and advocacy for equitable healthcare access, Dr. Chin has consistently demonstrated a life of service and compassion." (Letter from Dr. June E. Francis, Exhibit B hereto.) Dr. Kamilah Hylton, a professor whose institution has benefited directly from Dr. Chin's generosity, has echoed such sentiments, writing that "I have been continuously inspired by the kindness, generosity, and unwavering commitment he shows towards improving the lives of young Jamaicans. He has volunteered countless hours and provided resources that are immeasurable in their impact. In return he has never requested anything." (Letter from Kamilah Hylton, Ph.D., Exhibit C hereto.)

Another surgeon-colleague of more than 20 years, Dr. Richard R.M. Francis, has written of Dr. Chin:

> He has never been guided by the profit motive, as this is not his belief system. He has been guided by a personal compass in which a genuine desire to help the lives of the less fortunate, those dispossessed of hope, and the ones who sometimes science has forgotten, has primacy of place.

(Letter from Dr. Richard R.M. Francis, Exhibit D hereto.) Elaborating on these views of Dr. Chin, that letter shared personal experiences with Dr. Chin's generosity, including his having mentored Dr. Francis's two children and provided them with internships "at his own expense and ask[ing] for nothing in return," as well as Dr. Chin's volunteering his time to assist Dr. Francis and others in surgeries to help them learn new techniques to improve patient outcomes. (*Id.*) As the letter summarizes it, Dr. Chin "is selfless and has a deep desire to pass on his knowledge and experience." (*Id.*)

Dr. Chin's history of volunteering his time to mentor and serve others is a theme that flows through many of the letters attached here. Another writer whom Dr. Chin has mentored has described him similarly as "loyal, generous, and full of heart." (Letter from Taylor Headley, Exhibit E hereto.) A former patient, who reports having faced the possibility of being unable to continue her career as a lawyer after suffering a serious accident – until Dr. Chin performed surgery on her – also wrote about Dr. Chin having subsequently served as a mentor to the patient's daughter as she contemplated and eventually began a medical career of her own: "Dr. Chin took her under his wings, mentored her and has looked out for her wellbeing ever since. She is now a board-certified orthopedic surgeon." (Letter from Yvette C. Sterling, Exhibit F hereto.) Similarly, among those who have written to provide insight into Dr. Chin's character and generosity is the Chief Medical Officer of the National Spine and Pain Center, "the largest network of affiliated interventional pain management providers in the United States." (Letter from Dr. Yeshvant A. Navalgund, Exhibit G hereto.) That letter reports that "Dr. Chin has served as an invaluable educational resource," having "freely shared his time and surgical expertise," and that "[h]is

contributions have directly enhanced the care delivered to patients in a wide range of communities, many of which are underserved." (*Id.*)

Despite the burdens of this case, Dr. Chin has never ceased serving his patients and giving back. As one patient reported, he successfully operated on her, relieving "more than a decade of living with chronic pain," as recently as May 12, 2025, just one week before his trial in this case was scheduled to begin, and three days before he eventually pled guilty to violating § 1001. (Letter from Karen Matalon, Exhibit H hereto.) Facing the most difficult days of his life, Dr. Chin still made time to serve patients in need.

Others whose lives Dr. Chin has touched have expressed similar sentiments as the surgeons he mentored and helped throughout his career. An employee of one of Dr. Chin's companies describes him as "a leader whose integrity, compassion, and relentless commitment to patient care have profoundly impacted my life and the lives of many others." (Letter from Swapnil Pangarkar, Exhibit I hereto.) Mr. Pangarkar shared an experience in which Dr. Chin "show[ed] true concern for the welfare of his employees" when during revenue challenges associated with COVID, "Dr. Chin stopped taking his own salary, chose not to terminate visa-dependent employees, and insisted on continuing health benefits for furloughed staff at company's costs – knowing that this was when they would need coverage the most." (*Id.*)

Notwithstanding the seriousness of the crime, this background confirms that Dr. Chin is a kind, generous, and caring man who is worthy of this Court's mercy. The PSR and support letters tell the story of someone who worked incredibly hard. Rather than simple greed that can permeate similar offenses, Dr. Chin allowed his belief in the importance of his mission to override the need for strict compliance with rules. Since the investigation surfaced, Dr. Chin has turned to extremely

proactive compliance professionals, leaving no doubt that something like the events here will never happen again.

