UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KINGSLEY R. CHIN,<br><br>    Defendant | No. 21-cr-10256-1-IT |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this sentencing memorandum in connection with the sentencing of the defendant, Kingsley R. Chin. The government recommends the Court impose the following sentence: eight months of imprisonment; a fine of $9,500; three years of supervised release; and a mandatory special assessment of $100. The government's recommended sentence is supported by the considerations under 18 U.S.C. § 3553(a) and is sufficient, but not greater than necessary, to achieve the purposes of sentencing set forth therein.

I.    **BACKGROUND**

Kingsley Chin conducted a years-long kickback scheme through his companies, SpineFrontier, Inc. ("SpineFrontier") and Impartial Medical Expert ("IME"). With the help of his coconspirator, Aditya Humad, Chin paid kickbacks to certain surgeons in the form of sham consulting payments. The purpose of these payments was to induce surgeons' use of SpineFrontier's products in their surgeries. Rather than pay these surgeon-consultants based on the amount of consulting services performed, as would occur in a legitimate consulting relationship, Chin and SpineFrontier paid kickbacks to surgeons based on the number (and/or value), of surgeries in which the surgeons used SpineFrontier's products. Superseding Information, Dkt. No. 377 ¶ 7. Chin and SpineFrontier did this despite knowing it was unlawful

under the Anti-Kickback Statute, 42 U.S.C. 1320a-7b(b)(2) ("AKS"), to pay surgeons to induce their use of the Company's products. Superseding Information, Dkt. No. 377 ¶ 6.

Initially, in or around early 2013, Chin paid these kickbacks directly through SpineFrontier. Following the March 2013 effective date of the Physician Payments Sunshine Act, 42 U.S.C. § 1320a-7h, however, Chin began to use a nominally independent third-party company—IME—which he fully owned and controlled, PSR ¶ 109 (Chin owns 99.95% of IME) to make his bribe payments to certain surgeons in the form of supposed consulting payments. The Sunshine Act required disclosure to the Center for Medicare and Medicaid Services' ("CMS") Open Payments database of any payments by device manufacturers, like SpineFrontier, including consulting payments. While SpineFrontier did eventually disclose that it had made payments to physicians in the form of consulting payments, Chin and SpineFrontier never disclosed to CMS that such payments were frequently *not* for consulting services *actually* rendered, but in fact were payments to surgeons simply to induce the latter group's use of SpineFrontier's products.[1] Such payments made with the intent to induce surgeons' usage of SpineFrontier's products plainly violate the AKS, 42 U.S.C. § 1320a-7b(b)(2).

On May 15, 2025, Chin pleaded guilty to Count One of the Superseding Information, which charged him with false statements in violation of 18 U.S.C. § 1001(a)(2). Chin knew that the Sunshine Act obligated him and SpineFrontier to accurately and truthfully report any payments to surgeons. Superseding Information, Dkt. No. 377 ¶ 4. Chin nevertheless directed his employees to report false information to CMS. Chin pleaded guilty to directing SpineFrontier employees to

---

[1] The "Defendant's Version of the Offense Conduct," *see* PSR ¶ 42i, is not to the contrary. The government did agree to stipulate that "SpineFrontier made all disclosures required by the Sunshine Act of *monetary payments* made by SpineFrontier or IME to doctors in connection with consulting agreement." PSR ¶ 42i (emphasis added). The government did not agree, and it is not true, that Chin and/or SpineFrontier disclosed the true nature of many of those payments.

2

report the payment of fees to CMS as "consulting fees," including "*at least* reporting a payment of $4,750 made on or about January 19, 2016, which was a materially false statement to CMS." Superseding Information, Dkt. No. 377 ¶ 10 (emphasis added).

Chin paid hundreds of thousands of dollars in kickbacks to Drs. Jason Montone (approx. $379,719), Michael Murray (approx. $125,288), and John Atwater (approx. $35,625) in the form of sham consulting fees. Dr. Montone pleaded guilty to receiving kickbacks from SpineFrontier and awaits sentencing. *United States v. Jason Montone*, No. 20-cr-10159 (2020). In addition, Dr. Montone's SpineFrontier product distributor John Balzer, who worked with SpineFrontier as an independent contractor, also pleaded guilty to receiving kickbacks from SpineFrontier and awaits sentencing. *United States v. John Balzer*, No. 20-cr-10158 (2020).