## II.    Dr. Chin's Guilty Plea and the History of This Prosecution.

Dr. Chin has pled guilty to one count of violating, and has accepted full responsibility for his violation of, 18 U.S.C. § 1001, and flaws in his choices and priorities that allowed the offense to happen. That charged crime consists of Dr. Chin having caused SpineFrontier to make a filing with the Centers for Medicare & Medicaid Services ("CMS"), nine and a half years ago, which contained a false statement. More specifically, and as discussed with the Court during Dr. Chin's May 15, 2025 Rule 11 hearing, Dr. Chin has admitted that SpineFrontier, under his direction, made a January 2016 submission to CMS under the Sunshine Act, which represented that a $4,750 payment to Dr. John Atwater was for "consulting fees," despite the fact that Dr. Atwater (who had originally performed consulting services for SpineFrontier) had not actually performed consulting work in exchange for that particular payment. This charge was not included in the original charges against Dr. Chin that were brought in August 2021. Nor was it included in the April 2025 Superseding Indictment. In fact, Dr. Chin had never been charged with violating § 1001 until a Superseding Information filed the same day that he pled guilty to that charge pursuant to a plea agreement. By the time he is sentenced on August 6, Dr. Chin will have been subjected to prosecution for nearly four years. The investigation that led to the prosecution spanned more than four additional years before that, dating back to at least June 2017. Thus, for most of the last decade, Dr. Chin has been subjected to the consequences of actions that he took between six and thirteen years ago. All charges that the government had pursued against Dr. Chin (and SpineFrontier) for years were either dismissed by the Court over the government's objection,

dismissed voluntarily by the government as trial approached, or will be dismissed upon Dr. Chin's sentencing pursuant to his plea agreement.

The allegations behind the charges under the Anti-Kickback Statute ("AKS") and the money laundering allegations in the original Indictment occurred between six and thirteen years ago, as the Indictment alleged a conspiracy from 2012 through June 2019. The U.S. Attorney's Office issued a press release immediately following the Indictment, touting its decision to charge Dr. Chin with these crimes and highlighting the potential consequences that he faced, including a potential sentence of up to 20 years in prison on the money-laundering count.[1] By any measure, the prosecution was lengthy, burdensome, expensive, and extremely threatening to Dr. Chin and damaging to his reputation.

The government's full abandonment of the charges it had pursued for years was completed when, four days before trial was to begin, it entered into a plea agreement with Dr. Chin through which he agreed to plead guilty to *none* of the charges that had to that point been levied against him, but rather to one count of making a false statement under 18 U.S.C. § 1001. The government committed in the plea agreement to dismiss all the original Indictment's and Superseding Indictment's charges. That same day, the government filed a Superseding Information asserting the one charge under § 1001. Dr. Chin waived indictment and pled guilty the same day.

With respect to Sunshine Act disclosures generally, Dr. Chin and the government have stipulated as follows:

> It is hereby stipulated and agreed, by and between the United States of America through its undersigned counsel, and defendant Kingsley Chin through his undersigned counsel, as follows:

---

[1] *See* https://www.justice.gov/usao-ma/pr/ceo-cfo-and-boston-area-spinal-device-company-charged-bribery-and-money-laundering-scheme

> SpineFrontier made all disclosures required by the Sunshine Act of monetary payments made by SpineFrontier or IME to doctors in connection with consulting agreements.

(ECF No. 365.) While the parties thus agreed that SpineFrontier had disclosed *all* monetary payments made to surgeons under the Sunshine Act, including the one that is the subject of his guilty plea, that specific January 2016 disclosure about a payment to Dr. Atwater contained a false statement. As Dr. Chin admitted when pleading guilty, that filing labeled one such payment as a payment for "consulting fees," despite Dr. Atwater not having performed consulting in exchange for that particular payment. Dr. Chin accepts full responsibility for that false statement, and has thus pled guilty to violating § 1001 because of it.

Consistent with Dr. Chin's steadfast commitment to improving medical care and helping patients, the government expressly agreed in Dr. Chin's plea agreement that "there was no harm to patients resulting from Defendant's offense." (ECF No. 378, at 5.)