Chin himself and several doctors separately settled with the United States to resolve the government's civil claims under the False Claims Act, 31 U.S.C. § 3729 ("FCA"). Chin's own AKS-FCA settlement, which was based on his attested-to documentation of his inability-to-pay,[2] requires him to pay at least $40,000, and one of his companies, KICVentures (Chin owns 100% of KICVentures, PSR ¶ 109), to pay at least $855,000. PSR ¶ 124. Chin owes his payments over a five-year period, 2023-2028, and his payments may increase based on certain financial contingencies.

The doctors' civil settlements with the United States contained admissions to facts, including that SpineFrontier informed the physicians that they could bill SpineFrontier a set rate of payment on a per-case basis (generally, but not exclusively, 1 hour per cervical case, 2 hours per lumbar case) for purported consulting, regardless of any actual consulting work performed.

---

[2] Relatedly, based on Probation's analysis of the defendant's cash flow, PSR ¶¶ 117-124, it appears the defendant is spending far more than he earns every month. Exactly how the defendant is managing to do so is unclear from the "Cash Flow Analysis" in the PSR.

*See, e.g.*, PSR ¶¶ 32, 36. Dr. Atwater paid the United States $105,149.44 to resolve the government's AKS-FCA case against him. PSR ¶ 33. Dr. Murray paid the United States $330,668 to resolve the government's AKS-FCA case. PSR ¶ 36. In addition, Dr. John Carlson settled with the government for $1.75 million; Dr. F. Paul DeGenova settled with the government for $486,985; Dr. Agha Khan settled with the government for $310,843; and Dr. Joseph Shehadi settled with the government for $323,419.50. PSR ¶ 42.

## II.    SENTENCING GUIDELINES CALCULATION

The government concurs with the sentencing guidelines calculation set forth by the Probation Office in the PSR. The sentencing guidelines as calculated by Probation are set forth below. PSR ¶¶ 47-55.

| | |
|---|---|
| **Base Offense Level:** The guideline for 18 U.S.C. § 1001(a)(2) offenses is found in USSG §2B1.1. That section provides that the base offense level is six. USSG §2B1.1. | **6** |
| **Chapter Four Adjustment:** The defendant meets the criteria at USSG §§4C1.1(a)(1)-(11). Therefore, the defendant is a Zero-Point Offender, and the offense level is reduced by two levels. USSG §§4C1.1(a) and (b). | **-2** |
| **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a). | **-2** |
| **Total Offense Level:** | **2** |

This total offense level of 2, combined with a lack of criminal history (Criminal History Category I), results in a Guidelines Sentence Range of 0 – 6 months.

## III.    APPLICATION OF THE SECTION 3553(a) FACTORS

In determining the defendant's sentence, the Court must consider the Sentencing Guidelines and determine the advisory sentencing guideline range, which, once calculated,

4

establishes the Court's "starting point" or "initial benchmark." *See Gall v. United States*, 552 U.S. 38, 49 (2007). Next, the Court should consider the factors set forth in 18 U.S.C. § 3553(a).

Here, the government's recommended sentence is sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense, afford adequate deterrence, promote respect for the law, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(2).

### A. The Recommended Sentence Reflects the Seriousness of Chin's Crimes

The nature and circumstances of Chin's offenses weigh heavily in favor of an incarcerative sentence in line with the government's recommendation of eight months' imprisonment. Making false statements to a federal program, here CMS's Open Payments Program, is a serious offense, but the offense is far more serious considering its underlying purpose—to conceal kickbacks that the defendant was paying to surgeons to use his Company's devices. Health care fraud, including the payment of kickbacks, is a scourge that "drains billions of dollars from public and private payers annually[.]" *United States v. Lucien*, 347 F.3d 45, 48 (2d Cir. 2003). Moreover, the AKS is a prophylactic statute—Congress recognized the latent possibility of patient harm attendant to all kickback schemes and acted to prevent such harm via its passage. *United States ex rel. Banigan v. PharMerica, Inc.*, 950 F.3d 134, 137 (1st Cir. 2020) ("The AKS was designed to prevent medical providers from making decisions based on improper financial incentives rather than medical necessity and to ensure that federal health care programs do not bear the costs of such decisions.") (citing *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015)). Thus, even though the government did not advance evidence of patient harm in this case, the crime of paying kickbacks

5

always carries with it the possibility of patient harm, in addition to programmatic harm to CMS, and should be treated accordingly.

### B. Chin's History and Characteristics Provide No Explanation or Justification for His Criminal Conduct

The government acknowledges that there is more to Chin than his long-running kickback scheme to pay doctors to use his Company's spinal device products. As detailed in the Pre-Sentencing Report, the defendant's upbringing included some significant challenges. *See, e.g.,* PSR ¶¶ 66-74.