As serious as the charge to which Dr. Chin has pled guilty is – and Dr. Chin fully acknowledges its seriousness and his surrounding wrongdoing – that charge of making a false statement is a far cry from the charges that Dr. Chin had been forced to defend against for years. The government faced ultimately insurmountable factual and legal hurdles pursuing claims under the AKS. Focusing on *mens rea*, under existing caselaw, the government would have had the burden to show that payments had been made with a *purpose* of a *quid pro quo* rather than with a *mere hope, expectation, or belief* of business benefits and, if it did meet that burden, would still have had to show that Dr. Chin knew that having multiple purposes violated the law.[2] In the end,

---

[2] *See United States v. Regeneron Pharms., Inc.*, No. CV 20-11217-FDS, 2020 WL 7130004, at *8 (D. Mass. Dec. 4, 2020); *United States v. Teva Pharms. USA, Inc.*, 560 F. Supp. 3d 412, 420 (D. Mass. 2021) (finding that under AKS, "liability attaches only when the statements and actions of a [defendant] reveal an intent beyond a 'collateral hope or expectation,' … such that it is clear that the remunerations were designed specifically to encourage claims to Medicare"); *United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 157 (2d Cir. 2024) ("[T]he defendant must act "with knowledge that his conduct was

facing these and other challenges, including the credibility of witnesses following changes in the statements amid pressure on them by government actors, the government ultimately abandoned the AKS charges that Dr. Chin had been forced to defend against for nearly four years.

Dr. Chin recognizes that his conduct and choices problematically placed too much confidence in the good of his products over the need for compliance. He regrets enormously not focusing as the company's leader on matters of compliance, to ensure that SpineFrontier's practices were beyond reproach. As discussed below in Part IV, Dr. Chin's failure to do so has had drastic consequences not just for the business, but also for Dr. Chin personally. This prosecution in particular, and the related civil action that he settled with the United States, have been financially devastating for him and his family. Thus, while Dr. Chin is not being sentenced for the alleged crimes for which he was charged in the original Indictment and Superseding Indictment, he recognizes that his own conduct and choices led the government to accuse him of those crimes, with the consequences that he has already incurred and still experiences from this prosecution.

### III.    The Applicable Guidelines Provisions, and the Need to Avoid Unwarranted Sentencing Disparities, Also Counsel in Favor of a Sentence of Time Served.

The parties in their plea agreement, and the Probation Office in the PSR, all agree on the proper calculation of Dr. Chin's Sentencing Guidelines. Specifically, as set forth in the plea agreement, the proper Guidelines calculation leads to an Offense Level of 2, calculated as follows:

   a.   Base Offense Level of 6 under U.S.S.G. § 2B1.1(a)(2);

   b.   Offense Level decrease of 2 based on acceptance of responsibility, pursuant to U.S.S.G. § 3E.1.1;

---

unlawful."); *see also U.S. ex rel. Langer v. Zimmer Biomet Holdings, Inc.*, 743 F. Supp. 3d 282, 292 (D. Mass. Aug. 2, 2024) (citing *United States v. Bay State Ambulance and Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir. 1989), for proposition that establishing a violation of the AKS requires proof that the defendant "acted with knowledge that its conduct was unlawful").

    c.  Offense Level decrease of 2 based on Dr. Chin having zero criminal history points, pursuant to U.S.S.G. § 4C1.1;

    d.  ***Resultant Total Offense Level of 2***.

(*See* ECF No. 378, at 2; *see also* PSR ¶¶ 47-55.)

Based on Dr. Chin having no criminal history, and thus being in Criminal History Category I, his resultant Guidelines range is 0-6 months, in Zone A of the Sentencing Table. The Guidelines also establish a fine range of $200 to $9,500. U.S.S.G. § 5E1.2(c)(3).