Nevertheless, Chin's difficult childhood does not excuse his behavior as a highly educated and apparently successful physician and entrepreneur. Since his teenage years, he has had access to some of this country's most prestigious institutions of higher education. Chin excelled at academics and soccer. He earned a scholarship to attend Columbia University and played soccer there; he also was recruited to play for the Jamaican national soccer team. PSR ¶ 75. He enrolled in Columbia's dual degree program and earned a B.A. in 1988 and B.S. in 1989. PSR ¶ 99. He then went to Harvard Medical School and received his medical degree in 1996. PSR ¶ 100. He later earned Masters of Business Administration degrees from Harvard Business School and Ball State University. PSR ¶ 100. After graduating from Harvard Medical School, he completed a six-year residency, fellowship, and several internships. PSR ¶ 104.

Chin went on to found several companies, beginning with Kingsley Investment Company ("KIC") LLC in 2005. PSR ¶ 105. In 2006, he founded SpineFrontier and in 2012, he founded IME. As noted in the PSR, according to the United States's Patent and Trademark's official website, Chin successfully has secured more than 60 medical device patents. PSR ¶ 111.

Although Chin did face significant hardships in his upbringing, he received a world-class education at multiple different schools, and has had access to substantial capital, which he used to

help develop his companies, primarily SpineFrontier, KIC, and the LESS Clinic and associated entities. PSR ¶ 106. Unlike some defendants who appear in this Court to face sentencing, Chin was not without options or support. Nor is there any evidence that the defendant was facing dire, or even difficult, financial circumstances when he embarked on his kickback scheme. In 2015, he was successful enough to purchase a $2.3 million home, where he still resides. PSR ¶ 79-80. In short, his decision to engage in criminal conduct seems to have been motivated by nothing more than greed and a desire to compete with other spinal device companies in a crowded marketplace.

Chin had plenty of advantages and had carved out a successful life for himself, when he decided in approximately 2013, to offer kickbacks to certain surgeons in exchange for their use of his Company's products. Thus, while he faced serious difficulties as a child, he certainly knew better as an adult. His kickback scheme was intended to influence independent physician medical decision-making, and his sentence should reflect that reality.

### C. The Recommended Sentence is Necessary to Promote Respect for the Law and Provide Adequate Deterrence

The recommended sentence also would "promote respect for the law," 18 U.S.C. § 3553(a)(2)(A), and "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B).

Sentencing Chin to a significant term of incarceration would promote respect for the law by sending a clear message that making false statements, especially in the health care realm, is unacceptable. Such a message is particularly important here, where Chin seems not to have accepted the reality of this prosecution, let alone his underlying criminal conduct in the form of the kickback scheme he directed. Chin, through his KICVentures entity, has issued a press release claiming "All Charges Dismissed Against Dr. Kingsley R. Chin and His Companies as DOJ Case concludes." Available at: https://www.prnewswire.com/news-releases/all-charges-dismissed-against-dr-kingsley-r-chin-and-his-companies-as-doj-case-concludes-302469950.html, May 30,

2025 (last accessed on July 29, 2025). The press release claims that "All criminal charges have been dismissed against Dr. Kingsley R. Chin and his medical device companies, bringing an end to a multi-year investigation by the U.S. Department of Justice (DOJ)." *Id*. The press release goes on to state that "All of the charges in the Indictment and Superseding Indictment against Dr. Chin have been or are going to be dismissed, as the case resolved for a lesser charge," attributing that statement to "Dr. Chin's legal counsel." *Id*. The press release states that all charges have been dismissed, without mentioning that Chin pled guilty to a felony—making false statements to CMS about SpineFrontier's required Sunshine Act disclosures—which as noted, Chin did to conceal the underlying kickback scheme. Of course, Chin is free to maintain his innocence with respect to the underlying kickback scheme, but his press release leaves the reader with the misimpression that he has done nothing wrong, and worse, that the resolution of this case reflects that characterization. Obviously, it does not.

On the issue of the need for the sentence to afford adequate deterrence, both specific deterrence and general deterrence are necessary here. Specific deterrence is important because although Chin has accepted responsibility by pleading guilty to making false statements to CMS, he did so only on the eve of trial. He also remains unrepentant about the larger kickback scheme. To be clear, he does retain the right to defend himself and maintain his innocence, but it is fair to consider lack of remorse about the larger scheme, given the substantial evidence undergirding it,

including but not limited to Dr. Montone's and John Balzer's guilty pleas, and the civil settlements with *six* separate physicians, in different parts of the country, for receipt of kickbacks.[3]

General deterrence is also an important consideration here. "As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as particularly important in the area of white collar crime." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citations omitted). Health care fraud cases especially cry out for deterrence as the system is built on trust. *See United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (insurers "must rely on the honesty and integrity of medical practitioners"). The Medicare program is a behemoth; it does not, and cannot, review every claim for payment *prior* to its submission to determine whether it was kickback tainted. *See, e.g.,* Gov't Opp. To Def.'s Mot. In Limine To Preclude Testimony Of CMS Representative, Dkt. No. 348 at 4 (citing testimony of government witness in another case that Medicare is a "trust-based system in that we trust that the claims that will be submitted will be accurate and truthful, and we have to look retrospectively to evaluate those claims to determine after the fact if they're a problem and recoup those").