The parties and the Probation Office are all in agreement on these calculations and ranges.[3]

It is unusual for a defendant to come before a federal sentencing court with both no criminal history and an Offense Level as low as 2. For example, according to the United States Sentencing Commission's Judiciary Sentencing Information database ("JSIN"), after excluding cooperators who received departures under § 5K1.1, there were only 130 defendants in the entire country over a five-year period whose primary Guidelines provision was § 2B1.1, who had a total Offense Level of 2, and who were in Criminal History Category I. In contrast to Dr. Chin, it is likely that at least some of those 130 defendants over five years had some criminal history, as Criminal History Category I includes both those with zero criminal-history points, like Dr. Chin, and those with one criminal-history point. That distinction matters, as "[t]here is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History

---

[3] There are aspects of the PSR to which Dr. Chin has objected. In particular, the recitation of supposed offense conduct goes well beyond the present charge, driven largely by the government's submission to the Probation Office of alleged facts as a way to suggest a more general AKS crime than the § 1001 crime to which Dr. Chin has admitted. Dr. Chin's objections to those aspects of the PSR can be found in the Addendum to the Final PSR. Because those portions of the PSR do not factor into the Guidelines calculation, and because both the Guidelines and sentences in comparable cases make abundantly clear, as discussed below, that a sentence of incarceration is not appropriate, Dr. Chin does not dwell on the PSR's recitation of the government's version of the offense here.

Category I." *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007). According to

JSIN, for *all* of those 130 defendants nationwide, the median sentence length was 0 months.[4]

Thus, while the Guidelines range for those having an Offense Level of 2 and in Criminal

History Category I is 0-6 months, imprisonment is rarely appropriate for such defendants. In fact,

the Guidelines now *expressly* make clear that the default should be no term of imprisonment for

those in Dr. Chin's situation. Not only does an Offense Level 2 and Criminal History Category I

place Dr. Chin in "Zone A" of the Guidelines Sentencing Table, but both the government in the

plea agreement, and Probation in the PSR, agree that Dr. Chin is entitled to receive an adjustment

under § 4C1.1 for having zero criminal-history points. The Commentary to Guidelines § 5C1.1

now states that those who receive a zero-point adjustment and whose Guidelines range falls within

Zone A (or even Zone B) generally should *not* be sentenced to imprisonment:

> If the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate. U.S.S.G. § 5C1.1, cmt. n.10(A).

Dr. Chin's PSR notes this commentary provision and its statement that a sentence without

imprisonment "is generally appropriate" in these circumstances. (*See* PSR ¶ 127.)

The recency of this Commentary's addition to the Guidelines suggests that the JSIN

statistics, despite making clear that 0 months is the median length of imprisonment, likely

understate the extent to which a non-carceral sentence is appropriate. The Commentary concerning

---

[4] Forty-three percent of those 130 defendants received **no** "sentence of imprisonment" at all. Even that statistic overstates the number of defendants who received additional time at sentencing, as "sentence of imprisonment" for purposes of JSIN statistics includes those who were sentenced to "time served," no matter how short the previous period of incarceration. Indeed, the fact that the median sentence length for *all* defendants was 0 months – and thus that *at least* half of the 130 defendants received a sentence length of 0 months – makes clear that far more than 43% received either no sentence of confinement at all or, if they were sentenced to "time served," the time they served was so *de minimis* as to equate to 0 months.

zero-point offenders and the presumption of no imprisonment for those whose Guidelines place them in Zone A was not added until the November 1, 2023 version of the Guidelines. *See* U.S.S.G. Amendment 821 (Nov. 1, 2023). The most recent data on which the JSIN statistics are based is for the fiscal years 2021-2024. Thus, for most of the period covered by the statistics, the Commentary, with its express suggestion of no incarceration for similarly situated defendants, was not in place. The addition of the Commentary should, therefore, only serve to reduce the number of defendants who are sentenced to incarceration or even time served, compared to those in the data set covered by the above-reference JSIN statistics.

Also reflective of the clear preference for a sentence of probation or time served is the recent history in this District of sentences imposed on defendants who were convicted under only 18 U.S.C. § 1001 – as is the case with Dr. Chin. Even defendants with higher Offense Levels (including as high as 6), multiple counts of conviction under § 1001, higher criminal histories, or some combination of those factors, routinely receive sentences of probation or time served. In fact, a review of *every* sentencing in this District over the past eight years that defense counsel has been able to identify where a sole crime of conviction was violation of § 1001 and who had a total Offense Level of 6 or lower has revealed *not a single case* in which the Court imposed a sentence other than probation or time served. Specifically, Dr. Chin has identified a total of thirteen such cases in the last eight years, all of which resulted in sentences of probation or time served:

- In *United States v. Sturge*, 17-10197, the defendant was convicted of one count of violating § 1001. The defendant's Offense Level was 4. On May 21, 2018, Judge Saris sentenced the defendant to ***probation***.