A sentence consistent with the government's recommendation here would send a strong message to others who might engage in false claims to the Government, specifically about health care fraud, that trading on the trust of the Medicare program is a significant offense that will result in a jail sentence.

**D. The Recommended Sentence Would Avoid Unwarranted Sentencing Disparities**

Finally, the government's proposed sentence serves the purpose of avoiding unwarranted sentencing disparities. First, the government's recommended sentence falls only slight above the

---

[3] These are, Drs. Atwater (Illinois/Florida), Carlson (Virginia), DeGenova (Ohio), Khan (Maryland), Murray (New York), and Shehadi (Ohio).

9

sentencing guidelines range as calculated by Probation. As the drafters of the guidelines explain, "Guideline sentences, in many instances, will approximate average pre-guidelines practice and adherence to the guidelines will help to eliminate wide disparity." U.S.S.G. Ch. 1, Pt. A § (4)(G). The JSIN data, as relayed by Probation, demonstrates that 57% of similarly situated defendants (i.e., those whose primary guideline was § 2B1.1, with a Final Offense Level of 2 and a Criminal History Category of I, and excluding § 5K1.1 defendants) received a sentence of incarceration, and the average length of imprisonment was four months, and the median length was three months.

The government acknowledges that its recommendation (eight months) would result in a slightly higher sentence than the Guidelines range and is marginally higher than the average or the median as reflected in the JSIN data. The defendant's relevant conduct, however, places him outside the norm for otherwise similarly situated § 2B1.1 offenders. As described above, the defendant engaged in a long-running kickback scheme that involved hundreds of thousands of dollars of bribes paid through his companies, SpineFrontier and IME. Further, rather than comply with the Sunshine Act, which could have shined a bright light on his misconduct, he engaged in fig leaf compliance. He disclosed to CMS *only* that SpineFrontier "made payments" to purported consultants, while failing to disclose the true nature of many of those arrangements. Any patient, or any member of the public or the press, who wished to log on to CMS's publicly-available Open Payments website and inquire into whether there was a financial relationship between SpineFrontier and a particular doctor, would have left thinking that SpineFrontier made all its consultant payments for legitimate consulting. And, of course, that would have been incorrect.

While it is difficult to make an apples-to-apples comparison to recent health care sentences in this District, this case bears some similarities to *United States v. Miguel Saravia*, a case in which the defendant was charged with health care fraud. No. 24-cr-10280-ADB, Dkt. No. 38. While

10

obviously the charges are different in substance and in the resulting guidelines, the crimes are similar in that there was no evidence of patient harm, the scheme was not a one-off event, and there was a financial motive to commit the crime. There, recognizing the need for deterrence, and despite challenging personal circumstances involving his young children, the Court sentenced the defendant to 14 weeks' incarceration. Dkt. No. 38.

Given Chin's direction of the overall kickback scheme and his efforts at concealment, the government's recommended sentence is appropriate and will not create an unwarranted disparity.

## CONCLUSION

For the reasons set forth above, the government submits that the recommended sentence consisting of eight months of imprisonment, a fine of $9,500, three years of supervised release, and a mandatory special assessment of $100, is justified and appropriate in this case.

July 30, 2025                                       Respectfully submitted,

                                                    LEAH B. FOLEY
                                                    United States Attorney

                                    By:     /s/ Abraham R. George
                                            ABRAHAM R. GEORGE
                                            CHRISTOPHER LOONEY
                                            MACKENZIE A. QUEENIN
                                            Assistant United States Attorneys
                                            1 Courthouse Way
                                            John J. Moakley U.S. Courthouse
                                            Boston, MA 02210
                                            (617) 748-3100

**CERTIFICATE OF SERVICE**

      I, Abraham R. George, certify that on this 30th day of July 2025, I caused this document to be filed through the ECF system.

                                              /s/ *Abraham R. George*
                                              ABRAHAM R. GEORGE
                                              Assistant United States Attorney