- In *United States v. Pontoriero*, 18-10227, the defendant was convicted of one count of violating § 1001. As a term of its plea agreement with the defendant, the government agreed not to charge him with violating the Anti-Kickback statute, conspiracy, and obstruction of a healthcare investigation. The defendant's Offense Level was 4. On January 17, 2019, Judge Sorokin sentenced the defendant to ***probation***.

15

- In *United States v. De Lima*, 19-10042, the defendant was convicted of two counts of violating § 1001, one for creating and submitting a false document, and the other for making a false statement. The defendant's Offense Level was 4. On July 31, 2019, Judge Gorton sentenced the defendant to ***time served***.

- In *United States v. Chen*, 18-10083, the defendant was convicted of one count of violating § 1001, and had an Offense Level of 6. On September 10, 2019, Judge Casper sentenced the defendant to ***probation***.

- In *United States v. Waible*, 19-10251, the defendant was convicted of two counts of violating § 1001, with an Offense Level of 4. On November 15, 2019, Judge Saylor sentenced the defendant to ***probation***.

- In *United States v. Slavinkas*, 18-40011, the defendant was convicted of one count under § 1001, had a Guidelines Offense Level of 4, and a Criminal History Category II. On February 25, 2020, Judge Hillman sentenced the defendant to ***probation***.

- In *United States v. Zheng*, 20-10015, the defendant was convicted of a single count under § 1001 and had a Guidelines Offense Level of 4. On January 6, 2021, Judge Casper sentenced the defendant to ***time served***.

- In *United States v. Kamau*, 19-10464, the defendant was convicted of two counts of violating § 1001, with a total Offense Level of 4. On July 21, 2021, Judge Young sentenced the defendant to ***time served***, which equated to one day.

- In *United States v. Andrade*, 18-10364, the defendant was convicted of a single count under § 1001. The Probation Office calculated an Offense Level of 21, but Judge Woodlock rejected that calculation and adopted the Offense Level 4 from the parties' plea agreement. On March 7, 2022, Judge Woodlock sentenced the defendant to ***time served***, which equated to one day.

- In *United States v. Jittaphol*, 21-10270, the defendant was convicted of two counts of violating § 1001, with a total Offense Level of 6. On June 23, 2022, Judge Wolf sentenced the defendant to ***time served***.

- In *United States v. Leon*, 16-30044, the defendant was convicted of a single count under § 1001, with a total Offense Level 4. On September 21, 2022, Judge Mastroianni sentenced the defendant to ***time served***.

- In *United States v. Clark*, 22-30012, the defendant was convicted of two counts of violating § 1001. The Parties agreed in their plea agreement that the defendant's total Offense Level was 6. On April 30, 2024, Judge Mastroianni sentenced the defendant to one year of ***probation***.

- In *United States v. Morais*, 24-10179, the defendant was convicted of a single count under § 1001. The parties agreed in their plea agreement to an Offense Level calculation of 4, but the PSR ultimately calculated an Offense Level 2. On May 28, 2025, Judge Burroughs sentenced the defendant to ***time served***.

While Dr. Chin recognizes that every defendant's circumstances can be unique, it is meaningful – particularly with respect to avoiding unwarranted sentencing discrepancies – that *every* sentencing in this District that defense counsel has been able to identify in the last eight years in which the defendant was convicted under only § 1001 and had an Offense Level of 6 or lower, resulted in a sentence of either probation or time served. And as the summaries above make clear, with the exception of one case in which the defendant had an Offense Level that was the same as Dr. Chin's Offense Level of 2 (*Morais*), every one of those defendants had an Offense Level of either 4 or 6, and thus higher than Dr. Chin's total offense level.

Furthermore, even where defendants are convicted of crimes in addition to § 1001, or of violating only § 1001 but with Offense Levels higher than 6, it is still extremely common for Judges in this District to impose sentences of probation or time served (even after excluding cooperators receiving § 5K1.1 departures). For example:

- In *United States v. Smith*, 17-10290, the defendant was convicted of unlawful entry into a secure airport area, in addition to three counts of violating § 1001. The defendant's ***Offense Level was 8***. On January 17, 2018, Judge Sorokin sentenced the defendant to ***probation***, rejecting even the government's request for a portion of the probation to be subject to home confinement.

- In *United States v. El-Sayed*, 17-10019, the defendant was convicted of making false statements related to naturalization or citizenship, and unlawful attempted procurement of citizenship or naturalization, in addition to violating § 1001. The defendant was convicted after trial, thus receiving no credit for acceptance of responsibility. The defendant's ***Offense Level was 8***. On June 7, 2018, Judge Burroughs sentenced the defendant to ***probation***, with six months of the probation subject to home confinement.

- In *United States v. Withrow*, 15-1026, the defendant was convicted of one count of violating § 1001 and had an ***Offense Level of 8***. On December 12, 2018, Judge Saris sentenced the defendant to ***probation***, with 5 months of probation subject to home confinement.

- In *United States v. Benedict*, 18-40028, the defendant was convicted of theft of public money in addition to four counts of violating § 1001. The defendant's resultant ***Offense Level was 13***, with a Guidelines range of 12-18 months, which falls with Zone C of the sentencing table. On October 23, 2019, Judge Hillman rejected the government's request for a sentence of imprisonment and sentenced the defendant to ***probation***, with the first six months subject to home confinement.

- In *United States v. Boss*, 19-40052, the defendant was convicted of two counts of smuggling wildlife into the United States and two counts of smuggling wildlife out of the United States, in addition to violating § 1001. The defendant's criminal history put him in ***Category II***, and his ***Offense Level was 11***, resulting in a Guidelines range of 10-16 months, within Zone C of the sentencing table. Nevertheless, on October 5, 2020, Judge Hillman sentenced the defendant to ***time served***, amounting to 2 days.

- In *United States v. Camara*, 19-10442, the defendant was convicted of theft of government money, in addition to violating § 1001. The defendant was in Criminal History ***Category III***, with a total ***Offense Level 10***, which produced a Guidelines range of 10-16 months, within Zone C of the sentencing table. On December 15, 2020, this Court sentenced the defendant to ***time served*** (which equated to three months of pre-trial detention) with a five-month home-confinement condition attached to supervised release.

- In *United States v. Bernal*, 19-40026, the defendant was convicted of three counts of theft of government money, in addition to two counts of violating § 1001. The defendant's ***Offense Level was 10***, resulting in a Guidelines range of 6-12 months. On April 5, 2021, Judge Hillman sentenced the defendant to ***probation***, with the first month subject to home confinement.

- In *United States v. Urena*, 21-10060, the defendant was convicted of possession of false papers to defraud the United States, as well as violating § 1001. The defendant's total ***Offense Level was 6***. On October 12, 2021, Judge Stearns sentenced the defendant to ***probation***.

- In *United States v. Huynh*, 19-30040, the defendant was convicted of immigration fraud and conspiracy to commit immigration fraud, in addition to violating § 1001. Based on an ***Offense Level of 9***, and a Guidelines range of 4-10 months, the government requested a sentence of seven months imprisonment. On November 11, 2022, Judge Mastroianni sentenced the defendant instead to ***probation***.

- In *United States v. Oldham*, 20-10232, the defendant was convicted of 26 counts of wire fraud and three counts of filing false tax returns, in addition to violating § 1001. The defendant's total ***Offense Level was 13***, and the calculated Guidelines range was 12-18 months. The government requested a mid-Guidelines sentence of 15 months. On September 13, 2022, Judge Zobel instead sentenced the defendant to ***time served***.

- In *United States v. Lieber*, 20-10111, the defendant was convicted after trial (and thus without acceptance of responsibility) of two counts of filing a false tax return, two

18

counts of failure to file a report of a foreign bank and financial accounts, and two counts of violating § 1001. The defendant's total **Offense Level was 13**, with a resultant Guidelines range of 12-18 months. The government sought a carceral sentence of 90 days, plus 90 days home confinement as a condition of release. On April 26, 2023, Judge Zobel instead sentenced the defendant to **time served**, with a six-month home-confinement condition of supervised release.

- In *United States v. Augusto*, 22-30048, the defendant was convicted of making false statements to acquire firearms, making false statements with respect to information required to be kept by firearms dealers, and violation of § 1001, all resulting in a total **Offense Level of 13** and a Guidelines range of 12-18 months. On July 26, 2023, Judge Mastroianni sentenced the defendant to **probation**, with the first four months subject to home confinement.

- In *United States v. Nolan*, 21-10238, the defendant was convicted of two counts of theft of government money, in addition to two counts of violating § 1001. The defendant's total **Offense Level was 13**, with a resultant Guidelines range of 12-18 months. On December 7, 2023, Judge Hillman sentenced the defendant to one day of **time served**.

- In *United States v. Wright*, 21-30031 and 20-30033, the defendant was charged in two separate prosecutions, both of which he resolved through a single plea agreement, resulting in convictions for wire fraud and violating § 1001. The defendant's total **Offense Level was 13**, with a resultant Guidelines range of 12-18 months. The government sought a sentence of a year and a day in prison. On January 1, 2024, Judge Mastroianni rejected the government's recommendation and sentenced the defendant to **probation**.

- In *United States v. Platt*, 24-10165, the defendant was convicted of wire fraud and violating § 1001. With a total **Offense Level of 7**, Judge Joun sentenced the defendant on December 18, 2024 to one day of **time served**.

In *United Sates v. Parzival*, 24-10166, the defendant was convicted of making a false statement in a passport application, in addition to violating § 1001. The defendant's **Offense Level was 4**, and the government sought a sentence of six months, at the top of the Guidelines range. On February 5, 2025, Judge Stearns sentenced the defendant to **time served**. In each of these cases, the defendant was convicted of violating § 1001, and was either convicted of other crimes as well, or had Offense Levels of more than 6. In each case, the defendant was subject to a higher Offense Level calculation than Dr. Chin's, and in some cases a higher Criminal History Category as well. Yet in each case, the Court sentenced the defendant to either probation or time served.

In light of the plethora of such cases in this District, the cases noted above in which those with more comparable Offense Levels were convicted of violating only § 1001, the JSIN statistics cited above, and the guidance provided by the Commentary to Guidelines § 5C1.1, it would be appropriate to sentence Dr. Chin to probation or "time served" for the one day in custody he served upon his arrest in 2021.

**IV.    Dr. Chin Has Already Incurred Significant Consequences, Enormous Expense, and Restrictions on His Liberty, Which Along With the Age of the Events at Issue Justify a Non-Carceral Sentence.**

As the Court considers the sentencing factors set forth in 18 U.S.C. § 3553(a) – and in particular the need for the sentence imposed to reflect just punishment and provide deterrence – Dr. Chin respectfully requests that the Court take into account the severe consequences that he has already been subjected to as a result of the investigation and prosecution that began more than eight years ago. While the crime that Dr. Chin has been convicted of – violation of 18 U.S.C. § 1001 – is not a crime with which he was charged until May 2025, this prosecution has a long history that has impacted Dr. Chin's life in ways that have ensured, regardless of the sentence imposed, that Dr. Chin will never repeat the conduct that landed him before this Court.

As serious as the crime of which he has been convicted is, he has faced for the past four years the burdens, expenses, and other stressors of being the subject of a federal indictment for even more serious crimes, carrying the threat of lengthy terms of imprisonment. Not only has Dr. Chin lived under that indictment for nearly four years, but he has been subjected to an initial arrest and confinement, pre-trial supervision, and the inherent impingement on his personal liberty that such supervision entails, over that entire period. He has fully complied with restrictions during that entire, lengthy period of supervision. As the PSR notes, "Probation and Pretrial Services' records indicate that the defendant has complied with all Court-ordered conditions of release." (PSR ¶ 10.)

This case has also imposed an enormous financial burden on Dr. Chin and his family. Given the gravity of the charges he has faced, and the impact that a conviction on those charges could have on his freedom, family, businesses, and career, millions of (uninsured) dollars have been spent defending against the charges in the original Indictment and Superseding Indictment and parallel civil claims. While all the original criminal charges have been or will be dismissed, he and SpineFrontier faced them, the threats they carried, the reputational damages, and the expenses of defending against them, for far longer than most cases last.

Dr. Chin has made efforts to protect his family from the consequences to the extent possible, but his family has been inevitably impacted financially and emotionally by this longstanding and stressful prosecution. By way of example, that impact began immediately upon the charges being levied against him. The mother of one of his sons has written not only to extol Dr. Chin's character as a father, but also to report on the consequences of their son having been present when federal agents arrived unexpectedly in the early hours to arrest Dr. Chin:

> [Our son] was present at his father's home when he witnessed him being arrested and taken away in handcuffs. This was a deeply traumatic and confusing moment for a young child. When [our son] saw his father again after his release from Broward County Jail, he immediately burst into tears and wouldn't let him go. I enrolled [our son] in therapy to help him process his emotions about the incident which helped, but the noticeable difference has come from him spending time with his father.

(Letter from Venessa Henry, Exhibit J hereto.) Even though that experience to which his son was subjected arose from Dr. Chin being arrested for and charged with crimes that were not ultimately the crime of which he was convicted, Dr. Chin recognizes that it was his own conduct and choices that caused the government to target him, and thus feels intense guilt and regret that, at the end of the day, he is the one responsible for such impacts on his family.

Other collateral consequences of being charged with serious crimes and, now, being convicted of one serious crime, continue to this day. In light of his crime having occurred in the

context of his profession as a physician, Dr. Chin faces further proceedings concerning his licensing as a medical doctor. Immediately after pleading guilty, for example, he was required to engage separate counsel to inform the Florida Board of Medicine of the plea. It remains to be seen whether that Board will impose further sanctions on Dr. Chin, beyond what he has faced in this Court. He has already faced cancelation of credit and his business has been denied a banking relationship as a direct result of his pleading guilty.

While none of these consequences is necessarily out of the ordinary for what federal criminal defendants face – although the length of this prosecution and thus the overall expense and toll are atypical, even if not unique – they are real consequences that Dr. Chin has already suffered and will continue to suffer following his guilty plea. Dr. Chin notes them here not in an effort to generate sympathy or to suggest that any particular consequence is undeserved, but rather to make clear that there is no sense in which he could be considered to have "gotten off easy" regardless of the ultimate sentence that this Court imposes, and that deterrence has already been abundantly served. When determining "a sentence sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), the Court may thus wish to take into account the significant and severe consequences that Dr. Chin has already faced. *See Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

In addition to the direct impacts from this prosecution – being arrested and jailed, being subjected to years of supervision, being forced to incur enormous financial burdens, and ultimately being adjudged a convicted felon with the inevitable lifelong disadvantages that brings – Dr. Chin has also paid heavily through a related civil action. The events that gave rise to this prosecution were also the subject of a parallel civil investigation and a civil action by the United States. That civil case has had profound impacts on Dr. Chin as well.

As reported in the PSR, "[a]t the time the civil case was filed against [Dr. Chin], the United States Department of Justice froze his assets and limited his access to money. With no ability to pay his monthly mortgage, the defendant moved his family out of their residence . . . to a rental property . . . where the monthly rent was more manageable. To generate income, the defendant and his wife listed their residence on Airbnb. During this time, the family's residence went into foreclosure." (PSR ¶ 79.) Only upon settling the civil case was the family able to resume living in their home and remove the foreclosure proceedings. (*Id.*)

The settlement of that civil case did not occur until 2023. The terms impose significant financial burdens on Dr. Chin. In addition to large defined settlement payments in amounts that far exceed the top of the Guidelines fine range at issue here, uniquely, Dr. Chin is required to pay 75% of his gross income beyond a defined threshold for five years. Companies that he owns are required to make additional large payments, in both set amounts and in amounts contingent on their revenue, and the government is entitled to a percentage of proceeds in the event such businesses are sold or sell certain assets. The PSR calculates the *minimum* he will pay: "Chin will pay at least $40,000 and Chin's company, KIC Ventures, will pay at least $855,000. Chin owns 100% of KIC Ventures and KIC Ventures owns 98.26% of SpineFrontier and 99.95% of IME." (PSR ¶ 37.)

Dr. Chin respectfully requests that the Court take into account the many – and significant – consequences this case and the related civil case have imposed on him when fashioning an appropriate sentence.

**Conclusion**

Based on the foregoing, Dr. Chin respectfully requests that the Court impose a sentence of probation or time served and a fine of $4,850.

Respectfully submitted,

**KINGSLEY CHIN**

By his attorneys,

/s/ *Joshua L. Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

## CERTIFICATE OF SERVICE

The undersigned certifies that this document, filed on July 30, 2025, through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ *Joshua L. Solomon*